**Nos. 23-1362, 23-1667, 23-2041**

# United States Court of Appeals
# for the Federal Circuit

VROOM, INC., VROOM AUTOMOTIVE, LLC, dba
Vroom, dba Texas Direct Auto, CARSTORY, LLC,
VAST.COM, INC., dba CarStory,
*Plaintiffs-Appellees*

v.

SIDEKICK TECHNOLOGY, LLC,
*Defendant-Appellant*

Appeal from the United States District Court for the District of New Jersey in
No. 2:21-cv-06737-WJM-JSA, Judge William J. Martini.

## JOINT APPENDIX

Daniel J. Goettle
Stephanie Hatzikyriakou
**BAKER & HOSTETLER LLP**
1735 Market Street
Suite 3300
Philadelphia, PA 19103
(215) 568-3100

*Counsel for Plaintiffs-Appellees*

Devon C. Beane
Nathan J. Fuller
**K&L GATES LLP**
70 W. Madison Street
Suite 3100
Chicago, IL 60602
(312) 807-4436

*Counsel for Defendant-Appellant*

March 29, 2024

# **TABLE OF CONTENTS**

| Date | Description | Appendix Page No. |
|------|-------------|-------------------|
| 6/28/2022 | Order Granting Plaintiffs' Motion for Judgment on the Pleadings | Appx1 |
| 6/28/2022 | Opinion Granting Plaintiffs' Motion for Judgment on the Pleadings | Appx2 |
| 6/12/2023 | Defendant-Appellant's Notice of Appeal | Appx18 |
| | Docket Sheet | Appx20 |
| 3/25/2021 | Plaintiffs' Complaint (Dist. Ct. Dkt. 1) | Appx32 |
| 8/9/2021 | Defendant's Answer and Counterclaims (Dist. Ct. Dkt. 15) | Appx237 |
| 12/22/2021 | Plaintiffs' Motion for Judgment on the Pleadings (Dist. Ct. Dkt. 33) | Appx295 |
| 1/19/2022 | Defendant's Brief in Opposition to Plaintiffs' Motion for Judgment on the Pleadings (Dist. Ct. Dkt. 35) | Appx390 |
| 2/2/2022 | Plaintiffs' Reply Brief in Support of Plaintiffs' Motion for Judgment on the Pleadings (Dist. Ct. Dkt. 39) | Appx533 |
| 7/26/2022 | Defendant's Motion for Reconsideration to Order Granting Motion for Judgment on the Pleadings (Dist. Ct. Dkt. 52) | Appx829 |
| 10/18/2022 | Opinion Denying Defendant's Motion for Reconsideration (Dist. Ct. Dkt. 57) | Appx846 |
| 10/18/2022 | Order Denying Defendant's Motion for Reconsideration (Dist. Ct. Dkt. 58) | Appx850 |
| 3/21/2023 | Order Denying Defendant's Entry of Judgment (Dist. Ct. Dkt. 67) | Appx851 |
| 1/4/2023 | Defendant's Notice of Appeal to Federal Circuit on Order Denying Reconsideration to the Order Granting the Motion for Judgment on the Pleading (Dist. Ct. Dkt. 61) | Appx852 |

| Date | Description | Appendix Page No. |
|------|-------------|-------------------|
| 1/4/2023 | Defendant's Motion for Entry of Judgment under Rule 54(b) (Dist. Ct. Dkt. 62) | Appx856 |
| 3/22/2023 | Defendant's Notice of Appeal to the Federal Circuit to Order on Motion for entry of Judgment under Rule 54(b) (Dist. Ct. Dkt. 68) | Appx867 |
| 3/29/2023 | USCA Notice of Appeal for Case Number CAFC-23-1667 (Dist. Ct. Dkt. 69) | Appx869 |
| 5/1/2023 | Defendant's Letter to Judge Martini Requesting Entry of Order (Dist. Ct. Dkt. 74) | Appx870 |
| 5/24/2023 | Order Denying as Moot Defendant's Motion to Reopen to File an Appeal (Dist. Ct. Dkt. 78) | Appx872 |
|  | U.S. Patent No. 9,141,984 | Appx873 |
|  | U.S. Patent No. 8,650,093 | Appx894 |
|  | U.S. Patent No. 8,744,925 | Appx916 |
|  | U.S. Patent No. 9,123,075 | Appx937 |
|  | U.S. Patent No. 9,147,216 | Appx960 |
|  | U.S. Patent No. 9,460,467 | Appx980 |
|  | U.S. Patent No. 9,626,704 | Appx1003 |
|  | U.S. Patent No. 9,665,897 | Appx1023 |
|  | U.S. Patent No. 10,140,655 | Appx1044 |
|  | U.S. Patent No. 10,223,720 | Appx1067 |
|  | U.S. Patent No. 10,223,722 | Appx1087 |
|  | U.S. Patent No. 10,796,362 | Appx1107 |

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| **VROOM INC.; VROOM AUTOMOTIVE, LLC d/b/a VROOM, d/b/a TEXAS DIRECT AUTO; CARSTORY, LLC; and VAST.COM, INC. d/b/a CARSTORY,**<br><br>**Plaintiffs,**<br><br>**v.**<br><br>**SIDEKICK TECHNOLOGY, LLC,**<br><br>**Defendant.** | Case No.: 2:21-cv-06737-WJM-JSA<br><br>**ORDER** |

**WILLIAM J. MARTINI, U.S.D.J.:**

    **THIS MATTER** comes before the Court on plaintiffs Vroom, Inc., Vroom Automotive, LLC d/b/a Texas Direct Auto, CarStory, LLC, and Vast.com, Inc. d/b/a CarStory's (collectively, "Vroom" or "Plaintiffs") motion (the "Motion") for judgment on the pleadings pursuant to Rule 12(c) of the Federal Rules of Civil Procedure. ECF No. 33. For the reasons set forth in the accompanying Opinion, **IT IS** on this 27th day of June 2022, **ORDERED** as follows:

1. Plaintiffs' Motion is **GRANTED**.

2. Defendant Sidekick Technology, LLC's Counterclaims are **DISMISSED WITH PREJUDICE**.

 

                                        */s/ William J. Martini*
                                    **WILLIAM J. MARTINI, U.S.D.J.**

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| **VROOM INC.; VROOM AUTOMOTIVE, LLC d/b/a VROOM, d/b/a TEXAS DIRECT AUTO; CARSTORY, LLC; and VAST.COM, INC. d/b/a CARSTORY,** | Case No.: 2:21-cv-06737-WJM-JSA **OPINION** |
| **Plaintiffs,** | |
| **v.** | |
| **SIDEKICK TECHNOLOGY, LLC,** | |
| **Defendant.** | |

## WILLIAM J. MARTINI, U.S.D.J.:

Plaintiffs Vroom, Inc., Vroom Automotive, LLC d/b/a Texas Direct Auto, CarStory, LLC, and Vast.com, Inc. d/b/a CarStory (collectively, "Vroom" or "Plaintiffs") brought this declaratory judgment action against defendant Sidekick Technology, LLC ("Sidekick" or "Defendant") seeking a declaration that they do not infringe certain of Sidekick's patents. Before the Court is Plaintiffs' motion (the "Motion") for judgment on the pleadings pursuant to Rule 12(c) of the Federal Rules of Civil Procedure on the basis that each of Sidekick's relevant patents is directed to ineligible subject matter under 35 U.S.C. § 101. ECF No. 33. For the reasons set forth below, Plaintiffs' Motion is **GRANTED**.

## I.     BACKGROUND

### A.     The Patents-in-Suit

Sidekick is the owner of U.S. Patent Nos. 9,141,984 (the "'984 Patent"), 8,744,925 (the "'925 Patent"), 8,650,093 (the "'093 Patent"), 9,123,075 (the "'075 Patent"), 9,147,216 (the "'216 Patent"), 9,460,467 (the "'467 Patent"), 9,665,897 (the "'897 Patent"), 9,626,704 (the "'704 Patent"), 10,140,655 (the "'655 Patent"), 10,223,722 (the "'722 Patent"), 10,223,720 (the "'720 Patent"), and 10,796,362 (the "'362 Patent", and, collectively, the "Patents-in-Suit").[1] Broadly speaking, each of the 12 Patents-in-Suit describe systems, methods, and apparatuses for providing automobile market information

---

[1] Each of the 12 Patents-In-Suit was attached as an exhibit to Plaintiffs' Complaint, ECF No. 1. *See* '984 Patent, Compl., Ex. 5; '925 Patent, Compl., Ex. 6; '093 Patent, Compl. Ex. 7; '075 Patent, Compl., Ex. 8; '216 Patent, Compl., Ex. 9; '467 Patent, Compl., Ex. 10; '897 Patent, Compl., Ex. 11; '704 Patent, Compl., Ex. 12; '655 Patent, Compl., Ex. 13; '722 Patent, Compl., Ex. 14; '720 Patent, Compl., Ex. 15; '362 Patent, Compl., Ex. 16. All citations to any of the 12 Patents-in-Suit in this Opinion will be cited simply to the Patents themselves.

and performing or facilitating automobile transactions. *See, e.g.*, '984 Patent 1:55-57; '925 Patent 1:54-56; '093 Patent 1:66-2:1. The Patents-in-Suit are related, share a specification, and can be categorized across three distinct "lineages" that can be identified by the earliest filed patent in each such lineage: (1) the '984 Patent lineage, titled "Automobile Transaction Facilitation Using a Manufacturer Response," includes two continuations – the '897 Patent and the '720 Patent; (2) the '925 Patent lineage, titled "Automobile Transaction Facilitation Based on Customer Selection of a Specific Automobile," includes three continuations – the '216 Patent, the '704 Patent, and the '722 Patent; and (3) the '093 Patent lineage, which is itself a continuation-in-part of both the '925 and '984 Patents, is titled "Used Automobile Transaction Facilitation for a Specific Used Automobile" and includes four continuations – the '075 Patent, the '467 Patent, the '655 Patent, and the '362 Patent.

The Patents-in-Suit broadly describe flaws and inefficiencies in typical automobile transactions caused, chiefly, by a lack of available information and market data by each of the participants involved. Specifically, the Patents-in-Suit state that automobile transactions are routinely plagued by uncertainty, imperfect information, and mistrust that interferes with the ability to efficiently complete such transactions. *See* '984 Patent 1:23-34. For consumers, this may result from a lack of knowledge about specific automobiles, the relevant market, and what may be considered a fair price for a given automobile. *See id.* at 1:35-38. Dealers or sellers, in turn, may lack information about a consumer's capacity or willingness to pay a price for a given automobile in a way that would maximize their profits. *See id.* at 1:38-44. Similarly, manufacturers may lack sufficient market data which would be useful in optimizing production, delivery, and pricing of their automobile inventory. *See id.* at 1:44-51.

The Patents-in-Suit purport to solve these inefficiencies by creating a platform through which consumers, dealers, and manufacturers can input, access, or filter through a range of available automobile market data and use that data to complete automobile transactions. *See id.* at 1:57-62. For example, the Patents-in-Suit explain that automobile manufacturers and dealers may input data related to current offers, automobile specifications and availability, and suggested retail prices in order to generate reports or offers to consumers. *See id.* at 7:34-40, 15:64-16:12. That market data is then stored and used to generate search results or recommendations for consumers who request information about certain kinds of automobiles based on a wide array of qualifications or specifications, including, for example, geographic location, pricing, and inventory data. *See id.* at 5:41-6:4. This system is designed to efficiently match consumers with dealers, manufacturers, or other consumer automobile sellers in order to facilitate automobile transactions.

### B.    Procedural History

On March 25, 2021, Plaintiffs commenced this action by filing their 12 count Complaint against Defendant seeking a declaratory judgment that they are not infringing on any of the 12 Patents-in-Suit. ECF No. 1. On August 9, 2021, Defendant filed its Answer to the Complaint and asserted 12 counterclaims for patent infringement covering each of the Patents-in-Suit. ECF No. 15. On September 27, 2021, Plaintiffs answered Defendant's

counterclaims and asserted several affirmative defenses thereto, including that the Patents-in-Suit were each directed to ineligible subject matter under 25 U.S.C. § 101. ECF No. 26. Following the close of the pleadings, Plaintiffs filed the instant Motion seeking a determination on whether the Patents-in-Suit are directed to eligible subject matter within the meaning of § 101.

## II.   LEGAL STANDARD

Rule 12(c) of the Federal Rules of Civil Procedure provides that a party may move for judgment on the pleadings "[a]fter the pleadings are closed – but early enough not to delay trial." Fed. R. Civ. P. 12(c). Motions made under Rule 12(c) are analyzed under the same standard as those made under Rule 12(b)(6). *Trendx Enters., Inc. v. All-Luminum Prods., Inc.*, 856 F. Supp. 2d 661, 664 (D.N.J. 2012). That is, a Rule 12(c) motion will be granted where the movant "establishes that there are no material issues of fact, and he is entitled to judgment as a matter of law." *Zimmerman v. Corbett*, 873 F.3d 414, 417 (3d Cir. 2017) (quotations omitted). "In considering a motion for judgment on the pleadings, a court must accept all of the allegations in the pleadings of the party against whom the motion is addressed as true and draw all reasonable inferences in favor of the non-moving party." *Id.* at 417-18. The Court need not accept as true "legal conclusions," and "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *see also Trendx*, 856 F. Supp. 2d at 664. In ruling on a 12(c) motion, the Court is ordinarily limited to the facts as alleged in the nonmoving party's pleadings, the exhibits attached thereto, and matters of public record. *Pension Benefit Guar. Corp. v. White Consol. Indus.*, 998 F.2d 1192, 1196 (3d Cir. 1993). The Court may, however, look outside the pleadings and also consider "document[s] integral to or explicitly relied upon in the [pleadings]" or any "undisputedly authentic document that a defendant attaches as an exhibit to a motion to dismiss if the plaintiff's claims are based on the document." *In re Asbestos Prod. Liability Litig. (No. VI)*, 822 F.3d 125, 134 n.7 (3d Cir. 2016).

"Patent eligibility under § 101 is a question of law that may contain underlying questions of fact." *CosmoKey Sols. GmbH & Co. KG v. Duo Sec. LLC*, 15 F.4th 1091, 1095 (Fed. Cir. 2021). As such, "[p]atent eligibility can be determined on the pleadings under Rule 12(c) when there are no factual allegations that, when taken as true, prevent resolving the eligibility question as a matter of law." *Data Engine Techs. LLC v. Google, LLC*, 906 F.3d 999, 1007 (Fed. Cir. 2018).

## III.   DISCUSSION

### A.   Representative Claims

The threshold issue in this case which the Court must address before determining whether the Patents-in-Suit are directed to eligible subject matter is which claim or claims are representative of the four-hundred and five (405) claims included across the twelve Patents-in-Suit. Plaintiffs assert that claim 1 of the '362 Patent is representative of all claims. Defendant, however, disagrees and suggests that representative claims are needed as to each of the three separate patent lineages which comprise the Patents-in-Suit, with

claim 1 of the '925 Patent representing the '925 Patent lineage, claim 1 of the '984 Patent representing the '984 Patent lineage, and claim 1 of the '075 Patent representing the '093 Patent lineage.[2]

It is well established that, in determining questions of patent eligibility or invalidity, the Court may treat some claims as representative rather than address each claim individually where the claims are "substantially similar and linked to the same abstract idea." *Content Extraction and Transmission LLC v. Wells Fargo Bank, N.A.*, 776 F.3d 1343, 1348 (Fed. Cir. 2014). This includes the treatment of a single claim as representative of all claims across multiple patents. *See e.g., Elec. Power Grp., LLC v. Alstrom S.A.*, 830 F.3d 1350, 1351 (Fed. Cir. 2016) (treating one claim as representative of sixteen asserted claims across three patents). Indeed, it is also clear that the Court may treat claims as representative even where the parties do not agree or stipulate to such treatment. *See, e.g., Context Extraction*, 776 F.3d at 1348 (treating two claims from two patents as representative of 242 claims at issue across four patents over patentee's objection on appeal).

Less established, however, is the appropriate framework for resolving disputes over which claims are in fact representative. More specifically, it is not clear which party bears the burden of establishing, or contesting, the representativeness of a certain claim or claims, and courts have articulated different approaches and considerations in making this determination. *Compare Berkheimer v. HP Inc.*, 881 F.3d 1360, 1365 (Fed. Cir. 2018) (noting that courts may treat claims as representative where "the patentee does not present any meaningful argument for the distinctive significance of any claim limitations not found in the representative claim") *with Mortg. Grader, Inc. v. First Choice Loan Servs. Inc.*, 811 F.3d 1314, 1324 n.6 (Fed. Cir. 2016) (treating asserted claims together rather than individually despite no arguments, agreements, or findings as to representative claims because "there [was] no contention that the claims differ[ed] in any manner that [was] material to the patent-eligibility inquiry) *and with PPS Data, LLC v. Jack Henry & Assoc's, Inc.*, 404 F. Supp. 3d 1021, 1031-32 (E.D. Tex. 2019) (applying burden shifting framework in which party asserting representativeness must offer a substantial rationale for treating claim as representative, and, if able to do so, the party opposing representative claim designation must then "identify limitations that are presented in the asserted claims but that are not represented by the allegedly representative claim").

The Court is not convinced that either party has offered a particularly compelling argument in support of their respective proposed representative claims. On the one hand,

---

[2] Elsewhere in its brief, Defendant appears to argue that independent analysis of eligibility under § 101 with respect to all four-hundred and five claims is necessary. The Court disagrees. Defendant specifically asserts claim 1 of the '925 Patent, claim 1 of the '984 Patent, and claim 1 of the '075 Patent as representative claims. Having done so, Defendant cannot also ask that, should the Court find these claims ineligible under § 101, the remaining four-hundred and two claims each be analyzed individually. *See Maxell, Ltd. v. Fandango Media, LLC*, No. CV 17-07534 AG (SSX), 2018 WL 4502492, at *4 (C.D. Cal. Sept. 11, 2018).

aside from it being the most recently filed of the Patents-in-Suit, and thus the Patent-in-Suit with the longest lineage, Plaintiffs have not explained why claim 1 of the '362 Patent is an adequate representative of the remaining four hundred and four claims. On the other hand, however, Defendant has not offered any explanation why the three claims it offers as representative of the three lineages are either any more representative of the body of claims at issue than claim 1 of the '362 Patent or are sufficiently distinct from each other in any way that might alter the eligibility analysis so as to necessitate three separate representative claims. Indeed, it is worth noting that Defendant does not even analyze its proposed representative claims separately in arguing in favor of eligibility, and instead more generally references aspects of the Patents-in-Suit with citations to one or two of its proposed representative claims.

Having reviewed the Patents-in-Suit, their claims and claim elements, and the specifications, the Court will treat claim 1 of the '984 Patent as representative. Claim 1 of the '984 Patent recites:

1. A method comprising:

storing, on a computer readable medium, automobile market data which is representative of recent automobile market characteristics, including at least pricing data and inventory data, wherein the automobile market data includes information received from at least one manufacturer, a plurality of dealers, and a plurality of consumers, wherein at least a portion of the automobile market data is updated in real-time;

receiving, via a consumer interface, a first request for a response regarding a first automobile, which is manufactured by a first manufacturer, the first request made by a consumer located at a first location and including geolocation information of the consumer;

executing instructions, by at least one processing device, to:

determine current inventory data of the first automobile, wherein the current inventory data of the first automobile includes a plurality of dealer inventories of a plurality of dealers, with each respective dealer of the plurality of dealers having a respective dealer inventory, and wherein the current inventory data indicates that a first dealer of the plurality of dealers does not currently have the first automobile in a first inventory of the first dealer;

provide first automobile market data including the current inventory data of the first automobile to the first manufacturer, based on the first request, via a manufacturer interface, wherein the first automobile market data is based on real-time automobile market data;

generate, based on the first automobile market data including the current inventory data of the first automobile, via the manufacturer interface, at least one of a verification indicating that the first automobile can be provided for the consumer, a confirmation indicating that the first automobile can be provided for the consumer, and an offer indicating that the first automobile can be provided for the consumer;

determine, using the geolocation information, that the consumer is located at the first location;

generate, based on the first location, an in-market dealer area proximately located to the first location;

determine that the first dealer is located at a second location within the in-market dealer area;

provide a first manufacturer response via the consumer interface, the first manufacturer response including the at least one of the verification indicating that the first automobile can be provided for the consumer, the confirmation indicating that the first automobile can be provided for the consumer, and the offer indicating that the first automobile can be provided for the consumer;

request, from the first dealer, via a dealer interface, an inventory less bid to sell the first automobile based on the first manufacturer response;

receive, from the first dealer located at the second location and engaging in inventoryless bidding, the inventoryless bid to provide the first automobile, which is at least one of yet to be manufactured and in the inventory of another entity;

generate driving directions from the first location to the second location; and provide the inventoryless bid and the driving directions to the consumer interface, the inventoryless bid including at least a price and a delivery option; and

receiving a consumer selection of the inventoryless bid including a first delivery option which specifies a pickup location at the first dealer, wherein the consumer selection indicates a consumer intention to purchase the first automobile.

The reasons for treating claim 1 of the '984 Patent as representative are straightforward. Unlike claim 1 of the '362 Patent proposed by Plaintiffs, claim 1 of the '984 Patent includes the additional element of storing automobile market data. Moreover, with minor exceptions that no party has suggested bears on the eligibility analysis,[3] claim

---

[3] For example, claim 1 of the '984 Patent recites a process in which the automobile manufacturer is involved in receiving and responding to a consumer request for a response pertaining to a specific automobile made by that manufacturer. Neither claim 1 of the '925 Patent nor claim 1 of

1 of the '984 Patent includes the major elements and limitations argued by the parties for and against eligibility, including, for example, the use of geolocation data and driving directions. Because claim 1 of the '925 Patent and claim 1 of the '075 Patent are themselves substantially similar and, as explained below, are all linked to the same abstract idea as claim 1 of the '984 Patent, the Court sees no reason to analyze those claims, or the claims of any of the other Patents-in-Suit, separately.

## B. Patent Ineligibility

Section 101 of the Patent Act provides that anyone who "invents or discovers any new and useful process, machine, manufacture, or composition of matter, or any new and useful improvement thereof, may obtain a patent therefor." 35 U.S.C. § 101. Notwithstanding the breadth of § 101, the Supreme Court has long recognized that the provision "contains an important implicit exception: Laws of nature, natural phenomena, and abstract ideas are not patentable." *Alice Corp. Pty. Ltd. V. CLS Bank Int'l*, 573 U.S. 208, 216 (2014) (quotations omitted). In *Alice*, the Supreme Court set forth a two-step test used to determine whether a patent claim is directed to ineligible subject matter under § 101. *Id.* at 217. At step one, the Court considers "whether the claims at issue are directed to a patent-ineligible concept." *Id.* at 218. If so, the Court proceeds to step two, in which it must "examine the elements of the claim to determine whether it contains an 'inventive concept' sufficient to 'transform' the claimed abstracted idea into a patent-eligible application." *Id.* at 222.

### 1. *Alice* Step One

In deciding whether a patent claim is "directed to" ineligible subject matter at step one, the Court looks primarily to "what the patent asserts to be the 'focus of the claimed advance over the prior art.'" *Solutran, Inc. v. Elavon, Inc.*, 931 F.3d 1161, 1168 (Fed. Cir. 2019) (quoting *Affinity Labs of Tex., LLC v. DIRECTV, LLC*, 838 F.3d 1253, 1257 (Fed. Cir. 2016)). In so doing, the Court focuses on the language of the claims themselves considered in light of the specification. *See TecSec, Inc. v. Adobe Inc.*, 978 F.3d 1278, 1292-93 (Fed. Cir. 2020) (quotations omitted). The critical inquiry is whether the claims "focus on a specific means or method that improves the relevant technology or are instead directed to a result or effect that itself is the abstract idea and merely invoke generic processes and machinery." *McRO Inc. v. Bandai Namco Games Am. Inc.*, 837 F.3d 1299 (Fed. Cir. 2016). In the context of computer software innovations, the inquiry "often turns on whether the claims focus on specific asserted improvements in computer capabilities or instead on a process or system that qualifies [as] an abstract idea for which computers are

the '075 Patent directly requires manufacturer participation in this manner. Similarly, unlike either claim 1 of the '984 Patent or claim 1 of the '925 Patent, the '075 Patent is specifically focused on used automobile transactions from the perspective of a consumer seller. Neither of these differences is material to the eligibility analysis. Rather, they simply relate to the parties involved in a given process or transaction or narrow the focus to a specific kind of automobile transaction (i.e., new vs. used).

invoked merely as tools." *Uniloc USA, Inc. v. LG Elecs. USA, Inc.*, 957 F.3d 1303, 1306-07 (Fed. Cir. 2020).

Although the Supreme Court has not defined the "precise contours of the 'abstract ideas' category," courts have identified certain categories of claims that are generally found to be directed towards abstract ideas. *See Content Extraction*, 776 F.3d at 1347. For example, claims focused on "collecting information, analyzing it, and displaying certain results of the collection and analysis are directed to an abstract idea" and thus ineligible for patent protection. *SAP Am., Inc. v. Investpic, LLC*, 898 F.3d 1161, 1167 (Fed. Cir. 2018). Claims focused on longstanding and fundamental economic practices are likewise directed to ineligible subject matter within the meaning of § 101. *Alice*, 561 U.S. at 611.

Here, claim 1 of the '984 Patent is directed towards the abstract idea of collecting and using automobile market and user data to facilitate automobile transactions. With respect to the use of automobile market data, claim 1 of the '984 Patent recites no more than the sort of collection and storage of information that courts have routinely found abstract at *Alice* step one. *See, e.g.*, *Content Extraction*, 776 F.3d at 1347 (finding claims for method of extracting data from hard copy documents, recognizing and categorizing such data, and storing data in computer memory "drawn to basic concept of data recognition and storage"); *Elec. Power Grp.*, 830 F.3d at 1353-54 (finding claims for method of collecting, analyzing, and displaying electric power grid data directed to abstract idea); *Move, Inc. v. Real Estate Alliance Ltd.*, 721 F. App'x 950, 954-55 (Fed. Cir. 2018) (finding claims for method of searching for available real estate properties within given geographical area directed to abstract idea of "collecting and organizing information about available real estate properties and displaying this information on a digital map that can be manipulated by the user"); *Audatex N. Am., Inc. v. Mitchell Int'l, Inc.*, 703 F. App'x 986, 989-90 (Fed. Cir. 2017) (finding claims for method of generating vehicle valuation reports direct to abstract idea of "providing a vehicle valuation through the collection and use of vehicle information").

The remaining elements of claim 1 of the '984 Patent do no more than recite a computerized method of performing the basic steps in an automobile transaction. Specifically, claim 1 recites a process in which (1) a consumer requests information about a specific automobile, which includes the consumer's geolocation information; (2) an automobile manufacturer reviews real-time market data for the requested automobile, including inventory data from a plurality of dealers to determine whether the automobile can be provided to the consumer; (3) based on the manufacturer's response to the consumer's request, a dealer in an area proximately located to the consumer submits an inventoryless bid to sell the requested automobile; and (4) the consumer receives the bid, which includes at least price and delivery options, as well as driving directions to the dealer making the bid, and then selects a bid indicating an intent to purchase the automobile. *See* '984 Patent 19:15-20:9. These claim elements fall well within the category of claims found to be directed to patent-ineligible economic concepts and business practices. *See, e.g.*, *Mortg. Grader*, 811 F.3d at 1324 (claim directed at abstract idea of "anonymous loan shopping" where claim merely recited steps of completing loan transaction); *cxLoyalty,*

*Inc. v. Maritz Holdings Inc.*, 986 F.3d 1367, 1376 (Fed. Cir. 2021) (claim for method of using consumer loyalty or reward points to make purchases directly from third-party vendors directed to abstract idea of "facilitating, or brokering, a commercial transaction"); *OIP Techs., Inc. v. Amazon.com, Inc.*, 788 F.3d 1359, 1362 (Fed. Cir. 2015) (claim directed at abstract idea of "offer-based price optimization" where claim recited a method of pricing a product for sale); *Source Search Techs., LLC v. Kayak Software Corp.*, 111 F. Supp. 3d 603, 608 (D.N.J. 2015) (finding that concept of "obtaining quotes for goods or services from selected vendors" fell squarely within abstract category of fundamental economic practices).

In short, claim 1 of the '984 Patent merely combines abstract concepts and processes to describe the longstanding and fundamental practice of searching for and using available market information to complete automobile transactions. *See Elec. Power Grp.*, 830 F.3d at 1154; *see also FairWarning IP, LLC v. Iatric Sys., Inc.*, 839 F.3d 1089, 1094 (Fed. Cir. 2016) (claims for system and method of detecting fraud or misuse in use of computers by analyzing user or performance data directed to combination of abstract ideas of "collecting and analyzing information to detect misuse and notifying a user when misuse is detected").

That claim 1 of the '984 Patent provides for the implementation of this ordinary practice on a computer through an online platform does not make its focus any less abstract. *See Two-Way Media Ltd. v. Comcast Cable Commc'ns, LLC*, 874 F.3d 1329, 1337 (Fed. Cir. 2017). First, claim 1 of the '984 Patent does not focus on or describe any specific technological improvement or advance in computer or network functionality. Rather, the claims describe, in purely functional terms, the use of only generic computer components and conventional computer functions as tools to be used to accomplish abstract concepts. *See Affinity Labs*, 838 F.3d at 1258-59 (claims directed to abstract idea where they claimed "the function of wirelessly communicating regional broadcast content to an out-of-region recipient, not a particular way of performing that function"). For example, the first element of claim 1 of the '984 Patent recites the basic function of storing automobile market data in a format that can be accessed through a computer, without any mention of any new or improved process for collecting, analyzing, organizing, presenting, or storing that data. *See BSG Tech LLC v. Buyseasons, Inc.*, 899 F.3d 1281, 1288 (Fed. Cir. 2018) (noting that "an improvement to the information stored by database is not equivalent to an improvement in the database's functionality"). Similarly, the remaining claim elements recite (1) various user interfaces through which users navigate the platform to request information about automobiles or respond to such requests using the stored market data, and (2) the use of a processing device to enable these interactions. However, the claim elements neither describe any specific improvements in the creation or functionality of any such user interfaces or processing devices nor provide a technical explanation of how these elements are to be implemented on a computer. *See Move*, 721 F. App'x at 955-56 (claim directed to abstract idea where it "broadly recite[d] the commercial practice of 'using a computer for locating available real estate properties'" without any "technical details or explanation of how to implement the claimed abstract idea using the computer"); *cf. Data Engine Techs.*, 906 F.3d at 1010-11 (distinguishing claims "simply directed to displaying a

graphical user interface or collecting, manipulating, or organizing information" from those reciting a "specific improvement to the way computers . . . operate" (alterations in original) (quotations omitted)).[4]

Second, each of the elements of claim 1 of the '984 Patent recite a process that humans have long been able to do on their own without the use of a computer. *See Intellectual Ventures I LLC v. Symantec Corp.*, 838 F.3d 1307, 1318 (Fed. Cir. 2016). For example, as the specification itself acknowledges, there is no question that parties to a prospective automobile transaction searched for and took into account automobile market data, including price, availability, and other qualities such as mileage or safety features, before completing a transaction. *See Context Extraction*, 776 F.3d at 1347 (noting that humans have always performed functions of data collection, recognition, and storage); *see also* '984 Patent 1:35-51 (noting development of products used to assist parties to automobile transaction in tracking market prices). Similarly, notwithstanding Defendant's contention to the contrary, it is obvious that the use of "geolocation data" has always been implicitly taken into account by parties to a transaction, whether it be by consumers who only visit stores in their local area or by businesses which advertise locally. *See British Telecommunications PLC v. IAC/InteraActive Corp.*, 813 F. App'x 584, 587 (Fed. Cir. 2020) (tailoring information or content based on the characteristics of a user, including location data, is itself an abstract idea); *see also Intellectual Ventures I LLC v. Capital One Bank (USA)*, 792 F.3d 1363, 1369 (noting that information tailoring based on consumer characteristics is a fundamental practice). And, of course, humans have long been able to complete the steps inherent in automobile transactions described by the Patents-in-Suit – inquiring about a specific automobile, negotiating prices or weighing competing offers, and selecting an offer and physically going to a car dealership to pick up the purchased automobile – without a computer. *See Mortg. Grader*, 811 F.3d at 1324.

The specification confirms that claim 1 of the '984 Patent is directed to an abstract idea rather than any patentable improvement in technology. At the outset, the specification makes clear that the problem the Patents-in-Suit are designed to address is not one in either data collection or storage, user interface construction, computer processing ability, or network functionality which has, until now, prevented efficient automobile transactions. Rather, the specification identifies the problem as one of imperfect information: consumers

---

[4] For this same reason, Sidekick's reliance on Judge Martinotti's decision in *Nasdaq, Inc. v. IEX Grp., Inc.*, Civil Action No. 18-3014-BRM-DEA, 2019 WL 102408 (D.N.J. Jan. 4, 2019), is misplaced. That case, which Judge Martinotti acknowledged was a "close question of eligibility," involved claims directed to solving "bottleneck and other latency issues associated with transmission of large data sets" in the context of electronic securities trading. *Id.* at *6. Judge Martinotti found the claims at issue in *Nasdaq* were "directed as resolving an existing technological problem" that was specific to computer network functionality and were thus patent-eligible. *Id.* at *6-7. By contrast, there is nothing in the record of this case which indicates that representative claim 1 of the '984 Patent is directed towards the resolution of any such specific technological problem.

and dealers in the physical world lack the full body of relevant, real-time data needed to make optimally efficient transactions. *See* '984 Patent 1:17-51.

Moreover, in describing how to implement the claimed improvement, the specification, like the claim itself, describes the new systems and methods in "purely functional terms" using generic computer components. *In re TLI Commc'ns LLC Patent Litig.*, 823 F.3d 607, 612 (Fed. Cir. 2016). Indeed, the specification makes clear that the systems and methods claimed in the '984 Patent "can be implemented using one or more computer programs or components" which "may be provided as a series of computer instructions on any conventional computer-readable medium, including RAM, ROM, flash memory, magnetic or optical disks, optical memory, or other storage media" that are "configured to be executed by a processor." '984 Patent 18:40-46. Further, the specification describes the various computer components needed to carry out the basic steps of the claimed systems and methods in broad, general terms. *See, e.g., id.* at 2:64-3:4 (noting that system may include variety of client devices with displays, including desktop computers, mobile phones, or tablet computers), 3:5-9 (stating that client and host devices may communicate over any suitable wide area network or local area network), 3:50-53 (describing processor as "any suitable processor"), 3:63-65 (stating that interface circuit "may be implemented using any suitable interface standard, such as an Ethernet interface and/or a Universal Serial Bus interface"), 3:65-4:7 (noting variety of input devices that may be used to input data or commands, including a keyboard, mouse, touch screen, or voice recognition system, and output devices that may be used to receive information, such as displays, printers, speakers, or other output devices), 4:20-23 (stating that "one or more storage devices may be connected to the main unit via the interface circuit" including "a hard drive, CD drive, DVD drive, and/or other storage devices"), 4:30-45 (noting that network devices may include multiple servers which may include "any kind of data" and may "store and operate various applications relating to receiving, transmitting, processing, and storing" data, and that "various configurations of one or more servers may be used to support and maintain the system"), 4:63-65 (stating that "various options for managing data located within the computing device and/or in a server may be implemented"). These general descriptions of conventional computer and network components make clear that the components themselves are merely "conduits for the abstract idea" of collecting and using automobile market and user data to facilitate automobile transactions. *See In re TLI Commc'ns Patent Litig.*, 823 F.3d at 612-13.

Defendant makes a number of arguments against finding the claims of the Patents-in-Suit directed to an abstract idea, none of which is persuasive. First, the recited claim elements belie Defendant's contention that the performance of automobile transactions is simply the result of the non-abstract claimed steps and processes described in the Patents-in-Suit rather than their focus. As the Court has already noted, the claimed steps and processes are no more than the computerized method of performing the basic and essential steps of an automobile transaction. The abstract concept of automobile transactions does not become any less abstract simply because the Patents-in-Suit use generic technology to conduct such transactions over an online platform rather than in person. *See Capital One*,

792 F.3d at 1370 ("Steps that do nothing more than spell out what it means to 'apply it on a computer' cannot confer patent-eligibility"); *FairWarning*, 839 F.3d at 1094 ("FairWarning's claims merely implement an old practice in a new environment.").

Further, the Court is not persuaded by Defendant's argument that the Patents-in-Suit improve existing technology for at least two reasons. For one, in support of this contention, Defendant cites only conclusory statements in the specification that the Patents-in-Suit set forth a "new and innovative" method for providing automobile market information and facilitating automobile transactions, and that the "integration of various types of automobile market data . . . may provide a synergistic and optimal resource" for users rather than any specific technological improvements. Indeed, these statements support the Court's conclusion that the claimed improvement is in the abstract idea itself through the use of generic technology rather than any improvement in the function of technology as such. *See Customedia Techs.*, 951 F.3d at 1363. Claim 1 of the '984 Patent may recite improvements in how automobile transactions are performed, but nothing in the claim suggests that it is an improvement in the technology used to perform those transactions itself. *Move*, 721 F. App'x at 956. Beyond that, however, even if the Court were to accept Defendant's assertions, they describe only the sort of data synthesis and improved efficiency that courts have regularly found insufficient to render a claim nonabstract. *See FairWarning*, 839 F.3d at 1097 ("The mere combination of data sources, however, does not make the claims patent eligible."); *Capital One*, 792 F.3d at 1370 ("[M]erely adding computer functionality to increase the speed or efficiency of the process does not confer patent eligibility on an otherwise abstract idea.").

Finally, Defendant argues that the claim limitations in claim 1 of the '984 Patent for, among other things, the use of real-time market data, geolocation information, optical character recognition, driving directions from consumers to dealers, or the precise nature of the interactions between various users ensure that the Patents-in-Suit do not preempt the entire field of performing automobile transactions and thus ought to be patent-eligible. "A narrow claim directed to an abstract idea, however, is not necessarily patent-eligible, for '[w]hile preemption may signal patent ineligible subject matter, the absence of complete preemption does not demonstrate patent eligibility.'" *Symantec*, 838 F.3d at 1320-21 (quoting *Ariosa Diagnostics, Inc. v. Sequenom, Inc.*, 788 F.3d 1371, 1379 (Fed. Cir. 2015)); *OIP Techs.*, 788 F.3d at 1362-63 ("And that the claims do not preempt all price optimization or may be limited to price optimization in the e-commerce setting do not make them any less abstract."). The question, rather, becomes whether those additional features and limitations add the necessary "inventive concept" at step two of the *Alice* framework to take an otherwise abstract concept and place it in the realm of patent-eligible subject matter.

The Court concludes that the Patents-in-Suit are directed to an abstract idea. As such, the Court must proceed to step two of the *Alice* framework.

### 2. *Alice* Step Two

At step two of the *Alice* framework, the Court must consider whether the claim elements, considered both individually and 'as an ordered combination,' include an "inventive concept" sufficient to transform an abstract idea into a patent-eligible application. *Alice*, 573 U.S. at 217. To confer patent-eligibility, this 'inventive concept' must be "sufficient to ensure that the patent in practice amounts to significantly more than a patent upon the [ineligible concept] itself." *Alice*, 573 U.S. at 217 (quoting *Mayo Collaborative Servs. v. Prometheus Labs., Inc.*, 566 U.S. 66, 72-73 (2012)). "Claim limitations that recite 'conventional, routine and well understood applications in the art' are insufficient to 'supply an inventive concept.'" *BSG Tech*, 899 F.3d at 1289 (quoting *Ariosa Diagnostics*, 788 F.3d at 1378).

The Court finds that the elements of claim 1 of the '984 Patent, considered individually and in combination, fail to recite a sufficiently inventive concept to confer patent eligibility. Sidekick's recitation of the advantages and improvements provided by the patented systems and methods are unpersuasive. While Sidekick may be correct that the claimed systems and methods do indeed confer advantages in the realm of automobile transactions over the prior art, "provid[ing] a distinct advantage over alternatives is not the test for eligibility." *Smartflash LL v. Apple Inc.*, 680 F. App'x 977, 984 (Fed. Cir. 2017). Indeed, the Court "may assume that the techniques claimed are '[g]roundbreaking, innovative, or even brilliant,' but that is not enough for eligibility." *SAP Am.*, 898 F.3d at 1163 (quoting *Ass'n for Molecular Pathology v. Myriad Genetics, Inc.*, 569 U.S. 576, 591 (2013)). Instead, there must be an inventive concept recited in the claims themselves.

On this point, as the Court has already noted, Sidekick relies almost entirely on conclusory statements made in the specification that the claimed systems and methods are "new and innovative" or offer "a synergistic and optimal resource" for users which fail to identify any such inventive concept. Some of the specific claim limitations highlighted by Sidekick are routine, well understood features which, absent some specific improved technological process in implementation that is not claimed or otherwise described in the Patents-in-Suit, do not render the claims patent eligible. *See Move*, 721 F.3d at 957 (finding map zoom feature failed to supply inventive concept where neither claim language nor specification explained how feature or its implementation was inventive or non-generic); *see also, e.g.*, *Content Extraction*, 776 F.3d at 1349 (dependent claims reciting additional steps such as optical character recognition technology were insufficient to render claim patent eligible); *Elec. Power Grp.*, 830 F.3d at 1355 (collection and display of real-time data not inventive concept). Defendant has not pointed to any language in the claims or the specification that suggests any unconventional or nonroutine implementation of these various features. Moreover, other elements, such as the limitation with respect to inventoryless bidding or inclusion of a manufacturer response are simply insignificant additional steps in the automobile transaction process that do not "meaningfully limit" the abstract idea or add to it an inventive concept. *See OIP Techs.*, 788 F.3d at 1364; *Alice*, 573 U.S. at 222.

Because claim 1 of the '984 Patent does not recite any new process, technique, or method in performing any of the claimed features or limitations, the Court turns to consider whether the claim includes an inventive concept in the required computer implementation of its various steps. It does not. As the Court has already noted, it is clear that claim 1 of the '984 Patent recites the use of only generic computer components performing their conventional and routine functions as a means of carrying out the claimed steps. Just as the use of generic computer components and functions is insufficient to alter the "abstract idea" analysis at step one, the use of such generic components and functions is unable to provide the "inventive concept" necessary to transform that abstract idea into a patent-eligible application at step two. *Elec. Power Grp.*, 898 F.3d at 1170; *see also Content Extraction*, 776 F.3d at 1348 (noting that attempt to limit application of abstract idea to particular technological environment does not add requisite inventive concept).

Nor is there any inventive concept in the ordered combination of the elements of claim 1 of the '984 Patent. Rather, the steps are ordered in an entirely conventional way familiar to every automobile purchaser: a consumer seeks information on an automobile or type of automobile with certain features from a manufacturer, the manufacturer confirms whether that automobile is available in the consumer's area, dealers in the consumer's area which sell the desired automobile submit offers to the consumer, and the consumer evaluates the competing offers, accepts the most favorable one, and goes to the dealership to pick up their purchased automobile when it is available. *See Two-Way Media*, 874 F.3d at 1341. These are simply the ordinary steps of many automobile transactions. *Boom! Payments, Inc. v. Stripe, Inc.*, 839 F. App'x 528, 533 (Fed. Cir. 2021) ("[T]he order and timing of the claim elements are merely the necessary steps of executing payment escrow and so do not constitute an inventive concept."). Implementing these steps through the use of a data storage system and a processing device that enables interactions between consumers, dealers, and manufacturers is "no more than the sort of 'perfectly conventional' generic computer components employed in a customary manner" that is insufficient to transform an abstract idea into a patent-eligible invention. *Audatex*, 703 F. App'x at 990.

Sidekick's attempts to argue that the claims require anything other than routine, well-understood, or conventional computer components and functions are unavailing. First, while Sidekick is correct that, on a motion for judgment on the pleadings, the Court must accept its factual allegations as plead in its counterclaims as true, this does not apply to conclusory statements. As such, the Court is not required to accept as true Sidekick's conclusory allegations in its counterclaims, repeated for each of the twelve Patents-in-Suit, that the written description for each such Patent describes "how the non-conventional and non-generic combination of claim limitations is patentably distinct from and improved upon what may have been considered conventional or generic in the art at the time of the invention." Counterclaims ¶¶ 51, 65, 79, 93, 107, 121, 134, 147, 160, 170, 186, 199. Simply put, neither the allegations in the counterclaims nor the Patents-in-Suit themselves describe any sort of non-generic or not well-understood computer component, function, or combination thereof in the implementation of the claimed steps.

Sidekick also argues that claim construction is required as to the use of the term "processing device" in the claims before the question of eligibility can be determined, and, therefore, resolution of eligibility on a 12(c) motion in the absence of a developed factual record is inappropriate. The Court again disagrees. The claim itself states that the necessary processing device is used to execute instructions that utilize stored market data in enabling interactions between users through various interfaces. *See* '984 Patent 19:20-20:3. In describing the processing device recited in the claim, the specification makes clear that the necessary processor "may be any suitable processor" which may execute a stored software program to interact with other necessary devices "in any suitable manner." '984 Patent 3:50-57. There is nothing in either the claim or the specification that suggests the processing device is anything other than a generic processor used to perform a basic, routine, and well-understood function of conventional computers.

Sidekick argues that, properly construed, the term "processing device" may refer to the "automobile market information processing system" described in the specification. However, Sidekick does not explain how this proposed construction would alter the eligibility analysis. *See Simio*, 983 F.3d at 1365. There is nothing in either the claim or the specification that suggests that the "automobile market information processing system" is a non-generic or unconventional use of technology. *See SAP Am.*, 898 F.3d at 1170 (finding claimed use of parallel processing computing architecture generic where "neither the claim nor the specification call[ed] for any parallel processing architectures different from those available in existing systems"). Indeed, the opposite appears to be true. According to the specification, the system stores automobile market data in a database, provides that data to various users who interact with the system through their respective interfaces, facilitates interactions between users (i.e., processes communications between consumers, manufacturers, and dealers), and then stores and integrates user inputs (such as bids from dealers, completed transaction details, or other prior interactions with the system) to update the automobile market data in real time. These are ordinary data storage and processing functions of a computer unaccompanied by any description or explanation of a specific or unconventional development or implementation thereof. In other words, what Sidekick characterizes as hardware specifically programmed to perform the claimed steps is "purely functional and generic." *Alice*, 573 US at 226.[5]

---

[5] On this point, Sidekick's reliance on the out-of-district case *eBuddy Techs. B.V. v. LinkedIn Corp.*, No. 20-1501-RGA-CJB, 2021 WL 7209517 (D. Del. Nov. 29, 2021), *report and recommendation adopted*, 2022 WL 733996 (D. Del. Mar. 11, 2022) is unpersuasive. There, in denying a motion to dismiss patent infringement claims on the basis of patent-ineligible subject matter, the court relied on specific, detailed, and plausible allegations in the patentee's complaint demonstrating how and why the claimed invention was not conventional. *Id.* at *7-9. Here, by contrast, as the Court has noted, representative claim 1 of the '984 Patent and its specification recite only generic computer components and functions, and Sidekick's counterclaims merely reference, in conclusory fashion, how the written description of each Patent-in-Suit demonstrates the "non-conventional and non-generic combination of claim limitations" provided for therein.

<center>*     *     *</center>

Accordingly, claim 1 of the '984 Patent is directed to the abstract idea of collecting and using automobile market and user data to facilitate automobile transactions and fails to include any inventive concept that sufficiently transforms that abstract idea into a patent eligible application. Because the remaining claims of the '984 Patent do not meaningfully limit this central abstract idea or otherwise provide an inventive concept with respect thereto, those claims too are similarly patent-ineligible. Finally, as the Court has already noted, the claims of the other Patents-in-Suit include immaterial variations on the central abstract idea that do not add supply any inventive concept and thus do not alter the eligibility analysis. As such, each of the claims of the twelve Patents-in-Suit is directed towards ineligible subject matter under § 101.

## IV.     CONCLUSION

For the reasons set forth above, Plaintiffs' Motion for judgment on the pleadings is **GRANTED**. An appropriate order follows.

_/s/ William J. Martini_
**William J. Martini, U.S.D.J.**

**Date: June 27, 2022**

Loly G. Tor
K&L GATES LLP
One Newark Center
Tenth Floor
Newark, New Jersey 07102
Phone: (973) 848-4026
loly.tor@klgates.com

Benjamin E. Weed (admitted *pro hac vice*)
K&L GATES LLP
70 W. Madison Street, Suite 3100
Chicago, IL 60602
Phone: (312) 372-1121
benjamin.weed@klgates.com

*Attorneys for Defendant/Counter-Plaintiff*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| VROOM, INC.; VROOM AUTOMOTIVE, LLC d/b/a VROOM, d/b/a TEXAS DIRECT AUTO; CARSTORY, LLC; and VAST.COM INC. d/b/a CARSTORY, <br><br> Plaintiffs, <br><br> v. <br><br> SIDEKICK TECHNOLOGY, LLC, <br><br> Defendant. | Case No. 2:21-cv-06737-WJM-JSA <br><br> Hon. William J. Martini, U.S.D.J. <br> Hon. Jessica S. Allen, U.S.M.J. <br><br> **DEFENDANT'S NOTICE OF APPEAL** <br><br><br><br> *Document Electronically Filed* |

Notice is given that Defendant Sidekick Technology, LLC, pursuant to 28

U.S.C. §§ 1295 and 1447(d), appeals to the United States Court of Appeals for the

Federal Circuit (the "Federal Circuit") from the Court's Order dated May 24, 2023

(ECF No. 78).  Pursuant to the Federal Circuit's order dated April 11, 2023 (Exhibit

1), Defendant intends to indicate to the Federal Circuit that Defendant's first appeal

(*Vroom, Inc. v. Sidekick Technology, LLC*, No. 23-1362 (Fed. Cir.)) should be

reinstated and is related to the prior-filed appeal (Case No. 23-1667).

Respectfully submitted,

K&L GATES LLP

Dated: June 12, 2023

By: */s/ Loly G. Tor_____*
Loly G. Tor
 loly.tor@klgates.com
One Newark Center, Tenth Floor
Newark, New Jersey 07102
P: (973)848-4026
F: (973) 848-4000

Benjamin E. Weed (admitted *pro hac vice*)
 benjamin.weed@klgates.com
K&L GATES LLP
70 W. Madison Street, Suite 3100
Chicago, IL 60602
Telephone: (312) 372-1121
Facsimile: (312) 827-8000
*Attorneys for Defendant/Counter-Plaintiff*

## *2:21cv6737, Vroom, Inc. Et Al V. Sidekick Technology, Llc*

US District Court Docket

United States District Court, New Jersey

(Newark)

**This case was retrieved on 12/01/2023**

## Header

**Case Number:** 2:21cv6737
**Date Filed:** 03/25/2021
**Assigned To:** Judge William J. Martini
**Referred To:** Magistrate Judge Jessica S. Allen
**Nature of Suit:** Patent (830)
**Cause:** Declaratory Judgment
**Lead Docket:** None
**Other Docket:** Federal Circuit, 23-01362, Federal Circuit, 23-01667, Federal Circuit, 23-02041
**Jurisdiction:** Federal Question

**Class Code:** Open
**Statute:** 28:2201
**Jury Demand:** Defendant
**Demand Amount:** $0
**NOS Description:** Patent

## Participants

### Litigants

Vroom, Inc.
**Plaintiff**

VROOM AUTOMOTIVE, LLC VROOM
doing business as | doing business as | TEXAS DIRECT
AUTO |
**Plaintiff**

### Attorneys

STEPHANIE M. HATZIKYRIAKOU
LEAD ATTORNEY;ATTORNEY TO BE NOTICED
BAKER & HOSTETLER LLP
1735 Market Street Suite 3300
Philadelphia, PA  19103-7501
USA
215-564-3058 Fax: 215-568-3439
Email:Shatzikyriakou@bakerlaw.Com

LESLEY MCCALL GROSSBERG
ATTORNEY TO BE NOTICED
[Terminated: 07/18/2022]
ICE MILLER LLP
1735 Market Street Suite 3900
Philadelphia, PA  19103
USA
215-982-5169 Fax: 215-377-5029
Email:Lesley.Grossberg@icemiller.Com

STEPHANIE M. HATZIKYRIAKOU
LEAD ATTORNEY;ATTORNEY TO BE NOTICED
BAKER & HOSTETLER LLP
1735 Market Street Suite 3300
Philadelphia, PA  19103-7501
USA
215-564-3058 Fax: 215-568-3439
Email:Shatzikyriakou@bakerlaw.Com

LESLEY MCCALL GROSSBERG

2:21cv6737, Vroom, Inc. Et Al V. Sidekick Technology, Llc

| Litigants | Attorneys |
|---|---|
| | ATTORNEY TO BE NOTICED<br>[Terminated: 07/18/2022]<br>ICE MILLER LLP<br>1735 Market Street Suite 3900<br>Philadelphia, PA  19103<br>USA<br>215-982-5169 Fax: 215-377-5029<br>Email:Lesley.Grossberg@icemiller.Com |
| CARSTORY, LLC<br>**Plaintiff** | STEPHANIE M. HATZIKYRIAKOU<br>LEAD ATTORNEY;ATTORNEY TO BE NOTICED<br>BAKER & HOSTETLER LLP<br>1735 Market Street Suite 3300<br>Philadelphia, PA  19103-7501<br>USA<br>215-564-3058 Fax: 215-568-3439<br>Email:Shatzikyriakou@bakerlaw.Com<br><br>LESLEY MCCALL GROSSBERG<br>ATTORNEY TO BE NOTICED<br>[Terminated: 07/18/2022]<br>ICE MILLER LLP<br>1735 Market Street Suite 3900<br>Philadelphia, PA  19103<br>USA<br>215-982-5169 Fax: 215-377-5029<br>Email:Lesley.Grossberg@icemiller.Com |
| VAST.COM, INC.<br>doing business as | CARSTORY |<br>**Plaintiff** | STEPHANIE M. HATZIKYRIAKOU<br>LEAD ATTORNEY;ATTORNEY TO BE NOTICED<br>BAKER & HOSTETLER LLP<br>1735 Market Street Suite 3300<br>Philadelphia, PA  19103-7501<br>USA<br>215-564-3058 Fax: 215-568-3439<br>Email:Shatzikyriakou@bakerlaw.Com<br><br>LESLEY MCCALL GROSSBERG<br>ATTORNEY TO BE NOTICED<br>[Terminated: 07/18/2022]<br>ICE MILLER LLP<br>1735 Market Street Suite 3900<br>Philadelphia, PA  19103<br>USA<br>215-982-5169 Fax: 215-377-5029<br>Email:Lesley.Grossberg@icemiller.Com |
| SIDEKICK TECHNOLOGY, LLC<br>**Defendant** | THOMAS P. SCRIVO<br>LEAD ATTORNEY;ATTORNEY TO BE NOTICED<br>O'Toole Scrivo, LLC<br>14 Village Park Road<br>Cedar Grove, NJ  07009<br>USA<br>973 239 5700 Fax: 973 239 3400 Email:Tscrivo@oslaw.Com<br><br>LOLY G. TOR<br>ATTORNEY TO BE NOTICED<br>K&L Gates, LLP<br>One Newark Center<br>Newark, NJ  07102<br>USA<br>973-848-4026 Fax: 973-848-4001 |

2:21cv6737, Vroom, Inc. Et Al V. Sidekick Technology, Llc

| Litigants | Attorneys |
|---|---|
| | Email:Loly.Tor@klgates.Com |
| **SIDEKICK TECHNOLOGY, LLC**<br>**Counter Claimant** | THOMAS P. SCRIVO<br>LEAD ATTORNEY;ATTORNEY TO BE NOTICED<br>O'Toole Scrivo, LLC<br>14 Village Park Road<br>Cedar Grove, NJ  07009<br>USA<br>973 239 5700 Fax: 973 239 3400 Email:Tscrivo@oslaw.Com |
| | LOLY G. TOR<br>ATTORNEY TO BE NOTICED<br>K&L Gates, LLP<br>One Newark Center<br>Newark, NJ  07102<br>USA<br>973-848-4026 Fax: 973-848-4001<br>Email:Loly.Tor@klgates.Com |
| **CARSTORY, LLC**<br>**Counter Defendant** | STEPHANIE M. HATZIKYRIAKOU<br>LEAD ATTORNEY;ATTORNEY TO BE NOTICED<br>BAKER & HOSTETLER LLP<br>1735 Market Street Suite 3300<br>Philadelphia, PA  19103-7501<br>USA<br>215-564-3058 Fax: 215-568-3439<br>Email:Shatzikyriakou@bakerlaw.Com |
| | LESLEY MCCALL GROSSBERG<br>ATTORNEY TO BE NOTICED<br>[Terminated: 07/18/2022]<br>ICE MILLER LLP<br>1735 Market Street Suite 3900<br>Philadelphia, PA  19103<br>USA<br>215-982-5169 Fax: 215-377-5029<br>Email:Lesley.Grossberg@icemiller.Com |
| **VAST.COM, INC.**<br>**Counter Defendant** | STEPHANIE M. HATZIKYRIAKOU<br>LEAD ATTORNEY;ATTORNEY TO BE NOTICED<br>BAKER & HOSTETLER LLP<br>1735 Market Street Suite 3300<br>Philadelphia, PA  19103-7501<br>USA<br>215-564-3058 Fax: 215-568-3439<br>Email:Shatzikyriakou@bakerlaw.Com |
| | LESLEY MCCALL GROSSBERG<br>ATTORNEY TO BE NOTICED<br>[Terminated: 07/18/2022]<br>ICE MILLER LLP<br>1735 Market Street Suite 3900<br>Philadelphia, PA  19103<br>USA<br>215-982-5169 Fax: 215-377-5029<br>Email:Lesley.Grossberg@icemiller.Com |
| Vroom Automotive, LLC<br>**Counter Defendant** | STEPHANIE M. HATZIKYRIAKOU<br>LEAD ATTORNEY;ATTORNEY TO BE NOTICED<br>BAKER & HOSTETLER LLP<br>1735 Market Street Suite 3300<br>Philadelphia, PA  19103-7501<br>USA |

2:21cv6737, Vroom, Inc. Et Al V. Sidekick Technology, Llc

## Litigants

## Attorneys

215-564-3058 Fax: 215-568-3439
Email:Shatzikyriakou@bakerlaw.Com

LESLEY MCCALL GROSSBERG
ATTORNEY TO BE NOTICED
[Terminated: 07/18/2022]
ICE MILLER LLP
1735 Market Street Suite 3900
Philadelphia, PA  19103
USA
215-982-5169 Fax: 215-377-5029
Email:Lesley.Grossberg@icemiller.Com

Vroom, Inc.
**Counter Defendant**

STEPHANIE M. HATZIKYRIAKOU
LEAD ATTORNEY;ATTORNEY TO BE NOTICED
BAKER & HOSTETLER LLP
1735 Market Street Suite 3300
Philadelphia, PA  19103-7501
USA
215-564-3058 Fax: 215-568-3439
Email:Shatzikyriakou@bakerlaw.Com

LESLEY MCCALL GROSSBERG
ATTORNEY TO BE NOTICED
[Terminated: 07/18/2022]
ICE MILLER LLP
1735 Market Street Suite 3900
Philadelphia, PA  19103
USA
215-982-5169 Fax: 215-377-5029
Email:Lesley.Grossberg@icemiller.Com

## Proceedings

| # | Date | Proceeding Text | Source |
|---|------|-----------------|--------|
| 1 | 03/25/2021 | COMPLAINT against SIDEKICK TECHNOLOGY, LLC ( Filing and Admin fee $ 402 receipt number ANJDC-12305783), filed by VROOM, INC., VAST.COM, INC., CARSTORY, LLC, VROOM AUTOMOTIVE, LLC. (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Exhibit 3, # 4 Exhibit 4, # 5 Exhibit 5, # 6 Exhibit 6, # 7 Exhibit 7, # 8 Exhibit 8, # 9 Exhibit 9, # 10 Exhibit 10, # 11 Exhibit 11, # 12 Exhibit 12, # 13 Exhibit 13, # 14 Exhibit 14, # 15 Exhibit 15, # 16 Exhibit 16, # 17 Civil Cover Sheet)(GROSSBERG, LESLEY) (Entered: 03/25/2021) | |
| | 03/25/2021 | Case assigned to Judge William J. Martini and Chief Mag. Judge Mark Falk. (jr) (Entered: 03/25/2021) | |
| 2 | 03/25/2021 | Corporate Disclosure Statement by CARSTORY, LLC identifying VROOM, INC. as Corporate Parent.. (GROSSBERG, LESLEY) (Entered: 03/25/2021) | |
| 3 | 03/25/2021 | Corporate Disclosure Statement by VAST.COM, INC. identifying CARSTORY, LLC as Corporate Parent.. (GROSSBERG, LESLEY) (Entered: 03/25/2021) | |
| 4 | 03/25/2021 | Corporate Disclosure Statement by VROOM AUTOMOTIVE, LLC identifying VROOM, INC. as Corporate Parent.. (GROSSBERG, LESLEY) (Entered: 03/25/2021) | |
| 5 | 03/25/2021 | Corporate Disclosure Statement by VROOM, INC.. (GROSSBERG, LESLEY) (Entered: 03/25/2021) | |

2:21cv6737, Vroom, Inc. Et Al V. Sidekick Technology, Llc

| # | Date | Proceeding Text | Source |
|---|------|-----------------|--------|
| 6 | 04/05/2021 | SUMMONS ISSUED as to SIDEKICK TECHNOLOGY, LLC. Attached is the official court Summons, please fill out Defendant and Plaintiffs attorney information and serve. (ld, ) (Entered: 04/05/2021) | |
| 7 | 04/07/2021 | MOTION for Leave to Appear Pro Hac Vice Derek M. Freitas by CARSTORY, LLC, VAST.COM, INC., VROOM AUTOMOTIVE, LLC, VROOM, INC.. (Attachments: # 1 Declaration of Lesley M. Grossberg, # 2 Declaration of Derek M. Freitas, # 3 Text of Proposed Order)(GROSSBERG, LESLEY)(Entered: 04/07/2021) | |
| 8 | 04/07/2021 | MOTION for Leave to Appear Pro Hac Vice John F. Murphy by CARSTORY, LLC, VAST.COM, INC., VROOM AUTOMOTIVE, LLC, VROOM, INC.. (Attachments: # 1 Declaration of Lesley M. Grossberg, # 2 Declaration of John F. Murphy, # 3 Text of Proposed Order)(GROSSBERG, LESLEY) (Entered: 04/07/2021) | |
| 9 | 04/08/2021 | ORDER granting 7 Motion for Leave to Appear Pro Hac Vice as to Derek M. Freitas, Esq.. Signed by Chief Mag. Judge Mark Falk on 4/8/2021. (ld, ) (Entered: 04/08/2021) | |
| 10 | 04/08/2021 | ORDER granting 8 Motion for Leave to Appear Pro Hac Vice as to John F. Murphy, Esq.. Signed by Chief Mag. Judge Mark Falk on 4/8/2021. (ld, ) (Entered: 04/08/2021) | |
| | 04/20/2021 | Pro Hac Vice fee: for John F. Murphy and Derek Freitas $ 300, receipt number NEW44503 (pnm) (Entered: 04/20/2021) | |
| 11 | 04/21/2021 | Notice of Request by Pro Hac Vice John F. Murphy to receive Notices of Electronic Filings. (GROSSBERG, LESLEY) (Entered: 04/21/2021) | |
| 12 | 04/21/2021 | Notice of Request by Pro Hac Vice Derek M. Freitas to receive Notices of Electronic Filings. (GROSSBERG, LESLEY) (Entered: 04/21/2021) | |
| | 04/29/2021 | Pro Hac Vice counsel, JOHN F. MURPHY, ESQ. and DEREK M. FREITAS, ESQ., has been added to receive Notices of Electronic Filing. Pursuant to L.Civ.R. 101.1, only local counsel are entitled to sign and file papers, enter appearances and receive payments on judgments, decrees or orders. (ld, ) (Entered: 04/29/2021) | |
| 13 | 06/14/2021 | WAIVER OF SERVICE Returned Executed by VROOM, INC., VAST.COM, INC., CARSTORY, LLC, VROOM AUTOMOTIVE, LLC. SIDEKICK TECHNOLOGY, LLC waiver sent on 6/9/2021, answer due 8/9/2021. (GROSSBERG, LESLEY) (Entered: 06/14/2021) | |
| 14 | 06/17/2021 | NOTICE of Appearance by STEPHANIE HATZIKYRIAKOU on behalf of All Plaintiffs (HATZIKYRIAKOU, STEPHANIE) (Entered: 06/17/2021) | |
| 15 | 08/09/2021 | ANSWER to Complaint with JURY DEMAND , COUNTERCLAIM against CARSTORY, LLC, VAST.COM, INC., VROOM AUTOMOTIVE, LLC, VROOM, INC. by SIDEKICK TECHNOLOGY, LLC. (Attachments: # 1 Certificate of Service)(TOR, LOLY) (Entered: 08/09/2021) | |
| 16 | 08/09/2021 | Corporate Disclosure Statement by SIDEKICK TECHNOLOGY, LLC. (TOR, LOLY) (Entered: 08/09/2021) | |
| 17 | 08/10/2021 | LETTER ORDER: Initial Conference set for 10/4/2021 at 11:00 AM before Chief Mag. Judge Mark Falk. Signed by Chief Mag. Judge Mark Falk on 8/10/21. (LM, ) (Entered: 08/10/2021) | |
| 18 | 08/12/2021 | MOTION for Extension of Time to File Response/Reply as to 15 Answer to Complaint, Counterclaim  by All Plaintiffs. (Attachments: # 1 Brief, # 2 Text of Proposed Order, # 3 Certificate of Service)(GROSSBERG, LESLEY) (Entered: 08/12/2021) | |
| | 08/13/2021 | Set/Reset Deadlines as to 18 MOTION for Extension of Time to File Response/Reply as to 15 Answer to Complaint, Counterclaim | |

2:21cv6737, Vroom, Inc. Et Al V. Sidekick Technology, Llc

| # | Date | Proceeding Text | Source |
|---|------|-----------------|--------|
| | | . Motion set for 9/7/2021 before Judge William J. Martini. Unless otherwise directed by the Court, this motion will be decided on the papers and no appearances are required. Note that this is an automatically generated message from the Clerk`s Office and does not supersede any previous or subsequent orders from the Court. (ld, ) (Entered: 08/13/2021) | |
| 19 | 08/13/2021 | Letter from Loly G. Tor requesting the pro hac vice admission of Benjamin E. Weed and Gina A. Johnson on consent. (Attachments: # 1 Certification of Benjamin E. Weed, # 2 Certification of Loly G. Tor in Support of Pro Hac Vice Admission of Benjamin E. Weed, # 3 Text of Proposed Order as to Pro Hac Vice Admission of Benjamin E. Weed, # 4 Certification of Gina A. Johnson, # 5 Certification of Loly G. Tor in Support of Pro Hac Vice Admission of Gina A. Johnson, # 6 Text of Proposed Order as to Pro Hac Vice Admission of Gina A. Johnson)(TOR, LOLY) (Entered: 08/13/2021) | |
| 20 | 08/16/2021 | ORDER granting 19 Letter requesting admission pro hac vice as to Benjamin E. Weed, etc. Signed by Chief Mag. Judge Mark Falk on 8/16/2021. (lag, ) (Entered: 08/16/2021) | |
| 21 | 08/16/2021 | ORDER granting 19 Letter requesting admission pro hac vice as to GINA A. JOHNSON, etc. Signed by Chief Mag. Judge Mark Falk on 8/16/2021. (lag, ) (Entered: 08/16/2021) | |
| 22 | 08/16/2021 | ORDER granting 18 Motion for Extension of Time to answer through 9/27/2021, etc. Signed by Chief Mag. Judge Mark Falk on 8/16/2021. (lag, ) (Entered: 08/16/2021) | |
| 23 | 08/17/2021 | Notice of Request by Pro Hac Vice Gina A. Johnson to receive Notices of Electronic Filings. ( Pro Hac Vice fee $ 150 receipt number ANJDC-12722678.) (TOR, LOLY) (Entered: 08/17/2021) | |
| 24 | 08/17/2021 | Notice of Request by Pro Hac Vice Benjamin E. Weed to receive Notices of Electronic Filings. ( Pro Hac Vice fee $ 150 receipt number ANJDC-12722962.) (TOR, LOLY) (Entered: 08/17/2021) | |
| | 08/18/2021 | Pro Hac Vice counsel, BENJAMIN E. WEED and GINA A. JOHNSON, has been added to receive Notices of Electronic Filing. Pursuant to L.Civ.R. 101.1, only local counsel are entitled to sign and file papers, enter appearances and receive payments on judgments, decrees or orders. (lag, ) (Entered: 08/18/2021) | |
| 25 | 09/24/2021 | Case Reassigned to Magistrate Judge Jessica S. Allen. Chief Mag. Judge Mark Falk no longer assigned to the case. (smf, ) (Entered: 09/24/2021) | |
| 26 | 09/27/2021 | ANSWER to Counterclaim by All Plaintiffs.(GROSSBERG, LESLEY) (Entered: 09/27/2021) | |
| 27 | 09/28/2021 | TEXT ORDER: The Initial Scheduling Conference by Zoom Videoconference scheduled for 10/4/21 before the Hon. Mark Falk, U.S.M.J. is rescheduled for 10/19/21 at 9:30 a.m. before the Undersigned. The Court will provide the parties with the connection information in advance. On or before 10/15/21, the parties shall file the proposed joint discovery plan. So Ordered by Magistrate Judge Jessica S. Allen on 9/28/21. (jbb) (Entered: 09/28/2021) | |
| 28 | 10/07/2021 | Letter from Plaintiffs to Hon. Jessica S. Allen re 27 Order,. (GROSSBERG, LESLEY) (Entered: 10/07/2021) | |
| 29 | 10/08/2021 | ORDER that the Initial Scheduling Conference is rescheduled for November 18, 2021 at 3:30 p.m.. Signed by Magistrate Judge Jessica S. Allen on 10/8/2021. (ld, ) (Entered: 10/12/2021) | |
| 30 | 10/20/2021 | TEXT ORDER: The parties are advised that the TIME of the Initial Scheduling Conference scheduled for November 18, 2021 has been changed to 4:45 p.m. So Ordered by Magistrate Judge Jessica S. Allen on 10/20/21. (jbb) (Entered: 10/20/2021) | |

2:21cv6737, Vroom, Inc. Et Al V. Sidekick Technology, Llc

| # | Date | Proceeding Text | Source |
|---|------|-----------------|--------|
| 31 | 11/15/2021 | Joint Discovery Plan by All Plaintiffs.(GROSSBERG, LESLEY) (Entered: 11/15/2021) | |
| | 11/18/2021 | Minute Entry for proceedings held before Magistrate Judge Jessica S. Allen: Zoom Initial Pretrial Conference held on 11/18/2021. (Court Reporter: None) (jbb) (Entered: 11/22/2021) | |
| 32 | 11/19/2021 | SCHEDULING ORDER. etc. Signed by Magistrate Judge Jessica S. Allen on 11/19/2021. (ams, ) (Entered: 11/19/2021) | |
| 33 | 12/22/2021 | MOTION for Judgment on the Pleadings by All Plaintiffs. Responses due by 1/19/2021 (Attachments: # 1 Brief, # 2 Exhibit 1, # 3 Text of Proposed Order, # 4 Certificate of Service)(GROSSBERG, LESLEY) (Entered: 12/22/2021) | |
| | 12/23/2021 | Set/Reset Deadlines as to 33 MOTION for Judgment on the Pleadings . Motion set for 1/18/2022 before Judge William J. Martini. Unless otherwise directed by the Court, this motion will be decided on the papers and no appearances are required. Note that this is an automatically generated message from the Clerk`s Office and does not supersede any previous or subsequent orders from the Court. (ld, ) (Entered: 12/23/2021) | |
| 34 | 01/14/2022 | Letter from Plaintiffs to Hon. Jessica S. Allen, USMJ re 32 Scheduling Order. (Attachments: # 1 Text of Proposed Order [Proposed Discovery Confidentiality Order])(GROSSBERG, LESLEY) (Entered: 01/14/2022) | |
| 35 | 01/19/2022 | BRIEF in Opposition filed by SIDEKICK TECHNOLOGY, LLC re 33 MOTION for Judgment on the Pleadings   (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C, # 4 Exhibit D, # 5 Exhibit E)(TOR, LOLY) (Entered: 01/19/2022) | |
| 36 | 01/20/2022 | Stipulated Discovery Confidentiality Order. Signed by Magistrate Judge Jessica S. Allen on 1/20/2022. (ld, ) (Entered: 01/20/2022) | |
| 37 | 01/31/2022 | STATUS REPORT  by All Plaintiffs. (GROSSBERG, LESLEY) (Entered: 01/31/2022) | |
| 38 | 02/02/2022 | ORDER re 37 Status Report; Counsel who have entered appearances Pro Hac Vice in this matter are permitted to appear at the Status Conference without Ms. Tor. Signed by Magistrate Judge Jessica S. Allen on 2/2/2022. (ams, ) (Entered: 02/02/2022) | |
| 39 | 02/02/2022 | REPLY BRIEF to Opposition to Motion filed by All Plaintiffs re 33 MOTION for Judgment on the Pleadings   (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C, # 4 Exhibit D)(GROSSBERG, LESLEY) (Entered: 02/02/2022) | |
| | 02/03/2022 | Minute Entry for proceedings held before Magistrate Judge Jessica S. Allen: Telephone Status Conference held on 2/3/2022. (Court Reporter: None) (jbb) (Entered: 02/03/2022) | |
| 40 | 02/03/2022 | TEXT ORDER: As per today's Telephone Status Conference, the parties shall submit a joint letter on or before 3/31/22, setting forth the status of completing discovery. A Telephone Status Conference is scheduled for 4/7/22 at 9:30 a.m. The connection information will be provided in advance. So Ordered by Magistrate Judge Jessica S. Allen on 2/3/22. (jbb) (Entered: 02/03/2022) | |
| 41 | 03/31/2022 | STATUS REPORT re joint letter in advance of 4/7/2022 conference by All Plaintiffs. (GROSSBERG, LESLEY) (Entered: 03/31/2022) | |
| | 04/07/2022 | Minute Entry for proceedings held before Magistrate Judge Jessica S. Allen: Telephone Status Conference held on 4/7/2022. (Court Reporter: None) (jbb) (Entered: 04/07/2022) | |
| 42 | 04/07/2022 | TEXT ORDER: As per today's Telephone Status Conference, the parties shall provide a status letter on 6/1/22. A Telephone Status Conference is scheduled for 6/6/22 at 9:15 a.m. So Ordered by Magistrate Judge Jessica S. Allen on 4/7/22. (jbb) (Entered: 04/07/2022) | |

2:21cv6737, Vroom, Inc. Et Al V. Sidekick Technology, Llc

| # | Date | Proceeding Text | Source |
|---|------|-----------------|--------|
| 43 | 05/27/2022 | STATUS REPORT re joint letter in advance of 6/6/2022 conference by All Plaintiffs. (HATZIKYRIAKOU, STEPHANIE) (Entered: 05/27/2022) | |
| 44 | 05/27/2022 | MOTION to Withdraw as Attorney by Lesley Grossberg by All Plaintiffs. (GROSSBERG, LESLEY) (Entered: 05/27/2022) | |
| | 05/31/2022 | CLERK'S QUALITY CONTROL MESSAGE - The 44 Notice to Withdraw as Attorney by Lesley Grossberg on 5/27/2022 was submitted incorrectly as a Motion. For future reference, please use the event "Notice to Withdraw from NEF as to Case" that can be found under Notices. (ld, ) (Entered: 05/31/2022) | |
| 45 | 06/03/2022 | TEXT ORDER: The Court is in receipt of the parties' joint status letter of 5/27/22, (ECF No. 43), and request to adjourn the 6/6/22 at 9:15 a.m. The request is GRANTED. The Telephone Status Conference is rescheduled for 8/3/22 at 9:30 a.m. and the connection information will be provided in advance. The parties shall submit a joint status letter on or before 8/1/22. So Ordered by Magistrate Judge Jessica S. Allen on 6/3/22. (jbb) (Entered: 06/03/2022) | |
| 46 | 06/28/2022 | OPINION. Signed by Judge William J. Martini on 6/28/22. (gh, ) (Entered: 06/28/2022) | |
| 47 | 06/28/2022 | ORDER granting 33 Motion for Judgment on the Pleadings; Defendant Sidekick Technology, LLC"s Counterclaims are dismissed with prejudice. Signed by Judge William J. Martini on 6/28/22. (gh, ) (Entered: 06/28/2022) | |
| | 06/28/2022 | ***Civil Case Terminated. (gh, ) (Entered: 01/04/2023) | |
| 48 | 07/12/2022 | Letter from Sidekick Technology, LLC requesting entry of Consent Order extending time to file motion for reconsideration. (Attachments: # 1 Text of Proposed Order)(TOR, LOLY) (Entered: 07/12/2022) | |
| 49 | 07/13/2022 | CONSENT ORDER extending the time to file a motion for reconsideration until 7/26/22. Signed by Judge William J. Martini on 7/13/22. (gh, ) (Entered: 07/13/2022) | |
| 50 | 07/18/2022 | Notice to be terminated and withdraw from Notices of Electronic filing as to case. Attorney LESLEY MCCALL GROSSBERG terminated. (GROSSBERG, LESLEY) (Entered: 07/18/2022) | |
| 51 | 07/26/2022 | NOTICE of Appearance by THOMAS P. SCRIVO on behalf of SIDEKICK TECHNOLOGY, LLC (SCRIVO, THOMAS) (Entered: 07/26/2022) | |
| 52 | 07/26/2022 | MOTION for Reconsideration re 47 Order on Motion for Judgment on the Pleadings, 46 Opinion  by SIDEKICK TECHNOLOGY, LLC. (Attachments: # 1 Brief, # 2 Text of Proposed Order)(TOR, LOLY) (Entered: 07/26/2022) | |
| | 07/28/2022 | Set/Reset Deadlines as to 52 MOTION for Reconsideration re 47 Order on Motion for Judgment on the Pleadings, 46 Opinion . Motion set for 9/6/2022 before Judge William J. Martini. Unless otherwise directed by the Court, this motion will be decided on the papers and no appearances are required. Note that this is an automatically generated message from the Clerk`s Office and does not supersede any previous or subsequent orders from the Court. (ld, ) (Entered: 07/28/2022) | |
| 53 | 07/28/2022 | Letter from Plaintiffs requesting entry of Consent Order extending time to respond to the motion for reconsideration. (Attachments: # 1 Text of Proposed Order)(HATZIKYRIAKOU, STEPHANIE) (Entered: 07/28/2022) | |
| 54 | 08/01/2022 | STATUS REPORT re joint letter in advance of 8/3/2022 by All Plaintiffs. (HATZIKYRIAKOU, STEPHANIE) (Entered: 08/01/2022) | |
| 55 | 08/02/2022 | LETTER ORDER granting request to suspend this and further status conferences unless and until the judgment were modified | |

2:21cv6737, Vroom, Inc. Et Al V. Sidekick Technology, Llc

| # | Date | Proceeding Text | Source |
|---|------|-----------------|--------|
| | | such that the case would resume. Signed by Magistrate Judge Jessica S. Allen on 8/2/2022. (ld, ) (Entered: 08/02/2022) | |
| 56 | 08/23/2022 | BRIEF in Opposition filed by All Plaintiffs re 52 MOTION for Reconsideration re 47 Order on Motion for Judgment on the Pleadings, 46 Opinion  (HATZIKYRIAKOU, STEPHANIE) (Entered: 08/23/2022) | |
| 57 | 10/18/2022 | OPINION. Signed by Judge William J. Martini on 10/17/22. (gh, ) (Entered: 10/18/2022) | |
| 58 | 10/18/2022 | ORDER denying 52 Motion for Reconsideration re 52 MOTION for Reconsideration re 47 Order on Motion for Judgment on the Pleadings, 46 Opinion  filed by SIDEKICK TECHNOLOGY, LLC. Signed by Judge William J. Martini on 10/17/22. (gh, ) (Entered: 10/18/2022) | |
| 59 | 12/08/2022 | Letter from Plaintiffs to Hon. Jessica S. Allen Requesting Prompt Withdrawal and Termination of PHV Counsel John F. Murphy. (HATZIKYRIAKOU, STEPHANIE) (Entered: 12/08/2022) | |
| 60 | 12/09/2022 | LETTER ORDER granting request for the withdrawal and termination of John F. Murphy as pro hac vice counsel for Vroom. Signed by Magistrate Judge Jessica S. Allen on 12/9/2022. (ld, ) (Entered: 12/09/2022) | |
| 61 | 01/04/2023 | NOTICE OF APPEAL to Federal Circuit as to 58 Order on Motion for Reconsideration, 47 Order on Motion for Judgment on the Pleadings, 46 Opinion, 57 Opinion by SIDEKICK TECHNOLOGY, LLC. Filing fee $ 505, receipt number ANJDC-13935625. The Clerk's Office hereby certifies the record and the docket sheet available through ECF to be the certified list in lieu of the record and/or the certified copy of the docket entries. Appeal Record due by 2/14/2023. (Attachments: # 1 Certificate of Service)(TOR, LOLY) (Entered: 01/04/2023) | |
| 62 | 01/04/2023 | MOTION for Entry of Judgment under Rule 54(b) or, in the alternative, Certifying Legal Issue for Interlocutory Appeal by SIDEKICK TECHNOLOGY, LLC. (Attachments: # 1 Brief, # 2 Text of Proposed Order)(TOR, LOLY) (Entered: 01/04/2023) | |
| | 01/05/2023 | Set/Reset Deadlines as to 62 MOTION for Entry of Judgment under Rule 54(b) or, in the alternative, Certifying Legal Issue for Interlocutory Appeal. Motion set for 2/6/2023 before Judge William J. Martini. Unless otherwise directed by the Court, this motion will be decided on the papers and no appearances are required. Note that this is an automatically generated message from the Clerk`s Office and does not supersede any previous or subsequent orders from the Court. (ld, ) (Entered: 01/05/2023) | |
| 63 | 01/10/2023 | USCA Case Number 23-1362 for 61 Notice of Appeal (Federal Circuit), filed by SIDEKICK TECHNOLOGY, LLC. (Document Restricted - Court Only) (krg, ) (Entered: 01/12/2023) | |
| 64 | 01/23/2023 | BRIEF in Opposition filed by All Plaintiffs re 62 MOTION for Entry of Judgment under Rule 54(b) or, in the alternative, Certifying Legal Issue for Interlocutory Appeal  (HATZIKYRIAKOU, STEPHANIE) (Entered: 01/23/2023) | |
| 65 | 01/30/2023 | REPLY BRIEF to Opposition to Motion filed by SIDEKICK TECHNOLOGY, LLC re 62 MOTION for Entry of Judgment under Rule 54(b) or, in the alternative, Certifying Legal Issue for Interlocutory Appeal  (TOR, LOLY) (Entered: 01/30/2023) | |
| 66 | 02/03/2023 | Letter from Plaintiffs requesting permission to file sur-reply re 65 Reply Brief to Opposition to Motion. (HATZIKYRIAKOU, STEPHANIE) (Entered: 02/03/2023) | |
| 67 | 03/21/2023 | ORDER denying 62 Motion for Entry of Judgment under Rule 54(b). Signed by Judge William J. Martini on 3/21/23. (gh, ) (Entered: 03/21/2023) | |

2:21cv6737, Vroom, Inc. Et Al V. Sidekick Technology, Llc

| # | Date | Proceeding Text | Source |
|---|------|-----------------|--------|
| 68 | 03/22/2023 | NOTICE OF APPEAL to Federal Circuit as to 67 Order on Motion for Entry of Judgment under Rule 54(b) by SIDEKICK TECHNOLOGY, LLC. Filing fee $ 505, receipt number ANJDC-14191351. The Clerk`s Office hereby certifies the record and the docket sheet available through ECF to be the certified list in lieu of the record and/or the certified copy of the docket entries. (TOR, LOLY) (Main Document 68 replaced on 3/23/2023) (krg, ). (Entered: 03/22/2023) | |
| 69 | 03/29/2023 | USCA Case Number 23-1667 for 68 Notice of Appeal (Federal Circuit), filed by SIDEKICK TECHNOLOGY, LLC. (Document Restricted - Court Only) (krg, ) (Entered: 03/29/2023) | |
| 70 | 04/04/2023 | MOTION Reopen the Time to File an Appeal  by SIDEKICK TECHNOLOGY, LLC. (Attachments: # 1 Brief, # 2 Text of Proposed Order)(TOR, LOLY) (Entered: 04/04/2023) | |
| | 04/05/2023 | Set/Reset Deadlines as to 70 MOTION Reopen the Time to File an Appeal . Motion set for 5/1/2023 before Judge William J. Martini. Unless otherwise directed by the Court, this motion will be decided on the papers and no appearances are required. Note that this is an automatically generated message from the Clerk`s Office and does not supersede any previous or subsequent orders from the Court. (ld, ) (Entered: 04/05/2023) | |
| 71 | 04/11/2023 | *** VACATED pursuant to 83 Federal Circuit Order *** ORDER of Federal Circuit dismissing 61 Notice of Appeal (Federal Circuit), filed by SIDEKICK TECHNOLOGY, LLC for lack of jurisdiction, subject to reinstatement under the same docket number within 60 days of the date of filing of this order, etc. (Finance notified) (krg, ) Modified on 10/12/2023 (adc, ). (Entered: 04/11/2023) | |
| 72 | 04/14/2023 | Rule 7.1(d)(5) Letter for an automatic extension of the return date of a dispositive motion re 70 MOTION Reopen the Time to File an Appeal  . (HATZIKYRIAKOU, STEPHANIE) (Entered: 04/14/2023) | |
| | 04/14/2023 | Reset Deadlines as to 70 MOTION Reopen the Time to File an Appeal . Motion reset for 5/15/2023 before Judge William J. Martini. Unless otherwise directed by the Court, this motion will be decided on the papers and no appearances are required. Note that this is an automatically generated message from the Clerk`s Office and does not supersede any previous or subsequent orders from the Court. (ld, ) (Entered: 04/14/2023) | |
| 73 | 04/14/2023 | Letter from Plaintiffs regarding Federal Circuit Order. (HATZIKYRIAKOU, STEPHANIE) (Entered: 04/14/2023) | |
| 74 | 05/01/2023 | Letter from Loly G. Tor requesting entry of order. (Attachments: # 1 Text of Proposed Order)(TOR, LOLY) (Entered: 05/01/2023) | |
| 75 | 05/01/2023 | BRIEF in Opposition filed by All Plaintiffs re 70 MOTION Reopen the Time to File an Appeal   (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Exhibit 3, # 4 Exhibit 4, # 5 Exhibit 5, # 6 Exhibit 6, # 7 Exhibit 7, # 8 Exhibit 8, # 9 Exhibit 9, # 10 Exhibit 10, # 11 Exhibit 11, # 12 Exhibit 12, # 13 Exhibit 13, # 14 Exhibit 14, # 15 Exhibit 15, # 16 Exhibit 16, # 17 Exhibit 17, # 18 Exhibit 18, # 19 Exhibit 19, # 20 Exhibit 20)(HATZIKYRIAKOU, STEPHANIE) (Entered: 05/01/2023) | |
| 76 | 05/08/2023 | REPLY BRIEF to Opposition to Motion filed by SIDEKICK TECHNOLOGY, LLC re 70 MOTION Reopen the Time to File an Appeal   (TOR, LOLY) (Entered: 05/08/2023) | |
| 77 | 05/15/2023 | Letter from Plaintiffs regarding Plaintiffs' Federal Circuit Petition for Rehearing. (HATZIKYRIAKOU, STEPHANIE) (Entered: 05/15/2023) | |
| 78 | 05/24/2023 | ORDER denying as moot 70 Motion to Reopen the Time to File an Appeal. Signed by Judge William J. Martini on 5/24/23. (gh, ) (Entered: 05/24/2023) | |

2:21cv6737, Vroom, Inc. Et Al V. Sidekick Technology, Llc

| # | Date | Proceeding Text | Source |
|---|------|-----------------|--------|
| 79 | 06/12/2023 | NOTICE OF APPEAL to Federal Circuit as to 78 Order on Motion for Miscellaneous Relief by SIDEKICK TECHNOLOGY, LLC. Filing fee $ 505, receipt number ANJDC-14383292. The Clerk's Office hereby certifies the record and the docket sheet available through ECF to be the certified list in lieu of the record and/or the certified copy of the docket entries. Appeal Record due by 7/12/2023. (Attachments: # 1 Exhibit 1)(TOR, LOLY) (Entered: 06/12/2023) | |
| 80 | 06/20/2023 | USCA Case Number 23-2041 for 79 Notice of Appeal (Federal Circuit), filed by SIDEKICK TECHNOLOGY, LLC. (Document Restricted - Court Only) (adc, ) (Entered: 06/27/2023) | |
| 81 | 06/22/2023 | FEDERAL CIRCUIT ORDER denying petition for panel rehearing and rehearing en banc filed by Vroom, Inc., Vroom Automotive, LLC, CarStory, LLC and Vast.com, Inc. as to 61 Notice of Appeal (Federal Circuit). The Mandate of the Federal Circuit will issue 6/29/2023 (adc, ) Modified on 6/27/2023 (adc, ). (Entered: 06/27/2023) | |
| 82 | 06/29/2023 | *** RECALLED Pursuant to 83 Federal Circuit Order *** MANDATE of Federal Circuit as to 61 Notice of Appeal (Federal Circuit), filed by SIDEKICK TECHNOLOGY, LLC (Finance notified) (adc, ) Modified on 10/12/2023 (adc, ). (Entered: 07/05/2023) | |
| | 07/05/2023 | Pursuant to Local Rule 79.4, notice is hereby given of the Appellate ruling filed on 6/29/2023. In the event that the mandate or judgment provides for costs or directs a disposition other than an affirmance, the prevailing party shall prepare and submit an order implementing the mandate or judgment. (adc, ) (Entered: 07/05/2023) | |
| 83 | 10/06/2023 | Federal Circuit ORDER RECALLING MANDATE as to 61 Notice of Appeal (Federal Circuit), filed by SIDEKICK TECHNOLOGY, LLC, in 2023-1362, vacating the April 11, 2023 dismissal order in 2023-1362; and reinstating Appeal No. 2023-1362. (adc, ) Modified on 10/12/2023 (adc, ). (Entered: 10/12/2023) | |

## Patents

| Number | Title | Issued | Class | Subclass |
|--------|-------|--------|-------|----------|
| 8,650,093 | Used automobile transaction facilitation for a specific used automobile | 02/11/2014 | 705 | 26.4 |
| 8,744,925 | Automobile transaction facilitation based on customer selection of a    specific automobile | 06/03/2014 | 705 | 26.4 |
| 9,123,075 | Used automobile transaction facilitation for a specific used automobile | 09/01/2015 | 1 | 1 |
| 9,141,984 | Automobile transaction facilitation using a manufacturer response | 09/22/2015 | 1 | 1 |
| 9,147,216 | Automobile transaction facilitation based on customer selection of a    specific automobile | 09/29/2015 | 1 | 1 |
| 9,460,467 | Used automobile transaction facilitation for a specific used automobile | 10/04/2016 | 1 | 1 |
| 9,626,704 | Automobile transaction facilitation based on a customer selection of a    specific automobile | 04/18/2017 | 1 | 1 |
| 9,665,897 | Automobile transaction facilitation using a manufacturer response | 05/30/2017 | 1 | 1 |
| 10,796,362 | Used automobile transaction facilitation for a specific used automobile | 10/06/2020 | 1 | 1 |

Copyright © LexisNexis CourtLink, Inc. All Rights Reserved.
*** THIS DATA IS FOR INFORMATIONAL PURPOSES ONLY ***

**End of Document**

Lesley M. Grossberg (NJ No. 021682008)
John F. Murphy (*pro hac vice* pending)
Stephanie M. Hatzikyriakou (NJ No. 080582014)
BAKER & HOSTETLER LLP
2929 Arch Street
Cira Centre, 12th Floor
Philadelphia, PA  19104-2891
Telephone: 215.568.3100
Facsimile:  215.568.3439

Derek M. Freitas (*pro hac vice* pending)
BAKER & HOSTETLER LLP
312 Walnut Street
Suite 3200
Cincinnati, OH  45202-4074
Telephone: 513.929.3400
Facsimile:  513.929.0303

Attorneys for Plaintiffs

# UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

|  |  |
|---|---|
| VROOM, INC.;<br>VROOM AUTOMOTIVE, LLC<br>d/b/a VROOM, d/b/a<br>TEXAS DIRECT AUTO;<br>CARSTORY, LLC; and<br>VAST.COM, INC. d/b/a CARSTORY,<br><br>Plaintiffs,<br><br>v.<br><br>SIDEKICK<br>TECHNOLOGY, LLC,<br><br>Defendant. | ***Document Electronically Filed***<br><br>C.A. No. _____<br><br>**PLAINTIFFS' COMPLAINT FOR DECLARATORY JUDGMENT** |

Plaintiffs Vroom, Inc. ("Vroom") (address: 1375 Broadway, Floor 11, New York, New York, 10018), Vroom Automotive, LLC d/b/a Vroom, d/b/a Texas Direct Auto ("Vroom Automotive") (address: 12053 Southwest Freeway, Stafford, Texas, 77477), CarStory, LLC

("CarStory, LLC") (address: 320 Congress Ave, Ste C, Austin, Texas, 78701), and Vast.com, Inc. d/b/a CarStory ("CarStory") (address: 320 Congress Ave, Ste C, Austin, Texas, 78701), file this Complaint for Declaratory Judgment ("Complaint") against Defendant Sidekick Technology, LLC ("Sidekick") (address[1]: 77 Bloomfield Avenue, Pine Brook, New Jersey, 07058), and hereby allege as follows:

## NATURE OF THE ACTION

1.    This is an action for declaratory judgment of non-infringement of United States Patent Nos. 9,141,984 (the "'984 Patent"); 8,744,925 (the "'925 Patent"); 8,650,093 (the "'093 Patent"); 9,123,075 (the "'075 Patent"); 9,147,216 (the "'216 Patent"); 9,460,467 (the "'467 Patent"); 9,665,897 (the "'897 Patent"); 9,626,704 (the "'704 Patent"); 10,140,655 (the "'655 Patent"); 10,223,722 (the "'722 Patent"); 10,223,720 (the "'720 Patent"); and 10,796,362 (the "'362 Patent") (collectively, the "Patents-in-Suit") arising under the patent laws of the United States, 35 U.S.C. § 1, *et seq.*, and the Declaratory Judgment Act, 28 U.S.C. § 2201.

2.    Plaintiffs request relief because Sidekick has stated in correspondence that it owns the Patents-in-Suit and intends to enforce the Patents-in-Suit against Plaintiffs in Federal Court.

3.    On September 29, 2020, Sidekick's counsel sent Vroom's Chief Legal Officer a letter providing a cursory analysis of a single claim of a single patent[2] and alleging that Vroom infringes that patent as well as ten others.[3]  Sidekick demanded that Vroom "shall" shut down its business and open up its accounting information based on this cursory analysis and blanket allegation.  *See* Exhibit 1.

---

[1] On information and belief this address is Defendant's principal place of business.
[2] U.S. Patent No. 10,140,655.
[3] U.S. Patent Nos. 9,141,984; 8,744,925; 8,650,093; 9,123,075; 9,147,216; 9,460,467; 9,665,897; 9,626,704; 10,140,655; 10,223,722; and 10,223,720.

4.      Following Sidekick's September 29, 2020 letter, counsel for Vroom engaged in discussions with counsel for Sidekick.  The discussions ended on December 16, 2020, when counsel for Sidekick requested a written response to the September 29 letter by the end of the year.

5.      On December 31, 2020, Vroom responded by notifying Sidekick that Vroom does not directly or indirectly infringe, either literally or under the doctrine of equivalents, any of the 11 patents identified in Sidekick's September 29, 2020 letter. *See* Exhibit 2. Vroom also provided an element-by-element analysis illustrating noninfringement of claim 1 of the '655 Patent. *Id*.

6.      On March 2, 2021, counsel for Sidekick sent another demand letter, stating that "Sidekick fully intends to enforce its intellectual property rights to the fullest extent of the law and intends to pursue all remedies available to it." *See* Exhibit 3.  In its March 2 letter, Sidekick not only reiterated its allegations of infringement against Vroom, but also implicated Plaintiff CarStory in its allegations and demands.  *See id.*  Furthermore, Sidekick added a twelfth patent[4] to its allegations and demands.  *See id.*

7.      On information and belief, and according to Sidekick's representations, Sidekick owns the Patents-in-Suit.

8.      Plaintiffs have not infringed, and are not infringing, the Patents-in-Suit.  Plaintiffs thus seek declaratory judgment to that effect, so that they may remove the cloud of uncertainty arising from Sidekick's allegations of infringement.

---

[4] U.S. Patent No. 10,796,362.

## THE PARTIES

9.     Plaintiff Vroom is a corporation organized and existing under the laws of Delaware, with its principal place of business at 1375 Broadway, Floor 11, New York, New York, 10018.

10.     Plaintiff Vroom Automotive is a limited liability company organized and existing under the laws of Texas, with its principal place of business at 12053 Southwest Freeway, Stafford, Texas, 77477.  Vroom Automotive is a licensed motor vehicle dealer and a leading e-commerce platform for buying and selling used cars.

11.     Plaintiff CarStory, LLC is a limited liability company organized and existing under the laws of Delaware with a mailing address of 251 Little Falls Drive, Wilmington, Delaware, 19808.  CarStory, LLC, through its wholly owned subsidiary CarStory, is a leader in AI-powered analytics and digital services for automotive retail.

12.     Plaintiff CarStory is a corporation organized and existing under the laws of California, with its principal place of business at 320 Congress Ave, Ste C, Austin, Texas, 78701.

13.     Vroom is a public company listed and traded on The Nasdaq Global Select Market.  Each of Vroom Automotive, CarStory, LLC and CarStory is a wholly-owned subsidiary of Vroom.

14.     On information and belief, Defendant Sidekick is a limited liability company organized and existing under the laws of New Jersey, with a purported principal place of business at 77 Bloomfield Avenue, Pine Brook, New Jersey, 07058.  *See* Certificate of Formation on file with the New Jersey State Treasurer, attached as Exhibit 4.

## JURISDICTION AND VENUE

15.     Plaintiffs incorporate all preceding paragraphs by reference as though fully set forth herein.

16.     As detailed above and herein, an actual case or controversy exists between Plaintiffs and Defendant as to whether Plaintiffs have infringed or are infringing one or more claims of the Patents-in-Suit.

17.     The Court has subject matter jurisdiction over Plaintiffs' request for a declaratory judgment under 28 U.S.C. §§ 2201 and 2202.

18.     This action arises under the patent laws of the United States, 35 U.S.C. §§ 1, *et seq.*, which are within the subject matter of this Court under 28 U.S.C. §§ 1331 and 1338(a).

19.     The Court has personal jurisdiction over Defendant because Defendant is organized under the laws of and resides in the State of New Jersey in this district.

20.     Defendant is subject to general and specific personal jurisdiction in this judicial district based upon its purposeful, systematic, and continuous contacts with New Jersey, including forming under the laws of New Jersey, as well as maintaining an address and a registered agent in this judicial district.

21.     Venue is proper in this district under at least 28 U.S.C. § 1391 because Defendant resides in this judicial district and because Defendant is subject to personal jurisdiction within this judicial district.

## FACTUAL BACKGROUND

22.     Vroom is an innovative, end-to-end e-commerce platform designed to offer a better way to buy and a better way to sell used vehicles.  Vroom's scalable, data-driven technology brings all phases of the vehicle buying and selling process to consumers wherever

they are and offers an extensive selection of vehicles, transparent pricing, competitive financing, and at-home pick-up and delivery. Vroom's products and services may be accessed at Vroom.com or companion mobile applications.

23.    CarStory is a leader in AI-powered analytics and digital services for automotive retail. Leveraging its machine learning, informed by more than 7 million listings per day and more than 18 million consumer sessions per month, CarStory provides the industry's most complete and accurate view of predictive market data to Vroom's national e-commerce and vehicle operations platform. CarStory drives automotive retail innovation by aggregating, optimizing and distributing current market data from thousands of automotive sources and offering its digital retailing services to dealers, top automotive financial services companies and household names in automotive industry research and retailing. CarStory's products and services may be accessed at CarStory.com or companion mobile applications.

24.    Sidekick holds itself out as the developer of "technology" permitting customers to select a desired automobile based on available market information and complete the transaction for that automobile from their home. *See* Exhibit 1. On information and belief, Sidekick is a company that exists for the specific purpose of pursuing infringement lawsuits and does not commercialize any products or services embodying the Patents-in-Suit.

## COUNT I
### Declaratory Judgment of Non-infringement of the '984 Patent

25.    Plaintiffs incorporate the foregoing paragraphs by reference as though set forth fully herein.

26.    On information and belief, Sidekick claims to own all rights, title, and interest in the '984 Patent. A true and correct copy of the '984 Patent is attached hereto as Exhibit 5.

27.    The '984 Patent has four independent claims: claims 1, 2, 21, and 39.

28.    Claim 1 of the '984 Patent recites (with emphasis added):

A method comprising:

storing, on a computer readable medium, automobile market data which is representative of recent automobile market characteristics, including at least pricing data and inventory data, wherein the automobile market data includes information received from at least one manufacturer, a plurality of dealers, and a plurality of consumers, wherein at least a portion of the automobile market data is updated in real-time;

receiving, via a consumer interface, a first request for a response regarding a first automobile, which is manufactured by a first manufacturer, the first request made by a consumer located at a first location and including geolocation information of the consumer;

executing instructions, by at least one processing device, to:

determine current inventory data of the first automobile, wherein the current inventory data of the first automobile includes a plurality of dealer inventories of a plurality of dealers, with each respective dealer of the plurality of dealers having a respective dealer inventory, and wherein the current inventory data indicates that a first dealer of the plurality of dealers does not currently have the first automobile in a first inventory of the first dealer;

provide first automobile market data including the current inventory data of the first automobile to the first manufacturer, based on the first request, via a manufacturer interface, wherein the first automobile market data is based on real-time automobile market data;

generate, based on the first automobile market data including the current inventory data of the first automobile, via the manufacturer interface, at least one of a verification indicating that the first automobile can be provided for the consumer, a confirmation indicating that the first automobile can be provided for the consumer, and an offer indicating that the first automobile can be provided for the consumer;

determine, using the geolocation information, that the consumer is located at the first location;

generate, based on the first location, an in-market dealer area proximately located to the first location;

determine that the first dealer is located at a second location within the in-market dealer area;

provide a first manufacturer response via the consumer interface, the first manufacturer response including the at least one of the verification indicating that the first automobile can be provided for the consumer, the confirmation indicating that the first automobile can be provided for the consumer, and the offer indicating that the first automobile can be provided for the consumer;

request, from the first dealer, via a dealer interface, an *inventoryless bid* to sell the first automobile based on the first manufacturer response;

receive, from the first dealer located at the second location and engaging in *inventoryless bidding*, the *inventoryless bid* to provide the first automobile, which is at least one of yet to be manufactured and in the inventory of another entity;

generate driving directions from the first location to the second location; and

provide the *inventoryless bid* and the driving directions to the consumer interface, the *inventoryless bid* including at least a price and a delivery option; and

receiving a consumer selection of the *inventoryless bid* including a first delivery option which specifies a pickup location at the first dealer, wherein the consumer selection indicates a consumer intention to purchase the first automobile.

29.    Claim 2 of the '984 Patent recites (with emphasis added):

A method comprising:

storing, on a computer readable medium, automobile market data which is representative of recent automobile market characteristics, including at least pricing data and inventory data, wherein the automobile market data includes information received from at least one manufacturer, a plurality of dealers, and a plurality of consumers;

receiving, via a consumer interface, a first request for a response regarding a first automobile, which is manufactured by a first manufacturer, the first request made by a consumer located at a first location and including geolocation information of the consumer;

executing instructions, by at least one processing device, to:

determine current inventory data of the first automobile, wherein the current inventory data of the first automobile includes a plurality of dealer inventories of a plurality of dealers, with each respective dealer of the plurality of dealers having a respective dealer inventory, and wherein the current inventory data indicates that a first dealer of the plurality of dealers does not currently have the first automobile in a first inventory of the first dealer;

provide first automobile market data including the current inventory data of the first automobile to the first manufacturer, based on the first request, via a manufacturer interface;

generate, based on the first automobile market data including the current inventory data of the first automobile, via the manufacturer interface, at least one of a verification indicating that the first automobile can be provided for the consumer, a confirmation indicating that the first automobile can be provided for the consumer, and an offer indicating that the first automobile can be provided for the consumer;

determine, using the geolocation information, that the consumer is located at the first location;

generate, based on the first location, an in-market dealer area proximately located to the first location;

determine that the first dealer is located at a second location within the in-market dealer area;

provide a first manufacturer response via the consumer interface, the first manufacturer response including the at least one of the verification indicating that the first automobile can be provided for the consumer, the confirmation indicating that the first automobile can be provided for the consumer, and the offer indicating that the first automobile can be provided for the consumer;

request, from the first dealer, via a dealer interface, an *inventoryless bid* to sell the first automobile based on the first manufacturer response;

receive, from the first dealer located at the second location and engaging in *inventoryless bidding*, the *inventoryless bid* to provide the first automobile, which is at least one of yet to be manufactured and in the inventory of another entity;

generate driving directions from the first location to the second location; and

provide the ***inventoryless bid*** and the driving directions to the consumer interface, the ***inventoryless bid*** including at least a price and a delivery option; and

receiving a consumer selection of the ***inventoryless bid*** including a first delivery option which specifies a pickup location at the first dealer.

30.  Claim 21 of the '984 Patent recites (with emphasis added):

A system comprising:

a computer readable medium storing automobile market data which is representative of recent automobile market characteristics, including at least pricing data and inventory data, wherein the automobile market data includes information received from at least one manufacturer, a plurality of dealers, and a plurality of consumers; and

at least one processing device operably coupled to the computer readable medium, the at least one processing device executing instructions to:

receive, via a consumer interface, a first request for a response regarding a first automobile, which is manufactured by a first manufacturer, the first request made by a consumer located at a first location and including geolocation information of the consumer;

determine current inventory data of the first automobile, wherein the current inventory data of the first automobile includes a plurality of dealer inventories of a plurality of dealers, with each respective dealer of the plurality of dealers having a respective dealer inventory, and wherein the current inventory data indicates that a first dealer of the plurality of dealers does not currently have the first automobile in a first inventory of the first dealer;

provide first automobile market data including the current inventory data of the first automobile to the first manufacturer, based on the first request, via a manufacturer interface;

generate, based on the first automobile market data including the current inventory data of the first automobile, via the manufacturer interface, at least one of a verification indicating that the first automobile can be provided for the consumer, a confirmation

indicating that the first automobile can be provided for the consumer, and an offer indicating that the first automobile can be provided for the consumer;

determine, using the geolocation information, that the consumer is located at the first location;

generate, based on the first location, an in-market dealer area proximately located to the first location;

determine that the first dealer is located at a second location within the in-market dealer area;

provide a first manufacturer response via the consumer interface, the first manufacturer response including the at least one of the verification indicating that the first automobile can be provided for the consumer, the confirmation indicating that the first automobile can be provided for the consumer, and the offer indicating that the first automobile can be provided for the consumer;

request, from the first dealer, via a dealer interface, an *inventoryless bid* to sell the first automobile based on the first manufacturer response;

receive, from the first dealer located at the second location and engaging in *inventoryless bidding*, the *inventoryless bid* to provide the first automobile, which is at least one of yet to be manufactured and in the inventory of another entity;

generate driving directions from the first location to the second location;

provide the *inventoryless bid* and the driving directions via the consumer interface, the *inventoryless bid* including at least a price and a delivery option; and

receive a consumer selection of the *inventoryless bid* including a first delivery option which specifies a pickup location at the first dealer.

31.    Claim 39 of the '984 Patent recites (with emphasis added):

A non-transitory computer readable medium storing software instructions which, when executed, cause an information processing apparatus to:

store automobile market data which is representative of recent automobile market characteristics, including at least pricing data

and inventory data, wherein the automobile market data includes information received from at least one manufacturer, a plurality of dealers, and a plurality of consumers;

receive, via a consumer interface, a first request for a response regarding a first automobile, which is manufactured by a first manufacturer, the first request made by a consumer located at a first location and including geolocation information of the consumer;

determine current inventory data of the first automobile, wherein the current inventory data of the first automobile includes a plurality of dealer inventories of a plurality of dealers, with each respective dealer of the plurality of dealers having a respective dealer inventory, and wherein the current inventory data indicates that a first dealer of the plurality of dealers does not currently have the first automobile in a first inventory of the first dealer;

provide first automobile market data including the current inventory data of the first automobile to the first manufacturer, based on the first request, via a manufacturer interface;

generate, based on the first automobile market data including the current inventory data of the first automobile, via the manufacturer interface, at least one of a verification indicating that the first automobile can be provided for the consumer, a confirmation indicating that the first automobile can be provided for the consumer, and an offer indicating that the first automobile can be provided for the consumer;

determine, using the geolocation information, that the consumer is located at the first location;

generate, based on the first location, an in-market dealer area proximately located to the first location;

determine that the first dealer is located at a second location within the in-market dealer area;

provide a first manufacturer response via the consumer interface, the first manufacturer response including the at least one of the verification indicating that the first automobile can be provided for the consumer, the confirmation indicating that the first automobile can be provided for the consumer, and the offer indicating that the first automobile can be provided for the consumer;

request, from the first dealer, via a dealer interface, an *inventoryless bid* to sell the first automobile based on the first manufacturer response;

receive, from the first dealer located at the second location and engaging in *inventoryless bidding*, the *inventoryless bid* to provide the first automobile, which is at least one of yet to be manufactured and in the inventory of another entity;

generate driving directions from the first location to the second location;

provide the *inventoryless bid* and the driving directions via the consumer interface, the *inventoryless bid* including at least a price and a delivery option; and

receive a consumer selection of the *inventoryless bid* including a first delivery option which specifies a pickup location at the first dealer.

32.     Plaintiffs do not directly or indirectly infringe the '984 Patent, either literally or under the doctrine of equivalents, at least because Plaintiffs' services do not employ, incorporate, or otherwise make use of "inventoryless" bidding as required by every claim of the '984 Patent.

33.     A substantial, immediate, and real controversy exists between Plaintiffs and Defendant regarding whether Plaintiffs infringe the '984 Patent by making, using, importing, offering for sale and selling the functionalities available at their websites and/or any corresponding mobile device application.  A judicial declaration is necessary to determine the parties' respective rights regarding the '984 Patent.

34.     Plaintiffs seek a judgment declaring that Plaintiffs do not infringe, either literally or under the doctrine of equivalents, one or more claims of the '984 Patent by making, using, importing, offering for sale and selling the functionalities available at their websites and/or any corresponding mobile device application, either directly under 35 U.S.C. § 271(a), or indirectly under 35 U.S.C. §§ 271(b) and (c).

**COUNT II**
**Declaratory Judgment of Non-infringement of the '925 Patent**

35.     Plaintiffs incorporate the foregoing paragraphs by reference as though set forth

fully herein.

36.     On information and belief, Sidekick claims to own all rights, title, and interest in

the '925 Patent.  A true and correct copy of the '925 Patent is attached hereto as Exhibit 6.

37.     The '925 Patent has seven independent claims: claims 1, 2, 22, 34, 54, 55, and 56.

38.     Claim 1 of the '925 Patent recites (with emphasis added):

A method comprising:

storing, on a computer readable medium, automobile market data
which is representative of recent automobile market characteristics,
including at least pricing data and inventory data, wherein the
automobile market data includes information received from at least
one manufacturer, a plurality of dealers, and a plurality of
consumers, wherein at least a portion of the automobile market
data is updated in real-time;

receiving, via a consumer interface, a first request for a response
regarding a first automobile, wherein the first request is made by a
consumer using a mobile device which takes a picture of a vehicle
identification number and the vehicle identification number is
recognized using optical character recognition;

causing at least one processing device to:

provide first automobile market data, based on the first request, via
a dealer interface, wherein the first automobile market data is
based on real-time automobile market data and actual sales data for
comparable automobiles within a predetermined time period and
within a predetermined geographic area;

request, via a dealer interface from at least two dealers, a bid to sell
the first automobile based on the first request, wherein the at least
two dealers engage in ***inventoryless bidding*** by providing a bid on
the first automobile when the first automobile is at least one of yet
to be manufactured and in the inventory of another entity;

provide the response including at least two bids via the consumer
interface, the at least two bids each including at least a price and a

delivery option for the first automobile, the at least two bids based on the first automobile market data; and

receiving a consumer selection of a first bid including a first delivery option which specifies a first pickup location at a first dealer and a second delivery option which specifies a different second pickup location, wherein the consumer selection indicates a consumer intention to purchase the first automobile based on the first bid and specifies one of the first delivery option and the second delivery option, wherein the first bid is an ***inventoryless bid*** requiring the first automobile to be at least one of manufactured and transferred from the inventory of another entity to the first dealer.

39.    Claim 2 of the '925 Patent recites (with emphasis added):

A method comprising:

storing, on a computer readable medium, automobile market data which is representative of recent automobile market characteristics, including at least pricing data and inventory data, wherein the automobile market data includes information received from a plurality of dealers and a plurality of consumers;

receiving, via a consumer interface, a first request for a response regarding a first automobile, the first request including a vehicle identification number;

causing at least one processing device to:

provide first automobile market data, based on the first request, via a dealer interface, wherein the first automobile market data is based on real-time automobile market data and actual sales data for comparable automobiles within a predetermined time period and within a predetermined geographic area;

request, via a dealer interface from at least two dealers, a bid to sell the first automobile based on the first request;

provide the response including at least two bids via the consumer interface, the at least two bids each including at least a price and a ***delivery option*** for the first automobile, the at least two bids based on the first automobile market data; and

receiving a consumer selection of a first bid including a first ***delivery option*** which specifies a first pickup location at a first dealer and a second delivery option which specifies a different second pickup location, wherein the consumer selection indicates a

consumer intention to one of purchase the first automobile and lease the first automobile based on the first bid and specifies one of the first delivery option and the second delivery option.

40. Claim 22 of the '925 Patent recites (with emphasis added):

A method comprising:

storing, on a computer readable medium, automobile market data which is representative of recent automobile market characteristics, including at least pricing data and inventory data, wherein the automobile market data includes information received from a plurality of dealers and a plurality of consumers;

receiving, via a consumer interface, a first request for a response regarding a first automobile, the first request including data provided with at least one graphical user interface component;

causing at least one processing device to:

provide first automobile market data, based on the first request, via a dealer interface, wherein the first automobile market data is based on real-time automobile market data and actual sales data for comparable automobiles within a predetermined time period and within a predetermined geographic area;

request, via a dealer interface from at least two dealers, a bid to sell the first automobile based on the first request;

provide the response including at least two bids via the consumer interface, the at least two bids each including at least a price and a ***delivery option*** for the first automobile, the at least two bids based on the first automobile market data; and

receiving a consumer selection of a first bid including a first ***delivery option*** which specifies a first pickup location at a first dealer and a second ***delivery option*** which specifies a different second pickup location, wherein the consumer selection indicates a consumer intention to one of purchase the first automobile and lease the first automobile based on the first bid and specifies one of the first ***delivery option*** and the second ***delivery option***.

41. Claim 34 of the '925 Patent recites (with emphasis added):

A system comprising:

a computer readable medium storing automobile market data which is representative of recent automobile market characteristics,

including at least pricing data and inventory data, wherein the automobile market data includes information received from a plurality of dealers and a plurality of consumers;

at least one processing device operably coupled to the computer readable medium, the at least one processing device executing instructions to:

receive, via a consumer interface, a first request for a response regarding a first automobile, the first request including a vehicle identification number;

provide first automobile market data, based on the first request, via a dealer interface, wherein the first automobile market data is based on real-time automobile market data and actual sales data for comparable automobiles within a predetermined time period and within a predetermined geographic area;

request, via a dealer interface from at least two dealers, a bid to sell the first automobile based on the first request;

provide the response including at least two bids via the consumer interface, the at least two bids each including at least a price and a *delivery option* for the first automobile, the at least two bids based on the first automobile market data; and

receive a consumer selection of a first bid including a first *delivery option* which specifies a first pickup location at a first dealer and a second *delivery option* which specifies a different second pickup location, wherein the consumer selection indicates a consumer intention to one of purchase the first automobile and lease the first automobile based on the first bid and specifies one of the first *delivery option* and the second *delivery option*.

42.    Claim 54 of the '925 Patent recites (with emphasis added):

A system comprising:

a computer readable medium storing automobile market data which is representative of recent automobile market characteristics, including at least pricing data and inventory data, wherein the automobile market data includes information received from a plurality of dealers and a plurality of consumers;

at least one processing device operably coupled to the computer readable medium, the at least one processing device executing instructions to:

receive, via a consumer interface, a first request for a response regarding a first automobile, the first request including data provided with at least one graphical user interface component;

provide first automobile market data, based on the first request, via a dealer interface, wherein the first automobile market data is based on real-time automobile market data and actual sales data for comparable automobiles within a predetermined time period and within a predetermined geographic area;

request, via a dealer interface from at least two dealers, a bid to sell the first automobile based on the first request;

provide the response including at least two bids via the consumer interface, the at least two bids each including at least a price and a *delivery option* for the first automobile, the at least two bids based on the first automobile market data; and

receive a consumer selection of a first bid including a first *delivery option* which specifies a first pickup location at a first dealer and a second *delivery option* which specifies a different second pickup location, wherein the consumer selection indicates a consumer intention to one of purchase the first automobile and lease the first automobile based on the first bid and specifies one of the first *delivery option* and the second *delivery option*.

43.    Claim 55 of the '925 Patent recites (with emphasis added):

A non-transitory computer readable medium storing software instructions which, when executed, cause an information processing apparatus to:

store automobile market data which is representative of recent automobile market characteristics, including at least pricing data and inventory data, wherein the automobile market data includes information received from a plurality of dealers and a plurality of consumers;

receive, via a consumer interface, a first request for a response regarding a first automobile, the first request including a vehicle identification number;

provide first automobile market data, based on the first request, via a dealer interface, wherein the first automobile market data is based on real-time automobile market data and actual sales data for comparable automobiles within a predetermined time period and within a predetermined geographic area;

request, via a dealer interface from at least two dealers, a bid to sell the first automobile based on the first request;

provide the response including at least two bids via the consumer interface, the at least two bids each including at least a price and a ***delivery option*** for the first automobile, the at least two bids based on the first automobile market data; and

receive a consumer selection of a first bid including a first ***delivery option*** which specifies a first pickup location at a first dealer and a second ***delivery option*** which specifies a different second pickup location, wherein the consumer selection indicates a consumer intention to one of purchase the first automobile and lease the first automobile based on the first bid and specifies one of the first ***delivery option*** and the second ***delivery option***.

44.    Claim 56 of the '925 Patent recites (with emphasis added):

A non-transitory computer readable medium storing software instructions which, when executed, cause an information processing apparatus to:

store automobile market data which is representative of recent automobile market characteristics, including at least pricing data and inventory data, wherein the automobile market data includes information received from a plurality of dealers and a plurality of consumers;

receive, via a consumer interface, a first request for a response regarding a first automobile, the first request including data provided with at least one graphical user interface component;

provide first automobile market data, based on the first request, via a dealer interface, wherein the first automobile market data is based on real-time automobile market data and actual sales data for comparable automobiles within a predetermined time period and within a predetermined geographic area;

request, via a dealer interface from at least two dealers, a bid to sell the first automobile based on the first request;

provide the response including at least two bids via the consumer interface, the at least two bids each including at least a price and a ***delivery option*** for the first automobile, the at least two bids based on the first automobile market data; and

receive a consumer selection of a first bid including a first ***delivery option*** which specifies a first pickup location at a first dealer and a

second *delivery option* which specifies a different second pickup location, wherein the consumer selection indicates a consumer intention to one of purchase the first automobile and lease the first automobile based on the first bid and specifies one of the first *delivery option* and the second *delivery option*.

45.     Plaintiffs do not directly or indirectly infringe the '925 Patent, either literally or under the doctrine of equivalents, at least because Plaintiffs' services: (1) do not employ, incorporate, or otherwise make use of "inventoryless" bidding as required by independent claim 1 of the '925 Patent and any claims depending therefrom; (2) do not employ, incorporate, or otherwise make use of specifying one of the first delivery option and the second delivery option as required by independent claims 2, 22, 34, and 54-56 of the '925 Patent and any claims depending therefrom.

46.     A substantial, immediate, and real controversy exists between Plaintiffs and Defendant regarding whether Plaintiffs infringe the '925 Patent by making, using, importing, offering for sale and selling the functionalities available at their websites and/or any corresponding mobile device application.  A judicial declaration is necessary to determine the parties' respective rights regarding the '925 Patent.

47.     Plaintiffs seek a judgment declaring that Plaintiffs do not infringe, either literally or under the doctrine of equivalents, one or more claims of the '925 Patent by making, using, importing, offering for sale and selling the functionalities available at their websites and/or any corresponding mobile device application, either directly under 35 U.S.C. § 271(a), or indirectly under 35 U.S.C. §§ 271(b) and (c).

**COUNT III**
**Declaratory Judgment of Non-infringement of the '093 Patent**

48.     Plaintiffs incorporate the foregoing paragraphs by reference as though set forth fully herein.

49.    On information and belief, Sidekick claims to own all rights, title, and interest in the '093 Patent.  A true and correct copy of the '093 Patent is attached hereto as Exhibit 7.

50.    The '093 Patent has two independent claims: claims 1 and 11.

51.    Claim 1 of the '093 Patent recites (with emphasis added):

A method comprising:

storing, on a computer readable medium, automobile market data which is representative of recent automobile market characteristics, including at least pricing data and inventory data, wherein the automobile market data includes information received from at least one manufacturer, a plurality of dealers, and a plurality of consumers, wherein at least a portion of the automobile market data is updated in real-time;

receiving, via a used automobile consumer seller interface, a first request for a response regarding a first used automobile, wherein the first request is made by a consumer seller using a mobile device which takes a picture of a vehicle identification number and the vehicle identification number is recognized using optical character recognition, and the first request includes data provided with at least one graphical user interface component;

causing at least one processing device to:

provide first automobile market data, based on the first request, via a used automobile buyer interface, wherein the first automobile market data is based on real-time automobile market data and actual sales data for comparable automobiles within a specified time period and within a specified geographic area;

***request, via the used automobile buyer interface from at least two used automobile buyers, a bid to purchase the first used automobile*** based on the first request, wherein the at least two used automobile buyers include at least one dealer and at least one consumer;

provide the response including at least two bids via the used automobile consumer seller interface, the at least two bids each including at least a price and a delivery option for the first used automobile, the at least two bids based on the first automobile market data; and

receiving a consumer seller selection of a first bid including a first
delivery option which specifies a first pickup location and a second
delivery option which specifies a different second pickup location,
wherein the consumer seller selection indicates a consumer seller
intention to sell the first used automobile based on the first bid to a
first used automobile buyer and specifies one of the first delivery
option and the second delivery option

52.    Claim 11 of the '093 Patent recites (with emphasis added):

A system comprising:

a computer readable medium storing automobile market data
which is representative of recent automobile market characteristics,
including at least pricing data and inventory data, wherein the
automobile market data includes information received from at least
one manufacturer, a plurality of dealers, and a plurality of
consumers, wherein at least a portion of the automobile market
data is updated in real-time;

at least one processing device operably coupled to the computer
readable medium, the at least one processing device executing
instructions to:

receive, via a used automobile consumer seller interface, a first
request for a response regarding a first used automobile, wherein
the first request is made by a consumer seller using a mobile
device which takes a picture of a vehicle identification number and
the vehicle identification number is recognized using optical
character recognition, and the first request includes data provided
with at least one graphical user interface component;

provide first automobile market data, based on the first request, via
a used automobile buyer interface, wherein the first automobile
market data is based on real-time automobile market data and
actual sales data for comparable automobiles within a specified
time period and within a specified geographic area;

***request, via the used automobile buyer interface from at least two
used automobile buyers, a bid to purchase the first used
automobile*** based on the first request, wherein the at least two used
automobile buyers include at least one dealer and at least one
consumer;

provide the response including at least two bids via the used
automobile consumer seller interface, the at least two bids each
including at least a price and a delivery option for the first used

automobile, the at least two bids based on the first automobile market data; and

receive a consumer seller selection of a first bid including a first delivery option which specifies a first pickup location and a second delivery option which specifies a different second pickup location, wherein the consumer seller selection indicates a consumer seller intention to sell the first used automobile based on the first bid to a first used automobile buyer and specifies one of the first delivery option and the second delivery option.

53.     Plaintiffs do not directly or indirectly infringe the '093 Patent, either literally or under the doctrine of equivalents, at least because Plaintiffs' services do not request, via the used automobile buyer interface from at least two used automobile buyers, a bid to purchase the first used automobile as required by every claim of the '093 Patent.

54.     A substantial, immediate, and real controversy exists between Plaintiffs and Defendant regarding whether Plaintiffs infringe the '093 Patent by making, using, importing, offering for sale and selling the functionalities available at their websites and/or any corresponding mobile device application.  A judicial declaration is necessary to determine the parties' respective rights regarding the '093 Patent.

55.     Plaintiffs seek a judgment declaring that Plaintiffs do not infringe, either literally or under the doctrine of equivalents, one or more claims of the '093 Patent by making, using, importing, offering for sale and selling the functionalities available at their websites and/or any corresponding mobile device application, either directly under 35 U.S.C. § 271(a), or indirectly under 35 U.S.C. §§ 271(b) and (c).

### COUNT IV
### Declaratory Judgment of Non-infringement of the '075 Patent

56.     Plaintiffs incorporate the foregoing paragraphs by reference as though set forth fully herein.

57.     On information and belief, Sidekick claims to own all rights, title, and interest in the '075 Patent.  A true and correct copy of the '075 Patent is attached hereto as Exhibit 8.

58.     The '075 Patent has three independent claims: claims 1, 17, and 18.

59.     Claim 1 of the '075 Patent recites (with emphasis added):

A method comprising:

storing, on a computer readable medium, automobile market data which is representative of recent automobile market characteristics, including at least pricing data, wherein the automobile market data includes information received from at least a plurality of consumers;

receiving, via a used automobile consumer seller interface, a first request for a response regarding a first used automobile, the first request made by a consumer used automobile seller located at a first location and including a vehicle identification number and geolocation information of the consumer used automobile seller;

executing instructions, by at least one processing device, to:

determine, using on the geolocation information, that the consumer used automobile seller is located at the first location;

generate, based on the determined first location, an in-market used automobile buyer area;

determine that at least one used automobile buyer is located within the in-market used automobile buyer area;

provide first automobile market data, based on the first request, via a used automobile buyer interface;

request, via the used automobile buyer interface from the at least one used automobile buyer, a bid to purchase the first used automobile based on the first request;

receive, via the used automobile buyer interface, at least one bid from at least one used automobile buyer, the at least one bid including a first bid from a first used automobile buyer located at a second location within the in-market used automobile buyer area;

***generate, based on receiving the first bid, driving directions*** from the first location to the second location; and

provide the response including the first bid via the used automobile consumer seller interface, the first bid including at least a price for the first used automobile, and the response including the ***driving directions*** from the first location to the second location; and

receiving a consumer used automobile seller selection of the first bid, wherein the consumer used automobile seller selection indicates a consumer used automobile seller intention to sell the first used automobile based on the first bid to the first used automobile buyer.

60.    Claim 17 of the '075 Patent recites (with emphasis added):

A system comprising:

a computer readable medium storing automobile market data which is representative of recent automobile market characteristics, including at least pricing data, wherein the automobile market data includes information received from at least a plurality of consumers;

at least one processing device operably coupled to the computer readable medium, the at least one processing device executing instructions to:

receive, via a used automobile consumer seller interface, a first request for a response regarding a first used automobile, the first request made by a consumer used automobile seller located at a first location and including a vehicle identification number and geolocation information of the consumer used automobile seller;

determine, using on the geolocation information, that the consumer used automobile seller is located at the first location;

generate, based on the determined first location, an in-market used automobile buyer area;

determine that at least one used automobile buyer is located within the in-market used automobile buyer area;

provide first automobile market data, based on the first request, via a used automobile buyer interface;

request, via the used automobile buyer interface from the at least one used automobile buyer, a bid to purchase the first used automobile based on the first request;

receive, via the used automobile buyer interface, at least one bid from at least one used automobile buyer, the at least one bid including a first bid from a first used automobile buyer located at a second location within the in-market used automobile buyer area;

***generate, based on receiving the first bid, driving directions*** from the first location to the second location; and

provide the response including the first bid via the used automobile consumer seller interface, the first bid including at least a price for the first used automobile, and the response including the ***driving directions*** from the first location to the second location; and

receive a consumer used automobile seller selection of the first bid, wherein the consumer used automobile seller selection indicates a consumer used automobile seller intention to sell the first used automobile based on the first bid to the first used automobile buyer.

61.    Claim 18 of the '075 Patent recites (with emphasis added):

A non-transitory computer readable medium storing instructions which, when executed, are configured to cause an information processing apparatus to:

store automobile market data which is representative of recent automobile market characteristics, including at least pricing data, wherein the automobile market data includes information received from at least a plurality of consumers;

receive, via a used automobile consumer seller interface, a first request for a response regarding a first used automobile, the first request made by a consumer used automobile seller located at a first location and including a vehicle identification number and geolocation information of the consumer used automobile seller;

determine, using on the geolocation information, that the consumer used automobile seller is located at the first location;

generate, based on the determined first location, an in-market used automobile buyer area;

determine that at least one used automobile buyer is located within the in-market used automobile buyer area;

provide first automobile market data, based on the first request, via a used automobile buyer interface;

request, via the used automobile buyer interface from the at least one used automobile buyer, a bid to purchase the first used automobile based on the first request;

receive, via the used automobile buyer interface, at least one bid from at least one used automobile buyer, the at least one bid including a first bid from a first used automobile buyer located at a second location within the in-market used automobile buyer area;

**generate, based on receiving the first bid, driving directions** from the first location to the second location; and

provide the response including the first bid via the used automobile consumer seller interface, the first bid including at least a price for the first used automobile, and the response including the **driving directions** from the first location to the second location; and

receive a consumer used automobile seller selection of the first bid, wherein the consumer used automobile seller selection indicates a consumer used automobile seller intention to sell the first used automobile based on the first bid to the first used automobile buyer.

62.     Plaintiffs do not directly or indirectly infringe the '075 Patent, either literally or under the doctrine of equivalents, at least because Plaintiffs' services do not employ, incorporate, or otherwise make use of generating, based on receiving the first bid, driving directions from the first location to the second location as required by every claim of the '075 Patent.

63.     A substantial, immediate, and real controversy exists between Plaintiffs and Defendant regarding whether Plaintiffs infringe the '075 Patent by making, using, importing, offering for sale and selling the functionalities available at their websites and/or any corresponding mobile device application.  A judicial declaration is necessary to determine the parties' respective rights regarding the '075 Patent.

64.     Plaintiffs seek a judgment declaring that Plaintiffs do not infringe, either literally or under the doctrine of equivalents, one or more claims of the '075 Patent by making, using, importing, offering for sale and selling the functionalities available at their websites and/or any

corresponding mobile device application, either directly under 35 U.S.C. § 271(a), or indirectly under 35 U.S.C. §§ 271(b) and (c).

<div align="center">

**COUNT V**
**<u>Declaratory Judgment of Non-infringement of the '216 Patent</u>**

</div>

65.    Plaintiffs incorporate the foregoing paragraphs by reference as though set forth fully herein.

66.    On information and belief, Sidekick claims to own all rights, title, and interest in the '216 Patent.  A true and correct copy of the '216 Patent is attached hereto as Exhibit 9.

67.    The '216 Patent has three independent claims: claims 1, 24, and 25.

68.    Claim 1 of the '216 Patent recites (with emphasis added):

A method comprising:

storing, on a computer readable medium, automobile market data which is representative of recent automobile market characteristics, including at least pricing data and inventory data, wherein the automobile market data includes information received from a plurality of dealers and a plurality of consumers;

receiving, via a consumer interface, a first request for a response regarding a first automobile, the first request made by a consumer located at a first location and including geolocation information of the consumer;

executing instructions, by at least one processing device, to:

***determine, using the information, that the consumer is located at the first location***;

***determine, based on a determination that the consumer is located at the first location, that the consumer is located at a first dealer***;

generate, based on the first dealer, an in-market dealer area proximately located to the first dealer;

determine that a second dealer is located at a second location within the in-market dealer area;

provide first automobile market data to the second dealer, based on the first request, via a dealer interface;

request, via the dealer interface from the second dealer, a bid to sell the first automobile based on the first request; and

receive, via the dealer interface, a first bid from the second dealer located at the second location within the in-market dealer area;

generate, based on receiving the first bid, driving directions from the first location to the second location;

provide the response including the first bid via the consumer interface, the first bid including at least a price for the first automobile, and the response including the driving directions from the first location to the second location; and

receiving a consumer selection of the first bid.

69.    Claim 24 of the '216 Patent recites (with emphasis added):

A system comprising:

a computer readable medium storing automobile market data which is representative of recent automobile market characteristics, including at least pricing data and inventory data, wherein the automobile market data includes information received from a plurality of dealers and a plurality of consumers; and

at least one processing device operably coupled to the computer readable medium, the at least one processing device executing instructions to:

receive, via a consumer interface, a first request for a response regarding a first automobile, the first request made by a consumer located at a first location and including geolocation information of the consumer;

***determine, using the information, that the consumer is located at the first location;***

***determine, based on a determination that the consumer is located at the first location, that the consumer is located at a first dealer;***

generate, based on the first dealer, an in-market dealer area proximately located to the first dealer;

determine that a second dealer is located at a second location within the in-market dealer area;

provide first automobile market data to the second dealer, based on the first request, via a dealer interface;

request, via the dealer interface from the second dealer, a bid to sell the first automobile based on the first request;

receive, via the dealer interface, a first bid from the second dealer located at the second location within the in-market dealer area;

generate, based on receiving the first bid, driving directions from the first location to the second location;

provide the response including the first bid via the consumer interface, the first bid including at least a price for the first automobile, and the response including the driving directions from the first location to the second location; and

receiving a consumer selection of the first bid.

70.    Claim 25 of the '216 Patent recites (with emphasis added):

A non-transitory computer readable medium storing instructions which, when executed, are configured to cause an information processing apparatus to:

store automobile market data which is representative of recent automobile market characteristics, including at least pricing data and inventory data, wherein the automobile market data includes information received from a plurality of dealers and a plurality of consumers;

receive, via a consumer interface, a first request for a response regarding a first automobile, the first request made by a consumer located at a first location and including geolocation information of the consumer;

***determine, using the geolocation information, that the consumer is located at the first location;***

***determine, based on a determination that the consumer is located at the first location, that the consumer is located at a first dealer;***

generate, based on the first dealer, an in-market dealer area proximately located to the first dealer;

determine that a second dealer is located at a second location within the in-market dealer area;

provide first automobile market data to the second dealer, based on
the first request, via a dealer interface;

request, via the dealer interface from the second dealer, a bid to
sell the first automobile based on the first request;

receive, via the dealer interface, a first bid from the second dealer
located at the second location within the in-market dealer area;

generate, based on receiving the first bid, driving directions from
the first location to the second location;

provide the response including the first bid via the consumer
interface, the first bid including at least a price for the first
automobile, and the response including the driving directions from
the first location to the second location; and

receive a consumer selection of the first bid.

71.    Plaintiffs do not directly or indirectly infringe the '216 Patent, either literally or

under the doctrine of equivalents, at least because Plaintiffs' services do not employ, incorporate,

or otherwise make use of determining, based on a determination that the consumer is located at

the first location, that the consumer is located at a first dealer as required by every claim of the

'216 Patent.

72.    A substantial, immediate, and real controversy exists between Plaintiffs and

Defendant regarding whether Plaintiffs infringe the '216 Patent by making, using, importing,

offering for sale and selling the functionalities available at their websites and/or any

corresponding mobile device application.  A judicial declaration is necessary to determine the

parties' respective rights regarding the '216 Patent.

73.    Plaintiffs seek a judgment declaring that Plaintiffs do not infringe, either literally

or under the doctrine of equivalents, one or more claims of the '216 Patent by making, using,

importing, offering for sale and selling the functionalities available at their websites and/or any

corresponding mobile device application, either directly under 35 U.S.C. § 271(a), or indirectly under 35 U.S.C. §§ 271(b) and (c).

## COUNT VI
## <u>Declaratory Judgment of Non-infringement of the '467 Patent</u>

74.     Plaintiffs incorporate the foregoing paragraphs by reference as though set forth fully herein.

75.     On information and belief, Sidekick claims to own all rights, title, and interest in the '467 Patent.  A true and correct copy of the '467 Patent is attached hereto as Exhibit 10.

76.     The '467 Patent has three independent claims: claims 1, 19, and 20.

77.     Claim 1 of the '467 Patent recites (with emphasis added):

A method comprising:

receiving, via a used automobile consumer seller interface, a first request for a response regarding a first used automobile, the first request made by a consumer used automobile seller located at a first location and including a vehicle identifier and geolocation information of the consumer used automobile seller;

executing instructions, by at least one processing device, to:

***determine, based on the geolocation information, that the consumer used automobile seller is located at the first location;***

generate, based on the determined first location, an in-market used automobile buyer area;

determine that at least one used automobile buyer is located within the in-market used automobile buyer area;

receive, via a used automobile buyer interface, a first bid from a first used automobile buyer located at a second location within the in-market used automobile buyer area;

generate, based on receiving the first bid, ***driving directions*** from the first location to the second location; and

provide, via the used automobile consumer seller interface, the first bid including at least a price for the first used automobile and the ***driving directions*** from the first location to the second location.

78.    Claim 19 of the '467 Patent recites (with emphasis added):

A system comprising:

a computer readable medium storing instructions;

at least one processing device operably coupled to the computer readable medium, the at least one processing device executing the instructions to:

receive, via a used automobile consumer seller interface, a first request for a response regarding a first used automobile, the first request made by a consumer used automobile seller located at a first location and including a vehicle identifier and geolocation information of the consumer used automobile seller;

***determine, based on the geolocation information, that the consumer used automobile seller is located at the first location;***

generate, based on the determined first location, an in-market used automobile buyer area;

determine that at least one used automobile buyer is located within the in-market used automobile buyer area;

receive, via a used automobile buyer interface, a first bid from a first used automobile buyer located at a second location within the in-market used automobile buyer area;

generate, based on receiving the first bid, ***driving directions*** from the first location to the second location; and

provide, via the used automobile consumer seller interface, the first bid including at least a price for the first used automobile and the ***driving directions*** from the first location to the second location.

79.    Claim 20 of the '467 Patent recites (with emphasis added):

A non-transitory computer readable medium storing instructions which, when executed, are configured to cause an information processing apparatus to:

receive, via a used automobile consumer seller interface, a first request for a response regarding a first used automobile, the first request made by a consumer used automobile seller located at a first location and including a vehicle identifier and geolocation information of the consumer used automobile seller;

> *determine, based on the geolocation information, that the consumer used automobile seller is located at the first location;*
>
> generate, based on the determined first location, an in-market used automobile buyer area;
>
> determine that at least one used automobile buyer is located within the in-market used automobile buyer area;
>
> receive, via a used automobile buyer interface, a first bid from a first used automobile buyer located at a second location within the in-market used automobile buyer area;
>
> generate, based on receiving the first bid, *driving directions* from the first location to the second location; and
>
> provide, via the used automobile consumer seller interface, the first bid including at least a price for the first used automobile and the *driving directions* from the first location to the second location.

80.    Plaintiffs do not directly or indirectly infringe the '467 Patent, either literally or under the doctrine of equivalents, at least because Plaintiffs' services: (1) do not employ, incorporate, or otherwise make use of determining, based on the geolocation information, that the consumer used automobile seller is located at the first location as required by every claim of the '467 Patent; and (2) do not employ, incorporate, or otherwise make use of "driving directions" as required by every claim of the '467 Patent.

81.    A substantial, immediate, and real controversy exists between Plaintiffs and Defendant regarding whether Plaintiffs infringe the '467 Patent by making, using, importing, offering for sale and selling the functionalities available at their websites and/or any corresponding mobile device application.  A judicial declaration is necessary to determine the parties' respective rights regarding the '467 Patent.

82.    Plaintiffs seek a judgment declaring that Plaintiffs do not infringe, either literally or under the doctrine of equivalents, one or more claims of the '467 Patent by making, using, importing, offering for sale and selling the functionalities available at their websites and/or any

corresponding mobile device application, either directly under 35 U.S.C. § 271(a), or indirectly under 35 U.S.C. §§ 271(b) and (c).

## COUNT VII
### Declaratory Judgment of Non-infringement of the '897 Patent

83.     Plaintiffs incorporate the foregoing paragraphs by reference as though set forth fully herein.

84.     On information and belief, Sidekick claims to own all rights, title, and interest in the '897 Patent.  A true and correct copy of the '897 Patent is attached hereto as Exhibit 11.

85.     The '897 Patent has three independent claims: claims 1, 39, and 40.

86.     Claim 1 of the '897 Patent recites (with emphasis added):

1. A method comprising:

storing, on a computer readable medium, automobile market data which is representative of recent automobile market characteristics, including at least pricing data and inventory data, wherein the automobile market data includes information received from at least one manufacturer, a plurality of dealers, and a plurality of consumers, wherein at least a portion of the automobile market data is updated in real-time;

receiving, via a consumer interface, a first request for a response regarding a first automobile, which is manufactured by a first manufacturer, the first request made by a consumer located at a first location and including geolocation information of the consumer;

executing instructions, by at least one processing device, to:

determine current inventory data of the first automobile, wherein the current inventory data of the first automobile includes a plurality of dealer inventories of a plurality of dealers, with each respective dealer of the plurality of dealers having a respective dealer inventory, and wherein the current inventory data indicates that a first dealer of the plurality of dealers does not currently have the first automobile in a first inventory of the first dealer;

provide first automobile market data including the current inventory data of the first automobile to the first manufacturer,

based on the first request, via a manufacturer interface, wherein the first automobile market data is based on real-time automobile market data;

generate, based on the first automobile market data including the current inventory data of the first automobile, via the manufacturer interface, at least one of a verification indicating that the first automobile can be provided for the consumer, a confirmation indicating that the first automobile can be provided for the consumer, and an offer indicating that the first automobile can be provided for the consumer;

determine, using the geolocation information, that the consumer is located at the first location;

generate, based on the first location, an in-market dealer area proximately located to the first location;

determine that the first dealer is located at a second location within the in-market dealer area;

provide a first manufacturer response via the consumer interface, the first manufacturer response including the at least one of the verification indicating that the first automobile can be provided for the consumer, the confirmation indicating that the first automobile can be provided for the consumer, and the offer indicating that the first automobile can be provided for the consumer;

request, from the first dealer, via a dealer interface, an ***inventoryless bid*** to sell the first automobile based on the first manufacturer response;

receive, from the first dealer located at the second location and engaging in ***inventoryless bidding***, the ***inventoryless bid*** to provide the first automobile, which is at least one of yet to be manufactured and in the inventory of another entity;

generate driving directions from the first location to the second location; and

provide the ***inventoryless bid*** and the driving directions to the consumer interface, the ***inventoryless bid*** including at least a price and a delivery option; and

receiving a consumer selection of the ***inventoryless bid*** including a first delivery option which specifies a pickup location at the first dealer, wherein the consumer selection indicates a consumer intention to purchase the first automobile.

87.    Claim 39 of the '897 Patent recites (with emphasis added):

A system comprising:

a computer readable medium storing automobile market data which is representative of recent automobile market characteristics, including at least pricing data and inventory data, wherein the automobile market data includes information received from at least one manufacturer, a plurality of dealers, and a plurality of consumers; and

at least one processing device operably coupled to the computer readable medium, the at least one processing device executing instructions to:

receive, via a consumer interface, a first request for a response regarding a first automobile, which is manufactured by a first manufacturer, the first request made by a consumer located at a first location and including geolocation information of the consumer;

determine current inventory data of the first automobile, wherein the current inventory data of the first automobile includes a plurality of dealer inventories of a plurality of dealers, with each respective dealer of the plurality of dealers having a respective dealer inventory, and wherein the current inventory data indicates that a first dealer of the plurality of dealers does not currently have the first automobile in a first inventory of the first dealer;

provide first automobile market data including the current inventory data of the first automobile to the first manufacturer, based on the first request, via a manufacturer interface;

generate, based on the first automobile market data including the current inventory data of the first automobile, via the manufacturer interface, at least one of a verification indicating that the first automobile can be provided for the consumer, a confirmation indicating that the first automobile can be provided for the consumer, and an offer indicating that the first automobile can be provided for the consumer;

determine, using the geolocation information, that the consumer is located at the first location;

generate, based on the first location, an in-market dealer area proximately located to the first location;

determine that the first dealer is located at a second location within the in-market dealer area;

provide a first manufacturer response via the consumer interface, the first manufacturer response including the at least one of the verification indicating that the first automobile can be provided for the consumer, the confirmation indicating that the first automobile can be provided for the consumer, and the offer indicating that the first automobile can be provided for the consumer;

request, from the first dealer, via a dealer interface, an ***inventoryless bid*** to sell the first automobile based on the first manufacturer response;

receive, from the first dealer located at the second location and engaging in ***inventoryless bidding***, the ***inventoryless bid*** to provide the first automobile, which is at least one of yet to be manufactured and in the inventory of another entity;

generate driving directions from the first location to the second location;

provide the ***inventoryless bid*** and the driving directions via the consumer interface, the ***inventoryless bid*** including at least a price and a delivery option; and

receive a consumer selection of the ***inventoryless bid*** including a first delivery option which specifies a pickup location at the first dealer.

88.    Claim 40 of the '897 Patent recites (with emphasis added):

A non-transitory computer readable medium storing software instructions which, when executed, cause an information processing apparatus to:

store automobile market data which is representative of recent automobile market characteristics, including at least pricing data and inventory data, wherein the automobile market data includes information received from at least one manufacturer, a plurality of dealers, and a plurality of consumers;

receive, via a consumer interface, a first request for a response regarding a first automobile, which is manufactured by a first manufacturer, the first request made by a consumer located at a first location and including geolocation information of the consumer;

determine current inventory data of the first automobile, wherein the current inventory data of the first automobile includes a plurality of dealer inventories of a plurality of dealers, with each respective dealer of the plurality of dealers having a respective dealer inventory, and wherein the current inventory data indicates that a first dealer of the plurality of dealers does not currently have the first automobile in a first inventory of the first dealer;

provide first automobile market data including the current inventory data of the first automobile to the first manufacturer, based on the first request, via a manufacturer interface;

generate, based on the first automobile market data including the current inventory data of the first automobile, via the manufacturer interface, at least one of a verification indicating that the first automobile can be provided for the consumer, a confirmation indicating that the first automobile can be provided for the consumer, and an offer indicating that the first automobile can be provided for the consumer;

determine, using the geolocation information, that the consumer is located at the first location;

generate, based on the first location, an in-market dealer area proximately located to the first location;

determine that the first dealer is located at a second location within the in-market dealer area;

provide a first manufacturer response via the consumer interface, the first manufacturer response including the at least one of the verification indicating that the first automobile can be provided for the consumer, the confirmation indicating that the first automobile can be provided for the consumer, and the offer indicating that the first automobile can be provided for the consumer;

request, from the first dealer, via a dealer interface, an *inventoryless bid* to sell the first automobile based on the first manufacturer response;

receive, from the first dealer located at the second location and engaging in *inventoryless bidding*, the *inventoryless bid* to provide the first automobile, which is at least one of yet to be manufactured and in the inventory of another entity;

generate driving directions from the first location to the second location;

provide the *inventoryless bid* and the driving directions via the consumer interface, the *inventoryless bid* including at least a price and a delivery option; and

receive a consumer selection of the *inventoryless bid* including a first delivery option which specifies a pickup location at the first dealer.

89.     Plaintiffs do not directly or indirectly infringe the '897 Patent, either literally or under the doctrine of equivalents, at least because Plaintiffs' services do not employ, incorporate, or otherwise make use of "inventoryless" bidding as required by every claim of the '897 Patent.

90.     A substantial, immediate, and real controversy exists between Plaintiffs and Defendant regarding whether Plaintiffs infringe the '897 Patent by making, using, importing, offering for sale and selling the functionalities available at their websites and/or any corresponding mobile device application.  A judicial declaration is necessary to determine the parties' respective rights regarding the '897 Patent.

91.     Plaintiffs seek a judgment declaring that Plaintiffs do not infringe, either literally or under the doctrine of equivalents, one or more claims of the '897 Patent by making, using, importing, offering for sale and selling the functionalities available at their websites and/or any corresponding mobile device application, either directly under 35 U.S.C. § 271(a), or indirectly under 35 U.S.C. §§ 271(b) and (c).

**COUNT VIII**
**Declaratory Judgment of Non-infringement of the '704 Patent**

92.     Plaintiffs incorporate the foregoing paragraphs by reference as though set forth fully herein.

93.     On information and belief, Sidekick claims to own all rights, title, and interest in the '704 Patent.  A true and correct copy of the '704 Patent is attached hereto as Exhibit 12.

94.     The '704 Patent has three independent claims: claims 1, 37, and 38.

95.    Claim 1 of the '704 Patent recites (with emphasis added):

A method comprising:

receiving, via a consumer interface, a first request for a response regarding a first automobile, the first request made by a consumer located at a first location and including geolocation information of the consumer;

executing instructions, by at least one processing device, to:

*determine, based on the geolocation information, that the consumer is located at the first location*;

generate, based on the first location, an in-market dealer area proximately located to the first location;

determine that a first dealer is located at a second location within the in-market dealer area;

request, via a dealer interface from the first dealer, a bid to sell the first automobile based on the first request;

receive, via the dealer interface, a first bid from the first dealer located at the second location within the in-market dealer area;

*generate, based on receiving the first bid, driving directions from the first location to the second location*; and

provide the first bid and the *driving directions* via the consumer interface, the first bid including at least a price for the first automobile.

96.    Claim 37 of the '704 Patent recites (with emphasis added):

A system comprising:

a computer readable medium storing instructions; and

at least one processing device operably coupled to the computer readable medium, the at least one processing device the executing instructions to:

receive, via a consumer interface, a first request for a response regarding a first automobile, the first request made by a consumer located at a first location and including geolocation information of the consumer;

*determine, using the geolocation information, that the consumer is located at the first location*;

generate, based on the first location, an in-market dealer area proximately located to the first location;

determine that a first dealer is located at a second location within the in-market dealer area;

request, via a dealer interface from the first dealer, a bid to sell the first automobile based on the first request;

receive, via the dealer interface, a first bid from the first dealer located at the second location within the in-market dealer area;

*generate, based on receiving the first bid, driving directions from the first location to the second location*; and

provide the first bid and the *driving directions* via the consumer interface, the first bid including at least a price for the first automobile.

97.    Claim 38 of the '704 Patent recites (with emphasis added):

A non-transitory computer readable medium storing instructions which, when executed, are configured to cause an information processing apparatus to:

receive, via a consumer interface, a first request for a response regarding a first automobile, the first request made by a consumer located at a first location and including geolocation information of the consumer;

*determine, using the geolocation information, that the consumer is located at the first location*;

generate, based on the first location, an in-market dealer area proximately located to the first location;

determine that a first dealer is located at a second location within the in-market dealer area;

request, via a dealer interface from the first dealer, a bid to sell the first automobile based on the first request;

receive, via the dealer interface, a first bid from the first dealer located at the second location within the in-market dealer area;

> **generate, based on receiving the first bid, driving directions from the first location to the second location**; and
>
> provide the first bid and the ***driving directions*** via the consumer interface, the first bid including at least a price for the first automobile.

98.    Plaintiffs do not directly or indirectly infringe the '704 Patent, either literally or under the doctrine of equivalents, at least because Plaintiffs' services do not employ, incorporate, or otherwise make use of (1) determining, using the geolocation information, that the consumer is located at the first location as required by every claim of the '704 Patent; and (2) generating, based on receiving the first bid, driving directions from the first location to the second location as required by every claim of the '704 Patent.

99.    A substantial, immediate, and real controversy exists between Plaintiffs and Defendant regarding whether Plaintiffs infringe the '704 Patent by making, using, importing, offering for sale and selling the functionalities available at their websites and/or any corresponding mobile device application.  A judicial declaration is necessary to determine the parties' respective rights regarding the '704 Patent.

100.    Plaintiffs seek a judgment declaring that Plaintiffs do not infringe, either literally or under the doctrine of equivalents, one or more claims of the '704 Patent by making, using, importing, offering for sale and selling the functionalities available at their websites and/or any corresponding mobile device application, either directly under 35 U.S.C. § 271(a), or indirectly under 35 U.S.C. §§ 271(b) and (c).

## COUNT IX
## Declaratory Judgment of Non-infringement of the '655 Patent

101.    Plaintiffs incorporate the foregoing paragraphs by reference as though set forth fully herein.

102.    On information and belief, Sidekick claims to own all rights, title, and interest in the '655 Patent.  A true and correct copy of the '655 Patent is attached hereto as Exhibit 13.

103.    The '655 Patent has three independent claims: claims 1, 19, and 28.

104.    Claim 1 of the '655 Patent recites (with emphasis added):

A method comprising:

receiving, via a used automobile seller interface, a first request for a response regarding a first used automobile, the first request made by a used automobile seller located at a first location and including a vehicle identifier and geolocation information of the used automobile;

executing instructions, by at least one processing device, to:

determine, based on the geolocation information, that the used automobile is located at the first location;

generate, based on the determined first location, an in-market used automobile buyer area;

determine that at least one used automobile buyer is located within the in-market used automobile buyer area;

receive, via a used automobile buyer interface, a first bid from a first used automobile buyer located at a second location within the in-market used automobile buyer area;

***generate, based on receiving the first bid, driving directions from the first location to the second location***; and

***provide, via the used automobile seller interface, the first bid including at least a price for the first used automobile and the driving directions from the first location to the second location***.

105.    Claim 19 of the '655 Patent recites (with emphasis added):

A system comprising:

a computer readable medium storing instructions;

at least one processing device operably coupled to the computer readable medium, the at least one processing device executing the instructions to:

receive, via a used automobile seller interface, a first request for a response regarding a first used automobile, the first request made by a used automobile seller located at a first location and including a vehicle identifier and geolocation information of the used automobile seller;

determine, based on the geolocation information, that the used automobile is located at the first location;

generate, based on the determined first location, an in-market used automobile buyer area;

determine that at least one used automobile buyer is located within the in-market used automobile buyer area;

receive, via a used automobile buyer interface, a first bid from a first used automobile buyer located at a second location within the in-market used automobile buyer area;

***generate, based on receiving the first bid, driving directions from the first location to the second location***; and

***provide, via the used automobile seller interface, the first bid including at least a price for the first used automobile and the driving directions from the first location to the second location***.

106.    Claim 28 of the '655 Patent recites (with emphasis added):

A non-transitory computer readable medium storing instructions which, when executed, are configured to cause an information processing apparatus to:

receive, via a used automobile seller interface, a first request for a response regarding a first used automobile, the first request made by a used automobile seller located at a first location and including a vehicle identifier and geolocation information of the used automobile;

determine, based on the geolocation information, that the used automobile is located at the first location;

generate, based on the determined first location, an in-market used automobile buyer area;

determine that at least one used automobile buyer is located within the in-market used automobile buyer area;

receive, via a used automobile buyer interface, a first bid from a
first used automobile buyer located at a second location within the
in-market used automobile buyer area;

*generate, based on receiving the first bid, driving directions from
the first location to the second location*; and

*provide, via the used automobile seller interface, the first bid
including at least a price for the first used automobile and the
driving directions from the first location to the second location*.

107.    Plaintiffs do not directly or indirectly infringe the '655 Patent, either literally or

under the doctrine of equivalents, at least because Plaintiffs' services do not employ, incorporate,

or otherwise make use of (1) generating based on receiving the first bid, driving directions from

the first location to the second location as required by every claim of the '655 Patent; and (2)

providing the driving directions from the first location to the second location as required by

every claim of the '655 Patent.

108.    A substantial, immediate, and real controversy exists between Plaintiffs and

Defendant regarding whether Plaintiffs infringe the '655 Patent by making, using, importing,

offering for sale and selling the functionalities available at their websites and/or any

corresponding mobile device application.  A judicial declaration is necessary to determine the

parties' respective rights regarding the '655 Patent.

109.    Plaintiffs seek a judgment declaring that Plaintiffs do not infringe, either literally

or under the doctrine of equivalents, one or more claims of the '655 Patent by making, using,

importing, offering for sale and selling the functionalities available at their websites and/or any

corresponding mobile device application, either directly under 35 U.S.C. § 271(a), or indirectly

under 35 U.S.C. §§ 271(b) and (c).

## COUNT X
### Declaratory Judgment of Non-infringement of the '722 Patent

110.    Plaintiffs incorporate the foregoing paragraphs by reference as though set forth

fully herein.

111.    On information and belief, Sidekick claims to own all rights, title, and interest in

the '722 Patent.  A true and correct copy of the '722 Patent is attached hereto as Exhibit 14.

112.    The '722 Patent has three independent claims: claims 1, 27, and 33.

113.    Claim 1 of the '722 Patent recites (with emphasis added):

A method comprising:

receiving, via a consumer interface, a first request for a response
regarding a first automobile, the first request made by a consumer
located at a first location and including geolocation information of
the consumer;

executing instructions, by at least one processing device, to:

*determine, based on the geolocation information, that the
consumer is located at the first location*;

generate, based on the first location, an in-market dealer area
proximately located to the first location;

determine that a first dealer is located at a second location within
the in-market dealer area;

receive, via a dealer interface, a first bid from the first dealer
located at the second location within the in-market dealer area;

*generate, after receiving the first bid, driving directions between
the first location and the second location*; and

provide the first bid and the driving directions via the consumer
interface, the first bid including at least a price for the first
automobile.

114.    Claim 27 of the '722 Patent recites (with emphasis added):

A system comprising:

a computer readable medium storing instructions; and

at least one processing device operably coupled to the computer readable medium, the at least one processing device the executing instructions to:

receive, via a consumer interface, a first request for a response regarding a first automobile, the first request made by a consumer located at a first location and including geolocation information of the consumer;

***determine, using the geolocation information, that the consumer is located at the first location***;

generate, based on the first location, an in-market dealer area proximately located to the first location;

determine that a first dealer is located at a second location within the in-market dealer area;

receive, via a dealer interface, a first bid from the first dealer located at the second location within the in-market dealer area;

***generate, after receiving the first bid, driving directions between the first location and the second location***; and

provide the first bid and the driving directions via the consumer interface, the first bid including at least a price for the first automobile.

115. Claim 33 of the '722 Patent recites (with emphasis added):

A non-transitory computer readable medium storing instructions which, when executed, are configured to cause an information processing apparatus to:

receive, via a consumer interface, a first request for a response regarding a first automobile, the first request made by a consumer located at a first location and including geolocation information of the consumer;

***determine, using the geolocation information, that the consumer is located at the first location***;

generate, based on the first location, an in-market dealer area proximately located to the first location;

determine that a first dealer is located at a second location within the in-market dealer area;

receive, via a dealer interface, a first bid from the first dealer located at the second location within the in-market dealer area;

**generate, after receiving the first bid, driving directions between the first location and the second location**; and

provide the first bid and the driving directions via the consumer interface, the first bid including at least a price for the first automobile.

116. Plaintiffs do not directly or indirectly infringe the '722 Patent, either literally or under the doctrine of equivalents, at least because Plaintiffs' services do not employ, incorporate, or otherwise make use of (1) determining, using the geolocation information, that the consumer is located at the first location as required by every claim of the '722 Patent; and (2) generating, after receiving the first bid, driving directions between the first location and the second location as required by every claim of the '722 Patent.

117. A substantial, immediate, and real controversy exists between Plaintiffs and Defendant regarding whether Plaintiffs infringe the '722 Patent by making, using, importing, offering for sale and selling the functionalities available at their websites and/or any corresponding mobile device application. A judicial declaration is necessary to determine the parties' respective rights regarding the '722 Patent.

118. Plaintiffs seek a judgment declaring that Plaintiffs do not infringe, either literally or under the doctrine of equivalents, one or more claims of the '722 Patent by making, using, importing, offering for sale and selling the functionalities available at their websites and/or any corresponding mobile device application, either directly under 35 U.S.C. § 271(a), or indirectly under 35 U.S.C. §§ 271(b) and (c).

**COUNT XI**
**Declaratory Judgment of Non-infringement of the '720 Patent**

119.    Plaintiffs incorporate the foregoing paragraphs by reference as though set forth

fully herein.

120.    On information and belief, Sidekick claims to own all rights, title, and interest in

the '720 Patent.  A true and correct copy of the '720 Patent is attached hereto as Exhibit 15.

121.    The '720 Patent has three independent claims: claims 1, 29, and 34.

122.    Claim 1 of the '720 Patent recites (with emphasis added):

A method comprising:

receiving, via a consumer interface, a first request for a response
regarding a first automobile, which is manufactured by a first
manufacturer, the first request made by a consumer located at a
first location and including geolocation information of the
consumer;

executing instructions, by at least one processing device, to:

generate, based on current inventory data of the first automobile at
least one of a verification indicating that the first automobile can
be provided for the consumer, a confirmation indicating that the
first automobile can be provided for the consumer, and an offer
indicating that the first automobile can be provided for the
consumer;

***determine, based on the geolocation information, that the
consumer is located at the first location***;

generate, based on the first location, an in-market dealer area
proximately located to the first location;

determine that at least a first dealer is located within the in-market
dealer area, the first dealer located at a second location;

provide a first manufacturer response via the consumer interface,
the first manufacturer response including the at least one of the
verification indicating that the first automobile can be provided for
the consumer, the confirmation indicating that the first automobile
can be provided for the consumer, and the offer indicating that the
first automobile can be provided for the consumer;

receive, from the first dealer located at the second location, the bid to provide the first automobile;

*generate driving directions between the first location and the second location*; and

provide the bid and the driving directions to the consumer interface, the bid including at least a price.

123.    Claim 29 of the '720 Patent recites (with emphasis added):

A system comprising:

a computer readable medium storing instructions; and

at least one processing device operably coupled to the computer readable medium, the at least one processing device executing the instructions to:

receive, via a consumer interface, a first request for a response regarding a first automobile, which is manufactured by a first manufacturer, the first request made by a consumer located at a first location and including geolocation information of the consumer;

generate, based on current inventory data of the first automobile at least one of a verification indicating that the first automobile can be provided for the consumer, a confirmation indicating that the first automobile can be provided for the consumer, and an offer indicating that the first automobile can be provided for the consumer;

*determine, based on the geolocation information, that the consumer is located at the first location*;

generate, based on the first location, an in-market dealer area proximately located to the first location;

determine that at least a first dealer is located within the in-market dealer area, the first dealer located at a second location;

provide a first manufacturer response via the consumer interface, the first manufacturer response including the at least one of the verification indicating that the first automobile can be provided for the consumer, the confirmation indicating that the first automobile can be provided for the consumer, and the offer indicating that the first automobile can be provided for the consumer;

receive, from the first dealer located at the second location, the bid to provide the first automobile;

***generate driving directions between the first location and the second location***; and

provide the bid and the driving directions via the consumer interface, the bid including at least a price.

124.    Claim 34 of the '720 Patent recites (with emphasis added):

A non-transitory computer readable medium storing software instructions which, when executed, cause an information processing apparatus to:

receive, via a consumer interface, a first request for a response regarding a first automobile, which is manufactured by a first manufacturer, the first request made by a consumer located at a first location and including geolocation information of the consumer;

generate, based on current inventory data of the first automobile at least one of a verification indicating that the first automobile can be provided for the consumer, a confirmation indicating that the first automobile can be provided for the consumer, and an offer indicating that the first automobile can be provided for the consumer;

***determine, based on the geolocation information, that the consumer is located at the first location***;

generate, based on the first location, an in-market dealer area proximately located to the first location;

determine that at least a first dealer is located within the in-market dealer area, the first dealer located at a second location;

provide a first manufacturer response via the consumer interface, the first manufacturer response including the at least one of the verification indicating that the first automobile can be provided for the consumer, the confirmation indicating that the first automobile can be provided for the consumer, and the offer indicating that first automobile can be provided for the consumer;

receive, from the first dealer located at the second location, the bid to provide the first automobile;

*generate driving directions between the first location and the
second location*; and

provide the bid and the driving directions via the consumer
interface, the bid including at least a price.

125.    Plaintiffs do not directly or indirectly infringe the '720 Patent, either literally or

under the doctrine of equivalents, at least because Plaintiffs' services do not employ, incorporate,

or otherwise make use of providing: (1) determining, using the geolocation information, that the

consumer is located at the first location as required by every claim of the '720 Patent; and (2)

generating driving directions between the first location and the second location as required by

every claim of the '720 Patent.

126.    A substantial, immediate, and real controversy exists between Plaintiffs and

Defendant regarding whether Plaintiffs infringe the '720 Patent by making, using, importing,

offering for sale and selling the functionalities available at their websites and/or any

corresponding mobile device application.  A judicial declaration is necessary to determine the

parties' respective rights regarding the '720 Patent.

127.    Plaintiffs seek a judgment declaring that Plaintiffs do not infringe, either literally

or under the doctrine of equivalents, one or more claims of the '720 Patent by making, using,

importing, offering for sale and selling the functionalities available at their websites and/or any

corresponding mobile device application, either directly under 35 U.S.C. § 271(a), or indirectly

under 35 U.S.C. §§ 271(b) and (c).

**COUNT XII**
**Declaratory Judgment of Non-infringement of the '362 Patent**

128.    Plaintiffs incorporate the foregoing paragraphs by reference as though set forth

fully herein.

129.    On information and belief, Sidekick claims to own all rights, title, and interest in

the '362 Patent. A true and correct copy of the '362 Patent is attached hereto as Exhibit 16.

130.    The '362 Patent has three independent claims: claims 1, 32, and 63.

131.    Claim 1 of the '362 Patent recites (with emphasis added):

A method comprising:

receiving, via a used automobile seller interface, a first request for
a response regarding a first used automobile, the first request made
by a used automobile seller located at a first location and including
a vehicle identifier and geolocation information of the first used
automobile;

determining, based on the geolocation information, that the first
used automobile is located at the first location;

generating, based on the determined first location, an in-market
used automobile buyer area;

determining that at least one used automobile buyer is located
within the in-market used automobile buyer area;

receiving, via a used automobile buyer interface, a first bid from a
first used automobile buyer located at a second location within the
in-market used automobile buyer area;

***generating, based on receiving the first bid, driving directions
between the first location and the second location***; and

***providing, via the used automobile seller interface, the first bid
including at least a price for the first used automobile and the
driving directions between the first location and the second
location.***

132.    Claim 32 of the '362 Patent recites (with emphasis added):

A system comprising:

a computer readable medium storing instructions;

at least one processing device operably coupled to the computer
readable medium, the at least one processing device executing the
instructions to:

receive, via a used automobile seller interface, a first request for a response regarding a first used automobile, the first request made by a used automobile seller located at a first location and including a vehicle identifier and geolocation information of the first used automobile;

determine, based on the geolocation information, that the first used automobile is located at the first location;

generate, based on the determined first location, an in-market used automobile buyer area;

determine that at least one used automobile buyer is located within the in-market used automobile buyer area;

receive, via a used automobile buyer interface, a first bid from a first used automobile buyer located at a second location within the in-market used automobile buyer area;

***generate, based on receiving the first bid, driving directions between the first location and the second location***; and

***provide, via the used automobile seller interface, the first bid including at least a price for the first used automobile and the driving directions between the first location and the second location***.

133.  Claim 63 of the '362 Patent recites (with emphasis added):

A non-transitory computer readable medium storing instructions which, when executed, are configured to cause an information processing apparatus to:

receive, via a used automobile seller interface, a first request for a response regarding a first used automobile, the first request made by a used automobile seller located at a first location and including a vehicle identifier and geolocation information of the first used automobile;

determine, based on the geolocation information, that the first used automobile is located at the first location;

generate, based on the determined first location, an in-market used automobile buyer area;

determine that at least one used automobile buyer is located within the in-market used automobile buyer area;

receive, via a used automobile buyer interface, a first bid from a first used automobile buyer located at a second location within the in-market used automobile buyer area;

***generate, based on receiving the first bid, driving directions between the first location and the second location***; and

***provide, via the used automobile seller interface, the first bid including at least a price for the first used automobile and the driving directions between the first location and the second location***.

134.    Plaintiffs do not directly or indirectly infringe the '362 Patent, either literally or under the doctrine of equivalents, at least because Plaintiffs' services do not employ, incorporate, or otherwise make use of (1) generating based on receiving the first bid, driving directions between the first location and the second location as required by every claim of the '362 Patent; and (2) providing the driving directions between the first location and the second location as required by every claim of the '362 Patent.

135.    A substantial, immediate, and real controversy exists between Plaintiffs and Defendant regarding whether Plaintiffs infringe the '362 Patent by making, using, importing, offering for sale and selling the functionalities available at their websites and/or any corresponding mobile device application.  A judicial declaration is necessary to determine the parties' respective rights regarding the '362 Patent.

136.    Plaintiffs seek a judgment declaring that Plaintiffs do not infringe, either literally or under the doctrine of equivalents, one or more claims of the '362 Patent by making, using, importing, offering for sale and selling the functionalities available at their websites and/or any corresponding mobile device application, either directly under 35 U.S.C. § 271(a), or indirectly under 35 U.S.C. §§ 271(b) and (c).

## **PRAYERS FOR RELIEF**

WHEREFORE, Plaintiffs prays for judgment as follows:

137.    That the Court enter judgment in Plaintiffs' favor and declare that Plaintiffs do not infringe each and every one of the Patents-in-Suit;

138.    That the Court declare that Plaintiffs are free and clear to make, use, offer for sale and sell the functionalities available at their websites and/or any corresponding mobile device application despite any rights Defendant purports to own;

139.    That the Court enjoin Defendant from representing to anyone that Plaintiffs are infringing on any rights Defendant purports to own, including any rights based on the patents in suit;

140.    That the Court declare that this is an exceptional case under 35 U.S.C. § 285 and award Plaintiffs their attorneys' fees and costs incurred in this action; and

141.    That this Court grants Plaintiffs such other further relief as the Court deems just and proper.


Dated: March 25, 2021

Lesley M. Grossberg (NJ No. 021682008)
lgrossberg@bakerlaw.com
John F. Murphy (*pro hac vice* pending)
johnmurphy@bakerlaw.com
Stephanie M. Hatzikyriakou (NJ No. 080582014)
shatzikyriakou@bakerlaw.com
BAKER & HOSTETLER LLP
2929 Arch Street
Cira Centre, 12th Floor
Philadelphia, PA  19104-2891
Telephone:    215.568.3100
Facsimile:    215.568.3439

Derek M. Freitas (*pro hac vice* pending)
dfreitas@bakerlaw.com
BAKER & HOSTETLER LLP
312 Walnut Street
Suite 3200
Cincinnati, OH  45202-4074
Telephone:      513.929.3400
Facsimile:      513.929.0303

*Attorneys for Declaratory Judgment Plaintiffs*

## **RULE 11.2 CERTIFICATION**

      I hereby certify, under penalty of perjury, that, to the best of my knowledge, the matter in

controversy is not the subject of any other action pending in any court, or of any pending

arbitration or administrative proceeding at this time.

Dated:  March 25, 2021

_____

Lesley M. Grossberg (NJ No. 021682008)
lgrossberg@bakerlaw.com
BAKER & HOSTETLER LLP
2929 Arch Street
Cira Centre, 12th Floor
Philadelphia, PA  19104-2891
Telephone: 215.568.3100
Facsimile: 215.568.3439

# Exhibit 1



September 29, 2020

Benjamin E. Weed
benjamin.weed@klgates.com

T +1 312 781 7166
F +1 312 827 8000

**By E-mail and Overnight Federal Express**

Vroom, Inc.
Co: Chief Legal Officer, Patricia Moran
1375 Broadway, Floor 11
New York, New York 10018
Telephone: (855) 524-1300

Re:    **Notice of Infringement of Sidekick Technology, LLC's Patents**

Dear Ms. Moran:

For nearly a decade, Sidekick Technology, LLC ("Sidekick") has invested substantial resources in independently developing systems, methods, and apparatuses for providing automobile market information and performing automobile transactions (the "Sidekick Technology"). The Sidekick Technology permits customers to select a desired automobile based on available market information and complete the transaction for that automobile from their home. This technology advantageously permits customers to avoid the traditional car dealership experience, while searching an inventory of automobiles from disparate geographic locations.

In short, the innovation embodied in the Sidekick Technology enables consumers, dealers, and manufacturers to make informed decisions in purchasing, selling, and making automobiles, in order to maximize efficiency on all accounts.

Sidekick is committed to protecting its innovations and its substantial investment in automobile transaction technology, including enforcing its patents as needed. Such patents include U.S. Patent Nos. 9,141,984; 8,744,925; 8,650,093; 9,123,075; 9,147,216; 9,460,467; 9,665,897; 9,626,704; 10,140,655; 10,223,722; and 10,223,720 (collectively referred to hereinafter as the "Sidekick Patents"). Sidekick is also the assignee of certain pending intellectual property rights that it expects to mature into enforceable patent rights in the very near future. And Sidekick expects that its patent portfolio will continue to develop and mature with the market, as the disclosures of the Sidekick Patents permit a wide variety of claims to be permissibly prosecuted based on the original patent filings.

The large (and growing) nature of Sidekick's portfolio confirms that the United States Patent and Trademark Office has seen value, and continues to see value, in the technology disclosed therein.

K&L GATES LLP
70 W. MADISON ST.  SUITE 3100  CHICAGO  IL 60602
T +1 312 372 1121  F +1 312 827 8000  klgates.com

This letter is to address Vroom, Inc.'s ("Vroom") infringement of the Sidekick Patents that embody the innovative Sidekick Technology.

The infringing functionality available at the website Vroom.com and/or its corresponding mobile device application(s) has been made, used, offered for sale, and sold for some time, and continues to be made, used, offered for sale, and sold today. As a result, Vroom directly infringes, induces others to infringe, and/or contributorily infringes one of more claims of one or more of the Sidekick Patents, either literally or under the doctrine of equivalents. Non-limiting examples of such infringement are provided below, based on the limited information currently available to Sidekick.

By way of example, for U.S. Patent No. 10,140,655, the Vroom.com website and/or the corresponding mobile device application(s) infringe at least claim 1 of this patent because they receive, via a used automobile seller interface, a first request for a response regarding a first used automobile, the first request made by a used automobile seller located at a first location and including a vehicle identifier and geolocation information of the used automobile:



(source: https://www.vroom.com/sell).

Vroom.com and the corresponding mobile device application(s) further infringe at least claim 1 of this patent because they execute instructions, by at least one processing device, to determine, based on the geolocation information, that the used automobile is located at the first location:

2

> ## How do you schedule my delivery?
>
> Once we have received your funds and approved your signed contract, we will book your vehicle for transport with our network of trusted carriers.
>
> Vroom will email you an estimated date of delivery when your vehicle is picked up and on its way to you. This is typically within 5 days from the funds being received and contract being approved.
>
> If you have any circumstances that would interfere with the delivery, please let us know by calling our Delivery Support team at (844)-532-0907.

(source: https://vroom.zendesk.com/hc/en-us/articles/205360575-How-do-you-schedule-my-delivery-).

Vroom.com and the corresponding mobile device application(s) further infringe at least claim 1 of this patent because they execute instructions, by at least one processing device, to generate, based on the determined first location, an in-market used automobile buyer area:

> ## How do you schedule my delivery?
>
> Once we have received your funds and approved your signed contract, we will book your vehicle for transport with our network of trusted carriers.
>
> Vroom will email you an estimated date of delivery when your vehicle is picked up and on its way to you. This is typically within 5 days from the funds being received and contract being approved.
>
> If you have any circumstances that would interfere with the delivery, please let us know by calling our Delivery Support team at (844)-532-0907.

(source: https://vroom.zendesk.com/hc/en-us/articles/205360575-How-do-you-schedule-my-delivery-).

Vroom.com and the corresponding mobile device application(s) further infringe at least claim 1 of this patent because they execute instructions, by at least one processing device, to determine that at least one used automobile buyer is located within the in-market used automobile buyer area:

3

> ## How do you schedule my delivery?
>
> Once we have received your funds and approved your signed contract, we will book your vehicle for transport with our network of trusted carriers.
>
> Vroom will email you an estimated date of delivery when your vehicle is picked up and on its way to you. This is typically within 5 days from the funds being received and contract being approved.
>
> If you have any circumstances that would interfere with the delivery, please let us know by calling our Delivery Support team at (844)-532-0907.

(source: https://vroom.zendesk.com/hc/en-us/articles/205360575-How-do-you-schedule-my-delivery-).

Vroom.com and the corresponding mobile device application(s) further infringe at least claim 1 of this patent because they execute instructions, by at least one processing device, to receive, via a used automobile buyer interface, a first bid from a first used automobile buyer located at a second location within the in-market used automobile buyer area:



(source: https://www.vroom.com/vehicle/jaguar-f-type-2016-SAJWA6AT9G8K31012).

4

Vroom.com and the corresponding mobile device application(s) further infringe at least claim 1 of this patent because they execute instructions, by at least one processing device, to generate, based on receiving the first bid, driving directions from the first location to the second location:



(source: https://www.vroom.com/how-it-works).

Vroom.com and the corresponding mobile device application(s) further infringe at least claim 1 of this patent because they execute instructions, by at least one processing device, to provide, via the used automobile seller interface, the first bid including at least a price for the first used automobile and the driving directions from the first location to the second location:



(source: https://www.vroom.com/how-it-works).

To the extent the details of the claims of this patent are not immediately apparent from the Vroom.com front end, it is Sidekick's belief that Vroom must be performing these steps for its business to have any profitability whatsoever.

Sidekick believes that Vroom is infringing the other Sidekick Patents for similar reasons, and hereby provides notice that Vroom's infringement of the Sidekick Patents is ongoing and hereinafter willful. Sidekick will not tolerate continued infringement of the Sidekick Patents, which from at least the date of this letter forward Sidekick believes is willful.

Sidekick is willing to discuss a licensing arrangement on mutually agreeable terms, such that Vroom can continue its business while recognizing the value the Sidekick Patents provide to your underlying business model. In addition, as an early licensee of the Sidekick Patents, Vroom will enjoy a comparably more favorable licensing arrangement than its competitors that take licenses in the future.

5

Please respond to the undersigned by October 8, 2020 and confirm that: (1) Vroom will ensure that the making, use, offer for sale, and sale of the functionalities available at vroom.com and/or its corresponding mobile device application will cease and desist immediately; and (2) personnel within Vroom with relevant authority will promptly negotiate in good faith with Sidekick to discuss patent license terms in good faith for Vroom's past infringement. This discussion shall include the sharing, under appropriate confidentiality agreements or other protections, United States sales revenue derived from Vroom's infringing website.

We look forward to receiving Vroom's formal response to our allegation that Vroom is infringing the Sidekick Patents.

Very truly yours,

Benjamin E. Weed

Cc: privacy@vroom.com

6

Appx97

# Exhibit 2

Baker&Hostetler LLP

2929 Arch Street
Cira Centre, 12th Floor
Philadelphia, PA 19104-2891

T 215.568.3100
F 215.568.3439
www.bakerlaw.com

John F. Murphy
direct dial: 215.564.1603
JohnMurphy@bakerlaw.com

December 31, 2020

**CONFIDENTIAL**

**VIA E-MAIL (BENJAMIN.WEED@KLGATES.COM)**

Benjamin E. Weed, Esq.
K&L Gates LLP
70 W. Madison Street
Suite 3100
Chicago, Illinois 60602

*Re:*     *Vroom, Inc. Response to Sidekick Technology, LLC's Notice of Infringement*

Dear Benjamin:

Thank you for taking the time to discuss Sidekick Technology, LLC's Notice of Infringement, dated September 29, 2020, with me on several occasions over the past several weeks. I write on behalf of Vroom, Inc. in response.

As an initial matter, Vroom does not directly or indirectly infringe, either literally or under the doctrine of equivalents, any claim of any of the 11 patents that Sidekick identified in its Notice through the Vroom.com website, the corresponding mobile device application(s), or otherwise. Because you focused on claim 1 of U.S. Patent No. 10,140,655 (the "'655 patent") in your allegations, I will respond accordingly. To that end, Vroom.com and a corresponding mobile device do not meet the limitations of Claim 1 for at least the following reasons.

**Vroom.com and the corresponding mobile device do not execute instructions to "determine, based on the geolocation information, that the used automobile is located at the first location."**

Vroom does not "determine, based on the geolocation information, that the used automobile is located at the first location." Upon a user entering a "vehicle's license plate or VIN, mileage, and any extra features," Vroom sends the user a price. *See* figure below and https://vroom.zendesk.com/hc/en-us/articles/205360685-How-do-I-sell-my-car-to-Vroom-

Atlanta   Chicago   Cincinnati   Cleveland   Columbus   Costa Mesa   Dallas   Denver   Houston
Los Angeles   New York   Orlando   Philadelphia   San Francisco   Seattle   Washington, DC   Wilmington

Appx99

Benjamin E. Weed, Esq.
December 31, 2020
Page 2

VROOM Help Center  >  Selling Your Car to Vroom

## How do I sell my car to Vroom?

You can sell or trade-in your vehicle entirely online and have it safely picked up contact-free.

**How Contact-Free Selling Your Vehicle Works:**

1. Start by getting your free appraisal by completing this form. We'll ask for your vehicle's license plate or VIN, mileage, and any extra features, then send you a price. The price is good for 7 days or 250 additional miles (whichever comes first).

2. Next, you'll upload pictures of your photo ID and registration (within the 7-day window) and our team will be in touch to discuss finalizing your deal.

3. We'll schedule your free vehicle pick-up. All of this is still done from the comfort of your home. When the driver arrives to pick up your vehicle, they will give you proof of pick-up (e.g. a bill of lading), which you will send to Vroom.

4. The driver departs with the vehicle and notifies Vroom of the successful pick-up.

4. Last, we will send you a check via overnight mail within 2-3 business days from when we picked up the vehicle.

Vroom provides user with "an instant price for [his] vehicle based on [his] description and data from thousands of similar transactions."  https://www.vroom.com/how-it-works

## for sellers

 

**Get Your Price**

✓ **Tell Us About Your Vehicle**
Provide basic information about your vehicle including your license plate or VIN, mileage, and condition. Vroom's proprietary buying system gives you an instant price for your vehicle based on your description and data from thousands of similar transactions.

✓ **Get Your Instant Price**
We'll give you an instant price for your vehicle that is good for the earlier of 7 days or 250 additional miles. If we're unable to calculate an instant price, one of our car-buying experts will email you a price typically within the same day.

MORE ABOUT SELLING TO VROOM ›

*See also* Vroom 2020 Prospectus at 119 (available at https://ir.vroom.com/financial-information/sec-filings?items_per_page=10&page=2) and figure below.

Appx100

Benjamin E. Weed, Esq.
December 31, 2020
Page 3



**Vroom.com and the corresponding mobile device do not execute instructions to "generate, based on the determined first location, an in-market used automobile buyer area."**

After the user enters a VIN, Vroom requests additional information, but at no point "generate[s] based on the determined first location, an in-market used automobile buyer area." Vroom's 2020 prospectus show how, after a user provides a VIN, the customer confirms or updates information about the vehicle, including information such as make, model and mileage." Vroom 2020 Prospectus at 119. It further states that Vroom's "data analytics tools are able to accurately appraise the value of a vehicle based on the answers provided." *Id. See also* figure below and https://www.vroom.com/sell/vehicleinformation.



3

Benjamin E. Weed, Esq.
December 31, 2020
Page 4

Once the user tells Vroom about his vehicle, Vroom provides a "guaranteed offer." *See* Vroom 2020 Prospectus at 119 and figure below. "Upon receiving a customer's application for an appraisal, we run the vehicle information through our central vehicle database in order to generate a competitive appraisal based on market demand, estimated reconditioning costs, depreciation and other factors that impact the retail and wholesale value of the vehicle." *Id.* at 119.



**Vroom.com and the corresponding mobile device do not execute instructions to "determine that at least one used automobile buyer is located within the in-market used automobile buyer area."**

In addition to the portions of Vroom's website and 2020 Prospectus cited above, Vroom's website confirms that Vroom itself is the buyer of the automobile and there is no determination of "at least one used automobile buyer [] located within the in-market used automobile buyer area." *See, e.g.*, https://vroom.zendesk.com/hc/en-us/articles/205360685-How-do-I-sell-my-car-to-Vroom-; https://vroom.zendesk.com/hc/en-us/articles/360048529492-How-will-I-get-proof-that-my-ownership-has-transferred-.



4

Benjamin E. Weed, Esq.
December 31, 2020
Page 5

**Vroom.com and the corresponding mobile device do not execute instructions to "receive, via a used automobile buyer interface, a first bid from a first used automobile buyer located at a second location within the in-market used automobile buyer area."**

There is no "first bid from a first used automobile buyer located at a second location within the in-market used automobile buyer area." Vroom provides a guaranteed offer. *See* Vroom 2020 Prospectus at 119 (stating "Upon receiving a customer's application for an appraisal, we run the vehicle information through our central vehicle database in order to generate a competitive appraisal based on market demand, estimated reconditioning costs, depreciation and other factors that impact the retail and wholesale value of the vehicle."); *id.* (stating "[a]fter a customer has accepted *our guaranteed purchase offer* on their vehicle, a customer can arrange payment and at-home vehicle pick-up free of charge within days of accepting our offer.") (emphasis added). *See also* Vroom 2020 Prospectus at 111 and excerpt below.

*A Better Way to Sell*

We are revolutionizing the process for consumers to sell or trade-in their vehicles. Consumers typically encounter either low-ball prices from their local dealer or face the prospect of advertising and selling the vehicle themselves in a time-consuming process through the peer-to-peer market. In contrast, we offer consumers the following:

- **Ease of Use.** We offer the ease of online submission of basic vehicle information in order to receive an appraisal. There is no trip to the dealership and no cost to submit a vehicle for sale, but rather a simple, hassle-free process enabling customers to sell us their vehicles.

- **On-Demand Appraisals.** Our Sell Us Your Car® proposition gives customers on-demand appraisals. We utilize our extensive data insights and experience across thousands of transactions to generate a purchase offer that reflects a competitive market-based price, providing customers a fast and easy customer experience.

- **A Guaranteed, Real-Time Price on Every Vehicle.** For every vehicle that customers submit for appraisal, we provide a guaranteed price and purchase offer.

*See also* figure below and https://www.vroom.com/how-it-works.



**for sellers**



**Get Your Price**

✓ **Tell Us About Your Vehicle**

Provide basic information about your vehicle including your license plate or VIN, mileage, and condition. Vroom's proprietary buying system gives you an instant price for your vehicle based on your description and data from thousands of similar transactions.

✓ **Get Your Instant Price**

We'll give you an instant price for your vehicle that is good for the earlier of 7 days or 250 additional miles. If we're unable to calculate an instant price, one of our car-buying experts will email you a price typically within the same day.

**MORE ABOUT SELLING TO VROOM ›**

*See also* figure below and https://www.vroom.com/sell.

5

Benjamin E. Weed, Esq.
December 31, 2020
Page 6



**Vroom.com and the corresponding mobile device do not execute instructions to "generate, based on receiving the first bid, driving directions from the first location to the second location."**

Once a user accepts Vroom's guaranteed purchase offer, the user provides documentation (e.g., title and a mileage statement) and "Vroom provides free vehicle pick-up from the convenience of the customer's home." Vroom 2020 Prospectus at 118; *id.* at 119 ("After a customer has accepted our guaranteed purchase offer on their vehicle, a customer can arrange payment and at-home vehicle pick-up free of charge within days of accepting our offer. Using our network of third-party logistics operators, we arrange for vehicle pick-up from the convenience of the customer's home.").

**Vroom.com and the corresponding mobile device do not execute instructions to "provide, via the used automobile seller interface, the first bid including at least a price for the first used automobile and the driving directions from the first location to the second location."**

Vroom does not provide a first bid and "at least a price for the first used automobile and the driving directions from the first location to the second location." Once a user accepts Vroom's guaranteed purchase offer, the user provides documentation (e.g., title and a mileage statement) and "Vroom provides free vehicle pick-up from the convenience of the customer's home." Vroom 2020 Prospectus at 118; *id.* at 119 ("After a customer has accepted our guaranteed purchase offer on their vehicle, a customer can arrange payment and at-home vehicle pick-up free of charge within days of accepting our offer. Using our network of third-party logistics operators, we arrange for vehicle pick-up from the convenience of the customer's home."). *See* also figure below and https://vroom.zendesk.com/hc/en-us/articles/205360685-How-do-I-sell-my-car-to-Vroom-.

6

Benjamin E. Weed, Esq.
December 31, 2020
Page 7

VROOM Help Center  >  Selling Your Car to Vroom

**How do I sell my car to Vroom?**

You can sell or trade-in your vehicle entirely online and have it safely picked up contact-free.

**How Contact-Free Selling Your Vehicle Works:**

1. Start by getting your free appraisal by completing this form. We'll ask for your vehicle's license plate or VIN, mileage, and any extra features, then send you a price. The price is good for 7 days or 250 additional miles (whichever comes first).

2. Next, you'll upload pictures of your photo ID and registration (within the 7-day window) and our team will be in touch to discuss finalizing your deal.

3. We'll schedule your free vehicle pick-up. All of this is still done from the comfort of your home. When the driver arrives to pick up your vehicle, they will give you proof of pick-up (e.g. a bill of lading), which you will send to Vroom.

4. The driver departs with the vehicle and notifies Vroom of the successful pick-up.

4. Last, we will send you a check via overnight mail within 2-3 business days from when we picked up the vehicle.

Sidekick's Notice of Infringement made grave allegations and demanded no less than for Vroom to cease and desist its business. As shown, these allegations are false and the demand unfounded. Furthermore, your letter was an entirely unproductive and hostile way to seek a cooperative business arrangement. If Sidekick would like to have a business discussion with Vroom, such discussions should begin with the understanding that Vroom does not infringe Sidekick's patents. Please do not hesitate to contact me if such a discussion is of interest to Sidekick. Otherwise, Vroom will consider this matter closed.

Sincerely,

John F. Murphy
Partner

Cc: Gina A. Johnson, Esq.
Stephanie M. Hatzikyriakou, Esq.

7

Appx105

# Exhibit 3



March 2, 2021

Benjamin E. Weed
Benjamin.Weed@klgates.com

T +(312) 781-7166

John F. Murphy, Esq.
Baker & Hostetler LLP
2929 Arch Street
Circa Centre, 12th Floor
Philadelphia, PA 19104-2891

**Re: Vroom, Inc.'s December 31, 2020 Response to Sidekick Technology, LLC's Notice of Infringement**

Dear John,

Thank you for your response to Sidekick Technology, LLC's Notice of Infringement, which we received on December 31, 2020. We have carefully considered the positions articulated therein. However, after further investigation, we have identified additional infringing activities carried out by Vroom and/or CarStory. Sidekick therefore maintains its prior belief that Vroom and/or CarStory require a license to the 11 patents identified in Sidekick's Notice of Infringement. We respond in substance to your letter below, and attach as Exhibit A hereto a detailed claim chart demonstrating Vroom's and/or CarStory's need for a license as to a different one of the Sidekick patents.

Please confirm, by one week from today (March 9, 2021), that Vroom principals will undertake a good-faith licensing discussion with Sidekick. Absent such an assurance, Sidekick fully intends to enforce its intellectual property rights to the fullest extent of the law and intends to pursue all remedies available to it.

In response to your analysis of claim 1 of U.S. Patent No. 10,140,655 (the "'655 patent") provided in your December 31, 2020 letter, please see below.

**Vroom.com, the corresponding mobile device and/or CarStory.com execute instructions to "determine, based on the geolocation information, that the used automobile is located at the first location."**

As noted in Vroom's privacy policy, Vroom determines the first automobile location based on the geographic information of the user. Vroom's service of picking up the used automobiles that are being sold is not possible if the location of the first used automobile is not determined. See figures below and https://www.vroom.com/; https://www.carstory.com/

 

- **Location Information.** With your consent, our Apps may collect geolocation information from your device in order to tailor our Services to you, for example, showing you vehicles closer to your location. You may opt out of location sharing by accessing the location settings on your device and setting your device not to share its location with us.

- **Information Collected Automatically.** When you use the Services, we or our third-party service providers may automatically receive and record certain information from your device or through the Services. For example, this may include your device's IP address, user-agent, web pages you visit or features you use within the Services, the date and time of your activities on the Services, time since your last visit, links you click, searches conducted, the website visited before navigating to the Services, your software and hardware attributes (including browser and operating system type and version, app version, device type, and device identifiers), demographic and interest data based on browsing activity, and your general location inferred from your IP address. To obtain such information, we or our third-party service providers may use the following technologies to recognize your device and collect information about your device and Services usage:

March 2, 2021

K&L GATES LLP

70 W. MADISON ST. SUITE 3100 CHICAGO IL 60602

T +1 312 372 1121 F +1 312 827 8000 klgates.com

Appx108



**Vroom.com, the corresponding mobile device and/or CarStory.com execute instructions to "generate, based on the determined first location, an in-market used automobile buyer area."**

Vroom.com, the corresponding mobile device and/or CarStory.com generate an in-market used automobile buyer area based on utilizing the seller's location. This allows for buyers of used vehicles to purchases vehicles within a certain geographic radius. Additionally, Vroom.com, the corresponding mobile devices rely on this information for their advertised delivery service. Without generating an in-market used automobile buyer area based on the seller's location, this service would not be possible. See figures below and https://www.vroom.com/; https://www.carstory.com/

- **Location Information.** With your consent, our Apps may collect geolocation information from your device in order to tailor our Services to you, for example, showing you vehicles closer to your location. You may opt out of location sharing by accessing the location settings on your device and setting your device not to share its location with us.

3

March 2, 2021

K&L GATES LLP
70 W. MADISON ST.  SUITE 3100  CHICAGO  IL 60602
T +1 312 372 1121  F +1 312 827 8000  klgates.com





| Category | Category Collected |
|---|---|
| A. Identifiers. | YES |
| B. Personal information categories listed in the California Customer Records statute (Cal. Civ. Code § 1798.80(e)). | YES |
| C. Protected classification characteristics under California or federal law. | NO |
| D. Commercial information. | YES |
| E. Biometric information. | NO |
| F. Internet or other similar network activity. | YES |
| G. Geolocation data. | YES |
| H. Sensory data. | NO |
| I. Professional or employment-related information. | YES |
| J. Non-public education information (per the Family Educational Rights and Privacy Act (20 U.S.C. Section 1232g, 34 C.F.R. Part 99)). | NO |
| K. Inferences drawn from other personal information. | YES |

We obtain the categories of personal information listed above from the following categories of sources:

- *Directly or indirectly from you;*
- *From activity on our website, apps, marketing campaigns or social networking sites; and*
- *Service providers and other partners*

vroom

WHAT'S

## how it works

① **Tell Us About Your Car**

Here's what we ask for:

- License Plate or VIN
- Trim (LE, SE, SLT, etc)
- Exact mileage
- Vehicle condition
- Vehicle history

② **Get Your Price**

We'll give you an instant price for your vehicle that is good for 7 days or 250 additional miles (whichever comes first). If we're unable to calculate an instant price, one of our car-buying experts will email you a price typically within the same day.

③ **We Pick It Up. You Get Paid**

We'll schedule a time to come pick up your vehicle, free of charge, anywhere in the lower 48 states. Once we have your car, we'll send your payment.

CHEVROLET TAHOE within 50 miles of 60602

441 Used Chevrolet Tahoe For Sale near Chicago, IL sorted by Best Deals

PRICE 1K-84K | CONDITION FAIR TO NEW | YEAR 2001-2021 | FEATURES BASE MODEL TO FUL...

**Vroom.com, the corresponding mobile device and/or CarStory.com execute instructions to "determine that at least one used automobile buyer is located within the in-market used automobile buyer area."**

Vroom.com, the corresponding mobile device and/or CarStory.com determine that a used automobile buyer is located within the in-market used buyer area by utilizing the buyer's

K&L GATES LLP
70 W. MADISON ST. SUITE 3100 CHICAGO IL 60602
T +1 312 372 1121 F +1 312 827 8000 klgates.com

geographic information. Additionally, Vroom.com, the corresponding mobile devices rely on this information for their advertised delivery service. Without generating an in-market used automobile buyer area based on the seller's location, this service would not be possible. See figures below and https://www.vroom.com/; https://www.carstory.com.

- **Location Information.** With your consent, our Apps may collect geolocation information from your device in order to tailor our Services to you, for example, showing you vehicles closer to your location. You may opt out of location sharing by accessing the location settings on your device and setting your device not to share its location with us.

- **Information Collected Automatically.** When you use the Services, we or our third-party service providers may automatically receive and record certain information from your device or through the Services. For example, this may include your device's IP address, user-agent, web pages you visit or features you use within the Services, the date and time of your activities on the Services, time since your last visit, links you click, searches conducted, the website visited before navigating to the Services, your software and hardware attributes (including browser and operating system type and version, app version, device type, and device identifiers), demographic and interest data based on browsing activity, and your general location inferred from your IP address. To obtain such information, we or our third-party service providers may use the following technologies to recognize your device and collect information about your device and Services usage:



**Delivered Right to You**

Get your car or truck shipped to your home or a convenient nearby location.

| Category | Category Collected |
|---|---|
| A. Identifiers. | YES |
| B. Personal information categories listed in the California Customer Records statute (Cal. Civ. Code § 1798.80(e)). | YES |
| C. Protected classification characteristics under California or federal law. | NO |
| D. Commercial information. | YES |
| E. Biometric information. | NO |
| F. Internet or other similar network activity. | YES |
| G. Geolocation data. | YES |
| H. Sensory data. | NO |
| I. Professional or employment-related information. | YES |
| J. Non-public education information (per the Family Educational Rights and Privacy Act (20 U.S.C. Section 1232g; 34 C.F.R. Part 99)). | NO |
| K. Inferences drawn from other personal information. | YES |

We obtain the categories of personal information listed above from the following categories of sources:

- Directly or indirectly from you;
- From activity on our website, apps, marketing campaigns or social networking sites; and
- Service providers and other partners

5

March 2, 2021

K&L GATES LLP
70 W. MADISON ST.  SUITE 3100  CHICAGO  IL 60602
T +1 312 372 1121  F +1 312 827 8000  klgates.com



**Vroom.com, the corresponding mobile device and/or CarStory.com execute instructions to "receive, via a used automobile buyer interface, a first bid from a first used automobile buyer located at a second location within the in-market used automobile buyer area."**

Vroom.com, the corresponding mobile device and/or CarStory.com receive a first bid from a first used automobile buyer within the in-market used automobile buyer area. As previously noted Vroom.com, the corresponding mobile device and/or CarStory.com utilize the buyer's geographic location to verify the user is within the in-market used automobile buyer area. Additionally, a first bid from a first used automobile buyer is received through the user selecting a vehicle at a price the user would like to bid. See figures below and https://www.vroom.com/; https://www.carstory.com/



6

March 2, 2021

K&L GATES LLP
70 W. MADISON ST. SUITE 3100 CHICAGO IL 60602
T +1 312 372 1121 F +1 312 827 8000 klgates.com

**Vroom.com, the corresponding mobile device and/or CarStory.com execute instructions to "generate, based on receiving the first bid, driving directions from the first location to the second location."**

Vroom.com, the corresponding mobile device and/or CarStory.com generate driving directions to where the used automobile is available. For example, the buyer would be directed to drive to Countryside Nissan.  Additionally, in order for Vroom to perform its pick and delivery services, driving directions between buyer and seller must generated. See figures below and https://www.vroom.com/; https://www.carstory.com/

• **Location Information.** With your consent, our Apps may collect geolocation information from your device in order to tailor our Services to you, for example, showing you vehicles closer to your location. You may opt out of location sharing by accessing the location settings on your device and setting your device not to share its location with us.



**Vroom.com, the corresponding mobile device and/or CarStory.com execute instructions to "provide, via the used automobile seller interface, the first bid including at least a price for the first used automobile and the driving directions from the first location to the second location."**

7

March 2, 2021

K&L GATES LLP
70 W. MADISON ST.  SUITE 3100  CHICAGO  IL 60602
T +1 312 372 1121  F +1 312 827 8000  klgates.com

Vroom.com, the corresponding mobile device and/or CarStory.com generate driving directions to where the used automobile is available. For example, the buyer would be directed to drive to Countryside Nissan. Additionally, in order for Vroom to perform its pick and delivery services, driving directions between buyer and seller must generated. See figures below and https://www.vroom.com/; https://www.carstory.com/



Additionally, as detailed below, Vroom and/or CarStory infringe each and every element of claim 1 of U.S. Patent No. 10,796,362 (the "'362 patent") directly or indirectly infringe, either literally or under the doctrine of equivalents.

**Vroom.com, the corresponding mobile device and/or CarStory.com "receive, via a used automobile seller interface, a first request for a response regarding a first used automobile, the first request made by a used automobile seller located at a first location and including a vehicle identifier and geolocation information of the first used automobile."**

8

March 2, 2021

Vroom.com, the corresponding mobile device and CarStory.com provide an automobile seller interface that receives a first request from a used automobile seller located a first geographical location. The request includes a vehicle identifier and geolocation information of the first used automobile. As noted in the privacy policy, Vroom receives the first automobile seller's geographic location. See figures below and https://www.vroom.com/; https://www.carstory.com/




- **Location Information.** With your consent, our Apps may collect geolocation information from your device in order to tailor our Services to you, for example, showing you vehicles closer to your location. You may opt out of location sharing by accessing the location settings on your device and setting your device not to share its location with us.



| Category | Category Collected |
|---|---|
| A. Identifiers. | YES |
| B. Personal information categories listed in the California Customer Records statute (Cal. Civ. Code § 1798.80(e)). | YES |
| C. Protected classification characteristics under California or federal law. | NO |
| D. Commercial information. | YES |
| E. Biometric information. | NO |
| F. Internet or other similar network activity. | YES |
| G. Geolocation data. | YES |
| H. Sensory data. | NO |
| I. Professional or employment-related information. | YES |
| J. Non-public education information (per the Family Educational Rights and Privacy Act (20 U.S.C. Section 1232g, 34 C.F.R. Part 99)). | NO |
| K. Inferences drawn from other personal information. | YES |

We obtain the categories of personal information listed above from the following categories of sources:

- Directly or indirectly from you;
- From activity on our website, apps, marketing campaigns or social networking sites; and
- Service providers and other partners

**Vroom.com, the corresponding mobile device and/or CarStory.com "determine, based on the geolocation information, that the first used automobile is located at the first location."**

9

March 2, 2021

As noted in Vroom's privacy policy, Vroom determines the first automobile location based on the geographic information of the user. Vroom's service of picking up the used automobiles that are being sold is not possible if the location of the first used automobile is not determined. See figures below and https://www.vroom.com/; https://www.carstory.com/

- **Location Information.** With your consent, our Apps may collect geolocation information from your device in order to tailor our Services to you, for example, showing you vehicles closer to your location. You may opt out of location sharing by accessing the location settings on your device and setting your device not to share its location with us.

- **Information Collected Automatically.** When you use the Services, we or our third-party service providers may automatically receive and record certain information from your device or through the Services. For example, this may include your device's IP address, user-agent, web pages you visit or features you use within the Services, the date and time of your activities on the Services, time since your last visit, links you click, searches conducted, the website visited before navigating to the Services, your software and hardware attributes (including browser and operating system type and version, app version, device type, and device identifiers), demographic and interest data based on browsing activity, and your general location inferred from your IP address. To obtain such information, we or our third-party service providers may use the following technologies to recognize your device and collect information about your device and Services usage:

**vroom**                                      WHAT'S

## how it works

① **Tell Us About Your Car**

Here's what we ask for:
- License Plate or VIN     • Vehicle condition
- Trim (LE, SE, SLT, etc)  • Vehicle history
- Exact mileage

② **Get Your Price**

We'll give you an instant price for your vehicle that is good for 7 days or 250 additional miles (whichever comes first). If we're unable to calculate an instant price, one of our car-buying experts will email you a price typically within the same day.

③ **We Pick It Up. You Get Paid**

We'll schedule a time to come pick up your vehicle, free of charge, anywhere in the lower 48 states. Once we have your car, we'll send you your payment.

| Category | Category Collected |
|---|---|
| A. Identifiers. | YES |
| B. Personal information categories listed in the California Customer Records statute (Cal. Civ. Code § 1798.80(e)). | YES |
| C. Protected classification characteristics under California or federal law. | NO |
| D. Commercial information. | YES |
| E. Biometric information. | NO |
| F. Internet or other similar network activity. | YES |
| G. Geolocation data. | YES |
| H. Sensory data. | NO |
| I. Professional or employment-related information. | YES |
| J. Non-public education information (per the Family Educational Rights and Privacy Act (20 U.S.C. Section 1232g, 34 C.F.R. Part 99)). | NO |
| K. Inferences drawn from other personal information. | YES |

We obtain the categories of personal information listed above from the following categories of sources:

- *Directly or indirectly from you;*
- *From activity on our website, apps, marketing campaigns or social networking sites; and*
- *Service providers and other partners*

10

March 2, 2021

K&L GATES LLP
70 W. MADISON ST.   SUITE 3100   CHICAGO   IL 60602
T +1 312 372 1121   F +1 312 827 8000   klgates.com

**Vroom.com, the corresponding mobile device and/or CarStory.com "generate, based on the determined first location, an in-market used automobile buyer area."**

Vroom.com, the corresponding mobile device and/or CarStory.com generate an in-market used automobile buyer area based on utilizing the seller's location. This allows for buyers of used vehicles to purchases vehicles within a certain geographic radius. Additionally, Vroom.com, the corresponding mobile devices rely on this information for their advertised delivery service. Without generating an in-market used automobile buyer area based on the seller's location, this service would not be possible. See figures below and https://www.vroom.com/; https://www.carstory.com/

- **Location Information.** With your consent, our Apps may collect geolocation information from your device in order to tailor our Services to you, for example, showing you vehicles closer to your location. You may opt out of location sharing by accessing the location settings on your device and setting your device not to share its location with us.

- **Information Collected Automatically.** When you use the Services, we or our third-party service providers may automatically receive and record certain information from your device or through the Services. For example, this may include your device's IP address, user-agent, web pages you visit or features you use within the Services, the date and time of your activities on the Services, time since your last visit, links you click, searches conducted, the website visited before navigating to the Services, your software and hardware attributes (including browser and operating system type and version, app version, device type, and device identifiers), demographic and interest data based on browsing activity, and your general location inferred from your IP address. To obtain such information, we or our third-party service providers may use the following technologies to recognize your device and collect information about your device and Services usage:

| Category | Category Collected |
|---|---|
| A. Identifiers. | YES |
| B. Personal information categories listed in the California Customer Records statute (Cal. Civ. Code § 1798.80(e)). | YES |
| C. Protected classification characteristics under California or federal law. | NO |
| D. Commercial information. | YES |
| E. Biometric information. | NO |
| F. Internet or other similar network activity. | YES |
| G. Geolocation data. | YES |
| H. Sensory data. | NO |
| I. Professional or employment-related information. | YES |
| J. Non-public education information (per the Family Educational Rights and Privacy Act (20 U.S.C. Section 1232g, 34 C.F.R. Part 99)). | NO |
| K. Inferences drawn from other personal information. | YES |

We obtain the categories of personal information listed above from the following categories of sources:

- *Directly or indirectly from you;*
- *From activity on our website, apps, marketing campaigns or social networking sites; and*
- *Service providers and other partners*



**Delivered Right to You**

Get your car or truck shipped to your home or a convenient nearby location.

11

March 2, 2021

K&L GATES LLP
70 W. MADISON ST.   SUITE 3100   CHICAGO   IL 60602
T +1 312 372 1121   F +1 312 827 8000   klgates.com



**Vroom.com, the corresponding mobile device and/or CarStory.com "determine that at least one used automobile buyer is located within the in-market used automobile buyer area."**

Vroom.com, the corresponding mobile device and/or CarStory.com determine that a used automobile buyer is located within the in-market used buyer area by utilizing the buyer's geographic information. Additionally, Vroom.com, the corresponding mobile devices rely on this information for their advertised delivery service. Without generating an in-market used automobile buyer area based on the seller's location, this service would not be possible. See figures below and https://www.vroom.com/; https://www.carstory.com.

- **Information Collected Automatically.** When you use the Services, we or our third-party service providers may automatically receive and record certain information from your device or through the Services. For example, this may include your device's IP address, user-agent, web pages you visit or features you use within the Services, the date and time of your activities on the Services, time since your last visit, links you click, searches conducted, the website visited before navigating to the Services, your software and hardware attributes (including browser and operating system type and version, app version, device type, and device identifiers), demographic and interest data based on browsing activity, and your general location inferred from your IP address. To obtain such information, we or our third-party service providers may use the following technologies to recognize your device and collect information about your device and Services usage:

- **Location Information.** With your consent, our Apps may collect geolocation information from your device in order to tailor our Services to you, for example, showing you vehicles closer to your location. You may opt out of location sharing by accessing the location settings on your device and setting your device not to share its location with us.

12

March 2, 2021

K&L GATES LLP
70 W. MADISON ST. SUITE 3100 CHICAGO IL 60602
T +1 312 372 1121 F +1 312 827 8000 klgates.com





**Vroom.com, the corresponding mobile device and/or CarStory.com "receive, via a used automobile buyer interface, a first bid from a first used automobile buyer located at a second location within the in-market used automobile buyer area."**

Vroom.com, the corresponding mobile device and/or CarStory.com receive a first bid from a first used automobile buyer within the in-market used automobile buyer area. As previously noted Vroom.com, the corresponding mobile device and/or CarStory.com utilize the buyer's geographic location to verify the user is within the in-market used automobile buyer area. Additionally, a first bid from a first used automobile buyer is received through the user selecting a vehicle at a price the user would like to bid. See figures below and https://www.vroom.com/; https://www.carstory.com/

March 2, 2021

K&L GATES LLP
70 W. MADISON ST.  SUITE 3100  CHICAGO  IL 60602
T +1 312 372 1121  F +1 312 827 8000  klgates.com



**Vroom.com, the corresponding mobile device and/or CarStory.com "generate, based on receiving the first bid, driving directions between the first location and the second location."**

Vroom.com, the corresponding mobile device and/or CarStory.com generate driving directions to where the used automobile is available. For example, the buyer would be directed to drive to Countryside Nissan. Additionally, in order for Vroom to perform its pick and delivery services, driving directions between buyer and seller must generated. See figures below and https://www.vroom.com/; https://www.carstory.com/

- **Location Information.** With your consent, our Apps may collect geolocation information from your device in order to tailor our Services to you, for example, showing you vehicles closer to your location. You may opt out of location sharing by accessing the location settings on your device and setting your device not to share its location with us.



14

March 2, 2021

K&L GATES LLP
70 W. MADISON ST. SUITE 3100 CHICAGO IL 60602
T +1 312 372 1121 F +1 312 827 8000 klgates.com



| Category | Category Collected |
|---|---|
| A. Identifiers. | YES |
| B. Personal information categories listed in the California Customer Records statute (Cal. Civ. Code § 1798.80(e)). | YES |
| C. Protected classification characteristics under California or federal law. | NO |
| D. Commercial information. | YES |
| E. Biometric information. | NO |
| F. Internet or other similar network activity. | YES |
| G. Geolocation data. | YES |
| H. Sensory data. | NO |
| I. Professional or employment-related information. | YES |
| J. Non-public education information (per the Family Educational Rights and Privacy Act (20 U.S.C. Section 1232g, 34 C.F.R. Part 99)). | NO |
| K. Inferences drawn from other personal information. | YES |

We obtain the categories of personal information listed above from the following categories of sources:

- *Directly or indirectly from you;*
- *From activity on our website, apps, marketing campaigns or social networking sites; and*
- *Service providers and other partners*

**Vroom.com, the corresponding mobile device and/or CarStory.com "provide, via the used automobile seller interface, the first bid including at least a price for the first used automobile and the driving directions between the first location and the second location."**

Vroom.com, the corresponding mobile device and/or CarStory.com provide both the first bid and driving directions to where the used automobile is available. For example, the buyer would be directed to drive to Countryside Nissan. Additionally, in order for Vroom to perform its pick and

March 2, 2021

K&L GATES LLP
70 W. MADISON ST. SUITE 3100 CHICAGO IL 60602
T +1 312 372 1121 F +1 312 827 8000 klgates.com

delivery services, driving directions between buyer and seller must generated. See figures below and https://www.vroom.com/; https://www.carstory.com/



| Category | Category Collected |
|---|---|
| A. Identifiers. | YES |
| B. Personal information categories listed in the California Customer Records statute (Cal. Civ. Code § 1798.80(e)). | YES |
| C. Protected classification characteristics under California or federal law. | NO |
| D. Commercial information. | YES |
| E. Biometric information. | NO |
| F. Internet or other similar network activity. | YES |
| G. Geolocation data. | YES |
| H. Sensory data. | NO |
| I. Professional or employment-related information. | YES |
| J. Non-public education information (per the Family Educational Rights and Privacy Act (20 U.S.C. Section 1232g, 34 C.F.R. Part 99)). | NO |
| K. Inferences drawn from other personal information. | YES |

We obtain the categories of personal information listed above from the following categories of sources:

- *Directly or indirectly from you;*
- *From activity on our website, apps, marketing campaigns or social networking sites; and*
- *Service providers and other partners*



We trust this addresses your arguments as to the '655 Patent, and further reiterates why it is Vroom and/or CarStory require a license thereto.

I have also attached a detailed claim chart explaining Vroom and/or CarStory's infringement of U.S. Patent No. 10,796,372, attached hereto as Exhibit A. This further demonstrates Vroom's and/or CarStory's need for a license to the Sidekick portfolio.

As mentioned above, Sidekick intends to enforce its intellectual property rights to the fullest extent of the law and intends to pursue all remedies available. We were disappointed by the apparent lack of interest in a serious conversation during our last round of communications, and trust that the additional content above and in the attached claim chart confirms our seriousness.

16

March 2, 2021

K&L GATES LLP
70 W. MADISON ST. SUITE 3100 CHICAGO IL 60602
T +1 312 372 1121 F +1 312 827 8000 klgates.com

Please confirm, by March 9, 2021, that you will make an appropriately senior executive of Vroom available for a conversation as to how to resolve this dispute with Sidekick's Chief Executive Officer.

Sincerely,

*/s/ Benjamin E. Weed*

Benjamin E. Weed

17

March 2, 2021

# Exhibit A

| Infringement of U.S. Patent No. 10,796,362 by Vroom, Vroom.com and/or Carstory.com | |
|---|---|
| 1[pre] A method comprising: | |
| 1[a] receiving, via a used automobile seller interface, a first request for a response regarding a first used automobile, the first request made by a used automobile seller located at a first location and including a vehicle identifier and geolocation information of the first used automobile; | Vroom, Vroom.com and/or Carstory.com include receiving, via a used automobile seller interface, a first request for a response regarding a first used automobile, the first request made by a used automobile seller located at a first location and including a vehicle identifier and geolocation information of the first used automobile.<br><br>NEW YORK, Dec. 15, 2020 (GLOBE NEWSWIRE) -- Vroom (**www.vroom.com**), an innovative ecommerce platform that offers a better way to buy and sell used vehicles, today announced that it has entered into a definitive agreement to acquire CarStory, a leader in AI-powered analytics and digital services for automotive retail, through the acquisition of Vast Holdings, Inc. Leveraging its machine learning, informed by more than 7 million listings per day and more than 18 million consumer sessions per month, CarStory brings the industry's most complete and accurate view of predictive market data to Vroom's national ecommerce and vehicle operations platform. As part of Vroom, CarStory will continue to drive automotive retail innovation by aggregating, optimizing and distributing current market data from thousands of automotive sources and offering its digital retailing services to dealers, top automotive financial services companies and household names in automotive industry research and retailing.<br><br>https://www.globenewswire.com/news-release/2020/12/15/2145364/0/en/Online-Automotive-Retailer-Vroom-to-Acquire-CarStory.html<br><br><br><br>https://www.vroom.com/how-it-works<br><br><br><br>https://www.vroom.com/sell |



| Infringement of U.S. Patent No. 10,796,362 by Vroom, Vroom.com and/or Carstory.com | |
|---|---|
| |   https://www.vroom.com/   https://www.vroom.com/sell   https://www.vroom.com/inventory/honda-odyssey-2017-5FNRL5H69HB019731 |

| | Infringement of U.S. Patent No. 10,796,362 by Vroom, Vroom.com and/or Carstory.com |
|---|---|
| | • **Location Information.** With your consent, our Apps may collect geolocation information from your device in order to tailor our Services to you, for example, showing you vehicles closer to your location. You may opt out of location sharing by accessing the location settings on your device and setting your device not to share its location with us.<br><br>• **Information Collected Automatically.** When you use the Services, we or our third-party service providers may automatically receive and record certain information from your device or through the Services. For example, this may include your device's IP address, user-agent, web pages you visit or features you use within the Services, the date and time of your activities on the Services, time since your last visit, links you click, searches conducted, the website visited before navigating to the Services, your software and hardware attributes (including browser and operating system type and version, app version, device type, and device identifiers), demographic and interest data based on browsing activity, and your general location inferred from your IP address. To obtain such information, we or our third-party service providers may use the following technologies to recognize your device and collect information about your device and Services usage:<br><br>https://www.vroom.com/legal/privacy-policy<br><br><br><br>https://www.carstory.com/cars/make-chevrolet/model-tahoe/location-chicago_il?zip=60602 |
| 1[b] determining, based on the geolocation information, that the first used automobile is located at the first location; | Vroom, Vroom.com and/or Carstory.com include determining, based on the geolocation information, that the first used automobile is located at the first location.<br><br>NEW YORK, Dec. 15, 2020 (GLOBE NEWSWIRE) -- Vroom (**www.vroom.com**), an innovative ecommerce platform that offers a better way to buy and sell used vehicles, today announced that it has entered into a definitive agreement to acquire CarStory, a leader in AI-powered analytics and digital services for automotive retail, through the acquisition of Vast Holdings, Inc. Leveraging its machine learning, informed by more than 7 million listings per day and more than 18 million consumer sessions per month, CarStory brings the industry's most complete and accurate view of predictive market data to Vroom's national ecommerce and vehicle operations platform. As part of Vroom, CarStory will continue to drive automotive retail innovation by aggregating, optimizing and distributing current market data from thousands of automotive sources and offering its digital retailing services to dealers, top automotive financial services companies and household names in automotive industry research and retailing.<br><br>https://www.globenewswire.com/news-release/2020/12/15/2145364/0/en/Online-Automotive-Retailer-Vroom-to-Acquire-CarStory.html<br><br>• **Location Information.** With your consent, our Apps may collect geolocation information from your device in order to tailor our Services to you, for example, showing you vehicles closer to your location. You may opt out of location sharing by accessing the location settings on your device and setting your device not to share its location with us. |

| | |
|---|---|
| | Infringement of U.S. Patent No. 10,796,362 by Vroom, Vroom.com and/or Carstory.com |

- **Information Collected Automatically.** When you use the Services, we or our third-party service providers may automatically receive and record certain information from your device or through the Services. For example, this may include your device's IP address, user-agent, web pages you visit or features you use within the Services, the date and time of your activities on the Services, time since your last visit, links you click, searches conducted, the website visited before navigating to the Services, your software and hardware attributes (including browser and operating system type and version, app version, device type, and device identifiers), demographic and interest data based on browsing activity, and your general location inferred from your IP address. To obtain such information, we or our third-party service providers may use the following technologies to recognize your device and collect information about your device and Services usage:

https://www.vroom.com/legal/privacy-policy

**About Vroom:**
Vroom is an innovative, end-to-end ecommerce platform designed to offer a better way to buy and a better way to sell used vehicles. The company's scalable, data-driven technology brings all phases of the vehicle buying and selling process to consumers wherever they are and offers an extensive selection of vehicles, transparent pricing, competitive financing, and at-home pick-up and delivery. Vroom is based in New York and Houston and also operates the Texas Direct Auto brand. For more information, visit **vroom.com**.

https://www.globenewswire.com/news-release/2020/12/15/2145364/0/en/Online-Automotive-Retailer-Vroom-to-Acquire-CarStory.html



https://www.carstory.com/cars/make-chevrolet/model-tahoe/location-chicago_il?zip=60602

| 1[c] generating, based on the determined first location, an in-market used automobile buyer area | Vroom, Vroom.com and/or Carstory.com include generating, based on the determined first location, an in-market used automobile buyer area.<br><br>• **Location Information.** With your consent, our Apps may collect geolocation information from your device in order to tailor our Services to you, for example, showing you vehicles closer to your location. You may opt out of location sharing by accessing the location settings on your device and setting your device not to share its location with us.<br><br>• **Information Collected Automatically.** When you use the Services, we or our third-party service providers may automatically receive and record certain information from your device or through the Services. For example, this may include your device's IP address, user-agent, web pages you visit or features you use within the Services, the date and time of your activities on the Services, time since your last visit, links you click, searches conducted, the website visited before navigating to the Services, your software and hardware attributes (including browser and operating system type and version, app version, device type, and device identifiers), demographic and interest data based on browsing activity, and your general location inferred from your IP address. To obtain such information, we or our third-party service providers may use the following technologies to recognize your device and collect information about your device and Services usage:<br><br>https://www.vroom.com/legal/privacy-policy |

| | |
|---|---|
| | **Infringement of U.S. Patent No. 10,796,362 by Vroom, Vroom.com and/or Carstory.com** |
| | **About Vroom:**<br>Vroom is an innovative, end-to-end ecommerce platform designed to offer a better way to buy and a better way to sell used vehicles. The company's scalable, data-driven technology brings all phases of the vehicle buying and selling process to consumers wherever they are and offers an extensive selection of vehicles, transparent pricing, competitive financing, and at-home pick-up and delivery. Vroom is based in New York and Houston and also operates the Texas Direct Auto brand. For more information, visit **vroom.com**.<br><br>https://www.globenewswire.com/news-release/2020/12/15/2145364/0/en/Online-Automotive-Retailer-Vroom-to-Acquire-CarStory.html<br><br><br>  <br>https://www.carstory.com/cars/make-chevrolet/model-tahoe/location-chicago_il?zip=60602 |
| 1[d] determining that at least one used automobile buyer is located within the in-market used automobile buyer area; | Vroom, Vroom.com and/or Carstory.com include determining that at least one used automobile buyer is located within the in-market used automobile buyer area.<br><br>NEW YORK, Dec. 15, 2020 (GLOBE NEWSWIRE) -- Vroom (**www.vroom.com**), an innovative ecommerce platform that offers a better way to buy and sell used vehicles, today announced that it has entered into a definitive agreement to acquire CarStory, a leader in AI-powered analytics and digital services for automotive retail, through the acquisition of Vast Holdings, Inc. Leveraging its machine learning, informed by more than 7 million listings per day and more than 18 million consumer sessions per month, CarStory brings the industry's most complete and accurate view of predictive market data to Vroom's national ecommerce and vehicle operations platform. As part of Vroom, CarStory will continue to drive automotive retail innovation by aggregating, optimizing and distributing current market data from thousands of automotive sources and offering its digital retailing services to dealers, top automotive financial services companies and household names in automotive industry research and retailing.<br><br>https://www.globenewswire.com/news-release/2020/12/15/2145364/0/en/Online-Automotive-Retailer-Vroom-to-Acquire-CarStory.html<br><br>• **Location Information.** With your consent, our Apps may collect geolocation information from your device in order to tailor our Services to you, for example, showing you vehicles closer to your location. You may opt out of location sharing by accessing the location settings on your device and setting your device not to share its location with us. |

| Infringement of U.S. Patent No. 10,796,362 by Vroom, Vroom.com and/or Carstory.com |
|---|

- **Information Collected Automatically.** When you use the Services, we or our third-party service providers may automatically receive and record certain information from your device or through the Services. For example, this may include your device's IP address, user-agent, web pages you visit or features you use within the Services, the date and time of your activities on the Services, time since your last visit, links you click, searches conducted, the website visited before navigating to the Services, your software and hardware attributes (including browser and operating system type and version, app version, device type, and device identifiers), demographic and interest data based on browsing activity, and your general location inferred from your IP address. To obtain such information, we or our third-party service providers may use the following technologies to recognize your device and collect information about your device and Services usage:

https://www.vroom.com/legal/privacy-policy

**About Vroom:**

Vroom is an innovative, end-to-end ecommerce platform designed to offer a better way to buy and a better way to sell used vehicles. The company's scalable, data-driven technology brings all phases of the vehicle buying and selling process to consumers wherever they are and offers an extensive selection of vehicles, transparent pricing, competitive financing, and at-home pick-up and delivery. Vroom is based in New York and Houston and also operates the Texas Direct Auto brand. For more information, visit **vroom.com**.

https://www.globenewswire.com/news-release/2020/12/15/2145364/0/en/Online-Automotive-Retailer-Vroom-to-Acquire-CarStory.html



**Delivered Right to You**

Get your car or truck shipped to your home or a convenient nearby location.

https://www.vroom.com/





https://www.carstory.com/cars/make-chevrolet/model-tahoe/location-chicago_il?zip=60602

| 1[e] receiving, via a used automobile buyer interface, a first bid from a first used automobile buyer located at a second location within the in-market used automobile buyer area | Vroom, Vroom.com and/or Carstory.com include receiving, via a used automobile buyer interface, a first bid from a first used automobile buyer located at a second location within the in-market used automobile buyer area. |
|---|---|

NEW YORK, Dec. 15, 2020 (GLOBE NEWSWIRE) -- Vroom (**www.vroom.com**), an innovative ecommerce platform that offers a better way to buy and sell used vehicles, today announced that it has entered into a definitive agreement to acquire CarStory, a leader in AI-powered analytics and digital services for automotive retail, through the acquisition of Vast Holdings, Inc. Leveraging its machine learning, informed by more than 7 million listings per day and more than 18 million consumer sessions per month, CarStory brings the industry's most complete and accurate view of predictive market data to Vroom's national ecommerce and vehicle operations platform. As part of Vroom, CarStory will continue to drive automotive retail innovation by aggregating, optimizing and distributing current market data from thousands of automotive sources and offering its digital retailing services to dealers, top automotive financial services companies and household names in automotive industry research and retailing.

https://www.globenewswire.com/news-release/2020/12/15/2145364/0/en/Online-Automotive-Retailer-Vroom-to-Acquire-CarStory.html

- **Location Information.** With your consent, our Apps may collect geolocation information from your device in order to tailor our Services to you, for example, showing you vehicles closer to your location. You may opt out of location sharing by accessing the location settings on your device and setting your device not to share its location with us.

- **Information Collected Automatically.** When you use the Services, we or our third-party service providers may automatically receive and record certain information from your device or through the Services. For example, this may include your device's IP address, user-agent, web pages you visit or features you use within the Services, the date and time of your activities on the Services, time since your last visit, links you click, searches conducted, the website visited before navigating to the Services, your software and hardware attributes (including browser and operating system type and version, app version, device type, and device identifiers), demographic and interest data based on browsing activity, and your general location inferred from your IP address. To obtain such information, we or our third-party service providers may use the following technologies to recognize your device and collect information about your device and Services usage:

https://www.vroom.com/legal/privacy-policy

About Vroom:
Vroom is an innovative, end-to-end ecommerce platform designed to offer a better way to buy and a better way to sell used vehicles. The company's scalable, data-driven technology brings all phases of the vehicle buying and selling process to consumers wherever they are and offers an extensive selection of vehicles, transparent pricing, competitive financing, and at-home pick-up and delivery. Vroom is based in New York and Houston and also operates the Texas Direct Auto brand. For more information, visit **vroom.com**.

https://www.globenewswire.com/news-release/2020/12/15/2145364/0/en/Online-Automotive-Retailer-Vroom-to-Acquire-CarStory.html



### Delivered Right to You

Get your car or truck shipped to your home or a convenient nearby location.

https://www.vroom.com/

| Infringement of U.S. Patent No. 10,796,362 by Vroom, Vroom.com and/or Carstory.com | |
|---|---|
| | 

https://www.carstory.com/cars/make-chevrolet/model-tahoe/location-chicago_il?zip=60602 |
| 1[f] generating, based on receiving the first bid, driving directions between the first location and the second location; and | Vroom, Vroom.com and/or Carstory.com include generating, based on receiving the first bid, driving directions between the first location and the second location.

NEW YORK, Dec. 15, 2020 (GLOBE NEWSWIRE) -- Vroom (**www.vroom.com**), an innovative ecommerce platform that offers a better way to buy and sell used vehicles, today announced that it has entered into a definitive agreement to acquire CarStory, a leader in AI-powered analytics and digital services for automotive retail, through the acquisition of Vast Holdings, Inc. Leveraging its machine learning, informed by more than 7 million listings per day and more than 18 million consumer sessions per month, CarStory brings the industry's most complete and accurate view of predictive market data to Vroom's national ecommerce and vehicle operations platform. As part of Vroom, CarStory will continue to drive automotive retail innovation by aggregating, optimizing and distributing current market data from thousands of automotive sources and offering its digital retailing services to dealers, top automotive financial services companies and household names in automotive industry research and retailing.

https://www.globenewswire.com/news-release/2020/12/15/2145364/0/en/Online-Automotive-Retailer-Vroom-to-Acquire-CarStory.html

- **Location Information.** With your consent, our Apps may collect geolocation information from your device in order to tailor our Services to you, for example, showing you vehicles closer to your location. You may opt out of location sharing by accessing the location settings on your device and setting your device not to share its location with us.

- **Information Collected Automatically.** When you use the Services, we or our third-party service providers may automatically receive and record certain information from your device or through the Services. For example, this may include your device's IP address, user-agent, web pages you visit or features you use within the Services, the date and time of your activities on the Services, time since your last visit, links you click, searches conducted, the website visited before navigating to the Services, your software and hardware attributes (including browser and operating system type and version, app version, device type, and device identifiers), demographic and interest data based on browsing activity, and your general location inferred from your IP address. To obtain such information, we or our third-party service providers may use the following technologies to recognize your device and collect information about your device and Services usage:

https://www.vroom.com/legal/privacy-policy

**About Vroom:**
Vroom is an innovative, end-to-end ecommerce platform designed to offer a better way to buy and a better way to sell used vehicles. The company's scalable, data-driven technology brings all phases of the vehicle buying and selling process to consumers wherever they are and offers an extensive selection of vehicles, transparent pricing, competitive financing, and at-home pick-up and delivery. Vroom is based in New York and Houston and also operates the Texas Direct Auto brand. For more information, visit **vroom.com**. |

| | Infringement of U.S. Patent No. 10,796,362 by Vroom, Vroom.com and/or Carstory.com |
|---|---|
| | https://www.globenewswire.com/news-release/2020/12/15/2145364/0/en/Online-Automotive-Retailer-Vroom-to-Acquire-CarStory.html<br><br>**Delivered Right to You**<br>Get your car or truck shipped to your home or a convenient nearby location.<br><br>https://www.vroom.com/<br><br>CHEVROLET TAHOE within 50 miles of 60602<br>441 Used Chevrolet Tahoe For Sale near Chicago, IL sorted by Best Deals<br><br>PRICE 1K-84K   CONDITION FAIR TO NEW   YEAR 2001-2021   FEATURES BASE MODEL TO FUL...<br><br>2019 Chevrolet Tahoe LS   2015 Chevrolet Tahoe LS   2018 Chevrolet Tahoe LT<br>18,569 miles / $41,340   21,216 miles / $29,699   21,263 miles / $40,980<br>Texas Direct Auto. Powered by Vroo...   Countryside Nissan / Countryside, IL   Texas Direct Auto. Powered by Vroo...<br>Ad closed by Google<br><br>https://www.carstory.com/cars/make-chevrolet/model-tahoe/location-chicago_il?zip=60602 |
| 1[g] providing, via the used automobile seller interface, the first bid including at least a price for the first used automobile and the driving directions between the first location and the second location. | Vroom, Vroom.com and/or Carstory.com include providing, via the used automobile seller interface, the first bid including at least a price for the first used automobile and the driving directions between the first location and the second location.<br><br>NEW YORK, Dec. 15, 2020 (GLOBE NEWSWIRE) -- Vroom (**www.vroom.com**), an innovative ecommerce platform that offers a better way to buy and sell used vehicles, today announced that it has entered into a definitive agreement to acquire CarStory, a leader in AI-powered analytics and digital services for automotive retail, through the acquisition of Vast Holdings, Inc. Leveraging its machine learning, informed by more than 7 million listings per day and more than 18 million consumer sessions per month, CarStory brings the industry's most complete and accurate view of predictive market data to Vroom's national ecommerce and vehicle operations platform. As part of Vroom, CarStory will continue to drive automotive retail innovation by aggregating, optimizing and distributing current market data from thousands of automotive sources and offering its digital retailing services to dealers, top automotive financial services companies and household names in automotive industry research and retailing.<br><br>https://www.globenewswire.com/news-release/2020/12/15/2145364/0/en/Online-Automotive-Retailer-Vroom-to-Acquire-CarStory.html<br><br>• **Location Information.** With your consent, our Apps may collect geolocation information from your device in order to tailor our Services to you, for example, showing you vehicles closer to your location. You may opt out of location sharing by accessing the location settings on your device and setting your device not to share its location with us. |

- **Information Collected Automatically.** When you use the Services, we or our third-party service providers may automatically receive and record certain information from your device or through the Services. For example, this may include your device's IP address, user-agent, web pages you visit or features you use within the Services, the date and time of your activities on the Services, time since your last visit, links you click, searches conducted, the website visited before navigating to the Services, your software and hardware attributes (including browser and operating system type and version, app version, device type, and device identifiers), demographic and interest data based on browsing activity, and your general location inferred from your IP address. To obtain such information, we or our third-party service providers may use the following technologies to recognize your device and collect information about your device and Services usage:

https://www.vroom.com/legal/privacy-policy

**About Vroom:**
Vroom is an innovative, end-to-end ecommerce platform designed to offer a better way to buy and a better way to sell used vehicles. The company's scalable, data-driven technology brings all phases of the vehicle buying and selling process to consumers wherever they are and offers an extensive selection of vehicles, transparent pricing, competitive financing, and at-home pick-up and delivery. Vroom is based in New York and Houston and also operates the Texas Direct Auto brand. For more information, visit **vroom.com**.

https://www.globenewswire.com/news-release/2020/12/15/2145364/0/en/Online-Automotive-Retailer-Vroom-to-Acquire-CarStory.html



### Delivered Right to You

Get your car or truck shipped to your home or a convenient nearby location.

https://www.vroom.com/



https://www.carstory.com/cars/make-chevrolet/model-tahoe/location-chicago_il?zip=60602

Infringement of U.S. Patent No. 10,796,362 by Vroom, Vroom.com and/or Carstory.com

| | |
|---|---|
| 2[a] The method of claim 1, wherein the used automobile seller interface is a manufacturer off-lease seller interface, further comprising: receiving, via the manufacturer off-lease seller interface, a manufacturer used automobile seller selection of the first bid, wherein the manufacturer used automobile seller selection indicates a manufacturer used automobile seller intention to sell the first used automobile based on the first bid to the first used automobile buyer. | Vroom, Vroom.com and/or Carstory.com include wherein the used automobile seller interface is a manufacturer off-lease seller interface, further comprising: receiving, via the manufacturer off-lease seller interface, a manufacturer used automobile seller selection of the first bid, wherein the manufacturer used automobile seller selection indicates a manufacturer used automobile seller intention to sell the first used automobile based on the first bid to the first used automobile buyer.

NEW YORK, Dec. 15, 2020 (GLOBE NEWSWIRE) -- Vroom (**www.vroom.com**), an innovative ecommerce platform that offers a better way to buy and sell used vehicles, today announced that it has entered into a definitive agreement to acquire CarStory, a leader in AI-powered analytics and digital services for automotive retail, through the acquisition of Vast Holdings, Inc. Leveraging its machine learning, informed by more than 7 million listings per day and more than 18 million consumer sessions per month, CarStory brings the industry's most complete and accurate view of predictive market data to Vroom's national ecommerce and vehicle operations platform. As part of Vroom, CarStory will continue to drive automotive retail innovation by aggregating, optimizing and distributing current market data from thousands of automotive sources and offering its digital retailing services to dealers, top automotive financial services companies and household names in automotive industry research and retailing.

https://www.globenewswire.com/news-release/2020/12/15/2145364/0/en/Online-Automotive-Retailer-Vroom-to-Acquire-CarStory.html



https://www.vroom.com/

 |

| Infringement of U.S. Patent No. 10,796,362 by Vroom, Vroom.com and/or Carstory.com | |
|---|---|

|  | https://www.carstory.com/cars/make-chevrolet/model-tahoe/location-chicago_il?zip=60602 |
|  | Vroom differs from other used car sites in that it takes possession of the cars it lists for sale. Rather than function as a marketplace for people to sell cars to each other, Vroom provides a "white glove" service that spans the entire transaction. Anyone seeking to sell on Vroom can take a few photos of their car (including a scan of the VIN number) and get an exact appraisal based Vroom's marketplace pricing system. If the seller agrees, Vroom sends the paperwork via FedEx, provides a voucher, picks up the car, and hauls it to its 22-acre reconditioning facility in Dallas, Texas. |
|  | https://fortune.com/2015/06/16/vroom-used-cars/ |
|  | **vroom** WHAT'S |
|  | **how it works**<br><br>① **Tell Us About Your Car**<br>Here's what we ask for:<br>• License Plate or VIN  • Vehicle condition<br>• Trim (LE, SE, SLT, etc)  • Vehicle history<br>• Exact mileage<br><br>② **Get Your Price**<br>We'll give you an instant price for your vehicle that is good for 7 days or 250 additional miles (whichever comes first). If we're unable to calculate an instant price, one of our car-buying experts will email you a price typically within the same day.<br><br>③ **We Pick It Up. You Get Paid**<br>We'll schedule a time to come pick up your vehicle, free of charge, anywhere in the lower 48 states. Once we have your car, we'll send your payment. |
|  | https://www.vroom.com/sell |
| 3[a] The method of claim 1, wherein the first request is made by the used automobile seller using a mobile device which takes a picture of a vehicle identifier, and the vehicle identifier is recognized using optical character recognition | Vroom, Vroom.com and/or Carstory.com include wherein the first request is made by the used automobile seller using a mobile device which takes a picture of a vehicle identifier, and the vehicle identifier is recognized using optical character recognition. |

| | Infringement of U.S. Patent No. 10,796,362 by Vroom, Vroom.com and/or Carstory.com |
|---|---|
| | Vroom differs from other used car sites in that it takes possession of the cars it lists for sale. Rather than function as a marketplace for people to sell cars to each other, Vroom provides a "white glove" service that spans the entire transaction. Anyone seeking to sell on Vroom can take a few photos of their car (including a sean of the VIN number) and get an exact appraisal based Vroom's marketplace pricing system. If the seller agrees, Vroom sends the paperwork via FedEx, provides a voucher, picks up the car, and hauls it to its 22-acre reconditioning facility in Dallas, Texas.<br><br>https://fortune.com/2015/06/16/vroom-used-cars/<br><br><br><br>https://www.vroom.com/ |

| Infringement of U.S. Patent No. 10,796,362 by Vroom, Vroom.com and/or Carstory.com |
| --- |



https://apps.apple.com/us/app/vroom-used-cars-delivered/id1494048038

| Infringement of U.S. Patent No. 10,796,362 by Vroom, Vroom.com and/or Carstory.com | |
|---|---|
| |  |
| 4[a] The method of claim 1, wherein the first request is made by the used automobile seller using a mobile device including a microphone, and the vehicle identifier is input via the microphone, and the vehicle identifier is recognized using speech recognition. | Vroom, Vroom.com and/or Carstory.com include wherein the first request is made by the used automobile seller using a mobile device including a microphone, and the vehicle identifier is input via the microphone, and the vehicle identifier is recognized using speech recognition. |

| Infringement of U.S. Patent No. 10,796,362 by Vroom, Vroom.com and/or Carstory.com |
|---|



https://apps.apple.com/us/app/vroom-used-cars-delivered/id1494048038



| 5[a] The method of claim 1, further comprising storing, on a computer readable medium, | Vroom, Vroom.com and/or Carstory.com include storing, on a computer readable medium, automobile market data that is representative of recent automobile market characteristics, wherein the automobile market data is based on real-time automobile market data. |
|---|---|

| | |
|---|---|
| | **Infringement of U.S. Patent No. 10,796,362 by Vroom, Vroom.com and/or Carstory.com** |
| automobile market data that is representative of recent automobile market characteristics, wherein the automobile market data is based on real-time automobile market data. | NEW YORK, Dec. 15, 2020 (GLOBE NEWSWIRE) -- Vroom (**www.vroom.com**), an innovative ecommerce platform that offers a better way to buy and sell used vehicles, today announced that it has entered into a definitive agreement to acquire CarStory, a leader in AI-powered analytics and digital services for automotive retail, through the acquisition of Vast Holdings, Inc. Leveraging its machine learning, informed by more than 7 million listings per day and more than 18 million consumer sessions per month, CarStory brings the industry's most complete and accurate view of predictive market data to Vroom's national ecommerce and vehicle operations platform. As part of Vroom, CarStory will continue to drive automotive retail innovation by aggregating, optimizing and distributing current market data from thousands of automotive sources and offering its digital retailing services to dealers, top automotive financial services companies and household names in automotive industry research and retailing.<br><br>https://www.globenewswire.com/news-release/2020/12/15/2145364/0/en/Online-Automotive-Retailer-Vroom-to-Acquire-CarStory.html<br><br><br><br>https://www.carstory.com/cars/make-chevrolet/model-tahoe/location-chicago_il?zip=60602<br><br><br>https://www.carstory.ai/track/ |
| 6[a] The method of claim 1, wherein the first request includes a picture of at least one of the exterior of the automobile, the interior of | Vroom, Vroom.com and/or Carstory.com include wherein the first request includes a picture of at least one of the exterior of the automobile, the interior of the automobile, the dashboard of the automobile, the odometer of the automobile, service records of the automobile, and ownership records of the automobile. |

| Infringement of U.S. Patent No. 10,796,362 by Vroom, Vroom.com and/or Carstory.com | |
|---|---|
| the automobile, the dashboard of the automobile, the odometer of the automobile, service records of the automobile, and ownership records of the automobile. | <br>https://www.vroom.com/inventory/land-rover-discovery-2020-SALRG2RV2L2423807<br><br>https://www.vroom.com/sell |

| Infringement of Claim 7 of U.S. Patent No. 10,796,362 by Vroom, Vroom.com and/or Carstory.com | |
|---|---|
| 7[a] The method of claim 1, further comprising storing, on a computer readable medium, pricing data including used automobile data and new automobile data, including actual prices of executed transactions, dealer listing prices, dealer sale prices, manufacturer incentives, dealer bids, consumer | Vroom, Vroom.com and/or Carstory.com include storing, on a computer readable medium, pricing data including used automobile data and new automobile data, including actual prices of executed transactions, dealer listing prices, dealer sale prices, manufacturer incentives, dealer bids, consumer bids, and consumer pricing parameters. |

| Infringement of U.S. Patent No. 10,796,362 by Vroom, Vroom.com and/or Carstory.com | |
|---|---|
| bids, and consumer pricing parameters. | NEW YORK, Dec. 15, 2020 (GLOBE NEWSWIRE) -- Vroom (**www.vroom.com**), an innovative ecommerce platform that offers a better way to buy and sell used vehicles, today announced that it has entered into a definitive agreement to acquire CarStory, a leader in AI-powered analytics and digital services for automotive retail, through the acquisition of Vast Holdings, Inc. Leveraging its machine learning, informed by more than 7 million listings per day and more than 18 million consumer sessions per month, CarStory brings the industry's most complete and accurate view of predictive market data to Vroom's national ecommerce and vehicle operations platform. As part of Vroom, CarStory will continue to drive automotive retail innovation by aggregating, optimizing and distributing current market data from thousands of automotive sources and offering its digital retailing services to dealers, top automotive financial services companies and household names in automotive industry research and retailing.<br><br>https://www.globenewswire.com/news-release/2020/12/15/2145364/0/en/Online-Automotive-Retailer-Vroom-to-Acquire-CarStory.html<br><br><br><br>https://www.carstory.com/cars/make-chevrolet/model-tahoe/location-chicago_il?zip=60602<br><br><br>https://www.carstory.ai/track/ |
| Infringement of Claim 8 of U.S. Patent No. 10,796,362 by Vroom, Vroom.com and/or Carstory.com | |
| 8[a] The method of claim 1, wherein an add-on, including at least one of insurance, financing, a service contract, a | Vroom, Vroom.com and/or Carstory.com include wherein an add-on, including at least one of insurance, financing, a service contract, a warranty, and a hard-add accessory, is provided by a third party to the first used automobile buyer with the first request, via the used automobile buyer interface, wherein the third party is different from the used automobile seller and the first used automobile buyer. |

Infringement of U.S. Patent No. 10,796,362 by Vroom, Vroom.com and/or Carstory.com

warranty, and a hard-add accessory, is provided by a third party to the first used automobile buyer with the first request, via the used automobile buyer interface, wherein the third party is different from the used automobile seller and the first used automobile buyer.



https://www.vroom.com/protection

| | Infringement of U.S. Patent No. 10,796,362 by Vroom, Vroom.com and/or Carstory.com |
|---|---|
| | <br>https://www.vroom.com/finance<br><br>https://www.vroom.com/finance |
| 9 [a] The method of claim 8, wherein the add-on is selected for inclusion in the first bid by the first used automobile buyer. | Vroom, Vroom.com and/or Carstory.com include wherein the add-on is selected for inclusion in the first bid by the first used automobile buyer. |

| Infringement of U.S. Patent No. 10,796,362 by Vroom, Vroom.com and/or Carstory.com | |
|---|---|



https://www.vroom.com/protection

| 10[a] The method of claim 1, further comprising providing second driving directions between the first location and a third location. | Vroom, Vroom.com and/or Carstory.com include providing second driving directions between the first location and a third location. |
|---|---|
| | NEW YORK, Dec. 15, 2020 (GLOBE NEWSWIRE) -- Vroom (www.vroom.com), an innovative ecommerce platform that offers a better way to buy and sell used vehicles, today announced that it has entered into a definitive agreement to acquire CarStory, a leader in AI-powered analytics and digital services for automotive retail, through the acquisition of Vast Holdings, Inc. Leveraging its machine learning, informed by more than 7 million listings per day and more than 18 million consumer sessions per month, CarStory brings the industry's most complete and accurate view of predictive market data to Vroom's national ecommerce and vehicle operations platform. As part of Vroom, CarStory will continue to drive automotive retail innovation by aggregating, optimizing and distributing current market data from thousands of automotive sources and offering its digital retailing services to dealers, top automotive financial services companies and household names in automotive industry research and retailing. |
| | https://www.globenewswire.com/news-release/2020/12/15/2145364/0/en/Online-Automotive-Retailer-Vroom-to-Acquire-CarStory.html |

| | Infringement of U.S. Patent No. 10,796,362 by Vroom, Vroom.com and/or Carstory.com |
|---|---|
| |  **CHEVROLET TAHOE** within 50 miles of 60602<br>441 Used Chevrolet Tahoe For Sale near Chicago, IL sorted by Best Deals<br><br>PRICE 1K-84K  CONDITION FAIR TO NEW  YEAR 2001-2021  FEATURES BASE MODEL TO FUL...<br><br>2019 Chevrolet Tahoe LS 18,569 miles / $41,340  2015 Chevrolet Tahoe LS 21,216 miles / $29,699  2018 Chevrolet Tahoe LT 21,263 miles / $40,980  Ad closed by Google<br><br>https://www.carstory.com/cars/make-chevrolet/model-tahoe/location-chicago_il?zip=60602 |
| 11[a] The method of claim 1, further comprising providing a plurality of pickup locations, each having different driving directions. | Vroom, Vroom.com and/or Carstory.com include providing a plurality of pickup locations, each having different driving directions.<br><br>NEW YORK, Dec. 15, 2020 (GLOBE NEWSWIRE) -- Vroom (**www.vroom.com**), an innovative ecommerce platform that offers a better way to buy and sell used vehicles, today announced that it has entered into a definitive agreement to acquire CarStory, a leader in AI-powered analytics and digital services for automotive retail, through the acquisition of Vast Holdings, Inc. Leveraging its machine learning, informed by more than 7 million listings per day and more than 18 million consumer sessions per month, CarStory brings the industry's most complete and accurate view of predictive market data to Vroom's national ecommerce and vehicle operations platform. As part of Vroom, CarStory will continue to drive automotive retail innovation by aggregating, optimizing and distributing current market data from thousands of automotive sources and offering its digital retailing services to dealers, top automotive financial services companies and household names in automotive industry research and retailing.<br><br>https://www.globenewswire.com/news-release/2020/12/15/2145364/0/en/Online-Automotive-Retailer-Vroom-to-Acquire-CarStory.html<br><br>**CHEVROLET TAHOE** within 50 miles of 60602<br>441 Used Chevrolet Tahoe For Sale near Chicago, IL sorted by Best Deals<br><br>PRICE 1K-84K  CONDITION FAIR TO NEW  YEAR 2001-2021  FEATURES BASE MODEL TO FUL...<br><br>2019 Chevrolet Tahoe LS 18,569 miles / $41,340  2015 Chevrolet Tahoe LS 21,216 miles / $29,699  2018 Chevrolet Tahoe LT 21,263 miles / $40,980  Ad closed by Google<br>https://www.carstory.com/cars/make-chevrolet/model-tahoe/location-chicago_il?zip=60602 |
| 12 [a] The method of claim 1, wherein a consumer receives at least one of an insurance policy and a service contract at no charge. | Vroom, Vroom.com and/or Carstory.com include wherein a consumer receives at least one of an insurance policy and a service contract at no charge. |

| Infringement of U.S. Patent No. 10,796,362 by Vroom, Vroom.com and/or Carstory.com |
|---|



https://www.vroom.com/protection

https://www.vroom.com/finance

| 13 [a] The method of claim 1, wherein the first used automobile is an off-lease automobile, and the first location is a dealer in possession of the first used automobile. | Vroom, Vroom.com and/or Carstory.com include wherein the first used automobile is an off-lease automobile, and the first location is a dealer in possession of the first used automobile. |
|---|---|

NEW YORK, Dec. 15, 2020 (GLOBE NEWSWIRE) -- Vroom (**www.vroom.com**), an innovative ecommerce platform that offers a better way to buy and sell used vehicles, today announced that it has entered into a definitive agreement to acquire CarStory, a leader in AI-powered analytics and digital services for automotive retail, through the acquisition of Vast Holdings, Inc. Leveraging its machine learning, informed by more than 7 million listings per day and more than 18 million consumer sessions per month, CarStory brings the industry's most complete and accurate view of predictive market data to Vroom's national ecommerce and vehicle operations platform. As part of Vroom, CarStory will continue to drive automotive retail innovation by aggregating, optimizing and distributing current market data from thousands of automotive sources and offering its digital retailing services to dealers, top automotive financial services companies and household names in automotive industry research and retailing.

https://www.globenewswire.com/news-release/2020/12/15/2145364/0/en/Online-Automotive-Retailer-Vroom-to-Acquire-CarStory.html

Vroom differs from other used car sites in that it takes possession of the cars it lists for sale. Rather than function as a marketplace for people to sell cars to each other, Vroom provides a "white glove" service that spans the entire transaction. Anyone seeking to sell on Vroom can take a few photos of their car (including a scan of the VIN number) and get an exact appraisal based Vroom's marketplace pricing system. If the seller agrees, Vroom sends the paperwork via FedEx, provides a voucher, picks up the car, and hauls it to its 22-acre reconditioning facility in Dallas, Texas.

https://fortune.com/2015/06/16/vroom-used-cars/



https://www.vroom.com/sell

| | Infringement of U.S. Patent No. 10,796,362 by Vroom, Vroom.com and/or Carstory.com |
|---|---|
| | **About Vroom:**<br>Vroom is an innovative, end-to-end ecommerce platform designed to offer a better way to buy and a better way to sell used vehicles. The company's scalable, data-driven technology brings all phases of the vehicle buying and selling process to consumers wherever they are and offers an extensive selection of vehicles, transparent pricing, competitive financing, and at-home pick-up and delivery. Vroom is based in New York and Houston and also operates the Texas Direct Auto brand. For more information, visit **vroom.com**.<br><br>https://www.globenewswire.com/news-release/2020/12/15/2145364/0/en/Online-Automotive-Retailer-Vroom-to-Acquire-CarStory.html<br><br>CHEVROLET TAHOE within 50 miles of 60602<br>441 Used Chevrolet Tahoe For Sale near Chicago, IL sorted by Best Deals<br><br>PRICE 1K-84K   CONDITION FAIR TO NEW   YEAR 2001-2021   FEATURES BASE MODEL TO FUL...<br><br>2019 Chevrolet Tahoe LS — 18,569 miles / $41,340 — Texas Direct Auto, Powered by Vroo...<br>2015 Chevrolet Tahoe LS — 21,216 miles / $29,699 — Countryside Nissan / Countryside, IL<br>2018 Chevrolet Tahoe LT — 21,263 miles / $40,980 — Texas Direct Auto, Powered by Vroo...<br>Ad closed by Google<br><br>https://www.carstory.com/cars/make-chevrolet/model-tahoe/location-chicago_il?zip=60602 |
| 14 [a] The method of claim 1, wherein the used automobile seller interface is a manufacturer off-lease seller interface. | Vroom, Vroom.com and/or Carstory.com include wherein the used automobile seller interface is a manufacturer off-lease seller interface.<br><br><br><br>https://www.vroom.com/ |

Infringement of U.S. Patent No. 10,796,362 by Vroom, Vroom.com and/or Carstory.com

Vroom differs from other used car sites in that it takes possession of the cars it lists for sale. Rather than function as a marketplace for people to sell cars to each other, Vroom provides a "white glove" service that spans the entire transaction. Anyone seeking to sell on Vroom can take a few photos of their car (including a scan of the VIN number) and get an exact appraisal based Vroom's marketplace pricing system. If the seller agrees, Vroom sends the paperwork via FedEx, provides a voucher, picks up the car, and hauls it to its 22-acre reconditioning facility in Dallas, Texas.

https://fortune.com/2015/06/16/vroom-used-cars/

**vroom**                                                           WHAT'S

## how it works

① **Tell Us About Your Car**

Here's what we ask for:

- License Plate or VIN        • Vehicle condition
- Trim (LE, SE, SLT, etc)     • Vehicle history
- Exact mileage

② **Get Your Price**

We'll give you an instant price for your vehicle that is good for 7 days or 250 additional miles (whichever comes first). If we're unable to calculate an instant price, one of our car-buying experts will email you a price typically within the same day.

③ **We Pick It Up. You Get Paid**

We'll schedule a time to come pick up your vehicle, free of charge, anywhere in the lower 48 states. Once we have your car, we'll send your payment.

https://www.vroom.com/sell

**CHEVROLET TAHOE** within 50 miles of 60602

441 Used Chevrolet Tahoe For Sale near Chicago, IL sorted by Best Deals

| PRICE | 1K-84K | CONDITION | FAIR TO NEW | YEAR | 2001-2021 | FEATURES | BASE MODEL TO FUL... |

CALL (932) 526-5545
2019 Chevrolet Tahoe LS
18,569 miles / $41,340
Texas Direct Auto, Powered by Vroo...

CountrysideNissan.com
LOW MILES
2015 Chevrolet Tahoe LS
21,216 miles / $29,699
Countryside Nissan / Countryside, IL

ONE OWNER
CALL (932) 526-5545
2018 Chevrolet Tahoe LT
21,263 miles / $40,980
Texas Direct Auto, Powered by Vroo...

Ad closed by Google

https://www.carstory.com/cars/make-chevrolet/model-tahoe/location-chicago_il?zip=60602

| Infringement of U.S. Patent No. 10,796,362 by Vroom, Vroom.com and/or Carstory.com | |
|---|---|
| 15 [a] The method of claim 14, wherein the manufacturer off-lease seller interface includes a number of matches or search hits for the first used automobile. | Vroom, Vroom.com and/or Carstory.com include wherein the manufacturer off-lease seller interface includes a number of matches or search hits for the first used automobile.<br><br>NEW YORK, Dec. 15, 2020 (GLOBE NEWSWIRE) -- Vroom (**www.vroom.com**), an innovative ecommerce platform that offers a better way to buy and sell used vehicles, today announced that it has entered into a definitive agreement to acquire CarStory, a leader in AI-powered analytics and digital services for automotive retail, through the acquisition of Vast Holdings, Inc. Leveraging its machine learning, informed by more than 7 million listings per day and more than 18 million consumer sessions per month, CarStory brings the industry's most complete and accurate view of predictive market data to Vroom's national ecommerce and vehicle operations platform. As part of Vroom, CarStory will continue to drive automotive retail innovation by aggregating, optimizing and distributing current market data from thousands of automotive sources and offering its digital retailing services to dealers, top automotive financial services companies and household names in automotive industry research and retailing.<br><br>https://www.globenewswire.com/news-release/2020/12/15/2145364/0/en/Online-Automotive-Retailer-Vroom-to-Acquire-CarStory.html<br><br><br><br>https://www.carstory.com/cars/make-chevrolet/model-tahoe/location-chicago_il?zip=60602 |
| 16 [a] The method of claim 14, wherein a manufacturer user inputs the vehicle identifier into the manufacturer off-lease seller interface by one of typing, speaking, or providing an image of the vehicle identifier. | Vroom, Vroom.com and/or Carstory.com include wherein a manufacturer user inputs the vehicle identifier into the manufacturer off-lease seller interface by one of typing, speaking, or providing an image of the vehicle identifier. |

| Infringement of U.S. Patent No. 10,796,362 by Vroom, Vroom.com and/or Carstory.com |
|---|



https://apps.apple.com/us/app/vroom-used-cars-delivered/id1494048038



| 17 [a] The method of claim 14, wherein the manufacturer off-lease seller interface receives a | Vroom, Vroom.com and/or Carstory.com include wherein the manufacturer off-lease seller interface receives a parameter that the first used automobile will be available for pickup only after a certain date. |
|---|---|

| Infringement of U.S. Patent No. 10,796,362 by Vroom, Vroom.com and/or Carstory.com | |
|---|---|
| parameter that the first used automobile will be available for pickup only after a certain date | **vroom**  WHAT'S<br><br>**how it works**<br><br>① **Tell Us About Your Car**<br>Here's what we ask for:<br>• License Plate or VIN  • Vehicle condition<br>• Trim (LE, SE, SLT, etc)  • Vehicle history<br>• Exact mileage<br><br>② **Get Your Price**<br>We'll give you an instant price for your vehicle that is good for 7 days or 250 additional miles (whichever comes first). If we're unable to calculate an instant price, one of our car-buying experts will email you a price typically within the same day.<br><br>③ **We Pick It Up. You Get Paid**<br>We'll schedule a time to come pick up your vehicle, free of charge, anywhere in the lower 48 states. Once we have your car, we'll send you payment.<br><br>https://www.vroom.com/sell |
| 18 [a] The method of claim 1, wherein the used automobile seller interface and the used automobile buyer interface are integrated within at least one of a single website and a single application. | Vroom, Vroom.com and/or Carstory.com include wherein the used automobile seller interface and the used automobile buyer interface are integrated within at least one of a single website and a single application.<br><br>Vroom differs from other used car sites in that it takes possession of the cars it lists for sale. Rather than function as a marketplace for people to sell cars to each other, Vroom provides a "white glove" service that spans the entire transaction. Anyone seeking to sell on Vroom can take a few photos of their car (including a scan of the VIN number) and get an exact appraisal based Vroom's marketplace pricing system. If the seller agrees, Vroom sends the paperwork via FedEx, provides a voucher, picks up the car, and hauls it to its 22-acre reconditioning facility in Dallas, Texas.<br>https://fortune.com/2015/06/16/vroom-used-cars/ |

Infringement of U.S. Patent No. 10,796,362 by Vroom, Vroom.com and/or Carstory.com



https://www.vroom.com/

https://apps.apple.com/us/app/vroom-used-cars-delivered/id1494048038

https://www.carstory.com/

| | Infringement of U.S. Patent No. 10,796,362 by Vroom, Vroom.com and/or Carstory.com |
|---|---|
| | <br>https://www.carstory.com/instant-cash-offer#/sell-my-car/start |
| 19 [a] The method of claim 1, further comprising: receiving, via the used automobile buyer interface, a second bid from a second used automobile buyer located at a third location within the in-market used automobile buyer area; | Vroom, Vroom.com and/or Carstory.com include receiving, via the used automobile buyer interface, a second bid from a second used automobile buyer located at a third location within the in-market used automobile buyer area.<br><br><br>https://www.vroom.com/<br><br>Vroom differs from other used car sites in that it takes possession of the cars it lists for sale. Rather than function as a marketplace for people to sell cars to each other, Vroom provides a "white glove" service that spans the entire transaction. Anyone seeking to sell on Vroom can take a few photos of their car (including a scan of the VIN number) and get an exact appraisal based Vroom's marketplace pricing system. If the seller agrees, Vroom sends the paperwork via FedEx, provides a voucher, picks up the car, and hauls it to its 22-acre reconditioning facility in Dallas, Texas.<br>https://fortune.com/2015/06/16/vroom-used-cars/<br><br>• **Location Information.** With your consent, our Apps may collect geolocation information from your device in order to tailor our Services to you, for example, showing you vehicles closer to your location. You may opt out of location sharing by accessing the location settings on your device and setting your device not to share its location with us. |

| Infringement of U.S. Patent No. 10,796,362 by Vroom, Vroom.com and/or Carstory.com |

- **Information Collected Automatically.** When you use the Services, we or our third-party service providers may automatically receive and record certain information from your device or through the Services. For example, this may include your device's IP address, user-agent, web pages you visit or features you use within the Services, the date and time of your activities on the Services, time since your last visit, links you click, searches conducted, the website visited before navigating to the Services, your software and hardware attributes (including browser and operating system type and version, app version, device type, and device identifiers), demographic and interest data based on browsing activity, and your general location inferred from your IP address. To obtain such information, we or our third-party service providers may use the following technologies to recognize your device and collect information about your device and Services usage:

https://www.vroom.com/legal/privacy-policy

**CHEVROLET  TAHOE** within 50 miles of 60602

441 Used Chevrolet Tahoe For Sale near Chicago, IL sorted by Best Deals

| PRICE | 1K-84K | CONDITION | FAIR TO NEW | YEAR | 2001-2021 | FEATURES | BASE MODEL TO FUL... |

2019 Chevrolet Tahoe LS
18,569 miles / $41,340
Texas Direct Auto. Powered by Vroo...

2015 Chevrolet Tahoe LS
21,216 miles / $29,699
Countryside Nissan / Countryside, IL

2018 Chevrolet Tahoe LT
21,263 miles / $40,980
Texas Direct Auto. Powered by Vroo...

Ad closed by Google

https://www.carstory.com/cars/make-chevrolet/model-tahoe/location-chicago_il?zip=60602

| 19 [b] generating, based on receiving the second bid, second driving directions between the first location and the third location; and | Vroom, Vroom.com and/or Carstory.com include generating, based on receiving the second bid, second driving directions between the first location and the third location. |

**vroom**

WHAT'S

**how it works**

① **Tell Us About Your Car**
Here's what we ask for:
- License Plate or VIN
- Trim (LE, SE, SLT, etc)
- Exact mileage
- Vehicle condition
- Vehicle history

② **Get Your Price**
We'll give you an instant price for your vehicle that is good for 7 days or 250 additional miles (whichever comes first). If we're unable to calculate an instant price, one of our car-buying experts will email you a price typically within the same day.

③ **We Pick It Up. You Get Paid**
We'll schedule a time to come pick up your vehicle, free of charge, anywhere in the lower 48 states. Once we have your car, we'll send you payment.

| Infringement of U.S. Patent No. 10,796,362 by Vroom, Vroom.com and/or Carstory.com ||
|---|---|
| | https://www.vroom.com/sell<br><br>• **Location Information.** With your consent, our Apps may collect geolocation information from your device in order to tailor our Services to you, for example, showing you vehicles closer to your location. You may opt out of location sharing by accessing the location settings on your device and setting your device not to share its location with us.<br><br>• **Information Collected Automatically.** When you use the Services, we or our third-party service providers may automatically receive and record certain information from your device or through the Services. For example, this may include your device's IP address, user-agent, web pages you visit or features you use within the Services, the date and time of your activities on the Services, time since your last visit, links you click, searches conducted, the website visited before navigating to the Services, your software and hardware attributes (including browser and operating system type and version, app version, device type, and device identifiers), demographic and interest data based on browsing activity, and your general location inferred from your IP address. To obtain such information, we or our third-party service providers may use the following technologies to recognize your device and collect information about your device and Services usage:<br><br>https://www.vroom.com/legal/privacy-policy<br><br><br>https://www.carstory.com/cars/make-chevrolet/model-tahoe/location-chicago_il?zip=60602 |
| 19 [c] providing, via the used automobile seller interface, the second bid including at least a second price for the first used automobile and the second driving directions between the first location and the third location. | Vroom, Vroom.com and/or Carstory.com include providing, via the used automobile seller interface, the second bid including at least a second price for the first used automobile and the second driving directions between the first location and the third location. |

Infringement of U.S. Patent No. 10,796,362 by Vroom, Vroom.com and/or Carstory.com

**vroom** WHAT'S

## how it works

**① Tell Us About Your Car**

Here's what we ask for:

- License Plate or VIN
- Trim (LE, SE, SLT, etc)
- Exact mileage
- Vehicle condition
- Vehicle history

**② Get Your Price**

We'll give you an instant price for your vehicle that is good for 7 days or 250 additional miles (whichever comes first). If we're unable to calculate an instant price, one of our car-buying experts will email you a price typically within the same day.

**③ We Pick It Up. You Get Paid**

We'll schedule a time to come pick up your vehicle, free of charge, anywhere in the lower 48 states. Once we have your car, we'll send your payment.

https://www.vroom.com/sell

- **Location Information.** With your consent, our Apps may collect geolocation information from your device in order to tailor our Services to you, for example, showing you vehicles closer to your location. You may opt out of location sharing by accessing the location settings on your device and setting your device not to share its location with us.

- **Information Collected Automatically.** When you use the Services, we or our third-party service providers may automatically receive and record certain information from your device or through the Services. For example, this may include your device's IP address, user-agent, web pages you visit or features you use within the Services, the date and time of your activities on the Services, time since your last visit, links you click, searches conducted, the website visited before navigating to the Services, your software and hardware attributes (including browser and operating system type and version, app version, device type, and device identifiers), demographic and interest data based on browsing activity, and your general location inferred from your IP address. To obtain such information, we or our third-party service providers may use the following technologies to recognize your device and collect information about your device and Services usage:

https://www.vroom.com/legal/privacy-policy

| Infringement of U.S. Patent No. 10,796,362 by Vroom, Vroom.com and/or Carstory.com | |
|---|---|
| |  https://www.carstory.com/cars/make-chevrolet/model-tahoe/location-chicago_il?zip=60602 |
| 20 [a] The method of claim 1, wherein the used automobile seller is an original equipment manufacturer. | Vroom, Vroom.com and/or Carstory.com include wherein the used automobile seller is an original equipment manufacturer.<br><br>NEW YORK, Dec. 15, 2020 (GLOBE NEWSWIRE) -- Vroom (**www.vroom.com**), an innovative ecommerce platform that offers a better way to buy and sell used vehicles, today announced that it has entered into a definitive agreement to acquire CarStory, a leader in AI-powered analytics and digital services for automotive retail, through the acquisition of Vast Holdings, Inc. Leveraging its machine learning, informed by more than 7 million listings per day and more than 18 million consumer sessions per month, CarStory brings the industry's most complete and accurate view of predictive market data to Vroom's national ecommerce and vehicle operations platform. As part of Vroom, CarStory will continue to drive automotive retail innovation by aggregating, optimizing and distributing current market data from thousands of automotive sources and offering its digital retailing services to dealers, top automotive financial services companies and household names in automotive industry research and retailing.<br><br>https://www.globenewswire.com/news-release/2020/12/15/2145364/0/en/Online-Automotive-Retailer-Vroom-to-Acquire-CarStory.html |
| 21 [a] The method of claim 1, wherein the used automobile seller is not an original equipment manufacturer. | Vroom, Vroom.com and/or Carstory.com include wherein the used automobile seller is not an original equipment manufacturer.<br><br>NEW YORK, Dec. 15, 2020 (GLOBE NEWSWIRE) -- Vroom (**www.vroom.com**), an innovative ecommerce platform that offers a better way to buy and sell used vehicles, today announced that it has entered into a definitive agreement to acquire CarStory, a leader in AI-powered analytics and digital services for automotive retail, through the acquisition of Vast Holdings, Inc. Leveraging its machine learning, informed by more than 7 million listings per day and more than 18 million consumer sessions per month, CarStory brings the industry's most complete and accurate view of predictive market data to Vroom's national ecommerce and vehicle operations platform. As part of Vroom, CarStory will continue to drive automotive retail innovation by aggregating, optimizing and distributing current market data from thousands of automotive sources and offering its digital retailing services to dealers, top automotive financial services companies and household names in automotive industry research and retailing.<br><br>https://www.globenewswire.com/news-release/2020/12/15/2145364/0/en/Online-Automotive-Retailer-Vroom-to-Acquire-CarStory.html |

| | Infringement of U.S. Patent No. 10,796,362 by Vroom, Vroom.com and/or Carstory.com |
|---|---|
| | Vroom differs from other used car sites in that it takes possession of the cars it lists for sale. Rather than function as a marketplace for people to sell cars to each other, Vroom provides a "white glove" service that spans the entire transaction. Anyone seeking to sell on Vroom can take a few photos of their car (including a scan of the VIN number) and get an exact appraisal based Vroom's marketplace pricing system. If the seller agrees, Vroom sends the paperwork via FedEx, provides a voucher, picks up the car, and hauls it to its 22-acre reconditioning facility in Dallas, Texas. https://fortune.com/2015/06/16/vroom-used-cars/ <br><br>  <br> https://www.vroom.com/ <br><br>  <br> https://www.carstory.com/cars/make-chevrolet/model-tahoe/location-chicago_il?zip=60602 |
| 22 [a] The method of claim 1, wherein a third party sells a plurality of used automobiles via the used automobile seller interface. | Vroom, Vroom.com and/or Carstory.com include wherein a third party sells a plurality of used automobiles via the used automobile seller interface. |

| | Infringement of U.S. Patent No. 10,796,362 by Vroom, Vroom.com and/or Carstory.com |
|---|---|
| | NEW YORK, Dec. 15, 2020 (GLOBE NEWSWIRE) -- Vroom (**www.vroom.com**), an innovative ecommerce platform that offers a better way to buy and sell used vehicles, today announced that it has entered into a definitive agreement to acquire CarStory, a leader in AI-powered analytics and digital services for automotive retail, through the acquisition of Vast Holdings, Inc. Leveraging its machine learning, informed by more than 7 million listings per day and more than 18 million consumer sessions per month, CarStory brings the industry's most complete and accurate view of predictive market data to Vroom's national ecommerce and vehicle operations platform. As part of Vroom, CarStory will continue to drive automotive retail innovation by aggregating, optimizing and distributing current market data from thousands of automotive sources and offering its digital retailing services to dealers, top automotive financial services companies and household names in automotive industry research and retailing.<br><br>https://www.globenewswire.com/news-release/2020/12/15/2145364/0/en/Online-Automotive-Retailer-Vroom-to-Acquire-CarStory.html<br><br><br><br>https://www.carstory.com/cars/make-chevrolet/model-tahoe/location-chicago_il?zip=60602 |
| 23 [a] The method of claim 22, wherein sales by the third party are made at negotiated prices. | Vroom, Vroom.com and/or Carstory.com include wherein sales by the third party are made at negotiated prices. |

Infringement of U.S. Patent No. 10,796,362 by Vroom, Vroom.com and/or Carstory.com



https://www.vroom.com/inventory/honda-odyssey-2017-5FNRL5H69HB019731

https://www.vroom.com/sell

| | Infringement of U.S. Patent No. 10,796,362 by Vroom, Vroom.com and/or Carstory.com | |
|---|---|

| | NEW YORK, Dec. 15, 2020 (GLOBE NEWSWIRE) -- Vroom (**www.vroom.com**), an innovative ecommerce platform that offers a better way to buy and sell used vehicles, today announced that it has entered into a definitive agreement to acquire CarStory, a leader in AI-powered analytics and digital services for automotive retail, through the acquisition of Vast Holdings, Inc. Leveraging its machine learning, informed by more than 7 million listings per day and more than 18 million consumer sessions per month, CarStory brings the industry's most complete and accurate view of predictive market data to Vroom's national ecommerce and vehicle operations platform. As part of Vroom, CarStory will continue to drive automotive retail innovation by aggregating, optimizing and distributing current market data from thousands of automotive sources and offering its digital retailing services to dealers, top automotive financial services companies and household names in automotive industry research and retailing.<br><br>https://www.globenewswire.com/news-release/2020/12/15/2145364/0/en/Online-Automotive-Retailer-Vroom-to-Acquire-CarStory.html<br><br><br>https://www.carstory.com/cars/make-chevrolet/model-tahoe/location-chicago_il?zip=60602 |
|---|
| 24 [a] The method of claim 22, wherein the used automobile seller interface includes lot inventory of the third party. | Vroom, Vroom.com and/or Carstory.com include wherein the used automobile seller interface includes lot inventory of the third party.<br><br>NEW YORK, Dec. 15, 2020 (GLOBE NEWSWIRE) -- Vroom (**www.vroom.com**), an innovative ecommerce platform that offers a better way to buy and sell used vehicles, today announced that it has entered into a definitive agreement to acquire CarStory, a leader in AI-powered analytics and digital services for automotive retail, through the acquisition of Vast Holdings, Inc. Leveraging its machine learning, informed by more than 7 million listings per day and more than 18 million consumer sessions per month, CarStory brings the industry's most complete and accurate view of predictive market data to Vroom's national ecommerce and vehicle operations platform. As part of Vroom, CarStory will continue to drive automotive retail innovation by aggregating, optimizing and distributing current market data from thousands of automotive sources and offering its digital retailing services to dealers, top automotive financial services companies and household names in automotive industry research and retailing.<br><br>https://www.globenewswire.com/news-release/2020/12/15/2145364/0/en/Online-Automotive-Retailer-Vroom-to-Acquire-CarStory.html |

| | |
|---|---|
| | Infringement of U.S. Patent No. 10,796,362 by Vroom, Vroom.com and/or Carstory.com |
| | <br><br>https://www.carstory.com/cars/make-chevrolet/model-tahoe/location-chicago_il?zip=60602<br><br><br><br>https://www.carstory.ai/track/ |
| 25 [a] The method of claim 22, wherein the used automobile buyer interface includes lot inventory of the third party. | Vroom, Vroom.com and/or Carstory.com include wherein the used automobile buyer interface includes lot inventory of the third party.<br><br>NEW YORK, Dec. 15, 2020 (GLOBE NEWSWIRE) -- Vroom (**www.vroom.com**), an innovative ecommerce platform that offers a better way to buy and sell used vehicles, today announced that it has entered into a definitive agreement to acquire CarStory, a leader in AI-powered analytics and digital services for automotive retail, through the acquisition of Vast Holdings, Inc. Leveraging its machine learning, informed by more than 7 million listings per day and more than 18 million consumer sessions per month, CarStory brings the industry's most complete and accurate view of predictive market data to Vroom's national ecommerce and vehicle operations platform. As part of Vroom, CarStory will continue to drive automotive retail innovation by aggregating, optimizing and distributing current market data from thousands of automotive sources and offering its digital retailing services to dealers, top automotive financial services companies and household names in automotive industry research and retailing.<br><br>https://www.globenewswire.com/news-release/2020/12/15/2145364/0/en/Online-Automotive-Retailer-Vroom-to-Acquire-CarStory.html |

Infringement of U.S. Patent No. 10,796,362 by Vroom, Vroom.com and/or Carstory.com



https://www.carstory.com/cars/make-chevrolet/model-tahoe/location-chicago_il?zip=60602

https://www.carstory.ai/track/

| 26 [a] The method of claim 1, wherein the used automobile seller is a company that operates at least one leasing activity. | Vroom, Vroom.com and/or Carstory.com include wherein the used automobile seller is a company that operates at least one leasing activity. |
| --- | --- |

https://www.vroom.com/

| Infringement of U.S. Patent No. 10,796,362 by Vroom, Vroom.com and/or Carstory.com | |
|---|---|
| | Vroom differs from other used car sites in that it takes possession of the cars it lists for sale. Rather than function as a marketplace for people to sell cars to each other, Vroom provides a "white glove" service that spans the entire transaction. Anyone seeking to sell on Vroom can take a few photos of their car (including a scan of the VIN number) and get an exact appraisal based Vroom's marketplace pricing system. If the seller agrees, Vroom sends the paperwork via FedEx, provides a voucher, picks up the car, and hauls it to its 22-acre reconditioning facility in Dallas, Texas. https://fortune.com/2015/06/16/vroom-used-cars/  https://www.vroom.com/finance |
| 27 [a] The method of claim 1, wherein the used automobile seller is a company that operates at least one financing activity. | Vroom, Vroom.com and/or Carstory.com include wherein the used automobile seller is a company that operates at least one financing activity. |

| Infringement of U.S. Patent No. 10,796,362 by Vroom, Vroom.com and/or Carstory.com | |
|---|---|
| | https://www.vroom.com/finance |
| 28 [a] The method of claim 1, wherein the used automobile seller is a captive finance company. | Vroom, Vroom.com and/or Carstory.com include wherein the used automobile seller is a captive finance company. |

| Infringement of U.S. Patent No. 10,796,362 by Vroom, Vroom.com and/or Carstory.com | |
|---|---|
| | https://www.vroom.com/finance<br><br>https://www.vroom.com/finance |
| 29 [a] The method of claim 1, further comprising, receiving an auction bid from a third party. | Vroom, Vroom.com and/or Carstory.com include comprising, receiving an auction bid from a third party. |

| Infringement of U.S. Patent No. 10,796,362 by Vroom, Vroom.com and/or Carstory.com | |
|---|---|
| | NEW YORK, Dec. 15, 2020 (GLOBE NEWSWIRE) -- Vroom (**www.vroom.com**), an innovative ecommerce platform that offers a better way to buy and sell used vehicles, today announced that it has entered into a definitive agreement to acquire CarStory, a leader in AI-powered analytics and digital services for automotive retail, through the acquisition of Vast Holdings, Inc. Leveraging its machine learning, informed by more than 7 million listings per day and more than 18 million consumer sessions per month, CarStory brings the industry's most complete and accurate view of predictive market data to Vroom's national ecommerce and vehicle operations platform. As part of Vroom, CarStory will continue to drive automotive retail innovation by aggregating, optimizing and distributing current market data from thousands of automotive sources and offering its digital retailing services to dealers, top automotive financial services companies and household names in automotive industry research and retailing. |
| | https://www.globenewswire.com/news-release/2020/12/15/2145364/0/en/Online-Automotive-Retailer-Vroom-to-Acquire-CarStory.html |
| |  |
| | https://www.carstory.com/ |
| | https://www.carstory.com/cars/make-chevrolet/model-tahoe/location-chicago_il?range=25&zip=60602. |
| 30 [a] The method of claim 1, further comprising, providing an auction bid to the used automobile buyer interface. | Vroom, Vroom.com and/or Carstory.com include providing an auction bid to the used automobile buyer interface. |
| | NEW YORK, Dec. 15, 2020 (GLOBE NEWSWIRE) -- Vroom (**www.vroom.com**), an innovative ecommerce platform that offers a better way to buy and sell used vehicles, today announced that it has entered into a definitive agreement to acquire CarStory, a leader in AI-powered analytics and digital services for automotive retail, through the acquisition of Vast Holdings, Inc. Leveraging its machine learning, informed by more than 7 million listings per day and more than 18 million consumer sessions per month, CarStory brings the industry's most complete and accurate view of predictive market data to Vroom's national ecommerce and vehicle operations platform. As part of Vroom, CarStory will continue to drive automotive retail innovation by aggregating, optimizing and distributing current market data from thousands of automotive sources and offering its digital retailing services to dealers, top automotive financial services companies and household names in automotive industry research and retailing. |
| | https://www.globenewswire.com/news-release/2020/12/15/2145364/0/en/Online-Automotive-Retailer-Vroom-to-Acquire-CarStory.html |

| | Infringement of U.S. Patent No. 10,796,362 by Vroom, Vroom.com and/or Carstory.com |
|---|---|
| | https://www.carstory.com/cars/make-chevrolet/model-tahoe/location-chicago_il?zip=60602 |
| 31 [a] The method of claim 1, wherein the used automobile seller interface and the used automobile buyer interface are provided by at least one webpage. | Vroom, Vroom.com and/or Carstory.com include wherein the used automobile seller interface and the used automobile buyer interface are provided by at least one webpage.<br><br>https://www.vroom.com/how-it-works<br><br>https://www.vroom.com/sell |

| Infringement of U.S. Patent No. 10,796,362 by Vroom, Vroom.com and/or Carstory.com | |
|---|---|
| | NEW YORK, Dec. 15, 2020 (GLOBE NEWSWIRE) -- Vroom (**www.vroom.com**), an innovative ecommerce platform that offers a better way to buy and sell used vehicles, today announced that it has entered into a definitive agreement to acquire CarStory, a leader in AI-powered analytics and digital services for automotive retail, through the acquisition of Vast Holdings, Inc. Leveraging its machine learning, informed by more than 7 million listings per day and more than 18 million consumer sessions per month, CarStory brings the industry's most complete and accurate view of predictive market data to Vroom's national ecommerce and vehicle operations platform. As part of Vroom, CarStory will continue to drive automotive retail innovation by aggregating, optimizing and distributing current market data from thousands of automotive sources and offering its digital retailing services to dealers, top automotive financial services companies and household names in automotive industry research and retailing. <br><br> https://www.globenewswire.com/news-release/2020/12/15/2145364/0/en/Online-Automotive-Retailer-Vroom-to-Acquire-CarStory.html <br><br>  <br> https://www.carstory.com/ <br><br> CHEVROLET TAHOE within 25 miles of 60602 <br><br> 240 Used Chevrolet Tahoe For Sale near Chicago, IL sorted by Best Deals <br><br> https://www.carstory.com/cars/make-chevrolet/model-tahoe/location-chicago_il?range=25&zip=60602 |
| 32 [a] A system comprising: a computer readable medium storing instructions | Vroom, Vroom.com and/or Carstory.com include a system comprising: a computer readable medium storing instructions. |

| Infringement of U.S. Patent No. 10,796,362 by Vroom, Vroom.com and/or Carstory.com |
|---|



https://apps.apple.com/us/app/vroom-used-cars-delivered/id1494048038



https://www.vroom.com/sell

NEW YORK, Dec. 15, 2020 (GLOBE NEWSWIRE) -- Vroom (**www.vroom.com**), an innovative ecommerce platform that offers a better way to buy and sell used vehicles, today announced that it has entered into a definitive agreement to acquire CarStory, a leader in AI-powered analytics and digital services for automotive retail, through the acquisition of Vast Holdings, Inc. Leveraging its machine learning, informed by more than 7 million listings per day and more than 18 million consumer sessions per month, CarStory brings the industry's most complete and accurate view of predictive market data to Vroom's national ecommerce and vehicle operations platform. As part of Vroom, CarStory will continue to drive automotive retail innovation by aggregating, optimizing and distributing current market data from thousands of automotive sources and offering its digital retailing services to dealers, top automotive financial services companies and household names in automotive industry research and retailing.

| Infringement of U.S. Patent No. 10,796,362 by Vroom, Vroom.com and/or Carstory.com | |
|---|---|
| | https://www.globenewswire.com/news-release/2020/12/15/2145364/0/en/Online-Automotive-Retailer-Vroom-to-Acquire-CarStory.html <br><br>  <br><br> https://www.carstory.com/ <br><br> CHEVROLET TAHOE within 25 miles of 60602 <br><br> 240 Used Chevrolet Tahoe For Sale near Chicago, IL sorted by Best Deals <br><br> https://www.carstory.com/cars/make-chevrolet/model-tahoe/location-chicago_il?range=25&zip=60602 |
| 32 [b] at least one processing device operably coupled to the computer readable medium, the at least one processing device executing the instructions to: | Vroom, Vroom.com and/or Carstory.com include at least one processing device operably coupled to the computer readable medium, the at least one processing device executing the instructions to. <br><br>  <br><br>  <br><br> https://apps.apple.com/us/app/vroom-used-cars-delivered/id1494048038 |

| Infringement of U.S. Patent No. 10,796,362 by Vroom, Vroom.com and/or Carstory.com |
|---|



https://www.vroom.com/sell

NEW YORK, Dec. 15, 2020 (GLOBE NEWSWIRE) -- Vroom (**www.vroom.com**), an innovative ecommerce platform that offers a better way to buy and sell used vehicles, today announced that it has entered into a definitive agreement to acquire CarStory, a leader in AI-powered analytics and digital services for automotive retail, through the acquisition of Vast Holdings, Inc. Leveraging its machine learning, informed by more than 7 million listings per day and more than 18 million consumer sessions per month, CarStory brings the industry's most complete and accurate view of predictive market data to Vroom's national ecommerce and vehicle operations platform. As part of Vroom, CarStory will continue to drive automotive retail innovation by aggregating, optimizing and distributing current market data from thousands of automotive sources and offering its digital retailing services to dealers, top automotive financial services companies and household names in automotive industry research and retailing.

https://www.globenewswire.com/news-release/2020/12/15/2145364/0/en/Online-Automotive-Retailer-Vroom-to-Acquire-CarStory.html

https://www.carstory.com/

https://www.carstory.com/cars/make-chevrolet/model-tahoe/location-chicago_il?range=25&zip=60602

| 32 [c] receive, via a used automobile seller interface, a first request for a response regarding a first used automobile, the first request made by a used automobile seller located at a first location and including a vehicle identifier and geolocation | Vroom, Vroom.com and/or Carstory.com include receiving, via a used automobile seller interface, a first request for a response regarding a first used automobile, the first request made by a used automobile seller located at a first location and including a vehicle identifier and geolocation information of the first used automobile. |
|---|---|

Infringement of U.S. Patent No. 10,796,362 by Vroom, Vroom.com and/or Carstory.com

| | |
|---|---|
| information of the first used automobile; |  |

https://www.vroom.com/sell

- **Location Information.** With your consent, our Apps may collect geolocation information from your device in order to tailor our Services to you, for example, showing you vehicles closer to your location. You may opt out of location sharing by accessing the location settings on your device and setting your device not to share its location with us.

- **Information Collected Automatically.** When you use the Services, we or our third-party service providers may automatically receive and record certain information from your device or through the Services. For example, this may include your device's IP address, user-agent, web pages you visit or features you use within the Services, the date and time of your activities on the Services, time since your last visit, links you click, searches conducted, the website visited before navigating to the Services, your software and hardware attributes (including browser and operating system type and version, app version, device type, and device identifiers), demographic and interest data based on browsing activity, and your general location inferred from your IP address. To obtain such information, we or our third-party service providers may use the following technologies to recognize your device and collect information about your device and Services usage:

https://www.vroom.com/legal/privacy-policy

NEW YORK, Dec. 15, 2020 (GLOBE NEWSWIRE) -- Vroom (**www.vroom.com**), an innovative ecommerce platform that offers a better way to buy and sell used vehicles, today announced that it has entered into a definitive agreement to acquire CarStory, a leader in AI-powered analytics and digital services for automotive retail, through the acquisition of Vast Holdings, Inc. Leveraging its machine learning, informed by more than 7 million listings per day and more than 18 million consumer sessions per month, CarStory brings the industry's most complete and accurate view of predictive market data to Vroom's national ecommerce and vehicle operations platform. As part of Vroom, CarStory will continue to drive automotive retail innovation by aggregating, optimizing, and distributing current market data from thousands of automotive sources and offering its digital retailing services to dealers, top automotive financial services companies and household names in automotive industry research and retailing.

https://www.globenewswire.com/news-release/2020/12/15/2145364/0/en/Online-Automotive-Retailer-Vroom-to-Acquire-CarStory.html



https://www.carstory.com/

| | Infringement of U.S. Patent No. 10,796,362 by Vroom, Vroom.com and/or Carstory.com |
|---|---|
| | **CHEVROLET TAHOE** within 25 miles of 60602<br><br>240 Used Chevrolet Tahoe For Sale near Chicago, IL sorted by Best Deals<br><br>https://www.carstory.com/cars/make-chevrolet/model-tahoe/location-chicago_il?range=25&zip=60602 |
| 32 [d] determine, based on the geolocation information, that the first used automobile is located at the first location; | Vroom, Vroom.com and/or Carstory.com include determining, based on the geolocation information, that the first used automobile is located at the first location.<br><br><br><br>https://www.vroom.com/sell<br><br>• **Location Information.** With your consent, our Apps may collect geolocation information from your device in order to tailor our Services to you, for example, showing you vehicles closer to your location. You may opt out of location sharing by accessing the location settings on your device and setting your device not to share its location with us.<br><br>• **Information Collected Automatically.** When you use the Services, we or our third-party service providers may automatically receive and record certain information from your device or through the Services. For example, this may include your device's IP address, user-agent, web pages you visit or features you use within the Services, the date and time of your activities on the Services, time since your last visit, links you click, searches conducted, the website visited before navigating to the Services, your software and hardware attributes (including browser and operating system type and version, app version, device type, and device identifiers), demographic and interest data based on browsing activity, and your general location inferred from your IP address. To obtain such information, we or our third-party service providers may use the following technologies to recognize your device and collect information about your device and Services usage:<br><br>https://www.vroom.com/legal/privacy-policy<br><br><br><br>https://www.carstory.com/<br><br>**CHEVROLET TAHOE** within 25 miles of 60602<br><br>240 Used Chevrolet Tahoe For Sale near Chicago, IL sorted by Best Deals |

| Infringement of U.S. Patent No. 10,796,362 by Vroom, Vroom.com and/or Carstory.com ||
|---|---|
| | https://www.carstory.com/cars/make-chevrolet/model-tahoe/location-chicago_il?range=25&zip=60602 |
| 32 [e] generate, based on the determined first location, an in-market used automobile buyer area; | Vroom, Vroom.com and/or Carstory.com include generating, based on the determined first location, an in-market used automobile buyer area.  https://www.vroom.com/sell <br> • **Location Information.** With your consent, our Apps may collect geolocation information from your device in order to tailor our Services to you, for example, showing you vehicles closer to your location. You may opt out of location sharing by accessing the location settings on your device and setting your device not to share its location with us. <br> • **Information Collected Automatically.** When you use the Services, we or our third-party service providers may automatically receive and record certain information from your device or through the Services. For example, this may include your device's IP address, user-agent, web pages you visit or features you use within the Services, the date and time of your last visit, time since your last visit, links you click, searches conducted, the website visited before navigating to the Services, your software and hardware attributes (including browser and operating system type and version, app version, device type, and device identifiers), demographic and interest data based on browsing activity, and your general location inferred from your IP address. To obtain such information, we or our third-party service providers may use the following technologies to recognize your device and collect information about your device and Services usage: <br> https://www.vroom.com/legal/privacy-policy  https://www.carstory.com/ CHEVROLET TAHOE within 25 miles of 60602 240 Used Chevrolet Tahoe For Sale near Chicago, IL sorted by Best Deals https://www.carstory.com/cars/make-chevrolet/model-tahoe/location-chicago_il?range=25&zip=60602 |
| 32 [f] determine that at least one used automobile buyer is located within the | Vroom, Vroom.com and/or Carstory.com include determining that at least one used automobile buyer is located within the in-market used automobile buyer area. |

| Infringement of U.S. Patent No. 10,796,362 by Vroom, Vroom.com and/or Carstory.com | |
|---|---|
| in-market used automobile buyer area; | <br><br>https://www.vroom.com/sell<br><br>• **Location Information.** With your consent, our Apps may collect geolocation information from your device in order to tailor our Services to you, for example, showing you vehicles closer to your location. You may opt out of location sharing by accessing the location settings on your device and setting your device not to share its location with us.<br><br>• **Information Collected Automatically.** When you use the Services, we or our third-party service providers may automatically receive and record certain information from your device or through the Services. For example, this may include your device's IP address, user-agent, web pages you visit or features you use within the Services, the date and time of your activities on the Services, time since your last visit, links you click, searches conducted, the website visited before navigating to the Services, your software and hardware attributes (including browser and operating system type and version, app version, device type, and device identifiers), demographic and interest data based on browsing activity, and your general location inferred from your IP address. To obtain such information, we or our third-party service providers may use the following technologies to recognize your device and collect information about your device and Services usage:<br><br>https://www.vroom.com/legal/privacy-policy<br><br><br>https://www.carstory.com/<br><br><br>https://www.carstory.com/cars/make-chevrolet/model-tahoe/location-chicago_il?range=25&zip=60602 |
| 32 [g] receive, via a used automobile buyer interface, a first bid from a first used automobile buyer located at a second location within the in-market used automobile buyer area; | Vroom, Vroom.com and/or Carstory.com include receiving, via a used automobile buyer interface, a first bid from a first used automobile buyer located at a second location within the in-market used automobile buyer area. |

https://www.vroom.com/sell

- **Location Information.** With your consent, our Apps may collect geolocation information from your device in order to tailor our Services to you, for example, showing you vehicles closer to your location. You may opt out of location sharing by accessing the location settings on your device and setting your device not to share its location with us.

- **Information Collected Automatically.** When you use the Services, we or our third-party service providers may automatically receive and record certain information from your device or through the Services. For example, this may include your device's IP address, user-agent, web pages you visit or features you use within the Services, the date and time of your activities on the Services, time since your last visit, links you click, searches conducted, the website visited before navigating to the Services, your software and hardware attributes (including browser and operating system type and version, app version, device type, and device identifiers), demographic and interest data based on browsing activity, and your general location inferred from your IP address. To obtain such information, we or our third-party service providers may use the following technologies to recognize your device and collect information about your device and Services usage:

https://www.vroom.com/legal/privacy-policy



https://www.carstory.com/

CHEVROLET TAHOE within 25 miles of 60602

**240** Used Chevrolet Tahoe For Sale near Chicago, IL sorted by Best Deals

https://www.carstory.com/cars/make-chevrolet/model-tahoe/location-chicago_il?range=25&zip=60602

| | Infringement of U.S. Patent No. 10,796,362 by Vroom, Vroom.com and/or Carstory.com |
|---|---|
| | https://www.carstory.com/cars/make-chevrolet/model-tahoe/location-chicago_il?zip=60602 |
| 32 [h] generate, based on receiving the first bid, driving directions between the first location and the second location; and | Vroom, Vroom.com and/or Carstory.com include generating, based on receiving the first bid, driving directions between the first location and the second location.<br><br><br><br>https://www.vroom.com/sell<br><br>• **Location Information.** With your consent, our Apps may collect geolocation information from your device in order to tailor our Services to you, for example, showing you vehicles closer to your location. You may opt out of location sharing by accessing the location settings on your device and setting your device not to share its location with us.<br><br>• **Information Collected Automatically.** When you use the Services, we or our third-party service providers may automatically receive and record certain information from your device or through the Services. For example, this may include your device's IP address, user-agent, web pages you visit or features you use within the Services, the date and time of your activities on the Services, time since your last visit, links you click, searches conducted, the website visited before navigating to the Services, your software and hardware attributes (including browser and operating system type and version, app version, device type, and device identifiers), demographic and interest data based on browsing activity, and your general location inferred from your IP address. To obtain such information, we or our third-party service providers may use the following technologies to recognize your device and collect information about your device and Services usage:<br><br>https://www.vroom.com/legal/privacy-policy |

| | Infringement of U.S. Patent No. 10,796,362 by Vroom, Vroom.com and/or Carstory.com |
|---|---|
| | <br>https://www.carstory.com/cars/make-chevrolet/model-tahoe/location-chicago_il?zip=60602 |
| 32 [i] provide, via the used automobile seller interface, the first bid including at least a price for the first used automobile and the driving directions between the first location and the second location. | Vroom, Vroom.com and/or Carstory.com include providing, via the used automobile seller interface, the first bid including at least a price for the first used automobile and the driving directions between the first location and the second location.<br><br><br>https://www.vroom.com/sell<br><br>• **Location Information.** With your consent, our Apps may collect geolocation information from your device in order to tailor our Services to you, for example, showing you vehicles closer to your location. You may opt out of location sharing by accessing the location settings on your device and setting your device not to share its location with us.<br><br>• **Information Collected Automatically.** When you use the Services, we or our third-party service providers may automatically receive and record certain information from your device or through the Services. For example, this may include your device's IP address, user-agent, web pages you visit or features you use within the Services, the date and time of your activities on the Services, time since your last visit, links you click, searches conducted, the website visited before navigating to the Services, your software and hardware attributes (including browser and operating system type and version, app version, device type, and device identifiers), demographic and interest data based on browsing activity, and your general location inferred from your IP address. To obtain such information, we or our third-party service providers may use the following technologies to recognize your device and collect information about your device and Services usage:<br>https://www.vroom.com/legal/privacy-policy |

| | Infringement of U.S. Patent No. 10,796,362 by Vroom, Vroom.com and/or Carstory.com |
|---|---|
| |  |
| 33 [a] The system of claim 32, wherein the used automobile seller interface is a manufacturer off-lease seller interface, | Vroom, Vroom.com and/or Carstory.com include wherein the used automobile seller interface is a manufacturer off-lease seller interface. |
| | NEW YORK, Dec. 15, 2020 (GLOBE NEWSWIRE) -- Vroom (**www.vroom.com**), an innovative ecommerce platform that offers a better way to buy and sell used vehicles, today announced that it has entered into a definitive agreement to acquire CarStory, a leader in AI-powered analytics and digital services for automotive retail, through the acquisition of Vast Holdings, Inc. Leveraging its machine learning, informed by more than 7 million listings per day and more than 18 million consumer sessions per month, CarStory brings the industry's most complete and accurate view of predictive market data to Vroom's national ecommerce and vehicle operations platform. As part of Vroom, CarStory will continue to drive automotive retail innovation by aggregating, optimizing and distributing current market data from thousands of automotive sources and offering its digital retailing services to dealers, top automotive financial services companies and household names in automotive industry research and retailing. |
| | https://www.globenewswire.com/news-release/2020/12/15/2145364/0/en/Online-Automotive-Retailer-Vroom-to-Acquire-CarStory.html |
| | https://www.carstory.com/cars/make-chevrolet/model-tahoe/location-chicago_il?zip=60602 |
| 33 [b] and wherein the at least one processing device further executes the instructions to | Vroom, Vroom.com and/or Carstory.com include wherein the at least one processing device further executes the instructions. |

| Infringement of U.S. Patent No. 10,796,362 by Vroom, Vroom.com and/or Carstory.com |
|---|



https://www.vroom.com/sell

https://apps.apple.com/us/app/vroom-used-cars-delivered/id1494048038

https://www.carstory.com/

| Infringement of U.S. Patent No. 10,796,362 by Vroom, Vroom.com and/or Carstory.com | |
|---|---|
| | **CHEVROLET  TAHOE** within 25 miles  of 60602 <br><br> 240 Used Chevrolet Tahoe For Sale near Chicago, IL sorted by  Best Deals <br><br> https://www.carstory.com/cars/make-chevrolet/model-tahoe/location-chicago_il?range=25&zip=60602 |
| 33 [c] receive, via the manufacturer off-lease seller interface, a manufacturer used automobile seller selection of the first bid, wherein the manufacturer used automobile seller selection indicates a manufacturer used automobile seller intention to sell the first used automobile based on the first bid to the first used automobile buyer. | Vroom, Vroom.com and/or Carstory.com include receiving, via the manufacturer off-lease seller interface, a manufacturer used automobile seller selection of the first bid, wherein the manufacturer used automobile seller selection indicates a manufacturer used automobile seller intention to sell the first used automobile based on the first bid to the first used automobile buyer. <br><br> NEW YORK, Dec. 15, 2020 (GLOBE NEWSWIRE) -- Vroom (**www.vroom.com**), an innovative ecommerce platform that offers a better way to buy and sell used vehicles, today announced that it has entered into a definitive agreement to acquire CarStory, a leader in AI-powered analytics and digital services for automotive retail, through the acquisition of Vast Holdings, Inc. Leveraging its machine learning, informed by more than 7 million listings per day and more than 18 million consumer sessions per month, CarStory brings the industry's most complete and accurate view of predictive market data to Vroom's national ecommerce and vehicle operations platform. As part of Vroom, CarStory will continue to drive automotive retail innovation by aggregating, optimizing and distributing current market data from thousands of automotive sources and offering its digital retailing services to dealers, top automotive financial services companies and household names in automotive industry research and retailing. <br><br> https://www.globenewswire.com/news-release/2020/12/15/2145364/0/en/Online-Automotive-Retailer-Vroom-to-Acquire-CarStory.html <br><br>  <br><br> https://www.vroom.com/sell <br><br>  |

| Infringement of U.S. Patent No. 10,796,362 by Vroom, Vroom.com and/or Carstory.com | |
|---|---|
| | https://www.carstory.com/instant-cash-offer#/sell-my-car/start |
| 34 [a] The system of claim 32, wherein the first request is made by the used automobile seller using a mobile device which takes a picture of a vehicle identifier, and the vehicle identifier is recognized using optical character recognition. | Vroom, Vroom.com and/or Carstory.com include wherein the first request is made by the used automobile seller using a mobile device which takes a picture of a vehicle identifier, and the vehicle identifier is recognized using optical character recognition.<br><br><br><br>https://apps.apple.com/us/app/vroom-used-cars-delivered/id1494048038 |

| Infringement of U.S. Patent No. 10,796,362 by Vroom, Vroom.com and/or Carstory.com | |
|---|---|
| |   |
| 35 [a] The system of claim 32, wherein the first request is made by the used automobile seller using a mobile device including a microphone, and the vehicle identifier is input via the microphone, and the vehicle identifier is recognized using speech recognition. | Vroom, Vroom.com and/or Carstory.com include wherein the first request is made by the used automobile seller using a mobile device including a microphone, and the vehicle identifier is input via the microphone, and the vehicle identifier is recognized using speech recognition.  https://apps.apple.com/us/app/vroom-used-cars-delivered/id1494048038 |

| Infringement of U.S. Patent No. 10,796,362 by Vroom, Vroom.com and/or Carstory.com |
|---|

<table>
<tr><td></td><td> </td></tr>
<tr>
<td>36 [a] The system of claim 32, wherein the computer readable medium stores automobile market data that is representative of recent automobile market characteristics, wherein the automobile market data is based on real-time automobile market data.</td>
<td>

Vroom, Vroom.com and/or Carstory.com include wherein the computer readable medium stores automobile market data that is representative of recent automobile market characteristics, wherein the automobile market data is based on real-time automobile market data.

NEW YORK, Dec. 15, 2020 (GLOBE NEWSWIRE) -- Vroom (**www.vroom.com**), an innovative ecommerce platform that offers a better way to buy and sell used vehicles, today announced that it has entered into a definitive agreement to acquire CarStory, a leader in AI-powered analytics and digital services for automotive retail, through the acquisition of Vast Holdings, Inc. Leveraging its machine learning, informed by more than 7 million listings per day and more than 18 million consumer sessions per month, CarStory brings the industry's most complete and accurate view of predictive market data to Vroom's national ecommerce and vehicle operations platform. As part of Vroom, CarStory will continue to drive automotive retail innovation by aggregating, optimizing and distributing current market data from thousands of automotive sources and offering its digital retailing services to dealers, top automotive financial services companies and household names in automotive industry research and retailing.

https://www.globenewswire.com/news-release/2020/12/15/2145364/0/en/Online-Automotive-Retailer-Vroom-to-Acquire-CarStory.html

</td>
</tr>
<tr>
<td>37 [a] The system of claim 32, wherein the first request includes a picture of at least one of the exterior of the automobile, the interior of the automobile, the dashboard of the automobile, the odometer of the automobile, service records of the automobile,</td>
<td>Vroom, Vroom.com and/or Carstory.com include wherein the first request includes a picture of at least one of the exterior of the automobile, the interior of the automobile, the dashboard of the automobile, the odometer of the automobile, service records of the automobile, and ownership records of the automobile.</td>
</tr>
</table>

| Infringement of U.S. Patent No. 10,796,362 by Vroom, Vroom.com and/or Carstory.com |

and ownership records of the automobile.



https://www.vroom.com/sell

| Infringement of U.S. Patent No. 10,796,362 by Vroom, Vroom.com and/or Carstory.com | |
|---|---|
| | https://apps.apple.com/us/app/vroom-used-cars-delivered/id1494048038  https://www.vroom.com/inventory/land-rover-discovery-2020-SALRG2RV2L2423807 |
| 38 [a] The system of claim 32, wherein the computer readable medium stores pricing data including used automobile data and new automobile data, including actual prices of executed transactions, dealer listing prices, dealer sale prices, manufacturer incentives, dealer bids, consumer | Vroom, Vroom.com and/or Carstory.com include wherein the computer readable medium stores pricing data including used automobile data and new automobile data, including actual prices of executed transactions, dealer listing prices, dealer sale prices, manufacturer incentives, dealer bids, consumer bids, and consumer pricing parameters. |

| Infringement of U.S. Patent No. 10,796,362 by Vroom, Vroom.com and/or Carstory.com | |
|---|---|
| bids, and consumer pricing parameters. | NEW YORK, Dec. 15, 2020 (GLOBE NEWSWIRE) -- Vroom (**www.vroom.com**), an innovative ecommerce platform that offers a better way to buy and sell used vehicles, today announced that it has entered into a definitive agreement to acquire CarStory, a leader in AI-powered analytics and digital services for automotive retail, through the acquisition of Vast Holdings, Inc. Leveraging its machine learning, informed by more than 7 million listings per day and more than 18 million consumer sessions per month, CarStory brings the industry's most complete and accurate view of predictive market data to Vroom's national ecommerce and vehicle operations platform. As part of Vroom, CarStory will continue to drive automotive retail innovation by aggregating, optimizing and distributing current market data from thousands of automotive sources and offering its digital retailing services to dealers, top automotive financial services companies and household names in automotive industry research and retailing.<br><br>https://www.globenewswire.com/news-release/2020/12/15/2145364/0/en/Online-Automotive-Retailer-Vroom-to-Acquire-CarStory.html<br><br><br><br>https://www.carstory.ai/track/ |
| 39 [a] The system of claim 32, wherein an add-on, including at least one of insurance, financing, a service contract, a warranty, and a hard-add accessory, is provided by a third party to the first used automobile buyer with the first request, via the used automobile buyer interface, wherein the third party is different from the used automobile seller and the first used automobile buyer | Vroom, Vroom.com and/or Carstory.com include wherein an add-on, including at least one of insurance, financing, a service contract, a warranty, and a hard-add accessory, is provided by a third party to the first used automobile buyer with the first request, via the used automobile buyer interface, wherein the third party is different from the used automobile seller and the first used automobile buyer. |

Infringement of U.S. Patent No. 10,796,362 by Vroom, Vroom.com and/or Carstory.com

https://www.vroom.com/finance

https://www.vroom.com/finance

| | |
|---|---|
| 40 [a] The system of claim 39, wherein the add-on is selected for inclusion in the first bid by the first used automobile buyer. | Vroom, Vroom.com and/or Carstory.com include wherein the add-on is selected for inclusion in the first bid by the first used automobile buyer. |

| Infringement of U.S. Patent No. 10,796,362 by Vroom, Vroom.com and/or Carstory.com | |
|---|---|
| |  https://www.vroom.com/protection |
| 41 [a] The system of claim 32, wherein second driving directions are provided between the first location and a third location. | Vroom, Vroom.com and/or Carstory.com include wherein second driving directions are provided between the first location and a third location.<br><br>NEW YORK, Dec. 15, 2020 (GLOBE NEWSWIRE) -- Vroom (**www.vroom.com**), an innovative ecommerce platform that offers a better way to buy and sell used vehicles, today announced that it has entered into a definitive agreement to acquire CarStory, a leader in AI-powered analytics and digital services for automotive retail, through the acquisition of Vast Holdings, Inc. Leveraging its machine learning, informed by more than 7 million listings per day and more than 18 million consumer sessions per month, CarStory brings the industry's most complete and accurate view of predictive market data to Vroom's national ecommerce and vehicle operations platform. As part of Vroom, CarStory will continue to drive automotive retail innovation by aggregating, optimizing and distributing current market data from thousands of automotive sources and offering its digital retailing services to dealers, top automotive financial services companies and household names in automotive industry research and retailing. |

| | Infringement of U.S. Patent No. 10,796,362 by Vroom, Vroom.com and/or Carstory.com |
|---|---|
| | https://www.globenewswire.com/news-release/2020/12/15/2145364/0/en/Online-Automotive-Retailer-Vroom-to-Acquire-CarStory.html

- **Location Information.** With your consent, our Apps may collect geolocation information from your device in order to tailor our Services to you, for example, showing you vehicles closer to your location. You may opt out of location sharing by accessing the location settings on your device and setting your device not to share its location with us.

- **Information Collected Automatically.** When you use the Services, we or our third-party service providers may automatically receive and record certain information from your device or through the Services. For example, this may include your device's IP address, user-agent, web pages you visit or features you use within the Services, the date and time of your activities on the Services, time since your last visit, links you click, searches conducted, the website visited before navigating to the Services, your software and hardware attributes (including browser and operating system type and version, app version, device type, and device identifiers), demographic and interest data based on browsing activity, and your general location inferred from your IP address. To obtain such information, we or our third-party service providers may use the following technologies to recognize your device and collect information about your device and Services usage:

https://www.vroom.com/legal/privacy-policy

**About Vroom:**
Vroom is an innovative, end-to-end ecommerce platform designed to offer a better way to buy and a better way to sell used vehicles. The company's scalable, data-driven technology brings all phases of the vehicle buying and selling process to consumers wherever they are and offers an extensive selection of vehicles, transparent pricing, competitive financing, and at-home pick-up and delivery. Vroom is based in New York and Houston and also operates the Texas Direct Auto brand. For more information, visit **vroom.com**.

https://www.globenewswire.com/news-release/2020/12/15/2145364/0/en/Online-Automotive-Retailer-Vroom-to-Acquire-CarStory.html



https://www.carstory.com/cars/make-chevrolet/model-tahoe/location-chicago_il?zip=60602 |
| 42 [a] The system of claim 32, wherein a plurality of pickup locations, each having different driving directions, are provided. | Vroom, Vroom.com and/or Carstory.com include wherein a plurality of pickup locations, each having different driving directions, are provided.

- **Location Information.** With your consent, our Apps may collect geolocation information from your device in order to tailor our Services to you, for example, showing you vehicles closer to your location. You may opt out of location sharing by accessing the location settings on your device and setting your device not to share its location with us. |

| | Infringement of U.S. Patent No. 10,796,362 by Vroom, Vroom.com and/or Carstory.com |
|---|---|
| | • **Information Collected Automatically.** When you use the Services, we or our third-party service providers may automatically receive and record certain information from your device or through the Services. For example, this may include your device's IP address, user-agent, web pages you visit or features you use within the Services, the date and time of your activities on the Services, time since your last visit, links you click, searches conducted, the website visited before navigating to the Services, your software and hardware attributes (including browser and operating system type and version, app version, device type, and device identifiers), demographic and interest data based on browsing activity, and your general location inferred from your IP address. To obtain such information, we or our third-party service providers may use the following technologies to recognize your device and collect information about your device and Services usage: <br><br>https://www.vroom.com/legal/privacy-policy <br><br>**About Vroom:** <br>Vroom is an innovative, end-to-end ecommerce platform designed to offer a better way to buy and a better way to sell used vehicles. The company's scalable, data-driven technology brings all phases of the vehicle buying and selling process to consumers wherever they are and offers an extensive selection of vehicles, transparent pricing, competitive financing, and at-home pick-up and delivery. Vroom is based in New York and Houston and also operates the Texas Direct Auto brand. For more information, visit **vroom.com**. <br><br>https://www.globenewswire.com/news-release/2020/12/15/2145364/0/en/Online-Automotive-Retailer-Vroom-to-Acquire-CarStory.html <br><br> <br>https://www.carstory.com/cars/make-chevrolet/model-tahoe/location-chicago_il?zip=60602 |
| 43 [a] The system of claim 32, wherein a consumer receives at least one of an insurance policy and a service contract at no charge. | Vroom, Vroom.com and/or Carstory.com include wherein a consumer receives at least one of an insurance policy and a service contract at no charge. |

Infringement of U.S. Patent No. 10,796,362 by Vroom, Vroom.com and/or Carstory.com



https://www.vroom.com/protection

| | |
|---|---|
| Infringement of U.S. Patent No. 10,796,362 by Vroom, Vroom.com and/or Carstory.com | |



https://www.vroom.com/finance

https://www.vroom.com/finance

| 44 [a] The system of claim 32, wherein the first used automobile is an off-lease automobile, and the first location is a dealer in possession of the first used automobile. | Vroom, Vroom.com and/or Carstory.com include wherein the first used automobile is an off-lease automobile, and the first location is a dealer in possession of the first used automobile. |
|---|---|

| | Infringement of U.S. Patent No. 10,796,362 by Vroom, Vroom.com and/or Carstory.com |
|---|---|
| | **About Vroom:**<br>Vroom is an innovative, end-to-end ecommerce platform designed to offer a better way to buy and a better way to sell used vehicles. The company's scalable, data-driven technology brings all phases of the vehicle buying and selling process to consumers wherever they are and offers an extensive selection of vehicles, transparent pricing, competitive financing, and at-home pick-up and delivery. Vroom is based in New York and Houston and also operates the Texas Direct Auto brand. For more information, visit **vroom.com**.<br><br>https://www.globenewswire.com/news-release/2020/12/15/2145364/0/en/Online-Automotive-Retailer-Vroom-to-Acquire-CarStory.html<br><br><br>https://www.vroom.com/sell<br><br><br>https://www.carstory.com/cars/make-chevrolet/model-tahoe/location-chicago_il?zip=60602 |
| 45 [a] The system of claim 32, wherein the used automobile seller interface is a manufacturer off-lease seller interface. | Vroom, Vroom.com and/or Carstory.com include wherein the used automobile seller interface is a manufacturer off-lease seller interface. |

Infringement of U.S. Patent No. 10,796,362 by Vroom, Vroom.com and/or Carstory.com

**About Vroom:**

Vroom is an innovative, end-to-end ecommerce platform designed to offer a better way to buy and a better way to sell used vehicles. The company's scalable, data-driven technology brings all phases of the vehicle buying and selling process to consumers wherever they are and offers an extensive selection of vehicles, transparent pricing, competitive financing, and at-home pick-up and delivery. Vroom is based in New York and Houston and also operates the Texas Direct Auto brand. For more information, visit **vroom.com**.

https://www.globenewswire.com/news-release/2020/12/15/2145364/0/en/Online-Automotive-Retailer-Vroom-to-Acquire-CarStory.html



https://www.vroom.com/sell



https://www.carstory.com/cars/make-chevrolet/model-tahoe/location-chicago_il?zip=60602

| 46 [a] The system of claim 45, wherein the manufacturer off-lease seller interface includes a number of matches or | Vroom, Vroom.com and/or Carstory.com include wherein the manufacturer off-lease seller interface includes a number of matches or search hits for the first used automobile. |

| Infringement of U.S. Patent No. 10,796,362 by Vroom, Vroom.com and/or Carstory.com | |
|---|---|
| search hits for the first used automobile. | |
| 47 [a] The system of claim 45, wherein a manufacturer user inputs the vehicle identifier into the manufacturer off-lease seller interface by one of typing, speaking, or providing an image of the vehicle identifier. | Vroom, Vroom.com and/or Carstory.com include wherein a manufacturer user inputs the vehicle identifier into the manufacturer off-lease seller interface by one of typing, speaking, or providing an image of the vehicle identifier.<br><br><br><br>https://apps.apple.com/us/app/vroom-used-cars-delivered/id1494048038 |

| Infringement of U.S. Patent No. 10,796,362 by Vroom, Vroom.com and/or Carstory.com | |
|---|---|
| |  |
| 48 [a] The system of claim 45, wherein the manufacturer off-lease seller interface receives a parameter that the first used automobile will be available for pickup only after a certain date. | Vroom, Vroom.com and/or Carstory.com include wherein the manufacturer off-lease seller interface receives a parameter that the first used automobile will be available for pickup only after a certain date.<br><br>**About Vroom:**<br>Vroom is an innovative, end-to-end ecommerce platform designed to offer a better way to buy and a better way to sell used vehicles. The company's scalable, data-driven technology brings all phases of the vehicle buying and selling process to consumers wherever they are and offers an extensive selection of vehicles, transparent pricing, competitive financing, and at-home pick-up and delivery. Vroom is based in New York and Houston and also operates the Texas Direct Auto brand. For more information, visit **vroom.com**.<br><br>https://www.globenewswire.com/news-release/2020/12/15/2145364/0/en/Online-Automotive-Retailer-Vroom-to-Acquire-CarStory.html |

| | Infringement of U.S. Patent No. 10,796,362 by Vroom, Vroom.com and/or Carstory.com |
|---|---|
| |  https://www.vroom.com/sell |
| 49 [a] The system of claim 32, wherein the used automobile seller interface and the used automobile buyer interface are integrated within at least one of a single website and a single application. | Vroom, Vroom.com and/or Carstory.com include wherein the used automobile seller interface and the used automobile buyer interface are integrated within at least one of a single website and a single application.<br><br>https://www.vroom.com/how-it-works |

| Infringement of U.S. Patent No. 10,796,362 by Vroom, Vroom.com and/or Carstory.com | |
|---|---|
| |  https://apps.apple.com/us/app/vroom-used-cars-delivered/id1494048038 https://www.carstory.com/instant-cash-offer#/sell-my-car/start |
| 50 [a] The system of claim 32, wherein the at least one processing device further executes the instructions to: | Vroom, Vroom.com and/or Carstory.com include wherein the at least one processing device further executes the instructions. |

Infringement of U.S. Patent No. 10,796,362 by Vroom, Vroom.com and/or Carstory.com



https://www.vroom.com/how-it-works

https://apps.apple.com/us/app/vroom-used-cars-delivered/id1494048038

| Infringement of U.S. Patent No. 10,796,362 by Vroom, Vroom.com and/or Carstory.com ||
|---|---|
| |  |
| | https://www.carstory.com/instant-cash-offer#/sell-my-car/start |
| 50 [b] receive, via the used automobile buyer interface, a second bid from a second used automobile buyer located at a third location within the in-market used automobile buyer area; | Vroom, Vroom.com and/or Carstory.com include receiving, via the used automobile buyer interface, a second bid from a second used automobile buyer located at a third location within the in-market used automobile buyer area. |
| |  |
| | https://www.vroom.com/how-it-works |
| | • **Location Information.** With your consent, our Apps may collect geolocation information from your device in order to tailor our Services to you, for example, showing you vehicles closer to your location. You may opt out of location sharing by accessing the location settings on your device and setting your device not to share its location with us. |
| | • **Information Collected Automatically.** When you use the Services, we or our third-party service providers may automatically receive and record certain information from your device or through the Services. For example, this may include your device's IP address, user-agent, web pages you visit or features you use within the Services, the date and time of your last activities on the Services, time since your last visit, links you click, searches conducted, the website visited before navigating to the Services, your software and hardware attributes (including browser and operating system type and version, app version, device type, and device identifiers), demographic and interest data based on browsing activity, and your general location inferred from your IP address. To obtain such information, we or our third-party service providers may use the following technologies to recognize your device and collect information about you and Services usage: |
| | https://www.vroom.com/legal/privacy-policy |

| | Infringement of U.S. Patent No. 10,796,362 by Vroom, Vroom.com and/or Carstory.com |
|---|---|
| | **About Vroom:**<br>Vroom is an innovative, end-to-end ecommerce platform designed to offer a better way to buy and a better way to sell used vehicles. The company's scalable, data-driven technology brings all phases of the vehicle buying and selling process to consumers wherever they are and offers an extensive selection of vehicles, transparent pricing, competitive financing, and at-home pick-up and delivery. Vroom is based in New York and Houston and also operates the Texas Direct Auto brand. For more information, visit **vroom.com**.<br><br>https://www.globenewswire.com/news-release/2020/12/15/2145364/0/en/Online-Automotive-Retailer-Vroom-to-Acquire-CarStory.html<br><br><br>https://www.carstory.com/cars/make-chevrolet/model-tahoe/location-chicago_il?zip=60602 |
| 50 [c] generate, based on receiving the second bid, second driving directions between the first location and the third location; and | Vroom, Vroom.com and/or Carstory.com include generating, based on receiving the second bid, second driving directions between the first location and the third location.<br><br>**vroom**  ⌕ Enter make, model or body style<br><br>**HOW IT WORKS**<br>**buying and selling made easy**<br>You've found it: The better way to buy or sell a car.<br>Find a great car and make it yours or sell us the one you have, all without a trip to the dealership. But how, exactly? Here's how.<br>**SHOP NOW**<br>https://www.vroom.com/how-it-works<br><br>• **Location Information.** With your consent, our Apps may collect geolocation information from your device in order to tailor our Services to you, for example, showing you vehicles closer to your location. You may opt out of location sharing by accessing the location settings on your device and setting your device not to share its location with us. |

| Infringement of U.S. Patent No. 10,796,362 by Vroom, Vroom.com and/or Carstory.com | |
|---|---|
| | • **Information Collected Automatically.** When you use the Services, we or our third-party service providers may automatically receive and record certain information from your device or through the Services. For example, this may include your device's IP address, user-agent, web pages you visit or features you use within the Services, the date and time of your activities on the Services, time since your last visit, links you click, searches conducted, the website visited before navigating to the Services, your software and hardware attributes (including browser and operating system type and version, app version, device type, and device identifiers), demographic and interest data based on browsing activity, and your general location inferred from your IP address. To obtain such information, we or our third-party service providers may use the following technologies to recognize your device and collect information about your device and Services usage:

https://www.vroom.com/legal/privacy-policy

**About Vroom:**
Vroom is an innovative, end-to-end ecommerce platform designed to offer a better way to buy and a better way to sell used vehicles. The company's scalable, data-driven technology brings all phases of the vehicle buying and selling process to consumers wherever they are and offers an extensive selection of vehicles, transparent pricing, competitive financing, and at-home pick-up and delivery. Vroom is based in New York and Houston and also operates the Texas Direct Auto brand. For more information, visit **vroom.com**.

https://www.globenewswire.com/news-release/2020/12/15/2145364/0/en/Online-Automotive-Retailer-Vroom-to-Acquire-CarStory.html



https://www.carstory.com/cars/make-chevrolet/model-tahoe/location-chicago_il?zip=60602 |
| 50 [d] provide, via the used automobile seller interface, the second bid including at least a second price for the first used automobile and the second driving directions between the first location and the third location. | Vroom, Vroom.com and/or Carstory.com include providing, via the used automobile seller interface, the second bid including at least a second price for the first used automobile and the second driving directions between the first location and the third location.



https://www.vroom.com/how-it-works |

| Infringement of U.S. Patent No. 10,796,362 by Vroom, Vroom.com and/or Carstory.com | |
|---|---|
| | • **Location Information.** With your consent, our Apps may collect geolocation information from your device in order to tailor our Services to you, for example, showing you vehicles closer to your location. You may opt out of location sharing by accessing the location settings on your device and setting your device not to share its location with us.<br><br>• **Information Collected Automatically.** When you use the Services, we or our third-party service providers may automatically receive and record certain information from your device or through the Services. For example, this may include your device's IP address, user-agent, web pages you visit or features you use within the Services, the date and time of your activities on the Services, time since your last visit, links you click, searches conducted, the website visited before navigating to the Services, your software and hardware attributes (including browser and operating system type and version, app version, device type, and device identifiers), demographic and interest data based on browsing activity, and your general location inferred from your IP address. To obtain such information, we or our third-party service providers may use the following technologies to recognize your device and collect information about your device and Services usage:<br><br>https://www.vroom.com/legal/privacy-policy<br><br>**About Vroom:**<br>Vroom is an innovative, end-to-end ecommerce platform designed to offer a better way to buy and a better way to sell used vehicles. The company's scalable, data-driven technology brings all phases of the vehicle buying and selling process to consumers wherever they are and offers an extensive selection of vehicles, transparent pricing, competitive financing, and at-home pick-up and delivery. Vroom is based in New York and Houston and also operates the Texas Direct Auto brand. For more information, visit **vroom.com**.<br><br>https://www.globenewswire.com/news-release/2020/12/15/2145364/0/en/Online-Automotive-Retailer-Vroom-to-Acquire-CarStory.html<br><br><br>https://www.carstory.com/cars/make-chevrolet/model-tahoe/location-chicago_il?zip=60602 |
| 51 [a] The system of claim 32, wherein the used automobile seller is an original equipment manufacturer. | Vroom, Vroom.com and/or Carstory.com include wherein the used automobile seller is an original equipment manufacturer. |

| Infringement of U.S. Patent No. 10,796,362 by Vroom, Vroom.com and/or Carstory.com | |
|---|---|
| | NEW YORK, Dec. 15, 2020 (GLOBE NEWSWIRE) -- Vroom (**www.vroom.com**), an innovative ecommerce platform that offers a better way to buy and sell used vehicles, today announced that it has entered into a definitive agreement to acquire CarStory, a leader in AI-powered analytics and digital services for automotive retail, through the acquisition of Vast Holdings, Inc. Leveraging its machine learning, informed by more than 7 million listings per day and more than 18 million consumer sessions per month, CarStory brings the industry's most complete and accurate view of predictive market data to Vroom's national ecommerce and vehicle operations platform. As part of Vroom, CarStory will continue to drive automotive retail innovation by aggregating, optimizing and distributing current market data from thousands of automotive sources and offering its digital retailing services to dealers, top automotive financial services companies and household names in automotive industry research and retailing.<br><br>https://www.globenewswire.com/news-release/2020/12/15/2145364/0/en/Online-Automotive-Retailer-Vroom-to-Acquire-CarStory.html |
| 52 [a] The system of claim 32, wherein the used automobile seller is not an original equipment manufacturer. | Vroom, Vroom.com and/or Carstory.com include wherein the used automobile seller is not an original equipment manufacturer.<br><br><br>https://www.vroom.com/how-it-works<br><br><br>https://www.vroom.com/ |

| | Infringement of U.S. Patent No. 10,796,362 by Vroom, Vroom.com and/or Carstory.com |
|---|---|
| | <br>https://www.carstory.com/instant-cash-offer#/sell-my-car/start<br><br><br>https://www.carstory.com/ |
| 53 [a] The system of claim 32, wherein a third party sells a plurality of used automobiles via the used automobile seller interface. | Vroom, Vroom.com and/or Carstory.com include wherein a third party sells a plurality of used automobiles via the used automobile seller interface.<br><br>NEW YORK, Dec. 15, 2020 (GLOBE NEWSWIRE) -- Vroom (**www.vroom.com**), an innovative ecommerce platform that offers a better way to buy and sell used vehicles, today announced that it has entered into a definitive agreement to acquire CarStory, a leader in AI-powered analytics and digital services for automotive retail, through the acquisition of Vast Holdings, Inc. Leveraging its machine learning, informed by more than 7 million listings per day and more than 18 million consumer sessions per month, CarStory brings the industry's most complete and accurate view of predictive market data to Vroom's national ecommerce and vehicle operations platform. As part of Vroom, CarStory will continue to drive automotive retail innovation by aggregating, optimizing and distributing current market data from thousands of automotive sources and offering its digital retailing services to dealers, top automotive financial services companies and household names in automotive industry research and retailing.<br><br>https://www.globenewswire.com/news-release/2020/12/15/2145364/0/en/Online-Automotive-Retailer-Vroom-to-Acquire-CarStory.html<br><br><br>https://www.carstory.com/ |

| Infringement of U.S. Patent No. 10,796,362 by Vroom, Vroom.com and/or Carstory.com | |
|---|---|



https://www.carstory.com/cars/make-chevrolet/model-tahoe/location-chicago_il?zip=60602

| 54 [a] The system of claim 53, wherein sales by the third party are made at negotiated prices. | Vroom, Vroom.com and/or Carstory.com include wherein sales by the third party are made at negotiated prices.<br><br>NEW YORK, Dec. 15, 2020 (GLOBE NEWSWIRE) -- Vroom (**www.vroom.com**), an innovative ecommerce platform that offers a better way to buy and sell used vehicles, today announced that it has entered into a definitive agreement to acquire CarStory, a leader in AI-powered analytics and digital services for automotive retail, through the acquisition of Vast Holdings, Inc. Leveraging its machine learning, informed by more than 7 million listings per day and more than 18 million consumer sessions per month, CarStory brings the industry's most complete and accurate view of predictive market data to Vroom's national ecommerce and vehicle operations platform. As part of Vroom, CarStory will continue to drive automotive retail innovation by aggregating, optimizing and distributing current market data from thousands of automotive sources and offering its digital retailing services to dealers, top automotive financial services companies and household names in automotive industry research and retailing.<br><br>https://www.globenewswire.com/news-release/2020/12/15/2145364/0/en/Online-Automotive-Retailer-Vroom-to-Acquire-CarStory.html<br><br>https://www.carstory.com/cars/make-chevrolet/model-tahoe/location-chicago_il?zip=60602 |
| 55 [a] The system of claim 53, wherein the used automobile seller interface includes lot inventory of the third party. | Vroom, Vroom.com and/or Carstory.com include wherein the used automobile seller interface includes lot inventory of the third party. |

| | Infringement of U.S. Patent No. 10,796,362 by Vroom, Vroom.com and/or Carstory.com |
|---|---|
| | NEW YORK, Dec. 15, 2020 (GLOBE NEWSWIRE) -- Vroom (**www.vroom.com**), an innovative ecommerce platform that offers a better way to buy and sell used vehicles, today announced that it has entered into a definitive agreement to acquire CarStory, a leader in AI-powered analytics and digital services for automotive retail, through the acquisition of Vast Holdings, Inc. Leveraging its machine learning, informed by more than 7 million listings per day and more than 18 million consumer sessions per month, CarStory brings the industry's most complete and accurate view of predictive market data to Vroom's national ecommerce and vehicle operations platform. As part of Vroom, CarStory will continue to drive automotive retail innovation by aggregating, optimizing and distributing current market data from thousands of automotive sources and offering its digital retailing services to dealers, top automotive financial services companies and household names in automotive industry research and retailing.<br><br>https://www.globenewswire.com/news-release/2020/12/15/2145364/0/en/Online-Automotive-Retailer-Vroom-to-Acquire-CarStory.html<br><br><br><br>https://www.carstory.ai/track/ |
| 56 [a] The system of claim 53, wherein the used automobile buyer interface includes lot inventory of the third party. | Vroom, Vroom.com and/or Carstory.com include wherein the used automobile buyer interface includes lot inventory of the third party.<br><br>NEW YORK, Dec. 15, 2020 (GLOBE NEWSWIRE) -- Vroom (**www.vroom.com**), an innovative ecommerce platform that offers a better way to buy and sell used vehicles, today announced that it has entered into a definitive agreement to acquire CarStory, a leader in AI-powered analytics and digital services for automotive retail, through the acquisition of Vast Holdings, Inc. Leveraging its machine learning, informed by more than 7 million listings per day and more than 18 million consumer sessions per month, CarStory brings the industry's most complete and accurate view of predictive market data to Vroom's national ecommerce and vehicle operations platform. As part of Vroom, CarStory will continue to drive automotive retail innovation by aggregating, optimizing and distributing current market data from thousands of automotive sources and offering its digital retailing services to dealers, top automotive financial services companies and household names in automotive industry research and retailing.<br><br>https://www.globenewswire.com/news-release/2020/12/15/2145364/0/en/Online-Automotive-Retailer-Vroom-to-Acquire-CarStory.html |

| | Infringement of U.S. Patent No. 10,796,362 by Vroom, Vroom.com and/or Carstory.com |
|---|---|
| |  https://www.carstory.com/cars/make-chevrolet/model-tahoe/location-chicago_il?zip=60602 |
| 57 [a] The system of claim 32, wherein the used automobile seller is a company that operates at least one leasing activity. | Vroom, Vroom.com and/or Carstory.com include wherein the used automobile seller is a company that operates at least one leasing activity.<br><br>https://www.vroom.com/finance |

| | Infringement of U.S. Patent No. 10,796,362 by Vroom, Vroom.com and/or Carstory.com |
|---|---|
| | https://www.vroom.com/finance |
| 58 [a] The system of claim 32, wherein the used automobile seller is a company that operates at least one financing activity. | Vroom, Vroom.com and/or Carstory.com include wherein the used automobile seller is a company that operates at least one financing activity.<br><br>https://www.vroom.com/finance |



| Infringement of U.S. Patent No. 10,796,362 by Vroom, Vroom.com and/or Carstory.com | |
|---|---|
| | <br><br>https://www.vroom.com/finance |
| 59 [a] The system of claim 32, wherein the used automobile seller is a captive finance company. | Vroom, Vroom.com and/or Carstory.com include wherein the used automobile seller is a captive finance company.<br><br><br>https://www.vroom.com/finance |

| Infringement of U.S. Patent No. 10,796,362 by Vroom, Vroom.com and/or Carstory.com | |
|---|---|
| |  https://www.vroom.com/finance |
| 60 [a] The system of claim 32, wherein an auction bid is received from a third party. | Vroom, Vroom.com and/or Carstory.com include wherein an auction bid is received from a third party.<br><br>NEW YORK, Dec. 15, 2020 (GLOBE NEWSWIRE) -- Vroom (www.vroom.com), an innovative ecommerce platform that offers a better way to buy and sell used vehicles, today announced that it has entered into a definitive agreement to acquire CarStory, a leader in AI-powered analytics and digital services for automotive retail, through the acquisition of Vast Holdings, Inc. Leveraging its machine learning, informed by more than 7 million listings per day and more than 18 million consumer sessions per month, CarStory brings the industry's most complete and accurate view of predictive market data to Vroom's national ecommerce and vehicle operations platform. As part of Vroom, CarStory will continue to drive automotive retail innovation by aggregating, optimizing and distributing current market data from thousands of automotive sources and offering its digital retailing services to dealers, top automotive financial services companies and household names in automotive industry research and retailing.<br><br>https://www.globenewswire.com/news-release/2020/12/15/2145364/0/en/Online-Automotive-Retailer-Vroom-to-Acquire-CarStory.html<br><br>https://www.carstory.com/cars/make-chevrolet/model-tahoe/location-chicago_il?zip=60602 |
| 61 [a] The system of claim 32, wherein an auction bid is provided to the used automobile buyer interface. | Vroom, Vroom.com and/or Carstory.com include wherein an auction bid is provided to the used automobile buyer interface. |

| | Infringement of U.S. Patent No. 10,796,362 by Vroom, Vroom.com and/or Carstory.com |
|---|---|

NEW YORK, Dec. 15, 2020 (GLOBE NEWSWIRE) -- Vroom, an innovative ecommerce platform that offers a better way to buy and sell used vehicles, today announced that it has entered into a definitive agreement to acquire CarStory, a leader in AI-powered analytics and digital services for automotive retail, through the acquisition of Vast Holdings, Inc. Leveraging its machine learning, informed by more than 7 million listings per day and more than 18 million consumer sessions per month, CarStory brings the industry's most complete and accurate view of predictive market data to Vroom's national ecommerce and vehicle operations platform. As part of Vroom, CarStory will continue to drive automotive retail innovation by aggregating, optimizing and distributing current market data from thousands of automotive sources and offering its digital retailing services to dealers, top automotive financial services companies and household names in automotive industry research and retailing.

https://www.globenewswire.com/news-release/2020/12/15/2145364/0/en/Online-Automotive-Retailer-Vroom-to-Acquire-CarStory.html



https://www.vroom.com/inventory/honda-odyssey-2017-5FNRL5H69HB019731



https://www.carstory.com/cars/make-chevrolet/model-tahoe/location-chicago_il?zip=60602

| 62 [a] The system of claim 32, wherein the | Vroom, Vroom.com and/or Carstory.com include wherein the used automobile seller interface and the used automobile buyer interface are provided by at least one webpage. |
|---|---|

Infringement of U.S. Patent No. 10,796,362 by Vroom, Vroom.com and/or Carstory.com

used automobile seller interface and the used automobile buyer interface are provided by at least one webpage.



https://apps.apple.com/us/app/vroom-used-cars-delivered/id1494048038

https://www.vroom.com/

| Infringement of U.S. Patent No. 10,796,362 by Vroom, Vroom.com and/or Carstory.com | |
|---|---|
| | 

https://www.carstory.com/



https://www.carstory.com/instant-cash-offer#/sell-my-car/start |
| 63 [a] A non-transitory computer readable medium storing instructions which, when executed, are configured to cause an information processing apparatus to: | Vroom, Vroom.com and/or Carstory.com include a non-transitory computer readable medium storing instructions which, when executed, are configured to cause an information processing apparatus.

NEW YORK, Dec. 15, 2020 (GLOBE NEWSWIRE) -- Vroom (**www.vroom.com**), an innovative ecommerce platform that offers a better way to buy and sell used vehicles, today announced that it has entered into a definitive agreement to acquire CarStory, a leader in AI-powered analytics and digital services for automotive retail, through the acquisition of Vast Holdings, Inc. Leveraging its machine learning, informed by more than 7 million listings per day and more than 18 million consumer sessions per month, CarStory brings the industry's most complete and accurate view of predictive market data to Vroom's national ecommerce and vehicle operations platform. As part of Vroom, CarStory will continue to drive automotive retail innovation by aggregating, optimizing and distributing current market data from thousands of automotive sources and offering its digital retailing services to dealers, top automotive financial services companies and household names in automotive industry research and retailing.

https://www.globenewswire.com/news-release/2020/12/15/2145364/0/en/Online-Automotive-Retailer-Vroom-to-Acquire-CarStory.html |

| Infringement of U.S. Patent No. 10,796,362 by Vroom, Vroom.com and/or Carstory.com |
| --- |



https://apps.apple.com/us/app/vroom-used-cars-delivered/id1494048038

https://www.vroom.com/

| Infringement of U.S. Patent No. 10,796,362 by Vroom, Vroom.com and/or Carstory.com ||
|---|---|
| |  |
| | https://www.carstory.com/instant-cash-offer#/sell-my-car/start |
| 63 [b] receive, via a used automobile seller interface, a first request for a response regarding a first used automobile, the first request made by a used automobile seller located at a first location and including a vehicle identifier and geolocation information of the first used automobile; | Vroom, Vroom.com and/or Carstory.com include receiving, via a used automobile seller interface, a first request for a response regarding a first used automobile, the first request made by a used automobile seller located at a first location and including a vehicle identifier and geolocation information of the first used automobile.<br><br>NEW YORK, Dec. 15, 2020 (GLOBE NEWSWIRE) -- Vroom (**www.vroom.com**), an innovative ecommerce platform that offers a better way to buy and sell used vehicles, today announced that it has entered into a definitive agreement to acquire CarStory, a leader in AI-powered analytics and digital services for automotive retail, through the acquisition of Vast Holdings, Inc. Leveraging its machine learning, informed by more than 7 million listings per day and more than 18 million consumer sessions per month, CarStory brings the industry's most complete and accurate view of predictive market data to Vroom's national ecommerce and vehicle operations platform. As part of Vroom, CarStory will continue to drive automotive retail innovation by aggregating, optimizing and distributing current market data from thousands of automotive sources and offering its digital retailing services to dealers, top automotive financial services companies and household names in automotive industry research and retailing.<br><br>https://www.globenewswire.com/news-release/2020/12/15/2145364/0/en/Online-Automotive-Retailer-Vroom-to-Acquire-CarStory.html<br><br><br>https://www.vroom.com/ |

| Infringement of U.S. Patent No. 10,796,362 by Vroom, Vroom.com and/or Carstory.com |
|---|

<table>
<tr><td></td><td>

- **Location Information.** With your consent, our Apps may collect geolocation information from your device in order to tailor our Services to you, for example, showing you vehicles closer to your location. You may opt out of location sharing by accessing the location settings on your device and setting your device not to share its location with us.

- **Information Collected Automatically.** When you use the Services, we or our third-party service providers may automatically receive and record certain information from your device or through the Services. For example, this may include your device's IP address, user-agent, web pages you visit or features you use within the Services, the date and time of your activities on the Services, time since your last visit, links you click, searches conducted, the website visited before navigating to the Services, your software and hardware attributes (including browser and operating system type and version, app version, device type, and device identifiers), demographic and interest data based on browsing activity, and your general location inferred from your IP address. To obtain such information, we or our third-party service providers may use the following technologies to recognize your device and collect information about your device and Services usage:

https://www.vroom.com/legal/privacy-policy



https://www.carstory.com/instant-cash-offer#/sell-my-car/start



https://www.carstory.com/

</td></tr>
<tr><td>

63 [c] determine, based on the geolocation information, that the first used automobile is located at the first location;

</td><td>

Vroom, Vroom.com and/or Carstory.com include determining, based on the geolocation information, that the first used automobile is located at the first location.

</td></tr>
</table>

| Infringement of U.S. Patent No. 10,796,362 by Vroom, Vroom.com and/or Carstory.com | |
|---|---|
| | NEW YORK, Dec. 15, 2020 (GLOBE NEWSWIRE) -- Vroom (**www.vroom.com**), an innovative ecommerce platform that offers a better way to buy and sell used vehicles, today announced that it has entered into a definitive agreement to acquire CarStory, a leader in AI-powered analytics and digital services for automotive retail, through the acquisition of Vast Holdings, Inc. Leveraging its machine learning, informed by more than 7 million listings per day and more than 18 million consumer sessions per month, CarStory brings the industry's most complete and accurate view of predictive market data to Vroom's national ecommerce and vehicle operations platform. As part of Vroom, CarStory will continue to drive automotive retail innovation by aggregating, optimizing and distributing current market data from thousands of automotive sources and offering its digital retailing services to dealers, top automotive financial services companies and household names in automotive industry research and retailing.<br><br>https://www.globenewswire.com/news-release/2020/12/15/2145364/0/en/Online-Automotive-Retailer-Vroom-to-Acquire-CarStory.html<br><br>• **Location Information.** With your consent, our Apps may collect geolocation information from your device in order to tailor our Services to you, for example, showing you vehicles closer to your location. You may opt out of location sharing by accessing the location settings on your device and setting your device not to share its location with us.<br><br>• **Information Collected Automatically.** When you use the Services, we or our third-party service providers may automatically receive and record certain information from your device or through the Services. For example, this may include your device's IP address, user-agent, web pages you visit or features you use within the Services, the date and time of your activities on the Services, time since your last visit, links you click, searches conducted, the website visited before navigating to the Services, your software and hardware attributes (including browser and operating system type and version, app version, device type, and device identifiers), demographic and interest data based on browsing activity, and your general location inferred from your IP address. To obtain such information, we or our third-party service providers may use the following technologies to recognize your device and collect information about your device and Services usage:<br><br>https://www.vroom.com/legal/privacy-policy<br><br><br><br>https://www.carstory.com/ |
| 63 [d] generate, based on the determined first location, an in-market used automobile buyer area; | Vroom, Vroom.com and/or Carstory.com include generating, based on the determined first location, an in-market used automobile buyer area. |

**Infringement of U.S. Patent No. 10,796,362 by Vroom, Vroom.com and/or Carstory.com**

NEW YORK, Dec. 15, 2020 (GLOBE NEWSWIRE) -- Vroom (**www.vroom.com**), an innovative ecommerce platform that offers a better way to buy and sell used vehicles, today announced that it has entered into a definitive agreement to acquire CarStory, a leader in AI-powered analytics and digital services for automotive retail, through the acquisition of Vast Holdings, Inc. Leveraging its machine learning, informed by more than 7 million listings per day and more than 18 million consumer sessions per month, CarStory brings the industry's most complete and accurate view of predictive market data to Vroom's national ecommerce and vehicle operations platform. As part of Vroom, CarStory will continue to drive automotive retail innovation by aggregating, optimizing and distributing current market data from thousands of automotive sources and offering its digital retailing services to dealers, top automotive financial services companies and household names in automotive industry research and retailing.

https://www.globenewswire.com/news-release/2020/12/15/2145364/0/en/Online-Automotive-Retailer-Vroom-to-Acquire-CarStory.html



https://www.vroom.com/inventory/honda-odyssey-2017-5FNRL5H69HB019731

- **Location Information.** With your consent, our Apps may collect geolocation information from your device in order to tailor our Services to you, for example, showing you vehicles closer to your location. You may opt out of location sharing by accessing the location settings on your device and setting your device not to share its location with us.

| | Infringement of U.S. Patent No. 10,796,362 by Vroom, Vroom.com and/or Carstory.com |
|---|---|
| | • **Information Collected Automatically.** When you use the Services, we or our third-party service providers may automatically receive and record certain information from your device or through the Services. For example, this may include your device's IP address, user-agent, web pages you visit or features you use within the Services, the date and time of your activities on the Services, time since your last visit, links you click, searches conducted, the website visited before navigating to the Services, your software and hardware attributes (including browser and operating system type and version, app version, device type, and device identifiers), demographic and interest data based on browsing activity, and your general location inferred from your IP address. To obtain such information, we or our third-party service providers may use the following technologies to recognize your device and collect information about your device and Services usage:<br><br>https://www.vroom.com/legal/privacy-policy<br><br><br>https://www.carstory.com/cars/make-chevrolet/model-tahoe/location-chicago_il?zip=60602 |
| 63 [e] determine that at least one used automobile buyer is located within the in-market used automobile buyer area; | Vroom, Vroom.com and/or Carstory.com include determining that at least one used automobile buyer is located within the in-market used automobile buyer area.<br><br>NEW YORK, Dec. 15, 2020 (GLOBE NEWSWIRE) -- Vroom (**www.vroom.com**), an innovative ecommerce platform that offers a better way to buy and sell used vehicles, today announced that it has entered into a definitive agreement to acquire CarStory, a leader in AI-powered analytics and digital services for automotive retail, through the acquisition of Vast Holdings, Inc. Leveraging its machine learning, informed by more than 7 million listings per day and more than 18 million consumer sessions per month, CarStory brings the industry's most complete and accurate view of predictive market data to Vroom's national ecommerce and vehicle operations platform. As part of Vroom, CarStory will continue to drive automotive retail innovation by aggregating, optimizing and distributing current market data from thousands of automotive sources and offering its digital retailing services to dealers, top automotive financial services companies and household names in automotive industry research and retailing.<br><br>https://www.globenewswire.com/news-release/2020/12/15/2145364/0/en/Online-Automotive-Retailer-Vroom-to-Acquire-CarStory.html |

| Infringement of U.S. Patent No. 10,796,362 by Vroom, Vroom.com and/or Carstory.com | |
|---|---|
| | https://www.carstory.com/cars/make-chevrolet/model-tahoe/location-chicago_il?zip=60602 |
| 63 [f] receive, via a used automobile buyer interface, a first bid from a first used automobile buyer located at a second location within the in-market used automobile buyer area; | Vroom, Vroom.com and/or Carstory.com include receiving, via a used automobile buyer interface, a first bid from a first used automobile buyer located at a second location within the in-market used automobile buyer area.

NEW YORK, Dec. 15, 2020 (GLOBE NEWSWIRE) -- Vroom (**www.vroom.com**), an innovative ecommerce platform that offers a better way to buy and sell used vehicles, today announced that it has entered into a definitive agreement to acquire CarStory, a leader in AI-powered analytics and digital services for automotive retail, through the acquisition of Vast Holdings, Inc. Leveraging its machine learning, informed by more than 7 million listings per day and more than 18 million consumer sessions per month, CarStory brings the industry's most complete and accurate view of predictive market data to Vroom's national ecommerce and vehicle operations platform. As part of Vroom, CarStory will continue to drive automotive retail innovation by aggregating, optimizing and distributing current market data from thousands of automotive sources and offering its digital retailing services to dealers, top automotive financial services companies and household names in automotive industry research and retailing.

https://www.globenewswire.com/news-release/2020/12/15/2145364/0/en/Online-Automotive-Retailer-Vroom-to-Acquire-CarStory.html



https://www.vroom.com/inventory/honda-odyssey-2017-5FNRL5H69HB019731

- **Location Information.** With your consent, our Apps may collect geolocation information from your device in order to tailor our Services to you, for example, showing you vehicles closer to your location. You may opt out of location sharing by accessing the location settings on your device and setting your device not to share its location with us. |

| Infringement of U.S. Patent No. 10,796,362 by Vroom, Vroom.com and/or Carstory.com | |
|---|---|
| | • **Information Collected Automatically.** When you use the Services, we or our third-party service providers may automatically receive and record certain information from your device or through the Services. For example, this may include your device's IP address, user-agent, web pages you visit or features you use within the Services, the date and time of your activities on the Services, time since your last visit, links you click, searches conducted, the website visited before navigating to the Services, your software and hardware attributes (including browser and operating system type and version, app version, device type, and device identifiers), demographic and interest data based on browsing activity, and your general <mark>location</mark> inferred from your IP address. To obtain such information, we or our third-party service providers may use the following technologies to recognize your device and collect information about your device and Services usage:<br><br>https://www.vroom.com/legal/privacy-policy<br><br><br><br>https://www.carstory.com/cars/make-chevrolet/model-tahoe/location-chicago_il?zip=60602 |
| 63 [g] generate, based on receiving the first bid, driving directions between the first location and the second location; and | Vroom, Vroom.com and/or Carstory.com include generating, based on receiving the first bid, driving directions between the first location and the second location.<br><br>NEW YORK, Dec. 15, 2020 (GLOBE NEWSWIRE) -- Vroom (**www.vroom.com**), an innovative ecommerce platform that offers a better way to buy and sell used vehicles, today announced that it has entered into a definitive agreement to acquire CarStory, a leader in AI-powered analytics and digital services for automotive retail, through the acquisition of Vast Holdings, Inc. Leveraging its machine learning, informed by more than 7 million listings per day and more than 18 million consumer sessions per month, CarStory brings the industry's most complete and accurate view of predictive market data to Vroom's national ecommerce and vehicle operations platform. As part of Vroom, CarStory will continue to drive automotive retail innovation by aggregating, optimizing and distributing current market data from thousands of automotive sources and offering its digital retailing services to dealers, top automotive financial services companies and household names in automotive industry research and retailing.<br><br>https://www.globenewswire.com/news-release/2020/12/15/2145364/0/en/Online-Automotive-Retailer-Vroom-to-Acquire-CarStory.html |

Infringement of U.S. Patent No. 10,796,362 by Vroom, Vroom.com and/or Carstory.com



https://www.vroom.com/inventory/honda-odyssey-2017-5FNRL5H69HB019731

- **Location Information.** With your consent, our Apps may collect geolocation information from your device in order to tailor our Services to you, for example, showing you vehicles closer to your location. You may opt out of location sharing by accessing the location settings on your device and setting your device not to share its location with us.

- **Information Collected Automatically.** When you use the Services, we or our third-party service providers may automatically receive and record certain information from your device or through the Services. For example, this may include your device's IP address, user-agent, web pages you visit or features you use within the Services, the date and time of your activities on the Services, time since your last visit, links you click, searches conducted, the website visited before navigating to the Services, your software and hardware attributes (including browser and operating system type and version, app version, device type, and device identifiers), demographic and interest data based on browsing activity, and your general location inferred from your IP address. To obtain such information, we or our third-party service providers may use the following technologies to recognize your device and collect information about your device and Services usage:

https://www.vroom.com/legal/privacy-policy

| Infringement of U.S. Patent No. 10,796,362 by Vroom, Vroom.com and/or Carstory.com | |
|---|---|
| | 
https://www.carstory.com/cars/make-chevrolet/model-tahoe/location-chicago_il?zip=60602 |
| 63 [h] provide, via the used automobile seller interface, the first bid including at least a price for the first used automobile and the driving directions between the first location and the second location. | Vroom, Vroom.com and/or Carstory.com include providing, via the used automobile seller interface, the first bid including at least a price for the first used automobile and the driving directions between the first location and the second location.

NEW YORK, Dec. 15, 2020 (GLOBE NEWSWIRE) -- Vroom (**www.vroom.com**), an innovative ecommerce platform that offers a better way to buy and sell used vehicles, today announced that it has entered into a definitive agreement to acquire CarStory, a leader in AI-powered analytics and digital services for automotive retail, through the acquisition of Vast Holdings, Inc. Leveraging its machine learning, informed by more than 7 million listings per day and more than 18 million consumer sessions per month, CarStory brings the industry's most complete and accurate view of predictive market data to Vroom's national ecommerce and vehicle operations platform. As part of Vroom, CarStory will continue to drive automotive retail innovation by aggregating, optimizing and distributing current market data from thousands of automotive sources and offering its digital retailing services to dealers, top automotive financial services companies and household names in automotive industry research and retailing.

https://www.globenewswire.com/news-release/2020/12/15/2145364/0/en/Online-Automotive-Retailer-Vroom-to-Acquire-CarStory.html |

Infringement of U.S. Patent No. 10,796,362 by Vroom, Vroom.com and/or Carstory.com



https://www.vroom.com/inventory/honda-odyssey-2017-5FNRL5H69HB019731

- **Location Information.** With your consent, our Apps may collect geolocation information from your device in order to tailor our Services to you, for example, showing you vehicles closer to your location. You may opt out of location sharing by accessing the location settings on your device and setting your device not to share its location with us.

- **Information Collected Automatically.** When you use the Services, we or our third-party service providers may automatically receive and record certain information from your device or through the Services. For example, this may include your device's IP address, user-agent, web pages you visit or features you use within the Services, the date and time of your activities on the Services, time since your last visit, links you click, searches conducted, the website visited before navigating to the Services, your software and hardware attributes (including browser and operating system type and version, app version, device type, and device identifiers), demographic and interest data based on browsing activity, and your general location inferred from your IP address. To obtain such information, we or our third-party service providers may use the following technologies to recognize your device and collect information about your device and Services usage:

https://www.vroom.com/legal/privacy-policy

Infringement of U.S. Patent No. 10,796,362 by Vroom, Vroom.com and/or Carstory.com



https://www.carstory.com/cars/make-chevrolet/model-tahoe/location-chicago_il?zip=60602

# Exhibit 4



LLC

FILED

JUN 27 2011

STATE TREASURER

CERTIFICATE OF FORMATION
OF
SIDEKICK TECHNOLOGY, LLC

This is to certify that there is hereby organized a Limited Liability Company under and by virtue of N.J.S.A. 42, the "New Jersey Limited Liability Company Act."



0600 375424

1.   The name of the limited liability company is SIDEKICK TECHNOLOGY, LLC.

2.   The address of the limited liability company's initial registered office is: ABOYOUN & HELLER, L.L.C., 77 BLOOMFIELD AVENUE, PINE BROOK, NEW JERSEY 07058.  The name of the registered agent at such address is JOSEPH S. ABOYOUN, ESQ.

3.   The within limited liability company is to have one (1) or more members.

4.   The name and address of the person authorized to file the within Certificate of Formation is JOSEPH S. ABOYOUN, ESQ., 77 Bloomfield Avenue, Pine Brook, New Jersey 07058.

5.   The within limited liability company shall have perpetual existence.

**IN WITNESS WHEREOF**, the undersigned authorized person, being over eighteen (18) years of age, has signed this Certificate this 24TH day of June, 2011.

_____
JOSEPH S. ABOYOUN

Appx233

JS 44  (Rev. 10/20)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court.  This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet.   *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

## I. (a) PLAINTIFFS

VROOM, INC.; VROOM AUTOMOTIVE, LLC d/b/a/ VROOM, d/b/a TEXAS DIRECT AUTO; CARSTORY, LLC; and VAST.COM, INC. d/b/a CARSTORY

**DEFENDANTS**

SIDEKICK TECHNOLOGY, LLC

**(b)** County of Residence of First Listed Plaintiff _____
*(EXCEPT IN U.S. PLAINTIFF CASES)*

County of Residence of First Listed Defendant   Morris
*(IN U.S. PLAINTIFF CASES ONLY)*

NOTE:   IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*

See Attachment "A"

Attorneys *(If Known)*

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

| | |
|---|---|
| ☐ 1  U.S. Government Plaintiff | ☒ 3  Federal Question *(U.S. Government Not a Party)* |
| ☐ 2  U.S. Government Defendant | ☐ 4  Diversity *(Indicate Citizenship of Parties in Item III)* |

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff*
*(For Diversity Cases Only)*                                   *and One Box for Defendant)*

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated *or* Principal Place of Business In This State | ☐ 4 | ☒ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated *and* Principal Place of Business In Another State | ☒ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*
Click here for: Nature of Suit Code Descriptions.

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 422 Appeal 28 USC 158 | ☐ 375 False Claims Act |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 365 Personal Injury - | ☐ 690 Other | ☐ 423 Withdrawal | ☐ 376 Qui Tam (31 USC |
| ☐ 130 Miller Act | ☐ 315 Airplane Product | Product Liability | | 28 USC 157 | 3729(a)) |
| ☐ 140 Negotiable Instrument | Liability | ☐ 367 Health Care/ | | | ☐ 400 State Reapportionment |
| ☐ 150 Recovery of Overpayment | ☐ 320 Assault, Libel & | Pharmaceutical | | **PROPERTY RIGHTS** | ☐ 410 Antitrust |
| & Enforcement of Judgment | Slander | Personal Injury | | ☐ 820 Copyrights | ☐ 430 Banks and Banking |
| ☐ 151 Medicare Act | ☐ 330 Federal Employers' | Product Liability | | ☒ 830 Patent | ☐ 450 Commerce |
| ☐ 152 Recovery of Defaulted | Liability | ☐ 368 Asbestos Personal | | ☐ 835 Patent - Abbreviated | ☐ 460 Deportation |
| Student Loans | ☐ 340 Marine | Injury Product | | New Drug Application | ☐ 470 Racketeer Influenced and |
| (Excludes Veterans) | ☐ 345 Marine Product | Liability | | ☐ 840 Trademark | Corrupt Organizations |
| ☐ 153 Recovery of Overpayment | Liability | **PERSONAL PROPERTY** | **LABOR** | ☐ 880 Defend Trade Secrets | ☐ 480 Consumer Credit |
| of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 370 Other Fraud | ☐ 710 Fair Labor Standards | Act of 2016 | (15 USC 1681 or 1692) |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle | ☐ 371 Truth in Lending | Act | | ☐ 485 Telephone Consumer |
| ☐ 190 Other Contract | Product Liability | ☐ 380 Other Personal | ☐ 720 Labor/Management | **SOCIAL SECURITY** | Protection Act |
| ☐ 195 Contract Product Liability | ☐ 360 Other Personal | Property Damage | Relations | ☐ 861 HIA (1395ff) | ☐ 490 Cable/Sat TV |
| ☐ 196 Franchise | Injury | ☐ 385 Property Damage | ☐ 740 Railway Labor Act | ☐ 862 Black Lung (923) | ☐ 850 Securities/Commodities/ |
| | ☐ 362 Personal Injury - | Product Liability | ☐ 751 Family and Medical | ☐ 863 DIWC/DIWW (405(g)) | Exchange |
| | Medical Malpractice | | Leave Act | ☐ 864 SSID Title XVI | ☐ 890 Other Statutory Actions |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 790 Other Labor Litigation | ☐ 865 RSI (405(g)) | ☐ 891 Agricultural Acts |
| ☐ 210 Land Condemnation | ☐ 440 Other Civil Rights | **Habeas Corpus:** | ☐ 791 Employee Retirement | | ☐ 893 Environmental Matters |
| ☐ 220 Foreclosure | ☐ 441 Voting | ☐ 463 Alien Detainee | Income Security Act | **FEDERAL TAX SUITS** | ☐ 895 Freedom of Information |
| ☐ 230 Rent Lease & Ejectment | ☐ 442 Employment | ☐ 510 Motions to Vacate | | ☐ 870 Taxes (U.S. Plaintiff | Act |
| ☐ 240 Torts to Land | ☐ 443 Housing/ | Sentence | | or Defendant) | ☐ 896 Arbitration |
| ☐ 245 Tort Product Liability | Accommodations | ☐ 530 General | | ☐ 871 IRS—Third Party | ☐ 899 Administrative Procedure |
| ☐ 290 All Other Real Property | ☐ 445 Amer. w/Disabilities - | ☐ 535 Death Penalty | **IMMIGRATION** | 26 USC 7609 | Act/Review or Appeal of |
| | Employment | **Other:** | ☐ 462 Naturalization Application | | Agency Decision |
| | ☐ 446 Amer. w/Disabilities - | ☐ 540 Mandamus & Other | ☐ 465 Other Immigration | | ☐ 950 Constitutionality of |
| | Other | ☐ 550 Civil Rights | Actions | | State Statutes |
| | ☐ 448 Education | ☐ 555 Prison Condition | | | |
| | | ☐ 560 Civil Detainee - | | | |
| | | Conditions of | | | |
| | | Confinement | | | |

## V. ORIGIN *(Place an "X" in One Box Only)*

| | | | | | | |
|---|---|---|---|---|---|---|
| ☒ 1 Original Proceeding | ☐ 2 Removed from State Court | ☐ 3 Remanded from Appellate Court | ☐ 4 Reinstated or Reopened | ☐ 5 Transferred from Another District *(specify)* | ☐ 6 Multidistrict Litigation - Transfer | ☐ 8 Multidistrict Litigation - Direct File |

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
28 U.S.C. §§ 2201, 2202; and 35 U.S.C. §§ 1 et seq.

Brief description of cause:
Seeking Declaratory Judgment of Noninfringement of certain patents

## VII. REQUESTED IN COMPLAINT:

☐ CHECK IF THIS IS A **CLASS ACTION** UNDER RULE 23, F.R.Cv.P.

**DEMAND $**

CHECK YES only if demanded in complaint:

**JURY DEMAND:**   ☐ Yes   ☒ No

## VIII. RELATED CASE(S) IF ANY

*(See instructions):*

JUDGE _____   DOCKET NUMBER _____

| DATE | SIGNATURE OF ATTORNEY OF RECORD |
|---|---|
| Mar 25, 2021 | /s/ Lesley M. Grossberg |

**FOR OFFICE USE ONLY**

| RECEIPT # | AMOUNT | APPLYING IFP | JUDGE | MAG. JUDGE |
|---|---|---|---|---|
| | | | | |

## INSTRUCTIONS FOR ATTORNEYS COMPLETING CIVIL COVER SHEET FORM JS 44

Authority For Civil Cover Sheet

The JS 44 civil cover sheet and the information contained herein neither replaces nor supplements the filings and service of pleading or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. Consequently, a civil cover sheet is submitted to the Clerk of Court for each civil complaint filed. The attorney filing a case should complete the form as follows:

**I.(a)**    **Plaintiffs-Defendants.** Enter names (last, first, middle initial) of plaintiff and defendant. If the plaintiff or defendant is a government agency, use only the full name or standard abbreviations. If the plaintiff or defendant is an official within a government agency, identify first the agency and then the official, giving both name and title.

**(b)**    **County of Residence.** For each civil case filed, except U.S. plaintiff cases, enter the name of the county where the first listed plaintiff resides at the time of filing. In U.S. plaintiff cases, enter the name of the county in which the first listed defendant resides at the time of filing. (NOTE: In land condemnation cases, the county of residence of the "defendant" is the location of the tract of land involved.)

**(c)**    **Attorneys.** Enter the firm name, address, telephone number, and attorney of record. If there are several attorneys, list them on an attachment, noting in this section "(see attachment)".

**II.**    **Jurisdiction.** The basis of jurisdiction is set forth under Rule 8(a), F.R.Cv.P., which requires that jurisdictions be shown in pleadings. Place an "X" in one of the boxes. If there is more than one basis of jurisdiction, precedence is given in the order shown below.
United States plaintiff. (1) Jurisdiction based on 28 U.S.C. 1345 and 1348. Suits by agencies and officers of the United States are included here.
United States defendant. (2) When the plaintiff is suing the United States, its officers or agencies, place an "X" in this box.
Federal question. (3) This refers to suits under 28 U.S.C. 1331, where jurisdiction arises under the Constitution of the United States, an amendment to the Constitution, an act of Congress or a treaty of the United States. In cases where the U.S. is a party, the U.S. plaintiff or defendant code takes precedence, and box 1 or 2 should be marked.
Diversity of citizenship. (4) This refers to suits under 28 U.S.C. 1332, where parties are citizens of different states. When Box 4 is checked, the citizenship of the different parties must be checked**.** (See Section III below**; NOTE: federal question actions take precedence over diversity cases.**)

**III.**    **Residence (citizenship) of Principal Parties.** This section of the JS 44 is to be completed if diversity of citizenship was indicated above. Mark this section for each principal party.

**IV.**    **Nature of Suit.** Place an "X" in the appropriate box. If there are multiple nature of suit codes associated with the case, pick the nature of suit code that is most applicable. Click here for: Nature of Suit Code Descriptions.

**V.**    **Origin.** Place an "X" in one of the seven boxes.
Original Proceedings. (1) Cases which originate in the United States district courts.
Removed from State Court. (2) Proceedings initiated in state courts may be removed to the district courts under Title 28 U.S.C., Section 1441.
Remanded from Appellate Court. (3) Check this box for cases remanded to the district court for further action. Use the date of remand as the filing date.
Reinstated or Reopened. (4) Check this box for cases reinstated or reopened in the district court. Use the reopening date as the filing date.
Transferred from Another District. (5) For cases transferred under Title 28 U.S.C. Section 1404(a). Do not use this for within district transfers or multidistrict litigation transfers.
Multidistrict Litigation – Transfer. (6) Check this box when a multidistrict case is transferred into the district under authority of Title 28 U.S.C. Section 1407.
Multidistrict Litigation – Direct File. (8) Check this box when a multidistrict case is filed in the same district as the Master MDL docket.
**PLEASE NOTE THAT THERE IS NOT AN ORIGIN CODE 7.** Origin Code 7 was used for historical records and is no longer relevant due to changes in statue.

**VI.**    **Cause of Action.** Report the civil statute directly related to the cause of action and give a brief description of the cause. **Do not cite jurisdictional statutes unless diversity.** Example: U.S. Civil Statute: 47 USC 553 Brief Description: Unauthorized reception of cable service.

**VII.**    **Requested in Complaint.** Class Action. Place an "X" in this box if you are filing a class action under Rule 23, F.R.Cv.P.
Demand. In this space enter the actual dollar amount being demanded or indicate other demand, such as a preliminary injunction.
Jury Demand. Check the appropriate box to indicate whether or not a jury is being demanded.

**VIII.**    **Related Cases.** This section of the JS 44 is used to reference related pending cases, if any. If there are related pending cases, insert the docket numbers and the corresponding judge names for such cases.

**Date and Attorney Signature.** Date and sign the civil cover sheet.

# APPENDIX A

Lesley M. Grossberg (NJ No. 021682008)
John F. Murphy (*pro hac vice* pending)
Stephanie M. Hatzikyriakou (NJ No. 080582014)
BAKER & HOSTETLER LLP
2929 Arch Street
Cira Centre, 12th Floor
Philadelphia, PA  19104-2891
Telephone: 215.568.3100
Facsimile:  215.568.3439

Derek M. Freitas (*pro hac vice* pending)
BAKER & HOSTETLER LLP
312 Walnut Street
Suite 3200
Cincinnati, OH  45202-4074
Telephone: 513.929.3400
Facsimile:  513.929.0303


Attorneys for Plaintiff

Loly G. Tor
K&L GATES LLP
One Newark Center
Tenth Floor
Newark, New Jersey 07102
Phone: (973) 848-4026
loly.tor@klgates.com

Benjamin E. Weed (pro hac vice to be filed)
IL Bar No. 6180457
Gina A. Johnson (pro hac vice to be filed)
IL Bar No. 6320853
K&L GATES LLP
70 W. Madison Street, Suite 3100
Chicago, IL 60602
Phone: (312) 372-1121
benjamin.weed@klgates.com
gina.johnson@klgates.com

*Attorneys for Defendant/Counter-Plaintiff*

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| VROOM, INC.;<br>VROOM AUTOMOTIVE, LLC<br>d/b/a VROOM, d/b/a<br>TEXAS DIRECT AUTO;<br>CARSTORY, LLC; and<br>VAST.COM, INC. d/b/a CARSTORY,<br><br>Plaintiffs,<br><br>v.<br><br>SIDEKICK<br>TECHNOLOGY, LLC,<br><br>Defendant. | Case No. 2:21-cv-06737-WJM-MF<br><br>Hon. William J. Martini, U.S.D.J.<br>Hon. Mark Falk, U.S.M.J.<br><br>**ANSWER, COUNTERCLAIM<br>AND DEMAND FOR JURY<br>TRIAL**<br><br><br>*Document Electronically Filed* |

Defendant Sidekick Technology, LLC ("Sidekick" or "Defendant"), by and through its

undersigned counsel, hereby responds to Plaintiffs Vroom, Inc., Vroom Automotive, LLC,

1

organized and existing under the laws of the State of Delaware, with a mailing address of 251 Little Falls Drive, Wilmington, Delaware, 19808.

6.     Upon information and belief, Vast.com is a corporation organized and existing under the laws of the State of California, with its principal place of business at 320 Congress Ave, Ste C, Austin, Texas, 78701.

## JURISDICTION AND VENUE

7.     This Court has subject matter jurisdiction over this action under 28 U.S.C. §§ 1331 and 1338(a) because this action arises under the patent laws of the United States.

8.     Vroom is subject to personal jurisdiction in this District, based on at least its filing of the Complaint in New Jersey and its purposeful, systematic, and continuous contacts with New Jersey.

9.     Venue is proper in this District under 28 U.S.C. §§ 1391(b) and 1400(b). On information and belief, certain acts complained of herein also occurred within this District and significant evidence of these acts is located within this District.

## SIDEKICK'S LEGACY OF INNOVATION

10.     For nearly a decade, Sidekick Technology, LLC has invested substantial resources in independently developing systems, methods, and apparatuses for providing automobile market information and performing automobile transactions (the "Sidekick Technology").

11.     The Sidekick Technology permits customers to select a desired automobile based on available market information and complete the transaction for that automobile from their home.

12.     This technology advantageously permits customers to avoid the traditional car dealership experience, while searching an inventory of automobiles from disparate geographic locations.

24

13. In short, the innovation embodied in the Sidekick Technology enables consumers, dealers, and manufacturers to make informed decisions in purchasing, selling, and making automobiles, in order to maximize efficiency on all accounts.

14. Sidekick is (and has always been) committed to protecting its innovations and its substantial investment in automobile transaction technology, including memorializing its inventions by way of patent protection. Sidekick's commitment in this regard is further expanded upon in the following section, below, regarding the Asserted Patents.

15. Sidekick's commitment in this regard is ongoing. Indeed, Sidekick expects that its patent portfolio will continue to develop and mature with the market, as the disclosures of the Asserted Patents permit a wide variety of claims to be permissibly prosecuted based on the original patent filings.

16. The large (and growing) nature of Sidekick's portfolio confirms that the United States Patent and Trademark Office has seen value, and continues to see value, in the technology disclosed therein.

## THE ASSERTED PATENTS

17. On September 22, 2015, U.S. Patent No. 9,141,984, entitled "Automobile Transaction Facilitation Using a Manufacturer Response," was duly and legally issued by the United States Patent and Trademark Office. A true and accurate copy of the '984 Patent has been previously filed as Dkt. No. 1-5.

18. On June 3, 2014, U.S. Patent No. 8,744,925, entitled "Automobile Transaction Facilitation Based on Customer Selection of a Specific Automobile," was duly and legally issued by the United States Patent and Trademark Office. A true and accurate copy of the '925 Patent has been previously filed as Dkt. No. 1-6.

25

45.     Vroom's counsel ultimately responded to Sidekick's September 29, 2020 letter, for the first time in writing, on December 31, 2020.

46.     On March 2, 2021, Sidekick sent another demand letter, reiterating its allegations of infringement against Vroom, and further putting Vroom on notice of its infringement of a twelfth Sidekick patent, the '362 Patent.

47.     On information and belief, Vroom has not changed the operation of its website or mobile application, complied with the cease and desist demands in Sidekick's correspondence, or otherwise designed the accused products around Sidekick's claims of infringement.

48.     In other words, despite being on notice of Sidekick's specific charges of infringement, Vroom continues to knowingly infringe the Asserted Patents.

## COUNT 1

## <u>INFRINGEMENT OF THE '984 PATENT</u>

49.     Sidekick incorporates by reference and re-alleges each and every allegation of the foregoing paragraphs as if set forth herein.

50.     Sidekick owns all substantial rights, interest, and title in and to the '984 Patent, including the sole and exclusive right to prosecute this action and enforce the '984 Patent against infringers, and to collect damages for all relevant times.

51.     The written description of the '984 Patent describes in technical detail each of the limitations of the claims, allowing a skilled artisan to understand the scope of the claims and how the non-conventional and non-generic combination of claim limitations is patentably distinct from and improved upon what may have been considered conventional or generic in the art at the time of the invention.

52.     Vroom has made, had made, used, imported, supplied, distributed, sold, or offered

310572127.1

for sale products and/or systems at least on its website, www.vroom.com and by way of the mobile application associated with that website (the "Infringing Products").

53. Contrary to Vroom's articulated bases for purported non-infringement, on information and belief, the claim elements Vroom identified in its Complaint at paragraph 32 are met, either literally or under the doctrine of equivalents, under an appropriate construction of the claims of the '984 Patent.

54. Vroom has infringed and is infringing at least Claim 1 of the '984 Patent by making, having made, using, importing, supplying, distributing, selling, and/or offering for sale the Infringing Products.

55. Vroom actively induced and is actively inducing infringement of at least Claim 1 of the '984 Patent by selling the Infringing Products with instructions as to how to use the Infringing Products in a system such as that recited in the '984 Patent. Vroom aids, instructs, or otherwise acts with the intent to cause an end user to use the Infringing Products. Vroom knew of the '984 Patent and knew that its use and sale of the Infringing Products infringe at least Claim 1 of the '984 Patent.

56. Vroom is liable for contributory infringement of at least Claim 1 of the '984 Patent by providing, and by having knowingly provided, a material part of the instrumentalities, namely the Infringing Products used to infringe Claim 1 of the '984 Patent. The Infringing Products have no substantial non-infringing uses. When an end user uses the Infringing Products, the end user directly infringes Claim 1 of the '984 Patent. Vroom knew that the Infringing Products were especially made for use in an infringing manner prior to the filing of this lawsuit. For at least the reasons set forth above, Vroom contributes to the infringement of the '984 Patent by others.

57. Sidekick has been and continues to be damaged as a result of the infringing conduct

310572127.1

by Vroom alleged above. Thus, Vroom is liable to Sidekick in an amount that compensates it for such infringement, which by law cannot be less than a reasonable royalty, together with interest and costs as fixed by this Court under 35 U.S.C. § 284.

58.     Vroom's infringement of the '984 Patent has caused, and will continue to cause, Sidekick to suffer substantial and irreparable harm.

59.     Vroom has been aware that it infringes the '984 Patent since at least September 29, 2020, upon the receipt of the letter previously filed as Dkt. No. 1-1.

60.     Since obtaining knowledge of its infringing activities, Vroom has failed to cease its infringing activities.

61.     Vroom's infringement of the '984 Patent is, has been, and continues to be, willful, intentional, deliberate, and/or in conscious disregard of Sidekick's rights under the patent.

62.     Sidekick has complied with 35 U.S.C. § 287 with respect to the '984 Patent.

## COUNT 2

## INFRINGEMENT OF THE '925 PATENT

63.     Sidekick incorporates by reference and re-alleges each and every allegation of the foregoing paragraphs as if set forth herein.

64.     Sidekick owns all substantial rights, interest, and title in and to the '925 Patent, including the sole and exclusive right to prosecute this action and enforce the '925 Patent against infringers, and to collect damages for all relevant times.

65.     The written description of the '925 Patent describes in technical detail each of the limitations of the claims, allowing a skilled artisan to understand the scope of the claims and how the non-conventional and non-generic combination of claim limitations is patentably distinct from and improved upon what may have been considered conventional or generic in the art at the time

32

of the invention.

66.     Vroom has made, had made, used, imported, supplied, distributed, sold, or offered for sale products and/or systems, including the Infringing Products.

67.     Contrary to Vroom's articulated bases for purported non-infringement, on information and belief, the claim elements Vroom identified in its Complaint at paragraph 45 are met, either literally or under the doctrine of equivalents, under an appropriate construction of the claims of the '925 Patent.

68.     Vroom has infringed and is infringing at least Claim 1 of the '925 Patent by making, having made, using, importing, supplying, distributing, selling, and/or offering for sale the Infringing Products.

69.     Vroom actively induced and is actively inducing infringement of at least Claim 1 of the '925 Patent by selling the Infringing Products with instructions as to how to use the Infringing Products in a system such as that recited in the '925 Patent. Vroom aids, instructs, or otherwise acts with the intent to cause an end user to use the Infringing Products. Vroom knew of the '925 Patent and knew that its use and sale of the Infringing Products infringe at least Claim 1 of the '925 Patent.

70.     Vroom is liable for contributory infringement of at least Claim 1 of the '925 Patent by providing, and by having knowingly provided, a material part of the instrumentalities, namely the Infringing Products used to infringe Claim 1 of the '925 Patent. The Infringing Products have no substantial non-infringing uses. When an end user uses the Infringing Products, the end user directly infringes Claim 1 of the '925 Patent. Vroom knew that the Infringing Products were especially made for use in an infringing manner prior to the filing of this lawsuit. For at least the reasons set forth above, Vroom contributes to the infringement of the '925 Patent by others.

310572127.1

71.     Sidekick has been and continues to be damaged as a result of the infringing conduct by Vroom alleged above. Thus, Vroom is liable to Sidekick in an amount that compensates it for such infringement, which by law cannot be less than a reasonable royalty, together with interest and costs as fixed by this Court under 35 U.S.C. § 284.

72.     Vroom's infringement of the '925 Patent has caused, and will continue to cause, Sidekick to suffer substantial and irreparable harm.

73.     Vroom has been aware that it infringes the '925 Patent since at least September 29, 2020, upon the receipt of the letter previously filed as Dkt. No. 1-1.

74.     Since obtaining knowledge of its infringing activities, Vroom has failed to cease its infringing activities.

75.     Vroom's infringement of the '925 Patent is, has been, and continues to be, willful, intentional, deliberate, and/or in conscious disregard of Sidekick's rights under the patent.

76.     Sidekick has complied with 35 U.S.C. § 287 with respect to the '925 Patent.

## COUNT 3

### INFRINGEMENT OF THE '093 PATENT

77.     Sidekick incorporates by reference and re-alleges each and every allegation of the foregoing paragraphs as if set forth herein.

78.     Sidekick owns all substantial rights, interest, and title in and to the '093 Patent, including the sole and exclusive right to prosecute this action and enforce the '093 Patent against infringers, and to collect damages for all relevant times.

79.     The written description of the '093 Patent describes in technical detail each of the limitations of the claims, allowing a skilled artisan to understand the scope of the claims and how the non-conventional and non-generic combination of claim limitations is patentably distinct from

34

and improved upon what may have been considered conventional or generic in the art at the time of the invention.

80.     Vroom has made, had made, used, imported, supplied, distributed, sold, or offered for sale products and/or systems, including the Infringing Products.

81.     Contrary to Vroom's articulated bases for purported non-infringement, on information and belief, the claim elements Vroom identified in its Complaint at paragraph 53 are met, either literally or under the doctrine of equivalents, under an appropriate construction of the claims of the '093 Patent.

82.     Vroom has infringed and is infringing at least Claim 1 of the '093 Patent by making, having made, using, importing, supplying, distributing, selling, and/or offering for sale the Infringing Products.

83.     Vroom actively induced and is actively inducing infringement of at least Claim 1 of the '093 Patent by selling the Infringing Products with instructions as to how to use the Infringing Products in a system such as that recited in the '093 Patent. Vroom aids, instructs, or otherwise acts with the intent to cause an end user to use the Infringing Products. Vroom knew of the '093 Patent and knew that its use and sale of the Infringing Products infringe at least Claim 1 of the '093 Patent.

84.     Vroom is liable for contributory infringement of at least Claim 1 of the '093 Patent by providing, and by having knowingly provided, a material part of the instrumentalities, namely the Infringing Products used to infringe Claim 1 of the '093 Patent. The Infringing Products have no substantial non-infringing uses. When an end user uses the Infringing Products the end user directly infringes Claim 1 of the '093 Patent. Vroom knew that the Infringing Products were especially made for use in an infringing manner prior to the filing of this lawsuit. For at least the

310572127.1

reasons set forth above, Vroom contributes to the infringement of the '093 Patent by others.

85.    Sidekick has been and continues to be damaged as a result of the infringing conduct by Vroom alleged above. Thus, Vroom is liable to Sidekick in an amount that compensates it for such infringement, which by law cannot be less than a reasonable royalty, together with interest and costs as fixed by this Court under 35 U.S.C. § 284.

86.    Vroom's infringement of the '093 Patent has caused, and will continue to cause, Sidekick to suffer substantial and irreparable harm.

87.    Vroom has been aware that it infringes the '093 Patent since at least September 29, 2020, upon the receipt of the letter previously filed as Dkt. No. 1-1.

88.    Since obtaining knowledge of its infringing activities, Vroom has failed to cease its infringing activities.

89.    Vroom's infringement of the '093 Patent is, has been, and continues to be, willful, intentional, deliberate, and/or in conscious disregard of Sidekick's rights under the patent.

90.    Sidekick has complied with 35 U.S.C. § 287 with respect to the '093 Patent.

## COUNT 4

## <u>INFRINGEMENT OF THE '075 PATENT</u>

91.    Sidekick incorporates by reference and re-alleges each and every allegation of the foregoing paragraphs as if set forth herein.

92.    Sidekick owns all substantial rights, interest, and title in and to the '075 Patent, including the sole and exclusive right to prosecute this action and enforce the '075 Patent against infringers, and to collect damages for all relevant times.

93.    The written description of the '075 Patent describes in technical detail each of the limitations of the claims, allowing a skilled artisan to understand the scope of the claims and how

310572127.1

the non-conventional and non-generic combination of claim limitations is patentably distinct from and improved upon what may have been considered conventional or generic in the art at the time of the invention.

94.     Vroom has made, had made, used, imported, supplied, distributed, sold, or offered for sale products and/or systems, including the Infringing Products.

95.     Contrary to Vroom's articulated bases for purported non-infringement, on information and belief, the claim elements Vroom identified in its Complaint at paragraph 62 are met, either literally or under the doctrine of equivalents, under an appropriate construction of the claims of the '075 Patent.

96.     Vroom has infringed and is infringing at least Claim 1 of the '075 Patent by making, having made, using, importing, supplying, distributing, selling, and/or offering for sale the Infringing Products.

97.     Vroom actively induced and is actively inducing infringement of at least Claim 1 of the '075 Patent by selling the Infringing Products with instructions as to how to use the Infringing Products in a system such as that recited in the '075 Patent. Vroom aids, instructs, or otherwise acts with the intent to cause an end user to use the Infringing Products Vroom knew of the '075 Patent and knew that its use and sale of the Infringing Products infringe at least Claim 1 of the '075 Patent.

98.     Vroom is liable for contributory infringement of at least Claim 1 of the '075 Patent by providing, and by having knowingly provided, a material part of the instrumentalities, namely the Infringing Products used to infringe Claim 1 of the '075 Patent. The Infringing Products have no substantial non-infringing uses. When an end user uses the Infringing Products the end user directly infringes Claim 1 of the '075 Patent. Vroom knew that the Infringing Products were

310572127.1

especially made for use in an infringing manner prior to the filing of this lawsuit. For at least the reasons set forth above, Vroom contributes to the infringement of the '075 Patent by others.

99.     Sidekick has been and continues to be damaged as a result of the infringing conduct by Vroom alleged above. Thus, Vroom is liable to Sidekick in an amount that compensates it for such infringement, which by law cannot be less than a reasonable royalty, together with interest and costs as fixed by this Court under 35 U.S.C. § 284.

100.    Vroom's infringement of the '075 Patent has caused, and will continue to cause, Sidekick to suffer substantial and irreparable harm.

101.    Vroom has been aware that it infringes the '075 Patent since at least September 29, 2020, upon the receipt of the letter previously filed as Dkt. No. 1-1.

102.    Since obtaining knowledge of its infringing activities, Vroom has failed to cease its infringing activities.

103.    Vroom's infringement of the '075 Patent is, has been, and continues to be, willful, intentional, deliberate, and/or in conscious disregard of Sidekick's rights under the patent.

104.    Sidekick has complied with 35 U.S.C. § 287 with respect to the '075 Patent.

<div style="text-align:center">

**COUNT 5**

**<u>INFRINGEMENT OF THE '216 PATENT</u>**

</div>

105.    Sidekick incorporates by reference and re-alleges each and every allegation of the foregoing paragraphs as if set forth herein.

106.    Sidekick owns all substantial rights, interest, and title in and to the '216 Patent, including the sole and exclusive right to prosecute this action and enforce the '216 Patent against infringers, and to collect damages for all relevant times.

107.    The written description of the '216 Patent describes in technical detail each of the

<div style="text-align:center">38</div>

limitations of the claims, allowing a skilled artisan to understand the scope of the claims and how the non-conventional and non-generic combination of claim limitations is patentably distinct from and improved upon what may have been considered conventional or generic in the art at the time of the invention.

108.    Vroom has made, had made, used, imported, supplied, distributed, sold, or offered for sale products and/or systems, including the Infringing Products

109.    Contrary to Vroom's articulated bases for purported non-infringement, on information and belief, the claim elements Vroom identified in its Complaint at paragraph 71 are met, either literally or under the doctrine of equivalents, under an appropriate construction of the claims of the '216 Patent.

110.    Vroom has infringed and is infringing at least Claim 1 of the '216 Patent by making, having made, using, importing, supplying, distributing, selling, and/or offering for sale the Infringing Products.

111.    Vroom actively induced and is actively inducing infringement of at least Claim 1 of the '216 Patent by selling the Infringing Products with instructions as to how to use the Infringing Products in a system such as that recited in the '216 Patent. Vroom aids, instructs, or otherwise acts with the intent to cause an end user to use the Infringing Products Vroom knew of the '216 Patent and knew that its use and sale of the Infringing Products infringe at least Claim 1 of the '216 Patent.

112.    Vroom is liable for contributory infringement of at least Claim 1 of the '216 Patent by providing, and by having knowingly provided, a material part of the instrumentalities, namely the Infringing Products used to infringe Claim 1 of the '216 Patent. The Infringing Products have no substantial non-infringing uses. When an end user uses the Infringing Products the end user

directly infringes Claim 1 of the '216 Patent. Vroom knew that the Infringing Products were especially made for use in an infringing manner prior to the filing of this lawsuit. For at least the reasons set forth above, Vroom contributes to the infringement of the '216 Patent by others.

113.   Sidekick has been and continues to be damaged as a result of the infringing conduct by Vroom alleged above. Thus, Vroom is liable to Sidekick in an amount that compensates it for such infringement, which by law cannot be less than a reasonable royalty, together with interest and costs as fixed by this Court under 35 U.S.C. § 284.

114.   Vroom's infringement of the '216 Patent has caused, and will continue to cause, Sidekick to suffer substantial and irreparable harm.

115.   Vroom has been aware that it infringes the '216 Patent since at least September 29, 2020, upon the receipt of the letter previously filed as Dkt. No. 1-1.

116.   Since obtaining knowledge of its infringing activities, Vroom has failed to cease its infringing activities.

117.   Vroom's infringement of the '216 Patent is, has been, and continues to be, willful, intentional, deliberate, and/or in conscious disregard of Sidekick's rights under the patent.

118.   Sidekick has complied with 35 U.S.C. § 287 with respect to the '216 Patent.

## COUNT 6

## **INFRINGEMENT OF THE '467 PATENT**

119.   Sidekick incorporates by reference and re-alleges each and every allegation of the foregoing paragraphs as if set forth herein.

120.   Sidekick owns all substantial rights, interest, and title in and to the '467 Patent, including the sole and exclusive right to prosecute this action and enforce the '467 Patent against infringers, and to collect damages for all relevant times.

310572127.1

121.   The written description of the '467 Patent describes in technical detail each of the limitations of the claims, allowing a skilled artisan to understand the scope of the claims and how the non-conventional and non-generic combination of claim limitations is patentably distinct from and improved upon what may have been considered conventional or generic in the art at the time of the invention.

122.   Vroom has made, had made, used, imported, supplied, distributed, sold, or offered for sale products and/or systems, including the Infringing Products.

123.   Contrary to Vroom's articulated bases for purported non-infringement, on information and belief, the claim elements Vroom identified in its Complaint at paragraph 80 are met, either literally or under the doctrine of equivalents, under an appropriate construction of the claims of the '467 Patent.

124.   Vroom has infringed and is infringing at least Claim 1 of the '467 Patent by making, having made, using, importing, supplying, distributing, selling, and/or offering for sale the Infringing Products.

125.   Vroom actively induced and is actively inducing infringement of at least Claim 1 of the '467 Patent by selling the Infringing Products with instructions as to how to use the Infringing Products in a system such as that recited in the '467 Patent. Vroom aids, instructs, or otherwise acts with the intent to cause an end user to use the Infringing Products Vroom knew of the '467 Patent and knew that its use and sale of the Infringing Products infringe at least Claim 1 of the '467 Patent.

126.   Vroom is liable for contributory infringement of at least Claim 1 of the '467 Patent by providing, and by having knowingly provided, a material part of the instrumentalities, namely the Infringing Products used to infringe Claim 1 of the '467 Patent. The Infringing Products have

310572127.1

no substantial non-infringing uses. When an end user uses the Infringing Products the end user directly infringes Claim 1 of the '467 Patent. Vroom knew that the Infringing Products were especially made for use in an infringing manner prior to the filing of this lawsuit. For at least the reasons set forth above, Vroom contributes to the infringement of the '467 Patent by others.

127.    Sidekick has been and continues to be damaged as a result of the infringing conduct by Vroom alleged above. Thus, Vroom is liable to Sidekick in an amount that compensates it for such infringement, which by law cannot be less than a reasonable royalty, together with interest and costs as fixed by this Court under 35 U.S.C. § 284.

128.    Vroom's infringement of the '467 Patent has caused, and will continue to cause, Sidekick to suffer substantial and irreparable harm.

129.    Vroom has been aware that it infringes the '467 Patent since at least September 29, 2020, upon the receipt of the letter previously filed as Dkt. No. 1-1. Since obtaining knowledge of its infringing activities, Vroom has failed to cease its infringing activities.

130.    Vroom's infringement of the '467 Patent is, has been, and continues to be, willful, intentional, deliberate, and/or in conscious disregard of Sidekick's rights under the patent.

131.    Sidekick has complied with 35 U.S.C. § 287 with respect to the '467 Patent.

## COUNT 7

## **<u>INFRINGEMENT OF THE '897 PATENT</u>**

132.    Sidekick incorporates by reference and re-alleges each and every allegation of the foregoing paragraphs as if set forth herein.

133.    Sidekick owns all substantial rights, interest, and title in and to the '897 Patent, including the sole and exclusive right to prosecute this action and enforce the '897 Patent against infringers, and to collect damages for all relevant times.

310572127.1

134.     The written description of the '897 Patent describes in technical detail each of the limitations of the claims, allowing a skilled artisan to understand the scope of the claims and how the non-conventional and non-generic combination of claim limitations is patentably distinct from and improved upon what may have been considered conventional or generic in the art at the time of the invention.

135.     Vroom has made, had made, used, imported, supplied, distributed, sold, or offered for sale products and/or systems, including the Infringing Products.

136.     Contrary to Vroom's articulated bases for purported non-infringement, on information and belief, the claim elements Vroom identified in its Complaint at paragraph 89 are met, either literally or under the doctrine of equivalents, under an appropriate construction of the claims of the '897 Patent.

137.     Vroom has infringed and is infringing at least Claim 1 of the '897 Patent by making, having made, using, importing, supplying, distributing, selling, and/or offering for sale the Infringing Products.

138.     Vroom actively induced and is actively inducing infringement of at least Claim 1 of the '897 Patent by selling the Infringing Products with instructions as to how to use the Infringing Products in a system such as that recited in the '897 Patent. Vroom aids, instructs, or otherwise acts with the intent to cause an end user to use the Infringing Products Vroom knew of the '897 Patent and knew that its use and sale of the Infringing Products infringe at least Claim 1 of the '897 Patent.

139.     Vroom is liable for contributory infringement of at least Claim 1 of the '897 Patent by providing, and by having knowingly provided, a material part of the instrumentalities, namely the Infringing Products used to infringe Claim 1 of the '897 Patent. The Infringing Products have

43

no substantial non-infringing uses. When an end user uses the Infringing Products the end user directly infringes Claim 1 of the '897 Patent. Vroom knew that the Infringing Products were especially made for use in an infringing manner prior to the filing of this lawsuit. For at least the reasons set forth above, Vroom contributes to the infringement of the '897 Patent by others.

140.     Sidekick has been and continues to be damaged as a result of the infringing conduct by Vroom alleged above. Thus, Vroom is liable to Sidekick in an amount that compensates it for such infringement, which by law cannot be less than a reasonable royalty, together with interest and costs as fixed by this Court under 35 U.S.C. § 284.

141.     Vroom's infringement of the '897 Patent has caused, and will continue to cause, Sidekick to suffer substantial and irreparable harm.

142.     Vroom has been aware that it infringes the '897 Patent since at least September 29, 2020, upon the receipt of the letter previously filed as Dkt. No. 1-1. Since obtaining knowledge of its infringing activities, Vroom has failed to cease its infringing activities.

143.     Vroom's infringement of the '897 Patent is, has been, and continues to be, willful, intentional, deliberate, and/or in conscious disregard of Sidekick's rights under the patent.

144.     Sidekick has complied with 35 U.S.C. § 287 with respect to the '897 Patent.

### COUNT 8

### INFRINGEMENT OF THE '704 PATENT

145.     Sidekick incorporates by reference and re-alleges each and every allegation of the foregoing paragraphs as if set forth herein.

146.     Sidekick owns all substantial rights, interest, and title in and to the '704 Patent, including the sole and exclusive right to prosecute this action and enforce the '704 Patent against infringers, and to collect damages for all relevant times.

147.    The written description of the '704 Patent describes in technical detail each of the limitations of the claims, allowing a skilled artisan to understand the scope of the claims and how the non-conventional and non-generic combination of claim limitations is patentably distinct from and improved upon what may have been considered conventional or generic in the art at the time of the invention.

148.    Vroom has made, had made, used, imported, supplied, distributed, sold, or offered for sale products and/or systems, including the Infringing Products.

149.    Contrary to Vroom's articulated bases for purported non-infringement, on information and belief, the claim elements Vroom identified in its Complaint at paragraph 98 are met, either literally or under the doctrine of equivalents, under an appropriate construction of the claims of the '704 Patent.

150.    Vroom has infringed and is infringing at least Claim 1 of the '704 Patent by making, having made, using, importing, supplying, distributing, selling, and/or offering for sale the Infringing Products.

151.    Vroom actively induced and is actively inducing infringement of at least Claim 1 of the '704 Patent by selling the Infringing Products with instructions as to how to use the Infringing Products in a system such as that recited in the '704 Patent. Vroom aids, instructs, or otherwise acts with the intent to cause an end user to use the Infringing Products Vroom knew of the '704 Patent and knew that its use and sale of the Infringing Products infringe at least Claim 1 of the '704 Patent.

152.    Vroom is liable for contributory infringement of at least Claim 1 of the '704 Patent by providing, and by having knowingly provided, a material part of the instrumentalities, namely the Infringing Products used to infringe Claim 1 of the '704 Patent. The Infringing Products have

no substantial non-infringing uses. When an end user uses the Infringing Products the end user directly infringes Claim 1 of the '704 Patent. Vroom knew that the Infringing Products were especially made for use in an infringing manner prior to the filing of this lawsuit. For at least the reasons set forth above, Vroom contributes to the infringement of the '704 Patent by others.

153.     Sidekick has been and continues to be damaged as a result of the infringing conduct by Vroom alleged above. Thus, Vroom is liable to Sidekick in an amount that compensates it for such infringement, which by law cannot be less than a reasonable royalty, together with interest and costs as fixed by this Court under 35 U.S.C. § 284.

154.     Vroom's infringement of the '704 Patent has caused, and will continue to cause, Sidekick to suffer substantial and irreparable harm.

155.     Vroom has been aware that it infringes the '704 Patent since at least September 29, 2020, upon the receipt of the letter previously filed as Dkt. No. 1-1. Since obtaining knowledge of its infringing activities, Vroom has failed to cease its infringing activities.

156.     Vroom's infringement of the '704 Patent is, has been, and continues to be, willful, intentional, deliberate, and/or in conscious disregard of Sidekick's rights under the patent.

157.     Sidekick has complied with 35 U.S.C. § 287 with respect to the '704 Patent.

## COUNT 9

## **<u>INFRINGEMENT OF THE '655 PATENT</u>**

158.     Sidekick incorporates by reference and re-alleges each and every allegation of the foregoing paragraphs as if set forth herein.

159.     Sidekick owns all substantial rights, interest, and title in and to the '655 Patent, including the sole and exclusive right to prosecute this action and enforce the '655 Patent against infringers, and to collect damages for all relevant times.

46

160.    The written description of the '655 Patent describes in technical detail each of the limitations of the claims, allowing a skilled artisan to understand the scope of the claims and how the non-conventional and non-generic combination of claim limitations is patentably distinct from and improved upon what may have been considered conventional or generic in the art at the time of the invention.

161.    Vroom has made, had made, used, imported, supplied, distributed, sold, or offered for sale products and/or systems, including the Infringing Products.

162.    Contrary to Vroom's articulated bases for purported non-infringement, on information and belief, the claim elements Vroom identified in its Complaint at paragraph 107 are met, either literally or under the doctrine of equivalents, under an appropriate construction of the claims of the '655 Patent.

163.    Vroom has infringed and is infringing at least Claim 1 of the '655 Patent by making, having made, using, importing, supplying, distributing, selling, and/or offering for sale the Infringing Products.

164.    Vroom actively induced and is actively inducing infringement of at least Claim 1 of the '655 Patent by selling the Infringing Products with instructions as to how to use the Infringing Products in a system such as that recited in the '655 Patent. Vroom aids, instructs, or otherwise acts with the intent to cause an end user to use the Infringing Products Vroom knew of the '655 Patent and knew that its use and sale of the Infringing Products infringe at least Claim 1 of the '655 Patent.

165.    Vroom is liable for contributory infringement of at least Claim 1 of the '655 Patent by providing, and by having knowingly provided, a material part of the instrumentalities, namely the Infringing Products used to infringe Claim 1 of the '655 Patent. The Infringing Products have

310572127.1

no substantial non-infringing uses. When an end user uses the Infringing Products the end user directly infringes Claim 1 of the '655 Patent. Vroom knew that the Infringing Products were especially made for use in an infringing manner prior to the filing of this lawsuit. For at least the reasons set forth above, Vroom contributes to the infringement of the '655 Patent by others.

166.     Sidekick has been and continues to be damaged as a result of the infringing conduct by Vroom alleged above. Thus, Vroom is liable to Sidekick in an amount that compensates it for such infringement, which by law cannot be less than a reasonable royalty, together with interest and costs as fixed by this Court under 35 U.S.C. § 284.

167.     Vroom's infringement of the '655 Patent has caused, and will continue to cause, Sidekick to suffer substantial and irreparable harm.

168.     Vroom has been aware that it infringes the '655 Patent since at least September 29, 2020, upon the receipt of the letter previously filed as Dkt. No. 1-1. Since obtaining knowledge of its infringing activities, Vroom has failed to cease its infringing activities.

169.     Vroom's infringement of the '655 Patent is, has been, and continues to be, willful, intentional, deliberate, and/or in conscious disregard of Sidekick's rights under the patent.

170.     Sidekick has complied with 35 U.S.C. § 287 with respect to the '655 Patent.

<div align="center">

**COUNT 10**

**<u>INFRINGEMENT OF THE '722 PATENT</u>**

</div>

171.     Sidekick incorporates by reference and re-alleges each and every allegation of the foregoing paragraphs as if set forth herein.

172.     Sidekick owns all substantial rights, interest, and title in and to the '722 Patent, including the sole and exclusive right to prosecute this action and enforce the '722 Patent against infringers, and to collect damages for all relevant times.

310572127.1

173.    The written description of the '722 Patent describes in technical detail each of the limitations of the claims, allowing a skilled artisan to understand the scope of the claims and how the non-conventional and non-generic combination of claim limitations is patentably distinct from and improved upon what may have been considered conventional or generic in the art at the time of the invention.

174.    Vroom has made, had made, used, imported, supplied, distributed, sold, or offered for sale products and/or systems, including the Infringing Products.

175.    Contrary to Vroom's articulated bases for purported non-infringement, on information and belief, the claim elements Vroom identified in its Complaint at paragraph 116 are met, either literally or under the doctrine of equivalents, under an appropriate construction of the claims of the '722 Patent.

176.    Vroom has infringed and is infringing at least Claim 1 of the '722 Patent by making, having made, using, importing, supplying, distributing, selling, and/or offering for sale the Infringing Products.

177.    Vroom actively induced and is actively inducing infringement of at least Claim 1 of the '722 Patent by selling the Infringing Products with instructions as to how to use the Infringing Products in a system such as that recited in the '722 Patent. Vroom aids, instructs, or otherwise acts with the intent to cause an end user to use the Infringing Products Vroom knew of the '722 Patent and knew that its use and sale of the Infringing Products infringe at least Claim 1 of the '722 Patent.

178.    Vroom is liable for contributory infringement of at least Claim 1 of the '722 Patent by providing, and by having knowingly provided, a material part of the instrumentalities, namely the Infringing Products used to infringe Claim 1 of the '722 Patent. The Infringing Products have

49

no substantial non-infringing uses. When an end user uses the Infringing Products the end user directly infringes Claim 1 of the '722 Patent. Vroom knew that the Infringing Products were especially made for use in an infringing manner prior to the filing of this lawsuit. For at least the reasons set forth above, Vroom contributes to the infringement of the '722 Patent by others.

179.  Sidekick has been and continues to be damaged as a result of the infringing conduct by Vroom alleged above. Thus, Vroom is liable to Sidekick in an amount that compensates it for such infringement, which by law cannot be less than a reasonable royalty, together with interest and costs as fixed by this Court under 35 U.S.C. § 284.

180.  Vroom's infringement of the '722 Patent has caused, and will continue to cause, Sidekick to suffer substantial and irreparable harm.

181.  Vroom has been aware that it infringes the '722 Patent since at least September 29, 2020, upon the receipt of the letter previously filed as Dkt. No. 1-1. Since obtaining knowledge of its infringing activities, Vroom has failed to cease its infringing activities.

182.  Vroom's infringement of the '722 Patent is, has been, and continues to be, willful, intentional, deliberate, and/or in conscious disregard of Sidekick's rights under the patent.

183.  Sidekick has complied with 35 U.S.C. § 287 with respect to the '722 Patent.

<center>**COUNT 11**</center>

<center>**<u>INFRINGEMENT OF THE '720 PATENT</u>**</center>

184.  Sidekick incorporates by reference and re-alleges each and every allegation of the foregoing paragraphs as if set forth herein.

185.  Sidekick owns all substantial rights, interest, and title in and to the '720 Patent, including the sole and exclusive right to prosecute this action and enforce the '720 Patent against infringers, and to collect damages for all relevant times.

<center>50</center>

186.     The written description of the '720 Patent describes in technical detail each of the limitations of the claims, allowing a skilled artisan to understand the scope of the claims and how the non-conventional and non-generic combination of claim limitations is patentably distinct from and improved upon what may have been considered conventional or generic in the art at the time of the invention.

187.     Vroom has made, had made, used, imported, supplied, distributed, sold, or offered for sale products and/or systems, including the Infringing Products.

188.     Contrary to Vroom's articulated bases for purported non-infringement, on information and belief, the claim elements Vroom identified in its Complaint at paragraph 125 are met, either literally or under the doctrine of equivalents, under an appropriate construction of the claims of the '720 Patent.

189.     Vroom has infringed and is infringing at least Claim 1 of the '720 Patent by making, having made, using, importing, supplying, distributing, selling, and/or offering for sale the Infringing Products.

190.     Vroom actively induced and is actively inducing infringement of at least Claim 1 of the '720 Patent by selling the Infringing Products with instructions as to how to use the Infringing Products in a system such as that recited in the '720 Patent. Vroom aids, instructs, or otherwise acts with the intent to cause an end user to use the Infringing Products Vroom knew of the '720 Patent and knew that its use and sale of the Infringing Products infringe at least Claim 1 of the '720 Patent.

191.     Vroom is liable for contributory infringement of at least Claim 1 of the '720 Patent by providing, and by having knowingly provided, a material part of the instrumentalities, namely the Infringing Products used to infringe Claim 1 of the '720 Patent. The Infringing Products have

310572127.1

no substantial non-infringing uses. When an end user uses the Infringing Products the end user directly infringes Claim 1 of the '720 Patent. Vroom knew that the Infringing Products were especially made for use in an infringing manner prior to the filing of this lawsuit. For at least the reasons set forth above, Vroom contributes to the infringement of the '720 Patent by others.

192.    Sidekick has been and continues to be damaged as a result of the infringing conduct by Vroom alleged above. Thus, Vroom is liable to Sidekick in an amount that compensates it for such infringement, which by law cannot be less than a reasonable royalty, together with interest and costs as fixed by this Court under 35 U.S.C. § 284.

193.    Vroom's infringement of the '720 Patent has caused, and will continue to cause, Sidekick to suffer substantial and irreparable harm.

194.    Vroom has been aware that it infringes the '720 Patent since at least September 29, 2020, upon the receipt of the letter previously filed as Dkt. No. 1-1. Since obtaining knowledge of its infringing activities, Vroom has failed to cease its infringing activities.

195.    Vroom's infringement of the '720 Patent is, has been, and continues to be, willful, intentional, deliberate, and/or in conscious disregard of Sidekick's rights under the patent.

196.    Sidekick has complied with 35 U.S.C. § 287 with respect to the '720 Patent.

## COUNT 12

## <u>INFRINGEMENT OF THE '362 PATENT</u>

197.    Sidekick incorporates by reference and re-alleges each and every allegation of the foregoing paragraphs as if set forth herein.

198.    Sidekick owns all substantial rights, interest, and title in and to the '362 Patent, including the sole and exclusive right to prosecute this action and enforce the '362 Patent against infringers, and to collect damages for all relevant times.

310572127.1

199.    The written description of the '362 Patent describes in technical detail each of the limitations of the claims, allowing a skilled artisan to understand the scope of the claims and how the non-conventional and non-generic combination of claim limitations is patentably distinct from and improved upon what may have been considered conventional or generic in the art at the time of the invention.

200.    Vroom has made, had made, used, imported, supplied, distributed, sold, or offered for sale products and/or systems, including the Infringing Products.

201.    Contrary to Vroom's articulated bases for purported non-infringement, on information and belief, the claim elements Vroom identified in its Complaint at paragraph 134 are met, either literally or under the doctrine of equivalents, under an appropriate construction of the claims of the '362 Patent.

202.    Vroom has infringed and is infringing at least Claim 1 of the '362 Patent by making, having made, using, importing, supplying, distributing, selling, and/or offering for sale the Infringing Products.

203.    Vroom actively induced and is actively inducing infringement of at least Claim 1 of the '362 Patent by selling the Infringing Products with instructions as to how to use the Infringing Products in a system such as that recited in the '362 Patent. Vroom aids, instructs, or otherwise acts with the intent to cause an end user to use the Infringing Products Vroom knew of the '362 Patent and knew that its use and sale of the Infringing Products infringe at least Claim 1 of the '362 Patent.

204.    Vroom is liable for contributory infringement of at least Claim 1 of the '362 Patent by providing, and by having knowingly provided, a material part of the instrumentalities, namely the Infringing Products used to infringe Claim 1 of the '362 Patent. The Infringing Products have

no substantial non-infringing uses. When an end user uses the Infringing Products the end user directly infringes Claim 1 of the '362 Patent. Vroom knew that the Infringing Products were especially made for use in an infringing manner prior to the filing of this lawsuit. For at least the reasons set forth above, Vroom contributes to the infringement of the '362 Patent by others.

205.    Sidekick has been and continues to be damaged as a result of the infringing conduct by Vroom alleged above. Thus, Vroom is liable to Sidekick in an amount that compensates it for such infringement, which by law cannot be less than a reasonable royalty, together with interest and costs as fixed by this Court under 35 U.S.C. § 284.

206.    Vroom's infringement of the '362 Patent has caused, and will continue to cause, Sidekick to suffer substantial and irreparable harm.

207.    Vroom has been aware that it infringes the '362 Patent since at least March 2, 2021, upon the receipt of the letter previously filed as Dkt. No. 1-1. Since obtaining knowledge of its infringing activities, Vroom has failed to cease its infringing activities.

208.    Vroom's infringement of the '362 Patent is, has been, and continues to be, willful, intentional, deliberate, and/or in conscious disregard of Sidekick's rights under the patent.

209.    Sidekick has complied with 35 U.S.C. § 287 with respect to the '362 Patent.

## **JURY DEMANDED**

Sidekick hereby requests a trial by jury on all issues so triable by right.

310572127.1

## PRAYER FOR RELIEF

WHEREFORE, Sidekick requests that:

A.      The Court find that Vroom has directly infringed and is directly infringing the Asserted Patents and hold Vroom liable for such infringement;

B.      The Court find that Vroom has indirectly infringed and is indirectly infringing the Asserted Patents by inducing its customers to directly infringe the Asserted Patents and hold Vroom liable for such infringement;

C.      The Court find that Vroom has indirectly infringed and is indirectly infringing the Asserted Patents by contributing to Vroom's customers' direct infringement of the Asserted Patents and hold Vroom liable for such infringement;

D.      The Court find that Vroom's infringement (direct and/or indirect) is and has been willful;

E.      The Court award damages pursuant to 35 U.S.C. § 284 adequate to compensate Sidekick for Vroom's past infringement of the Asserted Patents, including both pre- and post-judgment interest and costs as fixed by the Court;

F.      The Court increase the damages to be awarded to Sidekick by three times the amount found by the jury or assessed by the Court;

G.      The Court declare that this is an exceptional case entitling Sidekick to its reasonable attorneys' fees under 35 U.S.C. § 285; and

H.      The Court award such other relief as the Court may deem just and proper.

Dated: August 9, 2021                                    K&L GATES LLP

                                                        _/s/ Loly G. Tor_
                                                        Loly G. Tor
                                                        One Newark Center, Tenth Floor
                                                        Newark, New Jersey 07102

310572127.1

Loly G. Tor
K&L GATES LLP
One Newark Center, Tenth Floor
Newark, New Jersey 07102
Phone: (973) 848-4026
loly.tor@klgates.com
*Attorneys for Defendant/Counter-Plaintiff*

### IN THE UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| VROOM, INC.;<br>VROOM AUTOMOTIVE, LLC<br>d/b/a VROOM, d/b/a<br>TEXAS DIRECT AUTO;<br>CARSTORY, LLC; and<br>VAST.COM, INC. d/b/a CARSTORY,<br><br>Plaintiffs,<br><br>v.<br><br>SIDEKICK<br>TECHNOLOGY, LLC,<br><br>Defendant. | Case No. 2:21-cv-06737-WJM-MF<br><br>Hon. William J. Martini, U.S.D.J.<br>Hon. Mark Falk, U.S.M.J.<br><br>**CERTIFICATION OF SERVICE**<br><br><br>*Document Electronically Filed* |

I, Loly G. Tor, hereby certify as follows:

1.      I am an attorney-at-law of the State of New Jersey and a partner with the law firm of K&L Gates LLP, attorneys for Defendant/Counterclaim Plaintiff Sidekick Technology, LLC.

2.      On August 9, 2021, I caused to be served on all counsel of record copies of the following via ECF:  (1) Answer, Counterclaims, and Demand for Jury Trial; (2) Corporate Disclosure Statement; and (3) this Certification of Service.

3.      I certify that the foregoing statements made by me are true.  I am aware that if any of the foregoing statements made by me are willfully false, I am subject to punishment.

Dated: August 9, 2021                    s/ Loly G. Tor

310572389.1

Lesley M. Grossberg (N.J. Bar No. 021682008)
John F. Murphy (*pro hac vice* admitted)
Stephanie M. Hatzikyriakou (N.J. Bar No. 080582014)
BAKER & HOSTETLER LLP
1735 Market St., Suite 3300
Philadelphia, PA 19103
lgrossberg@bakerlaw.com
johnmurphy@bakerlaw.com
shatzikyriakou@bakerlaw.com
Telephone: 215.568.3100
Facsimile: 215.568.3439

Derek M. Freitas (*pro hac vice* admitted)
BAKER & HOSTETLER LLP
312 Walnut Street
Suite 3200
Cincinnati, OH  45202-4074
dfreitas@bakerlaw.com
Telephone: 513.929.3400
Facsimile: 513.929.0303

*Attorneys for Plaintiffs*

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY
## NEWARK VICINAGE

| | |
|---|---|
| VROOM INC.; VROOM AUTOMOTIVE, LLC d/b/a VROOM, d/b/a TEXAS DIRECT AUTO; CARSTORY, LLC; and VAST.COM, INC. d/b/a CARSTORY;<br><br>Plaintiffs,<br><br>v.<br><br>SIDEKICK TECHNOLOGY, LLC,<br><br>Defendant. | C.A. No. 2:21-cv-06737-WJM-JSA<br><br>Judge William J. Martini<br>Magistrate Judge Jessica S. Allen<br><br>**Oral Argument Requested**<br><br>Motion Date: January 18, 2022*<br><br>**But see* Dkt. 32 at 3 (Reply brief due Feb. 2, 2022). |

## NOTICE OF MOTION
## FOR JUDGMENT ON THE PLEADINGS UNDER RULE 12(c)

TO ALL COUNSEL OF RECORD:

PLEASE TAKE NOTICE that pursuant to Local Rule 101.1(c), the undersigned attorney for Plaintiffs Vroom, Inc., Vroom Automotive, LLC d/b/a Vroom, d/b/a Texas Direct Auto, CarStory, LLC, Vast.com, Inc. d/b/a CarStory, will move on January 18, 2022,[1] or as soon thereafter as the motion may be heard, for judgment on the pleadings pursuant to Federal Rule of Civil Procedure 12(c) on the grounds that the claims of Defendant's asserted patents are directed to abstract ideas that are patent-ineligible and are therefore invalid under 35 U.S.C. § 101.

PLEASE TAKE FURTHER NOTICE that in support of this motion, a Brief in Support and Proposed Order been filed herewith.

PLEASE TAKE FURTHER NOTICE that oral argument is requested.


Dated:  December 22, 2021            /s/ Lesley M. Grossberg
                                      Lesley M. Grossberg
                                      BAKER & HOSTETLER LLP
                                      1735 Market St., Suite 3300
                                      Philadelphia, PA  19103
                                      Telephone:  215-568-3100
                                      Facsimile:  215-568-3439
                                      lgrossberg@bakerlaw.com

                                      *Counsel for Plaintiffs*

---

[1] This Motion is filed with permission of the Court, and subject to a briefing schedule where the opposition is due January 19, 2022, and any reply is due February 2, 2022.  Dkt. 32 at 3.

2

Lesley M. Grossberg (NJ No. 021682008)
John F. Murphy (*pro hac vice* admitted)
Stephanie M. Hatzikyriakou (NJ No.
080582014)
BAKER & HOSTETLER LLP
1735 Market Street
Suite 3300
Philadelphia, PA  19103
Telephone:  215.568.3100
Facsimile:   215.568.3439

Derek M. Freitas (*pro hac vice* admitted)
BAKER & HOSTETLER LLP
312 Walnut Street
Suite 3200
Cincinnati, OH  45202-4074
Telephone:  513.929.3400
Facsimile:   513.929.0303

*Attorneys for Plaintiffs*

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| VROOM, INC.;<br>VROOM AUTOMOTIVE, LLC<br>d/b/a VROOM, d/b/a<br>TEXAS DIRECT AUTO;<br>CARSTORY, LLC; and<br>VAST.COM, INC. d/b/a CARSTORY,<br><br>Plaintiffs,<br><br>v.<br><br>SIDEKICK<br>TECHNOLOGY, LLC,<br><br>Defendant. | Document Electronically Filed<br><br>C.A. No. 2:21-cv-06737-WJM-JSA<br><br>**BRIEF IN SUPPORT OF PLAINTIFFS' MOTION FOR JUDGMENT ON THE PLEADINGS UNDER RULE 12(c)**<br><br>**Oral Argument Requested**<br><br>Motion Date: January 18, 2022*<br><br>*But see* Dkt. 32 at 3 (Reply brief due Feb. 2, 2022). |

# <u>TABLE OF CONTENTS</u>

I.  INTRODUCTION ........................................................................1

II.  FACTUAL BACKGROUND..........................................................3

    A.  The Parties and Procedural history.........................................3

    B.  Sidekick's patents-in-suit all center around facilitating used car sales by matching sellers and buyers based on parameters such as vehicle information, price, and locations. .............................5

III.  LEGAL STANDARD ................................................................12

    A.  Patent eligibility can, and should, be decided as a matter of law on judgment on the pleadings under Rule 12(c). ....................................12

    B.  Under 35 U.S.C. § 101, fundamental business practices and other abstract ideas implemented using generic and conventional computer technology are not patent eligible. ......................13

IV.  ARGUMENT.............................................................................17

    A.  *Alice* Step 1: The claims of the patents-in-suit are directed to the abstract idea of facilitating used car sales by matching sellers and buyers based on parameters such as vehicle information, price, and locations.........................................................................17

    B.  *Alice* Step 2: The patents add no inventive concept to the abstract idea because the claims do nothing more than recite the abstract idea and its implementation using generic computer technology........26

    C.  No other claim of the patents-in-suit adds anything to change the outcome of the analysis of representative claim 1 of the 362 patent above................................................................................29

        1.  The other claims of the 362 patent are invalid for the same reasons as claim 1; they add nothing inventive. ......................32

        2.  The claims of the other 11 patents-in-suit are invalid for the same reasons as the 362 patent; they add nothing inventive. ...33

D.    The patent claims are ineligible on the pleadings. ..............................38

V.    CONCLUSION.............................................................................................40

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Aatrix Software, Inc. v. Green Shades Software, Inc.*,
   882 F.3d 1121 (Fed. Cir. 2018) ....................................................39, 40

*Advanced Auctions LLC v. eBay Inc.*,
   No. 13CV1612, 2015 WL 1415265 (S.D. Cal. Mar. 27, 2015) ..................17, 18

*Affinity Labs of Texas, LLC v. DIRECTV*,
   LLC, 838 F.3d 1253, 1257 (Fed. Cir. 2016)........................................15

*Alice Corp. Pty. Ltd. v. CLS Bank Int'l*,
   573 U.S. 208 (2014)............................................................*passim*

*Baggage Airline Guest Servs., Inc. v. Roadie, Inc.*,
   351 F. Supp. 3d 753 (D. Del. 2019)................................................25

*Bascom Global Internet Servs., Inc. v. AT&T Mobility LLC*,
   827 F.3d 1341 (Fed. Cir. 2016) ...................................................28

*Berkheimer v. HP Inc.*,
   881 F.3d 1360 (Fed. Cir. 2018) ............................................31, 39, 40

*Bilski v. Kappos*,
   561 U.S. 593 (2010)...............................................................1

*Boom! Payments, Inc. v. Stripe, Inc.*,
   839 Fed. Appx. 528 (Fed. Cir. 2021)...............................................29

*British Telecomms. PLC v. IAC/InterActiveCorp*,
   813 F. App'x 584 (Fed. Cir. 2020) ................................................31

*BSG Tech LLC v. Buyseasons, Inc.*,
   899 F.3d 1281 (Fed. Cir. 2018) ...............................................26, 30

*buySAFE, Inc. v. Google, Inc.*,
   765 F.3d 1350 (Fed. Cir. 2014) ...........................................16, 18, 38

*Chamberlain Grp. v. Techtronic Indus. Co.*,
   935 F.3d 1341 (Fed. Cir. 2019) ...................................................30

*Content Extraction & Transmission LLC v. Wells Fargo Bank, Nat. Ass'n*,
   776 F.3d 1343 (Fed. Cir. 2014) ....................................................31, 39

*Customedia Techs. v. Dish Network Corp.*,
   951 F.3d 1359 (Fed. Cir. 2020) ...................................................16, 26

*cxLoyalty, Inc. v. Maritz Holdings, Inc.*,
   986 F.3d 1367 (Fed. Cir. 2021) .........................................................16

*Data Engine Techs. LLC v. Google LLC*,
   906 F.3d 999 (Fed. Cir. 2018) ...........................................................25

*DDR Holdings, LLC v. Hotels.com, L.P.*,
   773 F.3d 1245 (Fed. Cir. 2014) .........................................................22

*Elec. Comm'n Techs., LLC v. ShoppersChoice.com, LLC*,
   958 F.3d 1178 (Fed. Cir. 2020) ...................................................24, 38

*Enfish, LLC v. Microsoft Corp.*,
   822 F.3d 1327 (Fed. Cir. 2016) .........................................................25

*FairWarning IP, LLC v. Iatric Sys., Inc.*,
   839 F.3d 1089 (Fed. Cir. 2016) .........................................................38

*Finjan, Inc. v. Blue Coat Sys., Inc.*,
   879 F.3d 1299 (Fed. Cir. 2018) .........................................................14

*Intellectual Ventures I LLC v. Capital One Bank (USA)*,
   792 F.3d 1363 (Fed. Cir. 2015) ...................................15, 16, 24, 30

*Intellectual Ventures I LLC v. Symantec Corp.*,
   838 F.3d 1307 (Fed. Cir. 2016) ...........................................14, 20, 24

*Mayo Collab. Servs. v. Prometheus Labs.*, 566 U.S. 66, 77 (2012) ........................28

*Mortgage Grader, Inc. v. First Choice Loan Servs. Inc.*,
   811 F.3d 1314 (Fed. Cir. 2016) ...............................................*passim*

*Move, Inc. v. Real Est. All. Ltd.*,
   721 F. App'x 950 (Fed. Cir. 2018) ....................................................19

*OIP Techs. v. Amazon.com,*
    788 F.3d 1359 (Fed. Cir. 2015) ................................................*passim*

*RecogniCorp, LLC v. Nintendo Co., Ltd.,*
    855 F.3d 1322 (Fed. Cir. 2017) ................................................24, 30

*Revell v. Port Auth. of New York, New Jersey,*
    598 F.3d 128 (3d Cir. 2010) ...........................................................12

*SAP Am., Inc. v. Investpic, LLC,*
    898 F.3d 1161 (Fed. Cir. 2018) ................................................*passim*

*Simio, LLC v. FlexSim Software Prod., Inc.,*
    983 F.3d 1353 (Fed. Cir. 2020) .......................................................13

*SmileDirectClub, LLC v. Candid Care Co.,*
    505 F. Supp. 3d 340 (D. Del. 2020), *aff'd*, 856 F. App'x 893 (Fed.
    Cir. 2021) .......................................................................................15

*Source Search Technologies, LLC v. Kayak Software Corp.,*
    111 F. Supp. 3d 603 (D.N.J. 2015) .................................................17

*SRI Int'l, Inc. v. Cisco Sys., Inc.,*
    930 F.3d 1295 (Fed. Cir. 2019), *cert. denied*, 140 S. Ct. 1108
    (2020)..............................................................................................25

*Two-Way Media Ltd. v. Comcast Cable Commc'ns, LLC,*
    874 F.3d 1329 (Fed. Cir. 2017) .........................................14, 21, 38

*Ultramercial, Inc. v. Hulu, LLC,*
    772 F.3d 709 (Fed. Cir. 2014) ...........................................13, 16, 31

*Voit Techs., LLC v. Del-Ton, Inc.,*
    757 F. App'x 1000 (Fed. Cir. 2019) .........................................18, 38

*Wireless Media Innovations, LLC v. Maher Terminals, LLC,*
    100 F. Supp. 3d 405 (D.N.J. 2015)..................................................24

*Zimmerman v. Corbett,*
    873 F.3d 414 (3d Cir. 2017) ...........................................................13

**Statutes**

35 U.S.C. § 101 .............................................................................*passim*

35 U.S.C. § 102 ..........................................................................4

35 U.S.C. § 103 ..........................................................................4

35 U.S.C. § 112 ..........................................................................4

**Rules**

Fed. R. Civ. P. 12 ......................................................................13

Fed. R. Civ. P. 12[] ...................................................................38

Fed. R. Civ. P. 12(b)(6)............................................................12

Fed. R. Civ. P. 12(c)............................................................12, 40

## I.    INTRODUCTION

The Supreme Court has repeatedly instructed that abstract ideas — such as mathematical concepts, mental processes, and fundamental economic practices — are ineligible for patent protection under 35 U.S.C. § 101.  *See, e.g., Alice Corp. Pty. Ltd. v. CLS Bank Int'l*, 573 U.S. 208, 216-18 (2014); *Bilski v. Kappos*, 561 U.S. 593, 601-02 (2010).  Such ideas cannot be removed from the public domain and owned as private property because they are basic tools in the "storehouse of knowledge" that are "free to all . . . and reserved exclusively to none." *Bilski*, 561 U.S. at 602 (cleaned up).  The Supreme Court has been clear that this critical patent law principle cannot be circumvented merely by implementing an abstract idea using generic computer components.  *Alice*, 573 U.S. at 221-27.

Accordingly, in *Alice*, the Supreme Court set forth a two-step test for determining patent ineligibility under § 101.  *Id.* at 218-27.  Claims are ineligible if they (1) are directed to a patent-ineligible concept such as an abstract idea, and (2) add no inventive concept to that idea.  *Id.*  Since *Alice*, the Federal Circuit and district courts have held over and over again that patents that take a business practice and conduct it over the Internet or with modern information technology are directed to an abstract idea and are not eligible for patenting.

The Defendant Sidekick Technology, LLC ("Sidekick") did just that — it took basic business practices and added generic computer technology.  Sidekick's

patents are directed to the abstract idea of facilitating used car sales by matching sellers and buyers based on parameters such as vehicle information, price, and locations, which involves nothing more than collecting, processing, and providing information.  The patent claims recite a series of basic steps that humans may perform.  Implementing such practices using computers and the Internet does not render the abstract idea patent eligible, where, such as here, the patent claims employ result-based functional language without describing how to achieve the claimed functions, instead simply relying on assumed and known technological implementations.  Essentially, all the claims say is to "apply it with a computer," which is insufficient for patent eligibility.  *Id.* at 223.

Nor do the claims add any inventive concept to the abstract idea that can transform it into eligible subject matter.  The patents' specifications expressly admit that the claimed invention can be implemented with generic off-the-shelf computer components and conventional computer technology such as simple HTML websites.  And the patents make no attempt at all to disclose any type of new computer technology.  The claims are not limited to specific implementations of the abstract idea, let alone any implementations that can be deemed inventive concepts.  Rather, Sidekick's patent claims practically preempt all use of the abstract ideas no matter what hardware or software is employed.  Sidekick's patent

claims are precisely what the Federal Circuit has deemed ineligible as a matter of law and regularly invalidates at the pleadings stage.

The parties are well aware that § 101 is a critical threshold issue for this case — so much so that the parties jointly proposed to stay all discovery pending resolution of this motion.  Dkt. 31 at 5.  The Court granted permission to Plaintiffs to file this motion, and granted the stay, except for limited preliminary disclosures and document production.  Dkt. 32 at 1-2.  As in most of the authorities cited in this brief, no factual question prevents the Court from determining the ineligibility of Sidekick's patents now.  And, although Sidekick's 12 patents-in-suit have many claims, every one of those patent claims is ineligible for the same simple reasons. The patents are all related and share overlapping specifications. The claims all represent minor and legally irrelevant variations of the abstract idea of facilitating used car sales by matching sellers and buyers based on parameters such as vehicle information, price, and locations.  And every claim in each of those 12 patents is invalid for the same reasons.

## II.    FACTUAL BACKGROUND

### A.    The Parties and Procedural history.

Vroom is an innovative, end-to-end, e-commerce platform designed to offer a better way to buy and sell used vehicles, and CarStory is a leader in AI-powered analytics and digital services for automotive retail.  Dkt. 1 ¶¶ 22-23 (describing

Plaintiffs' businesses and referring to Vroom.com and CarStory.com). Sidekick

owns several patents, but alleges no business of its own other than the development

of "technology," acquisition of patents, and assertion of patents. Dkt. 15 at 24-

25 ¶¶ 10-16. After Sidekick repeatedly, and wrongly, accused Plaintiffs of patent

infringement and demanded that Plaintiffs cease their operations, Plaintiffs filed

this action, seeking declaratory judgment that Plaintiffs do not infringe any claim

of 12 Sidekick patents, including United States Patent Nos. 9,141,984 (the "984

patent"), 8,744,925 (the "925 patent"), 8,650,093 (the "093 patent"), 9,123,075

(the "075 patent"), 9,147,216 (the "216 patent"), 9,460,467 (the "467 patent"),

9,665,897 (the "897 patent"), 9,626,704 (the "704 patent"), 10,140,655 (the "655

patent"), 10,223,722 (the "722 patent"), 10,223,720 (the "720 patent"), and

10,796,362 (the "362 patent") (collectively the "patents-in-suit"). Dkt. 1. On

August 9, 2021, Sidekick answered the Complaint and filed counterclaims of

infringement for "at least Claim 1" of each of the patents-in-suit. Dkt. 15 at 30-54.

On September 27, 2021, Plaintiffs answered Sidekick's counterclaims, asserting as

affirmative defenses that the patent claims are invalid under 35 U.S.C. §§ 101, 102,

103, and 112, and that Sidekick has failed to state a claim, because all patents-in-

suit are directed to patent ineligible subject matter under § 101. Dkt. 26 at 18-24.

The pleadings are now closed. Plaintiffs file this motion for judgment on the

pleadings that Sidekick's patent claims are invalid under § 101 with the Court's

permission, granted in the Scheduling Order.  Dkt. 32 ¶ 18.

> **B.     Sidekick's patents-in-suit all center around facilitating used car sales by matching sellers and buyers based on parameters such as vehicle information, price, and locations.**

All 12 patents-in-suit are generally directed to computer-implemented methods "for performing used automobile transactions."  *E.g.*, Dkt. 1-16 at Abstract. Sidekick alleges that its technology "permits customers to select a desired automobile based on available market information and complete the transaction for that automobile from their home."  Dkt. 15 at 23 ¶ 2.  According to Sidekick, "[t]his technology advantageously permits customers to avoid the traditional car dealership experience, while searching an inventory of automobiles from disparate geographic locations."  *Id.*  Indeed, Sidekick's allegations admit the abstract idea at the heart of its patents: "In short, the innovation embodied in the Sidekick Technology enables consumers, dealers, and manufacturers to make informed decisions in purchasing, selling, and making automobiles, in order to maximize efficiency on all accounts." *Id.* at 25 ¶ 13.

The patents-in-suit are all related, as shown in the diagram below this paragraph.  As reflected in the diagram, Sidekick first filed for the 925 and 984 patents on July 5, 2011.  Dkt. 1-6 at 1; Dkt. 1-5 at 1.  Sidekick obtained several additional patents as continuations of each of these — the 897 and 720 patents (Dkt. 1-11 & 1-15) originated with the 984 patent and the 216, 704, and 722 patents

originated with the 925 patent (Dkt. 1-9, 1-12, & 1-14).  Sidekick filed for the 093

patent on August 11, 2011.  Dkt. 1-7.  The 093 patent is a continuation-in-part of

both the 925 and 984 patents, which means that it may incorporate what those patents

disclose and add additional disclosure.  *Id*.  The remaining patents — the 075, 467,

655, and 362 patents — in turn originated with the 093 patent.  Dkt. 1-8, 1-10, 1-13,

& 1-16.



The specifications of the 12 patents are all very similar, with each of the

three color-coded families in the above diagram consisting of patents with

essentially identical specifications.  The claims of the 12 patents are also very

similar to each other — they all address facilitating used car sales by matching

sellers and buyers based on parameters such as vehicle information, price, and

locations; some take the perspective of the buyer (e.g., the 984 and 925 patents and

6

their progeny, shown in blue and orange) and some the seller (e.g., the 093 patent and its progeny, shown in green).  Some patents also focus on including the manufacturer in the transaction (e.g., the 984 patent and its progeny).  Those categorizations are generally correct and helpful for understanding the patents-in-suit, but there is some degree of categorical overlap among the claims of the individual patents.

For the sake of efficiency and clarity, this motion will highlight the specification of the most recently issued patent-in-suit — the 362 patent — which Sidekick specifically asserted against Vroom in its March 2, 2021 letter.  Dkt. 1 at 3 ¶ 6; Dkt. 15 at 3 ¶ 6; Dkt. 1-3 at 20-126 (showing what Sidekick alleges is a "detailed analysis" of the 362 patent).  Plaintiffs submit that claim 1 of the 362 patent is fully and fairly representative of the claims of the 12 patents-in-suit for purposes of § 101, although Plaintiffs address the other claims toward the end of this brief.  *See infra*, Section IV.C.

The specification of the 362 patent summarizes the alleged invention as a system and method[1] for "providing automobile market information and facilitating

---

[1] The '362 patent, like the other patents-in-suit, includes claims to methods, meaning, a series of steps for performing the computer implemented transaction (*e.g.*, claim 1), systems for performing those methods (*e.g.*, claim 32), and computer readable media for storing instructions that perform those methods (*e.g.*, claim 63).  The styling of the claim is irrelevant for purposes of the § 101 analysis. *Alice*, 573 U.S. at 226.

used automobile transactions." Dkt. 1-16 at 2:9-14. As the specification explains, "used automobile transactions" were nothing new. *Id.* at 1:27-32 ("In the used automobile market, consumers typically sell or trade in used automobiles to dealers or dealerships, or privately sell to other consumers, for example, through personal advertisements. Dealers often purchase used automobiles from consumers as part of a deal for a new automobile, typically referred to as a trade in."). The sharing of "automobile market information" was also common practice prior to the alleged invention. *Id.* at 1:49-53 ("[U]sed automobile buyers and sellers, including consumers and dealers, often base the negotiations on established market prices."), 1:59-62 ("Various products and services have become available that allow sellers and buyers, including consumers and dealers, to perform research on market prices for used automobiles."). The specification identifies inefficiencies in the used car market, such as incomplete knowledge, imperfect pricing, and negotiation imbalances. *Id.* at 1:35-2:5.

To address these problems, the specification describes a method where consumer (or manufacturer) users input their used vehicle data (via, *e.g.*, the VIN number), and solicit bids for that vehicle based on market data from buyers (*e.g.*, car dealers). *Id.* at 2:57-3:10. The consumer users may then select one of those bids "based on the prices and delivery options available" and proceed to arrange a purchase. *Id.* at 3:11-13. The specification explains that, in view of the large

market for used vehicles across the country, such a system "may be helpful for facilitating large numbers of used automobile transactions" and "matches seller and buyer parameters, such as price and pickup location," to facilitate the transactions. *Id.* at 3:22-32.

Many of the claims of the patents-in-suit, including those of the 362 patent, include the matching of used car buyers and sellers using geolocation information. *E.g., id.* at 25:17-41 (claim 1). The patents (correctly) assume the existence of the notion that people take their locations into account in shopping decisions, and assume the existence of technological versions of that same notion. For example, the specification states generally that "a mobile application may include the geolocation of a used car seller, so the seller does not need to enter such information" and that the advantage of matching based on geolocation information is that buyers and seller achieve the "minimal cost for picking up a car" and "optimize the opportunity for creating a new customer relationship" because they are in the same area. *Id.* at 13:43-59; *see also id.* at 16:9-17:2 (explaining that buyers and sellers may take vehicle location into account in their decision-making process along with price or other factors).

During prosecution of the patents-in-suit, Sidekick confirmed the general nature of its claimed inventions in statements to the Patent Office. For example, when distinguishing prior art during prosecution of the 093 patent — the great-

great-grandparent of the 362 patent — Sidekick argued how geolocation information features "are extremely advantageous for both dealers and consumers. Dealers can offer better trade in prices to create new customer relationships with high value in-market customers, which are very valuable, while consumers can get a better deal by simply following the provided directions to the nearby competing dealer, or can instead stay where they are and use the nearby dealer's better price to negotiate a better deal." Ex. 1 (Portions of 093 Patent File Wrapper, Response to Office Action of March 25, 2013) at 11. Sidekick also explained that providing "different delivery options as claimed advantageously allows the consumer seller to weigh the convenience and price, which results in better results for both used car seller and used car buyers." *Id.* at 13.

The claims of the patents-in-suit all recite the steps of a used car transaction on a computer (or systems or software that perform those steps), with various focus on buyer or seller, various parties involved, and various inclusion of aspects such as geolocation, the provision of driving directions, reliance on real-time market data, and the like. For instance, claim 1 of the 362 patent states:

1. A method comprising:

[a] receiving, via a used automobile seller interface, a first request for a response regarding a first used automobile, the first request made by a used automobile seller located at a first location and including a vehicle identifier and geolocation information of the first used automobile;

[b] determining, based on the geolocation information, that the first used automobile is located at the first location;

10

[c] generating, based on the determined first location, an in-market used automobile buyer area;

[d] determining that at least one used automobile buyer is located within the in-market used automobile buyer area;

[e] receiving, via a used automobile buyer interface, a first bid from a first used automobile buyer located at a second location within the in-market used automobile buyer area;

[f] generating, based on receiving the first bid, driving directions between the first location and the second location; and

[g] providing, via the used automobile seller interface, the first bid including at least a price for the first used automobile and the driving directions between the first location and the second location.

Dkt. 1-16 at 25:17-41 (claim 1). The claim is drafted from the perspective of a computer system that receives an initial request from a used car seller, and then gathers up bids from potential buyers and provides those to the seller along with a price and driving directions so that, presumably, the seller may select one. *Id.* The 362 patent provides graphical examples of such transactions in Figures 4 and 6.

As far as exactly how this transaction system is implemented, the patents-in-suit admit, expressly and repeatedly, that the alleged invention does not require any new or special computer technology. The specification explains that the system and each component use generic technology and can be implemented using off-the-shelf devices and processors. *See, e.g.*, *id.* at 24:46-56 ("all of the disclosed methods and procedures . . . can be implemented using one or more computer programs or components. These components may be provided as a series of computer instructions on *any conventional computer-readable medium*, including

RAM, ROM, flash memory, magnetic or optical disks, optical memory, or other storage media.") (emphasis added), 3:40-45 ("The system 100 may include a variety of client devices 102, such as *desktop computers* and the like, which typically include a display 112 . . ."), 16:27-29 ("the consumer buyer location may be determined using the geolocation of the buyer's mobile device 103."), 3:45-48 ("[M]obile device 103 . . . may be *a cellular phone, a personal digital assistant, a laptop computer, a tablet computer*, etc."), 4:27-29 ("The processor 204 may be *any suitable processor*, such as a microprocessor from the INTEL PENTIUM® family of microprocessors."). These are just a few examples from the lengthy, yet entirely generic, recitation of known computer functions provided in the specification. *Id.* at 3:36-6:21 & Figs. 1-3.

## III.    LEGAL STANDARD

### A.    Patent eligibility can, and should, be decided as a matter of law on judgment on the pleadings under Rule 12(c).

Under Rule 12(c) of the Federal Rules of Civil Procedure, a party may move for judgment on the pleadings "[a]fter the pleadings are closed—but early enough not to delay trial." Fed. R. Civ. P. 12(c). A motion for judgment on the pleadings under Rule 12(c) "is analyzed under the same standards that apply to a Rule 12(b)(6) motion." *Revell v. Port Auth. of New York, New Jersey*, 598 F.3d 128, 134 (3d Cir. 2010). In other words, a Rule 12(c) motion "should be granted if the movant establishes that there are no material issues of fact, and he is entitled to

judgment as a matter of law." *Zimmerman v. Corbett*, 873 F.3d 414, 417 (3d Cir. 2017) (cleaned up). "In considering a motion for judgment on the pleadings, a court must accept all of the allegations in the pleadings of the party against whom the motion is addressed as true and draw all reasonable inferences in favor of the non-moving party." *Id.*

Patent-ineligibility under § 101 is a threshold "question of law" that the Federal Circuit and district courts "frequently" resolve on a Rule 12 motion, where — as is almost always the case — there are no relevant factual disputes. *SAP Am., Inc. v. Investpic, LLC*, 898 F.3d 1161, 1166 (Fed. Cir. 2018); *Simio, LLC v. FlexSim Software Prod., Inc.*, 983 F.3d 1353, 1358 (Fed. Cir. 2020). Resolving patent eligibility on the pleadings minimizes "expenditure of time and money by the parties and the court" and "protects the public" from illegitimate patents that improperly monopolize fundamental tools and the public store of knowledge. *Ultramercial, Inc. v. Hulu, LLC*, 772 F.3d 709, 719 (Fed. Cir. 2014) (Mayer, J., concurring) (cleaned up).

**B.   Under 35 U.S.C. § 101, fundamental business practices and other abstract ideas implemented using generic and conventional computer technology are not patent eligible.**

Section 101 of the Patent Act provides that "[w]hoever invents or discovers any new and useful process, machine, manufacture, or composition of matter, or any new and useful improvement thereof, may obtain a patent therefor, subject to

the conditions and requirements of this title." 35 U.S.C. § 101. Section 101

"contains an important implicit exception" for abstract ideas, such as mathematical

concepts, mental processes, and fundamental economic practices. *Alice*, 573 U.S.

at 216. The Supreme Court's two-step *Alice* framework governs whether

computer-based claims are ineligible under § 101.

At step one, the Court determines whether the patent claims are, at root,

directed to an abstract idea. *Id.* at 218. Implementing an abstract idea in a

"particular technological environment" using conventional computer technology

does not make the claims "any less abstract." *Intellectual Ventures I LLC v.

Symantec Corp.*, 838 F.3d 1307, 1314, 1316 (Fed. Cir. 2016) ("*Symantec*"). As

such, under *Alice* step one, courts "look to whether the claims in the patent focus

on a specific means or method, or are instead directed to a result or effect that itself

is the abstract idea and merely invokes generic processes and machinery." *Two-

Way Media Ltd. v. Comcast Cable Commc'ns, LLC*, 874 F.3d 1329, 1337 (Fed.

Cir. 2017). In cases involving software implementation, "this inquiry often turns

on whether the claims focus on 'the specific asserted improvement in computer

capabilities . . . or, instead, on a process that qualifies as an "abstract idea" for

which computers are invoked merely as a tool.'" *Finjan, Inc. v. Blue Coat Sys.,

Inc.*, 879 F.3d 1299, 1303 (Fed. Cir. 2018).

Numerous cases have established that "patents that simply take a standard business practice and describe how to conduct it over the internet or with modern information technology are directed to an abstract idea." *SmileDirectClub, LLC v. Candid Care Co.*, 505 F. Supp. 3d 340, 350 (D. Del. 2020), *aff'd*, 856 F. App'x 893 (Fed. Cir. 2021); *Affinity Labs of Texas, LLC v. DIRECTV*, LLC, 838 F.3d 1253, 1257 (Fed. Cir. 2016) (finding patent that claimed systems and methods for streaming out-of-region broadcast content to cellphones was directed to an abstract idea); *Intellectual Ventures I LLC v. Capital One Bank (USA)*, 792 F.3d 1363, 1367 (Fed. Cir. 2015) (finding claims directed to budgeting using a "communication medium" abstract).

At step two, the Court determines whether the other claim elements, "individually and as an ordered combination," add "significantly more" to the abstract idea — an "inventive concept" — that is "sufficient to transform the claimed abstract idea into a patent-eligible application." *Alice*, 573 U.S. at 217-22 (cleaned up). Implementing an abstract idea with "well-understood, routine, or conventional activities" contributes nothing inventive, even if the techniques for implementation are "groundbreaking, innovative, or even brilliant." *Id.* at 225-26; *SAP*, 898 F.3d at 1163.

In summary, patent claims that are directed to an abstract idea under step one, and add nothing inventive to that idea at step two, are ineligible under § 101

as a matter of law. *Alice*, 573 U.S. at 217-18. In *Alice*, the Supreme Court held

ineligible claims for a computer-implemented "exchanging financial obligations

between two parties using a third-party intermediary to mitigate settlement risk."

*Id.* at 219. Since then, the Federal Circuit has followed *Alice* time and time again

to hold claims invalid as a matter of law in patents where business ideas — even

ideas considered novel and nonobvious by the Patent Office — are implemented

using conventional computer technology. *cxLoyalty, Inc. v. Maritz Holdings, Inc.*,

986 F.3d 1367, 1376-1379 (Fed. Cir. 2021) (facilitating or brokering a commercial

transaction between a purchaser using a first form of value and a seller transacting

in a second form of value); *Customedia Techs. v. Dish Network Corp.*, 951 F.3d

1359, 1362-66 (Fed. Cir. 2020) (delivering targeted advertising to a user);

*Mortgage Grader, Inc. v. First Choice Loan Servs. Inc.*, 811 F.3d 1314, 1323-25

(Fed. Cir. 2016) (credit grading and anonymous loan shopping); *OIP Techs. v.

Amazon.com*, 788 F.3d 1359, 1362-64 (Fed. Cir. 2015) (offer-based price

optimization); *Intellectual Ventures I LLC v. Capital One Bank (USA)*, 792 F.3d

1363, 1366-69 (Fed. Cir. 2015) ("*Capital One*") (tracking financial transactions to

determine whether they exceed a pre-set spending limit); *buySAFE, Inc. v. Google,

Inc.*, 765 F.3d 1350, 1353-55 (Fed. Cir. 2014) (transaction performance

guaranties); *Ultramercial, Inc. v. Hulu, LLC*, 772 F.3d 709, 714-18 (Fed. Cir.

2014) (advertisement-sponsored media).

16

## IV.   ARGUMENT

**A.   *Alice* Step 1: The claims of the patents-in-suit are directed to the abstract idea of facilitating used car sales by matching sellers and buyers based on parameters such as vehicle information, price, and locations.**

The asserted patent claims are directed to the abstract idea of facilitating used car sales by matching sellers and buyers based on parameters such as vehicle information, price, and locations — a basic and fundamental economic practice not eligible for patenting. *See, e.g.*, *Source Search Technologies, LLC v. Kayak Software Corp.*, 111 F. Supp. 3d 603, 607-08 (D.N.J. 2015) (holding "the concept of obtaining quotes for goods and services from selected vendors" to fall "squarely within the fundamental economic practices held to be abstract ideas"); *Advanced Auctions LLC v. eBay Inc.*, No. 13CV1612, 2015 WL 1415265, at *3 (S.D. Cal. Mar. 27, 2015) (holding claim relating to computer-based auctions directed to "a fundamental economic practice" and thus an abstract idea).

The specification is clear that the alleged invention focuses on this abstract idea.  Dkt. 1-16 (362 patent) at 2:57-59 ("The present disclosure relates in general to a system for facilitating used automobile transactions and, in particular, to an automobile transaction for a specific used automobile."); *see also, e.g.*, Dkt. 1-5 (984 patent) at 2:34-37, 1-6 (925 patent) at 2:31-34, 1-7 (093 patent) at 2:45-47, 1-8 (075 patent) at 2:45-47, 1-9 (216 patent) at 2:34-37, 1-10 (467 patent) at 2:53-55,

1-11 (897 patent) at 2:38-41, 1-12 (704 patent) at 2:36-39, 1-13 (655 patent) at

2:56-58, 1-14 (722 patent) at 2:38-41, 1-15 (720 patent) at 2:39-42.

Representative claim 1 of the 362 patent does nothing more than recite basic

steps for performing that fundamental economic practice: (1) receiving a request to

sell a used car, (2) determining the location of the car, (3) generating a buyer area

based on the location of the car, (4) finding buyer(s) in the buyer area,

(5) receiving a bid from a buyer in the buyer area, (6) generating driving directions

between the buyer's location to the location of the car, and (7) providing buyer's

bid to the seller.  Dkt. 1-16 at 25:17-41 (claim 1).  The claim uses only result-based

functional language and is agnostic as to how any of these steps should be

accomplished.  *Id.*  The Federal Circuit has repeatedly found similar claims to be

directed to abstract ideas.  *E.g.*, *Mortgage Grader*, 811 F.3d at 1324 ("The claim

limitations, analyzed individually and as a whole, recite nothing more than the

collection of information to generate a credit grading and to facilitate anonymous

loan shopping." (cleaned up)); *OIP Techs.*, 788 at 1362 ("This concept of 'offer

based pricing' is similar to other 'fundamental economic concepts' found to be

abstract ideas by the Supreme Court and this court."); *buySAFE*, 765 F.3d at 1355

("The claims are squarely about creating a contractual relationship — a

'transaction performance guaranty' — that is beyond question of ancient

lineage."); *Voit Techs., LLC v. Del-Ton, Inc.*, 757 F. App'x 1000, 1002 (Fed. Cir.

2019) ("The Asserted Claims are directed to the abstract idea of entering, transmitting, locating, compressing, storing, and displaying data (including text and image data) to facilitate the buying and selling of items."); *Move, Inc. v. Real Est. All. Ltd.*, 721 F. App'x 950, 954 (Fed. Cir. 2018) ("method for collecting and organizing information about available real estate properties and displaying this information on a digital map that can be manipulated by the user" was directed to an abstract idea). Sidekick's patent claims suffer the same core defect as those claims and the claims in many other post-*Alice* decisions: the essence of Sidekick's claim is a way of doing business.

The practices of used car transactions, including buyers and sellers taking location into account, are of course familiar from non-technological contexts, as Sidekick's patents recognize. Indeed, the meaningful steps in claim 1 of the 362 patent are business tasks that human participants in used car transactions can perform without a computer:

| Claim language | Equivalent human business transaction |
|---|---|
| [a] receiving, via a used automobile seller interface, a first request for a response regarding a first used automobile, the first request made by a used automobile seller located at a first location and including a vehicle identifier and geolocation information of the first used automobile; | [a] seller makes a request to sell her used car, and the request includes the vehicle identifier and address where the car may be picked up; |

19

| | |
|---|---|
| [b] determining, based on the geolocation information, that the first used automobile is located at the first location; | [b] the location of the car is determined based on the address provided (*e.g.*, based on zip code); |
| [c] generating, based on the determined first location, an in-market used automobile buyer area; | [c] a buyer area is created or drawn on a map in the vicinity of the car's location (*e.g.*, a list or map of areas with nearby zip codes); |
| [d] determining that at least one used automobile buyer is located within the in-market used automobile buyer area; | [d] prosecutive buyers (*e.g.*, car dealers) from a phone book or contact list who are within the buyer area are identified (*e.g.*, based on zip code); |
| [e] receiving, via a used automobile buyer interface, a first bid from a first used automobile buyer located at a second location within the in-market used automobile buyer area; | [e] a bid for the used car is obtained from one of the buyers, who is at a different location in the buyer area; |
| [f] generating, based on receiving the first bid, driving directions between the first location and the second location; and | [f] driving directions from the buyer's location to the car's location are created (*e.g.*, by looking at a map and writing them down); and |
| [g] providing, via the used automobile seller interface, the first bid including at least a price for the first used automobile and the driving directions between the first location and the second location. | [g] the bid is sent to the seller, including the price offered and the driving directions between the car's location and the buyer's location. |

That the claimed activities can be performed by humans confirms that they are directed to an abstract idea. *See, e.g.*, *Mortgage Grader*, 811 F.3d at 1324 (finding claims invalid where the steps of the claims "could all be performed by humans without a computer").

Implementing the abstract idea using generic computer components with basic functionality does not make the claims non-abstract. *Symantec*, 838 F.3d at

1314; *Two-Way Media*, 874 F.3d at 1337; *Alice*, 573 U.S. at 222 (collecting cases that "demonstrate that the mere recitation of a generic computer cannot transform a patent-ineligible abstract idea into a patent-eligible invention"). Here, the only claim language that may have anything to do with computers consists of "a used automobile seller interface" and "a used automobile buyer interface." Even assuming that these phrases limit the claimed method to being performed only using computers, they are still too broad and generic to be considered sufficiently specific and meaningful applications of the abstract idea. Indeed, these "interface[s]" can be any computer component, hardware or software, so long as they are programmed to achieve the claimed functions.

Further, the specification confirms that "used automobile seller interface" and "used automobile buyer interface" can be implemented using conventional website(s) in HTML format, and that no new or improved computer technology is intended or required. Dkt. 1-16 at 8:21-24 (disclosing that "used automobile seller interface" and "used automobile buyer interface" are parts of a "consumer interface 304), 11:41-46 ("It should be appreciated that the consumer interface 304 . . . may be implemented, for example, in a web browser using an HTML file received from the automobile market information processing system 302."); *see also id.* at 6:7-14 ("Interface generation unit 316 may provide, for example, HTML files which are used at the consumer interface 304 . . ."), 9:33-37 ("the used automobile seller

interface 318 and a used automobile buyer interface 320 may be integrated within a single website or application, or for example, may be implemented as distinct websites.").  Adding these generic components to a claim that can otherwise be practiced by humans without a computer does not take the claim outside ineligible subject matter.  *DDR Holdings, LLC v. Hotels.com, L.P.*, 773 F.3d 1245, 1256 (Fed. Cir. 2014) (summarizing the precedent by explaining that "[a]lthough many of the claims recited various computer hardware elements, these claims in substance were directed to nothing more than the performance of an abstract business practice on the Internet or using a conventional computer.").

Importantly, the specification expressly and repeatedly admits that the claimed invention can be practiced using generic, conventional, off-the-shelf products and components:

- "The client devices 102 may communicate with the host device 104 via a connection to one or more communications channels 106 such as *the Internet* or some other data network, including, but not limited to, *any suitable wide area network or local area network*." Dkt. 1-16 at 3:48-52;

- "The processor 204 may be *any suitable processor*, such as a microprocessor from the INTEL PENTIUM® family of microprocessors." *Id.* at 4:27-29;

- "Preferably, the memory 208 stores a software program that interacts with the other devices in the system 100 as described below. This program may be executed by the processor 204 in *any suitable manner*." *Id.* at 4:31-34;

- "The storage devices 218 may store *any type of data*, such as pricing data, transaction data, operations data, inventory data, commission

data, manufacturing data, image data, video data, audio data, tagging data, historical access or usage data, statistical data, security data, etc., which may be used by the computing device 102, 104." *Id.* at 5:1-5:7;

- "The network connection may be *any type of network connection*, such as an Ethernet connection, digital subscriber line (DSL), telephone line, coaxial cable, wireless connection, etc." *Id.* at 5:29-32; and

- "It will be appreciated that all of the disclosed methods and procedures described herein can be implemented using one or more computer programs or components. These components may be provided as a series of computer instructions on *any conventional computer-readable medium*, including RAM, ROM, flash memory, magnetic or optical disks, optical memory, or other storage media." *Id.* at 24:46-56 (all emphasis added).

The repeated use of the phrase "any suitable [computer component]" confirms that the patent is agnostic as to what kind of components are used to implement the claimed invention so long as they can be programmed to carry out the claimed steps. Where the specification does provide examples of technology that may be used, the examples consist of non-exhaustive laundry lists of generic and conventional components. *See, e.g.*, *id.* at 4:46-49 ("For example, the input device 214 may be a keyboard, mouse, touch screen, track pad, track ball, isopoint, image sensor, character recognition, barcode scanner, microphone, and/or a speech/voice recognition system."), 4:59-64 ("A user interface may include prompts for human input from a user 114 including links, buttons, tabs, checkboxes, thumbnails, text fields, drop down boxes, etc., and may provide various outputs in response to the user inputs, such as text, still images, videos, audio, and animations.").

23

It is apparent from such disclosure that the claimed invention does not seek to improve or solve any problems with existing computer technology, but rather focuses entirely on achieving "an abstract end-result" with "already available computers, with their already available basic functions, to use as tools in executing the claimed process." *SAP*, 898 F.3d at 1169-70; *RecogniCorp, LLC v. Nintendo Co., Ltd.*, 855 F.3d 1322, 1326-27 (Fed. Cir. 2017). Essentially, all the patent teaches is to "apply [an abstract idea] with a computer," which is insufficient for patent eligibility. *Alice*, 573 U.S. at 223.

Even if the claims' generic computerization "automate[s] or otherwise" makes performing tasks "more efficient," *OIP Techs.*, 788 F.3d at 1363, that does not make the claims "'any less abstract.'" *Symantec*, 838 F.3d at 1319 (cleaned up); *see also Capital One*, 792 F.3d at 1363 ("improved speed or efficiency" does not make claims non-abstract). Arranging transactions or other business dealings based on "geolocation" does not save the claims either, because courts have repeatedly held such location-based business practices patent ineligible. *E.g.*, *Elec. Comm'n Techs., LLC v. ShoppersChoice.com, LLC*, 958 F.3d 1178, 1184 (Fed. Cir. 2020) (holding ineligible claims directed to the abstract idea of providing advanced notification of pickup or delivery of a mobile thing); *Wireless Media Innovations, LLC v. Maher Terminals, LLC*, 100 F. Supp. 3d 405, 413-14 (D.N.J. 2015) (holding abstract and ineligible claims directed to "monitoring locations,

movement, and load status of shipping containers within a container-receiving

yard, and storing, reporting and communicating this information in various forms

through generic computer functions"); *Baggage Airline Guest Servs., Inc. v.

Roadie, Inc.*, 351 F. Supp. 3d 753, 758-59 (D. Del. 2019) (holding claims ineligible

directed to "basic steps of coordinating and monitoring delivery, a well-known

method of organizing human activity").

 Sidekick's patent claims are unlike the type of specific improvements on

computer functionality that the Federal Circuit has found non-abstract at *Alice* step

one.  *Cf. SRI Int'l, Inc. v. Cisco Sys., Inc.*, 930 F.3d 1295, 1303 (Fed. Cir. 2019),

*cert. denied*, 140 S. Ct. 1108 (2020) ("The claims are directed to using a specific

technique . . . to solve a technological problem arising in computer networks:

identifying hackers or potential intruders into the network."); *Data Engine Techs.*

*LLC v. Google LLC*, 906 F.3d 999, 1007–08 (Fed. Cir. 2018) ("[T]he claim is

directed to a specific method for navigating through three-dimensional electronic

spreadsheets.  The method provides a specific solution to then-existing

technological problems in computers and prior art electronic spreadsheets.");

*Enfish, LLC v. Microsoft Corp.*, 822 F.3d 1327, 1337 (Fed. Cir. 2016) ("Here, the

claims are not simply directed to *any* form of storing tabular data, but instead are

specifically directed to a *self-referential* table for a computer database … [T]he

plain focus of the claims is on an improvement to computer functionality itself, not

on economic or other tasks for which a computer is used in its ordinary capacity.").

In those cases, the claimed invention solved a technological problem and improved

the computer technology itself.  But any benefits from Sidekick's claimed

invention flow not from improved computer technology, but from the performance

of an abstract idea in conjunction with well-known conventional technology.  *See*

*BSG Tech LLC v. Buyseasons, Inc.*, 899 F.3d 1281, 1288 (Fed. Cir. 2018); *see also*

Dkt. 15 at ¶ 12 (Sidekick's counterclaims characterize advantage of claimed

invention as "permit[ting] customers to avoid the traditional car dealership

experience" without mentioning any improved computer technology).  This is a

hallmark of claims directed to an abstract idea.  At best, the claims improve the

abstract idea — not the function of any computer — and that is not enough.

*Customedia*, 951 F.3d at 1363 (improving the abstract concept "is not what the

Supreme Court meant by improving the functioning of the computer itself").

**B.    *Alice* Step 2: The patents add no inventive concept to the abstract idea because the claims do nothing more than recite the abstract idea and its implementation using generic computer technology.**

At *Alice* step two, the Court must determine whether the claims add

something "significant" to the abstract idea — an inventive concept that

"'transform[s] the nature of the claim' into a patent-eligible application." *Alice*,

573 U.S. at 217. Sidekick's patent claims adding nothing of any significance to the

abstract idea, instead reciting only the most generic and functionally claimed

computer implementation.

As discussed above, claim 1 of the 362 patent recites only generic computer components ("used automobile seller interface" and "used automobile buyer interface") and functions to be performed using generic computer components (receiving request from seller, determining location of the car, generating buyer area, determining buyer within the area, receiving bid, generating driving directions, and providing bid to seller). These are "basic functions of a computer" and "purely functional and generic" components that courts have found merely automate the abstract idea in a "particular technological environment," which is insufficient to add an inventive concept. *Alice*, 573 U.S. at 225-26; *see also Mortgage Grader*, 811 F.3d at 1324-25 (holding no inventive concept because "the claims add only generic computer components such as an interface, network, and database," which "do not satisfy the inventive concept requirement" (cleaned up)); *OIP*, 788 F.3d at 1363 ("Beyond the abstract idea of offer-based price optimization, the claims merely recite 'well-understood, routine conventional activit[ies],' either by requiring conventional computer activities or routine data-gathering steps. Considered individually or taken together as an ordered combination, the claim elements fail 'to "transform" the claimed abstract idea into a patent-eligible application.'") (cleaned up). Rather, Sidekick's claims' bare recitations amount to no more than "a mere instruction to 'implement' an abstract

27

idea 'on . . . a computer,' [which] cannot impart patent eligibility." *Alice*, 573 U.S. at 223-224 ("[W]holly generic computer implementation is not generally the sort of 'additional featur[e]' that provides any 'practical assurance that the process is more than a drafting effort designed to monopolize the [abstract idea] itself.'") (citing *Mayo Collab. Servs. v. Prometheus Labs.*, 566 U.S. 66, 77 (2012)).

Since *Alice*, the Federal Circuit has seldom found claims otherwise directed to an abstract idea to contain an inventive concept. In these rare cases, the claims were directed to sufficiently specific, unconventional implementations that were improvements over existing technology. *E.g.*, *Bascom Global Internet Servs., Inc. v. AT&T Mobility LLC*, 827 F.3d 1341, 1352 (Fed. Cir. 2016) (finding an inventive concept in how the claims "carve out a specific location for the filtering system (a remote ISP server) and require the filtering system to give users the ability to customize filtering for their individual network accounts"). Sidekick's patent claims lack an inventive concept such as *Bascom*'s because they do not offer specific technological implementations or improvements. As discussed previously, "used automobile seller interface" and "used automobile buyer interface" can be implemented using such generic components as simple HTML webpages. Each claimed step — (1) receiving a request to sell a used car, (2) determining the location of the car, (3) generating a "buyer area" based on the location of the car, (4) finding buyer(s) in the buyer area, (5) receiving a bid from a buyer in the buyer

area, (6) generating driving directions between the buyer's location to the location of the car, and (7) providing buyer's bid to the seller — can be achieved using generic and off-the-shelf components.  Nor is the order of the claimed steps anything inventive; rather, the claim recites the steps in the same order as a generic car dealer does in conducting a used car transaction.  *See Boom! Payments, Inc. v. Stripe, Inc.*, 839 Fed. Appx. 528, 533 (Fed. Cir. 2021) ("[T]he order and timing of the claim elements are merely the necessary steps of executing payment escrow and so do not constitute an inventive concept.").  The claim requires "no improved computer resources" that Sidekick can claim to have invented, but only requires "already available computers, with their already available basic functions, to use as tools in executing the claimed process." *SAP*, 898 F.3d at 1169-70.  Therefore, the claim lacks anything sufficient to transform the abstract idea into a patent eligible invention, and, in turn, the claim is invalid.

**C.    No other claim of the patents-in-suit adds anything to change the outcome of the analysis of representative claim 1 of the 362 patent above.**

The analysis presented above for claim 1 of the 362 patent reaches the exact same result for any other claim of any of the patents-in-suit.  In its counterclaims, Sidekick alleged infringement with respect to "at least claim 1" of each of the 12 patents-in-suit — no claims other than claim 1 were specifically mentioned or discussed.  Dkt. 15 at 30-54.  Plaintiffs exemplified their analysis above using

claim 1 of the 362 patent because (i) that is the patent that Sidekick highlighted in its most recent correspondence with Plaintiffs before this lawsuit; (ii) the 362 patent descends from the 093 patent, which in turn is a continuation-in-part of Sidekick's original two filings, the 925 and 984 patents, and so it therefore has the longest lineage in the family, and; (iii) among the 12 patents, the 362 patent contains some of the more general and sweeping claims (indeed, the third reason is probably why Sidekick featured the 362 patent in its letter).  But it would not have mattered which claim Plaintiffs used as an example.

The crucial point of law is that adding nuances to the abstract idea of facilitating used car sales by matching sellers and buyers based on parameters such as vehicle information, price, and locations makes no difference to eligibility.  This is because, "[a]s a matter of law, narrowing or reformulating an abstract idea does not add 'significantly more' to it."  *BSG*, 899 F.3d at 1291; *see also RecogniCorp*, 855 F.3d at 1327 ("Adding one abstract idea (math) to another abstract idea (encoding and decoding) does not render the claim non-abstract.").  Nor does it make any difference if the claims are limited to any particular technological environment, because fields of use are not inventive concepts.  *Capital One*, 792 F.3d at 1366; *see, e.g.*, *Chamberlain Grp. v. Techtronic Indus. Co.*, 935 F.3d 1341, 1348-49 (Fed. Cir. 2019) (wireless communication is non-inventive).

Thus, a representative claim approach is so often useful for a patent

eligibility analysis because most cases are like this one — numerous claims at

issue with the same abstract idea or minor variations on that theme.  "Courts may

treat a claim as representative in certain situations, such as if the patentee does not

present any meaningful argument for the distinctive significance of any claim

limitations not found in the representative claim." *Berkheimer v. HP Inc.*, 881

F.3d 1360, 1365 (Fed. Cir. 2018).  A claim is representative of other claims which

are "substantially similar in that they recite little more than the same abstract idea."

*Content Extraction & Transmission LLC v. Wells Fargo Bank, Nat. Ass'n*, 776

F.3d 1343, 1348 (Fed. Cir. 2014).  The minor variations presented by dependent

claims are rarely of any significance in the patentable subject matter analysis.

*Ultramercial*, 772 F.3d at 715 ("Although certain additional limitations, such as

consulting an activity log, add a degree of particularity, the concept embodied by

the majority of the limitations describes only the abstract idea of showing an

advertisement before delivering free content.").  Sidekick's counterclaims give no

indication that Sidekick regards any of its patents or claims differently than claim 1

of the 362 patent for purposes of patent eligibility, but for the sake of

completeness, Plaintiffs will address the other claims below.  *See Mortgage*

*Grader*, 811 F.3d 1314, 1324 n.6 (Fed. Cir. 2016) ("no need to address . . . claims

individually" as "there is . . . no contention that the claims differ in any manner

that is material to . . . patent-eligibility"); *British Telecomms. PLC v.*

31

Appx334

*IAC/InterActiveCorp*, 813 F. App'x 584, 587-88 (Fed. Cir. 2020) (patentee

"forfeit[s] its ability to argue that other claims are separately patent eligible" by

"not present[ing] any 'meaningful argument for the[ir] distinctive significance'").

> **1.     The other claims of the 362 patent are invalid for the same reasons as claim 1; they add nothing inventive.**

The claims of the 362 patent other than claim 1 add nothing to render them

patent eligible.  Below is a brief summary that illustrates both why claim 1 of the

362 patent is representative of the patent, and why the other claims of the 362

patent are similarly invalid:

| Independent claims 32 and 63 | These claims have the same steps as claim 1, but claim them in the format of a system for executing steps (32) or software configured to cause a system to execute the steps (63). |
| --- | --- |
| Dependent claims 2, 5, 7, 13-15, 17, 19-30 | These claims merely refine the participants and vehicles, such as narrowing the type of buyer/seller (2, 13, 14, 20-21, 26-28); adding more buyers/sellers (19); refining the nature of the business transaction (22-25, 29-30); or narrowing or adding to the information being processed (5, 7, 15, 17). |
| Dependent claims 3, 4, 16 | These claims incorporate various other generically described computer components, such as optical character recognition (3), speech recognition (4), input interface (16). |
| Dependent claims 6, 8, 9-12 | These claims require additional steps that are similarly abstract, such as taking photographs of the vehicle (6), including add-on information (8, 9, 12), including more driving directions (10), including more pickup locations (11). |
| Dependent claims 18, 31 | These claims merely set the field of use as websites and applications (18, 31). |

| Dependent claims 33-62 | These claims exactly mirror claims 2-31, discussed above, but modify independent claim 32 instead of independent claim 1.[2] |
|---|---|

The categories above are themselves illustrative, because many of the claims fit into multiple categories.  But what all the claims have in common is that they are *all* directed to the patent-ineligible abstract idea of facilitating used car sales by matching sellers and buyers based on parameters such as vehicle information, price, and locations, and *none* of them adds any non-generic computer technology, improves computer functionality, or does anything to yield the inventive concept that step 2 of *Alice* requires.  Therefore, all of the claims of the 362 patent are invalid for the same reasons as claim 1 of the 362 patent.

> **2.      The claims of the other 11 patents-in-suit are invalid for the same reasons as the 362 patent; they add nothing inventive.**

Just as the dependent claims of the 362 patent added nothing to change the eligibility analysis, so too are the claims of the remaining 11 patents invalid.  Once again, they are *all* directed to the patent-ineligible abstract idea of facilitating used car sales by matching sellers and buyers based on parameters such as vehicle information, price, and locations, and none adds a patent-eligible inventive

---

[2] Generally, the patents-in-suit follow a standard structure for computer-related patents: three independent claims — one method claim, one system claim, and one computer-readable medium claim — and then parallel sets of dependent claims modifying those independent claims.  This predictable redundancy is all the more reason why a representative claim approach is appropriate here.

concept. It would certainly be possible, given enough pages, to repeat the same

arguments and cite the same cases over and over again for each of these patents,

but that would burden the Court with no apparent benefit. Given that Sidekick

chose to identify only claim 1 of each of its patents in its counterclaims, Plaintiffs

will address those claims below as representative of each of their respective

patents, and use the same-color coded shading as used in the patent family figure in

Section II.B. Dkt. 15 at 30-54.

| | |
|---|---|
| Claim 1 of the 655 patent (Dkt. 1-13) | This claim tracks almost identically with claim 1 of the 362 patent, but for some grammatical changes of no consequence to the § 101 analysis. It is invalid for exactly the same reasons. |
| Claim 1 of the 467 patent (Dkt. 1-10) | This claim tracks almost identically with claim 1 of the 362 patent, but for some grammatical changes of no consequence to the § 101 analysis. It is invalid for exactly the same reasons. |
| Claim 1 of the 075 patent (Dkt. 1-8) | This claim is very similar to claim 1 of the 362 patent, but recites three additional steps: (i) storing "automobile market data which is representative of recent automobile market characteristics" from customers; (ii) providing that data to buyers; and (iii) receiving the consumer buyer's selection of a bid.<br><br>These steps merely speak to the flow of information in the transaction—who gets what when. For the same reasons already discussed, the steps do not change the abstract idea nor provide an "inventive concept" sufficient to render the claims patentable. |
| Claim 1 of the 093 patent (Dkt. 1-7) | This claim addresses the same basic transaction as claim 1 of the 362 patent, but it further requires: (i) market data that includes inventory data, be derived from additional sources, and be updated in real time; (ii) optical character recognition of the VIN of the car after a user takes a picture with a mobile device; (iii) that there be at least two buyers bidding, a dealer and a consumer; (iv) that the bids be based on market data; and (v) multiple pickup locations. |

| | |
|---|---|
| | Most of these steps again merely speak to the flow of information in the transaction — who gets what when.  Others just add more of the same sort of business steps (additional buyers and pickup locations).  Still others call for the use of generically specified, functional computer technology (optical character recognition).  Again, none of these change the abstract idea or provide the requisite "inventive concept." |
| Claim 1 of the 722 patent (Dkt. 1-14) | This claim is structured similarly to claim 1 of the 362 patent, but it calls for an even more generic transaction where a consumer requests a "response regarding a first automobile" including the geolocation of the consumer, and then an in-market dealer may provide a bid and accompanying driving directions back to the consumer.<br><br>This claim is apparently facially broader than claim 1 of the 362 patent and adds no apparent steps or aspects that could render it patent eligible. |
| Claim 1 of the 704 patent (Dkt. 1-12) | This claim tracks almost identically with claim 1 of the 722 patent, but it also includes a step of requesting "via a dealer interface from the first dealer, a bid to sell the first automobile based on the first request."  This step has no consequence whatsoever to the § 101 analysis and the claim is invalid for exactly the same reasons as claim 1 of the 722 patent. |
| Claim 1 of the 216 patent (Dkt. 1-9) | This claim has essentially the same structure as the 704 patent claims, but, similar to the 075 patent, it further requires: (i) storing market data including price and inventory data derived from dealers and consumers; (ii) determining whether the consumer is at the first dealer (*e.g.*, a scenario where a customer is shopping at a dealership and checking prices while there); and (iii) requiring a second dealer to provide the bid and driving directions (*e.g.*, to poach the customer from the first dealer).<br><br>These requirements are manifestly of no consequence to patent eligibility and relate to nothing more than yet another way to facilitate the used car sale.  This claim is invalid for the same reasons as claim 1 of the 722 patent. |

35

| Claim 1 of the 925 patent (Dkt. 1-6) | This claim addresses a similar transaction as the 722 patent, but, similar to the 093 patent, it further requires: (i) storing market data including price and inventory data derived from dealers and consumers, where that data is updated in real-time; (ii) optical character recognition of the VIN of the car after a user takes a picture with a mobile device; (iii) providing market data based on real-time data and actual sales data within a particular time and geographical area; (iv) that there be at least two dealers bidding; (v) that the bidding be "inventoryless," meaning that the vehicles are not on the dealer's lot; that the bids be based on market data; and (iv) multiple pickup locations.<br><br>Most of these steps again merely speak to the flow of information in the transaction — who gets what when.  Others just add more of the same sort of business steps (additional dealers, inventoryless bidding, pickup locations).  Still others call for the use of generically specified, functional computer technology (optical character recognition).  Again, none of these change the abstract idea or provide the requisite "inventive concept." |
|---|---|
| Claim 1 of the 720 patent (Dkt. 1-15) | This claim is structured similarly to claim 1 of the 362 patent, but it facilitates a transaction where the seller is the vehicle manufacturer.  The claim calls for the consumer to request a response for a vehicle, and then (i) the manufacturer verifying and providing confirmation that the vehicle can be provided, and (ii) the dealer providing a bid and driving directions to the consumer.<br><br>This claim is again directed to the same abstract idea, and the addition of the manufacturer verification and confirmation does nothing to provide an "inventive concept."  It is invalid for the same reasons as claim 1 of the 362 patent. |
| Claim 1 of the 897 patent (Dkt. 1-11) | This claim addresses almost exactly the same transaction as claim 1 of the 720 patent, but with the small addition of expressly requiring generating inventory data for the vehicle from several dealers and providing it to the manufacturer before the verification and confirmation by the manufacturer.<br><br>This addition has no bearing on patent eligibility, so this claim is invalid for the same reasons as claim 1 of the 720 patent. |

36

| Claim 1 of the 984 patent (Dkt. 1-5) | This claim addresses a similar transaction as the 720 and 897 patents, but it adds the real-time data and inventoryless bidding aspects of the transactions, similar to the 925 and 093 patents. In particular, this claim requires (i) storing market data including price and inventory data derived from dealers and consumers, where that data is updated in real-time; (ii) that there be at least two dealer inventories, one of which lacks the vehicle; (iii) using the real-time market data for the remainder of the transaction; (iv) that the bidding be "inventoryless," meaning that the vehicles are not on the dealer's lot; and (v) the consumer makes a selection indicating intent to purchase.

Most of these steps again merely speak to the flow of information in the transaction — who gets what when.  Others just add more of the same sort of business steps (additional dealers, inventoryless bidding, consumer making the selection).  Again, none of these change the abstract idea or provide the requisite "inventive concept."  This claim is also invalid for the same reasons discussed above. |

Each of these 11 patents has more than 1 claim, but the claims of the patents are structured in a manner very similar to that of the 362 patent — there are several independent claims of essentially the same content (method, system, and computer-readable medium), and then there are sets of dependent claims that typically run in parallel after each independent claim.  The dependent claims of each of the other 11 patents offer exactly the same sorts of narrowing requirements as those of the 362 patent, fall into the same categories discussed for the 362 patent, and therefore suffer from the same problems as those of the 362 patent.  Every one of the many claims spread across the 12 patents-in-suit is directed to the ineligible abstract idea of facilitating used car sales by matching sellers and buyers based on parameters such

37

as vehicle information, price, and locations.  And not one of those many claims recites anything remotely close to the "inventive concept" demanded by *Alice*.

### D.    The patent claims are ineligible on the pleadings.

The Federal Circuit has "repeatedly recognized that in many cases it is possible and proper to determine patent eligibility . . . on a Rule 12[] motion." *FairWarning IP, LLC v. Iatric Sys., Inc.*, 839 F.3d 1089, 1097 (Fed. Cir. 2016); *see SAP*, 898 F.3d at 1166 (claims "frequently" ineligible on the pleadings).  That is the proper outcome here, as there can be no plausible allegation of inventiveness apart from the abstract idea.

The patents' specifications themselves establish that the claim elements provide no technological improvement — like the claims the Federal Circuit found ineligible as a matter of law and on the pleadings, in cases such as *buySAFE*, *Voit*, *OIP*, and *Two-Way Media*, discussed above.  No claim construction could change that conclusion, given the patents' repeated admissions that the claims require only known and conventional technology and their overt focus on the longstanding economic practice of used car transactions.  *See, e.g.*, *Elec. Comm'n Techs.*, 958 F.3d at 1184 (claims ineligible on pleadings; claim construction would not "affect the analysis").  For example, there is no plausible construction of "used automobile seller interface" and "used automobile buyer interface" that can transform these limitations from generic and conventional computer components, when the

specification expressly admits that they can be implemented using simple HTML webpages.  As the Federal Circuit has held, "claim construction is not an inviolable prerequisite to a validity determination under § 101," especially, whereas here, the "basic character of the claimed subject matter" in dispute in this action is clearly evident.  *Content Extraction & Transmission LLC v. Wells Fargo Bank, Nat'l Ass'n*, 776 F.3d. 1343 (Fed. Cir. 2014).

In the handful of cases where the Federal Circuit found factual issues at *Alice* step two, the patents and pleadings provided detailed allegations explaining how claimed features specifically improve computer technology itself.  *Aatrix Software, Inc. v. Green Shades Software, Inc.*, 882 F.3d 1121, 1128 (Fed. Cir. 2018) ("There are concrete allegations in the second amended complaint that individual elements and the claimed combination are not well-understood, routine, or conventional activity.  There are also concrete allegations regarding the claimed combination's improvement to the functioning of the computer."); *Berkheimer*, 881 F.3d at 1370 ("The specification states one-to-many editing substantially reduces effort needed to update files because a single edit can update every document in the archive linked to that object structure. . . . According to the specification, conventional digital asset management systems cannot perform one-to-many editing because they store documents with numerous instances of redundant elements, rather than eliminate redundancies through the storage of

linked object structures."). In those cases, further fact-finding was required to determine if such allegations were true and whether the claimed implementations were improvements over existing technology. *Id.*; *Aatrix*, 882 F.3d at 1128.

Those sort of factual and non-conclusory allegations are entirely absent in this case. Sidekick's patents do not claim to confer any specific improvement to existing computer technology, but instead focus on a fundamental economic practice that humans can and do perform and require only conventional and generic computer components. Further, Sidekick's counterclaims do not and cannot allege that the claimed subject matter results in any particular improvements to computer technology itself. Quite the opposite. *See* Dkt. 15 ¶ 13 (characterizing advantage of claimed invention as "permit[ting] customers to avoid the traditional car dealership experience" without mentioning any improved computer technology). There are no factual allegations that prevent the Court from deciding patent ineligibility under either *Berkheimer* or *Aatrix*. Therefore, Sidekick's counterclaims should be dismissed in full with prejudice.

## V.    CONCLUSION

The claims of the patents-in-suit claim ineligible subject matter under 35 U.S.C. § 101 and are thus invalid. Plaintiffs respectfully request that the Court grant Plaintiffs' motion for judgment on the pleadings under Fed. R. Civ. P. 12(c) and dismiss Sidekick's counterclaims with prejudice.

Dated:        December 22, 2021

_____
Lesley M. Grossberg (NJ No. 021682008)
lgrossberg@bakerlaw.com
John F. Murphy (*pro hac vice* admitted)
johnmurphy@bakerlaw.com
Stephanie M. Hatzikyriakou
(NJ No. 080582014)
shatzikyriakou@bakerlaw.com
BAKER & HOSTETLER LLP
1735 Market Street
Suite 3300
Philadelphia, PA  19103
Telephone:  215.568.3100
Facsimile:    215.568.3439

Derek M. Freitas (*pro hac vice* admitted)
dfreitas@bakerlaw.com
BAKER & HOSTETLER LLP
312 Walnut Street
Suite 3200
Cincinnati, OH  45202-4074
Telephone:  513.929.3400
Facsimile:    513.929.0303

*Attorneys for Declaratory Judgment
Plaintiffs*

41

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

VROOM INC.; VROOM
AUTOMOTIVE, LLC d/b/a
VROOM, d/b/a TEXAS DIRECT
AUTO; CARSTORY, LLC; and
VAST.COM, INC. d/b/a
CARSTORY,

        Plaintiffs,

   v.

SIDEKICK TECHNOLOGY, LLC.

        Defendant.

Case No. 2:21-cv-06737-WJM-JSA

Hon. William J. Martini, U.S.D.J.
Hon. Jessica S. Allen, U.S.M.J.

---

## BRIEF IN OPPOSITION OF PLAINTIFF'S MOTION FOR JUDGMENT ON THE PLEADINGS UNDER RULE 12(c)

### ORAL ARGUMENT REQUESTED

---

Loly G. Tor
K&L GATES LLP
One Newark Center, Tenth Floor
Newark, New Jersey 07102
Phone: (973) 848-4026
loly.tor@klgates.com

Benjamin E. Weed (admitted pro hac vice)
Gina A. Johnson (admitted pro hac vice)
K&L GATES LLP
70 W Madison Street, Suite 3100
Chicago, IL 60602
Phone: (312) 372-1121
benjamin.weed@klgates.com
gina.johnson@klgates.com

*Attorneys for Defendant/Counter-Plaintiff Sidekick Technology, LLC*

311624386.2

by offering claim construction positions that are unsupported by the specification or expert testimony. *Id.* at 19–20; *Berkheimer*, 881 F.3d at 1368 ("The question of whether a claim element or combination of elements is well-understood, routine and conventional to a skilled artisan in the relevant field is a question of fact"); *see also eBuddy Techs. B.V. v. Linkedin Corp.*, No. 20-1501-RGA-CJB, 2021 U.S. Dist. LEXIS 227815, at *16–17 (D. Del. Nov. 29, 2021) ("Alleged improvements to the prior art described in a patent's specification and captured in the claims can create a factual dispute regarding whether the invention describes well-understood, routine, and conventional activities—thus precluding either summary judgment, or dismissal at the Rule 12 stage.") (citing *BASCOM Glob. Internet Servs., Inc. v. AT&T Mobility LLC*, 827 F.3d 1341, 1350 (Fed. Cir. 2016)) (internal citations omitted).

At this stage, the court must accept Sidekick's allegations as true and construe the Counterclaims in the light most favorable to Sidekick. *See, e.g.*, Dkt. No. 15 (Counterclaims) ¶ 107 ("The written description of the '216 Patent describes . . . how the non-conventional and non-generic combination of claim limitations is patentably distinct from and improved upon what may have been considered conventional or generic in the art at the time of the invention."); *id.* ¶¶ 51, 65, 79, 93, 121, 134, 147, 160, 173, 186, 199; *see also* Dkt. No. 1-8 ('075 Patent) at 1:66–2:1 ("The present disclosure provides a new and innovative system, methods and

9

apparatus for providing automobile market information and facilitating used automobile transactions.").

Plaintiffs' suggestions for purposes of *Alice* step two are incorrect, and at the very least premature; in either case, denial under *Alice* step two is warranted.

## A.     The Patent-in-Suit

The Patents-in-Suit in this case are related, share a specification, and comprise three lineages stemming from the earliest filings, the '925 and '984 Patents, filed on July 5, 2011.  The '925 Patent lineage includes three continuations, the '216, '704, and '722 Patents.  The '984 Patent lineage includes two continuations, the '897 and '720 Patents.  The third lineage stems from the '093 Patent, which is a continuation-in-part of both the '925 and '984 Patents.  The '093 Patent lineage includes four continuations, the '075, '467, '655, and '362 Patents.

### 1.     Representative Claim From The '925 Patent Lineage

The '925 Patent was filed on July 5, 2011 and issued on June 3, 2014.  Claim 1 of the '925 Patent recites:

1. A method comprising:

storing, on a **computer readable medium**, **automobile market data** which is representative of **recent automobile market characteristics**, including at least **pricing data** and **inventory data**, wherein the automobile market data includes information received from at least **one manufacturer**, a **plurality of dealers**, and a **plurality of consumers**, wherein at least a portion of the automobile market data is **updated in real-time**;

receiving, via a **consumer interface**, a **first request for a response regarding a first automobile**, wherein the first request is made by

10

a consumer using a **mobile device** which takes **a picture of a vehicle identification number** and the vehicle identification number is recognized **using optical character recognition**;

causing at least one **processing device** to:

provide **first automobile market data**, based on the first request, via a **dealer interface**, wherein the first automobile market data is based on **real-time automobile market data** and **actual sales data** for **comparable automobiles** within a **predetermined time period** and within a **predetermined geographic area**;

request, via a **dealer interface** from **at least two dealers**, **a bid to sell** the **first automobile** based on the **first request**, wherein the at least two dealers engage in **inventoryless bidding** by providing a bid on the first automobile when the first automobile is at least one of **yet to be manufactured** and in the inventory of another entity;

provide the response including at least **two bids via the consumer interface**, the at least two bids each including at least **a price** and a **delivery option** for the first automobile, the at least two bids based on the first automobile market data; and

receiving a **consumer selection of a first bid** including a **first delivery option** which specifies a **first pickup location** at a first dealer and **a second delivery option** which specifies a different **second pickup location**, wherein the consumer selection indicates a consumer **intention to purchase the first automobile** based on the first bid and specifies one of the first delivery option and the second delivery option, wherein the first bid is an inventory less bid requiring the first automobile to be at least one of manufactured and transferred from the inventory of another entity to the first dealer.

Dkt. No. 1-6 ('925 Patent) at cl. 1 (emphasis added).

2.    Representative Claim From The '984 Patent Lineage

The '984 Patent was filed on July 5, 2011 and issued on September 22, 2015.

Claim 1 of the '984 Patent recites:

1. A method comprising:

storing, on a **computer readable medium**, **automobile market data** which is representative of **recent automobile market characteristics**, including at least **pricing data** and **inventory data**, wherein the automobile market data includes information received from at least **one manufacturer**, a **plurality of dealers**, and a **plurality of consumers**, wherein at least a portion of the automobile market data is **updated in real-time**;

receiving, via a **consumer interface**, a **first request** for a response regarding a **first automobile**, which is manufactured by a **first manufacturer**, the first request made by a consumer located at a **first location** and including **geolocation information** of the consumer;

executing **instructions**, by at least one **processing device**, to:

determine **current inventory data** of the **first automobile**, wherein the current inventory data of the first automobile includes a **plurality of dealer inventories** of a plurality of dealers, with each **respective dealer** of the plurality of dealers having a **respective dealer inventory**, and wherein the current inventory data indicates that a first dealer of the plurality of dealers does not currently have the first automobile in a first inventory of the first dealer;

provide **first automobile market data** including the current inventory data of the first automobile to the first manufacturer, based on the first request, via a **manufacturer interface**, wherein the first automobile market data is based on **real-time automobile market data**;

generate, based on the first automobile market data including the current inventory data of the first automobile, via the manufacturer interface, at least one of a **verification** indicating that the first automobile can be provided for the consumer, a **confirmation** indicating that the first automobile can be

12

provided for the consumer, and an **offer** indicating that the first automobile can be provided for the consumer;

determine, using the **geolocation information**, that the consumer is located at the first location;

generate, based on the first location, an **in-market dealer area** proximately located to the first location;

determine that the first dealer is located at a **second location** within the in-market dealer area;

provide a **first manufacturer response** via the **consumer interface**, the first manufacturer response including the at least one of the **verification** indicating that the first automobile can be provided for the consumer, the **confirmation** indicating that the first automobile can be provided for the consumer, and the **offer** indicating that the first automobile can be provided for the consumer;

request, from the **first dealer**, via a **dealer interface**, an **inventory less bid** to sell the first automobile based on the first manufacturer response;

receive, from the first dealer located at the second location and engaging in inventory less bidding, the inventory less bid to provide the first automobile, which is at least one of **yet to be manufactured** and in the inventory of another entity;

generate **driving directions** from the first location to the second location; and provide the **inventoryless bid** and the driving directions to the consumer interface, the inventoryless bid including at least a price and a delivery option; and

receiving a **consumer selection** of the inventoryless bid including a **first delivery option** which specifies a **pickup location** at the first dealer, wherein the consumer selection indicates a consumer **intention to purchase** the first automobile.

Dkt. No. 1-5 ('984 Patent) at cl. 1 (emphasis added).

### 3. Representative Claim From The '093 Patent Lineage

The '075 Patent is a continuation of the '093 Patent. Claim 1 of the '075 Patent recites:

1. A method comprising:

storing, on a **computer readable medium**, **automobile market data** which is representative of **recent automobile market characteristics**, including at least **pricing data**, wherein the automobile market data includes information received from at least a **plurality of consumers**;

receiving, via a **used automobile consumer seller interface**, a **first request** for a response regarding a **first used automobile**, the first request made by a **consumer used automobile seller** located at a **first location** and including a **vehicle identification number** and **geolocation information** of the consumer used automobile seller;

executing **instructions**, by at least one **processing device**, to:

determine, using on the **geolocation information**, that the consumer used automobile seller is located at the first location;

generate, based on the determined first location, an **in-market used automobile buyer area**;

determine that at least one **used automobile buyer** is located within the in-market used automobile buyer area;

provide **first automobile market data**, based on the first request, via a **used automobile buyer interface**;

request, via the used automobile buyer interface from the **at least one used automobile buyer**, a **bid to purchase** the first used automobile based on the first request;

receive, via the used automobile buyer interface, **at least one bid** from at least one used automobile buyer, the at least one bid including a **first bid** from a **first used automobile buyer** located at a **second location** within the in-market used automobile buyer area;

generate, based on receiving the first bid, **driving directions** from the first location to the second location; and

provide the **response** including the first bid via the used automobile consumer seller interface, the **first bid** including at least **a price** for the **first used automobile**, and the response including the **driving**

14

**directions** from the first location to the second location; and receiving a **consumer used automobile seller selection** of the first bid, wherein the consumer used automobile seller selection indicates a consumer used automobile seller **intention to sell** the first used automobile based on the first bid to the first used automobile buyer.

Dkt. No. 1-8 ('075 Patent) at cl. 1 (emphasis added).

### B.    Alice Step One—The Claims of the Patents-in-Suit Are Not Directed to an Abstract Idea.

Plaintiffs allege that the claims of the Patents-in-Suit are directed to a "fundamental economic practice," i.e., "facilitating used car sales by matching sellers and buyers," and therefore are directed to an abstract idea.  Dkt. No. 33-1 (Motion) at 9–10, 12–13, 24–25, 40, 44, 47.  However, Plaintiffs' characterization of the claims is an unfair oversimplification, directly contrary to controlling precedent.  *See, e.g.*, *Mayo Collaborative Servs. v. Prometheus Labs., Inc.*, 566 U.S. 66, 70 (2012) (oversimplifying the claims should be avoided because "all inventions at some level embody, use, or abstract ideas").  To do as Plaintiffs suggest—reduce the claims of the Patents-in-Suit to the abstract idea of "performing automobile transactions"—oversimplifies the claims and ignores the express recitation of specific limitations in those claims.  *See Eagle View*, 358 F. Supp. 3d at 404 ("[A]t step one, the court also reflects on the ***specifically recited elements*** in the claim to avoid characterizing the invention too generally.") (citing *McRO*, 837 F.3d at 1313) (emphasis added).

Fundamentally, the methods and systems claimed of Patents-in-Suit are directed to an improved automobile sales platform to facilitate automobile transactions with specific data integration, message flow, and geolocation-based processing, among various types of users via specific user interfaces. The claims of the Patents-in-Suit specifically require certain computer-based functionality not otherwise available in traditional car-selling environments. For example, the Patents-in-Suit permit location-based techniques that were not even relevant when a customer walked into a showroom floor looking to purchase a car. And the Patents-in-Suit variously also provide computerized interfaces to permit the previously impossible online car-purchasing transaction to be completed by, for example, generating driving directions to facilitate delivery of the purchased car.

For example, Plaintiffs' characterization ignores the following steps: (1) "**storing**, on a computer readable medium, **automobile market data** . . . received from at least **one manufacturer**, a **plurality of dealers**, and a **plurality of consumers**;" (2) "**receiving**, via a **consumer interface**, a **first request** for a response **regarding a first automobile**, wherein the first request is made by a **consumer**;" (3) "**provid[ing] . . .** based on the first request[] via a **dealer interface . . . first automobile market data**[,] based on **real-time automobile market data** and **actual sales data for comparable automobiles** within a **predetermined time period** and within a **predetermined geographic area**;" (4) "**request[ing]** via a

16

**dealer interface** from **at least two dealers**, **a bid to sell** . . wherein the at least two dealers engage in **inventoryless bidding**;" (5) "**provid[ing]** the **response** including **at least two bids** via the **consumer interface**;" and (6) "**receiving** a **consumer selection of a first bid** including a **first delivery option** which specifies a **first pickup location** at a first dealer and **a second delivery option** which specifies a different **second pickup location**, wherein the consumer selection indicates a consumer **intention to purchase the first automobile**."  Dkt. No. 1-6 ('925 Patent) at cl. 1 (emphasis added).  The claims of the Patents-in-Suit are directed to more than just using a computer to perform the sale of an automobile.  *See Nasdaq*, 2019 WL 102408, *5 ("[T]he Federal Circuit defined the key inquiry as whether the claims in these patents focus on a specific means or method that improves the relevant technology or are instead directed to a result or effect that itself is the abstract idea and merely invoke generic processes and machinery.") (citing *McRO*, 837 F.3d at 1314) (internal quotations omitted).  By wrongly focusing on the result of the methods and systems (i.e., the transaction itself), rather than the claimed steps or process itself, Plaintiffs' characterization ignores ***specifically recited elements*** that give rise to the improvements that the claims embody.

Plaintiffs not only allege that the Patents-in-Suit are merely directed to a fundamental economic practice (i.e., an abstract idea), but also allege that "the claimed invention does not seek to improve or solve any problems with existing

<div align="center">17</div>

computer technology" and "can be performed by humans" without the use of a computer.  Dkt. No. 33-1 (Motion) at 31; *see also id.* at 9, 27, 29, 47.  However, this is not the case.  The common specification[1] clearly sets forth the benefits and improvements of the patented inventions over the then-existing technology and methods.  *See e.g.*, Dkt. No. 1-8 ('075 Patent) at 1:66–2:1 ("The present disclosure provides a new and innovative system, methods and apparatus for providing automobile market information and facilitating used automobile transactions."); *id.* at 21:48–52 ("The integration of the various types of automobile market data 506 received from the consumer interface 304, dealer interface 306, and manufacturer interface 308 may provide a synergistic and optimal resource for consumers, dealers, and manufacturers alike."); *see also id.* at 15:21–28, 20:4–30, 21:48–22:10.  Plaintiffs argue that "[a]t best, the claims improve the abstract idea — not the function of any computer — and that is not enough."  Dkt. No. 33-1 (Motion) at 33.

However, again, this is again not the case.  And again, by a simple review of the intrinsic record of the patents-in-suit, the factual underpinning for Plaintiffs'

---

[1] *See Invitae Corp. v. Natera, Inc.*, No. 21-669-LPS, 2021 U.S. Dist. LEXIS 228701, at *10 (D. Del. Nov. 30, 2021) (In finding the claims directed to an improvement in computer technology and patent eligible under step one, the court looked to the specification when the claims themselves did not necessarily articulate the improvements and advantages of the invention.).

18

arguments crumbles. In particular, during the prosecution of the Patents-in-Suit, Sidekick explained:

> The combination of elements in the system results in **improved automobile transaction facilitation and automobile logistics technology** in the automobile industry, enabling more efficient transactions for dealers, consumers, and manufacturers, for example, matching supply to demand to result in more efficient delivery options and shipping of automobiles . . . result[ing] in various **existing computer system improvements**, such as **reducing bandwidth usage** for automobile sellers by implementing the claimed system, due to improved matching of automobile sellers to in-market buyers.

Exhibit B, August 30, 2018 Response to Non-Final Office Action ('720 Patent) at 10 (emphasis added); *see also* Exhibit C, May 21, 2018 Response to Non-Final Office Action ('655 Patent) at 9–10; Exhibit D, September 6, 2018 Response to Non-Final Office Action ('722 Patent) at 10.

Taking the evidence of record in the light most favorable to Sidekick, there is plainly a dispute of fact as to whether the claims are directed to an "improvement of the relevant technology" and whether the claimed methods "could be performed by humans without the use of a computer." Even if the prosecution histories are deemed not to be a part of the Rule 12(c) record, they nevertheless indicate that a factual dispute exists, and demonstrate the way in which this Court should weigh the facts in Sidekick's favor.

To support their allegations, Plaintiffs' Motion both argues unsupported factual statements and construes specific claim limitations as generic elements

without the use of expert testimony or proper citation to the shared specification. *See* Dkt. No. 33-1 (Motion) at 8–9, 18–21, 27–44.  For example, Plaintiffs argue the claims are directed to "facilitating used car sales by matching sellers and buyers based on ***parameters*** such as vehicle information, price, and locations." *Id.* at 24 (emphasis added).  This is an incorrect and unfair characterization of specific claim limitations or terms for such "***parameters***," such as "automobile market data[2]," which the specification clearly indicates includes more than merely "vehicle information, price, and locations."  *See* Dkt. No. 1-6 ('925 Patent) at 15:33–36 ("Automobile market data 506 may include, for example, executed sales data 508, consumer data 510, dealer data 512, manufacturer data 514, statistical data 516, and/or historical data 518."); *see also id.* at 15:36–16:33; Fig. 5.  In addition, Fig. 5 illustrates some of the novel computer system architecture disclosed and claimed in the Patents-in-Suit; in particular, this figure shows how the system can integrate data in a way that cannot be achieved by a human without the use of a computer.

---

[2] *See* Dkt. No. 1-5 ('984 Patent) at cls. 1, 2, 9, 10, 18, 21, 28, 29, 39; Dkt. No. 1-6 ('925 Patent) at cls. 1, 2, 18, 21, 22, 33, 34, 50, 53, 54, 55, 56; Dkt. No. 1-7 ('093 Patent) at cls. 1, 11; Dkt. No. 1-8 ('075 Patent) at cls. 1, 9, 17, 19; Dkt. No. 1-9 ('216 Patent) at cls. 1, 8, 9, 18, 21, 24, 25; Dkt. No. 1-10 ('467 Patent) at cl. 10; Dkt. No. 1-11 ('897 Patent) at cls. 7, 8; Dkt. No. 1-13 ('655 Patent) at cl. 10; Dkt. No. 1-15 ('720 Patent) at cl. 5; No. 1-16 ('362 Patent) at cls. 5, 36.

20



**Fig. 5**

*Id.* at 16:4–33.

Because factual disputes exist regarding (1) construction of specific claim limitations, (2) a determination of whether or not the claimed methods could be performed by a human without the use of a computer, and (3) a determination of whether a claim element or claimed combination is "well-understood, routine, and conventional to a skilled artisan at the time of the patent" (discussed below); Plaintiffs have failed to meet the burden of clear and convincing evidence and therefore, their Motion should be denied. *See eBuddy*, 2021 U.S. Dist. LEXIS

227815, at *16 ("Alleged improvements to the prior art described in a patent's specification and captured in the claims can create a factual dispute regarding whether the invention describes well-understood, routine, and conventional activities—thus precluding either summary judgment or dismissal at the Rule 12 stage.") (citing *BASCOM*, 827 F.3d at 1350) (internal citations omitted); *Invitae*, 2021 U.S. Dist. LEXIS 228701 at *15 ("[Movant's] argument only serves to illustrate the material fact dispute revealed by the minimal record at this stage of the case.  On a motion to dismiss, of course, I cannot resolve such a factual question in [the movant's] favor."); *Tobii Tech.*, 2021 WL 3879132 at *4, 5 (Finding "a factual question concerning whether a human can perform with a pen and paper the activity covered by the '341 Patent[,]" the court "[c]onstru[ed] the Asserted Claims in a manner most favorable to Weinblatt, [and] decline[d] to conclude, at this stage, the Asserted Claims [were] directed to an abstract idea.").

Furthermore, the § 101 analysis is "driven in significant part by the concern of pre-emption, which in turn compels a court to assess whether the claims at issue attempt to preempt every application or a great many applications of the abstract idea at issue." *eBuddy*, 2021 U.S. Dist. LEXIS 227815 at *4 (internal citations omitted).  The claims of the Patents-in-Suit certainly do not preempt the entire concept of "performing used automobile transactions."  *See* specific claim limitations highlighted in three example claims from the Patents-in-Suit in Sections

22

III(A)(1)–(3).   For example, claim 1 of the '925 Patent requires "**automobile market data**," which is "**updated in real-time**," "received from at least **one manufacturer**, a **plurality of dealers**, and a **plurality of consumers**," and is stored on a "**computer readable medium**;" includes "a **first request** for a **response regarding a first automobile**" "via a **consumer interface**" "wherein the first request is made by a **consumer** using a **mobile device** which **takes a picture** of a **vehicle identification number** and the vehicle identification number is recognized using **optical character recognition**;" "**provide** . . . based on the first request[] via a **dealer interface** . . . **first automobile market data**[,] based on **real-time automobile market data** and **actual sales data** for **comparable automobiles** within a **predetermined time period** and within a **predetermined geographic area**;" a "**request**, via a **dealer interface** from **at least two dealers**, **a bid to sell the first automobile**;" and "a consumer selection of a first bid including a **first delivery option** which specifies a **first pickup location** at a first dealer and a **second delivery option** which specifies a different **second pickup location**."   Dkt. No. 1-6 ('925 Patent) at cl. 1 (emphasis added); *see also* Dkt. No. 1-8 at ('075 Patent) at cl. 1 ("**automobile market data** which is representative of **recent automobile market characteristics**" is **stored** on "a **computer readable medium**," "includes information received from at least a **plurality of consumers**," and "a **first request** made by a **consumer used automobile seller**" "including a **vehicle identification**

23

number and **geolocation information** of the consumer used automobile seller;" generates "an **in-market used automobile buyer area**," and **receives** a "**request**, via the **used automobile buyer interface** from the **at least one used automobile buyer**, a **bid to purchase** the **first used automobile**," and "generate" "driving directions from the first location to the second location") (emphasis added).  It is undisputable that there are many other methods and systems capable of facilitating various types of automobile transactions that fall outside the scope of the claims of the Patents-in-Suit.  For example, the myriad cited prior art references on the faces of the Patents-in-Suit, including the references eventually overcome during prosecution, demonstrate that there are other methodologies for achieving similar results without performing the exact methods or implementing the exact systems in the claims of the Patents-in-Suit.  And again, Vroom has made different non-infringement arguments for each of the Patents-in-Suit, indicating that Vroom itself believes that there are ways to operate commercially without infringing the Patents-in-Suit.  Sidekick of course disagrees, but nevertheless Vroom's filings indicate that preemption is not a substantial concern here.

Plaintiffs' characterization of the patent claims in this manner should be seen for the farce it is, and the preemption analysis highlights the true nature of the patent claims as well as the existence of certain factual disputes.  *See eBuddy*, 2021 U.S. Dist. LEXIS 227815 at *21–22 ("[F]urther expert testimony about this subject (i.e.,

24

about the extent to which those claim limitations would or would not preempt the relevant field) appears critical to a final assessment of eligibility. And so, this all augers in favor of denial of the Motion.").

Furthermore, Plaintiffs' Motion fails to properly consider the dependent claims of the Patents-in-Suit. Although Plaintiffs' Motion claims to address the '362 Patent's dependent claims, again Plaintiffs' oversimplify the specific limitations and simply conclude that none the dependent claims the '362 Patent "adds any non-generic computer technology, improves computer functionality, or does anything to yield the inventive concept that step two of *Alice* requires." Dkt. No. 33-1 (Motion) at 39–40. To the contrary, the dependent claims of the Patents-in-Suit further limit the scope of the independent claims and add additional limitations. Plaintiffs' decision to characterize these additional limitations as "generic" does not make them so, and only underscores the impropriety of their argument. *Id.* These additional claims add further details and limitations such as, "**providing second driving directions between the first location and a third location**" (Dkt. No. 1-16 ('362 Patent) at cl. 10), "**providing a plurality of pickup locations, each having different driving directions**" (*Id.* at cl. 11), "**the manufacturer off-lease seller interface includes a number of matches or search hits for the first used automobile**" (*Id.* at cl. 15), "**the manufacturer off-lease seller interface receives a parameter that the first used automobile will be available for pickup only**

25

after a certain date" (*Id.* at cl. 17), "**an insurance policy and a service contract**" (*Id.* at cl. 12), "**an auction bid from a third party**" (*Id.* at cl. 29), as well as specific limitations as to the "**used automobile seller**" (*Id.* at cls. 8, 20–21, 26–28, 51–52, 57–59), "**wherein the consumer selection of the bid indicates a consumer intention to lease the first automobile**" (Dkt. No. 1-11 ('897 Patent) at cl. 18), "**a consumer intention to lease the first automobile**" (*Id.* at cl. 18), "**wherein the pricing data includes normal listing prices, sale prices, manufacturer incentives, actual prices of executed transactions, and consumer offers**" (Dkt. No. 1-6 ('925 Patent) at cls. 3, 35), "**provide a manufacturer response via the consumer interface including at least one of a verification, a confirmation, and an offer indicating that the first automobile can be provided for the consumer**" (*Id.* at cl. 20) "**wherein the vehicle identification number is recognized using speech recognition**" (Dkt. No. 1-8 ('075 Patent) at cl. 7).  By over-generalizing the additional elements and specific limitations of the dependent claims of the Patents-in-Suit, Plaintiffs' Motion fails to properly consider any of the dependent claims under the *Alice* framework, but each additional element and specific limitation is another reason the claims are directed to patent eligible subject matter.

Plaintiffs, by ignoring the vast majority of the claim limitations, have effectively asked this Court to conduct speculative eligibility analysis against hypothetical, broadened claims, without any legal basis for doing so.  This over-

simplification reduces the claims to an unfair representation as to the focus of the claim as a whole, running afoul of how step one of *Alice* must be analyzed. *See Invitae*, 2021 U.S. Dist. LEXIS 228701 at *17 (Denying a motion to dismiss because the abstract idea articulated by Defendant was "far to general and far too broad" and was "an entirely unfair characterization of what the claim or the claims are actually directed to."). Courts have been clear, there is a distinction between claims that are ***directed*** to excluded subject matter and claims that ***involve*** excluded subject matter. *Enfish*, 822 F.3d at 1335; *see also Rapid Litig. Mgmt. Ltd. v. CellzDirect, Inc.*, 827 F.3d 1042, 1050 (2016). For these reasons, the claims of the Patents-in-Suit are not directed to ineligible subject matter at *Alice* step one, and the court need not proceed to step two.

### C. Alice Step Two—The Claims of the Patents-in-Suit Amount to Significantly More Than a Patent on an Ineligible Concept.

Should the Court proceed to step two of *Alice,* "the question of whether a claim element or combination of elements is well-understood, routine and conventional to a skilled artisan in the relevant field is a ***question of fact***," a question that "must be proven by ***clear and convincing evidence***." *Berkheimer*, 881 F.3d at 1368 (emphasis added). Importantly, step two is not satisfied by simply determining whether the components themselves are conventional or generic, for "an inventive concept can be found in the non-conventional and non-generic ***arrangement*** of known, conventional pieces." *BASCOM*, 827 F.3d at 1350 (emphasis added).

Moreover, contrary to what Plaintiffs' arguments seem to suggest, *Alice* step two is an entirely separate exercise from any obviousness determination. *Two-Way Media Ltd. v. Comcast Cable Commc'ns, LLC*, 874 F.3d 1329, 1339–40 (Fed. Cir. 2017).

If the court considers the claims at issue under step two, the ultimate answer will be the same: the claims of the Patents-in-Suit are directed to patent eligible subject matter. In analyzing the character of the individual claims Sidekick has identified specific claim elements that are "non-conventional and non-generic" and furthermore, has shown that the combination of those elements is "non-conventional and non-generic." *See* Dkt. No. 1-6 ('925 Patent) at 1:54–56 ("The present disclosure provides a new and innovative system, methods and apparatus for providing automobile market information and performing automobile transactions."); *see also*, *e.g.*, *id.* at 16:4–8 ("The integration of the various types of automobile market data 506 received from the consumer interface 304, dealer interface 306, and manufacturer interface 308 may provide a synergistic and optimal resource for consumers, dealers, and manufacturers alike."). The remaining advantages set forth above in Section III(B) further demonstrate how the claims of the Patents-in-Suit provide for improved systems.

Moreover, the court must "determine whether the facts alleged in the complaint, taken as true, entitle the plaintiff to a legal remedy." *Cellspin*, 927 F.3d at 1314. Sidekick's Counterclaim properly pleads "non-conventional and non-

28

generic combination[s] of claim limitations [that are] patentably distinct from and improved upon what may have been considered conventional or generic in the art at the time of the invention." *See* Dkt. No. 15 (Counterclaims) ¶ 107; *see also, id.* ¶¶ 51, 65, 79, 93, 121, 134, 147, 160, 173, 186, 199. Therefore, Sidekick's pleadings clearly allege the claims of the Patents-in-Suit are directed to patent eligible subject matter, recite specific claim elements that are "non-conventional and non-generic" and furthermore, these alleged improvements are grounded in the shared specification and file histories of the Patents-in-Suit.

Aside from broad statements, Plaintiffs' Motion is entirely silent with regard to any reason why the Court should find that the claimed invention of the Patents-in-Suit are conventional, thus they have certainly not met their burden of clear and convincing evidence. *Berkheimer*, 881 F.3d at 1368; *see also Align Tech., Inc v. 3Shape A/S*, No. 17-1647-LPS, 2020 WL 5979353, *2 (D. Del. Oct. 8, 2020) (denying 3Shape's motion is at *Alice* step one and determining that at step two "it is at least plausible that there is something in the patented invention that might be unconventional, not well-known, or not well-understood . . . [a]t this stage, Align is entitled to all plausible inferences. . . . 3Shape has failed to meet its burden at step 2"). Indeed, Sidekick's factual allegations are to be taken as true, and Plaintiffs have not identified any facts casting aspersions on the veracity of Sidekick's allegations.

In focusing only on claim 1 of the '362 Patent and pointing to conventional computer components and devices disclosed in the shared specification of the Patents-in-Suit, Plaintiffs' Motion erroneously concludes that the four-hundred and five (405) claims of the Patents-in-Suit "are directed to an abstract idea under step one, and add nothing inventive to that idea at step two." Dkt. No. 33-1 (Motion) at 22, 27–30. For example, at least one independent claim of each of the Patents-in-Suit, includes the limitation of "at least one processing device" and according to the Motion, Plaintiffs' construe this claim limitation as an "off-the shelf device." *Id.* at 18–19. However, the "**at least one processing device**" recited by claims of the Patents-in-Suit, may refer to the "**Automobile Market Information Processing System 302**" as shown in Figs. 3A, 3B, and 6 and also described in the shared specification, which is not necessarily an "off-the shelf processor," but a processor that is specifically programed to perform the individual steps recited in the claims. *See e.g.*, Dkt. No. 1-5 ('984 Patent) at cls. 1, 2, 12, 21, 5:67–40, 5:60–6:4. Indeed, the Patents-in-Suit describe this particular processing system as unique to their disclosure, and as such a factual dispute exists *on the current record* with respect to not only how the claim limitations are construed, but also whether the claim elements are "well-understood, routine and conventional to a skilled artisan in the relevant field." *See* Exhibit E, Appeal Brief ('984 Patent) at 17 ("Specifically, [the prior art reference] Nabors discloses a system which does <u>not</u> include the <u>manufacturer</u>

30

affirmatively interacting with the consumer or the dealer by providing a verification, confirmation, or offer as presently claimed.") (emphasis in original); *see also, Berkheimer*, 881 F.3d at 1368 (explaining that concepts may only be found unpatentable as a matter of law when "there is no genuine issue of material fact regarding whether the claim element or claimed combination is well-understood, routine, conventional to a skilled artisan in the relevant field"). What is "well-understood, routine, and conventional" to a skilled artisan in the relevant field is a question of fact and cannot be disposed of at this stage. Sidekick has sufficiently alleged facts within its Counterclaim that the claims of the Patents-in-Suit recite an "inventive concept" and the individual claim elements or combination of elements are not "well-understood, routine and conventional" to a skilled artisan in the relevant field. *See* Dkt. No. 15 (Counterclaims) ¶¶ 51, 65, 79, 93, 107, 121, 134, 147, 160, 173, 186, 199; *see also*, Section III(B). Plaintiffs, the burden-bearing party on this Motion, have submitted **no evidence**, such as expert testimony, as to resolve the factual disputes, i.e., whether the individual claimed elements are "well-understood, routine, conventional to a skilled artisan in the relevant field," and only offers legal conclusions and conclusory attorney arguments. This is plainly insufficient to meet their clear and convincing burden necessary to establish the twelve (12) Patents-in-Suit and their respective four-hundred and five (405) claims, are unpatentable under 35 U.S.C. § 101.

### D. Patent Eligible Subject Matter in Cases with Comparable Claims

The Supreme Court has not established a definitive rule to determine what constitutes an "abstract idea" sufficient to satisfy *Alice* step one; although one way courts often make this determination is by comparing claims at issue to those claims already found to be directed to an abstract idea in previous cases. *Enfish*, 822 F.3d at 1334.

The claims of the Patents-in-Suit are similar to the claims in *Nasdaq*, 2019 WL 102408. *Nasdaq* considered the validity of claims relating to electronic trading technologies and concluded that the '609 Patent claims were "patent eligible because they [were] directed at **resolving an existing technological problem** in extracting and selecting operators in an efficient way in order to **reduce the load on a processor** and to r**educe data dissemination such as bandwidth in a computer system**." *Id.* at *1, 6 (internal quotes omitted) (emphasis added). In finding the claims constituted an improvement to an existing technological process under step one, the court did not reach step two. Similarly, the Patents-in-Suit are directed to "an improvement to an existing technological process." *See* Exhibit B, August 30, 2018 Response to Non-Final Office Action ('720 Patent) at 10 ("The combination of elements in the system results in **improved automobile transaction facilitation and automobile logistics technology** in the automobile industry, enabling more efficient transactions for dealers, consumers, and manufacturers, for example,

32

matching supply to demand to result in more efficient delivery options and shipping of automobiles . . . result[ing] in various **existing computer system improvements**, such as **reducing bandwidth usage** for automobile sellers by implementing the claimed system, due to improved matching of automobile sellers to in-market buyers.") (emphasis added); *see also* Exhibit C, May 21, 2018 Response to Non-Final Office Action ('655 Patent) at 9–10; Exhibit D, September 6, 2018 Response to Non-Final Office Action ('722 Patent) at 10. Thus, like the claims in *Nasdaq*, the claims of the Patents-in-Suit are directed to an **improvement to an existing technological process**, such as **reducing bandwidth usage in the computer system**.

In *eBuddy*, the court considered claims related to "systems and methods of contact list aggregation across computer networks." 2021 U.S. Dist. LEXIS 227815 at *4. Although the court found that the claims in *eBuddy* were directed to an abstract idea at *Alice* step one, the court denied Defendant's motion to dismiss at *Alice* step two. *Id.* at *15, 23. At step two, the court determined that the claims "invoke elements that were known in the art" but "involve the non-conventional and non-generic arrangement of known, conventional pieces" (i.e., an "inventive concept"). *Id.* at *17. For example, Plaintiff explained that the "aggregated contact lists are stored in a separate location from local applications that house or provide access to the individual." *Id.* at *17–18. Plaintiff further explained that this method of storing

33

the aggregated contact lists "amounted to unconventional and inventive technological solutions to technical problems that existed at the time" since it "**reduced the use of the user's computing device and resources** . . . because the user is not required to . . . access multiple web services simultaneously." *Id.* at *18. *See also id.* at *19 ("being able to use just a single connection to obtain all of this aggregated information from the high-level network was a technological solution to the problem that faced devices at that time."). Accepting the Plaintiff's factual allegations as true, the *eBuddy* court denied Defendants' motion to dismiss at step two.

Similarly, the method and system claims of the Patents-in-Suit include claimed elements "involve the non-conventional and non-generic arrangement of known, conventional pieces" (i.e., an "inventive concept"). For example, the specification explains that "[t]he automobile market information processing system 302 may **integrate data received** from" various interfaces and can allow "[t]he dealer interface 306 . . . to interact with automobile market information processing system 302 to **provide the dealer with a wide variety of information**." Dkt. No. 1-13 ('655 Patent) at 6:49–53, 8:26–30. Similar to the claimed invention in *eBuddy*, the Patents-in-Suit provide methods and systems that allow users to access relevant integrated data, though a single user interface, providing solutions to technical problems that existed at the time. In addition, similar to the claims in *eBuddy* and as

34

previously discussed, the claims of the Patents-in-Suit also provide "**computer system improvements**, such as **reducing bandwidth usage** for used automobile sellers by implementing the system (302)." Exhibit C, May 21, 2018 Response to Non-Final Office Action ('655 Patent) at 10.

Consistent with the cases above, the claims of the Patent-in-Suit are patent eligible under both steps of the two-step test set forth by the Supreme Court in *Alice*, 573 U.S. Thus, denial of Plaintiffs' Motion is appropriate.

### E. Plaintiffs Fail to Consider the Claims in Their Totality, Rendering the Cited Authority Inapposite.

Plaintiffs rely primarily on five Federal Circuit decisions, claiming they are dispositive of this matter. Dkt. No. 33-1 (Motion) at 18. Unsurprisingly given Plaintiffs' mischaracterization of the claimed methods and systems, these cases are easily distinguished.

In *Mortgage Grader, Inc. v. First Choice Loan Servs. Inc.*, the Federal Circuit considered claims directed to "systems and methods for assisting borrowers to obtain loans." 811 F.3d 1314, 1317 (Fed. Cir. 2016). At step one the court determined "[t]he claim limitations, analyzed individually and as a whole, recite nothing more than the collection of information to generate a credit grading and to facilitate anonymous loan shopping." *Id.* at 1324 (internal citations omitted). Unlike the claims of the Patents-in-Suit, the claims at issue in *Mortgage Grader* do not "purport[] to improve the functioning of the computer itself or effect an

35

improvement in any other technology or technical field." *Id.* at 1325.  As previously described, claims of the Patents-in-Suit *do* improve the functioning of the computer itself and therefore, are distinguished from the ineligible claims of *Mortgage Grader.  See, e.g.*, Exhibit C, May 21, 2018 Response to Non-Final Office Action ('655 Patent) at 10.

In *OIP Techs. v. Amazon.com*, the Federal Circuit analyzed claims related to "computer-implemented methods for pricing a product for sale."  788 F.3d 1359, 1360 (Fed. Cir. 2015).  In affirming the district court's finding that the claims were ineligible, the court explained "[a]t best, the claims describe the automation of the fundamental economic concept of offer-based price optimization through the use of generic-computer functions" and furthermore "[b]oth the prosecution history and the specification emphasize that the key distinguishing feature of the claims is the ability to automate or otherwise make more efficient traditional price optimization methods." *Id.* at 1363.  As previously described, the Patents-in-Suit *do not* state that the "key distinguishing feature of the claims is the ability to automate" the method or process of buying or selling automobiles.  To the contrary, the common specification clearly sets forth the benefits and improvements of the patented inventions over the then-existing technology and methods.  *See e.g.*, Dkt. No. 1-8 ('075 Patent) at 1:66–2:1 ("The present disclosure provides a new and innovative system, methods and apparatus for providing automobile market information and

facilitating used automobile transactions."); 21:48−52 ("The integration of the various types of automobile market data 506 received from the consumer interface 304, dealer interface 306, and manufacturer interface 308 may provide a synergistic and optimal resource for consumers, dealers, and manufacturers alike."); *see also, id.* at 15:21−28, 20:4−30, 21:48−22:10.

In *buySAFE, Inc. v. Google, Inc.*, the Federal Circuit considered methods "to perform steps for guaranteeing a party's performance of its online transaction." 765 F.3d 1350, 1351 (Fed. Cir. 2014). The court summarized the claimed methods as follows: "(1) a computer operated by the provider of a safe transaction service receives a request for a performance guarantee for an online commercial transaction; (2) the computer processes the request by underwriting the requesting party in order to provide the transaction guarantee service; and (3) the computer offers, via a computer network, a transaction guaranty that binds to the transaction upon closing of the transaction." *Id.* Under step one, the court found the "claims are squarely about creating a contractual relationship—a 'transaction performance guaranty' [and] directed to an abstract idea." *Id.* at 1355. With respect to step two, the court explained "[t]he claims' invocation of computers adds no inventive concept. The computer functionality is generic—indeed, quite limited: a computer receives a request for a guarantee and transmits an offer of guarantee in return." *Id.*

37

The recited elements of the claimed methods and systems of the Patents-in-Suit, as well as the shared specification makes clear that the claimed invention is **unlike** that considered in *buySAFE*. Plaintiffs' assertion that the claims of the Patents-in-Suit are similar to those described in *buySAFE* only reaffirm the unfair oversimplified characterizations made by Plaintiffs.

For the same reasons the claims in *buySAFE* are distinguished, the claims considered in *Voit Techs., LLC v. Del-Ton, Inc.*, are also distinguish. 757 F. App'x 1000 (Fed. Cir. 2019). The claims considered by the court in *Voit* were "directed to the abstract idea of entering, transmitting, locating, compressing, storing, and displaying data (including text and image data) to facilitate the buying and selling of items." *Id.* at 1002. Under step two the court found no inventive concept and explained "Voit has to do more than simply restate the claim limitations and assert that the claims are directed to a technological improvement without an explanation of the nature of that improvement." *Id.* at 1004. For the reasons described above, the claims of the Patents-in-Suit are **not similar** to the claims considered in *Voit*.

Lastly, in *Move, Inc. v. Real Est. All. Ltd.*, the Federal Circuit considered claims directed to "a method for collecting and organizing information about available real estate properties and displaying this information on a digital map that can be manipulated by the user." 721 F. App'x 950, 954 (Fed. Cir. 2018). Under step one the court concluded the representative claims are "devoid of any

38

implementation details or technical description that would permit us to conclude that the claim as a whole is directed to something other than the abstract idea." *Id.*  In addition, the court explained the claims "broadly recite[] the commercial practice of using a computer for locating available real estate properties." *Id.* at 955.  Again, Plaintiffs' allegation that the claims of the Patents-in-Suit are similar or comparable to those considered in *Move*, as well as *buySAFE* and *Voit*, are a result of Plaintiffs' unfair characterization and are improper.

As with the preceding four cases, *Move* is not determinative of the claims of the Patents-in-Suit.

## IV.    CONCLUSION

For the reasons discussed above, Sidekick respectfully requests that this Court deny Plaintiffs' Rule 12(c) Motion.

Dated: January 19, 2022                 Respectfully submitted,

**K&L GATES LLP**

By: <u>s/Loly G. Tor          </u>
     Loly G. Tor
     One Newark Center, Tenth Floor
     Newark, New Jersey 07102
     Phone: (973) 848-4026
     loly.tor@klgates.com

     Benjamin E. Weed (admitted *pro hac vice*)
     Gina A. Johnson (admitted *pro hac vice*)
     K&L GATES LLP
     70 W Madison Street, Suite 3100
     Chicago, IL 60602

39

## REMARKS

This Response is submitted in reply to the Non-Final Office Action dated March 30, 2018. Claims 1 to 34 are currently pending in this application. Claims 1 to 30 stand rejected. Claims 1, 29, and 30 are in independent form. Claims 31 to 34 are newly presented. No new matter has been added as a result of this amendment. Enclosed with this Response is a fee for a two-month extension of time to reply to the Office Action and a Terminal Disclaimer. Entry of the amendment and favorable reconsideration is respectfully requested. Please charge Deposit Account No. 02-1818 for all payments due in connection with this Response.

The Office Action rejected Claims 1 to 30 on the ground of nonstatutory obviousness-type double patenting as allegedly being unpatentable over Claims 1, 2, 5, 6, 8 to 17, 19 to 21, and 23 to 40 of U.S. Patent No. 9,665,897. The Office Action also rejected Claims 1 to 30 on the ground of nonstatutory obviousness-type double patenting as allegedly being unpatentable over Claims 1, 4, 5, 9, 14, 15, 17, and 18 of U.S. Patent No. 9,123,075. The Office Action also rejected Claims 1 to 30 on the ground of nonstatutory obviousness-type double patenting as allegedly being unpatentable over Claims 1 and 4 to 16 of U.S. Patent No. 9,147,216. The Office Action also rejected Claims 1 to 30 on the ground of nonstatutory obviousness-type double patenting as allegedly being unpatentable over Claims 2, 4 to 10, 12, 15 to 17, 19 to 21, and 39 of U.S. Patent No. 9,141,984. The Office Action also rejected Claims 1 to 30 on the ground of nonstatutory obviousness-type double patenting as allegedly being unpatentable over Claims 1 and 16 to 20 of U.S. Patent No. 9,460,467. The Office Action also rejected Claims 1 to 30 on the ground of nonstatutory obviousness-type double patenting as allegedly being unpatentable over Claims 1, 3, 5, 8, 10, 13 to 16, and 19 to 38 of U.S. Patent No. 9,626,704.

Without acquiescing to the merits of these double patenting rejections, and solely for the purposes of advancing the prosecution of this application, Applicant has elected to overcome this ground of rejection through the enclosed Terminal Disclaimers. Such election shall not be deemed an admission as to the propriety or accuracy of the Office Action's conclusions or rejections.

Appl. No. 15/606,733
Response to Office Action dated March 30, 2018

Applicant respectfully submits that the newly presented claims are fully supported by the specification, for example, which explains at paragraph [0051], that a consumer may use the consumer interface to send a claimed first request only by taking a picture of a VIN, which results in a manufacturer response. The claimed first request includes the geolocation information of the consumer, which enables the system to use a new type of request in a new way. The combination of elements in the system results in improved automobile transaction facilitation and automobile logistics technology in the automobile industry, especially when manufacturers match supply to demand to result in more efficient shipping of automobiles. For example, the specification explains part of the technological impact of the present disclosure by stating that "manufacturer interface 308 may provide a manufacturer with a real-time lens into the automobile market which may allow the manufacturer to adjust production schedules, pricing plans, marketing activities, etc., which may provide a significant advantage for manufacturers." Specification, paragraph [0028]. The present disclosure provides new and different ways to match manufacturers to consumers using the consumers' locations relative to in-market dealer areas. In an example, a consumer that only takes a picture of a VIN on a car as the consumer walks down the street may have a manufacturer response that the car can be provided and driving directions to pick it up in minutes. *See, e.g.*, paragraphs [0037] and [0051]. In view of this, the system ultimately may result in various existing computer system improvements, such as reducing bandwidth usage for automobile sellers by implementing the claimed system, due to improved matching of automobile sellers to in-market buyers. Moreover, the present claims result in logistical systems improvements, such as production scheduling and inventory management, and enable more computationally efficient and useable automobile transaction systems, for manufacturers, dealers, and consumers. Thus, the combination of elements presented in the claims produce various desirable results as discussed above. Also, the specification describes aspects of the consumer interface and input devices, such as the use of various inputs other than a picture, such as inputs from a touch screen and barcode scanner, toggling between different viewing options, and describes that interface data (e.g., input data or output data) may be handled by one or more applications. *See, e.g.*, paragraphs [0017], [0039], [0048]. Applicant respectfully submits that the newly presented claims are allowable for at least the same reasons and the indicated allowable independent claims.

Appl. No. 15/606,733
Response to Office Action dated March 30, 2018

Therefore, for at least the reasons provided above, Applicant respectfully submits that all of the pending claims are patentably distinguished over the prior art of record, include an unconventional combination of elements contrary to known industry practices, and are currently in condition for allowance. An earnest endeavor has been made to place this application in condition for formal allowance, and such allowance is courteously solicited. If the Examiner has any questions regarding this Response, Applicant respectfully requests that the Examiner contact the undersigned.

The Commissioner is hereby authorized to charge deposit account 02-1818 for any fees which are due and owing. If any such charges are applied, please indicate Attorney Docket No. 0815637-00020 on the account statement.

Respectfully submitted,

K&L GATES LLP

BY __/Nolan R. Hubbard/_____
    Nolan R. Hubbard
    Reg. No. 62,327
    Customer No. 24573
    (312) 781-6017

Dated: __August 30, 2018_____

Appl. No. 15/284,181
Response to Office Action of December 19, 2017

## REMARKS

This Response is submitted in reply to the Non-Final Office Action dated December 19, 2017.  Claims 1 to 28 are currently pending in this application.  Claims 1 to 20 stand rejected.  Claims 1, 19, and 20 are in independent form.  Claims 1 to 5, 7, 15, 16, and 18 to 20 are hereby amended.  Claims 21 to 28 are newly presented.  No new matter has been introduced as a result of these amendments.  Entry of the amendments and favorable reconsideration is respectfully requested.  Enclosed with this Response is a fee for a two-month extension of time to reply to the Office Action.  Please charge Deposit Account No. 02-1818 for all payments due in connection with this Response.

The Office Action rejected Claims 1 to 20 under 35 U.S.C. 101 as claiming the same invention as that of Claims 1 to 20 of prior U.S. Patent No. 9,460,467 ("the '467 Patent").  The Office Action also rejected Claims 1 to 20 on the ground of nonstatutory obviousness-type double patenting as being unpatentable over Claims 1 to 18 of U.S. Patent No. 9,123,075 and Claims 1 and 4 to 16 of U.S. Patent No. 9,147,216.  Applicant respectfully submits that the present amendments traverse the double patenting rejection under section 101, as discussed below.  Applicant respectfully requests that the nonstatutory ground of rejection be held in abeyance until the statutory rejection under section 101 is resolved and any other double patenting rejection is presented to avoid incomplete resolution of this issue.

Applicant respectfully submits that the rejected Claims 1 to 20 currently differ from claims in the '467 Patent at least in that the presently recited claims do not recite certain limitations recited in Claim 1 of the '467 Patent.  For example, the claims at issue differ in that Claim 1 of the present application does not require "a consumer used automobile seller" as recited in Claim 1 of the '467 Patent.  Instead, the present claims recite a used automobile seller, for example, which may be a manufacturer off-lease seller, as opposed to a consumer seller.  Moreover, the present Claim 1 recites "determine, based on the geolocation information, that the used automobile is located at the first location" which is different than determining the location of the consumer used automobile seller.  Further, for example, dependent Claim 2 presently recites a manufacturer off-lease seller interface, which is not recited in the cited claims of the the '467 Patent.

8

Appl. No. 15/284,181
Response to Office Action of December 19, 2017

As explained in paragraph [0033] of the published application, a manufacturer off-lease seller interface (324) may be included in a manufacturer interface (308).  Although both consumer sellers and manufacturer off-lease sellers may follow a similar process, the manufacturer off-lease seller interface (324) may not provide the same experience as the used automobile consumer seller interface (318).  The present application explains that "[t]ypically, an off-lease automobile may be dropped off by a consumer lessee at any one of a variety of dealer locations. The manufacturer lessor may then wish to sell the used off-lease automobile, however, the dealer where the off-lease automobile was dropped off may have a significant bargaining advantage to purchase that automobile, as the manufacturer may need to sell the off-lease automobile quickly and may have limited options."  Typically, the manufacturer off-lease seller does not have possession of the automobile in contrast to a consumer seller that has possession of the automobile.  Thus, the manufacturer off-lease seller interface (324) may, as explained in the present application, "provide a manufacturer off-lease seller with leverage, not only through the ability to obtain bids to purchase the off-lease automobile, but through the ability to determine the number of matches or search hits for an off-lease automobile.  Paragraph [0034].  The claimed aspects in the present application provide various technological advantages.  The presently claimed used automobile seller interface handles a different type of request with a vehicle identifier and geolocation information of a used automobile to execute and provide both consumer sellers and manufacture off-lease sellers with improved functioning in used automobile sales interfaces.  For example, the request may include a picture of VIN and the geolocation of the used automobile, which enables the system to use this geolocation in a new way.  The system results in improved automobile transaction facilitation and automobile logistics technology, especially when manufacturers match supply to demand to result in more efficient shipping of automobiles.  The specification explains part of the technological impact of the present disclosure by stating that "manufacturer interface 308 may provide a manufacturer with a real-time lens into the automobile market which may allow the manufacturer to adjust production schedules, pricing plans, marketing activities, etc., which may provide a significant advantage for manufacturers."  Published specification, paragraph [0029].  The specification also explains that "manufacturer off-lease sellers may be selling thousands of used off-lease automobiles each month" and "the ability to identify in-market buyers may be particularly advantageous to

9

Appl. No. 15/284,181
Response to Office Action of December 19, 2017

manufacturer off-lease sellers, which may be able to identify matching searches of in-market buyers." Published specification, paragraph [0040], [0059]. The present disclosure describes a new way to match manufacturer off-lease sellers to in-market buyers using geolocation of the used automobile. In view of this, the system ultimately may result in various existing computer system improvements, such as reducing bandwidth usage for used automobile sellers by implementing the system (302), due to improved matching of used automobile sellers to in-market buyers. Moreover, the present claims result in logistical systems improvements and enable more computationally efficient and useable automobile transaction systems, for both consumers and manufacturers. Thus, for at least these reasons, the present claims are different from those of the '467 Patent with respect to the claimed used automobile seller interface and various other ways as presently recited in the claims. Accordingly, Applicant respectfully requests that the present 35 U.S.C. § 101, statutory type double patenting rejections be withdrawn.

Therefore, for at least the reasons provided above, Applicant respectfully submits that all of the pending claims are patentably distinguished over the prior art of record and currently in condition for allowance. An earnest endeavor has been made to place this application in condition for formal allowance, and such allowance is courteously solicited. If the Examiner has any questions regarding this Response, Applicant respectfully requests that the Examiner contact the undersigned.

The Commissioner is hereby authorized to charge deposit account 02-1818 for any fees which are due and owing. If any such charges are applied, please indicate Attorney Docket No. 0815637-00018 on the account statement.

Respectfully submitted,

K&L GATES LLP

BY   /Nolan R. Hubbard/
     Nolan R. Hubbard
     Reg. No. 62,327
     Customer No. 24573
     (312) 781-6017

Dated:   May 21, 2018

10

## REMARKS

This Response is submitted in reply to the Non-Final Office Action dated April 6, 2018. Claims 1 to 33 are currently pending in this application. Claims 1 to 28 stand rejected. Claims 1, 27, and 28 are in independent form. Claims 29 to 33 are newly presented. No new matter has been introduced as a result of these amendments. Entry of the amendments and favorable reconsideration is respectfully requested. Enclosed with this Response is the fee for a two month extension of time and Terminal Disclaimer. Please charge Deposit Account No. 02-1818 for all payments due in connection with this Response.

The Office Action rejected Claims 1 to 28 on the ground of non-statutory obviousness-type double patenting as allegedly being unpatentable over Claims 1, 5,6 , 8, 10, 11, 14 to 18, 20, 21, and 23 to 37 of U.S. Patent No. 9,626,704. The Office Action also rejected Claims 1 to 28 on the ground of non-statutory obviousness-type double patenting as allegedly being unpatentable over Claims 1, 3 to 5, 14, 15, 17, and 18 of U.S. Patent No. 9,123,075. The Office Action also rejected Claims 1 to 28 on the ground of non-statutory obviousness-type double patenting as allegedly being unpatentable over Claims 1, 5 to 7, 12 to 18, 20, 22, 24, and 25 of U.S. Patent No. 9,147,216. The Office Action also rejected Claims 1 to 28 on the ground of non-statutory obviousness-type double patenting as allegedly being unpatentable over Claims 1, 2, 6 to 8, 11 to 17, 19 to 21, and 39 of U.S. Patent No. 9, 141,984. The Office Action also rejected Claims 1 to 28 on the ground of non-statutory obviousness-type double patenting as allegedly being unpatentable over Claims 1, 4 to 6, 15, 16, and 18 to 20 of U.S. Patent No. 9,460,467. The Office Action also rejected Claims 1 to 28 on the ground of non-statutory obviousness-type double patenting as allegedly being unpatentable over Claims 1, 4 to 6, 9 to 13, 20, and 23 to 40 of U.S. Patent No. 9,665,897.

For purposes of advancing the prosecution of this application, and without acquiescing to the merits of the cited patents and claim numbers, Applicant has elected to overcome this ground of rejection through the enclosed Terminal Disclaimers. Such election shall not be deemed an admission as to the propriety or accuracy of the Office Action's conclusions or rejections.

Applicant respectfully submits that the newly presented claims are fully supported by the specification, for example, which explains at paragraph [0050], that an application stored on a mobile device may provide a consumer interface, and the application is configured to send a claimed first request by only taking a picture of a vehicle identification number, to which dealers and manufacturers may respond with information based on this request. The claimed first request includes the geolocation information of the consumer, which enables the system to use a new type of request in a new way. The combination of elements in the system results in improved automobile transaction facilitation and automobile logistics technology in the automobile industry, enabling more efficient transactions for dealers, consumers, and manufacturers, for example, matching supply to demand to result in more efficient delivery options and shipping of automobiles. The present disclosure provides new and different ways to match dealers to consumers using the consumers' locations relative to in-market dealer areas. In an example, a consumer that only takes a picture of a VIN on a car as the consumer walks down the street or at a dealer may have a response from a nearby dealer with driving directions to the pickup location in minutes. *See, e.g.*, paragraphs [0033], [0036], [0039], and [0050]. In view of this, the system ultimately may result in various existing computer system improvements, such as reducing bandwidth usage for automobile sellers by implementing the claimed system, due to improved matching of automobile sellers to in-market buyers. Moreover, the present claims result in logistical systems improvements, such as production scheduling and inventory management, and enable more computationally efficient and useable automobile transaction systems, for manufacturers, dealers, and consumers. Thus, the combination of elements presented in the claims produce various desirable results as discussed above. Also, the specification describes aspects of the consumer interface and input devices, such as the use of various inputs other than a picture, such as inputs from a touch screen and barcode scanner, toggling between different viewing options, and describes that interface data (e.g., input data or output data) may be handled by one or more applications. *See, e.g.*, paragraphs [0017], [0038], [0047]. Applicant respectfully submits that the newly presented claims are allowable for at least the same reasons and the indicated allowable independent claims.

Therefore, for at least the reasons provided above, Applicant respectfully submits that all of the pending claims are patentably distinguished over the prior art of record, include an unconventional combination of elements contrary to known industry practices, and are currently in condition for allowance. An earnest endeavor has been made to place this application in condition for formal allowance, and such allowance is courteously solicited. If the Examiner has any questions regarding this Response, Applicant respectfully requests that the Examiner contact the undersigned.

The Commissioner is hereby authorized to charge deposit account 02-1818 for any fees which are due and owing. If any such charges are applied, please indicate Attorney Docket No. 0815637-00019 on the account statement.

Respectfully submitted,

K&L GATES LLP

BY    /Nolan R. Hubbard/
     Nolan R. Hubbard
     Reg. No. 62,327
     Customer No. 24573
     (312) 781-6017

Dated:    September 6, 2018

modification." MPEP § 2143.01(V) (citing *In re Gordon*, 733 F.2d 900, 221 USPQ 1125 (Fed. Cir. 1984)).

C.     THE REJECTED CLAIMS

There are four independent claims currently on appeal:  independent Claims 1, 2, 22, and 42.  Independent Claims 1 and 2 are generally directed to a method for performing automobile transactions using a manufacturer response.  Independent Claim 22 and is generally directed to a system for performing automobile transactions using a manufacturer response.  Independent Claim 42 and is generally directed to a computer readable medium storing instructions for performing automobile transactions using a manufacturer response.

Claims 2, 22, and 42 stand rejected under 35 U.S.C. § 102(b) as being anticipated by Nabors.  Claim 1 stands rejected under 35 U.S.C. § 103(a) as being unpatentable over Nabors in view of Ellenson.  All pending dependent claims are rejected under 35 U.S.C. § 103(a) as being unpatentable over Nabors as the primary reference, alone or in combination with other references.  Appellants respectfully disagree with these rejections for at least the following reasons.

D.     THE REJECTION OF INDEPENDENT CLAIMS 1, 2, 22, AND 42 UNDER 35 U.S.C. §102(b) SHOULD BE REVERSED BECAUSE THE CITED PRIOR ART FAILS TO DISCLOSE EACH AND EVERY ELEMENT OF INDEPENDENT CLAIMS 1, 2, 22, AND 42

1.     Nabors Does Not Disclose Each And Every Element Recited In Independent Claim 2

In the anticipation rejection of Claim 2, the Final Office Action asserts that Nabors discloses as follows:

provide first automobile market data to the first manufacturer, based on the request, via a manufacturer interface (¶¶ 0046-0047);

receive from the first manufacturer via the manufacturer interface at least one of a verification indicating that the first automobile can

> be provided for the consumer, a confirmation indicating that the first automobile be provided for the consumer and an offer indicating that the firs automobile can be provided for the consumer (¶¶ 0046-0047- note the confirmation is the confirming);

> provide a first manufacturer response via the consumer interface, the first manufacturer response including the at least one of the verification, the confirmation indicating that the first automobile can be provided for the consumer, and the offer indicating that the first automobile can be provided for the consumer (¶ 0046-0047- note the confirmation is the confirming);

Final Office Action, page 3 (emphasis added). However, Appellants respectfully submit that Nabors fails to disclose, at least, "receiving, via a consumer interface, a request for a response indicating whether <u>a first automobile, which is manufactured by a first manufacturer</u>, can be provided; causing at least one processing device to: <u>provide first automobile market data to the first **manufacturer**, based on the request, via a **manufacturer interface**; receive from</u> the first <u>**manufacturer** via the **manufacturer interface**</u>, at least one of a <u>**verification**</u> indicating that <u>the first automobile **can be provided** for the consumer</u>, a <u>**confirmation**</u> indicating that <u>the first automobile **can be provided** for the consumer</u>, and an <u>**offer**</u> indicating that <u>the first automobile **can be provided** for the consumer</u>; <u>provide a first **manufacturer response** via the consumer interface</u>, the first manufacturer response including the at least one of <u>the verification</u> indicating that the first automobile <u>can be provided for the consumer</u>, <u>the confirmation</u> indicating that the first automobile <u>can be provided for the consumer</u>, and <u>the offer</u> indicating that the first automobile <u>can be provided for the consumer</u>" as presently recited in independent Claim 2.

By way of background, Appellants refer to Figure 3 of the present application, which is shown below for convenience.

Appl. No. 13/176,497
Appeal Brief



Fig. 3

As illustrated above, the present application discloses a system that includes a consumer interface 304, a dealer interface 306, and a manufacturer interface 308, which allows consumers, dealers, and manufacturers, to affirmatively interact with each other, rather than passively provide information to the system. For example, this system allows a manufacturer, using the manufacturer interface 308, to provide a response that guarantees that a consumer can actually obtain a specific automobile, in contrast to the cited prior art, in which a manufacturer does not ensure that a consumer can actually obtain the specific automobile. Specifically, Nabors discloses a system which does not include the manufacturer affirmatively interacting with the consumer or the dealer by providing a verification, confirmation, or offer as presently claimed.

Lesley M. Grossberg (N.J. Bar No. 021682008)
John F. Murphy (*pro hac vice* admitted)
Stephanie M. Hatzikyriakou (N.J. Bar No. 080582014)
BAKER & HOSTETLER LLP
1735 Market Street, Suite 3300
Philadelphia, PA 19103
lgrossberg@bakerlaw.com
johnmurphy@bakerlaw.com
shatzikyriakou@bakerlaw.com
Telephone:  215.568.3100
Facsimile:   215.568.3439

Derek M. Freitas (*pro hac vice* admitted)
312 Walnut Street, Suite 3200
Cincinnati, OH 45202-4074
dfreitas@bakerlaw.com
Telephone:  513.929.3400
Facsimile:   513.929.0303

*Attorneys for Plaintiffs*

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY
## NEWARK VICINAGE

| | |
|---|---|
| VROOM, INC.; VROOM AUTOMOTIVE, LLC d/b/a VROOM, d/b/a TEXAS DIRECT AUTO; CARSTORY, LLC; and VAST.COM, INC. d/b/a CARSTORY, <br><br> Plaintiffs, <br><br> v. <br><br> SIDEKICK TECHNOLOGY, LLC, <br><br> Defendant. | C.A. No. 2:21-cv-06737-WJM-JSA <br><br> Judge William J. Martini <br> Magistrate Judge Jessica S. Allen <br><br> **Oral Argument Requested** <br><br> **REPLY BRIEF IN SUPPORT OF PLAINTIFFS' MOTION FOR JUDGMENT ON THE PLEADINGS UNDER RULE 12(c)** <br><br> Motion Date: January 18, 2022* <br><br> **But see* Dkt. 32 at 3 (Reply brief due Feb. 2, 2022). |

generating a valuation report, including a special-purpose valuation server that processes the data and generates the valuation report'"). The Court held the claims ineligible, rejecting the argument that "'Audatex figured out how to combine aspects of multiple prior art systems (such as obtaining a repair cost and a market valuation) into a single integrated architecture for simplifying the process of creating a vehicle valuation report,'" instead finding "the proposed claims are directed to the abstract idea of providing a vehicle valuation through the collection and use of vehicle information." *Id.*

**Human steps.** Second, Sidekick repeatedly argues that the claims cannot be performed by a human without the use of a computer. Opp. 18-22. This entirely misses the point of Plaintiffs' argument. Br. 19-20 (showing how the claim limitations are directly analogous to familiar human activities). All of the § 101 authority relied upon by Plaintiffs involves claims on *computer implementations* of abstract ideas. That the claims are analogous to longstanding human activity is a useful indication that the claims are abstract, even if "human minds are unable to process and recognize the stream of bits" in exactly the same way as a computer. *Content*, 776 F.3d at 1347 (finding computer limitations akin to human activities). Here, as in similar cases, "with the exception of generic computer-implemented steps, there is nothing in the claims themselves that foreclose them from being performed by a human." *Intell. Ventures I LLC v. Symantec Corp.*, 838 F.3d 1307,

1317-18 (Fed. Cir. 2016) (finding email classification system akin to human activities in sorting mail in a mailroom).  Importantly, Sidekick nowhere disputes Plaintiffs' analogy.

Sidekick states, without explanation, that "the use of geolocation data is something that is simply impossible" without computer systems, but this argument does not hold water.  Opp. 6-7.  Geolocation data is simply one's location — an entirely human concept that buyers and sellers have taken into consideration since time immemorial.  Dkt. 1-16 at 7:7-13 (referring to "address or zip code").  Thus, it is no surprise that courts have placed little weight on "geolocation" in the § 101 analysis, even when computer-implemented.  Br. 24-25; *NantWorks, LLC v. Niantic, Inc.*, No. 20-CV-06262-LB, 2021 WL 24850, at *6 (N.D. Cal. Jan. 4, 2021) (collecting cases and finding "[c]ourts have held that a transaction based on location is an abstract idea").

**Improvement to a computer.**  Third, Sidekick argues that the claimed invention improves the relevant technology.  Opp. 16-22.  Sidekick cites to the patents' cryptic discussion of how integration of data leads to "a synergistic and optimal resource" and similar notions (*id.* at 18, 20-21), but, if there is something special about how Sidekick's patents propose to process the market data, that is not *claimed*.  The *claims* (and patents generally) refer to market data in only the vaguest sense (*e.g.*, providing it, basing a price on it), with no limitations on how it

is "integrated." Sidekick cannot rely on such unclaimed details to supply the patent-eligible content because "the important inquiry for a § 101 analysis is to look to the claim." *ChargePoint, Inc. v. SemaConnect, Inc.*, 920 F.3d 759, 766 (Fed. Cir. 2019) ("[R]eliance on the specification must always yield to the claim."); *Am. Axle & Mfg., Inc. v. Neapco Holdings*, 967 F.3d 1285, 1293 (Fed. Cir. 2020) ("[F]eatures that are not claimed are irrelevant as to step 1 or step 2.").

Sidekick also attempts to rely on several statements in the prosecution history of the patents suggesting "computer system improvements." Opp. 18-19 (quoting passages in Sidekick's Exs. B, C, & D). These statements deserve no weight at all, because they were made *by Sidekick*, and not in response to rejections under § 101. Rather, Sidekick was responding to obviousness-type double patenting rejections by filing terminal disclaimers, which requires no argument and has nothing to do with § 101. *Cf. Quad Env't Techs. Corp. v. Union Sanitary Dist.*, 946 F.2d 870, 874 (Fed. Cir. 1991) ("[T]he filing of a terminal disclaimer simply serves the statutory function of removing the rejection of double patenting, and raises neither presumption nor estoppel on the merits of the rejection."). For no apparent reason other than to inject the prosecution history with self-serving statements, Sidekick opined on the advantages of the invention. The Patent Office expressed no agreement or disagreement in response, because there was no reason to respond — the statements were irrelevant and the terminal disclaimers were

filed. And therefore, these statements should be ignored.

Regardless, Sidekick's allegations about its claims improving the function of a computer fall squarely within the Federal Circuit's cases holding that merely improving speed and efficiency is insufficient for § 101, because implementing the abstract idea of Sidekick's claims on a computer will, of course, result in more efficient transactions. Br. 24; *see also Customedia Techs., LLC v. Dish Network Corp.*, 951 F.3d 1359, 1363 (Fed. Cir. 2020) (finding "improved speeds and efficiencies" does not "improve the functionality of the computer itself"); *PersonalWeb Techs. LLC v. Google LLC*, 8 F.4th 1310, 1318 (Fed. Cir. 2021) (holding that efficiency improvements are unpersuasive because they were simply the result of the abstract idea); *Simio, LLC v. FlexSim Software Prod., Inc.*, 983 F.3d 1353, 1361 (Fed. Cir. 2020) ("'[C]laiming the improved speed or efficiency inherent with applying the abstract idea on a computer is insufficient to render the claims patent eligible as an improvement to computer functionality.'" (citation omitted)).

**Alleged fact disputes.** Sidekick also points to several alleged factual disputes: (1) claim construction; (2) performance by a human; and (3) conventionality. Opp. 21. First, because Sidekick failed to make any discernable claim construction argument relating to step one of *Alice*, the issue may be safely ignored. *Simio*, 983 F.3d at 1365 (finding claim construction irrelevant unless

Loly G. Tor
**K&L GATES LLP**
One Newark Center, 10th Fl.
Newark, NJ 07102
P: 973-848-4000
F: 973-848-4001
loly.tor@klgates.com
*Attorneys for Defendant/Counter-Plaintiff*
*Sidekick Technology, LLC*

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| VROOM, INC.; VROOM AUTOMOTIVE, LLC d/b/a VROOM, d/b/a TEXAS DIRECT AUTO; CARSTORY, LLC; and VAST.COM, INC. d/b/a CARSTORY, <br><br> Plaintiffs/Counter-Defendants, <br><br> v. <br><br> SIDEKICK TECHNOLOGY, LLC, <br><br> Defendant/Counter-Claimant. | No.: 2:21-cv-6737-WJM-JSA <br><br> Hon. William J. Martini, U.S.D.J. <br> Hon. Jessica S. Allen, U.S.M.J. <br><br> **NOTICE OF MOTION FOR RECONSIDERATION** |

**PLEASE TAKE NOTICE** that on September 6, 2022, at 9:00 a.m., or as

soon thereafter as counsel may be heard, the undersigned, counsel for

defendant/counter-plaintiff Sidekick Technology, LLC ("Sidekick") shall move

before the Hon. William J. Martini, U.S.D.J., at the Martin Luther King Building &

U.S. Courthouse, 50 Walnut Street, Newark, New Jersey, pursuant to L. Civ. R.

7.1(i) for an order in the form annexed hereto reconsidering the Court's decision to

dismiss Sidekick's Counterclaims with prejudice as set forth in the Court's June 28,

313061133.1

2022 Opinion and Order (ECF Nos. 46 and 47) and instead permitting the Counterclaims to proceed without the need for further amendment.

PLEASE TAKE FURTHER NOTICE that in support hereof, Sidekick relies upon the brief submitted herewith and the pleadings previously filed in this action.

PLEASE TAKE FURTHER NOTICE that Sidekick requests oral argument if this motion is opposed.

PLEASE TAKE FURTHER NOTICE that a proposed form of order is supplied herewith.

Date: July 26, 2022          K&L GATES LLP

By: /s/Loly G. Tor
Loly G. Tor
One Newark Center, Tenth Floor
Newark, New Jersey 07102
Phone: (973) 848-4026
loly.tor@klgates.com

Benjamin E. Weed (admitted pro hac vice)
Gina A. Johnson (admitted pro hac vice)
K&L GATES LLP
70 W Madison Street, Suite 3100
Chicago, IL 60602
Phone: (312) 372-1121
benjamin.weed@klgates.com
gina.johnson@klgates.com

Thomas P. Scrivo
O'TOOLE SCRIVO LLC
14 Village Park Road
Cedar Grove, NJ 07009

313061133.1

Phone: (973) 239-5700
tscrivo@oslaw.com

*Attorneys for Defendant/Counter-Plaintiff*
*Sidekick Technology, LLC*

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| VROOM INC.; VROOM AUTOMOTIVE, LLC d/b/a VROOM, d/b/a TEXAS DIRECT AUTO; CARSTORY, LLC; and VAST.COM, INC. d/b/a CARSTORY, | Case No. 2:21-cv-06737-WJM-JSA |
| Plaintiffs, | Hon. William J. Martini, U.S.D.J. |
| v. | Hon. Jessica S. Allen, U.S.M.J. |
| SIDEKICK TECHNOLOGY, LLC. | |
| Defendant. | |

---

## MOTION FOR RECONSIDERATION PURSUANT TO
## LOCAL CIVIL RULE 7.1(i)[1]

---

### ORAL ARGUMENT REQUESTED

---

| | |
|---|---|
| Thomas Scrivo | Benjamin E. Weed (admitted pro hac vice) |
| O'Toole Scrivo LLC | Gina A. Johnson (admitted pro hac vice) |
| 14 Village Park Road | K&L GATES LLP |
| Cedar Grove, NJ 07009 | 70 W Madison Street, Suite 3100 |
| tscrivo@oslaw.com | Chicago, IL 60602 |
| | Phone: (312) 372-1121 |
| Loly G. Tor | benjamin.weed@klgates.com |
| K&L GATES LLP | gina.johnson@klgates.com |
| One Newark Center, Tenth Floor | |
| Newark, New Jersey 07102 | |
| Phone: (973) 848-4026 | |
| loly.tor@klgates.com | |

*Attorneys for Defendant/Counter-Plaintiff Sidekick Technology, LLC*

---

[1] In the event the Court finds its Opinion (Dkt. 46) and Order (Dkt. 47) constitute a final judgment, we respectfully request that the Court treat this motion as a motion for reconsideration pursuant to Fed. R. Civ. P. 59.

313046906.2

# <u>TABLE OF CONTENTS</u>

**Page**

I. INTRODUCTION ...........................................................................1

II. ARGUMENT....................................................................................3

  A. The Court Failed to Address the Argument that the Claims of
    Ten (10) Patents-In-Suit Were Examined Post-*Alice*. .........................4

  B. The Court Impermissibly Shifted the Burden to Sidekick to
    Demonstrate Patent *Validity*.................................................5

  C. By Disregarding Properly-Pleaded Facts, the Court Made Fact
    Findings in Vroom's Favor in a Rule 12 Motion...............................6

III. CONCLUSION.................................................................................8

Defendant Sidekick Technology, LLC ("Defendant" or "Sidekick") respectfully requests reconsideration of this Court's Opinion (Dkt. 46) and Order (Dkt. 47) granting Plaintiffs Vroom, Inc.'s, Vroom Automotive, LLC's, CarStory, LLC's, and Vast.com's (collectively, "Vroom" or "Plaintiffs") Motion for Judgment on the Pleadings (Dkt. 33, "Motion") pursuant to Local Civil Rule 7.1(i).

## I.    INTRODUCTION

Sidekick acknowledges that reconsideration under Local Civil Rule 7.1(i)[2] is an "extraordinary remedy" to be granted "sparingly." *NL Indus. Inc. v. Commercial Union Ins. Co.*, 935 F. Supp. 513, 516 (D.N.J. 1996). Generally, reconsideration may be granted in three scenarios: (1) when there has been an intervening change in the law; (2) when new evidence has become available; or (3) when necessary to correct a clear error of law or to prevent manifest injustice. *See North River Ins. Co. v. CIGNA Reinsurance Co.*, 52 F.3d 1194, 1218 (3d Cir. 1995); *Carmichael v. Everson,* 2004 WL 1587894, at *1 (D.N.J. May 21, 2004). Local Civil Rule 7.1(i) requires specifically identifying the matter or controlling decisions which the party

---

[2] Local Civil Rule 7.1(i), as opposed to Rule 59(e) of the Federal Rules of Civil Procedure, governs here given that the Court did not enter final judgment on Plaintiffs' claims. (Dkt. 47.) With the Court's consent order extending the due date (Dkt. 49), this filing is timely. Nevertheless, the standards under each Rule are similar, and relief is appropriate under either. *Source Search Techs. v. Kayak Software Corp.*, 2016 WL 73746533, at *2 (D.N.J. Dec. 12, 2016) (Hillman, J.) (*citing Warner v. Twp. of S. Harrison*, 885 F. Supp. 2d 725, 747–48 (D.N.J. 2012)).

believes the Judge or Magistrate Judge has overlooked. *Egloff v. New Jersey Air Nat'l Guard*, 684 F. Supp. 1275, 1279 (D.N.J. 1988). Evidence or arguments available at the time of the original decision generally do not support reconsideration. *Damiano v. Sony Music Entm't, Inc.*, 975 F. Supp. 623, 636 (D.N.J. 1997).

In this case, there is no specific change in the law, though the law of patent eligibility under 35 U.S.C. § 101 is a murky area presently garnering much media, industry, and government attention. Indeed, on June 30, 2022, a mere two days after this Court's Order granting Plaintiffs' Motion to Dismiss, the United States Supreme Court denied *certiorari* in *American Axle & Manufacturing, Inc. v. Neapco Holdings LLC*, 967 F.3d 1285 (Fed. Cir. 2020), *cert. denied*, (___ U.S. ___ June 30, 2022) (No. 20-891)), despite the filing of several *amicus* briefs, one of which was a plea from the Solicitor General for Supreme Court clarification of the state of the law of patent eligibility. One of the questions for which *certiorari* was sought is whether "patent eligibility (at each step of the Court's two-step framework) [is] a question of law for the court based on the scope of the claims or a question of fact for the jury based on the state of art at the time of the patent." Petition for Writ of Certiorari at i, *American Axle & Manufacturing, Inc. v. Neapco Holdings LLC*, ___ U.S. ___ 2020 (No. 20-891).

While there has been no change in the law, the area of law on which this Court's Order (Dkt. 47) was based is plainly one for which the bench and bar are

2

crying out for clarity (*see e.g.*, Brittain, Blake, *U.S. Supreme Court rejects American Axle case on patent eligibility*, REUTERS, June 30, 2022, *available at* https://www.reuters.com/legal/litigation/us-supreme-court-rejects-american-axle-case-patent-eligibility-2022-06-30/*, last accessed* July 26, 2022).  For this reason, Sidekick respectfully submits that the factor relating to an intervening change in the law urges this Court to reconsider its grant of the Motion at least so that Sidekick has the benefit of obtaining discovery and permitting this Court to make a ruling on a full factual and legal record, as opposed to a motion under Rule 12 without the aid of a single shred of expert testimony or factual evidence.

Even if this Court is not persuaded that the uncertainty as to whether patent subject matter eligibility is a pure matter of law is enough, on its face, to warrant reconsideration, Sidekick contends that the Court's treatment of the record on a motion under Rule 12 of the Federal Rules of Civil Procedure impermissibly resolved factual disputes that are evident from the record in Vroom's favor.  Sidekick submits that in trying to address the massive number of claims put into issue by Vroom's declaratory judgment action, the Court made a clear error of law and that reconsideration is appropriate to prevent manifest injustice to Sidekick.

## II.    ARGUMENT

Given the posture of their Motion, Plaintiffs bore the burden of showing each and every claim of the Patents-in-Suit is invalid by clear and convincing evidence.

3

*Microsoft Corp. v. I4I Ltd. P'ship*, 564 U.S. 91, 95 (2011).  Plaintiffs attempted to do that by alleging that *all* claims of *all* twelve (12) Patents-in-Suit "represent minor and legally irrelevant variations" of the same.  (Dkt. No. 33-1 (Motion) at 10).  Plaintiffs' approach caused this Court to make clear errors of law, and reconsideration is warranted to correct manifest injustice, for three reasons:  (1) the Court did not address the fact that ten (10) of the twelve (12) patents-in-suit were prosecuted with the benefit of the Supreme Court's guidance on *Alice Corp. v. CLS Bank Int'l.*, and thus that those patents are entitled to a presumption of validity that cannot be overcome here, (2) the Court impermissibly shifted the burden to Sidekick to prove patent validity, on a claim-by-claim basis, at the pleading stage; and (3) the Court erroneously made fact findings that statements in the pleadings were untrue in finding patent ineligibility, contrary to Rule 12's requirement that the pleadings be taken in the light most favorable to Sidekick.

### A.    The Court Failed to Address the Argument that the Claims of Ten (10) Patents-In-Suit Were Examined Post-*Alice.*

This Court made a clear error of law by failing to acknowledge or address the fact that the United States Patent and Trademark Office examined ten (10) of the twelve (12) patents-in-suit with the benefit of the Supreme Court's guidance in *Alice Corp. v. CLS Bank Int'l*, 573 U.S. 208 (2014).  The Court's Opinion (Dkt. 46) does not make a single reference made to the Examiner, patent prosecution activities, or the United States Patent and Trademark Office.  Yet it is unquestionable that as a

matter of statute, "[a] patent shall be presumed valid" and thus that "[t]he burden of establishing invalidity of a patent or any claim thereof shall rest on the party asserting such invalidity." 35 U.S.C. § 282. This constitutes legal error.[3]

## B. The Court Impermissibly Shifted the Burden to Sidekick to Demonstrate Patent *Validity*

The Court also made manifest legal error by shifting the burden to prove *patent validity* to Sidekick in Footnote 2, in which the Court summarily ruled on all but three claims that were the subject of *Vroom's* motion by indicating that Sidekick had only identified a handful of claims in its opposition to Plaintiffs' Motion. (Dkt. 46 at 4, n. 2). This is particularly problematic where the Local Patent Rules of this Court provide for the very procedure by which Sidekick is to identify the claims it believes are infringed *later in the case*, after the pleading stage. L. Civ. R. 9.3; L. Pat. R. 3.1. In ruling as it did based on the analysis of Footnote 2, the Court faulted Sidekick for failing to set forth detailed infringement contentions in an opposition to a motion under Rule 12 of the Federal Rules of Civil Procedure.

The Court's burden-shifting error is exacerbated by the fact that the very pleading the Court wishes to use to bind Sidekick also outlines several distinguishing

---

[3] The Court's summary ruling on claim construction further underscores its failure to properly consider the prosecution file histories of the patents-in-suit, and remains a reason that denial of the Motion was warranted. (Dkt. 46 at 15). Nevertheless, Sidekick has focused its arguments here on the arguments that presented the clearest error and demonstrated the most manifest injustice, and reserves its rights on appeal of the Opinion and Order to the Court of Appeals for the Federal Circuit.

limitations added by several dependent claims.  (Dkt. 35 at 25-27).  From Sidekick's read of the Court's Opinion, however, it appears that the Court dealt with those arguments only in Footnote 2; Sidekick cannot find reference to the limitations articulated in its opposition, nor can it find discussion of "dependent claims" outside of the second footnote to the Court's opinion.[4]

These aspects of the Court's Opinion indicate that contrary to the posture of the Motion, the Court shifted the burden to Sidekick to prove patent validity, and faulted Sidekick for the fact that the case has not yet progressed to the stage of Sidekick providing fulsome infringement contentions to Vroom.  Fundamentally, by disposing of this case at the pleadings stage, and by doing so while ignoring the majority of the claims which the Court has now adjudged are invalid, the Court committed legal error and the outcome is manifestly unfair.

**C.    By Disregarding Properly-Pleaded Facts, the Court Made Fact Findings in Vroom's Favor in a Rule 12 Motion.**

As Sidekick noted in its Opposition, the court must "accept all factual allegations as true, construe the complaint in the light most favorable to the plaintiff,

---

[4] Should the Court be so inclined, Sidekick submits that denial of Vroom's Motion with respect to the addressed dependent claims (*i.e.*, claims 8, 10-12, 15, 17, 20-21, 26-29, 51-52, and 57-59 of the '362 Patent, claim 18 of the '897 Patent, claims 3, 20, and 35 of the '925 Patent, and claim 7 of the '075 Patent) would be a satisfactory intermediate result, with future review of the claims without those limitations being reserved for the Court of Appeals for the Federal Circuit, if needed, and hopefully with further guidance from the United States Supreme Court.

6

and determine whether, under any reasonable reading of the complaint, the [non-moving party] may be entitled to relief." *Fowler v. UPMC Shadyside*, 578 F.3d 203, 210 (3d Cir. 2009) (citations omitted). Sidekick respectfully submits that the Court did not abide by this guiding principle, and thus committed legal error.

Emblematic of the Court's error in this regard is its handling of "Defendant's argument that the Patents-in-Suit improve existing technology…" (Dkt. 46 at 12). In particular, the Court held that "Defendant cites only conclusory statements…" regarding the new and innovative techniques described and claimed in the Patents-in-Suit. *Id.* (*Alice* Step One Analysis); *id.* at 13 (*Alice* Step Two Analysis). The Court in analyzing *Alice* Step Two went found, as a matter of fact, that "elements, such as the limitation with respect to inventoryless bidding or inclusion of a manufacturer response are simply insignificant additional steps in the automobile transaction process." *Id*. at 13. There is no factual support for this conclusion in the record; to the contrary, the limited fact record contains these exact statements and thus supports the exact opposite conclusion.[5]

Defendant respectfully submits that the Court's position that these statements

---

[5] The Court's approach underscores the impropriety of failing to consider the patent prosecution activity that led to the Patents-in-Suit, addressed in Section II.A above. Sidekick cited to passages of the file history that *convinced the Examiner to allow* the Patents-in-Suit (Dkt. 35 at 19), and ultimately provide part of the factual record as to why a presumption of validity, including under 35 U.S.C. § 101, is appropriate.

7

are conclusory, and not factually accurate, is contrary to the mandate that the Court accept all factual allegations as true. *Fowler*, 578 F.3d at 210. Indeed, the allegations Defendant cited in its brief come straight from the disclosures of the patents-in-Suit (*see, e.g.*, Dkt. 35 at 9-10) and this Court choosing to disregard them amounts to impermissible fact-finding in favor of the Rule 12 movant.

## III.   CONCLUSION

For the reasons discussed above, Sidekick respectfully requests that this Court Reconsider its Order Granting Plaintiffs' Rule 12(c) Motion and enter an order denying Plaintiffs' Rule 12(c) Motion.

Dated: July 26, 2022                      Respectfully submitted,

**K&L GATES LLP**

By: /s/Loly G. Tor
Loly G. Tor
One Newark Center, Tenth Floor
Newark, New Jersey 07102
Phone: (973) 848-4026
loly.tor@klgates.com

Benjamin E. Weed (admitted *pro hac vice*)
Gina A. Johnson (admitted *pro hac vice*)
**K&L GATES LLP**
70 W Madison Street, Suite 3100
Chicago, IL 60602
Phone: (312) 372-1121
benjamin.weed@klgates.com
gina.johnson@klgates.com

Thomas P. Scrivo
**O'TOOLE SCRIVO LLC**

8

14 Village Park Road
Cedar Grove, NJ 07009
Phone: (973) 239-5700
tscrivo@oslaw.com

*Attorneys for Defendant/Counter-Plaintiff*
*Sidekick Technology, LLC*

9

## <u>CERTIFICATE OF SERVICE</u>

The undersigned hereby certifies that a true and correct copy of the above document was served on July 26, 2022 to all counsel of record via the Court's CM/ECF filing system.

<u>*s/Loly G. Tor*</u>
Loly G. Tor

Loly G. Tor
**K&L GATES LLP**
One Newark Center, 10th Fl.
Newark, NJ 07102
P: 973-848-4000
F: 973-848-4001
loly.tor@klgates.com
*Attorneys for Defendant/Counter-Plaintiff*
*Sidekick Technology, LLC*

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| VROOM, INC.; VROOM AUTOMOTIVE, LLC d/b/a VROOM, d/b/a TEXAS DIRECT AUTO; CARSTORY, LLC; and VAST.COM, INC. d/b/a CARSTORY, | No.: 2:21-cv-6737-WJM-JSA |
| | Hon. William J. Martini, U.S.D.J. |
| Plaintiffs/Counter-Defendants, | Hon. Jessica S. Allen, U.S.M.J. |
| v. | **ORDER** |
| SIDEKICK TECHNOLOGY, LLC, | |
| Defendant/Counter-Claimant. | |

**THIS MATTER** having been brought before the court by defendant/counter-plaintiff Sidekick Technology, LLC ("Sidekick"), by its counsel K&L Gates LLP, seeking an order reconsidering the Court's June 28, 2022 Opinion and Order dismissing Sidekick's Counterclaims with prejudice (ECF Nos. 46 and 47), the Court having considered the moving papers, any timely opposition thereto, and oral argument, if any, and good cause having been shown,

**IT IS** on the _____ day of _____, 2022

313060930.1

**ORDERED** that the Motion for Reconsideration be and hereby is **GRANTED**; and it is further

**ORDERED** that the Court's June 28, 2022 Opinion and Order dismissing Sidekick's Counterclaims with prejudice (ECF Nos. 46 and 47) are hereby vacated, and Sidekick's Counterclaims are reinstated and shall proceed without the need for further amendment.

_____

  Hon. William J. Martini, U.S.D.J.

313060930.1

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF NEW JERSEY

|  |  |
|---|---|
| VROOM, INC.; VROOM AUTOMOTIVE, LLC d/b/a VROOM, d/b/a TEXAS DIRECT AUTO; CARSTORY, LLC; and VAST.COM, INC. d/b/a CARSTORY,<br><br>**Plaintiffs,**<br><br>v.<br><br>**SIDEKICK TECHNOLOGY, LLC,**<br><br>**Defendant.** | Case No.: 2:21-cv-06737-WJM-JSA<br><br>**OPINION** |

### WILLIAM J. MARTINI, U.S.D.J.:

Plaintiffs Vroom, Inc., Vroom Automotive, LLC d/b/a Texas Direct Auto, CarStory, LLC, and Vast.com, Inc. d/b/a CarStory (collectively, "Vroom" or "Plaintiffs") brought this declaratory judgment action against defendant Sidekick Technology, LLC ("Sidekick" or "Defendant") seeking a declaration that they do not infringe certain of Sidekick's patents. This matter comes before the Court on Defendant's motion for reconsideration (the "Motion") of the Court's June 2022 opinion and order granting Plaintiffs' motion for judgment on the pleadings pursuant to Rule 12(c) of the Federal Rules of Civil Procedure. ECF No. 52. There was no oral argument. Fed. R. Civ. P. 78(b). For the reasons set forth below, Defendant's Motion is **DENIED**.

## I.    BACKGROUND

The Court assumes the parties' familiarity with the facts of the instant case and will summarize below only those facts relevant to the instant motion. On June 28, 2022, this Court granted Plaintiffs' motion for judgment on the pleadings and dismissed with prejudice Defendant's counterclaims. The Court held that, through an analysis of representative claims, each of the patents-in-suit were directed towards ineligible subject matters under § 101 of the Patent Act. 35 U.S.C. § 101. Specifically, the Court found that the representative claims were "directed to the abstract idea of collecting and using automobile market and user data to facilitate automobile transactions and fail[ed] to include any inventive concept that sufficiently transforms that abstract idea into a patent eligible application." *Vroom Inc. v. Sidekick Tech., LLC*, No. 2:21-cv-06737-WJM-JSA, 2022 U.S. Dist. LEXIS 113916, at *34-35 (D.N.J. June 27, 2022)

Defendant now moves for reconsideration, arguing first that the murkiness of patent eligibility coupled with the Supreme Court's denial of *certiorari* in *American Axle & Manufacturing, Inc. v. Neapco Holdings LLC*, 967 F.3d 1285 (Fed. Cir. 2020), *cert. denied*,

(142 S. Ct. 2902) (2022) should compel this Court to reconsider its June 2022 Opinion. Defendant next argues that the Court made a clear error of law by failing to address the United States Patent and Trademark Office's ("PTO") examination of 10 of the 12 patents at issue, impermissibly shifting the burden to Defendant to demonstrate patent validity, and making factual findings in Plaintiffs' favor in a Rule 12 motion.

Plaintiffs oppose reconsideration, arguing that Defendant lacks a valid ground for reconsideration because it conceded that there has been no specific change in the law of patent eligibility. Plaintiffs then argue that the substance of the Court's June 2022 Opinion was correct, specifically that the record before the PTO is irrelevant, the Court did not make an error with respect to the burden of proof, and the Court correctly held that it is not obligated to give weight to Defendant's conclusory statements.

## II.    LEGAL STANDARD

"A motion for reconsideration is properly treated as a motion under Rule 59(e) . . . to alter or amend the judgment." *Koshatka v. Phila. Newspapers, Inc.*, 762 F.2d 329, 333 (3d Cir. 1985). "[A] judgment may be altered or amended if the party seeking reconsideration shows at least one of the following grounds: (1) an intervening change in the controlling law; (2) the availability of new evidence that was not available when the court granted the motion . . .; or (3) the need to correct a clear error of law or fact or to prevent manifest injustice." *Max's Seafood Cafe ex rel. Lou-Ann, Inc. v. Quinteros*, 176 F.3d 669, 677 (3d Cir. 1999).

"The word 'overlooked' is the operative term in [Rule 7.1(i)]." *Lentz v. Mason*, 32 F. Supp. 2d 733, 751 (D.N.J. 1999) (citation omitted). "Only dispositive factual matters and controlling decisions of law which were presented to the court but not considered on the original motion may be the subject of a motion for reconsideration." *Id*. (quotation and citation omitted). "[S]uch motions are not an opportunity to argue what could have been, but was not, argued in the original set of moving and responsive papers." *Id*. (quotation and citation omitted).

## III.    DISCUSSION

Defendant moves under the clear error of law or manifest injustice rationale. The Court briefly addresses each of Defendant's arguments, but ultimately finds that Defendant does not raise any clear errors of law that warrant reconsideration.

### A. Defendant Does Not Cite to a Specific Change in the Law

First, Defendant concedes that "[i]n this case, there is no specific change in the law." Defendant's Motion for Reconsideration ("Def.'s Motion"), at 2, ECF No. 52. However, Defendant then goes on to suggest that the area of law on which this Court's June 2022 Opinion was based is "plainly one for which the bench and bar are crying out for clarity." *Id*. at 2-3. Clarity is an improper ground for a motion for reconsideration. *See Quinteros*, 176 F.3d 669, 677.

## B. The Court's Opinion Need Not Reference the Examiner, Patent Prosecution Activities, or the PTO

Defendant next argues that this Court's failure to acknowledge or address the PTO's examination of 10 of the 12 patents-in-suit constitutes legal error. In support of this, Defendant states that the Court's opinion did not reference "the Examiner, patent prosecution activities, or the United States Patent and Trademark Office." Def.'s Motion at 4-5. However, Defendant does not cite to a single case that would purport to require the Court to affirmatively address such facts. The Court is not persuaded by Defendant's suggestion that it must defer to the determination of the Patent Examiner concerning patent eligibility under § 101. *See Beteiro, LLC v. BetMGM, LLC*, No. 1:21-cv-20156, 2022 U.S. Dist. LEXIS 161156, at *25 (D.N.J. Sep. 7, 2022) (declining to defer to the determination of the Patent Examiner concerning patent eligibility under *Alice*); *Fitbit Inc. v. AliphCom*, No. 16-00118, 2017 U.S. Dist. LEXIS 115203, at *2 (N.D. Cal. July 24, 2017) ("An examiner's statements about a patent are not themselves evidence of the patent's validity.") Similarly, a court need not afford weight to prosecution histories, as opposed to final written decisions in *inter partes* review proceedings, in the analysis of patent eligibility. *See Interactive Wearables, LLC v. Polar Electro Oy*, 501 F. Supp. 3d 162, 183 (E.D.N.Y. 2020).

## C. The Court Did Not Shift the Burden of Proof to Defendant

Defendant next argues that the Court impermissibly shifted the burden of proof to Defendant to prove patent validity by designating a representative claim. Courts have routinely upheld the use of representative claims in determining patent eligibility under § 101. *See Content Extraction and Transmission LLC v. Wells Fargo Bank, N.A.*, 776 F.3d 1343, 1348 (Fed. Cir. 2014); *See, e.g.*, *Elec. Power Grp., LLC v. Alstrom S.A.*, 830 F.3d 1350, 1351 (Fed. Cir. 2016) (treating one claim as representative of sixteen asserted claims across three patents). Defendant itself suggested representative claims are needed as to each of the three separate patent lineages which comprised the patents-in-suit. *See Vroom Inc. v. Sidekick Tech., LLC*, 2022 U.S. Dist. LEXIS 113916, at *7 (D.N.J. June 27, 2022). The Court previously considered, and disagreed with, Defendant's argument that independent analysis of eligibility with respect to all four-hundred and five claims is necessary. *Id.* at n.2. Having already considered this issue in the original motion, the Court finds Defendant failed to raise a proper ground for reconsideration. *Lentz v. Mason*, 32 F. Supp. 2d 733, 751 (D.N.J. 1999) ("Only dispositive factual matters and controlling decisions of law which were presented to the court but not considered on the original motion may be the subject of a motion for reconsideration.")

## D. Defendant's Assertions Concerning the Court Making Factual Findings in Favor of Plaintiff is Misplaced

Finally, Defendant argues that the Court erred by disregarding properly pleaded facts and making factual findings in favor of Plaintiff. Defendant relies on the Court's finding that "elements, such as the limitation with respect to inventoryless bidding or inclusion of a manufacturer response are simply insignificant additional steps in the

automobile transaction process" in support. *Sidekick Tech., LLC*, U.S. Dist. LEXIS 113916, at *29. Defendant's contention is couched in a misreading of the Court's opinion. As a preliminary matter, the Court need not give weight to conclusory statements void of plausible factual allegations. *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). The Court addressed Defendant's various arguments against finding that the claims of the patents-in-suit were directed to an abstract idea. First, the Court found that the claimed steps and processes were no more than the computerized method of performing the basic and essential steps of an automobile transaction, insufficient to render the claims less abstract. *See Intellectual Ventures I LLC v. Capital One Bank (USA)*, 792 F.3d at 1370 (Fed. Cir. 2016) ("Steps that do nothing more than spell out what it means to 'apply it on a computer' cannot confer patent-eligibility") (internal quotations omitted). Second, the Court found that the patents-in-suit did not improve existing technology for two reasons: 1) Defendant only cited to conclusory statements in support and, 2) "even if the Court were to accept Defendant's assertions, they describe only the sort of data synthesis and improved efficiency that courts have regularly found insufficient to render a claim nonabstract." *Sidekick Tech., LLC*, U.S. Dist. LEXIS 113916, at *26. Finally, in applying step two of the *Alice* test, this Court found that the elements of the patent claims failed to recite a sufficiently inventive concept to confer patent eligibility. In so finding, this Court noted that Defendant again relied on conclusory statements that the claimed systems and methods were "new and innovative" or offer "a synergistic and optimal resource" for users. Furthermore, this Court found that the additional steps in the automobile transaction process such as "inventoryless bidding" or "inclusion of a manufacturer response" were insignificant in limiting the abstract idea or adding to it an inventive concept. *See, e.g.*, *Content Extraction and Transmission LLC v. Wells Fargo Bank, N.A.*, 776 F.3d 1343, 1349 (Fed. Cir. 2014) (dependent claims reciting additional steps such as optical character recognition technology were insufficient to render claim patent eligible); *Elec. Power Grp., LLC v. Alstom S.A.*, 830 F.3d 1350, 1355 (Fed. Cir. 2016) (collection and display of real-time data not inventive concept). Accordingly, the Court finds that Defendant does not raise any clear legal or factual errors or issues of manifest injustice that warrant reconsideration. Defendant's motion, therefore, is **DENIED**.

## IV.    CONCLUSION

For the reasons set forth above, Defendant's Motion for reconsideration is **DENIED**. An appropriate order follows.

/s/ William J. Martini
**William J. Martini, U.S.D.J.**

**Date: October 17, 2022**

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| **VROOM, INC.; VROOM AUTOMOTIVE, LLC d/b/a VROOM, d/b/a TEXAS DIRECT AUTO; CARSTORY, LLC; and VAST.COM, INC. d/b/a CARSTORY,** | Civ. No. 2:21-cv-06737-WJM-JSA |
| **Plaintiffs,** | **ORDER** |
| **v.** | |
| **SIDEKICK TECHNOLOGY, LLC,** | |
| **Defendant.** | |

**THIS MATTER** comes before the Court on defendant Sidekick Technology, LLC's ("Defendant") motion for reconsideration, ECF No. 52. For the reasons set forth in the accompanying Opinion, **IT IS** on this 17th day of October 2022, **ORDERED** as follows:

1. Defendants' motion for reconsideration is **DENIED**.

　　　　　　　　　　　　　　　/s/ William J. Martini
　　　　　　　　　　　　　　**WILLIAM J. MARTINI, U.S.D.J.**

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| VROOM, INC.; VROOM AUTOMOTIVE, LLC d/b/a VROOM, d/b/a TEXAS DIRECT AUTO; CARSTORY, LLC; and VAST.COM, INC. d/b/a CARSTORY, | Civ. No. 2:21-cv-06737-WJM-JSA |
| **Plaintiffs,** | **ORDER** |
| v. | |
| SIDEKICK TECHNOLOGY, LLC, | |
| **Defendant.** | |

**THIS MATTER** comes before the Court on defendant Sidekick Technology, LLC's ("Defendant") motion for entry of judgment or, in the alternative, certifying legal issue for interlocutory appeal. ECF No. 62. The Court having reviewed the parties' briefings, ECF Nos. 62, 64, & 65, and for good cause shown; the Court notes that its previous June 28, 2022 Order, ECF No. 47, granted plaintiff Vroom, Inc.'s ("Plaintiff") motion for judgment on the pleadings and dismissed Defendant's counterclaims as an invalid patent cannot be infringed. It further appearing that the Court, having already entered final judgment on the merits, **IT IS** on this 20th day of March 2023, **ORDERED** that Defendant's motion for entry of judgment is **DENIED**.

_____
WILLIAM J. MARTINI, U.S.D.J.

Loly G. Tor
K&L GATES LLP
One Newark Center
Tenth Floor
Newark, New Jersey 07102
Phone: (973) 848-4026
loly.tor@klgates.com

Benjamin E. Weed (admitted *pro hac vice*)
Gina A. Johnson (admitted *pro hac vice*)
K&L GATES LLP
70 W. Madison Street, Suite 3100
Chicago, IL 60602
Phone: (312) 372-1121
benjamin.weed@klgates.com
gina.johnson@klgates.com

*Attorneys for Defendant/Counter-Plaintiff*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| VROOM, INC.;<br>VROOM AUTOMOTIVE, LLC d/b/a<br>VROOM, d/b/a<br>TEXAS DIRECT AUTO;<br>CARSTORY, LLC; and<br>VAST.COM INC. d/b/a CARSTORY,<br><br>       Plaintiffs,<br><br>   v.<br><br>SIDEKICK<br>TECHNOLOGY, LLC,<br><br>       Defendant. | Case No. 2:21-cv-06737-WJM-JSA<br><br>Hon. William J. Martini, U.S.D.J.<br>Hon. Jessica S. Allen, U.S.M.J.<br><br>**DEFENDANT'S NOTICE OF<br>APPEAL**<br><br><br><br>*Document Electronically Filed* |

1

Notice is given that Defendant Sidekick Technology, LLC, pursuant to 28 U.S.C. §§ 1291 and 1447(d), appeals to the United States Court of Appeals for the Federal Circuit from two orders and their respective memorandum opinions: (1) the Order granting Plaintiffs' Motion for Judgment on the Pleadings by All Plaintiffs, ECF No. 47, and corresponding memorandum opinion, ECF No. 46, both entered in this action on June 28, 2022, and (2) the Order denying Defendant's Motion for Reconsideration of the Court's Order granting Plaintiffs' Motion for Judgment on the Pleadings by All Plaintiffs, ECF No. 58, and corresponding memorandum opinion, ECF No. 57, both entered in this action on October 18, 2022.

Respectfully submitted,

K&L GATES LLP

Dated: January 4, 2023

By: */s/ Loly G. Tor*_____
Loly G. Tor
 loly.tor@klgates.com
One Newark Center, Tenth Floor
Newark, New Jersey 07102
P: (973)848-4026
F: (973) 848-4000

Benjamin E. Weed (admitted *pro hac vice*)
 benjamin.weed@klgates.com
Gina A. Johnson (admitted *pro hac vice*)
 gina.johnson@klgates.com
K&L GATES LLP
70 W. Madison Street, Suite 3100
Chicago, IL 60602
Telephone: (312) 372-1121
Facsimile: (312) 827-8000
*Attorneys for Defendant/Counter-Plaintiff*

2

Loly G. Tor
K&L GATES LLP
One Newark Center
Tenth Floor
Newark, New Jersey 07102
Phone: (973) 848-4026
loly.tor@klgates.com

Benjamin E. Weed (admitted *pro hac vice*)
Gina A. Johnson (admitted *pro hac vice*)
K&L GATES LLP
70 W. Madison Street, Suite 3100
Chicago, IL 60602
Phone: (312) 372-1121
benjamin.weed@klgates.com
gina.johnson@klgates.com

*Attorneys for Defendant/Counter-Plaintiff*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| VROOM, INC.;<br>VROOM AUTOMOTIVE, LLC d/b/a<br>VROOM, d/b/a<br>TEXAS DIRECT AUTO;<br>CARSTORY, LLC; and<br>VAST.COM INC. d/b/a CARSTORY,<br><br>Plaintiffs,<br><br>v.<br><br>SIDEKICK<br>TECHNOLOGY, LLC,<br><br>Defendant. | Case No. 2:21-cv-06737-WJM-JSA<br><br>Hon. William J. Martini, U.S.D.J.<br>Hon. Jessica S. Allen, U.S.M.J.<br><br>**CERTIFICATE OF SERVICE** |

1

314396495.1

I hereby certify that on this date I caused a copy of foregoing Notice of Appeal and this Certificate of Service to be filed with the Court and served on all counsel of record via the Court's CM/ECF system.

I declare under penalty of perjury that the foregoing is true and correct.

Dated: January 4, 2023

*/s/ Loly G. Tor*_____

Loly G. Tor
loly.tor@klgates.com
K&L GATES LLP
One Newark Center, Tenth Floor
Newark, New Jersey 07102
P: (973)848-4026
F: (973) 848-4000

Loly G. Tor
**K&L GATES LLP**
One Newark Center, 10th Fl.
Newark, NJ 07102
P: 973-848-4000
F: 973-848-4001
loly.tor@klgates.com
*Attorneys for Defendant/Counter-Plaintiff*
*Sidekick Technology, LLC*

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| VROOM, INC.; VROOM AUTOMOTIVE, LLC d/b/a VROOM, d/b/a TEXAS DIRECT AUTO; CARSTORY, LLC; and VAST.COM, INC. d/b/a CARSTORY,<br><br>    Plaintiffs/Counter-Defendants,<br><br>       v.<br><br>SIDEKICK TECHNOLOGY, LLC,<br><br>    Defendant/Counter-Claimant. | No.: 2:21-cv-6737-WJM-JSA<br><br>Hon. William J. Martini, U.S.D.J.<br>Hon. Jessica S. Allen, U.S.M.J.<br><br>**NOTICE OF DEFENDANT'S MOTION FOR ENTRY OF FINAL JUDGMENT AND IN THE ALTERNATE MOTION FOR CERTIFICATION** |

**PLEASE TAKE NOTICE** that on February 6, 2023, at 9:00 a.m., or as soon thereafter as counsel may be heard, the undersigned, counsel for defendant/counter-plaintiff Sidekick Technology, LLC ("Sidekick") shall move before the Hon. William J. Martini, U.S.D.J., at the Martin Luther King Building & U.S. Courthouse, 50 Walnut Street, Newark, New Jersey, for an order in the form annexed hereto either (1) entering final judgment on Sidekick's counterclaims based on the Court's June 28, 2022 Opinion and Order (ECF Nos. 46 and 47) or, in the alternative, (2)

314398504.1

certifying the legal issue, stated in the order annexed hereto, for interlocutory appeal pursuant to 28 U.S.C. § 1292(b)

**PLEASE TAKE FURTHER NOTICE** that in support hereof, Sidekick relies upon the brief submitted herewith and the pleadings previously filed in this action.

**PLEASE TAKE FURTHER NOTICE** that Sidekick requests oral argument if this motion is opposed.

**PLEASE TAKE FURTHER NOTICE** that a proposed form of order is supplied herewith.

Date:  January 4, 2023         **K&L GATES LLP**

By: /s/Loly G. Tor
Loly G. Tor
One Newark Center, Tenth Floor
Newark, New Jersey 07102
Phone: (973) 848-4026
loly.tor@klgates.com

Benjamin E. Weed (admitted pro hac vice)
Gina A. Johnson (admitted pro hac vice)
**K&L GATES LLP**
70 W Madison Street, Suite 3100
Chicago, IL 60602
Phone: (312) 372-1121
benjamin.weed@klgates.com
gina.johnson@klgates.com

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| VROOM, INC.; VROOM AUTOMOTIVE, LLC d/b/a VROOM, d/b/a TEXAS DIRECT AUTO; CARSTORY, LLC; and VAST.COM, INC. d/b/a CARSTORY, | Case No. 2:21-cv-06737-WJM-JSA |
| Plaintiffs/Counter-Defendants, | Hon. William J. Martini, U.S.D.J. Hon. Jessica S. Allen, U.S.M.J. |
| v. | |
| SIDEKICK TECHNOLOGY, LLC, | *Document Electronically Filed* |
| Defendant/Counter-Claimant. | |

## DEFENDANT'S BRIEF IN SUPPORT OF MOTION FOR ENTRY OF FINAL JUDGMENT AND IN THE ALTERNATE MOTION FOR CERTIFICATION
## MOTION DAY: FEBRUARY 6, 2023

Loly G. Tor
K&L GATES LLP
One Newark Center, Tenth Floor
Newark, New Jersey 07102
Phone: (973) 848-4026
loly.tor@klgates.com

Benjamin E. Weed (admitted *pro hac vice*)
Gina A. Johnson (admitted *pro hac vice*)
K&L GATES LLP
70 W. Madison Street, Suite 3100
Chicago, IL 60602
Phone: (312) 372-1121
benjamin.weed@klgates.com
gina.johnson@klgates.com
*Attorneys for Defendant/Counter-Plaintiff*

314398300.1

## I. INTRODUCTION

Defendant Sidekick Technology, LLC ("Sidekick") moves for entry of final judgment on its counterclaims that were dismissed with prejudice in the Court's June 28, 2022 Order (the "Order").  (ECF No. 47).  In the alternate, Sidekick moves the Court to certify for interlocutory appeal pursuant to 28 U.S.C. § 1292(b) the issue of whether the Court can resolve what elements are "new" for the purposes of Step 2 of *Alice* on a motion pursuant to Rule 12(c).

## II. FACTUAL BACKGROUND

On December 22, 2021, Plaintiffs[1] filed a Motion for Judgment on the Pleadings by All Plaintiffs ("Motion").  (ECF No. 33).  In their Motion, "Plaintiffs respectfully request[ed] that the Court grant Plaintiffs' motion for judgment on the pleadings under Fed. R. Civ. P. 12(c) and dismiss Sidekick's counterclaims with prejudice."  (ECF No. 33-1 at 40).  The Court entered an Order (ECF No. 47) and Opinion (ECF No. 46) granting the Plaintiffs' requested relief.  In the course of resolving the Plaintiffs' Motion, the Court disregarded statements in the pleadings as "conclusory" and therefore did not view the evidence in light most favorable to Sidekick when resolving Step 2 of *Alice*.  (*See* ECF No. 46 at 13).  Based on the

---

[1] The Plaintiffs in this action are Vroom, Inc., Vroom Automotive, LLC d/b/a Vroom, d.b.a Texas Direct Auto; Carstory, LLC; AND Vast.com, Inc. d/b/a Carstory.

Court's findings, the Court dismissed with prejudice Sidekick's counterclaims. (ECF No. 47).

Critically, the Order is silent on the disposition of the Plaintiffs' Counts I-XII seeking a declaration of non-infringement of the various patents-in-suit.

## III. LEGAL STANDARD

### A.    Entry of Final Judgment

"[Rule] 54(b) provides a mechanism for rendering a partial final judgment as to some, but not all, parties or claims in a single action." *Hill v. City of Scranton*, 411 F.3d 118, 124 (3d Cir. 2005).  "When an action presents more than one claim for relief . . ., the court may direct entry of a final judgment as to one or more, but fewer than all, claims or parties only if the court expressly determines that there is no just reason for delay."  Fed. R. Civ. P. 54(b).  "A decision to certify a final decision under Rule 54(b) involves two separate findings: (1) there has been a final judgment on the merits, i.e., an ultimate disposition on a cognizable claim for relief; and (2) there is no just reason for delay." *Berckeley Inv. Grp., Ltd. v. Colkitt*, 455 F.3d 195, 202 (3d Cir. 2006) (internal quotation marks omitted); *see also Pet Gifts USA, LLC v. Imagine This Co.*, No. 14-3884, 2018 WL 3849903, at *1 (D.N.J. Aug. 13, 2018).

### B.    Certification of Issues for Interlocutory Appeal

28 U.S.C. § 1292(b) states in relevant part:

> When a district judge, in making in a civil action an order not otherwise appealable under this section, shall be of the opinion that such order involves a controlling question of law as to which there is substantial ground for difference of opinion and that an immediate appeal from the order may materially advance the termination of the litigation, he shall so state in writing in such order.

28 U.S.C. § 1292(b). The statute calls for a three-pronged inquiry: a court must decide whether an order presents a (1) controlling question of law as to which (2) there is substantial ground for difference of opinion and (3) an immediate appeal would materially advance the termination of the litigation. "Controlling questions of law" encompass orders which, "if erroneous, would be reversible error on final appeal." *Katz v. Carte Blanche Corp.*, 496 F.2d 747, 755 (3d Cir. 1974). A "substantial difference of opinion" requires "genuine doubt as to the correct legal standard. . . ." *Morgan v. Ford Motor Co.*, 2007 U.S. Dist. LEXIS 5455, at *24 (D.N.J. Jan. 25, 2007).

## IV. ARGUMENT

### A.     The Order Should Be Certified as a Final Judgment

Here, both findings necessary to certify a final decision under Rule 54(b) are present.  First, there has been a final judgment on the merits.  Although the Motion was brought pursuant to Rule 12(c), the Motion sought to invalidate the patents-in-suit pursuant to 35 U.S.C. § 101; an issue on the merits.  Because the Court found the patents-in-suit invalid, the Court effectively rendered a judgment on Sidekick's counterclaims on the merits.

Second, there is no just reason for delay in certifying the Court's Order as a final decision because Sidekick finds itself in litigation purgatory. Plaintiffs have taken the position that the Court's Order resolved its claim and therefore does not seek to continue litigating the case. However, because the Court's Order was silent on Plaintiffs' claim, Sidekick is presently unable to appeal the Court's (interlocutory) Order. Thus, in the interest of bringing about the resolution of this case, the Court should find there is not just reason for delay and certify the Order.

In the alternative, and should this Court continue to treat the Order as an interlocutory order, Sidekick requests that the Court certify the following legal issue for interlocutory appeal: whether the Court can resolve whether an element is "new" at Step 2 of *Alice* on a motion pursuant to Rule 12(c). "In considering a motion for judgment on the pleadings, a court must accept all of the allegations in the pleadings of the party against whom the motion is addressed as true and *draw all reasonable inferences in favor of the non-moving party*." *Zimmerman v. Corbett*, 873 F.3d 414, 417-18 (3d Cir. 2017) (emphasis added). Furthermore, it is the *movant's* burden to establish that there are no material issues of fact. *Id*. at 417.

The Court found that "the '984 Patent does not recite any *new* process, technique, or method in performing any of the claimed features or limitations" based simply on the pleadings. (ECF No. 46 at 14 (emphasis added)). This means, without the benefit of discovery or expert testimony or any facts put forth by the Plaintiffs,

the Court found by clear and convincing evidence that the elements of the '984 Patent were not "new."

Based on this, all three requirements for certification are met. First, the Court's failure to view the evidence in light most favorable to Sidekick and its finding that Plaintiffs put forth enough evidence to meet their burden is erroneous. Thus, the first requirement is met. *See Katz*, 496 F.2d at 755. Second, what is the proper level of factual development necessary to conclude whether something is not "new" under Step 2 of *Alice* is a substantial ground for difference of opinion. Third, an immediate appeal would materially advance the termination of this litigation.

## V. CONCLUSION

Sidekick respectfully requests that the Court enter partial final judgment as to Sidekick's counterclaim. In the alternative, Sidekick requests that the Court certify the above legal issue for interlocutory appeal pursuant to § 1292.

<div style="margin-left: 40%">

Respectfully submitted,

K&L GATES LLP

By: */s/ Loly G. Tor*
Loly G. Tor
loly.tor@klgates.com
One Newark Center, Tenth Floor
Newark, New Jersey 07102
P: (973)848-4026
F: (973) 848-4000

Benjamin E. Weed (admitted *pro hac vice*)
benjamin.weed@klgates.com

</div>

Dated: January 4, 2023

Gina A. Johnson (admitted *pro hac vice*)
gina.johnson@klgates.com
K&L GATES LLP
70 W. Madison Street, Suite 3100
Chicago, IL 60602
Telephone: (312) 372-1121
Facsimile: (312) 827-8000

*Attorneys for Defendant/Counter-Plaintiff*

Loly G. Tor
**K&L GATES LLP**
One Newark Center, 10th Fl.
Newark, NJ 07102
P: 973-848-4000
F: 973-848-4001
loly.tor@klgates.com
*Attorneys for Defendant/Counter-Plaintiff*
*Sidekick Technology, LLC*

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| VROOM, INC.; VROOM AUTOMOTIVE, LLC d/b/a VROOM, d/b/a TEXAS DIRECT AUTO; CARSTORY, LLC; and VAST.COM, INC. d/b/a CARSTORY, | No.: 2:21-cv-6737-WJM-JSA |
| | Hon. William J. Martini, U.S.D.J. |
| Plaintiffs/Counter-Defendants, | Hon. Jessica S. Allen, U.S.M.J. |
| v. | **ORDER** |
| SIDEKICK TECHNOLOGY, LLC, | |
| Defendant/Counter-Claimant. | |

**THIS MATTER** having been brought before the court by defendant/counter-plaintiff Sidekick Technology, LLC ("Sidekick"), by its counsel K&L Gates LLP, seeking an order for entry of final judgment of Sidekick's counterclaims or certification of the issue of whether the Court can resolve what elements are "new" for the purposes of Step 2 of *Alice* on a motion pursuant to Rule 12(c) for interlocutory appeal; and the Court having considered the moving papers, any timely opposition thereto, and oral argument, if any, and good cause having been shown,

314398548.1

**IT IS** on the _____ day of _____, 2022

**ORDERED** that the Motion for Entry of Final Judgment and in the alternative Motion for Certification be and hereby is **GRANTED**; and it is further

**ORDERED** that the Court's June 28, 2022 Opinion and Order dismissing Sidekick's Counterclaims with prejudice (ECF Nos. 46 and 47) is hereby a final judgment under Fed. R. Civ. 54(b) and final judgment is hereby entered as of the date of this order.

_____
 Hon. William J. Martini, U.S.D.J.

Loly G. Tor
K&L GATES LLP
One Newark Center
Tenth Floor
Newark, New Jersey 07102
Phone: (973) 848-4026
loly.tor@klgates.com

Benjamin E. Weed (admitted *pro hac vice*)
Gina A. Johnson (admitted *pro hac vice*)
K&L GATES LLP
70 W. Madison Street, Suite 3100
Chicago, IL 60602
Phone: (312) 372-1121
benjamin.weed@klgates.com
gina.johnson@klgates.com

*Attorneys for Defendant/Counter-Plaintiff*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| VROOM, INC.;<br>VROOM AUTOMOTIVE, LLC d/b/a<br>VROOM, d/b/a<br>TEXAS DIRECT AUTO;<br>CARSTORY, LLC; and<br>VAST.COM INC. d/b/a CARSTORY,<br><br>Plaintiffs,<br><br>v.<br><br>SIDEKICK<br>TECHNOLOGY, LLC,<br><br>Defendant. | Case No. 2:21-cv-06737-WJM-JSA<br><br>Hon. William J. Martini, U.S.D.J.<br>Hon. Jessica S. Allen, U.S.M.J.<br><br>**DEFENDANT'S NOTICE OF<br>APPEAL**<br><br><br><br>*Document Electronically Filed* |

1

Notice is given that Defendant Sidekick Technology, LLC, pursuant to 28 U.S.C. §§ 1291 and 1447(d), appeals to the United States Court of Appeals for the Federal Circuit from the Court's Order dated March 21, 2023 (ECF No. 68). Defendant intends to indicate to the Federal Circuit that this appeal is related to the prior-filed appeal (Case No. 23-1362).

                           Respectfully submitted,

                           K&L GATES LLP

Dated: March 22, 2023

                           By: */s/ Loly G. Tor*_____
                           Loly G. Tor
                            loly.tor@klgates.com
                           One Newark Center, Tenth Floor
                           Newark, New Jersey 07102
                           P: (973)848-4026
                           F: (973) 848-4000

                           Benjamin E. Weed (admitted *pro hac vice*)
                           benjamin.weed@klgates.com
                           Gina A. Johnson (admitted *pro hac vice*)
                           gina.johnson@klgates.com
                           K&L GATES LLP
                           70 W. Madison Street, Suite 3100
                           Chicago, IL 60602
                           Telephone: (312) 372-1121
                           Facsimile: (312) 827-8000
                           *Attorneys for Defendant/Counter-Plaintiff*

# ECFX was unable to download one or more documents most likely due to being SEALED. These documents will need to be downloaded by a user with authority to access them.

**Subject: Activity in Case 2:21-cv-06737-WJM-JSA VROOM, INC. et al v. SIDEKICK TECHNOLOGY, LLC USCA Case Number**

**This is an automatic e-mail message generated by the CM/ECF system. Please DO NOT RESPOND to this e-mail because the mail box is unattended.**

**\*\*\*NOTE TO PUBLIC ACCESS USERS\*\*\* Judicial Conference of the United States policy permits attorneys of record and parties in a case (including pro se litigants) to receive one free electronic copy of all documents filed electronically, if receipt is required by law or directed by the filer. PACER access fees apply to all other users. To avoid later charges, download a copy of each document during this first viewing. However, if the referenced document is a transcript, the free copy and 30 page limit do not apply.**

<div align="center">

**U.S. District Court**

**District of New Jersey [LIVE]**

</div>

**Notice of Electronic Filing**

The following transaction was entered on 3/29/2023 at 9:48 AM EDT and filed on 3/29/2023

| | |
|---|---|
| **Case Name:** | VROOM, INC. et al v. SIDEKICK TECHNOLOGY, LLC |
| **Case Number:** | 2:21-cv-06737-WJM-JSA |
| **Filer:** | |

**WARNING: CASE CLOSED on 06/28/2022**
**Document Number:** 69

**Docket Text:**

**USCA Case Number 23-1667 for [68] Notice of Appeal (Federal Circuit), filed by SIDEKICK TECHNOLOGY, LLC. (Document Restricted - Court Only) (krg, )**

**2:21-cv-06737-WJM-JSA Notice has been electronically mailed to:**

LOLY G. TOR    LOLY.TOR@KLGATES.COM, klgateseservice@klgates.com, sherry.pitt@klgates.com

STEPHANIE HATZIKYRIAKOU    shatzikyriakou@bakerlaw.com, mrick@bakerlaw.com, Vroom-Sidekick@bakerlaw.com

THOMAS P. SCRIVO    tscrivo@oslaw.com, mmeola@oslaw.com

**2:21-cv-06737-WJM-JSA Notice has been sent by regular U.S. Mail:**

The following document(s) are associated with this transaction:

**Document description:**

**Original filename:** n/a

Main Document

K&L GATES

May 1, 2023

Loly Garcia Tor
Partner
loly.tor@klgates.com

T +1 973 848 4026
F +1 973 848 4001

**VIA ECF**

Honorable William J. Martini, U.S.D.J
U.S. District Court for the District of New Jersey
Martin Luther King Building & U.S. Courthouse
50 Walnut Street
Newark, NJ 07102

*Re:*   *Vroom, Inc. et al. v. Sidekick Technology, LLC*, No. 2:21-cv-6737-WJM-JSA

Dear Judge Martini:

Defendant/Counter-Claimant Sidekick Technology, LLC ("Sidekick") brings a discrete dispute to the Court in light of the U.S. Court of Appeals for the Federal Circuit's April 11, 2023 Order (Dkt. 71) (the "Federal Circuit's Order"). Because of the unique procedural posture and the Federal Circuit's expectation that the parties and the district court "promptly resolve the outstanding request for relief," (Dkt. 71 at 3), Sidekick believes that the dispute between the parties may be resolved without motion practice.

At this time, the dispute between the parties is whether the Court should enter a final order that resolves all remaining relief sought by Plaintiffs, particularly Plaintiffs' request for injunctive relief.

Sidekick believes that the clearest path forward, and the one most in line with the Federal Circuit's Order, is for the Court to enter an order that moots all relief not previously granted by the Court. To this end, Sidekick submits a proposed order that moots all remaining issues pending before the Court. This order would also serve as a final judgment and, therefore, Sidekick's appeal would be allowed to proceed as long as the order is entered by Monday, June 12 (which is the next court day after 60 days from April 11).

Plaintiffs' position is as follows:

> Plaintiffs oppose entry of an order. As explained in Plaintiffs' letter filed in this Court on Friday April 14, 2023 (Dkt. 73), Plaintiffs believe that the Federal Circuit has misapplied both cases it cited in its April 11, 2023 Order, as to its jurisdiction. *See* Dkt. 71. Moreover, the Federal Circuit does not appear to have appreciated that the outstanding prayer for relief based on noninfringement is moot in light of this Court's invalidity finding. For at least these reasons, the Federal Circuit appeal requires an

K&L GATES LLP
ONE NEWARK CENTER   TENTH FLOOR   NEWARK   NJ 07102
T +1 973 848 4000  F +1 973 848 4001  klgates.com

Anthony P. La Rocco, Managing Partner, New Jersey
315328327.1

Appx870

answer to one or more precedent-setting questions of exceptional importance: the Federal Circuit's jurisdiction, the finality of district court final judgments, and the propriety of the Federal Circuit's exercise of jurisdiction in past cases in light of and potentially inconsistent with the Panel's ruling. Pursuant to the Federal Circuit Rules, and the Federal Circuit's April 20, 2023 Order (attached), Plaintiffs are filing a combined petition for panel rehearing and rehearing en banc of the Federal Circuit's April 11, 2023 Order and anticipate doing so by May 11.

Respectfully submitted,

*/s/ Loly Garcia Tor*

Loly Garcia Tor

315328327.1

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

VROOM, INC.; VROOM AUTOMOTIVE,
LLC d/b/a VROOM, d/b/a TEXAS DIRECT
AUTO; CARSTORY, LLC; and VAST.COM,
INC. d/b/a CARSTORY,

      Plaintiffs,

    v.

SIDEKICK TECHNOLOGY, LLC,

      Defendant.

Civ. No. 2:21-cv-06737-WJM-JSA

**ORDER**

**THIS MATTER** comes before the Court on the U.S. Court of Appeals for the Federal Circuit's Order dated April 11, 2023; **IT IS** on this 24th day of May 2023

**ORDERED** that all relief sought by Plaintiffs not previously granted by this Court is **DENIED AS MOOT**; it is further

**ORDERED** that Defendant's pending Motion to Reopen the Time to File an Appeal, ECF No. 70, is **DENIED AS MOOT**.

WILLIAM J. MARTINI, U.S.D.J.

US009141984B2

(12) **United States Patent**
Seergy et al.

(10) **Patent No.:** **US 9,141,984 B2**
(45) **Date of Patent:** *Sep. 22, 2015

(54) **AUTOMOBILE TRANSACTION FACILITATION USING A MANUFACTURER RESPONSE**

(75) Inventors: **Michael J. Seergy**, Pine Brook, NJ (US); **Benjamin N. S. Brown**, Pine Brook, NJ (US)

(73) Assignee: **Sidekick Technology LLC**, Pine Brook, NJ (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 491 days.

This patent is subject to a terminal disclaimer.

(21) Appl. No.: **13/176,497**

(22) Filed: **Jul. 5, 2011**

(65) **Prior Publication Data**
US 2012/0109770 A1    May 3, 2012

(51) **Int. Cl.**
*G06Q 30/00*        (2012.01)
*G06Q 30/06*        (2012.01)

(52) **U.S. Cl.**
CPC .................................. *G06Q 30/0605* (2013.01)

(58) **Field of Classification Search**
USPC ...................................... 705/26.1, 26.3, 27.1
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 5,970,472 | A | 10/1999 | Allsop et al. |
| 6,006,201 | A | 12/1999 | Berent et al. |
| 6,321,221 | B1 | 11/2001 | Bieganski |
| 6,463,431 | B1 | 10/2002 | Schmitt |
| 6,533,173 | B2 | 3/2003 | Benyak |
| 6,868,388 | B1 | 3/2005 | Millsap et al. |
| 6,868,389 | B1 | 3/2005 | Wilkins et al. |
| 7,395,223 | B1 | 7/2008 | Buzzell et al. |
| 7,406,436 | B1 | 7/2008 | Reisman |
| 7,479,949 | B2 | 1/2009 | Jobs et al. |
| 7,636,574 | B2 | 12/2009 | Poosala |
| 8,160,929 | B1 | 4/2012 | Park et al. |
| 8,392,193 | B2 | 3/2013 | Schultz et al. |
| 2002/0065707 | A1 | 5/2002 | Lancaster et al. |
| 2002/0082978 | A1 | 6/2002 | Ghouri et al. |
| 2002/0099628 | A1 | 7/2002 | Takaoka et al. |
| 2002/0111877 | A1 | 8/2002 | Nelson |

(Continued)

OTHER PUBLICATIONS

International Search Report issued Sep. 21, 2012 corresponding to Intl. Application No. PCT/US2012/045546.

(Continued)

*Primary Examiner* — Brandy A Zukanovich
(74) *Attorney, Agent, or Firm* — K&L Gates LLP

(57)        **ABSTRACT**

A system, methods, and apparatus for performing automobile transactions are disclosed. In an example embodiment, automobile market data representative of current automobile market characteristics is stored. The automobile market data may include pricing, inventory, and consumer interest information received from manufacturers, dealers, and consumers. A consumer may provide a request for a manufacturer response indicating whether a specific automobile can be provided. Automobile market data may be provided to a manufacturer based on the request and a manufacturer response provides a verification, confirmation, or offer indicating that the specific automobile can be provided for the consumer. Bids to sell the specific automobile may be requested from dealers based on the manufacturer response. Dealer bids may be provided to the consumer with prices and a delivery options. The consumer may select a bid which specifies a pickup location at a first dealer.

**39 Claims, 7 Drawing Sheets**



**US 9,141,984 B2**

Page 2

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 2002/0128946 A1* | 9/2002 | Chehade et al. | ............... 705/37 |
| 2003/0088435 A1 | 5/2003 | King | |
| 2003/0200151 A1 | 10/2003 | Ellenson et al. | |
| 2003/0229577 A1 | 12/2003 | Nabel | |
| 2004/0034544 A1 | 2/2004 | Fields et al. | |
| 2004/0059626 A1 | 3/2004 | Smallwood | |
| 2005/0004819 A1 | 1/2005 | Etzioni et al. | |
| 2005/0050097 A1 | 3/2005 | Yeh et al. | |
| 2005/0108112 A1* | 5/2005 | Ellenson et al. | ............... 705/27 |
| 2005/0240512 A1 | 10/2005 | Quintero et al. | |
| 2006/0020477 A1 | 1/2006 | Retzbach et al. | |
| 2007/0150362 A1 | 6/2007 | Sharma et al. | |
| 2007/0250403 A1 | 10/2007 | Altschuler | |
| 2007/0255663 A1 | 11/2007 | Jordan et al. | |
| 2007/0260526 A1 | 11/2007 | Bartel | |
| 2008/0046331 A1 | 2/2008 | Rand | |
| 2008/0177653 A1 | 7/2008 | Famolari et al. | |
| 2008/0183552 A1 | 7/2008 | O'Hagan | |
| 2008/0187125 A1* | 8/2008 | Siegrist | ................... 379/220.01 |
| 2008/0201184 A1 | 8/2008 | Rose et al. | |
| 2008/0201188 A1 | 8/2008 | Heyman et al. | |
| 2008/0201203 A1 | 8/2008 | Rose et al. | |
| 2008/0208731 A1 | 8/2008 | Ruckart | |
| 2008/0228657 A1* | 9/2008 | Nabors et al. | ................... 705/80 |
| 2009/0076896 A1 | 3/2009 | DeWitt et al. | |
| 2009/0132348 A1 | 5/2009 | Bria et al. | |
| 2009/0149199 A1 | 6/2009 | Maghoul | |
| 2009/0171761 A1 | 7/2009 | Noy et al. | |
| 2009/0187478 A1 | 7/2009 | Shipley | |
| 2009/0187513 A1 | 7/2009 | Noy et al. | |
| 2009/0198557 A1 | 8/2009 | Wang et al. | |
| 2009/0204600 A1 | 8/2009 | Kalik et al. | |
| 2010/0048242 A1 | 2/2010 | Rhoads et al. | |
| 2010/0106580 A1 | 4/2010 | Etheredge et al. | |
| 2010/0217525 A1 | 8/2010 | King et al. | |
| 2010/0274627 A1 | 10/2010 | Carlson | |
| 2010/0332292 A1 | 12/2010 | Anderson | |
| 2011/0040642 A1 | 2/2011 | O'Dell | |
| 2011/0082759 A1* | 4/2011 | Swinson et al. | ............. 705/26.1 |
| 2011/0087430 A1 | 4/2011 | Boss et al. | |
| 2011/0087556 A1 | 4/2011 | Pitkow | |
| 2011/0099036 A1 | 4/2011 | Sarkissian et al. | |
| 2011/0208418 A1 | 8/2011 | Looney et al. | |
| 2011/0238474 A1 | 9/2011 | Carr et al. | |
| 2011/0238514 A1 | 9/2011 | Ramalingam et al. | |
| 2011/0276394 A1* | 11/2011 | Chan | .......................... 705/14.49 |

OTHER PUBLICATIONS

AutoTrader.com, Inc.: Private Company Information—Business Week, http://investing.businessweek.com/research/stocks/private/snapshot.asp?privcapId=92642.

Autotrader.com Introduces IPhone App to Create a More Personalized "PC-to-Pocket" Experience for Car Shoppers, http://www.prnewswire.com/news-releases/autotradercom, Jul. 7, 2011.

AppStore-AutoTrader.com, http://itunes.apple.com/us/app/autotrader-com/id444552888?mt=8, Oct. 31, 2011.

Charlton, Auto Trader: iPhone app review. Mar. 15, 2010 [retrieved on Sep. 6, 2012] from the internet: <URL: http://econsultancy.com/us/blog/5593-auto-trader-iphone-app-review> entire document.

Autotraderuk. Introducing the Auto Trader iPhone App. Mar. 12, 2010 [retrieved on Sep. 6, 2012] from the internet: <URL: http://www.youtube.com/watch?v=6g_1g8IRG4&feature=player_embedded> entire document.

International Search Report mailed Oct. 5, 2012 for corresponding Intl. Appln. No. PCT/US2012/045545.

Anonymous, "instaVIN to offer free auto accident history reports for mobile phones," Wireless News, Jun. 2, 2010.

\* cited by examiner



Fig. 1



Fig. 2



Fig. 3



Start

400

Automobile market data including at least pricing data and inventory data is stored in a database system (e.g., data from manufacturers, dealers, and consumers regarding pricing, lot inventory, production scheduling, and shipment scheduling is collected and stored in a database)

402

A request for a response of whether an automobile can be provided is received from a consumer (e.g., a car buyer fills in a request form on a website or takes a picture of a VIN to receive a verification that a car can be produced or delivered)

404

Automobile market data is provided to a manufacturer based on the consumer request (e.g., the car maker receives a real-time report including local car sales data, inventory data, car delivery data, and car build time data of the subject car)

406

A manufacturer response is provided to the consumer indicating that the automobile can be provided for the consumer (e.g., the car maker provides a verification that a car can be produced, shipped, or is already in inventory based on current pricing data, car locations, and build times for the subject car)

408

A bid to sell the automobile to the consumer is requested from dealers based on the manufacturer response (e.g., several dealers provide bids based on the verification, current pricing data, dealer pickup locations, and potential add-ons)

410

Dealer bids are provided to the consumer (e.g., several dealers provide bids, so several different prices and delivery options may be available to the car buyer)

412

The consumer selects a bid including a delivery option which specifies a pickup location (e.g., the car buyer chooses to pickup at a nearby dealer in five days)

414

The manufacturer is instructed to provide the automobile to a dealer according to the consumer bid selection (e.g., the car maker is instructed to re-route a car already in transit to the dealer pickup location for delivery in less than five days)

416

The consumer and dealer execute the sale of the automobile (e.g., the car buyer e-signs a loan application and contract, and electronically transfers funds)

418

Fig. 4A    Fig. 4B



( Fig. 4A )          ⟋— 400

⟋— 420

The manufacturer provides the dealer with the purchased automobile according
to the consumer bid selection (e.g., the car maker re-routes a car en route to
delivery at another dealer to the dealer pickup location selected by the car buyer
or transports the car directly from the factory to the dealer pickup location)

⟋— 422

The consumer picks up the purchased automobile according to the consumer
selected delivery option at the dealer (e.g., the car buyer picks up the car at the
nearby dealer five days after the car sale is executed)

Fig. 4B



Fig. 5



Fig. 6

US 9,141,984 B2

**1**

AUTOMOBILE TRANSACTION
FACILITATION USING A MANUFACTURER
RESPONSE

CROSS REFERENCE TO RELATED
APPLICATIONS

This application is related to the co-pending commonly-owned patent application filed on Jul. 5, 2011, entitled "AUTOMOBILE TRANSACTION FACILITATION BASED ON CUSTOMER SELECTION OF A SPECIFIC AUTOMOBILE," the entire contents of which is incorporated by reference herein.

BACKGROUND

In the automobile industry, consumers typically purchase automobiles from dealers or dealerships. Dealers often purchase new automobiles from several manufacturers, to sell to consumers. Consumers typically negotiate a lower price than the manufacturer suggested retail price typically referred to as the "sticker price" and/or the price the dealer initially offers. In many cases, the negotiation process for an automobile may include a large degree of uncertainty for the consumer. Generally, the negotiation process is a zero sum process, and because the consumer and the dealer are each trying to get a better deal, there is typically some lack of trust during the negotiation. Accordingly, both dealers and consumers often base the negotiations on established market prices. However, market prices can fluctuate rapidly depending a variety of factors. For example, consumer demand may be affected by economic factors, such as changes in gasoline prices, unemployment rates, government sponsored tax rebates for automobile purchases, etc.

In many cases, a consumer may have concerns that a dealer may not offer a fair and competitive price. Various products and services have become available that allow consumers to perform research on market prices for automobiles. Similarly, dealers negotiating an automobile sale generally do not know the maximum price a consumer will be willing to pay for a particular automobile, or how long it will take to sell an automobile in inventory for a given price. Accordingly, dealers also use products and services for determining and/or tracking market prices. Further, automobile manufacturers may also have an interest in the market prices for automobiles, because the market activity captured as automobile market information may allow the manufacturer to, for example, more profitably determine which automobiles to manufacture, what prices the manufacture should offer to dealers, and whether manufacturer incentives should be offered on existing dealer automobile inventory.

SUMMARY

The present disclosure provides a new and innovative system, methods and apparatus for providing automobile market information and performing automobile transactions. In an example embodiment, automobile market data representative of recent automobile market characteristics is stored. The automobile market data may include pricing, inventory, and consumer interest information received from manufacturers, dealers, and consumers. A consumer may provide a request for a manufacturer response indicating whether a specific automobile can be provided. Automobile market data may be provided to a manufacturer based on the request and a manufacturer response may provide a verification, confirmation, or offer indicating that the specific automobile can be provided

**2**

for the consumer. Bids to sell the specific automobile may be requested from dealers based on the manufacturer response. Dealer bids may be provided to the consumer with prices and a delivery options. The consumer may select a bid which specifies a pickup location at a particular dealer.

Additional features and advantages of the disclosed method and apparatus are described in, and will be apparent from, the following Detailed Description and the Figures.

BRIEF DESCRIPTION OF THE FIGURES

FIG. **1** is a high level block diagram of an example network communicating system, according to an example embodiment of the present invention.

FIG. **2** is a detailed block diagram showing an example of a computing device, according to an example embodiment of the present invention.

FIG. **3** is a block diagram showing an example automobile transaction network structure, according to an example embodiment of the present invention.

FIG. **4** includes a flowchart illustrating an example process for facilitating an automobile transaction, according to an example embodiment of the present invention.

FIG. **5** is a block diagram showing an example data architecture, according to an example embodiment of the present invention.

FIG. **6** is flow diagram illustrating an example process for facilitating an automobile transaction, according to an example embodiment of the present invention.

DETAILED DESCRIPTION OF EXAMPLE
EMBODIMENTS

The present disclosure relates in general to a system for facilitating automobile transactions and, in particular, to automobile transaction facilitation using a manufacturer response. Briefly, in an example embodiment, a system is provided which allows a consumer to request a verification that a specific car can be obtained. For example, a consumer may use a mobile device to take a picture of a vehicle identification number and using optical character recognition, request real-time information on that automobile. For example, a manufacturer can provide a verification to the consumer and dealers that the automobile can be provided, along with specific logistics for delivery. Dealers may provide bids based on the consumer request and the manufacturer verification, including intrabrand bids and interbrand bids. A consumer may select a dealer bid to purchase or lease an automobile based on the prices and delivery options available. Also, the presently disclosed system may advantageously allow for inventoryless bidding by dealers. For example, a dealer does not need to have an automobile in its inventory (e.g., on the dealer lot), but can make a bid to sell that automobile anyways, and then have that automobile produced by a manufacturer or transported to the dealer lot. In a non-limiting example embodiment, certain features disclosed in the present patent application may be commercially embodied in products and services offered by Sidekick Technology LLC, the assignee of the present application.

The present system may be readily realized in a network communications system. A high level block diagram of an example network communications system **100** is illustrated in FIG. **1**. The illustrated system **100** includes one or more client devices **102**, and one or more host devices **104**. The system **100** may include a variety of client devices **102**, such as desktop computers and the like, which typically include a display **112**, which is a user display for providing information

US 9,141,984 B2

3                                    4

to users **114**, and various interface elements as will be discussed in further detail below. A client device **102** may be a mobile device **103**, which may be a cellular phone, a personal digital assistant, a laptop computer, a tablet computer, etc. The client devices **102** may communicate with the host device **104** via a connection to one or more communications channels **106** such as the Internet or some other data network, including, but not limited to, any suitable wide area network or local area network. It should be appreciated that any of the devices described herein may be directly connected to each other instead of over a network. Typically, one or more servers **108** may be part of the network communications system **100**, and may communicate with host servers **104** and client devices **102**.

One host device **104** may interact with a large number of users **114** at a plurality of different client devices **102**. Accordingly, each host device **104** is typically a high end computer with a large storage capacity, one or more fast microprocessors, and one or more high speed network connections. Conversely, relative to a typical host device **104**, each client device **102** typically includes less storage capacity, a single microprocessor, and a single network connection. It should be appreciated that a user **114** as described herein may include any person or entity which uses the presently disclosed system and may include a wide variety of parties. For example, as will be discussed in further detail below, users **114** of the presently disclosed system may include a consumer, a dealer, and/or a manufacturer.

Typically, host devices **104** and servers **108** store one or more of a plurality of files, programs, databases, and/or web pages in one or more memories for use by the client devices **102**, and/or other host devices **104** or servers **108**. A host device **104** or server **108** may be configured according to its particular operating system, applications, memory, hardware, etc., and may provide various options for managing the execution of the programs and applications, as well as various administrative tasks. A host device **104** or server may interact via one or more networks with one or more other host devices **104** or servers **108**, which may be operated independently. For example, host devices **104** and servers **108** operated by a separate and distinct entities may interact together according to some agreed upon protocol.

A detailed block diagram of the electrical systems of an example computing device (e.g., a client device **102**, and a host device **104**) is illustrated in FIG. **2**. In this example, the computing device **102**, **104** includes a main unit **202** which preferably includes one or more processors **204** electrically coupled by an address/data bus **206** to one or more memory devices **208**, other computer circuitry **210**, and one or more interface circuits **212**. The processor **204** may be any suitable processor, such as a microprocessor from the INTEL PENTIUM® family of microprocessors. The memory **208** preferably includes volatile memory and non-volatile memory. Preferably, the memory **208** stores a software program that interacts with the other devices in the system **100** as described below. This program may be executed by the processor **204** in any suitable manner. In an example embodiment, memory **208** may be part of a "cloud" such that cloud computing may be utilized by a computing device **102**, **104**. The memory **208** may also store digital data indicative of documents, files, programs, web pages, etc. retrieved from a computing device **102**, **104** and/or loaded via an input device **214**.

The interface circuit **212** may be implemented using any suitable interface standard, such as an Ethernet interface and/or a Universal Serial Bus (USB) interface. One or more input devices **214** may be connected to the interface circuit **212** for entering data and commands into the main unit **202**. For example, the input device **214** may be a keyboard, mouse, touch screen, track pad, track ball, isopoint, image sensor, character recognition, barcode scanner, and/or a voice recognition system.

One or more displays **112**, printers, speakers, and/or other output devices **216** may also be connected to the main unit **202** via the interface circuit **212**. The display **112** may be a cathode ray tube (CRTs), a liquid crystal display (LCD), or any other type of display. The display **112** generates visual displays generated during operation of the computing device **102**, **104**. For example, the display **112** may provide a user interface, which will be described in further detail below, and may display one or more web pages received from a computing device **102**, **104**. A user interface may include prompts for human input from a user **114** including links, buttons, tabs, checkboxes, thumbnails, text fields, drop down boxes, etc., and may provide various outputs in response to the user inputs, such as text, still images, videos, audio, and animations.

One or more storage devices **218** may also be connected to the main unit **202** via the interface circuit **212**. For example, a hard drive, CD drive, DVD drive, and/or other storage devices may be connected to the main unit **202**. The storage devices **218** may store any type of data, such as pricing data, transaction data, operations data, inventory data, commission data, manufacturing data, image data, video data, audio data, tagging data, historical access or usage data, statistical data, security data, etc., which may be used by the computing device **102**, **104**.

The computing device **102**, **104** may also exchange data with other network devices **220** via a connection to the network **106**. Network devices **220** may include one or more servers **226**, which may be used to store certain types of data, and particularly large volumes of data which may be stored in one or more data repository **222**. A server **226** may include any kind of data **224** including databases, programs, files, libraries, pricing data, transaction data, operations data, inventory data, commission data, manufacturing data, configuration data, index or tagging data, historical access or usage data, statistical data, security data, etc. A server **226** may store and operate various applications relating to receiving, transmitting, processing, and storing the large volumes of data. It should be appreciated that various configurations of one or more servers **226** may be used to support and maintain the system **100**. For example, servers **226** may be operated by various different entities, including automobile manufacturers, brokerage services, automobile information services, etc. Also, certain data may be stored in a client device **102** which is also stored on the server **226**, either temporarily or permanently, for example in memory **208** or storage device **218**. The network connection may be any type of network connection, such as an Ethernet connection, digital subscriber line (DSL), telephone line, coaxial cable, wireless connection, etc.

Access to a computing device **102**, **104** can be controlled by appropriate security software or security measures. An individual users' **114** access can be defined by the computing device **102**, **104** and limited to certain data and/or actions. Accordingly, users **114** of the system **100** may be required to register with one or more computing devices **102**, **104**. For example, registered users **114** may be able to request or manipulate data, such as submitting requests for pricing information or providing an offer or a bid.

As noted previously, various options for managing data located within the computing device **102**, **104** and/or in a server **226** may be implemented. A management system may manage security of data and accomplish various tasks such as facilitating a data backup process. A management system

US 9,141,984 B2

5

may be implemented in a client **102**, a host device **104**, and a server **226**. The management system may update, store, and back up data locally and/or remotely. A management system may remotely store data using any suitable method of data transmission, such as via the Internet and/or other networks **106**.

FIG. **3** is a block diagram showing an example automobile transaction network structure **300** which includes an automobile market information processing system **302**, a consumer interface **304**, a dealer interface **306**, and a manufacturer interface **308**. The example automobile market information processing system **302** may be implemented on one or more host devices **104** accessing one or more servers **108**, **226**. In an example embodiment, the automobile market information processing system **302** includes a database system **310**, a recommendation engine **312**, a vehicle identification number processor **314**, and an interface generation unit **316**. A user **114** may be a consumer, a dealer, or a manufacturer that interacts with the consumer interface **304**, dealer interface **306**, or manufacturer interface **308**, respectively. A database system **310** may include a wide variety of automobile market data. A recommendation engine **312** may provide recommendations for consumers, dealers, and manufacturers. A vehicle identification number processor **314** may be used for making requests regarding specific automobiles and automobiles with specific sets of features. For example, a vehicle identification number processor **314** may determine a specific set of features that a specific car has based on a picture of that specific car's vehicle identification number. Interface generation unit **316** may provide, for example, HTML files which are used at the consumer interface **304**, dealer interface **306**, and manufacturer interface **308** interface to provide information to the users **114**. It should be appreciated that he the consumer interface **304**, dealer interface **306**, and manufacturer interface **308** may be considered to be part of the automobile market information processing system **302**, however, for discussion purposes, the consumer interface **304**, dealer interface **306**, and manufacturer interface **308** may be referred to as separate from the automobile market information processing system **302**.

For example, a user **114** may interact with a consumer interface **304** to research automobiles the user **114** is interested in buying. For example, a consumer may be looking for a four door sedan with specific features, including a global positioning system (GPS), a sunroof, tinted windows, rated for at least thirty miles per gallon, four wheel drive, etc. The consumer may interact with the consumer interface **304** by inputting required and/or desired features, monthly budget or full price, etc. The consumer interface **304** may provide a wide variety of features and specifications which the consumer may choose from in providing a request. Based on the information put into the consumer interface **304** from the consumer, the consumer interface **304** may provide one or more reports or offers to the consumer. As will be discussed in further detail below, the information provided by the consumer interface **304** may include current market prices for automobiles, including information relating to additional features, and may include information on specific automobiles, for example, which may be en route to a dealer near the consumer's present location. The automobile market information processing system **302** may process data received by the consumer interface **304**, as well as the dealer interface **306** and/or the manufacturer interface **308**, to respond to a request from a consumer. For example, data from database system **310** may be queried for use in a report, or a recommendation **310** may be provided by recommendation engine **312** according to the consumer request and current market data. The auto-

6

mobile market information processing system **302** may integrate data received from consumer interface **304**, dealer interface **306**, and manufacturer interface **308** to provide current and accurate information relating to the automobile market.

It should be appreciated that the consumer interface **304** may be specific to one particular manufacturer or may provide information for multiple different manufacturers. For example, a consumer interface **304** may be a website with information on many manufacturers, and further, the consumer interface **304** may access or link to the manufacturer specific websites (e.g., Ford). Also, for example, a consumer interface **304** may be implemented as an automobile manufacturer's website. Typically, a manufacturer's website may provide consumers with a catalog like feature that provides information on different automobile models with any available options or features. For example, a manufacturer website may allow a consumer to select options that are desired to "build" a particular automobile, and may provide price comparisons using suggested retail prices, which may consumers use for initial research into what pricing the dealer may offer for a particular automobile with a particular feature set. Also, typically, the consumer may enter information, including, for example, name, an address or zip code, and telephone number. This information may be passed on from the manufacturer to a nearby dealer and/or nearby dealer information may be provided to the consumer (e.g., the dealer in or nearest to the consumer's entered zip code). Accordingly, the dealer may contact the consumer, or the consumer may inquire with the dealer, regarding the specific automobiles available on that dealer's lot and particular pricing being offered, etc. In many cases, consumers may not inquire with dealers that the manufacturer may recommend, and similarly, dealers may not diligently follow up with consumers that have an interest in purchasing an automobile. Further, it should be appreciated that the information provided via a consumer interface **304** and/or a manufacturer website may be very useful to consumers. For example, in the past, dealers often provided brochures with all the information on a manufacturer's available car models, including all the features and options information. However, dealers typically do not provide comprehensive information brochures, which may be relatively expensive to produce, and rather, that information is typically located on a manufacturer website and/or a consumer interface **304**.

Accordingly, the consumer interface **304** may provide a wide range of information, for example, based on any searches or queries performed by a user **114**. In an example embodiment, based on a user search or request for a response, the consumer interface **304** will display a quality index or value index based on normalized calculations for an automobile. The recommendation engine **312** may provide recommendations to a consumer based on the current automobile market data stored in the automobile market information processing system **302**. For example, metrics on gas mileage, emissions, operating and maintenance costs, safety ratings, etc. may be benchmarked against comparable automobiles of the same and different manufacturers. Similar purchase options to a specific search may also be provided, based on feature matching, price range, consumer popularity, etc. Information including price ranges, including MSRP, invoice prices, inventory levels, the user's **114** credit ratings (e.g., FICO score), may be provided which may include monthly payment estimates or projections. For example, a financing calculator may help a user **114** determine what financing rate is appropriate. It should be appreciated that dealers may mislead consumers into believing that a higher financing rate will be required to secure a loan. Further, for example, a lease vs. buy calculator may be provided which may use current mar-

7

ket data including prices, interest rates, incentives, estimated mileage per year, etc. for providing an analysis for a particular consumer regarding purchasing or leasing. Also, the consumer interface **304** may provide a purchase checklist, for example, of ten steps to buying a car. A qualitative checklist may allow a user to ask the right questions and get the right answers from a dealer. Additional tips may be provided, such as a list of products or services dealers may attempt to sell to a consumer with an analysis of the value of these products or services and a recommendation to accept or decline these dealer offers. Further, beyond analysis relating to automobiles, additional analysis or reports may be provided, for example, relating to dealer reviews, other supplemental products, financial entities that may provide financing, etc. For example, dealer reviews may provide a consumer with information the consumer may use in addition to automobile pricing and delivery options. Moreover, the consumer interface **304** may provide a wide variety of useful information to a consumer, for at home research and preparation, and/or in a dealer location while shopping as a negotiating tool that may provide confirmation on pricing, useful tips, and the like.

In an example embodiment, a dealer interface **306** may provide a user **114**, such as a dealer employee, information relating to the current automobile market. The dealer interface **306** allows a dealer to interact with automobile market information processing system **302** to provide the dealer with a wide variety of information, including, for example, current market pricing. Other automobile market information a dealer may receive on a dealer interface **306** includes information relating to lot inventory, turnover rates, automobile transportation and/or shipping costs, incentives, and various ratings, such as ratings relating to quality, safety, insurance, a consumer credit score, dealer ratings, residual or resale values, etc. A dealer may input information into dealer interface **306** relating to sales data, including current pricing offered, special sales offers, actual transaction data, inventory data, etc. In an example embodiment, the dealer may provide information through dealer interface **306** which will be used by automobile market information processing system **302** to prepare reports or offers to consumers and/or manufacturers. It should be appreciated that a dealer is typically a franchise entity, while a distribution location may not be a franchise entity. For brevity, throughout this specification, the term dealer may be used to describe both franchise entity dealers and non-franchise entity distribution location. Accordingly, as used in this disclosure, the term dealer does not indicate whether an entity is a franchise entity. Moreover, a franchise dealer or a non-franchise distribution location may utilize a dealer interface **306** as described herein.

In an example embodiment, a manufacturer interface **308** may provide a user **114**, such as a manufacturer employee, information relating to the current automobile market, including consumer requests. For example, an manufacturer interface **308** may provide a manufacturer a request received from a consumer interface **304**. Additionally, the manufacturer interface **308** may provide information such as a report that allows the manufacturer to provide a response to the requesting consumer. A report may include information from database system **310** relating to current market pricing, recent sales figures and trends, current manufacturer incentives, current inventory, including dealer inventory, inventory in transit, and/or build times or lead times for a desired automobile, etc. The manufacturer may use this information to provide a response to a consumer request. The manufacturer may provide the manufacturer interface **308** with information to provide a confirmation, a verification, or an offer to a consumer via consumer interface **304**. For example, a confirmation

8

number associated with the particular consumer request may be provided for the consumer. Also, a recommendation may be provided from the recommendation engine **312** to the manufacturer in relation to automobile pricing, responding to a specific request, manufacturer incentives, inventory management, production schedules, shipping schedules, etc. It should be appreciated that a manufacturer may be referred to as an OEM or original equipment manufacturer. The manufacturer interface **308** may provide a manufacturer with a real-time lens into the automobile market which may allow the manufacturer to adjust production schedules, pricing plans, marketing activities, etc., which may provide a significant advantage for manufacturers.

Accordingly, information may be provided to the automobile market information processing system **302** from consumers, dealers, and manufacturers with a very high degree of granularity, as every transaction that occurs and even every request or search may be stored and used by the automobile market information processing system **302**. This allows the automobile market information processing system **302** to use the most current automobile market data to provide information to consumers, dealers, and manufacturers. It should be appreciated that market prices can change relatively quickly, particularly when major events drive consumer behavior or manufacturer production, such as natural disasters. Accordingly, reports and recommendations provided by the automobile market information processing system **302** may be highly accurate, reliable, and sensitive to market changes.

It should be appreciated that certain functions described as performed, for example, at automobile market information processing system **302**, may instead be performed locally at consumer interface **304**, dealer interface **306**, and manufacturer interface **308**, or vice versa. Further, in certain cases, tasks may be performed using consumer interface **304**, dealer interface **306**, and manufacturer interface **308** or, for example, performed in person, such as a consumer signing documents at a dealer location, or a dealer communicating with a manufacturer using a telephone. It should be appreciated that the consumer interface **304**, dealer interface **306**, and manufacturer interface **308** may be implemented, for example, in a web browser using an HTML file received from the automobile market information processing system **302**. In an example embodiment, the consumer interface **304**, dealer interface **306**, and manufacturer interface **308** may be located on a website, and may further be implemented as a secure website. Also, consumer interface **304**, dealer interface **306**, and manufacturer interface **308** may require a local application, for example, which a manufacturer may pay for to have access to, for example, information from the automobile market information processing system **302** such as requests from consumers.

FIG. **4** is a flowchart of an example process **400** for facilitating an automobile transaction. Although the process **400** is described with reference to the flowchart illustrated in FIG. **4**, it will be appreciated that many other methods of performing the acts associated with the process **400** may be used. For example, the order of many of the blocks may be changed, certain blocks may be combined with other blocks, and many of the blocks described are optional.

The example process **400** for facilitating an automobile transaction may allow users **114**, including manufacturers and consumers, as well as dealers, to efficiently sell and purchase automobiles, respectively. The example process **400** may begin with automobile market data including at least pricing data and inventory data stored in a database system (block **402**). For example, automobile market data from manufacturers, dealers, and consumers regarding pricing, lot

US 9,141,984 B2

**9**

inventory, production scheduling, and shipment scheduling is collected and stored in a database. In an example embodiment, a wide variety of data is stored in a database system **310**. Automobile market data may include various relevant ratings, reports, awards, or other information, including quality information, safety information, insurance information, consumer credit information, dealer rating information, incentive information, residual value information, and/or any other data which may be relevant to consumers. For example, ratings data may include information from the National Highway Traffic Safety Administration (NHTSA), the Environmental Protection Agency (EPA), and/or the Insurance Institute for Highway Safety (IIHS). The data may include information from a consumer interface **304**, such as data in consumer searches or requests, information from a dealer interface **306**, such as currently offered dealer pricing, transaction data for finalized sales, current inventory data, shipping costs, and information from a manufacturer interface **308**, such as current manufacturer prices and suggested pricing, manufacturer incentives, and current inventory including finished inventory on hand, production scheduling, shipment scheduling, inventory in transit, and manufacturing lead times. The automobile market data may be comprised solely of information received from the consumer interface **304**, dealer interface **306**, and manufacturer interface **308**, or may include additional information received from other sources. It should be appreciated that various methods of storing the automobile market data may be employed according to the system requirements. For example, database system **310** may be organized according to different manufacturers, automobile make and model, different information categories (e.g., suggested pricing, market prices, production, shipping, lot inventory), etc., and may consist of one or more databases on one or more servers **108**, **226** which may be remotely located from each other and/or a host device **104** of the automobile market information processing system **302**. As will be discussed further below, the automobile market data may be continually updated as new data is provided to the automobile market information processing system **302**.

The example process **400** continues with a consumer providing a request to a manufacturer for a response of whether an automobile can be provided (block **404**). For example, a car buyer fills in a request form on a website to receive a verification that a car can be produced or delivered. In this example embodiment, the buyer's request may be transmitted from consumer interface **304** via the internet to the automobile market information processing system **302**. In another example embodiment, a car buyer may be located at a dealer location and take a picture of a vehicle identification number (VIN) on a car that the buyer would like to receive information for. For example, using an application stored on a mobile device **103**, the buyer may take a picture of the VIN on a car. The buyer may want information on that specific car or on other comparable cars with the same or similar features and/or options. The picture of the VIN may be processed using optical character recognition, which allows the automobile market information processing system **302** to determine the make and model of the car, along with various other characteristics of the car. It should be appreciated that the VIN may include human readable characters, a bar code, or any other graphical or machine readable information which acts as a vehicle identification number. Accordingly, the buyer may perform research, for example, while at home or while shopping at a dealer location. Further, for example, the buyer may take a picture of a VIN anywhere, including at automobile trade shows, mall displays, or anywhere new cars or cars for sale are displayed. The buyer may even take a picture of a car

**10**

parked in the street as the buyer walks down the street. Any request or query communicated from the consumer interface **304** may be stored, for example, in database system **310**, thereby updating the automobile market information processing system **302** with current automobile market data.

The example process **400** may continue with providing automobile market data to a manufacturer based on the consumer request (block **406**). For example, the car manufacturer receives a real-time report including local car sales data, inventory data, car delivery data, and car build time data of the consumer's requested car. In an example embodiment, a report may include quality information, safety information, insurance information, consumer credit information (e.g., buyer FICO score), dealer rating information, incentive information, residual value information, and/or any other data which may be relevant to consumers. The report may be provided through manufacturer interface **308** and include the consumer requirements and preferences. The request and/or the report may be provided in real-time and may provide real-time data. Data reported based on a real-time updates in the automobile market information processing system **302** may provide significant advantages, for example, when pricing conditions may change quickly due to unforeseen market conditions. The recommendation engine **312** may provide recommendations to a manufacturer based on the current automobile market data. For example, a report may indicate various estimated sales probabilities for different prices that a dealer may offer or bid, which can be very useful information for a manufacturer. In an example embodiment, a probability for a manufacturer or dealer to sell a certain lot of automobiles within a time frame may be provided. Such information may be illustrated in various ways, such as a bell curve graph or a chart. Further, the recommendation engine may provide suggestions regarding manufacturer incentives or other factors which affect the automobile market. Manufacturers may use such information in making important decisions, such as setting pricing, setting or modifying production schedules, marketing directives, future product features and focus, and the like. Also, in an example embodiment, the manufacturer interface **308** may provide information that is limited to cars which meet the consumer request requirements. The manufacturer may customize the manufacturer interface **308** to provide information in a pre-specified manner to suit the manufacturers needs.

A manufacturer response is provided to the consumer indicating that the automobile can be provided for the consumer (block **408**). For example, the car maker provides a verification that a car can be produced, shipped, or is already in inventory based on current pricing data, car locations, and build times for the subject car. The manufacturer interface **308** may be used to communicate a verification, or a confirmation or offer to a buyer. For example, a verification may state that a particular car with specific features may be produced within forty-five days if the buyer purchases that car and may provide a confirmation number associated with the verification. In another example, a particular car currently being shipped to New York may be re-routed to Illinois. The automobile market data may include, for example, shipping costs that the manufacturer may use for determining if an automobile should be re-routed. An offer to produce or ship a particular car to a dealer location near a consumer may be authorized through the manufacturer interface **308**. In an example embodiment, the automobile market information processing system **302** may be pre-authorized by a manufacturer to provide a confirmation of specific model with specific feature sets. A manufacturer may determine whether it is profitable to produce a car from scratch based on the automo-

**11**                                        **12**

bile market data such as current market pricing, current inventory levels, and the like. Accordingly, a manufacturer response may be adjusted by current automobile market conditions. In an example embodiment, a manufacturer response may not require the use of manufacturer interface **308**, for example, a manufacturer may otherwise provide a consumer with a verification, which may be provided by the consumer for use in the automobile market information processing system **302**. Any verification, confirmation, offer, and/or response communicated from a manufacturer interface **308** may be stored, for example, in database system **310**, to further update the automobile market information processing system **302** with current automobile market data.

Then, a bid to sell the automobile to the consumer is requested from dealers based on the manufacturer response (block **410**). For example, several dealers provide bids based on the verification, current pricing data, dealer pickup locations, and potential add-ons. Each dealer's bid may include a price, for example, a price with no additional add-on products or services, such as service contracts, warranties, aftermarket accessories, etc. For example, add-on products may provide substantial value to a dealer, above and beyond the profit margin for the sale of the requested car. A dealer may profit from selling financing options, for example, if a consumer needs financing, the financier may pay the dealer for sourcing the loan. A dealer may sell service plans or maintenance packages (e.g., an extended service contract), selling warranties (e.g., a lifetime warranty), or selling insurance plans (e.g., life, accident, and health insurance, liability insurance, comprehensive insurance, etc.). Also, a dealer may also sell various hard add accessories, for example, bicycle racks, hitches, commercial accessories (e.g., lights and sirens), or any aftermarket products or modifications (e.g., sunroof).

One or more dealer bids are provided to the consumer (block **412**). For example, several dealers provide bids, so several different prices and delivery options may be available to the car buyer. Typically, the bid will include at least a specified price and pickup time and location. Typically, a pickup location will be a dealer lot or distribution location. In an example embodiment, a buyer that has taken a picture of a VIN with a mobile device may receive dealer bids within minutes or seconds on the mobile device. Accordingly, the bids may be used in real-time as the buyer may be actively shopping for a car on a dealer lot. It should be appreciated that some dealers may have multiple locations which could serve as a pickup location. In an example embodiment, the automobile market data may indicate that the particular car requested by a consumer should be priced at, for example, $26,000. However, various factors may affect the bid or offer that a dealer will make for the particular car. For example, the potential for forming a customer relationship, the value of potential add-on products and services, or competition with other dealers may cause a dealer to bid lower than normal. In such a case, the dealer may bid $25,000 in an effort to create a customer relationship, sell add-on products, and/or undercut the competition pricing. Other factors, such as the buyer's credit score (e.g., FICO score), may be used by a dealer in determining a bid, as this may affect the profitability of a sale.

Further, for example, the particular automobile requested may not be available for immediate pickup near the buyer, and various alternative delivery options may be provided from several dealers' bids. A car that is in transit to an out of state dealer may be re-routed to a dealer near the buyer, or a new car may be built to the buyer's desired specifications and delivered to a dealer near the buyer. Therefore, for example, the consumer interface **304** may provide several different bids with different delivery options and prices to the buyer, for example, a price of $26,000 to pick up the car at an out of state dealership the next day, a price of $26,000 to pick up the car at a local dealer in two months, or a price of $26,500 to pick up the car at a local dealer in five days. For example, the costs of re-routing a car already in shipment may be factored into dealer bids. Inventoryless bidding may be highly beneficial when dealers that do not have a requested automobile in inventory can still profitably provide a bid. Further, for example, cars that are not exactly what the buyer requested may also be offered to the buyer. For example, the buyer may request a four wheel drive car, but if a two wheel drive car that meets all the other buyer criteria is immediately available at a nearby dealer, the dealer may provide an offer to the buyer for this car, possibly at a significantly lower price, such as $23,000 instead of $26,000 for a four wheel drive car as requested. Further, for example, dealers may use information such as ratings data to optimize their bids. For example, if gasoline prices are increasing, mileage ratings for a particular car may dictate increasing or decreasing a bid. If a vehicle has very good gas mileage, and gas prices are skyrocketing, that car may have an increasing demand as gas prices increase, or vice versa. Similarly, safety ratings of vehicles may be important to consumer demand if high profile problems have appeared for a particular automobile style, make, or model. As discussed above, various automobile market information may be used by a dealer including safety information, insurance information, consumer credit information, dealer rating information, incentive information, residual value information, and/or any other data which may be relevant to consumers.

The consumer interface **304** may organize dealer bids based on a variety of factors and may provide supplemental information. For example, certain dealer bids may be selected as the best options, all dealer bids may be summarized, various additional ratings, reviews, or popularity information, financing information, etc. may also be provided to a consumer along with any dealer bids. The recommendation engine **312** may provide recommendations to a consumer based on the current automobile market data. For example, of ten dealer bids provided with a response, three bids may be recommended, for example, as "Great Deals!" It should be appreciated that in some cases, a particular consumer search may not return any dealer bids, for example, if consumer search requirements are unrealistic for the consumer's required price range. Also, for example, if only one or two bids are received, the recommendation engine **312** may recommend that a consumer wait for a better bid because the bids provided are not competitive offers based on the current automobile market data stored in the database system **310**. Further, in an example embodiment, dealer bids may be organized according to distance to a dealer pickup location, lowest price, closest match to the consumer entered criteria, a normalized quality index or value index, etc. The consumer may be able to toggle between different viewing options for dealer bids or search results.

Further, in an example embodiment, a buyer may be at a dealer lot (e.g., a Nissan dealer) and take a picture of a VIN on a car (e.g., a Maxima). A bid from a competing dealer (e.g., a Toyota dealer) across the street may be received on the mobile device within seconds and include information for a comparable car (e.g., an Avalon) relating to, for example, gas mileage, safety ratings, price comparisons, residual value, driving directions to the competing dealer, etc. In an example embodiment, a dealer may use the geolocation of the buyer, such as in instances when the buyer is physically located close to the dealer. Accordingly, competing dealer bids may be interbrand or intrabrand in nature, and may be tailored to the

US 9,141,984 B2

13                                              14

buyer's particular situation, which a consumer may find highly advantageous. For example, the buyer may have a bid for a car the buyer wants to test drive as well as a bid for a comparable car across the street before a salesman from the dealer even introduces himself. Accordingly, a consumer may weigh the pros and cons of various dealer bids, based on delivery options, pricing, and any other relevant variants. Any bids communicated from a dealer interface 306 may be stored, for example, in database system 310, to further update the automobile market information processing system 302 with current automobile market data.

The consumer selects a bid including a delivery option which specifies a pickup location (block 414). For example, the car buyer chooses a delivery option of picking up the car at a nearby dealer in five days. As noted above, a dealer may be a franchise dealer entity or a non-franchise distribution location. The buyer may select an offer with a specified delivery option on the consumer interface 304. The car buyer may have been weighing two or more different delivery options and/or different features, price differences, etc., based on the response(s) received through the consumer interface 304. As noted above, the consumer interface 304 may organize bids and other helpful information in a variety of ways, which may make the information easier for a consumer to digest. It should be appreciated that a buyer will typically want to pick up a new car at a convenient location, often near the buyer's home. Accordingly, dealers may attempt to provide delivery options tailored towards maximizing profit for the dealer while also maximizing convenience to the buyer, while also providing a superior bid to other dealers. By providing multiple bids with different delivery options, the buyer may be allowed to save time or money based on the buyer's particular needs. In an example embodiment, the buyer may provide a counter offer or different request via the consumer interface 304 to a dealer via the dealer interface 306. Accordingly, the dealer may respond in kind, and may update delivery options or other terms. It should be appreciated that the consumer selection of a bid may, for example, occur simultaneously with the consumer executing the sale or providing a deposit or down payment, or the like (see, e.g., block 418). Accordingly, in an example embodiment, once the buyer selects a bid, the buyer has effectively purchased the car, and the dealer does need to worry about the buyer backing out of the deal. Any consumer selections, counter offers, or additional requests or responses may be stored in database system 310, as the communications are processed by automobile market information processing system 302, providing further data updates. Accordingly, in an example embodiment, a consumer may select a bid to purchase a car, and that purchase information may then be provided to another consumer searching for the same type of car with similar features, for example, the next day.

Once a bid with a specific delivery option has been selected, the manufacturer is instructed to provide the automobile to a dealer according to the consumer bid selection (block 416). For example, the car maker is instructed to re-route a car already in transit to the dealer pickup location for delivery in less than five days. In an example embodiment, the dealer may be required to send an instruction message from the dealer interface 306 to the manufacturer interface 308. It should be appreciated that the specific manner of instruction may be changed based on the particular application, for example, the automobile market information processing system 302 may automatically provide an instruction to a manufacturer to produce a car or re-route a car. It should also be appreciated that particular events may be required to trigger instructing a car to be delivered to a dealer, such as a deposit,

financing approval, etc. Further, the consumer may be required to send an instruction message from the consumer interface 304 to the manufacturer interface 308 affirming that the buyer has agreed to purchase the car from the dealer.

The consumer and the dealer execute the sale of the automobile (block 418). For example, the consumer electronically signs documentation such as loan application and a contract and performs an electronic funds transfer or credit card payment. After the delivery option is selected, an electronic contract may be provided by the manufacturer for the buyer who may e-sign the contract, and/or any other loan applications or other documentation as needed. In another example embodiment, paper copies of a contract may be signed, for example, after the buyer prints them or receives them from a nearby dealer or through the mail. In an example embodiment, the buyer may provide cash or a paper check. It should be appreciated that the process of executing a contract may take some time. For example, the process may occur in several steps, as loan processing may be required prior to executing a contract for sale of a car. Also, it should be appreciated that, for example, the consumer selection of a bid discussed above (see, e.g., block 414) may occur simultaneously with the consumer executing the sale. Once the sale is completed, the actual transaction data including the final negotiated price, may be provided to and stored in database system 310. Accordingly, the automobile market information processing system 302 may be updated with current automobile market data from every step in the negotiation process between a consumer and a manufacturer. In an example embodiment, the updates provided to the automobile market information processing system 302 are provided in real-time, for example, data may be transmitted and processed within seconds or minutes. Further, for example, it should be appreciated that certain data may be provided to the automobile market information processing system 302 according to a batch processing schedule.

Next, the manufacturer provides the dealer with the purchased automobile according to the consumer bid selection (block 420). For example, the car maker re-routes a car en route to delivery at another dealer to the dealer pickup location selected by the car buyer or transports the car directly from the factory to the dealer pickup location. If a buyer chooses a quicker delivery option, the car may need to be re-routed from a different destination to the selected dealer pickup location. If a buyer does not urgently need to have a car, a new car may be built to the buyer's exact specifications and delivered to the selected dealer pickup location. Also, for example, a purchased car may be already at a dealer which the buyer has agreed to pick the car up, in which case, the car does not need to be provided to the dealer. A dealer may interact with the automobile market information processing system 302 using dealer interface 306, for example, to receive notification that a car will be picked up by a buyer, and to report that a car has been delivered to the dealer. A notification may also be sent via consumer interface 304 to the buyer that the car is available for pickup at the specified dealer.

Finally, the consumer picks up the purchased automobile according to the consumer selected delivery option at the dealer (block 422). For example, the car buyer picks up the car at the nearby dealer five days after the car sale is executed. The buyer may pick up the car without ever having to talk to or negotiate, in person or over the telephone, with the dealer. For example, the buyer may arrive at the dealer, show identification and proof of purchase, and be provided the keys to the car. The buyer may sign paperwork indicating the car has been picked up. Also, the dealer may offer or provide additional products or services to the buyer when the buyer goes

US 9,141,984 B2

15

to the dealer to pick up the car. For example, the dealer may offer financing options, warranties, service plans, insurance plans, and hard add accessories to the buyer, as discussed in further detail above.

Accordingly, it should be appreciated that manufacturers, consumers, and dealers may receive significant benefits from the method of facilitating an automobile transaction disclosed herein. For example, production scheduling, price setting, inventory management, may be greatly improved for manufacturers and dealers by utilizing the disclosed system and method. Consumers may benefit from more competitive pricing, piece of mind knowing that a fair market price is being offered for prospective purchases, and improved delivery options that allow the consumer to weigh the benefits and drawbacks of different delivery options, pricing, and other variables. In an example embodiment, consumers can view prices paid for comparable cars in specific locations based on the automobile market data in the automobile market information processing system 302, for example, within a certain time frame such as one month and within a certain proximity to the consumer. Moreover, various inefficiencies in the automobile industry may be minimized utilizing the presently disclosed system and method.

FIG. 5 illustrates a block diagram of an example data architecture 500. In the example data architecture 500, interface data 502, administrative data 504, and automobile market data 506 interact with each other, for example, based on user commands or requests. The interface data 502, administrative data 504, and automobile market data 506 may be stored on any suitable storage medium (e.g., server 226). It should be appreciated that different types of data may use different data formats, storage mechanisms, etc. Further, various applications may be associated with processing interface data 502, administrative data 504, and automobile market data 506. Various other or different types of data may be included in the example data architecture 500.

Interface data 502 may include input and output data of various kinds. For example, input data may include mouse click data, scrolling data, hover data, keyboard data, touch screen data, voice recognition data, etc., while output data may include image data, text data, video data, audio data, etc. Interface data 502 may include data relating to formatting, user interface options, links or access to other websites or applications, and the like. Interface data 502 may include applications used to provide or monitor interface activities and handle input and output data.

Administrative data 504 may include data and applications regarding project data or data related to project compensation. For example, administrative data 504 may include information used for updating accounts, such as creating or modifying manufacturer accounts or dealer accounts. Further, administrative data 504 may include access data and/or security data. Administrative data 504 may interact with interface data in various manners, providing a user interface 304, 306, 308 with administrative features, such as implementing a user login and the like.

Automobile market data 506 may include, for example, executed sales data 508, consumer data 510, dealer data 512, manufacturer data 514, statistical data 516, and/or historical data 518. Executed sales data 508 may include actual negotiated prices for manufacturer and dealer sales, differences in list prices to negotiated prices, sales demographics, etc. Consumer data 510 may include consumer search activity, consumer requests and offers, consumer feedback, etc. Dealer data 512 may include dealer pricing, including list prices, sale prices for limited time dealer offers or deals of the day, negotiation information such as bottom line pricing, offers

16

received, foot traffic activity, and dealer inventory data, including current on location data, automobile turnover rates, etc. Manufacturer data 514 may include manufacturer pricing, including suggested pricing, preferred dealer pricing, etc., manufacturer incentives including cash rebates, special lease rates, special APR rates, zero down offers, lifetime warranties, guaranteed trade-in offers, etc., and inventory information including dealer inventory, inventory by location, inventory in transit, manufacturing or production lead times or build times, production scheduling, shipping scheduling, etc. Statistical data 516 may include information used for providing reports including graphs, forecasts, recommendations, calculators, depreciation schedules, tax information, etc., including equations and other data used for statistical analysis. Historical data 508 may include past sales data, such as historical list prices, actual sale prices, manufacturer and dealer margins, operating costs, service costs or profitability, loyalty information, etc. It should be appreciated that data may fall under multiple categories of automobile market data 506, or change with the passage of time. It should also be appreciated that automobile market data 506 may be tailored for a particular manufacturer or dealer, for example, a manufacturer may request that a specific type of data that is not normally stored or used be stored in the database system 310. Accordingly, for example, customized reports may be provided to a manufacturer interface 308 using that specific data for the manufacturer.

The integration of the various types of automobile market data 506 received from the consumer interface 304, dealer interface 306, and manufacturer interface 308 may provide a synergistic and optimal resource for consumers, dealers, and manufacturers alike. In an example embodiment, a consumer may benefit greatly from using an application in a mobile device 103 to receive both intrabrand information and interbrand information in real-time, based only on taking a picture of VIN. Dealers and manufacturers may be able to provide information to the consumer in a manner that highlights the benefits of the products the respective dealer or manufacturer would like to sell. The intrabrand and interbrand information provided on a consumer interface 304 may allow the best automobile options for a particular consumer to be provided to that consumer, may allow manufacturers to better follow through with opportunities for sales, and may allow dealers to compete with other dealers taking into account a greater amount of automobile market information, all of which may result in a more efficient automobile market.

Automobile market data 506 may be maintained in various servers 108, in databases or other files. It should be appreciated that, for example, a host device 104 may manipulate automobile market data 506 in accordance with the administrative data 504 and interface data 502 to provide requests or reports to users 114 including consumers, dealers, and manufacturers, and perform other associated tasks. It should also be appreciated that automobile market data 506 represents automobile market information, and that these terms may be used interchangeably in this disclosure depending upon the context.

FIG. 6 is flow diagram illustrating an example process 600 for facilitating an automobile transaction, according to an example embodiment of the present invention. Although the process 600 is described with reference to the flow diagram illustrated in FIG. 6, it will be appreciated that many other methods of performing the acts associated with the process 600 may be used. For example, the order of many of the blocks may be changed, certain blocks may be combined with other blocks, and many of the blocks described are optional.

US 9,141,984 B2

17                                                                          18

In the example process **600**, data may flow between the automobile market information processing system **302** and a consumer interface **304**, a manufacturer interface **308**, and a dealer interface **306**, as discussed above based on consumer, manufacturer, and dealer interaction with the automobile market information processing system **302**. It should be appreciated that the automobile market information processing system **302** may update the automobile market information stored in the database system **310** when automobile market information is received from a consumer, a dealer, or a manufacturer, or from any other information source. Accordingly, the automobile market information may remain current and/or provide sufficiently recent data for the benefit of consumers, dealers, and/or manufacturers.

The example process **600** may begin with a consumer taking a picture of a VIN using a mobile phone application (block **602**). The consumer interface **304** may use OCR to determine and provide the VIN to the automobile market information processing system **302** to provide a consumer request (block **604**). It should be appreciated that OCR may occur in the automobile market information processing system **302** or at the consumer interface **304**. The automobile market information processing system **302** receives the consumer request and prepares automobile market information based on the request (block **606**). The automobile market information processing system **302** may send the consumer request and automobile market information based on the consumer request to the manufacturer interface **308** (block **608**). It should be appreciated that while the consumer request is automobile market information, typically, additional automobile market information would be provided with the consumer request. For example, typically, data relating to recent sales of the requested automobile and/or comparable automobiles may be provided. In an example embodiment, a target price or "true" value of the requested automobile may be provided. The manufacturer receives the request, determines that an automobile can be provided and prepares and provides verification information for consumer and dealers (block **610**). A manufacturer response with the verification information may be provided from the manufacturer interface **308** to the automobile market information processing system **302** (block **612**). The automobile market information processing system **302** receives and processes the manufacturer response with the verification and prepares and provides information for consumer and dealers (block **614**). The manufacturer response with a verification may be sent from the automobile market information processing system **302** to the consumer interface **304** (block **616**). It should be appreciated that other automobile market information may be provided to the consumer interface **304** with a verification, for example, suggested pricing, ratings information, etc. The consumer interface **304** receives the verification that the automobile can be provided, for example, as a confirmation message on the mobile device (block **618**).

The automobile market information processing system **302** may also send to the dealer interface **306** a bid request for one or more dealers (block **620**). One or more dealers receive a bid request, determine prices and delivery options for the automobile, and prepare and provide bids for the consumer (block **622**). A dealer bid may be sent from the dealer interface **306** to the automobile market information processing system **302** for each dealer that wants to provide a bid (block **624**). The automobile market information processing system **302** receives and processes dealer bids and prepares the bids and automobile market data for the consumer (block **626**). The automobile market information processing system **302** may send dealer bids and automobile market information to the

consumer interface **304** (block **628**). It should be appreciated that automobile market information may be provided to the consumer before dealer bids are provided, and/or concurrently with dealer bids. Also, it should be appreciated that blocks **616** and **628** may be combined, particularly if the dealer bidding process can occur quickly, for example, in real-time. The consumer may receive dealer bids based on the verification and select a bid including a delivery option based on automobile market information (block **630**). The consumer interface **304** may send to the automobile market information processing system **302** a selection of a bid indicating that the consumer wants to purchase or lease the automobile based on the selected bid (block **632**). The automobile market information processing system **302** receives and processes the consumer bid selection (block **634**). For example, the automobile market information processing system **302** may send the bid selection to the dealer interface **306** (block **636**). The dealer may receive the bid selection and coordinate a sale by, for example, instructing the manufacturer to produce and ship the automobile to the dealer location for delivery to the consumer (block **638**). Also, for example, the dealer may provide contract or loan documents, collect a deposit or down payment, or the like. As discussed above, in each of blocks **606**, **614**, **626**, and **634**, the automobile market information processing system **302** may update the automobile market information in the database system **310** based on the information received from the consumer, dealer, and/or manufacturer.

For exemplary purposes, the present disclosure discusses a various examples relating to a purchase of a car. However, it should be appreciated that the disclosed system, methods, and apparatus may be advantageously used in relation to various automobiles other than cars including, for example, trucks, vans, sport utility vehicles, jeeps, motorcycles, commercial vehicles, and/or automobiles that have a VIN and require a license plate to operate.

It will be appreciated that all of the disclosed methods and procedures described herein can be implemented using one or more computer programs or components. These components may be provided as a series of computer instructions on any conventional computer-readable medium, including RAM, ROM, flash memory, magnetic or optical disks, optical memory, or other storage media. The instructions may be configured to be executed by a processor, which when executing the series of computer instructions performs or facilitates the performance of all or part of the disclosed methods and procedures.

Further, it will be appreciated that the presently disclosed system, methods, and apparatus for performing automobile transactions may be utilized in conjunction with other systems or methods. For example, the presently disclosed system, methods, and apparatus may be used in conjunction with the disclosure in the co-pending commonly-owned patent application filed on Jul. 5, 2011, entitled "AUTOMOBILE TRANSACTION FACILITATION BASED ON CUSTOMER SELECTION OF A SPECIFIC AUTOMOBILE," the entire contents of which are hereby incorporated by reference herein, and in an example embodiment, the features of which may be combined with the features of the present disclosure.

It should be understood that various changes and modifications to the example embodiments described herein will be apparent to those skilled in the art. Such changes and modifications can be made without departing from the spirit and scope of the present subject matter and without diminishing

US 9,141,984 B2

19

its intended advantages. It is therefore intended that such changes and modifications be covered by the appended claims.

The invention is claimed as follows:

**1**. A method comprising:

storing, on a computer readable medium, automobile market data which is representative of recent automobile market characteristics, including at least pricing data and inventory data, wherein the automobile market data includes information received from at least one manufacturer, a plurality of dealers, and a plurality of consumers, wherein at least a portion of the automobile market data is updated in real-time;

receiving, via a consumer interface, a first request for a response regarding a first automobile, which is manufactured by a first manufacturer, the first request made by a consumer located at a first location and including geolocation information of the consumer;

executing instructions, by at least one processing device, to:

determine current inventory data of the first automobile, wherein the current inventory data of the first automobile includes a plurality of dealer inventories of a plurality of dealers, with each respective dealer of the plurality of dealers having a respective dealer inventory, and wherein the current inventory data indicates that a first dealer of the plurality of dealers does not currently have the first automobile in a first inventory of the first dealer;

provide first automobile market data including the current inventory data of the first automobile to the first manufacturer, based on the first request, via a manufacturer interface, wherein the first automobile market data is based on real-time automobile market data;

generate, based on the first automobile market data including the current inventory data of the first automobile, via the manufacturer interface, at least one of a verification indicating that the first automobile can be provided for the consumer, a confirmation indicating that the first automobile can be provided for the consumer, and an offer indicating that the first automobile can be provided for the consumer;

determine, using the geolocation information, that the consumer is located at the first location;

generate, based on the first location, an in-market dealer area proximately located to the first location;

determine that the first dealer is located at a second location within the in-market dealer area;

provide a first manufacturer response via the consumer interface, the first manufacturer response including the at least one of the verification indicating that the first automobile can be provided for the consumer, the confirmation indicating that the first automobile can be provided for the consumer, and the offer indicating that the first automobile can be provided for the consumer;

request, from the first dealer, via a dealer interface, an inventoryless bid to sell the first automobile based on the first manufacturer response;

receive, from the first dealer located at the second location and engaging in inventoryless bidding, the inventoryless bid to provide the first automobile, which is at least one of yet to be manufactured and in the inventory of another entity;

generate driving directions from the first location to the second location; and

20

provide the inventoryless bid and the driving directions to the consumer interface, the inventoryless bid including at least a price and a delivery option; and

receiving a consumer selection of the inventoryless bid including a first delivery option which specifies a pickup location at the first dealer, wherein the consumer selection indicates a consumer intention to purchase the first automobile.

**2**. A method comprising:

storing, on a computer readable medium, automobile market data which is representative of recent automobile market characteristics, including at least pricing data and inventory data, wherein the automobile market data includes information received from at least one manufacturer, a plurality of dealers, and a plurality of consumers;

receiving, via a consumer interface, a first request for a response regarding a first automobile, which is manufactured by a first manufacturer, the first request made by a consumer located at a first location and including geolocation information of the consumer;

executing instructions, by at least one processing device, to:

determine current inventory data of the first automobile, wherein the current inventory data of the first automobile includes a plurality of dealer inventories of a plurality of dealers, with each respective dealer of the plurality of dealers having a respective dealer inventory, and wherein the current inventory data indicates that a first dealer of the plurality of dealers does not currently have the first automobile in a first inventory of the first dealer;

provide first automobile market data including the current inventory data of the first automobile to the first manufacturer, based on the first request, via a manufacturer interface;

generate, based on the first automobile market data including the current inventory data of the first automobile, via the manufacturer interface, at least one of a verification indicating that the first automobile can be provided for the consumer, a confirmation indicating that the first automobile can be provided for the consumer, and an offer indicating that the first automobile can be provided for the consumer;

determine, using the geolocation information, that the consumer is located at the first location;

generate, based on the first location, an in-market dealer area proximately located to the first location;

determine that the first dealer is located at a second location within the in-market dealer area;

provide a first manufacturer response via the consumer interface, the first manufacturer response including the at least one of the verification indicating that the first automobile can be provided for the consumer, the confirmation indicating that the first automobile can be provided for the consumer, and the offer indicating that the first automobile can be provided for the consumer;

request, from the first dealer, via a dealer interface, an inventoryless bid to sell the first automobile based on the first manufacturer response;

receive, from the first dealer located at the second location and engaging in inventoryless bidding, the inventoryless bid to provide the first automobile, which is at least one of yet to be manufactured and in the inventory of another entity;

US 9,141,984 B2

21

generate driving directions from the first location to the second location; and

provide the inventoryless bid and the driving directions to the consumer interface, the inventoryless bid including at least a price and a delivery option; and

receiving a consumer selection of the inventoryless bid including a first delivery option which specifies a pickup location at the first dealer.

**3**. The method of claim **2**, wherein the pricing data includes normal listing prices, sale prices, manufacturer incentives, actual prices of executed transactions, and consumer offers.

**4**. The method of claim **2**, wherein the inventory data includes at least one of inventory data by location, inventory in transit data, production lead time data, production schedule data, and shipping schedule data.

**5**. The method of claim **2**, wherein the first request is made by a consumer on a website using a request form including at least one of a text box and a drop down list.

**6**. The method of claim **2**, wherein the first request is made by a consumer using a mobile device which takes a picture of a vehicle identification number.

**7**. The method of claim **6**, wherein the vehicle identification number is recognized using optical character recognition.

**8**. The method of claim **2**, wherein the first automobile is one of a particular type of car with a specific set of features and a particular car with a specific vehicle identification number.

**9**. The method of claim **2**, wherein the first automobile market data provided to the first manufacturer consists of at least one of the first request and a suggested bid price.

**10**. The method of claim **2**, wherein the first automobile market data is based on real-time automobile market data.

**11**. The method of claim **2**, wherein the consumer selection of the inventoryless bid indicates that the consumer intends to one of purchase the first automobile and lease the first automobile.

**12**. The method of claim **2**, further comprising:

causing the at least one processing device to process the consumer selection of the first inventoryless bid to facilitate:

instructing the first manufacturer to provide the first automobile to the first dealer based on the consumer selection of the inventoryless bid; and

executing a sale, including at least one of providing for electronic signature of documents and providing for an electronic funds transfer.

**13**. The method of claim **12**, wherein the first automobile is made available for pickup at the first dealer according to the consumer selected first delivery option.

**14**. The method of claim **2**, wherein the manufacturer interface allows a manufacturer to request data via the consumer interface from a plurality of consumers.

**15**. The method of claim **2**, wherein the manufacturer interface allows a manufacturer to request data via the dealer interface from a plurality of dealers.

**16**. The method of claim **2**, wherein the first dealer at least one of provides and offers at least one of a financing plan, a service plan, an insurance plan, a warranty, and a hard add accessory, for at least the first automobile.

**17**. The method of claim **2**, wherein the first dealer is at least one of a franchise dealer and a non-franchise distribution location.

**18**. The method of claim **2**, wherein the automobile market data includes consumer interest data.

**19**. The method of claim **2**, wherein the first manufacturer response includes an acknowledgement of interest.

22

**20**. The method of claim **2**, wherein the inventoryless bid includes a first price corresponding to the first delivery option and a second price corresponding to a second delivery option.

**21**. A system comprising:

a computer readable medium storing automobile market data which is representative of recent automobile market characteristics, including at least pricing data and inventory data, wherein the automobile market data includes information received from at least one manufacturer, a plurality of dealers, and a plurality of consumers; and

at least one processing device operably coupled to the computer readable medium, the at least one processing device executing instructions to:

receive, via a consumer interface, a first request for a response regarding a first automobile, which is manufactured by a first manufacturer, the first request made by a consumer located at a first location and including geolocation information of the consumer;

determine current inventory data of the first automobile, wherein the current inventory data of the first automobile includes a plurality of dealer inventories of a plurality of dealers, with each respective dealer of the plurality of dealers having a respective dealer inventory, and wherein the current inventory data indicates that a first dealer of the plurality of dealers does not currently have the first automobile in a first inventory of the first dealer;

provide first automobile market data including the current inventory data of the first automobile to the first manufacturer, based on the first request, via a manufacturer interface;

generate, based on the first automobile market data including the current inventory data of the first automobile, via the manufacturer interface, at least one of a verification indicating that the first automobile can be provided for the consumer, a confirmation indicating that the first automobile can be provided for the consumer, and an offer indicating that the first automobile can be provided for the consumer;

determine, using the geolocation information, that the consumer is located at the first location;

generate, based on the first location, an in-market dealer area proximately located to the first location;

determine that the first dealer is located at a second location within the in-market dealer area;

provide a first manufacturer response via the consumer interface, the first manufacturer response including the at least one of the verification indicating that the first automobile can be provided for the consumer, the confirmation indicating that the first automobile can be provided for the consumer, and the offer indicating that the first automobile can be provided for the consumer;

request, from the first dealer, via a dealer interface, an inventoryless bid to sell the first automobile based on the first manufacturer response;

receive, from the first dealer located at the second location and engaging in inventoryless bidding, the inventoryless bid to provide the first automobile, which is at least one of yet to be manufactured and in the inventory of another entity;

generate driving directions from the first location to the second location;

provide the inventoryless bid and the driving directions via the consumer interface, the inventoryless bid including at least a price and a delivery option; and

US 9,141,984 B2

23

receive a consumer selection of the inventoryless bid including a first delivery option which specifies a pickup location at the first dealer.

**22**. The system of claim **21**, wherein the pricing data includes normal listing prices, sale prices, manufacturer incentives, actual prices of executed transactions, and consumer offers.

**23**. The system of claim **21**, wherein the inventory data includes at least one of inventory data by location, inventory in transit data, production lead time data, production schedule data, and shipping schedule data.

**24**. The system of claim **21**, wherein the request is made by a consumer on a website using a request form including at least one of a text box and a drop down list.

**25**. The system of claim **21**, wherein the request is made by a consumer using a mobile device which takes a picture of a vehicle identification number.

**26**. The system of claim **25**, wherein the vehicle identification number is recognized using optical character recognition.

**27**. The system of claim **21**, wherein the first automobile is one of a particular type of car with a specific set of features and a particular car with a specific vehicle identification number.

**28**. The system of claim **21**, wherein the first automobile market data provided to the first manufacturer consists of at least one of the first request and a suggested bid price.

**29**. The system of claim **21**, wherein the first automobile market data is based on real-time automobile market data.

**30**. The system of claim **21**, wherein the consumer selection of the inventoryless bid indicates that the consumer intends to one of purchase the first automobile and lease the first automobile.

**31**. The system of claim **21**, wherein the at least one processing device executes instructions to process the consumer selection of the first bid to facilitate:

instructing the first manufacturer to provide the first automobile to the first dealer based on the consumer selection of the inventoryless bid; and

executing a sale, including at least one of providing for electronic signature of documents and providing for an electronic funds transfer.

**32**. The system of claim **31**, wherein the first automobile is made available for pickup at the first dealer according to the consumer selected first delivery option.

**33**. The system of claim **21**, wherein the manufacturer interface allows a manufacturer to request data via the consumer interface from a plurality of consumers.

**34**. The system of claim **21**, wherein the manufacturer interface allows a manufacturer to request data via the dealer interface from a plurality of dealers.

**35**. The system of claim **21**, wherein the first dealer at least one of provides and offers at least one of a financing plan, a service plan, an insurance plan, a warranty, and a hard add accessory, for at least the first automobile.

**36**. The system of claim **21**, wherein the first dealer is at least one of a franchise dealer and a non-franchise distribution location.

**37**. The system of claim **21**, wherein the automobile market data includes consumer interest data.

**38**. The system of claim **21**, wherein the first manufacturer response includes an acknowledgement of interest.

24

**39**. A non-transitory computer readable medium storing software instructions which, when executed, cause an information processing apparatus to:

store automobile market data which is representative of recent automobile market characteristics, including at least pricing data and inventory data, wherein the automobile market data includes information received from at least one manufacturer, a plurality of dealers, and a plurality of consumers;

receive, via a consumer interface, a first request for a response regarding a first automobile, which is manufactured by a first manufacturer, the first request made by a consumer located at a first location and including geolocation information of the consumer;

determine current inventory data of the first automobile, wherein the current inventory data of the first automobile includes a plurality of dealer inventories of a plurality of dealers, with each respective dealer of the plurality of dealers having a respective dealer inventory, and wherein the current inventory data indicates that a first dealer of the plurality of dealers does not currently have the first automobile in a first inventory of the first dealer;

provide first automobile market data including the current inventory data of the first automobile to the first manufacturer, based on the first request, via a manufacturer interface;

generate, based on the first automobile market data including the current inventory data of the first automobile, via the manufacturer interface, at least one of a verification indicating that the first automobile can be provided for the consumer, a confirmation indicating that the first automobile can be provided for the consumer, and an offer indicating that the first automobile can be provided for the consumer;

determine, using the geolocation information, that the consumer is located at the first location;

generate, based on the first location, an in-market dealer area proximately located to the first location;

determine that the first dealer is located at a second location within the in-market dealer area;

provide a first manufacturer response via the consumer interface, the first manufacturer response including the at least one of the verification indicating that the first automobile can be provided for the consumer, the confirmation indicating that the first automobile can be provided for the consumer, and the offer indicating that the first automobile can be provided for the consumer;

request, from the first dealer, via a dealer interface, an inventoryless bid to sell the first automobile based on the first manufacturer response;

receive, from the first dealer located at the second location and engaging in inventoryless bidding, the inventoryless bid to provide the first automobile, which is at least one of yet to be manufactured and in the inventory of another entity;

generate driving directions from the first location to the second location;

provide the inventoryless bid and the driving directions via the consumer interface, the inventoryless bid including at least a price and a delivery option; and

receive a consumer selection of the inventoryless bid including a first delivery option which specifies a pickup location at the first dealer.

\* \* \* \* \*

US008650093B2

(12) **United States Patent**
Seergy et al.

(10) Patent No.: **US 8,650,093 B2**
(45) **Date of Patent:** **Feb. 11, 2014**

(54) **USED AUTOMOBILE TRANSACTION FACILITATION FOR A SPECIFIC USED AUTOMOBILE**

(75) Inventors: **Michael J. Seergy**, Pine Brook, NJ (US); **Benjamin N. S. Brown**, Pine Brook, NJ (US)

(73) Assignee: **Sidekick Technology LLC**, Pine Brook, NJ (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 76 days.

(21) Appl. No.: **13/207,858**

(22) Filed: **Aug. 11, 2011**

(65) **Prior Publication Data**

US 2012/0036033 A1    Feb. 9, 2012

**Related U.S. Application Data**

(63) Continuation-in-part of application No. 13/176,497, filed on Jul. 5, 2011, and a continuation-in-part of application No. 13/176,525, filed on Jul. 5, 2011.

(51) **Int. Cl.**
*G06Q 30/00* (2012.01)

(52) **U.S. Cl.**
USPC ........................................ **705/26.4**; 705/26.1

(58) **Field of Classification Search**
USPC ..................................... 705/26.1, 27.1, 26.4
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 5,970,472 | A | 10/1999 | Allsop et al. |
| 6,006,201 | A | 12/1999 | Berent et al. |
| 6,321,221 | B1 | 11/2001 | Bieganski |
| 6,463,431 | B1 | 10/2002 | Schmitt |
| 6,533,173 | B2 | 3/2003 | Benyak |
| 6,868,388 | B1 | 3/2005 | Millsap et al. |
| 6,868,389 | B1 | 3/2005 | Wilkins et al. |
| 7,395,223 | B1 | 7/2008 | Buzzell et al. |
| 7,406,436 | B1 | 7/2008 | Reisman |
| 7,479,949 | B2 | 1/2009 | Jobs et al. |
| 7,636,574 | B2 | 12/2009 | Poosala |
| 2002/0065707 | A1 | 5/2002 | Lancaster et al. |
| 2002/0082978 | A1 | 6/2002 | Ghouri et al. |
| 2002/0099628 | A1 | 7/2002 | Takaoka et al. |
| 2002/0111877 | A1 | 8/2002 | Nelson |
| 2003/0088435 | A1 | 5/2003 | King |
| 2003/0200151 | A1* | 10/2003 | Ellenson et al. ................ 705/26 |

(Continued)

OTHER PUBLICATIONS

Anonymous, "instaVIN to offer free auto accident history reports for mobile phones," Wireless News, Jun. 2, 2010.*

(Continued)

*Primary Examiner* — Brandy A Zukanovich

(74) *Attorney, Agent, or Firm* — K&L Gates LLP

(57) **ABSTRACT**

A system, methods, and apparatus for performing used automobile transactions are disclosed. In an example embodiment, automobile market data representative of current automobile market characteristics is stored. The automobile market data may include pricing and consumer interest information received from consumers, dealers, and manufacturers. A consumer seller or manufacturer off-lease seller may provide a request for a response regarding a specific used automobile with a specific a vehicle identification number. Automobile market data may be provided to a used automobile buyer based on the request. Bids to purchase the specific used automobile may be requested from used automobile buyers based on the request. Buyer bids may be provided to the consumer seller or manufacturer off-lease seller with prices and a delivery options. The consumer seller or manufacturer off-lease seller may select a bid to sell the specific used automobile based on the bid.

**11 Claims, 7 Drawing Sheets**



US 8,650,093 B2

Page 2

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 2003/0229577 | A1 | 12/2003 | Nabel |
| 2004/0034544 | A1 | 2/2004 | Fields et al. |
| 2004/0059626 | A1 | 3/2004 | Smallwood |
| 2005/0004819 | A1 | 1/2005 | Etzioni et al. |
| 2005/0050097 | A1 | 3/2005 | Yeh et al. |
| 2005/0108112 | A1 | 5/2005 | Ellenson et al. |
| 2005/0240512 | A1 | 10/2005 | Quintero et al. |
| 2006/0020477 | A1 | 1/2006 | Retzbach et al. |
| 2007/0150362 | A1 | 6/2007 | Sharma et al. |
| 2007/0255663 | A1 | 11/2007 | Jordan et al. |
| 2007/0260526 | A1 | 11/2007 | Bartel |
| 2008/0046331 | A1 | 2/2008 | Rand |
| 2008/0177653 | A1 | 7/2008 | Famolari et al. |
| 2008/0183552 | A1 | 7/2008 | O'Hagan |
| 2008/0187125 | A1 | 8/2008 | Siegrist |
| 2008/0201184 | A1 | 8/2008 | Rose et al. |
| 2008/0201188 | A1 | 8/2008 | Heyman et al. |
| 2008/0201203 | A1 | 8/2008 | Rose et al. |
| 2008/0208731 | A1 | 8/2008 | Ruckart |
| 2008/0228657 | A1 | 9/2008 | Nabors et al. |
| 2009/0132348 | A1 | 5/2009 | Bria et al. |
| 2009/0149199 | A1 | 6/2009 | Maghoul |
| 2009/0171761 | A1 | 7/2009 | Noy et al. |
| 2009/0187478 | A1 | 7/2009 | Shipley |
| 2009/0187513 | A1 | 7/2009 | Noy et al. |
| 2009/0198557 | A1 | 8/2009 | Wang et al. |
| 2009/0204600 | A1 | 8/2009 | Kalik et al. |
| 2010/0048242 | A1 | 2/2010 | Rhoads et al. |
| 2010/0106580 | A1 | 4/2010 | Etheredge et al. |
| 2010/0217525 | A1 | 8/2010 | King et al. |
| 2010/0274627 | A1 | 10/2010 | Carlson |
| 2010/0332292 | A1 | 12/2010 | Anderson |
| 2011/0040642 | A1 | 2/2011 | O'Dell |
| 2011/0082759 | A1 | 4/2011 | Swinson et al. |
| 2011/0087430 | A1 | 4/2011 | Boss et al. |
| 2011/0087556 | A1 | 4/2011 | Pitkow |
| 2011/0099036 | A1 | 4/2011 | Sarkissian et al. |
| 2011/0208418 | A1 | 8/2011 | Looney et al. |
| 2011/0238474 | A1 | 9/2011 | Carr et al. |
| 2011/0238514 | A1 | 9/2011 | Ramalingam et al. |
| 2011/0276394 | A1 | 11/2011 | Chan |

OTHER PUBLICATIONS

AutoTrader.com, Inc..: Private Company Information-Business Week, http://investing.businessweek.com/research/stocks/private/snapshot.asp?privcapId=92642.

Autotrader.com Introduces IPhone App to Create a More Personalized "PC-to-Pocket" Experience for Car Shoppers, from http://www.prnewswire.com/news-releases/autotradercom, Jul. 7, 2011.

AppStore-AutoTrader.com, http://itunes.apple.com/us/app/autotrader-com/id444552888?mt=8, Oct. 31, 2011.

International Search Report issued Sep. 21, 2012 corresponding to Intl. Appln. No. PCT/US2012/045546.

Charlton, Auto Trader: iPhone app review. Mar. 15, 2010 [retrieved on Sep. 6, 2012] from the internet: <URL: http://econsultancy.com/us/blog/5593-auto-trader-iphone-app-review> entire document.

Autodraderuk. Introducing the Auto Trader iPhone App. Mar. 12, 2010 [retrieved on Sep. 6, 2012] from the internet: <URL: http://www.youtube.com/watch?v+6g_lg8IRG4&feature=player_embedded> entire document.

International Search Report mailed Oct. 5, 2012 for corresponding Intl. Appln. No. PCT/US2012/045545.

* cited by examiner



Fig. 1



Fig. 2



Fig. 3A



Fig. 3B



Start
400
402
Automobile market data including at least pricing data is stored in a database system (e.g., data from consumers, dealers, manufacturers, and industry analysts, regarding pricing, inventory, insurance information, quality ratings, safety ratings, and other ratings is collected and stored in a database)
404
A request for a response regarding a used automobile is received from a consumer seller (e.g., a used car seller takes a picture of the VIN of a used car and fills in price parameters and other information into a mobile application to receive a response based on current market data)
406
Automobile market data is provided to used automobile buyers based on the consumer seller request (e.g., a group of consumers and dealers receive a real-time report including local used car sales data, inventory data, quality and safety ratings data, insurance data, and gas mileage data of the specific used car)
408
A bid to purchase the automobile from the consumer seller is requested from used automobile buyers (e.g., a group of consumers and dealers within a certain radius of the used car seller receive a bid request based on buyer searches)
410
Buyer bids are provided to the consumer seller (e.g., several consumers and dealers provide bids based on current pricing data, options information on the specific used car, and potential pickup locations, so several different prices and delivery options may be available to the used car seller)
412
The consumer seller selects a buyer bid including a price and a delivery option (e.g., the used car seller chooses to sell the used car based on the price and the pickup location of a consumer buyer bid)
414
The consumer seller and used automobile buyer execute the sale of the automobile (e.g., the used car buyer e-signs a contract and electronically transfers funds to the used car seller based on the consumer bid)
416
The consumer seller makes the purchased used automobile available according to the consumer seller bid selection (e.g., the seller drives the used car to the pickup location if the pickup location is not the used car seller's location)
418
The used automobile buyer receives the purchased used automobile according to the consumer seller selected delivery option (e.g., the used car buyer receives the used car at the pickup location the same day the sale is executed)

Fig. 4



Fig. 5



Fig. 6

US 8,650,093 B2

1

## USED AUTOMOBILE TRANSACTION FACILITATION FOR A SPECIFIC USED AUTOMOBILE

### CROSS REFERENCE TO RELATED APPLICATIONS AND PRIORITY CLAIM

This application is a continuation-in-part of the following co-pending commonly-owned patent applications filed on Jul. 5, 2011, entitled "AUTOMOBILE TRANSACTION FACILITATION USING A MANUFACTURER RESPONSE," application Ser. No. 13/176,497, and entitled "AUTOMOBILE TRANSACTION FACILITATION BASED ON CUSTOMER SELECTION OF A SPECIFIC AUTOMOBILE," application Ser. No. 13/176,525, the entire contents of each of which is incorporated by reference herein.

### BACKGROUND

In the used automobile market, consumers typically sell or trade in used automobiles to dealers or dealerships, or privately sell to other consumers, for example, through personal advertisements. Dealers often purchase used automobiles from consumers as part of a deal for a new automobile, typically referred to as a trade in. Typically, a description of a used automobile in a personal advertisement may include the make, model, and mileage of an automobile, but certain other relevant descriptive information may not be available to a potential buyer. Further, a dealer making a trade in offer for a used automobile may not have certain relevant descriptive information on that used automobile. In many cases, the negotiation process for a used automobile may include a large degree of uncertainty for consumers, including both a selling consumer and a purchasing consumer. A consumer seller may be particularly disadvantaged when negotiating with a dealer for a trade in value, as dealers typically have great knowledge and experience with the process, while consumers typically do not. Generally, the negotiation process is a zero sum process, and because a consumer seller of a used automobile and a used automobile buyer are each trying to get a better deal, there is typically some lack of trust during the negotiation. Accordingly, used automobile buyers and sellers, including consumers and dealers, often base the negotiations on established market prices. However, market prices can fluctuate rapidly depending a variety of factors. For example, consumer demand may be affected by economic factors, such as changes in gasoline prices, unemployment rates, government sponsored tax rebates for automobile purchases, etc.

In many cases, a consumer seller of a used automobile may have concerns that a buyer may not offer a fair and competitive price. Various products and services have become available that allow sellers and buyers, including consumers and dealers, to perform research on market prices for used automobiles. Typically, the highest possible value available to a consumer seller may be through a sale to another consumer, as opposed to trading in the used automobile to a dealer.

In addition to consumers and dealers, automobile manufacturers may also have an interest in the resale values of used automobiles. Further, in many cases, a manufacturer may want to sell used off-lease automobiles which have been returned by consumer lessees. In many cases, a manufacturer off-lease seller may not be able to receive the full market value of a used off-lease automobile.

### SUMMARY

The present disclosure provides a new and innovative system, methods and apparatus for providing automobile market information and facilitating used automobile transactions. In an example embodiment, automobile market data representative of current automobile market characteristics is stored. The automobile market data may include pricing and consumer interest information received from consumers, dealers, and manufacturers. A consumer seller or manufacturer off-lease seller may provide a request for a response regarding a specific used automobile with a specific a vehicle identification number. Automobile market data may be provided to a used automobile buyer based on the request. Bids to purchase the specific used automobile may be requested from used automobile buyers based on the request. Buyer bids may be provided to the consumer seller or manufacturer off-lease seller with prices and a delivery options. The consumer seller or manufacturer off-lease seller may select a bid to sell the specific used automobile based on the bid.

Additional features and advantages of the disclosed method and apparatus are described in, and will be apparent from, the following Detailed Description and the Figures.

### BRIEF DESCRIPTION OF THE FIGURES

FIG. 1 is a high level block diagram of an example network communicating system, according to an example embodiment of the present invention.

FIG. 2 is a detailed block diagram showing an example of a computing device, according to an example embodiment of the present invention.

FIGS. 3A and 3B provide a block diagram showing an example automobile transaction network structure, according to an example embodiment of the present invention.

FIG. 4 is a flowchart illustrating an example process for facilitating a used automobile transaction, according to an example embodiment of the present invention.

FIG. 5 is a block diagram showing an example data architecture, according to an example embodiment of the present invention.

FIG. 6 is flow diagram illustrating an example process for facilitating a used automobile transaction, according to an example embodiment of the present invention.

### DETAILED DESCRIPTION OF EXAMPLE EMBODIMENTS

The present disclosure relates in general to a system for facilitating used automobile transactions and, in particular, to an automobile transaction for a specific used automobile. Briefly, in an example embodiment, a system is provided which allows a consumer seller or a manufacturer off-lease seller of a used automobile to request bids and information regarding a specific automobile identified with a specific vehicle identification number. For example, a consumer may use a mobile device to take a picture of a vehicle identification number and may enter a desired price range or minimum asking price. The specific automobile may be identified using optical character recognition to provide, for example, a full list of the original manufacturer features and options, and the original manufacturer suggested retail price and invoice information, for that specific used automobile based on the vehicle identification number. Accordingly, the consumer seller need not enter all of this information, but may request bids and information in real-time for that specific used automobile. Used automobile buyers may include consumers and/or dealers which may provide bids based on the consumer seller request using real-time automobile market information. A consumer seller may select a buyer bid to sell a used automobile based on the prices and delivery options avail-

US 8,650,093 B2

3

able. Accordingly, typically unavailable or difficult to obtain data may be provided for offering a used automobile for sale, including a full listing of the manufacturer features and options, EPA mileage, safety ratings, recalls, quality reports, estimated insurance costs, etc. In an example embodiment, a manufacturer off-lease seller may select a buyer bid based on the prices and delivery options to maximize value, for example, by reducing costs typically associated with selling an off-lease automobile. The used automobile market is presently approximately three times the size of the new automobile market in the United States, as approximately 40 million used automobiles are sold each year. Accordingly, the present disclosure may be helpful for facilitating large numbers of used automobile transactions. In an example embodiment, the disclosed system matches seller and buyer parameters, such as price and pickup location, to facilitate a live binding process, which allows a used automobile seller to accept or reject bids using a great deal of information not typically available. In a non-limiting example embodiment, certain features disclosed in the present patent application may be commercially embodied in products and services offered by Sidekick Technology LLC, the assignee of the present application.

The present system may be readily realized in a network communications system. A high level block diagram of an example network communications system **100** is illustrated in FIG. **1**. The illustrated system **100** includes one or more client devices **102**, and one or more host devices **104**. The system **100** may include a variety of client devices **102**, such as desktop computers and the like, which typically include a display **112**, which is a user display for providing information to users **114**, and various interface elements as will be discussed in further detail below. A client device **102** may be a mobile device **103**, which may be a cellular phone, a personal digital assistant, a laptop computer, a tablet computer, etc. The client devices **102** may communicate with the host device **104** via a connection to one or more communications channels **106** such as the Internet or some other data network, including, but not limited to, any suitable wide area network or local area network. It should be appreciated that any of the devices described herein may be directly connected to each other instead of over a network. Typically, one or more servers **108** may be part of the network communications system **100**, and may communicate with host servers **104** and client devices **102**.

One host device **104** may interact with a large number of users **114** at a plurality of different client devices **102**. Accordingly, each host device **104** is typically a high end computer with a large storage capacity, one or more fast microprocessors, and one or more high speed network connections. Conversely, relative to a typical host device **104**, each client device **102** typically includes less storage capacity, a single microprocessor, and a single network connection. It should be appreciated that a user **114** as described herein may include any person or entity which uses the presently disclosed system and may include a wide variety of parties. For example, as will be discussed in further detail below, users **114** of the presently disclosed system may include a consumer, a dealer, and/or a manufacturer.

Typically, host devices **104** and servers **108** store one or more of a plurality of files, programs, databases, and/or web pages in one or more memories for use by the client devices **102**, and/or other host devices **104** or servers **108**. A host device **104** or server **108** may be configured according to its particular operating system, applications, memory, hardware, etc., and may provide various options for managing the execution of the programs and applications, as well as various

4

administrative tasks. A host device **104** or server may interact via one or more networks with one or more other host devices **104** or servers **108**, which may be operated independently. For example, host devices **104** and servers **108** operated by a separate and distinct entities may interact together according to some agreed upon protocol.

A detailed block diagram of the electrical systems of an example computing device (e.g., a client device **102**, and a host device **104**) is illustrated in FIG. **2**. In this example, the computing device **102**, **104** includes a main unit **202** which preferably includes one or more processors **204** electrically coupled by an address/data bus **206** to one or more memory devices **208**, other computer circuitry **210**, and one or more interface circuits **212**. The processor **204** may be any suitable processor, such as a microprocessor from the INTEL PENTIUM® family of microprocessors. The memory **208** preferably includes volatile memory and non-volatile memory. Preferably, the memory **208** stores a software program that interacts with the other devices in the system **100** as described below. This program may be executed by the processor **204** in any suitable manner. In an example embodiment, memory **208** may be part of a "cloud" such that cloud computing may be utilized by a computing devices **102**, **104**. The memory **208** may also store digital data indicative of documents, files, programs, web pages, etc. retrieved from a computing device **102**, **104** and/or loaded via an input device **214**.

The interface circuit **212** may be implemented using any suitable interface standard, such as an Ethernet interface and/or a Universal Serial Bus (USB) interface. One or more input devices **214** may be connected to the interface circuit **212** for entering data and commands into the main unit **202**. For example, the input device **214** may be a keyboard, mouse, touch screen, track pad, track ball, isopoint, image sensor, character recognition, barcode scanner, microphone, and/or a speech/voice recognition system.

One or more displays **112**, printers, speakers, and/or other output devices **216** may also be connected to the main unit **202** via the interface circuit **212**. The display **112** may be a cathode ray tube (CRTs), a liquid crystal display (LCD), or any other type of display. The display **112** generates visual displays generated during operation of the computing device **102**, **104**. For example, the display **112** may provide a user interface, which will be described in further detail below, and may display one or more web pages received from a computing device **102**, **104**. A user interface may include prompts for human input from a user **114** including links, buttons, tabs, checkboxes, thumbnails, text fields, drop down boxes, etc., and may provide various outputs in response to the user inputs, such as text, still images, videos, audio, and animations.

One or more storage devices **218** may also be connected to the main unit **202** via the interface circuit **212**. For example, a hard drive, CD drive, DVD drive, and/or other storage devices may be connected to the main unit **202**. The storage devices **218** may store any type of data, such as pricing data, transaction data, operations data, inventory data, commission data, manufacturing data, image data, video data, audio data, tagging data, historical access or usage data, statistical data, security data, etc., which may be used by the computing device **102**, **104**.

The computing device **102**, **104** may also exchange data with other network devices **220** via a connection to the network **106**. Network devices **220** may include one or more servers **226**, which may be used to store certain types of data, and particularly large volumes of data which may be stored in one or more data repository **222**. A server **226** may include any kind of data **224** including databases, programs, files,

US 8,650,093 B2

5

libraries, pricing data, transaction data, operations data, inventory data, commission data, manufacturing data, configuration data, index or tagging data, historical access or usage data, statistical data, security data, etc. A server **226** may store and operate various applications relating to receiving, transmitting, processing, and storing the large volumes of data. It should be appreciated that various configurations of one or more servers **226** may be used to support and maintain the system **100**. For example, servers **226** may be operated by various different entities, including automobile manufacturers, brokerage services, automobile information services, etc. Also, certain data may be stored in a client device **102** which is also stored on the server **226**, either temporarily or permanently, for example in memory **208** or storage device **218**. The network connection may be any type of network connection, such as an Ethernet connection, digital subscriber line (DSL), telephone line, coaxial cable, wireless connection, etc.

Access to a computing device **102**, **104** can be controlled by appropriate security software or security measures. An individual users' **114** access can be defined by the computing device **102**, **104** and limited to certain data and/or actions. Accordingly, users **114** of the system **100** may be required to register with one or more computing devices **102**, **104**. For example, registered users **114** may be able to request or manipulate data, such as submitting requests for pricing information or providing an offer or a bid.

As noted previously, various options for managing data located within the computing device **102**, **104** and/or in a server **226** may be implemented. A management system may manage security of data and accomplish various tasks such as facilitating a data backup process. A management system may be implemented in a client **102**, a host device **104**, and a server **226**. The management system may update, store, and back up data locally and/or remotely. A management system may remotely store data using any suitable method of data transmission, such as via the Internet and/or other networks **106**.

FIGS. **3**A and **3**B provide a block diagram showing an example automobile transaction network structure **300**. As illustrated in FIG. **3**A, the example automobile transaction network structure **300** includes an automobile market information processing system **302**, a consumer interface **304**, a dealer interface **306**, and a manufacturer interface **308**. The example automobile market information processing system **302** may be implemented on one or more host devices **104** accessing one or more servers **108**, **226**. In an example embodiment, the automobile market information processing system **302** includes a database system **310**, a recommendation engine **312**, a vehicle identification number processor **314**, and an interface generation unit **316**. A user **114** may be a consumer, a dealer, or a manufacturer that interacts with the consumer interface **304**, dealer interface **306**, or manufacturer interface **308**, respectively. A database system **310** may include a wide variety of automobile market data. A recommendation engine **312** may provide recommendations for consumers, dealers, and manufacturers. A vehicle identification number processor **314** may be used for making requests regarding specific automobiles and automobiles with specific sets of features. For example, a vehicle identification number processor **314** may determine a specific set of features that a specific car has based on a picture of that specific car's vehicle identification number. Interface generation unit **316** may provide, for example, HTML files which are used at the consumer interface **304**, dealer interface **306**, and manufacturer interface **308** interface to provide information to the users **114**. It should be appreciated that he the consumer interface **304**, dealer interface **306**, and manufacturer interface **308**

6

may be considered to be part of the automobile market information processing system **302**, however, for discussion purposes, the consumer interface **304**, dealer interface **306**, and manufacturer interface **308** may be referred to as separate from the automobile market information processing system **302**.

For example, a user **114** may interact with a consumer interface **304** to research new or used automobiles the user **114** is interested in buying and/or selling. For example, a consumer may be looking for a four door sedan with specific features, including a global positioning system (GPS), a sunroof, tinted windows, rated for at least thirty miles per gallon, four wheel drive, etc. The consumer may interact with the consumer interface **304** by inputting required and/or desired features, monthly budget or full price, etc. The consumer interface **304** may provide a wide variety of features and specifications which the consumer may choose from in providing a request. Based on the information put into the consumer interface **304** from the consumer, the consumer interface **304** may provide one or more reports or offers to the consumer. As will be discussed in further detail below, the information provided by the consumer interface **304** may include current market prices for automobiles, including information relating to additional features, and may include information on specific automobiles, for example, which may be en route to a dealer near the consumer's present location or may be already owned by the consumer. The automobile market information processing system **302** may process data received by the consumer interface **304**, as well as the dealer interface **306** and/or the manufacturer interface **308**, to respond to a request from a consumer. For example, data from database system **310** may be queried for use in a report, or a recommendation may be provided by recommendation engine **312** according to the consumer request and current market data. The automobile market information processing system **302** may integrate data received from consumer interface **304**, dealer interface **306**, and manufacturer interface **308** to provide current and accurate information relating to the automobile market.

It should be appreciated that the consumer interface **304** may be specific to one particular manufacturer or may provide information for automobiles manufactured by multiple different manufacturers. For example, a consumer interface **304** may be a website with information for many manufacturers. For example, the consumer interface **304** may access or link to the manufacturer specific websites (e.g., Ford), particularly with regard to new automobile information, but also for used automobile information. Also, for example, a consumer interface **304** may be implemented as an automobile manufacturer's website. Typically, a manufacturer's website may provide consumers with a catalog like feature that provides information on different automobile models with any available options or features. For example, a manufacturer website may allow a consumer to select options that are desired to "build" a particular new automobile, and may provide price comparisons using suggested retail prices, which may consumers use for initial research into what pricing the dealer may offer for a particular automobile with a particular feature set. Also, typically, the consumer may enter information, including, for example, name, an address or zip code, and telephone number. This information may be passed on from the manufacturer to a nearby dealer and/or nearby dealer information may be provided to the consumer (e.g., the dealer in or nearest to the consumer's entered zip code). Accordingly, the dealer may contact the consumer, or the consumer may inquire with the dealer, regarding the specific automobiles available on that dealer's lot and particular pric-

7

ing being offered, etc. In many cases, consumers may not inquire with dealers that the manufacturer may recommend, and similarly, dealers may not diligently follow up with consumers that have an interest in purchasing an automobile. Further, it should be appreciated that the information provided via a consumer interface **304** and/or a manufacturer website may be very useful to consumers. For example, in the past, dealers often provided brochures with all the information on a manufacturer's available car models, including all the features and options information. However, dealers typically do not provide comprehensive information brochures, which may be relatively expensive to produce, and rather, that information is typically located on a manufacturer website and/or a consumer interface **304**. It should also be appreciated that information on a manufacturer website and/or a consumer interface **304** may be directed to both new and used automobiles. For example, historical and statistical information which demonstrates favorable safety ratings, quality and reliability data, low maintenance costs, low insurance prices, low emissions, high gas mileage, etc. based on specific models for specific years, and/or groups of models and years may be provided on a manufacturer website and/or a consumer interface **304**.

Accordingly, the consumer interface **304** may provide a wide range of information, for example, based on any searches or queries performed by a user **114**. In an example embodiment, based on a user search or request for a response, the consumer interface **304** will display a quality index or value index based on normalized calculations for an automobile. The recommendation engine **312** may provide recommendations to a consumer based on the current automobile market data stored in the automobile market information processing system **302**. For example, metrics on gas mileage, emissions, operating and maintenance costs, safety ratings, etc. may be benchmarked against comparable automobiles of the same and different manufacturers. Similar purchase options to a specific search may also be provided, based on feature matching, price range, consumer popularity, etc. Information including price ranges, including MSRP, invoice prices, inventory levels, the user's **114** credit ratings (e.g., FICO score), may be provided which may include monthly payment estimates or projections. It should be appreciated that such data may be provided for both new and used automobiles. For example, a financing calculator may help a user **114** determine what financing rate is appropriate for an automobile purchase. It should be appreciated that dealers may mislead consumers into believing that a higher financing rate will be required to secure a loan. Further, for example, a lease vs. buy calculator may be provided which may use current market data including prices, interest rates, incentives, estimated mileage per year, etc. for providing an analysis for a particular consumer regarding purchasing or leasing. Also, the consumer interface **304** may provide a purchase checklist, for example, of ten steps to buying a car. A qualitative checklist may allow a user to ask the right questions and get the right answers from a dealer. Additional tips may be provided, such as a list of products or services dealers may attempt to sell to a consumer with an analysis of the value of these products or services and a recommendation to accept or decline these dealer offers. Further, beyond analysis relating to automobiles, additional analysis or reports may be provided, for example, relating to dealer reviews, other supplemental products, financial entities that may provide financing, etc. For example, dealer reviews may provide a consumer with information the consumer may use in addition to automobile pricing and delivery options. Moreover, the consumer interface **304** may provide a wide variety of useful information to a

8

consumer, for at home research and preparation, and/or in a dealer location while shopping as a negotiating tool that may provide confirmation on pricing, useful tips, and the like. As will be discussed in FIG. 3B in further detail below, the consumer interface **304** may include a used automobile seller interface **318** and a used automobile buyer interface **320**.

In an example embodiment, a dealer interface **306** may provide a user **114**, such as a dealer employee, information relating to the current automobile market. The dealer interface **306** allows a dealer to interact with automobile market information processing system **302** to provide the dealer with a wide variety of information, including, for example, current market pricing. Other automobile market information a dealer may receive on a dealer interface **306** includes information relating to lot inventory, turnover rates, automobile transportation and/or shipping costs, incentives, and various ratings, such as ratings relating to quality, safety, insurance, a consumer credit score, dealer ratings, residual or resale values, etc. A dealer may input information into dealer interface **306** relating to sales data, including current pricing offered, special sales offers, actual transaction data, inventory data, etc. In an example embodiment, the dealer may provide information through dealer interface **306** which will be used by automobile market information processing system **302** to prepare reports or offers to consumers and/or manufacturers. It should be appreciated that a dealer is typically a franchise entity, while a distribution location may not be a franchise entity. For brevity, throughout this specification, the term dealer may be used to describe both franchise entity dealers and non-franchise entity distribution location. Accordingly, as used in this disclosure, the term dealer does not indicate whether an entity is a franchise entity. Moreover, a franchise dealer or a non-franchise distribution location may utilize a dealer interface **306** as described herein.

In an example embodiment, a manufacturer interface **308** may provide a user **114**, such as a manufacturer employee, information relating to the current automobile market, including consumer requests. For example, an manufacturer interface **308** may provide a manufacturer a request received from a consumer interface **304**. Additionally, the manufacturer interface **308** may provide information such as a report that allows the manufacturer to provide a response to the requesting consumer. A report may include information from database system **310** relating to current market pricing, recent sales figures and trends, current manufacturer incentives, current inventory, including dealer inventory, inventory in transit, and/or build times or lead times for a desired automobile, etc. The manufacturer may use this information to provide a response to a consumer request. The manufacturer may provide the manufacturer interface **308** with information to provide a confirmation, a verification, or an offer to a consumer via consumer interface **304**. For example, a confirmation number associated with the particular consumer request may be provided for the consumer. Also, a recommendation may be provided from the recommendation engine **312** to the manufacturer in relation to automobile pricing, responding to a specific request, manufacturer incentives, inventory management, production schedules, shipping schedules, etc. It should be appreciated that a manufacturer may be referred to as an OEM or original equipment manufacturer. Further, it should be appreciated that a manufacturer may include various related affiliate entities all doing business as, or operating under, the same manufacturer name. For example, a manufacturer typically may include a manufacturing company (e.g., operating the manufacturing plant), a sales company (e.g., operating automobile sales activities), and a captive finance company (e.g., operating financing and leasing activi-

US 8,650,093 B2

**9**

ties). The manufacturer interface **308** may provide a manufacturer with a real-time lens into the automobile market which may allow the manufacturer to adjust production schedules, pricing plans, marketing activities, etc., which may provide a significant advantage for manufacturers.

As illustrated in FIG. 3B, a consumer interface **304** may include a used automobile seller interface **318** and a used automobile buyer interface **320**. The used automobile seller interface **318** may be used by consumer sellers to sell used automobiles, while the used automobile buyer interface **320** may be used by consumers to buy used automobiles. It should be appreciated that consumers may be able to access both interfaces **318** and **320** from consumer interface **304**. In an example embodiment, the used automobile seller interface **318** and a used automobile buyer interface **320** may be integrated within a single website or application, or for example, may be implemented as distinct websites. Similarly, in an example embodiment, a used automobile buyer interface **320** may be integrated with features of a consumer interface **304** for searching both new and used automobiles for purchase, or new and used automobiles may not be simultaneously searchable on a particular implementation of a consumer interface **304**. As will be discussed further below, a used automobile seller interface **318** may be used by a consumer seller of a specific used automobile to receive information on the specific automobile and request bids for the specific automobile. Similarly, a used automobile buyer interface **320** may be used for used automobile buyers to receive information on a used automobile and place a bid on that specific automobile.

It should be appreciated that, for example, a consumer seller of a used automobile may be considered different than a dealer seller of a used automobile in some respects. For example, a consumer seller of a used automobile is often selling through different channels, such as offering for sale in classified advertisements versus from a dealer lot. It should be appreciated that such differences may be relevant to the ability to maximize the value of a sale or purchase of a used automobile. Accordingly, where appropriate, the present disclosure may distinguish a consumer seller from a dealer seller, or distinguish a consumer buyer from a dealer buyer. Also, as discussed in further detail below, a manufacturer off-lease seller of a used automobile may also be considered different from a consumer seller and/or a dealer seller.

A dealer interface **306** may include a used automobile buyer interface **322**. For example, a typical dealer may use a dealer interface **306** primarily for facilitating sales of new and used automobiles, however, the dealer interface **306** may also be used to facilitate purchasing used automobiles. For example, a used automobile buyer interface **322** may be used by dealers similarly to the way that the used automobile buyer interface **320** may be used by consumers. It should be appreciated that in an example embodiment, the used automobile buyer interfaces **320**, **322** may be similar or the same, and/or may integrated as part of single website or application. In an example embodiment, a dealer may use the used automobile buyer interface **322** to facilitate bringing a consumer in to purchase a new automobile based on providing a competitive bid to purchase a used automobile as a trade in.

A manufacturer interface **308** may include a used automobile off-lease interface **324**. For example, a manufacturer may use a manufacturer interface **308** primarily for facilitating sales of new automobiles, however, the manufacturer interface **308** may also be used to facilitate selling off-lease automobiles which have been returned by a consumer lessor whose lease is expiring. An off-lease seller interface **324** may be used by a manufacturer, typically, a captive finance company of the manufacturer, similarly to the way

**10**

that the used automobile seller interface **318** may be used by consumers. It should be appreciated that, a manufacturer off-lease seller may have limited options to sell a used off-lease automobile and may have time constraints that are may be typically imposed on a consumer seller of a used automobile. Typically, an off-lease automobile may be dropped off by a consumer lessee at any one of a variety of dealer locations. The manufacturer lessor may then wish to sell the used off-lease automobile, however, the dealer where the off-lease automobile was dropped off may have a significant bargaining advantage to purchase that automobile, as the manufacturer may need to sell the off-lease automobile quickly and may have limited options. Typically, the dealer may not offer the manufacturer off-lease seller full market value for the off-lease automobile. It should be appreciated that the manufacturer off-lease seller may transport the car to an auction in an attempt to obtain a higher price. However, transportation costs, auction fees, and delay in selling the off-lease automobile may cause the manufacturer off-lease seller to accept less than market value for the off-lease automobile from the dealer, or otherwise not maximize the value of the off-lease automobile. For example, typically, an off-lease automobile sold at auction for near or even above the current market value is significantly offset by transportation costs and auction fees.

The off-lease seller interface **324** may provide a manufacturer off-lease seller with leverage, not only through the ability to obtain bids to purchase the off-lease automobile, but through the ability to determine the number of matches or search hits for an off-lease automobile. The dealer that has the off-lease automobile may know that the manufacturer may have the ability to track searches for the off-lease automobile performed by consumers and/or other dealers. The manufacturer off-lease seller may provide the dealer in possession of an off-lease automobile with matches and/or bids, which may provide the dealer with firm evidence of current demand or interest in the off-lease automobile. The dealer may be able to use this information to determine an appropriate price, and possibly even more profitably than the manufacturer. Accordingly, a dealer may often be inclined to make a significantly more competitive bid for an off-lease automobile. It should be appreciated that the manufacturer may use the off-lease seller interface **324** to identify in-market buyers, and even without receiving bids from those buyers, the manufacturer's bargaining power may improve, resulting in a greater value for off-lease sales.

Accordingly, information may be provided to the automobile market information processing system **302** from consumers, dealers, and manufacturers with a very high degree of granularity, as every transaction that occurs and even every request or search may be stored and used by the automobile market information processing system **302**. This allows the automobile market information processing system **302** to use the most current automobile market data to provide information to consumers, dealers, and manufacturers. It should be appreciated that market prices can change relatively quickly, particularly when major events drive consumer behavior or manufacturer production, such as natural disasters. Accordingly, reports and recommendations provided by the automobile market information processing system **302** may be highly accurate, reliable, and sensitive to market changes.

It should be appreciated that the users **114** of the automobile market information processing system **302**, including consumers, dealers, and manufacturers, and buyers and sellers of new and used automobiles, may be required to agree to and/or execute a terms of use agreement or terms of service agreement. Various forms of enforcing the agreement may be implemented, including a transaction deposit policy, which

US 8,650,093 B2

**11**

may require a deposit or a credit card hold, or the like, and a standard schedule of fees or default payment schedule for infractions such as improper condition of an automobile, delay in delivery, etc. Accordingly, all parties may be protected from another party breaching the agreement.

It should be appreciated that certain functions described as performed, for example, at automobile market information processing system **302**, may instead be performed locally at consumer interface **304**, dealer interface **306**, and manufacturer interface **308**, or vice versa. Further, in certain cases, tasks may be performed using consumer interface **304**, dealer interface **306**, and manufacturer interface **308** or, for example, performed in person, such as a consumer signing documents at a dealer location, or a dealer communicating with a manufacturer using a telephone. It should be appreciated that the consumer interface **304**, dealer interface **306**, and manufacturer interface **308** may be implemented, for example, in a web browser using an HTML file received from the automobile market information processing system **302**. In an example embodiment, the consumer interface **304**, dealer interface **306**, and manufacturer interface **308** may be located on a website, and may further be implemented as a secure website. Also, consumer interface **304**, dealer interface **306**, and manufacturer interface **308** may require a local application, for example, which a manufacturer or dealer may pay for to have access to, for example, information from the automobile market information processing system **302** such as requests from consumers.

FIG. **4** is a flowchart of an example process **400** for facilitating a used automobile transaction. Although the process **400** is described with reference to the flowchart illustrated in FIG. **4**, it will be appreciated that many other methods of performing the acts associated with the process **400** may be used. For example, the order of many of the blocks may be changed, certain blocks may be combined with other blocks, and many of the blocks described are optional.

The example process **400** for facilitating a used automobile transaction may allow users **114** to efficiently sell and purchase automobiles. The example process **400** may begin with automobile market data including at least pricing data is stored in a database system (block **402**). For example, automobile market data from dealers, consumers, and manufacturers regarding pricing, inventory, insurance information, quality ratings, safety ratings, and other ratings is collected and stored in a database. For example, inventory data may include data regarding off-lease automobiles, including scheduled drop off dates of automobiles with expiring leases. In an example embodiment, a wide variety of data is stored in a database system **310**. Automobile market data may include various relevant ratings, reports, awards, or other information, including quality information, safety information, insurance information, consumer credit information, dealer rating information, incentive information, residual value information, and/or any other data which may be relevant to consumers. For example, ratings data may include information from the National Highway Traffic Safety Administration (NHTSA), the Environmental Protection Agency (EPA), and/or the Insurance Institute for Highway Safety (IIHS). The data may include information from a consumer interface **304**, such as data in consumer searches or requests, information from a dealer interface **306**, such as currently offered dealer pricing, transaction data for finalized sales, current inventory data, transport or shipping costs, and information from a manufacturer interface **308**, such as current manufacturer prices and suggested pricing, manufacturer incentives, and current inventory including finished inventory on hand, production scheduling, shipment scheduling, inventory in tran-

**12**

sit, and manufacturing lead times. The automobile market data may be comprised solely of information received from the consumer interface **304**, dealer interface **306**, and manufacturer interface **308**, or may include additional information received from other sources, for example, industry analysts, consumer reports groups, government agencies, etc. It should be appreciated that various methods of storing the automobile market data may be employed according to the system requirements. For example, database system **310** may be organized according to different manufacturers or dealers, automobile make and model, different information categories (e.g., suggested pricing, market prices, production, shipping, lot inventory), etc., and may consist of one or more databases on one or more servers **108**, **226** which may be remotely located from each other and/or a host device **104** of the automobile market information processing system **302**. As will be discussed further below, the automobile market data may be continually updated as new data is provided to the automobile market information processing system **302**.

The automobile market data may be used by any or all parties involved in a used automobile transaction, including used automobile sellers including consumer sellers and manufacturer off-lease sellers, and used automobile buyers including consumer buyers and dealer buyers. In the example process **400**, as discussed further below, the used automobile seller described by way of example as a consumer seller. It should be appreciated that the example process **400** may work similarly or the same for a manufacturer off-lease seller. In an example embodiment, the consumer used automobile seller interface **318** and manufacturer off-lease seller interface **324** may be provided as a combined interface. Certain aspects of the disclosed example process **400** may be of greater or lesser advantage to a manufacturer off-lease seller compared with a consumer seller. For example, consumer sellers typically sell used automobiles infrequently, while manufacturer off-lease sellers may be selling thousands of used off-lease automobiles each month. Accordingly, the goals of the user **114** may vary between consumer sellers and manufacturer off-lease sellers. Certain notable aspects that may be distinguishable between a consumer seller and manufacturer off-lease seller will be discussed below.

The example process **400** continues with a consumer seller providing a request for a response (block **404**). For example, a used car seller takes a picture of the vehicle identification number (VIN) of a used car and fills in price parameters and other information into a mobile application to receive a response based on current market data. In an example embodiment, the seller's request may be transmitted from used automobile seller interface **318**, **324** via the internet to the automobile market information processing system **302**. For example, using an application stored on a mobile device **103**, the used car seller takes a picture of the VIN on the used car and fills in a minimum bid price, delivery parameters, etc. The seller's parameters may specify a pickup location by distance from an address, an area code, etc., which allows for matching the seller with buyers that are in-market. The picture of the VIN may be processed using optical character recognition, which allows the automobile market information processing system **302** to determine the make and model of the car, along with various other characteristics of the car. Also, for example, the used car seller may take a picture of the odometer, and the mileage may be determined using optical character recognition. It should be appreciated that the VIN may include human readable characters, a bar code, or any other graphical or machine readable information which acts as a vehicle identification number.

US 8,650,093 B2

13

14

Also, the used car seller may input into a mobile application or website a wide variety of additional information about the used car. For example, pictures of the used car may be uploaded with the request. In an example embodiment, pictures of the exterior, interior, dashboard, and/or odometer may be provided. Also, for example, service records, ownership records, and other documents or information may be included with a request. Further, a written description of the car may be provided. Accordingly, because the used car seller can provide information such as pictures, in addition to information which the seller may not have access to, such as the original manufacturer specifications of the used car, potential buyers may have access to a great deal of information on the used car. Further, in an example embodiment, a mobile application may include the geolocation of a used car seller, so the seller does not need to enter such information. Accordingly, the buyer may perform research, for example, while at home or while shopping at a dealer location. It should be appreciated that certain used car buyers may be highly interested in the geolocation of the consumer seller. For example, a dealer may find the consumer seller's geolocation to be more important than a consumer buyer, because a dealer may require a minimal cost for picking up a car to ensure profitability, and to optimize the opportunity for creating a new customer relationship. Similarly, certain used automobile sellers may be very interested in the geolocation of the used automobile buyer. For example, a manufacturer off-lease seller may have a high interest in determining the amount of in-market interest or demand for an off-lease automobile.

In an example embodiment, a manufacturer off-lease seller may provide a request for a response for an automobile that will be dropped off by a consumer lessee in the near future. For example, a manufacturer user **114** may input a VIN into off-lease seller interface **324** by typing, speaking, or providing an image of the VIN. The manufacturer off-lease seller may provide a parameter that the used off-lease automobile will be available only after a certain date. The manufacturer off-lease seller may find that providing a request for a response prior to the consumer lessee actually dropping off an off-lease automobile may significantly improve the value of off-lease automobiles. It should be appreciated that the dealer where the consumer lessee drops off the off-lease automobile may be bargaining without any particular advantage because the manufacturer off-lease seller may have multiple interested used automobile buyers that, based on search parameters, have received the off-lease automobile as a match, and/or bids from used automobile buyers.

Used car buyers may perform a search with used automobile buyer interfaces **320**, **322**, and may typically include parameters limiting the search to a specific automobile type, make, or model, certain options or features, a price range, and a pickup location or area. Further, for example, the buyer may take a picture of a VIN anywhere or manually type in a VIN number, including at automobile trade shows, mall displays, or anywhere new or used cars are for sale. The buyer may even take a picture of a car parked in the street as the buyer walks down the street. Any request or query communicated from the consumer interface **304** may be stored, for example, in database system **310**, thereby updating the automobile market information processing system **302** with current automobile market data.

The example process **400** may continue with providing automobile market data to used automobile buyers based on the consumer seller request (block **406**). For example, a group of consumers and dealers receive a real-time report including local used car sales data, inventory data, quality and safety ratings data, insurance data, and gas mileage data of the specific used car which is identified based on the VIN. The group of consumers and dealers that receive a real-time report may be based on prior searches conducted by consumers on used automobile buyer interface **320** and searches conducted by dealers with used automobile buyer interface **322**. In an example embodiment, a report may include quality information, safety information, insurance information, recall information, EPA gas mileage and emissions information, consumer credit information (e.g., buyer FICO score), dealer rating information, incentive information, residual value information, and/or any other data which may be relevant to consumers and/or dealers. In an example embodiment, a report may include a specific history information for the specific used car, such as a CARFAX report. The request and/or the report may be provided in real-time and may also provide real-time data. Data reported based on a real-time updates in the automobile market information processing system **302** may provide significant advantages, for example, when pricing conditions may change quickly due to unforeseen market conditions. The recommendation engine **312** may provide recommendations to a used automobile buyer based on the current automobile market data. For example, a report may indicate various estimated sales probabilities for different prices that the used automobile buyer may offer or bid. In an example embodiment, a estimated sale price or range may be provided. For example, a probability analysis may be provided with prices and corresponding probabilities may be estimated as, e.g., 80% chance to purchase at $6,000; 60% chance to purchase at $5,500; 30% chance to purchase at $5,000; 10% chance to purchase at $4,500. Such information may be illustrated in various ways, such as a bell curve graph or a chart. Further, for example, the recommendation engine may provide daily suggestions (e.g., a deal of the day) for dealers and/or consumers. Consumers may use such suggestions to save money or get a better value on a used car purchase by buying from another consumer rather than a dealer. Dealers may use such suggestions to purchase used cars at good deals, and/or to attract consumers to visit the dealer in person or online, as well as prepare responses or bids to other consumer requests. Dealers or consumers may customize the used automobile buyer interface **320**, **322** to provide information in a pre-specified manner to suit the particular needs of the specific dealer or consumer. In an example embodiment, a manufacturer off-lease seller may receive automobile market data including inventory information including data regarding off-lease cars which have been dropped off at dealer locations and cars which will soon be coming off-lease. Further, dealers and/or consumers may be able to receive information regarding off-lease cars as well. For example, information may include a specific automobile identified by a VIN with an expected drop off location and date based on a lease expiration.

A bid to purchase the used automobile from the consumer seller is requested from used automobile buyers (block **408**). For example, a group of consumers and dealers within a certain radius of the used car seller location may receive a bid request based on used automobile buyer searches via used automobile buyer interfaces **320**, **322**. Each used automobile buyer's bid may include, for example, a price and a delivery option or delivery suggestion. The used automobile buyer interfaces **320**, **322** may provide for simple input of necessary and optional data. Further, a used automobile buyer's bid may contain certain limitations, restrictions, or conditions. For example, a dealer may provide a bid with the condition that a new car be purchased and the used car be traded in at the bid price.

US 8,650,093 B2

15                                                    16

In an example embodiment, the request may provide one or more options, products, services, or add-ons for a used automobile buyer to select from. For example, used automobile buyers may be able to select financing options, warranties, extended service contracts, insurance plans, or other hard add accessories. These selectable options may be offered directly from the used automobile seller or may be offered through the AMIPS **302**. Accordingly, a seller may not be offering any options for a buyer to select, but the system may automatically provide the option to purchase further add-ons. In an example embodiment, AMIPS **302** may provide for third party providers of add-ons to provide live auction bids for a used automobile buyer to select for inclusion in a bid. Accordingly, for example, several insurance companies may provide a bid for key insurance, or several financial companies may provide bids for a loan. It should be appreciated that certain bids may depend on the particular buyer, so for example, a buyer's credit or driving record may cause different buyers to receive different third party bids for add-ons. For example, a particular buyer may be able to increase a bid to purchase a used automobile if third party add-ons are particularly advantageous, which may benefit a consumer seller or manufacturer off-lease seller. For example, a buyer may receive a better than expected interest rate and insurance price, and therefore be able to offer an additional $1,000 to the seller, while staying within the buyer's predetermined monthly budget. It should be appreciated that third parties may include dealers which may be otherwise involved in a transaction. Also, in an example embodiment, the AMIPS **302** may provide at no charge to the buyers or sellers, certain add-ons, such as a limited thirty day warranty. Accordingly, the AMIPS **302** may gain trust from buyers even if the buyers generally do not trust the sellers. It should also be appreciated that a buyer may not select any add-ons offered by third parties and/or the AMIPS **302**. A used automobile seller may have no interest in whether a buyer selects any add-ons, or the seller may receive additional compensation if an add-on is selected, so a buyer selection of add-ons may or may not affect a seller's value associated with the buyer's bid.

One or more buyer bids are provided to the consumer seller (block **410**). For example, several consumers and dealers provide bids based on current pricing data, options information of the specific used car, and potential pickup locations, so several different prices and delivery options may be available to the used car seller via the used automobile seller interface **318**. Typically, the bid will include at least a specified price and pickup time and location. In an example embodiment, a used car seller that has taken a picture of a VIN with a mobile device and entered some basic information such as an odometer reading may receive used car buyer bids within minutes or seconds on the mobile device. Accordingly, the bids may be used in real-time as the consumer seller may be actively selling a used car or shopping for a new or used car, for example, on a dealer lot. Typically, a pickup location will be at the consumer seller location, a consumer buyer location, or at a dealer lot or distribution location. In an example embodiment, the consumer buyer location may be determined using the geolocation of the buyer's mobile device **103**. It should be appreciated that some consumers may be flexible as to the delivery options and that some dealers may have multiple locations which could serve as a pickup location. In an example embodiment, the automobile market data may indicate that the particular used car that a consumer seller has requested bids for should be priced at, for example, $6,000. However, various factors may affect the bid or offer that a consumer or dealer may make for the specific used car. For example, for a consumer, personal preference for certain features or looks, convenience, insurance implications, gas mileage, and/or service records, may play a large role in pricing a bid above or below a suggested bid price. For example, for a dealer, the potential for forming a customer relationship, the value of potential other sales, add-on products, and/or services, or competition with other parties. All used automobile buyers that are interested may place a bid for a used car seller's consideration.

It should be appreciated that various alternative delivery options may be provided from several used automobile buyers' bids, for example, based on preferences or parameters indicated by the consumer seller of the used automobile. For example, the used automobile seller interface **318** may provide several different bids with different delivery options and prices to the used car seller, for example, a price of $6,000 to drop off the car at an out of state dealer the next day or a price of $5,500 to drop off the car at a local consumer buyer location in five days. For example, a consumer buyer may determine the cost of picking up the used car from the consumer seller and provide two pricing and delivery options, for example, $5,500 to pick up the used car from the consumer seller or $5,800 to have the used car delivered to the consumer buyer's home. For example, a manufacturer off-lease seller may review bid prices and delivery options on a number factors on used automobile seller interface **324**, but may be very interested in finding an in-market buyer to eliminate transportation costs. A manufacturer off-lease seller may often have somewhat different concerns than a consumer seller. For example, to meet a quarterly budget, a manufacturer off-lease seller may be primarily interested eliminating a high back log of off-lease cars even if selling cars at a significant discount is required.

Further, for example, used automobile buyers may use information such as ratings data to optimize their bids. For example, if gasoline prices are increasing, mileage ratings for a particular car may dictate increasing or decreasing a bid. If a vehicle has very good gas mileage, and gas prices are skyrocketing, that car may have an increasing demand as gas prices increase, or vice versa. Similarly, safety ratings of vehicles may be important to consumer demand if high profile problems have appeared for a particular automobile style, make, or model. As discussed above, various automobile market information may be used by a used automobile buyer including safety information, insurance information, consumer credit information, dealer rating information, incentive information, residual value information, and/or any other data which may be relevant.

The used automobile seller interface **318**, **324** may organize used automobile buyer bids based on a variety of factors and may provide supplemental information. For example, certain buyer bids may be selected as the best options, all buyer bids may be summarized, various additional ratings, reviews, or popularity information, special offers, etc. may also be provided to a consumer along with any used automobile buyer bids. The recommendation engine **312** may provide recommendations to a consumer seller based on the current automobile market data. For example, of ten used automobile buyer bids provided with a response, three bids may be recommended, for example, as "Great Deals!" It should be appreciated that in some cases, a particular used car seller request may not return any buyer bids, for example, if the used car for sale is in low demand or a unique item with a limited market. Also, for example, if only one or two bids are received, the recommendation engine **312** may recommend that a consumer seller wait for a better bid because the bids provided are not competitive offers based on the current automobile market data stored in the database system **310**. Fur-

US 8,650,093 B2

17 | 18

ther, in an example embodiment, buyer bids may be organized according to distance to a pickup location, highest price, closest match to the consumer seller entered criteria, a normalized quality index or value index, etc. The consumer seller or manufacturer off-lease seller may be able to toggle between different viewing options for buyer bids.

Further, in an example embodiment, a consumer seller may be at a dealer lot (e.g., a Nissan dealer) and take a picture of a VIN on a used car (e.g., a Maxima), which the consumer seller intends to trade in. A bid from a competing dealer (e.g., a Toyota dealer) across the street may be received on the mobile device within seconds and include information for a competing trade in value, and may have further information relating to other new or used cars which may be intended to cause the consumer seller to go to the competing dealer, for example, including various price comparisons, gas mileage ratings, safety ratings, residual value, driving directions to the competing dealer, etc. Accordingly, a consumer seller may weigh the pros and cons of various used automobile buyer bids from consumers and/or dealers, based on delivery options, pricing, and any other relevant variants. Any bids communicated from used automobile buyer interfaces **320**, **322** may be stored, for example, in database system **310**, to further update the automobile market information processing system **302** with current automobile market data.

The consumer seller selects a buyer bid including a price and a delivery option (block **412**). For example, the used car seller chooses to sell the used car based on the price and the pickup location of a consumer buyer bid. The seller may select an offer with a specified price and delivery option on the used automobile seller interface **318**, **324**. The used car seller may have been weighing two or more different delivery options, price differences, etc., based on the response(s) received through the used automobile seller interface **318**, **324**. As noted above, the used automobile seller interface **318**, **324** may organize received bids and other helpful information in a variety of ways, which may make the information easier for a consumer seller to digest. It should be appreciated that a consumer seller will typically want to deliver a used car at a convenient location, often at or near the seller's home. Accordingly, used automobile buyers may attempt to provide delivery options tailored towards maximizing profit and convenience, while still providing a superior bid to other used automobile buyers. By providing multiple bids with different delivery options, the consumer seller may be allowed to make extra money or save time based on the seller's particular situation. It should be appreciated that the consumer seller selection of a bid may, for example, occur simultaneously with the consumer seller and used automobile buyer executing the sale or providing a deposit or down payment, or the like (see, e.g., block **414**). Accordingly, in an example embodiment, once a consumer seller or manufacturer off-lease seller selects a bid, the used automobile buyer has effectively purchased the car, and both parties do not need to worry about the other party backing out of the deal.

It should be appreciated that a consumer seller may not want to drive to a distant pickup location without first receiving some form of deposit, or likewise, a used automobile buyer may not want to go to a distant pickup location to without assurance that the used automobile will actually be available for pickup and in good working order. Likewise, a manufacturer off-lease seller may be concerned with obtaining maximum value for an off-lease automobile within the required time constraints, but transportation costs may be strictly budgeted. The automobile market information processing system **302** may accommodate for deposits to provide any reasonable or necessary assurances to both buyers and

sellers. For example, the automobile market information processing system **302** may provide and/or require the use of a terms of service agreement, which the consumer seller or manufacturer off-lease seller and the used automobile buyer may sign and agree to the terms provided therein. For example, a credit card could be charged a default payment in the event that either party breaches the terms of service agreement. In an example embodiment, a schedule of various breaches may require different default payments, for example, if a buyer determines a headlight does not work, a standard $30 fee may be assessed from the consumer seller. Also, a variable default agreement may be based on a distance between a seller and a buyer, so that a party which travels a great distance may be compensated if the other party breaches the agreement. Also, for example, a time period for inspection may be specified in a request and/or a bid. A bid may be conditional based on one or more seller representations. Moreover, a terms of service agreement may provide assurances for any issues which may arise in the sale of a used car, and may provide one or more options based on a breach, including payment of fees or nullification of a bid acceptance and/or sale execution. Any consumer seller selections, counter offers, or additional requests or responses may be stored in database system **310**, as the communications are processed by automobile market information processing system **302**, providing further data updates. Accordingly, in an example embodiment, a consumer seller may select a bid in order to sell the used car, and that sale information may then be provided to another consumer searching for information regarding the same type of car with similar features, for example, the next day.

The consumer seller and the used automobile buyer execute the sale of the used automobile (block **414**). For example, the used automobile buyer electronically signs a contract and performs an electronic funds transfer or credit card payment. After a buyer bid is selected, an electronic contract may be prepared by the automobile market information processing system **302** and provided for the used automobile buyer who may e-sign the contract or other documentation as needed. Similarly, the consumer seller may e-sign the contract or other documentation as needed, either prior to selecting a bid, at the time of selecting a bid, or at a later time. A contract may be e-signed through the used automobile seller interface **318**, **324**, and the used automobile buyer interface **320**, **322**, respectively. In another example embodiment, paper copies of a contract may be signed, for example, after the used automobile buyer prints them or receives them through the mail. In an example embodiment, the used automobile buyer may provide cash or a paper check. It should be appreciated that the process of executing a contract may take some time. Also, it should be appreciated that, for example, the consumer seller selection of a bid discussed above (see, e.g., block **412**) may occur simultaneously with the consumer executing the sale. Once the sale is completed, the actual transaction data including the final sale price, may be provided to and stored in database system **310**. Accordingly, the automobile market information processing system **302** may be updated with current automobile market data from every step in the used car sales process between a consumer seller or manufacturer off-lease seller and a used automobile buyer. In an example embodiment, the updates provided to the automobile market information processing system **302** are provided in real-time, for example, data may be transmitted and processed within seconds or minutes. Further, for example, it should be appreciated that certain data may be provided to the automobile market information processing system **302** according to a batch processing schedule.

US 8,650,093 B2

19
20

Next, the consumer seller makes the purchased used automobile available according to the consumer seller bid selection (block **416**). For example, the seller drives the used car to the pickup location if the pickup location is not the used car seller's location. It should be appreciated that the consumer seller or a manufacturer off-lease seller and the used automobile buyer may use a wide variety of locations as a pickup location, and may work out a delivery option which is convenient for both parties. A consumer seller may interact with the automobile market information processing system **302** using used automobile seller interface **318**, for example, to provide notification that a car is at the pickup location and ready for delivery. A manufacturer off-lease seller may interact with the automobile market information processing system **302** using used automobile seller interface **324**, for example, to provide notification that a car has been dropped off by a consumer lessee and is at the pickup location and ready for delivery to the buyer. Similarly, a notification may be sent via used automobile buyer interface **322**, **322** to the used car buyer that the used car is available for pickup at the specified location.

Finally, the used automobile buyer receives the purchased used automobile according to the consumer seller selected delivery option (block **418**). For example, the used car buyer receives the used car at the pickup location the same day the sale is executed. The used car buyer may pick up the car without ever having to talk to or negotiate, in person or over the telephone, with the consumer seller or manufacturer off-lease seller. For example, the used car buyer may arrive at the pickup location, show identification and provide a proof of purchase, and be provided the keys to the car by the seller. The parties may sign paperwork indicating or confirming the car has been picked up. Proof of purchase documentation may include any or all documents that are legally required for an automobile sale for a given jurisdiction, for example, the title, odometer statement, or any other document required by the Department of Motor Vehicles. For example, the consumer seller or manufacturer off-lease seller may be required to provide any legally required documents to fully execute and record the sale of the used car.

Further, in an example embodiment, a consumer seller or manufacturer off-lease seller may offer various insurance policies or service contracts to a used car buyer, for example, etch insurance, key insurance, gap insurance, or a ninety day warranty may be provided. For example, a consumer seller or manufacturer off-lease seller may purchase insurance through the automobile market information processing system **302** in placing a request for bids, which may increase interest from buyers. Also, for example, an insurance policy or service contract may be provided for a used car being sold at no charge to the consumer seller or manufacturer off-lease seller, for example, as a convenience to all users **114** using the disclosed system. For example, key insurance may be provided at no cost to both the consumer seller and the used car buyer. It should be appreciated that, for example, using options provided through the automobile market information processing system **302**, a consumer seller or manufacturer off-lease seller may sell or provide any add-on products or services that a dealer would typically offer or provide in the sale of a used automobile. Also, if the used automobile buyer is a dealer, additional products or services may be offered to the consumer seller at the time of pickup. For example, the dealer may offer new or used cars, including related financing options, warranties, service plans, insurance plans, and hard add accessories to the buyer, as discussed in further detail above.

Accordingly, it should be appreciated that consumers, manufacturers, and dealers, may receive significant benefits from the method of facilitating a used automobile transaction disclosed herein. Consumers that are selling and buying used automobiles may benefit from more competitive pricing, piece of mind knowing that a fair market price is being offered for prospective purchases or sales, and improved delivery options that allow the consumer to weigh the benefits and drawbacks of different delivery options, pricing, and other variables. In an example embodiment, consumers can view prices paid for comparable cars in specific locations based on the automobile market data in the automobile market information processing system **302**, for example, within a certain time frame such as one month and within a certain proximity to the consumer. Manufacturers selling off-lease automobiles may benefit from reduced transportation costs, saving auction fees, and an improved bargaining position with a dealer in possession of an off-lease automobile. For example, the ability to identify in-market buyers may be particularly advantageous to manufacturer off-lease sellers, which may be able to identify matching searches of in-market buyers. Also, dealers and/or various third parties may benefit from the opportunity to sell insurance, credit, service contracts, hard add accessories, and other add-ons with used automobiles. Moreover, various inefficiencies in the automobile industry may be minimized utilizing the presently disclosed system and method.

FIG. **5** illustrates a block diagram of an example data architecture **500**. In the example data architecture **500**, interface data **502**, administrative data **504**, and automobile market data **506** interact with each other, for example, based on user commands or requests. The interface data **502**, administrative data **504**, and automobile market data **506** may be stored on any suitable storage medium (e.g., server **226**). It should be appreciated that different types of data may use different data formats, storage mechanisms, etc. Further, various applications may be associated with processing interface data **502**, administrative data **504**, and automobile market data **506**. Various other or different types of data may be included in the example data architecture **500**.

Interface data **502** may include input and output data of various kinds. For example, input data may include mouse click data, scrolling data, hover data, keyboard data, touch screen data, voice recognition data, etc., while output data may include image data, text data, video data, audio data, etc. Interface data **502** may include formatting, user interface options, links or access to other websites or applications, and the like. Interface data **502** may include applications used to provide or monitor interface activities and handle input and output data.

Administrative data **504** may include data and applications regarding user accounts. For example, administrative data **504** may include information used for updating accounts, such as creating or modifying consumer accounts and/or dealer accounts. Further, administrative data **504** may include access data and/or security data. Administrative data **504** may include a terms of service agreement. Administrative data **504** may interact with interface data in various manners, providing a user interface **304**, **306**, **308** with administrative features, such as implementing a user login and the like.

Automobile market data **506** may include, for example, executed sales data **508**, consumer data **510**, dealer data **512**, manufacturer data **514**, statistical data **516**, and/or historical data **518**. Executed sales data **508** may include actual negotiated prices for manufacturer and dealer sales, differences in list prices to negotiated prices, sales demographics, etc. Consumer data **510** may include consumer search activity, con-

US 8,650,093 B2

21

sumer requests and offers, consumer feedback, etc. Dealer data **512** may include dealer pricing, including list prices, sale prices for limited time dealer offers or deals of the day, negotiation information such as bottom line pricing, offers received, foot traffic activity, and dealer inventory data, including current on location data, automobile turnover rates, etc. Manufacturer data **514** may include manufacturer pricing, including suggested pricing, preferred dealer pricing, etc., manufacturer incentives including cash rebates, special lease rates, special APR rates, zero down offers, lifetime warranties, guaranteed trade-in offers, etc., and inventory information including dealer inventory, inventory by location, inventory in transit, manufacturing or production lead times or build times, production scheduling, shipping scheduling, lease information, etc. Statistical data **516** may include information used for providing reports including graphs, forecasts, recommendations, calculators, depreciation schedules, tax information, etc., including equations and other data used for statistical analysis. Historical data **518** may include past sales data, such as historical list prices, actual sale prices, manufacturer and dealer margins, operating costs, service costs or profitability, loyalty information, etc. It should be appreciated that data may fall under one or more categories of automobile market data **506**, and/or change with the passage of time. For example, industry analyst data may include historical data **518** and statistical data **516** relating to safety or quality reports, efficiency data, recall data, and the like for used automobiles, which may be organized or re-organized under various categories of automobile market data **506** as time passes or as supplemental data is provided to the automobile market information processing system **302**. It should be appreciated that a system administrator may load data into the automobile market information processing system **302** as it becomes available. For example, annual, quarterly, and/or monthly reports relating to safety, insurance, etc., may be input into automobile market data **506** on a regular basis. It should also be appreciated that automobile market data **506** may be tailored for a particular manufacturer and/or dealer, for example, a manufacturer may request that a specific type of data that is not normally stored or used be stored in the database system **310**. Accordingly, for example, customized reports may be provided to a manufacturer interface **308** using that specific data for the manufacturer, for example, relating to resale values of used automobiles.

The integration of the various types of automobile market data **506** received from the consumer interface **304**, dealer interface **306**, and manufacturer interface **308** may provide a synergistic and optimal resource for consumers, dealers, and manufacturers alike. In an example embodiment, a used automobile seller and a used automobile buyer may benefit greatly from using an application in a mobile device **103** to provide a request for buyer bids on a used automobile by taking a picture of the VIN of the used automobile, for example, using used automobile seller interface **318, 324**. Used automobile buyers may search for used automobiles for sale by consumer sellers, for example, using used automobile buyer interface **320**. The used automobile buyers may receive intrabrand and/or interbrand seller request information in real-time. The intrabrand and interbrand information provided on the used automobile buyer interface **320** may allow the best automobile options for a particular consumer to be provided to that consumer, and may allow consumer sellers, manufacturer off-lease sellers, and dealers to compete with each other taking into account a greater amount of automobile market information, which may result in a more efficient automobile market. Consumers that are selling used automobiles and consumers that are buying used automobiles may similarly

22

receive benefits from the presently disclosed system. Also, as discussed above, manufacturer off-lease sellers may benefit greatly from the presently disclosed system, for example, using bids and/or matches or search hits for an off-lease automobile to improve bargaining power with a dealer in possession of the off-lease automobile and other dealers and/or consumers.

Automobile market data **506** may be maintained in various servers **108**, in databases or other files. It should be appreciated that, for example, a host device **104** may manipulate automobile market data **506** in accordance with the administrative data **504** and interface data **502** to provide requests or reports to users **114** including consumers, dealers, and manufacturers, and perform other associated tasks. It should also be appreciated that automobile market data **506** represents automobile market information, and that these terms may be used interchangeably in this disclosure depending upon the context.

FIG. **6** is flow diagram illustrating an example process **600** for facilitating a used automobile transaction, according to an example embodiment of the present invention. Although the process **600** is described with reference to the flow diagram illustrated in FIG. **6**, it will be appreciated that many other methods of performing the acts associated with the process **600** may be used. For example, the order of many of the blocks may be changed, certain blocks may be combined with other blocks, and many of the blocks described are optional.

In the example process **600**, data may flow between the automobile market information processing system **302** and a used automobile seller interface **318, 324** and a used automobile buyer interface **320, 322**, as discussed above based on used automobile seller and buyer interaction with the automobile market information processing system **302**. As discussed above, a used automobile seller interface **318** and used automobile buyer interface **320** may be included in a consumer interface **304**, a used automobile buyer interface **322** may be included in a dealer interface **306**, and a used automobile seller interface **324** may be included in a manufacturer interface **308**. It should be appreciated that the automobile market information processing system **302** may update the automobile market information stored in the database system **310** when automobile market information is received from a buyer or seller, and/or a consumer, a dealer, a manufacturer, an industry analyst, and/or from any other information source. Accordingly, the automobile market information may remain current and/or provide sufficiently recent data for the benefit of consumers, dealers, and/or manufacturers.

The example process **600** may begin with a consumer seller or a manufacturer off-lease seller of a used automobile taking a picture of the VIN using a mobile phone application and entering in information such as pricing parameters (block **602**). The used automobile seller interface **318, 324** may use OCR to determine and provide the VIN and pricing parameters to the automobile market information processing system **302** as a consumer seller request or a manufacturer off-lease seller request (block **604**). It should be appreciated that OCR may occur in the automobile market information processing system **302** or at the used automobile seller interface **318, 324**. The automobile market information processing system **302** receives the seller request and prepares automobile market information based on the seller request (block **606**). The automobile market information processing system **302** may send a bid request and automobile market information based on the seller request to the used auto buyer interface **320, 322** for one or more consumers and/or dealers (block **608**). It should be appreciated that while the seller request is automobile market information, typically, additional automobile

US 8,650,093 B2

23

market information would be provided with the seller request. For example, typically, data relating to recent sales of similar used automobiles and/or comparable automobiles may be provided. In an example embodiment, a target price or "true" value of the used automobile, or an expected price range, may be provided. Also, for example, various gas mileage data, safety ratings, recall information, quality reports, estimated insurance costs, and the like may be provided. Further, add-on products or services, such as insurance, credit, warranties, service contracts, or hard add accessories, which may be determined based on a third party bidding process, may also be provided. One or more used automobile buyers, including consumers and/or dealers, receive the bid request and automobile market information, determine prices and delivery options for the used automobile using the automobile market information, and prepare and provide bids for the consumer seller or a manufacturer off-lease seller (block 610). A buyer bid may be sent from the used automobile buyer interface 320, 322 to the automobile market information processing system 302 for each consumer and/or dealer that wants to provide a bid (block 612). The automobile market information processing system 302 receives and processes buyer bids and prepares the bids and automobile market data for the consumer seller or manufacturer off-lease seller (block 614).

The automobile market information processing system 302 may send buyer bids and automobile market information to the used automobile seller interface 318, 324 (block 616). It should be appreciated that automobile market information may be provided to the consumer seller or manufacturer off-lease seller before buyer bids are provided, and/or concurrently with buyer bids. The seller may receive the buyer bids and automobile market information and may select a bid including a delivery option based on the automobile market information (block 618). The used automobile seller interface 318, 324 may send to the automobile market information processing system 302 a selection of a bid indicating that the consumer seller or manufacturer off-lease seller wants to sell the used automobile based on the selected bid (block 620). The automobile market information processing system 302 receives and processes the seller bid selection (block 622). For example, the automobile market information processing system 302 may send the bid selection to the used automobile buyer interface 320, 322 (block 624). The used automobile buyer may receive the bid selection and coordinate a sale by, for example, setting up a pick up time and location for the used automobile at the seller location or the buyer location (block 626). Also, for example, the automobile market information processing system 302 may provide contract or loan documents, collect a deposit or down payment, or the like, from the consumer seller, the manufacturer off-lease seller, and/or the used automobile buyer. As discussed above, in each of blocks 606, 614, and 622, the automobile market information processing system 302 may update the automobile market information in the database system 310 based on the information received from the consumer, manufacturer, and/or dealer.

For exemplary purposes, the present disclosure discusses a various examples relating to a purchase of a used car. However, it should be appreciated that the disclosed system, methods, and apparatus may be advantageously used in relation to various used automobiles other than cars including, for example, trucks, vans, sport utility vehicles, jeeps, motorcycles, commercial vehicles, and/or automobiles that have a VIN and require a license plate to operate.

It will be appreciated that all of the disclosed methods and procedures described herein can be implemented using one or more computer programs or components. These components

24

may be provided as a series of computer instructions on any conventional computer-readable medium, including RAM, ROM, flash memory, magnetic or optical disks, optical memory, or other storage media. The instructions may be configured to be executed by a processor, which when executing the series of computer instructions performs or facilitates the performance of all or part of the disclosed methods and procedures.

Further, it will be appreciated that the presently disclosed system, methods, and apparatus for performing used automobile transactions may be utilized in conjunction with other systems or methods. For example, the presently disclosed system, methods, and apparatus may be used in conjunction with the disclosure in the co-pending commonly-owned patent applications filed on Jul. 5, 2011, entitled "AUTOMOBILE TRANSACTION FACILITATION USING A MANUFACTURER RESPONSE," application Ser. No. 13/176,497, and entitled "AUTOMOBILE TRANSACTION FACILITATION BASED ON CUSTOMER SELECTION OF A SPECIFIC AUTOMOBILE," application Ser. No. 13/176,525, the entire contents of each of which is incorporated by reference herein, and in an example embodiment, the features of which may be combined with the features of the present disclosure.

It should be understood that various changes and modifications to the example embodiments described herein will be apparent to those skilled in the art. Such changes and modifications can be made without departing from the spirit and scope of the present subject matter and without diminishing its intended advantages. It is therefore intended that such changes and modifications be covered by the appended claims.

The invention is claimed as follows:

1. A method comprising:

storing, on a computer readable medium, automobile market data which is representative of recent automobile market characteristics, including at least pricing data and inventory data, wherein the automobile market data includes information received from at least one manufacturer, a plurality of dealers, and a plurality of consumers, wherein at least a portion of the automobile market data is updated in real-time;

receiving, via a used automobile consumer seller interface, a first request for a response regarding a first used automobile, wherein the first request is made by a consumer seller using a mobile device which takes a picture of a vehicle identification number and the vehicle identification number is recognized using optical character recognition, and the first request includes data provided with at least one graphical user interface component;

causing at least one processing device to:

provide first automobile market data, based on the first request, via a used automobile buyer interface, wherein the first automobile market data is based on real-time automobile market data and actual sales data for comparable automobiles within a specified time period and within a specified geographic area;

request, via the used automobile buyer interface from at least two used automobile buyers, a bid to purchase the first used automobile based on the first request, wherein the at least two used automobile buyers include at least one dealer and at least one consumer;

provide the response including at least two bids via the used automobile consumer seller interface, the at least two bids each including at least a price and a delivery option for the first used automobile, the at least two bids based on the first automobile market data; and

US 8,650,093 B2

25

receiving a consumer seller selection of a first bid including a first delivery option which specifies a first pickup location and a second delivery option which specifies a different second pickup location, wherein the consumer seller selection indicates a consumer seller intention to sell the first used automobile based on the first bid to a first used automobile buyer and specifies one of the first delivery option and the second delivery option.

**2**. The method of claim **1**, wherein the first used automobile buyer is one of a consumer and a dealer.

**3**. The method of claim **1**, wherein the at least one graphical user interface component includes at least one of a text box, a drop down list, a list box, a radio button, a checkbox, and a slider bar.

**4**. The method of claim **1**, wherein the first request includes a picture of at least one of the exterior of the automobile, the interior of the automobile, the dashboard of the automobile, the odometer of the automobile, service records of the automobile, and ownership records of the automobile.

**5**. The method of claim **1**, wherein the first request includes geolocation information of the consumer used automobile seller.

**6**. The method of claim **1**, wherein the first request includes at least one price parameter.

**7**. The method of claim **1**, wherein the pricing data includes used automobile data and new automobile data, including actual prices of executed transactions, dealer listing prices, dealer sale prices, manufacturer incentives, dealer bids, consumer bids, and consumer pricing parameters.

**8**. The method of claim **1**, further comprising:

causing the at least one processing device to process the consumer seller selection of the first bid to facilitate executing a sale including at least one of providing for electronic signature of documents and providing for an electronic funds transfer.

**9**. The method of claim **1**, wherein an add-on, including at least one of insurance, financing, a service contract, a warranty, and a hard-add accessory, is provided by a third party with the first request, via the used automobile buyer interface.

**10**. The method of claim **9**, wherein the add-on is selected for inclusion in the first bid by the first used automobile buyer.

**11**. A system comprising:

a computer readable medium storing automobile market data which is representative of recent automobile market

26

characteristics, including at least pricing data and inventory data, wherein the automobile market data includes information received from at least one manufacturer, a plurality of dealers, and a plurality of consumers, wherein at least a portion of the automobile market data is updated in real-time;

at least one processing device operably coupled to the computer readable medium, the at least one processing device executing instructions to:

receive, via a used automobile consumer seller interface, a first request for a response regarding a first used automobile, wherein the first request is made by a consumer seller using a mobile device which takes a picture of a vehicle identification number and the vehicle identification number is recognized using optical character recognition, and the first request includes data provided with at least one graphical user interface component;

provide first automobile market data, based on the first request, via a used automobile buyer interface, wherein the first automobile market data is based on real-time automobile market data and actual sales data for comparable automobiles within a specified time period and within a specified geographic area;

request, via the used automobile buyer interface from at least two used automobile buyers, a bid to purchase the first used automobile based on the first request, wherein the at least two used automobile buyers include at least one dealer and at least one consumer;

provide the response including at least two bids via the used automobile consumer seller interface, the at least two bids each including at least a price and a delivery option for the first used automobile, the at least two bids based on the first automobile market data; and

receive a consumer seller selection of a first bid including a first delivery option which specifies a first pickup location and a second delivery option which specifies a different second pickup location, wherein the consumer seller selection indicates a consumer seller intention to sell the first used automobile based on the first bid to a first used automobile buyer and specifies one of the first delivery option and the second delivery option.

\*    \*    \*    \*    \*

US008744925B2

(12) **United States Patent**
Seergy et al.

(10) **Patent No.:** **US 8,744,925 B2**
(45) **Date of Patent:** **Jun. 3, 2014**

(54) **AUTOMOBILE TRANSACTION FACILITATION BASED ON CUSTOMER SELECTION OF A SPECIFIC AUTOMOBILE**

(75) Inventors: **Michael J. Seergy**, Pine Brook, NJ (US); **Benjamin N. S. Brown**, Pine Brook, NJ (US)

(73) Assignee: **Sidekick Technology Inc.**, Pine Brook, NJ (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 359 days.

(21) Appl. No.: **13/176,525**

(22) Filed: **Jul. 5, 2011**

(65) **Prior Publication Data**

US 2011/0264552 A1    Oct. 27, 2011

(51) **Int. Cl.**
*G06Q 30/00* (2012.01)
(52) **U.S. Cl.**
USPC ........................................ **705/26.4**; 705/26.1
(58) **Field of Classification Search**
USPC .............................. 705/26.1, 26.3, 27.1, 26.4
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 5,970,472 | A | 10/1999 | Allsop et al. |
| 6,006,201 | A | 12/1999 | Berent et al. |
| 6,321,221 | B1 | 11/2001 | Bieganski |
| 6,463,431 | B1 | 10/2002 | Schmitt |
| 6,533,173 | B2 | 3/2003 | Benyak |
| 6,868,388 | B1 | 3/2005 | Simpson et al. |
| 6,868,389 | B1 | 3/2005 | Wilkins et al. |
| 7,395,223 | B1 | 7/2008 | Buzzell et al. |
| 7,406,436 | B1 | 7/2008 | Reisman |
| 7,479,949 | B2 | 1/2009 | Jobs et al. |
| 7,636,574 | B2 | 12/2009 | Poosala |

| | | | |
|---|---|---|---|
| 2002/0065707 | A1 | 5/2002 | Lancaster et al. |
| 2002/0082978 | A1 | 6/2002 | Ghouri et al. |
| 2002/0099628 | A1 | 7/2002 | Takaoka et al. |
| 2002/0111877 | A1 | 8/2002 | Nelson |
| 2003/0088435 | A1 | 5/2003 | King |
| 2003/0200151 | A1 | 10/2003 | Ellenson et al. |
| 2003/0229577 | A1 | 12/2003 | Nabel |
| 2004/0034544 | A1 | 2/2004 | Fields et al. |
| 2004/0059626 | A1 | 3/2004 | Smallwood |
| 2005/0004819 | A1 | 1/2005 | Etzioni et al. |
| 2005/0050097 | A1 | 3/2005 | Yeh et al. |
| 2005/0108112 | A1 | 5/2005 | Ellenson et al. |
| 2005/0240512 | A1 | 10/2005 | Quintero et al. |
| 2006/0020477 | A1 | 1/2006 | Retzbach et al. |
| 2007/0150362 | A1 | 6/2007 | Sharma et al. |
| 2007/0255663 | A1 | 11/2007 | Jordan et al. |

(Continued)

OTHER PUBLICATIONS

AutoTrader.com, Inc..: Private Company Information—Business Week, http://investing.businessweek.com/research/stocks/private/snapshot.asp?privcapId=92642.

(Continued)

*Primary Examiner* — Brandy A Zukanovich
(74) *Attorney, Agent, or Firm* — K&L Gates LLP

(57) **ABSTRACT**

A system, methods, and apparatus for performing automobile transactions are disclosed. In an example embodiment, automobile market data representative of current automobile market characteristics is stored. The automobile market data may include pricing, inventory, and consumer interest information received from dealers, manufacturers, and consumers. A consumer may provide a request for a response regarding a specific automobile using an image of a vehicle identification number or a graphical user interface. Automobile market data may be provided to a dealer based on the request. Bids to sell the specific automobile may be requested from dealers based on the request. Dealer bids may be provided to the consumer with prices and a delivery options. The consumer may select a bid which specifies a pickup location at a first dealer.

**56 Claims, 7 Drawing Sheets**



US 8,744,925 B2

Page 2

(56)     **References Cited**

U.S. PATENT DOCUMENTS

| | | |
|---|---|---|
| 2007/0260526 A1 | 11/2007 | Bartel |
| 2008/0046331 A1 | 2/2008 | Rand |
| 2008/0177653 A1 | 7/2008 | Famolari et al. |
| 2008/0183552 A1 | 7/2008 | O'Hagan |
| 2008/0187125 A1 | 8/2008 | Siegrist |
| 2008/0201184 A1 | 8/2008 | Rose et al. |
| 2008/0201188 A1 | 8/2008 | Heyman et al. |
| 2008/0201203 A1 | 8/2008 | Rose et al. |
| 2008/0208731 A1 | 8/2008 | Ruckart |
| 2008/0228657 A1 | 9/2008 | Nabors et al. |
| 2009/0132348 A1 | 5/2009 | Bria et al. |
| 2009/0149199 A1 | 6/2009 | Maghoul |
| 2009/0171761 A1 | 7/2009 | Noy et al. |
| 2009/0187478 A1 | 7/2009 | Shipley |
| 2009/0187513 A1 | 7/2009 | Noy et al. |
| 2009/0198557 A1 | 8/2009 | Wang et al. |
| 2009/0204600 A1 | 8/2009 | Kalik et al. |
| 2010/0048242 A1 | 2/2010 | Rhoads et al. |
| 2010/0106580 A1 | 4/2010 | Etheredge et al. |
| 2010/0217525 A1 | 8/2010 | King et al. |
| 2010/0274627 A1 | 10/2010 | Carlson |
| 2010/0332292 A1 | 12/2010 | Anderson |
| 2011/0040642 A1 | 2/2011 | O'Dell |
| 2011/0082759 A1 | 4/2011 | Swinson et al. |
| 2011/0087430 A1 | 4/2011 | Boss et al. |
| 2011/0087556 A1 | 4/2011 | Pitkow |
| 2011/0099036 A1 | 4/2011 | Sarkissian et al. |
| 2011/0208418 A1 | 8/2011 | Looney et al. |
| 2011/0238474 A1 | 9/2011 | Carr et al. |
| 2011/0238514 A1 | 9/2011 | Ramalingam et al. |
| 2011/0276394 A1 | 11/2011 | Chan |

OTHER PUBLICATIONS

Autotrader.com Introduces IPhone App to Create a More Personalized "PC-to-Pocket" Experience for Car Shoppers, http://www.prnewswire.com/news-releases/autotradercom, Jul. 7, 2011.
International Search Report issued Sep. 21, 2012 corresponding to Intl. Appln. No. PCT/US2012/045546.
Autodraderuk. Introducing the Auto Trader iPhone App. Mar. 12, 2010 [retrieved on Sep. 6, 2012] from the internet: <URL: http://www.youtube.com/watch?v+6g_1g8IRG4&feature=player_embedded> entire document.
Anonymous, "instaVIN to offer free auto accident history reports for mobile phones,", Wireless News, Jun. 2, 2012.



Fig. 1



Fig. 2



Fig. 3



Start
400
402
Automobile market data including at least pricing data and inventory data is stored in a database system (e.g., data from dealers, consumers, and manufacturers, regarding pricing, lot inventory, turnover rates, transport costs, and quality, safety, and other ratings is collected and stored in a database)
404
A request for a response regarding an automobile is received from a consumer (e.g., a car buyer fills in a request form on a website or takes a picture of a VIN at a dealer to receive a response based on current market data)
406
Automobile market data is provided to dealers based on the consumer request (e.g., a group of dealers receives a real-time report including local car sales data, inventory data, ratings data, and transport cost data of the subject car)
408
A bid to sell the automobile to the consumer is requested from dealers (e.g., a group of dealers within a certain radius of the buyer receive a bid request)
410
Dealer bids are provided to the consumer (e.g., several dealers provide bids based on current pricing data, dealer pickup locations, and potential add-ons, so several different prices and delivery options may be available to the car buyer)
412
The consumer selects a bid including a delivery option which specifies a pickup location (e.g., the car buyer chooses to pickup at a nearby dealer in five days)
414
The dealer provides the automobile at the dealer according to the consumer bid selection (e.g., the dealer notifies a commonly owned dealer that the car must be transported to the dealer pickup location for delivery in less than five days)
416
The consumer and dealer execute the sale of the automobile (e.g., the car buyer e-signs a loan application and contract, and electronically transfers funds)
Fig. 4B

Fig. 4A



Fig. 4A                    ⌐— 400

⌐— 418

| The dealer makes the purchased automobile available according to the consumer bid selection (e.g., the dealer transports the car from the commonly owned dealer location to the dealer pickup location selected by the car buyer if the car is not already located at the dealer pickup location) |

⌐— 420

| The consumer picks up the purchased automobile according to the consumer selected delivery option at the dealer (e.g., the car buyer picks up the car at the nearby dealer five days after the car sale is executed) |

Fig. 4B



Fig. 5



Fig. 6

US 8,744,925 B2

1

## AUTOMOBILE TRANSACTION FACILITATION BASED ON CUSTOMER SELECTION OF A SPECIFIC AUTOMOBILE

### CROSS REFERENCE TO RELATED APPLICATIONS

This application is related to the co-pending commonly-owned patent application filed on Jul. 5, 2011, entitled "AUTOMOBILE TRANSACTION FACILITATION USING A MANUFACTURER RESPONSE," the entire contents of which is incorporated by reference herein.

### BACKGROUND

In the automobile industry, consumers typically purchase automobiles from dealers or dealerships. Dealers often purchase new automobiles from several manufacturers, to sell to consumers. Consumers typically negotiate a lower price than the manufacturer suggested retail price typically referred to as the "sticker price" and/or the price the dealer initially offers. In many cases, the negotiation process for an automobile may include a large degree of uncertainty for the consumer. Generally, the negotiation process is a zero sum process, and because the consumer and the dealer are each trying to get a better deal, there is typically some lack of trust during the negotiation. Accordingly, both dealers and consumers often base the negotiations on established market prices. However, market prices can fluctuate rapidly depending a variety of factors. For example, consumer demand may be affected by economic factors, such as changes in gasoline prices, unemployment rates, government sponsored tax rebates for automobile purchases, etc.

In many cases, a consumer may have concerns that a dealer may not offer a fair and competitive price. Various products and services have become available that allow consumers to perform research on market prices for automobiles. Similarly, dealers negotiating an automobile sale generally do not know the maximum price a consumer will be willing to pay for a particular automobile, or how long it will take to sell an automobile in inventory for a given price. Accordingly, dealers also use products and services for determining and/or tracking market prices. Further, automobile manufacturers may also have an interest in the market prices for automobiles, because the market activity captured as automobile market information may allow the manufacturer to, for example, more profitably determine which automobiles to manufacture, what prices the manufacture should offer to dealers, and whether manufacturer incentives should be offered on existing dealer automobile inventory.

### SUMMARY

The present disclosure provides a new and innovative system, methods and apparatus for providing automobile market information and performing automobile transactions. In an example embodiment, automobile market data representative of recent automobile market characteristics is stored. The automobile market data may include pricing, inventory, and consumer interest information received from dealers, manufacturers, and consumers. A consumer may provide a request for a response regarding a specific automobile using an image of a vehicle identification number or a graphical user interface. Automobile market data may be provided to a dealer based on the request. Bids to sell the specific automobile may be requested from dealers based on the request. Dealer bids may be provided to the consumer with prices and a delivery

2

options. The consumer may select a bid which specifies a pickup location at a particular dealer.

Additional features and advantages of the disclosed method and apparatus are described in, and will be apparent from, the following Detailed Description and the Figures.

### BRIEF DESCRIPTION OF THE FIGURES

FIG. 1 is a high level block diagram of an example network communicating system, according to an example embodiment of the present invention.

FIG. 2 is a detailed block diagram showing an example of a computing device, according to an example embodiment of the present invention.

FIG. 3 is a block diagram showing an example automobile transaction network structure, according to an example embodiment of the present invention.

FIG. 4 includes a flowchart illustrating an example process for facilitating an automobile transaction, according to an example embodiment of the present invention.

FIG. 5 is a block diagram showing an example data architecture, according to an example embodiment of the present invention.

FIG. 6 is flow diagram illustrating an example process for facilitating an automobile transaction, according to an example embodiment of the present invention.

### DETAILED DESCRIPTION OF EXAMPLE EMBODIMENTS

The present disclosure relates in general to a system for facilitating automobile transactions and, in particular, to automobile transaction based on a consumer selection of a specific automobile. Briefly, in an example embodiment, a system is provided which allows a consumer to request information regarding a specific car including dealer bids. For example, a consumer may use a mobile device to take a picture of a vehicle identification number. The specific vehicle may be identified using optical character recognition to request real-time information on that automobile. Dealers may provide bids based on the consumer request using real-time automobile market information, including intrabrand bids and interbrand bids. A consumer may select a dealer bid to purchase or lease an automobile based on the prices and delivery options available. Also, the presently disclosed system may advantageously allow for inventoryless bidding by dealers. For example, a dealer that does not have an automobile in its inventory (e.g., on the dealer lot) can make a bid to sell that automobile, and then have that automobile produced by a manufacturer or transported to the dealer lot. In a non-limiting example embodiment, certain features disclosed in the present patent application may be commercially embodied in products and services offered by Sidekick Technology LLC, the assignee of the present application.

The present system may be readily realized in a network communications system. A high level block diagram of an example network communications system 100 is illustrated in FIG. 1. The illustrated system 100 includes one or more client devices 102, and one or more host devices 104. The system 100 may include a variety of client devices 102, such as desktop computers and the like, which typically include a display 112, which is a user display for providing information to users 114, and various interface elements as will be discussed in further detail below. A client device 102 may be a mobile device 103, which may be a cellular phone, a personal digital assistant, a laptop computer, a tablet computer, etc. The client devices 102 may communicate with the host device

US 8,744,925 B2

3

104 via a connection to one or more communications channels 106 such as the Internet or some other data network, including, but not limited to, any suitable wide area network or local area network. It should be appreciated that any of the devices described herein may be directly connected to each other instead of over a network. Typically, one or more servers 108 may be part of the network communications system 100, and may communicate with host servers 104 and client devices 102.

One host device 104 may interact with a large number of users 114 at a plurality of different client devices 102. Accordingly, each host device 104 is typically a high end computer with a large storage capacity, one or more fast microprocessors, and one or more high speed network connections. Conversely, relative to a typical host device 104, each client device 102 typically includes less storage capacity, a single microprocessor, and a single network connection. It should be appreciated that a user 114 as described herein may include any person or entity which uses the presently disclosed system and may include a wide variety of parties. For example, as will be discussed in further detail below, users 114 of the presently disclosed system may include a consumer, a dealer, and/or a manufacturer.

Typically, host devices 104 and servers 108 store one or more of a plurality of files, programs, databases, and/or web pages in one or more memories for use by the client devices 102, and/or other host devices 104 or servers 108. A host device 104 or server 108 may be configured according to its particular operating system, applications, memory, hardware, etc., and may provide various options for managing the execution of the programs and applications, as well as various administrative tasks. A host device 104 or server may interact via one or more networks with one or more other host devices 104 or servers 108, which may be operated independently. For example, host devices 104 and servers 108 operated by a separate and distinct entities may interact together according to some agreed upon protocol.

A detailed block diagram of the electrical systems of an example computing device (e.g., a client device 102, and a host device 104) is illustrated in FIG. 2. In this example, the computing device 102, 104 includes a main unit 202 which preferably includes one or more processors 204 electrically coupled by an address/data bus 206 to one or more memory devices 208, other computer circuitry 210, and one or more interface circuits 212. The processor 204 may be any suitable processor, such as a microprocessor from the INTEL PENTIUM® family of microprocessors. The memory 208 preferably includes volatile memory and non-volatile memory. Preferably, the memory 208 stores a software program that interacts with the other devices in the system 100 as described below. This program may be executed by the processor 204 in any suitable manner. In an example embodiment, memory 208 may be part of a "cloud" such that cloud computing may be utilized by a computing devices 102, 104. The memory 208 may also store digital data indicative of documents, files, programs, web pages, etc. retrieved from a computing device 102, 104 and/or loaded via an input device 214.

The interface circuit 212 may be implemented using any suitable interface standard, such as an Ethernet interface and/or a Universal Serial Bus (USB) interface. One or more input devices 214 may be connected to the interface circuit 212 for entering data and commands into the main unit 202. For example, the input device 214 may be a keyboard, mouse, touch screen, track pad, track ball, isopoint, image sensor, character recognition, barcode scanner, and/or a voice recognition system.

4

One or more displays 112, printers, speakers, and/or other output devices 216 may also be connected to the main unit 202 via the interface circuit 212. The display 112 may be a cathode ray tube (CRTs), a liquid crystal display (LCD), or any other type of display. The display 112 generates visual displays generated during operation of the computing device 102, 104. For example, the display 112 may provide a user interface, which will be described in further detail below, and may display one or more web pages received from a computing device 102, 104. A user interface may include prompts for human input from a user 114 including links, buttons, tabs, checkboxes, thumbnails, text fields, drop down boxes, etc., and may provide various outputs in response to the user inputs, such as text, still images, videos, audio, and animations.

One or more storage devices 218 may also be connected to the main unit 202 via the interface circuit 212. For example, a hard drive, CD drive, DVD drive, and/or other storage devices may be connected to the main unit 202. The storage devices 218 may store any type of data, such as pricing data, transaction data, operations data, inventory data, commission data, manufacturing data, image data, video data, audio data, tagging data, historical access or usage data, statistical data, security data, etc., which may be used by the computing device 102, 104.

The computing device 102, 104 may also exchange data with other network devices 220 via a connection to the network 106. Network devices 220 may include one or more servers 226, which may be used to store certain types of data, and particularly large volumes of data which may be stored in one or more data repository 222. A server 226 may include any kind of data 224 including databases, programs, files, libraries, pricing data, transaction data, operations data, inventory data, commission data, manufacturing data, configuration data, index or tagging data, historical access or usage data, statistical data, security data, etc. A server 226 may store and operate various applications relating to receiving, transmitting, processing, and storing the large volumes of data. It should be appreciated that various configurations of one or more servers 226 may be used to support and maintain the system 100. For example, servers 226 may be operated by various different entities, including automobile manufacturers, brokerage services, automobile information services, etc. Also, certain data may be stored in a client device 102 which is also stored on the server 226, either temporarily or permanently, for example in memory 208 or storage device 218. The network connection may be any type of network connection, such as an Ethernet connection, digital subscriber line (DSL), telephone line, coaxial cable, wireless connection, etc.

Access to a computing device 102, 104 can be controlled by appropriate security software or security measures. An individual users' 114 access can be defined by the computing device 102, 104 and limited to certain data and/or actions. Accordingly, users 114 of the system 100 may be required to register with one or more computing devices 102, 104. For example, registered users 114 may be able to request or manipulate data, such as submitting requests for pricing information or providing an offer or a bid.

As noted previously, various options for managing data located within the computing device 102, 104 and/or in a server 226 may be implemented. A management system may manage security of data and accomplish various tasks such as facilitating a data backup process. A management system may be implemented in a client 102, a host device 104, and a server 226. The management system may update, store, and back up data locally and/or remotely. A management system

US 8,744,925 B2

5                                                                6

may remotely store data using any suitable method of data transmission, such as via the Internet and/or other networks **106**.

FIG. **3** is a block diagram showing an example automobile transaction network structure **300** which includes an automobile market information processing system **302**, a consumer interface **304**, a dealer interface **306**, and a manufacturer interface **308**. The example automobile market information processing system **302** may be implemented on one or more host devices **104** accessing one or more servers **108**, **226**. In an example embodiment, the automobile market information processing system **302** includes a database system **310**, a recommendation engine **312**, a vehicle identification number processor **314**, and an interface generation unit **316**. A user **114** may be a consumer, a dealer, or a manufacturer that interacts with the consumer interface **304**, dealer interface **306**, or manufacturer interface **308**, respectively. A database system **310** may include a wide variety of automobile market data. A recommendation engine **312** may provide recommendations for consumers, dealers, and manufacturers. A vehicle identification number processor **314** may be used for making requests regarding specific automobiles and automobiles with specific sets of features. For example, a vehicle identification number processor **314** may determine a specific set of features that a specific car has based on a picture of that specific car's vehicle identification number. Interface generation unit **316** may provide, for example, HTML files which are used at the consumer interface **304**, dealer interface **306**, and manufacturer interface **308** interface to provide information to the users **114**. It should be appreciated that he the consumer interface **304**, dealer interface **306**, and manufacturer interface **308** may be considered to be part of the automobile market information processing system **302**, however, for discussion purposes, the consumer interface **304**, dealer interface **306**, and manufacturer interface **308** may be referred to as separate from the automobile market information processing system **302**.

For example, a user **114** may interact with a consumer interface **304** to research automobiles the user **114** is interested in buying. For example, a consumer may be looking for a four door sedan with specific features, including a global positioning system (GPS), a sunroof, tinted windows, rated for at least thirty miles per gallon, four wheel drive, etc. The consumer may interact with the consumer interface **304** by inputting required and/or desired features, monthly budget or full price, etc. The consumer interface **304** may provide a wide variety of features and specifications which the consumer may choose from in providing a request. Based on the information put into the consumer interface **304** from the consumer, the consumer interface **304** may provide one or more reports or offers to the consumer. As will be discussed in further detail below, the information provided by the consumer interface **304** may include current market prices for automobiles, including information relating to additional features, and may include information on specific automobiles, for example, which may be en route to a dealer near the consumer's present location. The automobile market information processing system **302** may process data received by the consumer interface **304**, as well as the dealer interface **306** and/or the manufacturer interface **308**, to respond to a request from a consumer. For example, data from database system **310** may be queried for use in a report, or a recommendation may be provided by recommendation engine **312** according to the consumer request and current market data. The automobile market information processing system **302** may integrate data received from consumer interface **304**, dealer interface **306**, and manufacturer interface **308** to provide current and accurate information relating to the automobile market.

It should be appreciated that the consumer interface **304** may be specific to one particular manufacturer or may provide information for multiple different manufacturers. For example, a consumer interface **304** may be a website with information on many manufacturers, and further, the consumer interface **304** may access or link to the manufacturer specific websites (e.g., Ford). Also, for example, a consumer interface **304** may be implemented as an automobile manufacturer's website. Typically, a manufacturer's website may provide consumers with a catalog like feature that provides information on different automobile models with any available options or features. For example, a manufacturer website may allow a consumer to select options that are desired to "build" a particular automobile, and may provide price comparisons using suggested retail prices, which may consumers use for initial research into what pricing the dealer may offer for a particular automobile with a particular feature set. Also, typically, the consumer may enter information, including, for example, name, an address or zip code, and telephone number. This information may be passed on from the manufacturer to a nearby dealer and/or nearby dealer information may be provided to the consumer (e.g., the dealer in or nearest to the consumer's entered zip code). Accordingly, the dealer may contact the consumer, or the consumer may inquire with the dealer, regarding the specific automobiles available on that dealer's lot and particular pricing being offered, etc. In many cases, consumers may not inquire with dealers that the manufacturer may recommend, and similarly, dealers may not diligently follow up with consumers that have an interest in purchasing an automobile. Further, it should be appreciated that the information provided via a consumer interface **304** and/or a manufacturer website may be very useful to consumers. For example, in the past, dealers often provided brochures with all the information on a manufacturer's available car models, including all the features and options information. However, dealers typically did not provide comprehensive information brochures, which may be relatively expensive to produce, and rather, that information is typically located on a manufacturer website and/or a consumer interface **304**.

Accordingly, the consumer interface **304** may provide a wide range of information, for example, based on any searches or queries performed by a user **114**. In an example embodiment, based on a user search or request for a response, the consumer interface **304** will display a quality index or value index based on normalized calculations for an automobile. The recommendation engine **312** may provide recommendations to a consumer based on the current automobile market data stored in the automobile market information processing system **302**. For example, metrics on gas mileage, emissions, operating and maintenance costs, safety ratings, etc. may be benchmarked against comparable automobiles of the same and different manufacturers. Similar purchase options to a specific search may also be provided, based on feature matching, price range, consumer popularity, etc. Information including price ranges, including MSRP, invoice prices, inventory levels, the user's **114** credit ratings (e.g., FICO score), may be provided which may include monthly payment estimates or projections. For example, a financing calculator may help a user **114** determine what financing rate is appropriate. It should be appreciated that dealers may mislead consumers into believing that a higher financing rate will be required to secure a loan. Further, for example, a lease vs. buy calculator may be provided which may use current market data including prices, interest rates, incentives, estimated mileage per year, etc. for providing an analysis for a particular

US 8,744,925 B2

7

consumer regarding purchasing or leasing. Also, the consumer interface 304 may provide a purchase checklist, for example, of ten steps to buying a car. A qualitative checklist may allow a user to ask the right questions and get the right answers from a dealer. Additional tips may be provided, such as a list of products or services dealers may attempt to sell to a consumer with an analysis of the value of these products or services and a recommendation to accept or decline these dealer offers. Further, beyond analysis relating to automobiles, additional analysis or reports may be provided, for example, relating to dealer reviews, other supplemental products, financial entities that may provide financing, etc. For example, dealer reviews may provide a consumer with information the consumer may use in addition to automobile pricing and delivery options. Moreover, the consumer interface 304 may provide a wide variety of useful information to a consumer, for at home research and preparation, and/or in a dealer location while shopping as a negotiating tool that may provide confirmation on pricing, useful tips, and the like.

In an example embodiment, a dealer interface 306 may provide a user 114, such as a dealer employee, information relating to the current automobile market. The dealer interface 306 allows a dealer to interact with automobile market information processing system 302 to provide the dealer with a wide variety of information, including, for example, current market pricing. Other automobile market information a dealer may receive on a dealer interface 306 includes information relating to lot inventory, turnover rates, automobile transportation and/or shipping costs, incentives, and various ratings, such as ratings relating to quality, safety, insurance, a consumer credit score, dealer ratings, residual or resale values, etc. A dealer may input information into dealer interface 306 relating to sales data, including current pricing offered, special sales offers, actual transaction data, inventory data, etc. In an example embodiment, the dealer may provide information through dealer interface 306 which will be used by automobile market information processing system 302 to prepare reports or offers to consumers and/or manufacturers. It should be appreciated that a dealer is typically a franchise entity, while a distribution location may not be a franchise entity. For brevity, throughout this specification, the term dealer may be used to describe both franchise entity dealers and non-franchise entity distribution location. Accordingly, as used in this disclosure, the term dealer does not indicate whether an entity is a franchise entity. Moreover, a franchise dealer or a non-franchise distribution location may utilize a dealer interface 306 as described herein.

In an example embodiment, a manufacturer interface 308 may provide a user 114, such as a manufacturer employee, information relating to the current automobile market, including consumer requests. For example, an manufacturer interface 308 may provide a manufacturer a request received from a consumer interface 304. Additionally, the manufacturer interface 308 may provide information such as a report that allows the manufacturer to provide a response to the requesting consumer. A report may include information from database system 310 relating to current market pricing, recent sales figures and trends, current manufacturer incentives, current inventory, including dealer inventory, inventory in transit, and/or build times or lead times for a desired automobile, etc. The manufacturer may use this information to provide a response to a consumer request. The manufacturer may provide the manufacturer interface 308 with information to provide a confirmation, a verification, or an offer to a consumer via consumer interface 304. For example, a confirmation number associated with the particular consumer request may be provided for the consumer. Also, a recommendation may

8

be provided from the recommendation engine 312 to the manufacturer in relation to automobile pricing, responding to a specific request, manufacturer incentives, inventory management, production schedules, shipping schedules, etc. It should be appreciated that a manufacturer may be referred to as an OEM or original equipment manufacturer. The manufacturer interface 308 may provide a manufacturer with a real-time lens into the automobile market which may allow the manufacturer to adjust production schedules, pricing plans, marketing activities, etc., which may provide a significant advantage for manufacturers.

Accordingly, information may be provided to the automobile market information processing system 302 from consumers, dealers, and manufacturers with a very high degree of granularity, as every transaction that occurs and even every request or search may be stored and used by the automobile market information processing system 302. This allows the automobile market information processing system 302 to use the most current automobile market data to provide information to consumers, dealers, and manufacturers. It should be appreciated that market prices can change relatively quickly, particularly when major events drive consumer behavior or manufacturer production, such as natural disasters. Accordingly, reports and recommendations provided by the automobile market information processing system 302 may be highly accurate, reliable, and sensitive to market changes.

It should be appreciated that certain functions described as performed, for example, at automobile market information processing system 302, may instead be performed locally at consumer interface 304, dealer interface 306, and manufacturer interface 308, or vice versa. Further, in certain cases, tasks may be performed using consumer interface 304, dealer interface 306, and manufacturer interface 308 or, for example, performed in person, such as a consumer signing documents at a dealer location, or a dealer communicating with a manufacturer using a telephone. It should be appreciated that the consumer interface 304, dealer interface 306, and manufacturer interface 308 may be implemented, for example, in a web browser using an HTML file received from the automobile market information processing system 302. In an example embodiment, the consumer interface 304, dealer interface 306, and manufacturer interface 308 may be located on a website, and may further be implemented as a secure website. Also, consumer interface 304, dealer interface 306, and manufacturer interface 308 may require a local application, for example, which a manufacturer may pay for to have access to, for example, information from the automobile market information processing system 302 such as requests from consumers.

FIG. 4 is a flowchart of an example process 400 for facilitating an automobile transaction. Although the process 400 is described with reference to the flowchart illustrated in FIG. 4, it will be appreciated that many other methods of performing the acts associated with the process 400 may be used. For example, the order of many of the blocks may be changed, certain blocks may be combined with other blocks, and many of the blocks described are optional.

The example process 400 for facilitating an automobile transaction may allow users 114, including dealers and consumers, as well as manufacturers, to efficiently sell and purchase automobiles, respectively. The example process 400 may begin with automobile market data including at least pricing data and inventory data stored in a database system (block 402). For example, automobile market data from dealers, consumers, and manufacturers regarding pricing, lot inventory, turnover rates, transport costs, and quality, safety, and/or other ratings is collected and stored in a database. In an

example embodiment, a wide variety of data is stored in a database system **310**. For example, transport costs may include manufacturer to dealer shipping costs and/or dealer to dealer costs for shipping or transporting an automobile (e.g., a dealer with multiple locations may drive automobiles between locations if necessary). Automobile market data may include various relevant ratings, reports, awards, or other information, including quality information, safety information, insurance information, consumer credit information, dealer rating information, incentive information, residual value information, and/or any other data which may be relevant to consumers. For example, ratings data may include information from the National Highway Traffic Safety Administration (NHTSA), the Environmental Protection Agency (EPA), and/or the Insurance Institute for Highway Safety (IIHS). The data may include information from a consumer interface **304**, such as data in consumer searches or requests, information from a dealer interface **306**, such as currently offered dealer pricing, transaction data for finalized sales, current inventory data, transport or shipping costs, and information from a manufacturer interface **308**, such as current manufacturer prices and suggested pricing, manufacturer incentives, and current inventory including finished inventory on hand, production scheduling, shipment scheduling, inventory in transit, and manufacturing lead times. The automobile market data may be comprised solely of information received from the consumer interface **304**, dealer interface **306**, and manufacturer interface **308**, or may include additional information received from other sources. It should be appreciated that various methods of storing the automobile market data may be employed according to the system requirements. For example, database system **310** may be organized according to different manufacturers or dealers, automobile make and model, different information categories (e.g., suggested pricing, market prices, production, shipping, lot inventory), etc., and may consist of one or more databases on one or more servers **108**, **226** which may be remotely located from each other and/or a host device **104** of the automobile market information processing system **302**. As will be discussed further below, the automobile market data may be continually updated as new data is provided to the automobile market information processing system **302**.

The example process **400** continues with a consumer providing a request for a response of whether an automobile can be provided (block **404**). For example, a car buyer fills in a request form on a website or takes a picture of a VIN at a dealer to receive a response based on current market data. In an example embodiment, the buyer's request may be transmitted from consumer interface **304** via the internet to the automobile market information processing system **302**. In another example embodiment, a car buyer takes a picture of a vehicle identification number (VIN) on a car that the buyer would like to receive information for. For example, using an application stored on a mobile device **103**, the buyer may be located at a dealer location and take a picture of the VIN on a car. The buyer may want information on that specific car or on other comparable cars with the same or similar features and/or options. The picture of the VIN may be processed using optical character recognition, which allows the automobile market information processing system **302** to determine the make and model of the car, along with various other characteristics of the car. It should be appreciated that the VIN may include human readable characters, a bar code, or any other graphical or machine readable information which acts as a vehicle identification number. Accordingly, the buyer may perform research, for example, while at home or while shopping at a dealer location. Further, for example, the buyer may

take a picture of a VIN anywhere, including at automobile trade shows, mall displays, or anywhere new cars or cars for sale are displayed. The buyer may even take a picture of a car parked in the street as the buyer walks down the street. Any request or query communicated from the consumer interface **304** may be stored, for example, in database system **310**, thereby updating the automobile market information processing system **302** with current automobile market data.

The example process **400** may continue with providing automobile market data to dealers based on the consumer request (block **406**). For example, a group of dealers receives a real-time report including local car sales data, inventory data, ratings data, and transport cost data of the consumer's requested car. In an example embodiment, a report may include quality information, safety information, insurance information, consumer credit information (e.g., buyer FICO score), dealer rating information, incentive information, residual value information, and/or any other data which may be relevant to consumers. The report may be provided through dealer interface **306** and include the consumer requirements and preferences. The request and/or the report may be provided in real-time and may provide real-time data. Data reported based on a real-time updates in the automobile market information processing system **302** may provide significant advantages, for example, when pricing conditions may change quickly due to unforeseen market conditions. The recommendation engine **312** may provide recommendations to a dealer based on the current automobile market data. For example, a report may indicate various estimated sales probabilities for different prices that the dealer may offer or bid. In an example embodiment, a probability to sell within a time frame may be provided, for example, for a 24 hour period, probabilities and prices may be estimated as, e.g., 80% chance to sell at $22,000; 60% chance to sell at $23,000; 50% chance to sell at $24,000; 20% chance to sell at $25,000. Such information may be illustrated in various ways, such as a bell curve graph or a chart. Further, the recommendation engine may provide daily suggestions (e.g., a deal of the day). Dealers may use such information to attract consumers to visit the dealer in person or online as well as prepare responses or bids to consumer requests. In an example embodiment the dealer interface **306** may provide information that is limited to cars which meet the consumer request requirements. Dealers may customize the dealer interface **306** to provide information in a pre-specified manner to suit the dealers particular needs.

A bid to sell the automobile to the consumer is requested from dealers (block **408**). For example, a group of dealers within a certain radius of the buyer location may receive a bid request. Each dealer's bid may include a price, for example, a price with no additional add-on products or services, such as service contracts, warranties, aftermarket accessories, etc. For example, add-on products may provide substantial value to a dealer, above and beyond the profit margin for the sale of the requested car. A dealer may profit from selling financing options, for example, if a consumer needs financing, the financier may pay the dealer for sourcing the loan. A dealer may sell service plans or maintenance packages (e.g., an extended service contract), selling warranties (e.g., a lifetime warranty), or selling insurance plans (e.g., life, accident, and health insurance, liability insurance, comprehensive insurance, etc.). Also, a dealer may also sell various hard add accessories, for example, bicycle racks, hitches, commercial accessories (e.g., lights and sirens), or any aftermarket products or modifications (e.g., sunroof).

One or more dealer bids are provided to the consumer (block **410**). For example, several dealers provide bids based

US 8,744,925 B2

11

on current pricing data, dealer pickup locations, and potential add-ons, so several different prices and delivery options may be available to the car buyer. Typically, the bid will include at least a specified price and pickup time and location. In an example embodiment, a buyer that has taken a picture of a VIN with a mobile device may receive dealer bids within minutes or seconds on the mobile device. Accordingly, the bids may be used in real-time as the buyer may be actively shopping for a car on a dealer lot. Typically, a pickup location will be a dealer lot or distribution location. It should be appreciated that some dealers may have multiple locations which could serve as a pickup location. In an example embodiment, the automobile market data may indicate that the particular car requested by a consumer should be priced at, for example, $26,000. However, various factors may affect the bid or offer that a dealer will make for the particular car. For example, the potential for forming a customer relationship, the value of potential add-on products and services, or competition with other dealers may cause a dealer to bid lower than normal. In such a case, the dealer may bid $25,000 in an effort to create a customer relationship, sell add-on products, and/or undercut the competition pricing. Other factors, such as the buyer's credit score (e.g., FICO score), may be used by a dealer in determining a bid, as this may affect the profitability of a sale.

Further, for example, the particular automobile requested may not be available for immediate pickup near the buyer, and various alternative delivery options may be provided from several dealers' bids. For example, a car that is located at an out of state dealer may be transported to a dealer near the buyer. Therefore, for example, the consumer interface **304** may provide several different bids with different delivery options and prices to the buyer, for example, a price of $26,000 to pick up the car at an out of state dealer the next day or a price of $26,500 to pick up the car at a local dealer in five days. For example, a dealer may determine a cost to transport a car from one dealer location to another based on the automobile market data such as current market pricing, current inventory levels, current shipping costs, and the like. Accordingly, a dealer response may be adjusted by current automobile market conditions. An offer to provide or ship a particular car to a dealer location near a consumer may be authorized through the dealer interface **306**. Inventoryless bidding may be highly beneficial when dealers that do not have a requested automobile in inventory can still profitably provide a bid. Further, for example, cars that are not exactly what the buyer requested may also be offered to the buyer. For example, the buyer may request a four wheel drive car, but if a two wheel drive car that meets all the other buyer criteria is immediately available at a nearby dealer, the dealer may provide an offer to the buyer for this car, possibly at a significantly lower price, such as $23,000 instead of $26,000 for a four wheel drive car as requested. Further, for example, dealers may use information such as ratings data to optimize their bids. For example, if gasoline prices are increasing, mileage ratings for a particular car may dictate increasing or decreasing a bid. If a vehicle has very good gas mileage, and gas prices are skyrocketing, that car may have an increasing demand as gas prices increase, or vice versa. Similarly, safety ratings of vehicles may be important to consumer demand if high profile problems have appeared for a particular automobile style, make, or model. As discussed above, various automobile market information may be used by a dealer including safety information, insurance information, consumer credit information, dealer rating information, incentive information, residual value information, and/or any other data which may be relevant to consumers.

12

The consumer interface **304** may organize dealer bids based on a variety of factors and may provide supplemental information. For example, certain dealer bids may be selected as the best options, all dealer bids may be summarized, various additional ratings, reviews, or popularity information, financing information, etc. may also be provided to a consumer along with any dealer bids. The recommendation engine **312** may provide recommendations to a consumer based on the current automobile market data. For example, of ten dealer bids provided with a response, three bids may be recommended, for example, as "Great Deals!" It should be appreciated that in some cases, a particular consumer search may not return any dealer bids, for example, if consumer search requirements are unrealistic for the consumer's required price range. Also, for example, if only one or two bids are received, the recommendation engine **312** may recommend that a consumer wait for a better bid because the bids provided are not competitive offers based on the current automobile market data stored in the database system **310**. Further, in an example embodiment, dealer bids may be organized according to distance to a dealer pickup location, lowest price, closest match to the consumer entered criteria, a normalized quality index or value index, etc. The consumer may be able to toggle between different viewing options for dealer bids or search results.

Further, in an example embodiment, a buyer may be at a dealer lot (e.g., a Nissan dealer) and take a picture of a VIN on a car (e.g., a Maxima). A bid from a competing dealer (e.g., a Toyota dealer) across the street may be received on the mobile device within seconds and include information for a comparable car (e.g., an Avalon) relating to, for example, gas mileage, safety ratings, price comparisons, residual value, driving directions to the competing dealer, etc. In an example embodiment, a dealer may use the geolocation of the buyer, such as in instances when the buyer is physically located close to the dealer. Accordingly, competing dealer bids may be interbrand or intrabrand in nature, and may be tailored to the buyer's particular situation, which a consumer may find highly advantageous. For example, the buyer may have a bid for a car the buyer wants to test drive as well as a bid for a comparable car across the street before a salesman from the dealer even introduces himself. Accordingly, a consumer may weigh the pros and cons of various dealer bids, based on delivery options, pricing, and any other relevant variants. Any bids communicated from a dealer interface **306** may be stored, for example, in database system **310**, to further update the automobile market information processing system **302** with current automobile market data.

The consumer selects a bid including a delivery option which specifies a pickup location (block **412**). For example, the car buyer chooses a delivery option of picking up the car at a nearby dealer in five days. As noted above, a dealer may be a franchise dealer entity or a non-franchise distribution location. The buyer may select an offer with a specified delivery option on the consumer interface **304**. The car buyer may have been weighing two or more different delivery options and/or different features, price differences, etc., based on the response(s) received through the consumer interface **304**. As noted above, the consumer interface may organize bids and other helpful information in a variety of ways, which may make the information easier for a consumer to digest. It should be appreciated that a buyer will typically want to pick up a new car at a convenient location, often near the buyer's home. Accordingly, dealers may attempt to provide delivery options tailored towards maximizing profit for the dealer while also maximizing convenience to the buyer, while also providing a superior bid to other dealers. By providing mul-

US 8,744,925 B2

13

14

tiple bids with different delivery options, the buyer may be allowed to save time or money based on the buyer's particular needs. In an example embodiment, the buyer may provide a counter offer or different request via the consumer interface 304 to a dealer via the dealer interface 306. Accordingly, the dealer may respond in kind, and may update delivery options or other terms. It should be appreciated that the consumer selection of a bid may, for example, occur simultaneously with the consumer executing the sale or providing a deposit or down payment, or the like (see, e.g., block 416). Accordingly, in an example embodiment, once the buyer selects a bid, the buyer has effectively purchased the car, and the dealer does need to worry about the buyer backing out of the deal. Any consumer selections, counter offers, or additional requests or responses may be stored in database system 310, as the communications are processed by automobile market information processing system 302, providing further data updates. Accordingly, in an example embodiment, a consumer may select a bid to purchase a car, and that purchase information may then be provided to another consumer searching for the same type of car with similar features, for example, the next day.

Once a bid with a specific delivery option has been selected, the dealer provides the automobile at the selected dealer according to the consumer bid selection (block 414). For example, the dealer notifies a commonly owned dealer that the car must be transported to the dealer pickup location for delivery in less than five days. In a typical example, the dealer may already have the car in question on the dealer lot, so the car would not need to be transported. In an example embodiment, the dealer may send a notification or instruction message through the dealer interface 306, which would be received by a commonly owned dealer in another city or state. It should be appreciated that the specific manner of notification or instruction may be changed based on the particular application, for example, the automobile market information processing system 302 may automatically provide a notification or instruction to a dealer to produce or transport a car based on inventory data. It should also be appreciated that particular events may be required to trigger instructing a car to be delivered to a dealer, such as a deposit, financing approval, etc. Further, the consumer may be required to send an instruction message from the consumer interface 304 to the dealer interface 306 affirming that the buyer has agreed to purchase the car from the dealer.

The consumer and the dealer execute the sale of the automobile (block 416). For example, the consumer electronically signs documentation such as loan application and a contract and performs an electronic funds transfer or credit card payment. After the delivery option is selected, an electronic contract may be provided by the dealer for the buyer who may e-sign the contract, and/or any other loan applications or other documentation as needed. In another example embodiment, paper copies of a contract may be signed, for example, after the buyer prints them or receives them from a nearby dealer or through the mail. In an example embodiment, the buyer may provide cash or a paper check. It should be appreciated that the process of executing a contract may take some time. For example, the process may occur in several steps, as loan processing may be required prior to executing a contract for sale of a car. Also, it should be appreciated that, for example, the consumer selection of a bid discussed above (see, e.g., block 412) may occur simultaneously with the consumer executing the sale. Once the sale is completed, the actual transaction data including the final negotiated price, may be provided to and stored in database system 310. Accordingly, the automobile market information processing

system 302 may be updated with current automobile market data from every step in the negotiation process between a consumer and a manufacturer. In an example embodiment, the updates provided to the automobile market information processing system 302 are provided in real-time, for example, data may be transmitted and processed within seconds or minutes. Further, it should be appreciated that certain data may be provided to the automobile market information processing system 302 according to a batch processing schedule.

Next, the dealer makes the purchased automobile available according to the consumer bid selection (block 418). For example, the dealer transports the car from the commonly owned dealer location to the dealer pickup location selected by the car buyer if the car is not already located at the dealer pickup location. When a purchased car is already at the dealer location where the buyer has agreed to pick the car up, the car does not need to be transported. Many dealers have multiple locations under the same ownership, and these dealers may drive or ship cars from one dealer location to another if the cost of transporting the car is justifiable. If a buyer chooses a quicker delivery option, the car may then be transported from a different dealer location to the selected dealer pickup location. A dealer may interact with the automobile market information processing system 302 using dealer interface 306, for example, to receive notification that a car will be picked up by a buyer, and to report that a car has been delivered to the dealer pickup location. A notification may also be sent via consumer interface 304 to the buyer that the car is available for pickup at the specified dealer.

Finally, the consumer picks up the purchased automobile according to the consumer selected delivery option at the dealer (block 420). For example, the car buyer picks up the car at the nearby dealer five days after the car sale is executed. The buyer may pick up the car without ever having to talk to or negotiate, in person or over the telephone, with the dealer. For example, the buyer may arrive at the dealer, show identification and proof of purchase, and be provided the keys to the car. The buyer may sign paperwork indicating the car has been picked up. Also, the dealer may offer or provide additional products or services to the buyer when the buyer goes to the dealer to pick up the car. For example, the dealer may offer financing options, warranties, service plans, insurance plans, and hard add accessories to the buyer, as discussed in further detail above.

Accordingly, it should be appreciated that consumers, dealers, and manufacturers may receive significant benefits from the method of facilitating an automobile transaction disclosed herein. For example, price setting, inventory management, and production scheduling, may be greatly improved for dealers and manufacturers by utilizing the disclosed system and method. Consumers may benefit from more competitive pricing, piece of mind knowing that a fair market price is being offered for prospective purchases, and improved delivery options that allow the consumer to weigh the benefits and drawbacks of different delivery options, pricing, and other variables. In an example embodiment, consumers can view prices paid for comparable cars in specific locations based on the automobile market data in the automobile market information processing system 302, for example, within a certain time frame such as one month and within a certain proximity to the consumer. Moreover, various inefficiencies in the automobile industry may be minimized utilizing the presently disclosed system and method.

FIG. 5 illustrates a block diagram of an example data architecture 500. In the example data architecture 500, interface data 502, administrative data 504, and automobile mar-

US 8,744,925 B2

15                                                                    16

ket data **506** interact with each other, for example, based on user commands or requests. The interface data **502**, administrative data **504**, and automobile market data **506** may be stored on any suitable storage medium (e.g., server **226**). It should be appreciated that different types of data may use different data formats, storage mechanisms, etc. Further, various applications may be associated with processing interface data **502**, administrative data **504**, and automobile market data **506**. Various other or different types of data may be included in the example data architecture **500**.

Interface data **502** may include input and output data of various kinds. For example, input data may include mouse click data, scrolling data, hover data, keyboard data, touch screen data, voice recognition data, etc., while output data may include image data, text data, video data, audio data, etc. Interface data **502** may include formatting, user interface options, links or access to other websites or applications, and the like. Interface data **502** may include applications used to provide or monitor interface activities and handle input and output data.

Administrative data **504** may include data and applications regarding project data or data related to project compensation. For example, administrative data **504** may include information used for updating accounts, such as creating or modifying manufacturer accounts or dealer accounts. Further, administrative data **504** may include access data and/or security data. Administrative data **504** may interact with interface data in various manners, providing a user interface **304**, **306**, **308** with administrative features, such as implementing a user login and the like.

Automobile market data **506** may include, for example, executed sales data **508**, consumer data **510**, dealer data **512**, manufacturer data **514**, statistical data **516**, and/or historical data **518**. Executed sales data **508** may include actual negotiated prices for manufacturer and dealer sales, differences in list prices to negotiated prices, sales demographics, etc. Consumer data **510** may include consumer search activity, consumer requests and offers, consumer feedback, etc. Dealer data **512** may include dealer pricing, including list prices, sale prices for limited time dealer offers or deals of the day, negotiation information such as bottom line pricing, offers received, foot traffic activity, and dealer inventory data, including current on location data, automobile turnover rates, etc. Manufacturer data **514** may include manufacturer pricing, including suggested pricing, preferred dealer pricing, etc., manufacturer incentives including cash rebates, special lease rates, special APR rates, zero down offers, lifetime warranties, guaranteed trade-in offers, etc., and inventory information including dealer inventory, inventory by location, inventory in transit, manufacturing or production lead times or build times, production scheduling, shipping scheduling, etc. Statistical data **516** may include information used for providing reports including graphs, forecasts, recommendations, calculators, depreciation schedules, tax information, etc., including equations and other data used for statistical analysis. Historical data **508** may include past sales data, such as historical list prices, actual sale prices, manufacturer and dealer margins, operating costs, service costs or profitability, loyalty information, etc. It should be appreciated that data may fall under multiple categories of automobile market data **506**, or change with the passage of time. It should also be appreciated that automobile market data **506** may be tailored for a particular manufacturer or dealer, for example, a manufacturer may request that a specific type of data that is not normally stored or used be stored in the database system **310**.

Accordingly, for example, customized reports may be provided to a manufacturer interface **308** using that specific data for the manufacturer.

The integration of the various types of automobile market data **506** received from the consumer interface **304**, dealer interface **306**, and manufacturer interface **308** may provide a synergistic and optimal resource for consumers, dealers, and manufacturers alike. In an example embodiment, a consumer may benefit greatly from using an application in a mobile device **103** to receive both intrabrand information and interbrand information in real-time, based only on taking a picture of VIN. Dealers and manufacturers may be able to provide information to the consumer in a manner that highlights the benefits of the products the respective dealer or manufacturer would like to sell. The intrabrand and interbrand information provided on a consumer interface **304** may allow the best automobile options for a particular consumer to be provided to that consumer, may allow dealers to compete with other dealers taking into account a greater amount of automobile market information, and may allow manufacturers to better follow through with opportunities for sales, which may result in a more efficient automobile market.

Automobile market data **506** may be maintained in various servers **108**, in databases or other files. It should be appreciated that, for example, a host device **104** may manipulate automobile market data **506** in accordance with the administrative data **504** and interface data **502** to provide requests or reports to users **114** including consumers, dealers, and manufacturers, and perform other associated tasks. It should also be appreciated that automobile market data **506** represents automobile market information, and that these terms may be used interchangeably in this disclosure depending upon the context.

FIG. **6** is flow diagram illustrating an example process **600** for facilitating an automobile transaction, according to an example embodiment of the present invention. Although the process **600** is described with reference to the flow diagram illustrated in FIG. **6**, it will be appreciated that many other methods of performing the acts associated with the process **600** may be used. For example, the order of many of the blocks may be changed, certain blocks may be combined with other blocks, and many of the blocks described are optional.

In the example process **600**, data may flow between the automobile market information processing system **302** and a consumer interface **304** and a dealer interface **306**, as discussed above based on consumer and dealer interaction with the automobile market information processing system **302**. It should be appreciated that the automobile market information processing system **302** may update the automobile market information stored in the database system **310** when automobile market information is received from a consumer, a dealer, or a manufacturer, or from any other information source. Accordingly, the automobile market information may remain current and/or provide sufficiently recent data for the benefit of consumers, dealers, and/or manufacturers.

The example process **600** may begin with a consumer taking a picture of a VIN using a mobile phone application (block **602**). The consumer interface **304** may use OCR to determine and provide the VIN to the automobile market information processing system **302** to provide a consumer request (block **604**). It should be appreciated that OCR may occur in the automobile market information processing system **302** or at the consumer interface **304**. The automobile market information processing system **302** receives the consumer request and prepares automobile market information based on the request (block **606**). The automobile market information processing system **302** may send a bid request

US 8,744,925 B2

17

and automobile market information based on the consumer request to the dealer interface **306** for one or more dealers (block **608**). It should be appreciated that while the consumer request is automobile market information, typically, additional automobile market information would be provided with the consumer request. For example, typically, data relating to recent sales of the requested automobile and/or comparable automobiles may be provided. In an example embodiment, a target price or "true" value of the requested automobile may be provided. One or more dealers receive the bid request and automobile market information, determine prices and delivery options for the automobile using the automobile market information, and prepare and provide bids for the consumer (block **610**). A dealer bid may be sent from the dealer interface **306** to the automobile market information processing system **302** for each dealer that wants to provide a bid (block **612**). The automobile market information processing system **302** receives and processes dealer bids and prepares the bids and automobile market data for the consumer (block **614**).

The automobile market information processing system **302** may send dealer bids and automobile market information to the consumer interface **304** (block **616**). It should be appreciated that automobile market information may be provided to the consumer before dealer bids are provided, and/or concurrently with dealer bids. The consumer may receive the dealer bids and automobile market information and may select a bid including a delivery option based on the automobile market information (block **618**). The consumer interface **304** may send to the automobile market information processing system **302** a selection of a bid indicating that the consumer wants to purchase or lease the automobile based on the selected bid (block **620**). The automobile market information processing system **302** receives and processes the consumer bid selection (block **622**). For example, the automobile market information processing system **302** may send the bid selection to the dealer interface **306** (block **624**). The dealer may receive the bid selection and coordinate a sale by, for example, transporting the automobile from one dealer location to the dealer location selected for delivery (block **626**). Also, for example, the dealer may provide contract or loan documents, collect a deposit or down payment, or the like. As discussed above, in each of blocks **606**, **614**, **626**, and **634**, the automobile market information processing system **302** may update the automobile market information in the database system **310** based on the information received from the consumer, dealer, and/or manufacturer.

For exemplary purposes, the present disclosure discusses a various examples relating to a purchase of a car. However, it should be appreciated that the disclosed system, methods, and apparatus may be advantageously used in relation to various automobiles other than cars including, for example, trucks, vans, sport utility vehicles, jeeps, motorcycles, commercial vehicles, and/or automobiles that have a VIN and require a license plate to operate.

It will be appreciated that all of the disclosed methods and procedures described herein can be implemented using one or more computer programs or components. These components may be provided as a series of computer instructions on any conventional computer-readable medium, including RAM, ROM, flash memory, magnetic or optical disks, optical memory, or other storage media. The instructions may be configured to be executed by a processor, which when executing the series of computer instructions performs or facilitates the performance of all or part of the disclosed methods and procedures.

18

Further, it will be appreciated that the presently disclosed system, methods, and apparatus for performing automobile transactions may be utilized in conjunction with other systems or methods. For example, the presently disclosed system, methods, and apparatus may be used in conjunction with the disclosure in the co-pending commonly-owned patent application filed on Jul. 5, 2011, entitled "AUTOMOBILE TRANSACTION FACILITATION USING A MANUFACTURER RESPONSE," the entire contents of which are hereby incorporated by reference herein, and in an example embodiment, the features of which may be combined with the features of the present disclosure.

It should be understood that various changes and modifications to the example embodiments described herein will be apparent to those skilled in the art. Such changes and modifications can be made without departing from the spirit and scope of the present subject matter and without diminishing its intended advantages. It is therefore intended that such changes and modifications be covered by the appended claims.

The invention is claimed as follows:

**1**. A method comprising:

storing, on a computer readable medium, automobile market data which is representative of recent automobile market characteristics, including at least pricing data and inventory data, wherein the automobile market data includes information received from at least one manufacturer, a plurality of dealers, and a plurality of consumers, wherein at least a portion of the automobile market data is updated in real-time;

receiving, via a consumer interface, a first request for a response regarding a first automobile, wherein the first request is made by a consumer using a mobile device which takes a picture of a vehicle identification number and the vehicle identification number is recognized using optical character recognition;

causing at least one processing device to:

provide first automobile market data, based on the first request, via a dealer interface, wherein the first automobile market data is based on real-time automobile market data and actual sales data for comparable automobiles within a predetermined time period and within a predetermined geographic area;

request, via a dealer interface from at least two dealers, a bid to sell the first automobile based on the first request, wherein the at least two dealers engage in inventoryless bidding by providing a bid on the first automobile when the first automobile is at least one of yet to be manufactured and in the inventory of another entity;

provide the response including at least two bids via the consumer interface, the at least two bids each including at least a price and a delivery option for the first automobile, the at least two bids based on the first automobile market data; and

receiving a consumer selection of a first bid including a first delivery option which specifies a first pickup location at a first dealer and a second delivery option which specifies a different second pickup location, wherein the consumer selection indicates a consumer intention to purchase the first automobile based on the first bid and specifies one of the first delivery option and the second delivery option, wherein the first bid is an inventoryless bid requiring the first automobile to be at least one of manufactured and transferred from the inventory of another entity to the first dealer.

US 8,744,925 B2

**19**

**2**. A method comprising:

storing, on a computer readable medium, automobile market data which is representative of recent automobile market characteristics, including at least pricing data and inventory data, wherein the automobile market data includes information received from a plurality of dealers and a plurality of consumers;

receiving, via a consumer interface, a first request for a response regarding a first automobile, the first request including a vehicle identification number;

causing at least one processing device to:

provide first automobile market data, based on the first request, via a dealer interface, wherein the first automobile market data is based on real-time automobile market data and actual sales data for comparable automobiles within a predetermined time period and within a predetermined geographic area;

request, via a dealer interface from at least two dealers, a bid to sell the first automobile based on the first request;

provide the response including at least two bids via the consumer interface, the at least two bids each including at least a price and a delivery option for the first automobile, the at least two bids based on the first automobile market data; and

receiving a consumer selection of a first bid including a first delivery option which specifies a first pickup location at a first dealer and a second delivery option which specifies a different second pickup location, wherein the consumer selection indicates a consumer intention to one of purchase the first automobile and lease the first automobile based on the first bid and specifies one of the first delivery option and the second delivery option.

**3**. The method of claim **2**, wherein the pricing data includes normal listing prices, sale prices, manufacturer incentives, actual prices of executed transactions, and consumer offers.

**4**. The method of claim **2**, wherein the inventory data includes at least one of inventory data by location, inventory in transit data, production lead time data, production schedule data, and shipping schedule data.

**5**. The method of claim **2**, wherein the first request is made by a consumer using a mobile device which takes a picture of a vehicle identification number.

**6**. The method of claim **5**, wherein the vehicle identification number is recognized using optical character recognition.

**7**. The method of claim **2**, wherein the first request includes geolocation information of the consumer.

**8**. The method of claim **2**, wherein the first automobile is one of a particular type of car with a specific set of features and a particular car with a specific vehicle identification number.

**9**. The method of claim **2**, wherein the first automobile market data provided to the first manufacturer consists of at least one of the first request and a suggested bid price.

**10**. The method of claim **2**, wherein the first bid is an inventoryless bid requiring the first automobile to be at least one of manufactured and transferred from the inventory of another entity to the first dealer.

**11**. The method of claim **2**, wherein the consumer selection of the first bid indicates that the consumer intends to lease the first automobile.

**12**. The method of claim **2**, further comprising:

causing the at least one processing device to process the consumer selection of the first bid to facilitate executing

**20**

a sale including at least one of providing for electronic signature of documents and providing for an electronic funds transfer.

**13**. The method of claim **12**, wherein the first automobile is made available for pickup at the first dealer according to the consumer selected first delivery option.

**14**. The method of claim **2**, wherein the dealer interface allows a dealer to request data via a consumer interface from a plurality of consumers.

**15**. The method of claim **2**, wherein the dealer interface allows a dealer to request data via a manufacturer interface from at least one manufacturer.

**16**. The method of claim **2**, wherein the first dealer at least one of provides and offers at least one of a financing plan, a service plan, an insurance plan, a warranty, and a hard add accessory, for at least the first automobile.

**17**. The method of claim **2**, wherein the first dealer is at least one of a franchise dealer and a non-franchise distribution location.

**18**. The method of claim **2**, wherein the automobile market data includes consumer interest data.

**19**. The method of claim **2**, further comprising:

causing the at least one processing device to provide a manufacturer response via the consumer interface including an acknowledgement of interest.

**20**. The method of claim **2**, further comprising:

causing the at least one processing device to provide a manufacturer response via the consumer interface including at least one of a verification, a confirmation, and an offer indicating that the first automobile can be provided for the consumer.

**21**. The method of claim **2**, wherein the first automobile market data provides a recommended deal of the day.

**22**. A method comprising:

storing, on a computer readable medium, automobile market data which is representative of recent automobile market characteristics, including at least pricing data and inventory data, wherein the automobile market data includes information received from a plurality of dealers and a plurality of consumers;

receiving, via a consumer interface, a first request for a response regarding a first automobile, the first request including data provided with at least one graphical user interface component;

causing at least one processing device to:

provide first automobile market data, based on the first request, via a dealer interface, wherein the first automobile market data is based on real-time automobile market data and actual sales data for comparable automobiles within a predetermined time period and within a predetermined geographic area;

request, via a dealer interface from at least two dealers, a bid to sell the first automobile based on the first request;

provide the response including at least two bids via the consumer interface, the at least two bids each including at least a price and a delivery option for the first automobile, the at least two bids based on the first automobile market data; and

receiving a consumer selection of a first bid including a first delivery option which specifies a first pickup location at a first dealer and a second delivery option which specifies a different second pickup location, wherein the consumer selection indicates a consumer intention to one of purchase the first automobile and lease the first automobile based on the first bid and specifies one of the first delivery option and the second delivery option.

US 8,744,925 B2

21

**23**. The method of claim **22**, wherein the first request is made by a consumer on a website.

**24**. The method of claim **23**, wherein the at least one graphical user interface component includes at least one of a text box, a drop down list, a list box, a radio button, a check-box, and a slider bar.

**25**. The method of claim **22**, wherein the first bid is an inventoryless bid requiring the first automobile to be at least one of manufactured and transferred from the inventory of another entity to the first dealer.

**26**. The method of claim **22**, further comprising:

causing the at least one processing device to process the consumer selection of the first bid to facilitate executing a sale including at least one of providing for electronic signature of documents and providing for an electronic funds transfer.

**27**. The method of claim **26**, wherein the first automobile is made available for pickup at the first dealer according to the consumer selected first delivery option.

**28**. The method of claim **22**, wherein the dealer interface allows a dealer to request data via a consumer interface from a plurality of consumers.

**29**. The method of claim **22**, wherein the dealer interface allows a dealer to request data via a manufacturer interface from at least one manufacturer.

**30**. The method of claim **22**, wherein the first dealer at least one of provides and offers at least one of a financing plan, a service plan, an insurance plan, a warranty, and a hard add accessory, for at least the first automobile.

**31**. The method of claim **22**, further comprising:

causing the at least one processing device to provide a manufacturer response via the consumer interface including an acknowledgement of interest.

**32**. The method of claim **22**, further comprising:

causing the at least one processing device to provide a manufacturer response via the consumer interface including at least one of a verification, a confirmation, and an offer indicating that the first automobile can be provided for the consumer.

**33**. The method of claim **22**, wherein the first automobile market data provides a recommended deal of the day.

**34**. A system comprising:

a computer readable medium storing automobile market data which is representative of recent automobile market characteristics, including at least pricing data and inventory data, wherein the automobile market data includes information received from a plurality of dealers and a plurality of consumers;

at least one processing device operably coupled to the computer readable medium, the at least one processing device executing instructions to:

receive, via a consumer interface, a first request for a response regarding a first automobile, the first request including a vehicle identification number;

provide first automobile market data, based on the first request, via a dealer interface, wherein the first automobile market data is based on real-time automobile market data and actual sales data for comparable automobiles within a predetermined time period and within a predetermined geographic area;

request, via a dealer interface from at least two dealers, a bid to sell the first automobile based on the first request;

provide the response including at least two bids via the consumer interface, the at least two bids each including at least a price and a delivery option for the first

22

automobile, the at least two bids based on the first automobile market data; and

receive a consumer selection of a first bid including a first delivery option which specifies a first pickup location at a first dealer and a second delivery option which specifies a different second pickup location, wherein the consumer selection indicates a consumer intention to one of purchase the first automobile and lease the first automobile based on the first bid and specifies one of the first delivery option and the second delivery option.

**35**. The system of claim **34**, wherein the pricing data includes normal listing prices, sale prices, manufacturer incentives, actual prices of executed transactions, and consumer offers.

**36**. The system of claim **34**, wherein the inventory data includes at least one of inventory data by location, inventory in transit data, production lead time data, production schedule data, and shipping schedule data.

**37**. The system of claim **34**, wherein the first request is made by a consumer using a mobile device which takes a picture of a vehicle identification number.

**38**. The system of claim **37**, wherein the vehicle identification number is recognized using optical character recognition.

**39**. The method of claim **34**, wherein the first request includes geolocation information of the consumer.

**40**. The method of claim **34**, wherein the first automobile is one of a particular type of car with a specific set of features and a particular car with a specific vehicle identification number.

**41**. The method of claim **34**, wherein the first automobile market data provided to the first manufacturer consists of at least one of the first request and a suggested bid price.

**42**. The method of claim **34**, wherein the first bid is an inventoryless bid requiring the first automobile to be at least one of manufactured and transferred from the inventory of another entity to the first dealer.

**43**. The method of claim **34**, wherein the consumer selection of the first bid indicates that the consumer intends to lease the first automobile.

**44**. The system of claim **34**, further comprising:

causing the at least one processing device to process the consumer selection of the first bid to facilitate executing a sale including at least one of providing for electronic signature of documents and providing for an electronic funds transfer.

**45**. The system of claim **44**, wherein the first automobile is made available for pickup at the first dealer according to the consumer selected first delivery option.

**46**. The system of claim **34**, wherein the dealer interface allows a dealer to request data via a consumer interface from a plurality of consumers.

**47**. The system of claim **34**, wherein the dealer interface allows a dealer to request data via a manufacturer interface from at least one manufacturer.

**48**. The system of claim **34**, wherein the first dealer at least one of provides and offers at least one of a financing plan, a service plan, an insurance plan, a warranty, and a hard add accessory, for at least the first automobile.

**49**. The system of claim **34**, wherein the first dealer is at least one of a franchise dealer and a non-franchise distribution location.

**50**. The system of claim **34**, wherein the automobile market data includes consumer interest data.

US 8,744,925 B2

23
24

**51**. The system of claim **34**, further comprising:

causing the at least one processing device to provide a manufacturer response via the consumer interface including an acknowledgement of interest.

**52**. The system of claim **34**, further comprising:

causing the at least one processing device to provide a manufacturer response via the consumer interface including at least one of a verification, a confirmation, and an offer indicating that the first automobile can be provided for the consumer.

**53**. The system of claim **34**, wherein the first automobile market data provides a recommended deal of the day.

**54**. A system comprising:

a computer readable medium storing automobile market data which is representative of recent automobile market characteristics, including at least pricing data and inventory data, wherein the automobile market data includes information received from a plurality of dealers and a plurality of consumers;

at least one processing device operably coupled to the computer readable medium, the at least one processing device executing instructions to:

receive, via a consumer interface, a first request for a response regarding a first automobile, the first request including data provided with at least one graphical user interface component;

provide first automobile market data, based on the first request, via a dealer interface, wherein the first automobile market data is based on real-time automobile market data and actual sales data for comparable automobiles within a predetermined time period and within a predetermined geographic area;

request, via a dealer interface from at least two dealers, a bid to sell the first automobile based on the first request;

provide the response including at least two bids via the consumer interface, the at least two bids each including at least a price and a delivery option for the first automobile, the at least two bids based on the first automobile market data; and

receive a consumer selection of a first bid including a first delivery option which specifies a first pickup location at a first dealer and a second delivery option which specifies a different second pickup location, wherein the consumer selection indicates a consumer intention to one of purchase the first automobile and lease the first automobile based on the first bid and specifies one of the first delivery option and the second delivery option.

**55**. A non-transitory computer readable medium storing software instructions which, when executed, cause an information processing apparatus to:

store automobile market data which is representative of recent automobile market characteristics, including at least pricing data and inventory data, wherein the automobile market data includes information received from a plurality of dealers and a plurality of consumers;

receive, via a consumer interface, a first request for a response regarding a first automobile, the first request including a vehicle identification number;

provide first automobile market data, based on the first request, via a dealer interface, wherein the first automobile market data is based on real-time automobile market data and actual sales data for comparable automobiles within a predetermined time period and within a predetermined geographic area;

request, via a dealer interface from at least two dealers, a bid to sell the first automobile based on the first request;

provide the response including at least two bids via the consumer interface, the at least two bids each including at least a price and a delivery option for the first automobile, the at least two bids based on the first automobile market data; and

receive a consumer selection of a first bid including a first delivery option which specifies a first pickup location at a first dealer and a second delivery option which specifies a different second pickup location, wherein the consumer selection indicates a consumer intention to one of purchase the first automobile and lease the first automobile based on the first bid and specifies one of the first delivery option and the second delivery option.

**56**. A non-transitory computer readable medium storing software instructions which, when executed, cause an information processing apparatus to:

store automobile market data which is representative of recent automobile market characteristics, including at least pricing data and inventory data, wherein the automobile market data includes information received from a plurality of dealers and a plurality of consumers;

receive, via a consumer interface, a first request for a response regarding a first automobile, the first request including data provided with at least one graphical user interface component;

provide first automobile market data, based on the first request, via a dealer interface, wherein the first automobile market data is based on real-time automobile market data and actual sales data for comparable automobiles within a predetermined time period and within a predetermined geographic area;

request, via a dealer interface from at least two dealers, a bid to sell the first automobile based on the first request;

provide the response including at least two bids via the consumer interface, the at least two bids each including at least a price and a delivery option for the first automobile, the at least two bids based on the first automobile market data; and

receive a consumer selection of a first bid including a first delivery option which specifies a first pickup location at a first dealer and a second delivery option which specifies a different second pickup location, wherein the consumer selection indicates a consumer intention to one of purchase the first automobile and lease the first automobile based on the first bid and specifies one of the first delivery option and the second delivery option.

\* \* \* \* \*

US009123075B2

(12) **United States Patent**
Seergy et al.

(10) **Patent No.:** **US 9,123,075 B2**
(45) **Date of Patent:** **Sep. 1, 2015**

(54) **USED AUTOMOBILE TRANSACTION FACILITATION FOR A SPECIFIC USED AUTOMOBILE**

(71) Applicant: **Sidekick Technology LLC**, Pine Brook, NJ (US)

(72) Inventors: **Michael J. Seergy**, Pine Brook, NJ (US); **Benjamin N. S. Brown**, Pine Brook, NJ (US)

(73) Assignee: **Sidekick Technology LLC**, Pine Brook, NJ (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

(21) Appl. No.: **14/176,700**

(22) Filed: **Feb. 10, 2014**

(65) **Prior Publication Data**

US 2014/0156445 A1    Jun. 5, 2014

**Related U.S. Application Data**

(63) Continuation of application No. 13/207,858, filed on Aug. 11, 2011, now Pat. No. 8,650,093, which is a continuation-in-part of application No. 13/176,497, filed on Jul. 5, 2011, and a continuation-in-part of application No. 13/176,525, filed on Jul. 5, 2011, now Pat. No. 8,744,925.

(51) **Int. Cl.**
*G06Q 30/00* (2012.01)
*G06Q 30/08* (2012.01)
*G06Q 30/06* (2012.01)

(52) **U.S. Cl.**
CPC ................ *G06Q 30/08* (2013.01); *G06Q 30/06* (2013.01)

(58) **Field of Classification Search**
CPC ... G06Q 30/08; G06Q 30/02; G06Q 30/0275; G06Q 30/0605

USPC ........................................ 705/26.1, 27.1, 26.4
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 5,970,472 A | 10/1999 | Allsop et al. | |
| 6,006,201 A | 12/1999 | Berent et al. | |

(Continued)

OTHER PUBLICATIONS

AutoTrader.com, Inc..: Private Company Information-Business Week, http://investing.businessweek.com/research/stocks/private/snapshot.asp?privcapId=92642.

(Continued)

*Primary Examiner* — Brandy A Zukanovich
(74) *Attorney, Agent, or Firm* — K&L Gates LLP

(57) **ABSTRACT**

A system, methods, and apparatus for performing used automobile transactions are disclosed. In an example embodiment, automobile market data representative of current automobile market characteristics is stored. The automobile market data may include pricing and consumer interest information received from consumers, dealers, and manufacturers. A consumer seller or manufacturer off-lease seller may provide a request for a response regarding a specific used automobile with a specific a vehicle identification number. Automobile market data may be provided to a used automobile buyer based on the request. Bids to purchase the specific used automobile may be requested from used automobile buyers based on the request. Buyer bids may be provided to the consumer seller or manufacturer off-lease seller with prices and a delivery options. The consumer seller or manufacturer off-lease seller may select a bid to sell the specific used automobile based on the bid.

**18 Claims, 7 Drawing Sheets**



US 9,123,075 B2

Page 2

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 6,321,221 | B1 | 11/2001 | Bieganski |
| 6,463,431 | B1 | 10/2002 | Schmitt |
| 6,533,173 | B2 | 3/2003 | Benyak |
| 6,868,388 | B1 | 3/2005 | Millsap et al. |
| 6,868,389 | B1 | 3/2005 | Wilkins et al. |
| 7,395,223 | B1 | 7/2008 | Buzzell et al. |
| 7,406,436 | B1 | 7/2008 | Reisman |
| 7,479,949 | B2 | 1/2009 | Jobs et al. |
| 7,636,574 | B2 | 12/2009 | Poosala |
| 8,160,929 | B1 | 4/2012 | Park et al. |
| 8,392,193 | B2 * | 3/2013 | Schultz et al. ............... 704/270 |
| 8,606,604 | B1 * | 12/2013 | Huber et al. ................... 705/4 |
| 2002/0065707 | A1 | 5/2002 | Lancaster et al. |
| 2002/0082978 | A1 | 6/2002 | Ghouri et al. |
| 2002/0099628 | A1 | 7/2002 | Takaoka et al. |
| 2002/0111877 | A1 | 8/2002 | Nelson |
| 2002/0128946 | A1 | 9/2002 | Chehade et al. |
| 2003/0088435 | A1 | 5/2003 | King |
| 2003/0200151 | A1 | 10/2003 | Ellenson et al. |
| 2003/0229577 | A1 | 12/2003 | Nabel |
| 2004/0034544 | A1 | 2/2004 | Fields et al. |
| 2004/0059626 | A1 | 3/2004 | Smallwood |
| 2005/0004819 | A1 | 1/2005 | Etzioni et al. |
| 2005/0050097 | A1 | 3/2005 | Yeh et al. |
| 2005/0108112 | A1 | 5/2005 | Ellenson et al. |
| 2005/0240512 | A1 | 10/2005 | Quintero et al. |
| 2006/0020477 | A1 | 1/2006 | Retzbach et al. |
| 2007/0150362 | A1 | 6/2007 | Sharma et al. |
| 2007/0250403 | A1 | 10/2007 | Altschuler |
| 2007/0255663 | A1 | 11/2007 | Jordan et al. |
| 2007/0260526 | A1 | 11/2007 | Bartel |
| 2008/0046331 | A1 | 2/2008 | Rand |
| 2008/0177653 | A1 | 7/2008 | Famolari et al. |
| 2008/0183552 | A1 | 7/2008 | O'Hagan |
| 2008/0187125 | A1 | 8/2008 | Siegrist |
| 2008/0201184 | A1 | 8/2008 | Rose et al. |
| 2008/0201188 | A1 | 8/2008 | Heyman et al. |
| 2008/0201203 | A1 | 8/2008 | Rose et al. |
| 2008/0208731 | A1 | 8/2008 | Ruckart |
| 2008/0228657 | A1 | 9/2008 | Nabors et al. |
| 2009/0076896 | A1 | 3/2009 | DeWitt et al. |
| 2009/0132348 | A1 | 5/2009 | Bria et al. |
| 2009/0149199 | A1 | 6/2009 | Maghoul |
| 2009/0171761 | A1 | 7/2009 | Noy et al. |
| 2009/0187478 | A1 | 7/2009 | Shipley |
| 2009/0187513 | A1 | 7/2009 | Noy et al. |
| 2009/0198557 | A1 | 8/2009 | Wang et al. |
| 2009/0204600 | A1 | 8/2009 | Kalik et al. |
| 2010/0048242 | A1 | 2/2010 | Rhoads et al. |
| 2010/0106580 | A1 | 4/2010 | Etheredge et al. |
| 2010/0217525 | A1 | 8/2010 | King et al. |
| 2010/0274627 | A1 | 10/2010 | Carlson |
| 2010/0332292 | A1 | 12/2010 | Anderson |
| 2011/0040642 | A1 | 2/2011 | O'Dell |
| 2011/0082759 | A1 | 4/2011 | Swinson et al. |
| 2011/0087430 | A1 | 4/2011 | Boss et al. |
| 2011/0087556 | A1 | 4/2011 | Pitkow |
| 2011/0099036 | A1 | 4/2011 | Sarkissian et al. |
| 2011/0208418 | A1 | 8/2011 | Looney et al. |
| 2011/0238474 | A1 | 9/2011 | Carr et al. |
| 2011/0238514 | A1 | 9/2011 | Ramalingam et al. |
| 2011/0276394 | A1 | 11/2011 | Chan |

OTHER PUBLICATIONS

Autotrader.com Introduces IPhone App to Create a More Personalized "PC-to-Pocket" Experience for Car Shoppers, from http://www.prnewswire.com/news-releases/autotradercom, Jul. 7, 2011.
AppStore-AutoTrader.com, http://itunes.apple.com/us/app/autotrader-com/id444552888?mt=8, Oct. 31, 2011.
Anonymous, "instaVIN to offer free auto accident history reports for mobile phones", Wireless News, Jun. 2, 2010.
Charlton, Auto Trader; iPhone app revirw, Mar. 15, 2010 [retrieved on Sep. 6, 2012] from the internet: <URL: http://econsultancy.cojm/us/blog/5593-auto-trader-iphone-app-review> entire document.
Autotraderuk, Introducing the Auto Trader iPhone App, Mar. 12, 2010 [retrieved on Sep. 6, 2012] from the internet: <URL: http://www.youtube.com/watch?v+6g_1g81RG4&feature=player_embedded> entire document.
International Search Report mailed Oct. 5, 2012 for corresponding Intl. Appln. No. PCT/US2010/045545.
International Search Report issued Sep. 21, 2012 corresponding to Inl. Appln. No. PCT/US2012/045546.

* cited by examiner



Fig. 1



Fig. 2



Fig. 3A



Fig. 3B



Start
400
402
Automobile market data including at least pricing data is stored in a database system (e.g., data from consumers, dealers, manufacturers, and industry analysts, regarding pricing, inventory, insurance information, quality ratings, safety ratings, and other ratings is collected and stored in a database)
404
A request for a response regarding a used automobile is received from a consumer seller (e.g., a used car seller takes a picture of the VIN of a used car and fills in price parameters and other information into a mobile application to receive a response based on current market data)
406
Automobile market data is provided to used automobile buyers based on the consumer seller request (e.g., a group of consumers and dealers receive a real-time report including local used car sales data, inventory data, quality and safety ratings data, insurance data, and gas mileage data of the specific used car)
408
A bid to purchase the automobile from the consumer seller is requested from used automobile buyers (e.g., a group of consumers and dealers within a certain radius of the used car seller receive a bid request based on buyer searches)
410
Buyer bids are provided to the consumer seller (e.g., several consumers and dealers provide bids based on current pricing data, options information on the specific used car, and potential pickup locations, so several different prices and delivery options may be available to the used car seller)
412
The consumer seller selects a buyer bid including a price and a delivery option (e.g., the used car seller chooses to sell the used car based on the price and the pickup location of a consumer buyer bid)
414
The consumer seller and used automobile buyer execute the sale of the automobile (e.g., the used car buyer e-signs a contract and electronically transfers funds to the used car seller based on the consumer bid)
416
The consumer seller makes the purchased used automobile available according to the consumer seller bid selection (e.g., the seller drives the used car to the pickup location if the pickup location is not the used car seller's location)
418
The used automobile buyer receives the purchased used automobile according to the consumer seller selected delivery option (e.g., the used car buyer receives the used car at the pickup location the same day the sale is executed)

Fig. 4



Fig. 5



Fig. 6

US 9,123,075 B2

1

**USED AUTOMOBILE TRANSACTION
FACILITATION FOR A SPECIFIC USED
AUTOMOBILE**

CROSS REFERENCE TO RELATED
APPLICATIONS AND PRIORITY CLAIM

This application is a continuation of U.S. patent application Ser. No. 13/207,858, filed on Aug. 11, 2011, which is a continuation-in-part of the following co-pending commonly-owned patent applications filed on Jul. 5, 2011, entitled "AUTOMOBILE TRANSACTION FACILITATION USING A MANUFACTURER RESPONSE," application Ser. No. 13/176,497, and entitled "AUTOMOBILE TRANS-ACTION FACILITATION BASED ON CUSTOMER SELECTION OF A SPECIFIC AUTOMOBILE," application Ser. No. 13/176,525, the entire contents of each of which is incorporated by reference herein.

BACKGROUND

In the used automobile market, consumers typically sell or trade in used automobiles to dealers or dealerships, or privately sell to other consumers, for example, through personal advertisements. Dealers often purchase used automobiles from consumers as part of a deal for a new automobile, typically referred to as a trade in. Typically, a description of a used automobile in a personal advertisement may include the make, model, and mileage of an automobile, but certain other relevant descriptive information may not be available to a potential buyer. Further, a dealer making a trade in offer for a used automobile may not have certain relevant descriptive information on that used automobile. In many cases, the negotiation process for a used automobile may include a large degree of uncertainty for consumers, including both a selling consumer and a purchasing consumer. A consumer seller may be particularly disadvantaged when negotiating with a dealer for a trade in value, as dealers typically have great knowledge and experience with the process, while consumers typically do not. Generally, the negotiation process is a zero sum process, and because a consumer seller of a used automobile and a used automobile buyer are each trying to get a better deal, there is typically some lack of trust during the negotiation. Accordingly, used automobile buyers and sellers, including consumers and dealers, often base the negotiations on established market prices. However, market prices can fluctuate rapidly depending a variety of factors. For example, consumer demand may be affected by economic factors, such as changes in gasoline prices, unemployment rates, government sponsored tax rebates for automobile purchases, etc.

In many cases, a consumer seller of a used automobile may have concerns that a buyer may not offer a fair and competitive price. Various products and services have become available that allow sellers and buyers, including consumers and dealers, to perform research on market prices for used automobiles. Typically, the highest possible value available to a consumer seller may be through a sale to another consumer, as opposed to trading in the used automobile to a dealer.

In addition to consumers and dealers, automobile manufacturers may also have an interest in the resale values of used automobiles. Further, in many cases, a manufacturer may want to sell used off-lease automobiles which have been returned by consumer lessees. In many cases, a manufacturer off-lease seller may not be able to receive the full market value of a used off-lease automobile.

SUMMARY

The present disclosure provides a new and innovative system, methods and apparatus for providing automobile market information and facilitating used automobile transactions. In an example embodiment, automobile market data representative of current automobile market characteristics is stored. The automobile market data may include pricing and consumer interest information received from consumers, dealers, and manufacturers. A consumer seller or manufacturer off-lease seller may provide a request for a response regarding a specific used automobile with a specific a vehicle identification number. Automobile market data may be provided to a used automobile buyer based on the request. Bids to purchase the specific used automobile may be requested from used automobile buyers based on the request. Buyer bids may be provided to the consumer seller or manufacturer off-lease seller with prices and a delivery options. The consumer seller or manufacturer off-lease seller may select a bid to sell the specific used automobile based on the bid.

Additional features and advantages of the disclosed method and apparatus are described in, and will be apparent from, the following Detailed Description and the Figures.

BRIEF DESCRIPTION OF THE FIGURES

FIG. 1 is a high level block diagram of an example network communicating system, according to an example embodiment of the present invention.

FIG. 2 is a detailed block diagram showing an example of a computing device, according to an example embodiment of the present invention.

FIGS. 3A and 3B provide a block diagram showing an example automobile transaction network structure, according to an example embodiment of the present invention.

FIG. 4 is a flowchart illustrating an example process for facilitating a used automobile transaction, according to an example embodiment of the present invention.

FIG. 5 is a block diagram showing an example data architecture, according to an example embodiment of the present invention.

FIG. 6 is flow diagram illustrating an example process for facilitating a used automobile transaction, according to an example embodiment of the present invention.

DETAILED DESCRIPTION OF EXAMPLE
EMBODIMENTS

The present disclosure relates in general to a system for facilitating used automobile transactions and, in particular, to an automobile transaction for a specific used automobile. Briefly, in an example embodiment, a system is provided which allows a consumer seller or a manufacturer off-lease seller of a used automobile to request bids and information regarding a specific automobile identified with a specific vehicle identification number. For example, a consumer may use a mobile device to take a picture of a vehicle identification number and may enter a desired price range or minimum asking price. The specific automobile may be identified using optical character recognition to provide, for example, a full list of the original manufacturer features and options, and the original manufacturer suggested retail price and invoice information, for that specific used automobile based on the vehicle identification number. Accordingly, the consumer seller need not enter all of this information, but may request bids and information in real-time for that specific used automobile. Used automobile buyers may include consumers and/or dealers which may provide bids based on the consumer seller request using real-time automobile market information. A consumer seller may select a buyer bid to sell a used automobile based on the prices and delivery options avail-

US 9,123,075 B2

**3**

able. Accordingly, typically unavailable or difficult to obtain data may be provided for offering a used automobile for sale, including a full listing of the manufacturer features and options, EPA mileage, safety ratings, recalls, quality reports, estimated insurance costs, etc. In an example embodiment, a manufacturer off-lease seller may select a buyer bid based on the prices and delivery options to maximize value, for example, by reducing costs typically associated with selling an off-lease automobile. The used automobile market is presently approximately three times the size of the new automobile market in the United States, as approximately 40 million used automobiles are sold each year. Accordingly, the present disclosure may be helpful for facilitating large numbers of used automobile transactions. In an example embodiment, the disclosed system matches seller and buyer parameters, such as price and pickup location, to facilitate a live bidding process, which allows a used automobile seller to accept or reject bids using a great deal of information not typically available. In a non-limiting example embodiment, certain features disclosed in the present patent application may be commercially embodied in products and services offered by Sidekick Technology LLC, the assignee of the present application.

The present system may be readily realized in a network communications system. A high level block diagram of an example network communications system **100** is illustrated in FIG. **1**. The illustrated system **100** includes one or more client devices **102**, and one or more host devices **104**. The system **100** may include a variety of client devices **102**, such as desktop computers and the like, which typically include a display **112**, which is a user display for providing information to users **114**, and various interface elements as will be discussed in further detail below. A client device **102** may be a mobile device **103**, which may be a cellular phone, a personal digital assistant, a laptop computer, a tablet computer, etc. The client devices **102** may communicate with the host device **104** via a connection to one or more communications channels **106** such as the Internet or some other data network, including, but not limited to, any suitable wide area network or local area network. It should be appreciated that any of the devices described herein may be directly connected to each other instead of over a network. Typically, one or more servers **108** may be part of the network communications system **100**, and may communicate with host servers **104** and client devices **102**.

One host device **104** may interact with a large number of users **114** at a plurality of different client devices **102**. Accordingly, each host device **104** is typically a high end computer with a large storage capacity, one or more fast microprocessors, and one or more high speed network connections. Conversely, relative to a typical host device **104**, each client device **102** typically includes less storage capacity, a single microprocessor, and a single network connection. It should be appreciated that a user **114** as described herein may include any person or entity which uses the presently disclosed system and may include a wide variety of parties. For example, as will be discussed in further detail below, users **114** of the presently disclosed system may include a consumer, a dealer, and/or a manufacturer.

Typically, host devices **104** and servers **108** store one or more of a plurality of files, programs, databases, and/or web pages in one or more memories for use by the client devices **102**, and/or other host devices **104** or servers **108**. A host device **104** or server **108** may be configured according to its particular operating system, applications, memory, hardware, etc., and may provide various options for managing the execution of the programs and applications, as well as various

**4**

administrative tasks. A host device **104** or server may interact via one or more networks with one or more other host devices **104** or servers **108**, which may be operated independently. For example, host devices **104** and servers **108** operated by a separate and distinct entities may interact together according to some agreed upon protocol.

A detailed block diagram of the electrical systems of an example computing device (e.g., a client device **102**, and a host device **104**) is illustrated in FIG. **2**. In this example, the computing device **102**, **104** includes a main unit **202** which preferably includes one or more processors **204** electrically coupled by an address/data bus **206** to one or more memory devices **208**, other computer circuitry **210**, and one or more interface circuits **212**. The processor **204** may be any suitable processor, such as a microprocessor from the INTEL PEN-TIUM® family of microprocessors. The memory **208** preferably includes volatile memory and non-volatile memory. Preferably, the memory **208** stores a software program that interacts with the other devices in the system **100** as described below. This program may be executed by the processor **204** in any suitable manner. In an example embodiment, memory **208** may be part of a "cloud" such that cloud computing may be utilized by a computing devices **102**, **104**. The memory **208** may also store digital data indicative of documents, files, programs, web pages, etc. retrieved from a computing device **102**, **104** and/or loaded via an input device **214**.

The interface circuit **212** may be implemented using any suitable interface standard, such as an Ethernet interface and/or a Universal Serial Bus (USB) interface. One or more input devices **214** may be connected to the interface circuit **212** for entering data and commands into the main unit **202**. For example, the input device **214** may be a keyboard, mouse, touch screen, track pad, track ball, isopoint, image sensor, character recognition, barcode scanner, microphone, and/or a speech/voice recognition system.

One or more displays **112**, printers, speakers, and/or other output devices **216** may also be connected to the main unit **202** via the interface circuit **212**. The display **112** may be a cathode ray tube (CRTs), a liquid crystal display (LCD), or any other type of display. The display **112** generates visual displays generated during operation of the computing device **102**, **104**. For example, the display **112** may provide a user interface, which will be described in further detail below, and may display one or more web pages received from a computing device **102**, **104**. A user interface may include prompts for human input from a user **114** including links, buttons, tabs, checkboxes, thumbnails, text fields, drop down boxes, etc., and may provide various outputs in response to the user inputs, such as text, still images, videos, audio, and animations.

One or more storage devices **218** may also be connected to the main unit **202** via the interface circuit **212**. For example, a hard drive, CD drive, DVD drive, and/or other storage devices may be connected to the main unit **202**. The storage devices **218** may store any type of data, such as pricing data, transaction data, operations data, inventory data, commission data, manufacturing data, image data, video data, audio data, tagging data, historical access or usage data, statistical data, security data, etc., which may be used by the computing device **102**, **104**.

The computing device **102**, **104** may also exchange data with other network devices **220** via a connection to the network **106**. Network devices **220** may include one or more servers **226**, which may be used to store certain types of data, and particularly large volumes of data which may be stored in one or more data repository **222**. A server **226** may include any kind of data **224** including databases, programs, files,

US 9,123,075 B2

**5**

libraries, pricing data, transaction data, operations data, inventory data, commission data, manufacturing data, configuration data, index or tagging data, historical access or usage data, statistical data, security data, etc. A server **226** may store and operate various applications relating to receiving, transmitting, processing, and storing the large volumes of data. It should be appreciated that various configurations of one or more servers **226** may be used to support and maintain the system **100**. For example, servers **226** may be operated by various different entities, including automobile manufacturers, brokerage services, automobile information services, etc. Also, certain data may be stored in a client device **102** which is also stored on the server **226**, either temporarily or permanently, for example in memory **208** or storage device **218**. The network connection may be any type of network connection, such as an Ethernet connection, digital subscriber line (DSL), telephone line, coaxial cable, wireless connection, etc.

Access to a computing device **102**, **104** can be controlled by appropriate security software or security measures. An individual users' **114** access can be defined by the computing device **102**, **104** and limited to certain data and/or actions. Accordingly, users **114** of the system **100** may be required to register with one or more computing devices **102**, **104**. For example, registered users **114** may be able to request or manipulate data, such as submitting requests for pricing information or providing an offer or a bid.

As noted previously, various options for managing data located within the computing device **102**, **104** and/or in a server **226** may be implemented. A management system may manage security of data and accomplish various tasks such as facilitating a data backup process. A management system may be implemented in a client **102**, a host device **104**, and a server **226**. The management system may update, store, and back up data locally and/or remotely. A management system may remotely store data using any suitable method of data transmission, such as via the Internet and/or other networks **106**.

FIGS. **3**A and **3**B provide a block diagram showing an example automobile transaction network structure **300**. As illustrated in FIG. **3**A, the example automobile transaction network structure **300** includes an automobile market information processing system **302**, a consumer interface **304**, a dealer interface **306**, and a manufacturer interface **308**. The example automobile market information processing system **302** may be implemented on one or more host devices **104** accessing one or more servers **108**, **226**. In an example embodiment, the automobile market information processing system **302** includes a database system **310**, a recommendation engine **312**, a vehicle identification number processor **314**, and an interface generation unit **316**. A user **114** may be a consumer, a dealer, or a manufacturer that interacts with the consumer interface **304**, dealer interface **306**, or manufacturer interface **308**, respectively. A database system **310** may include a wide variety of automobile market data. A recommendation engine **312** may provide recommendations for consumers, dealers, and manufacturers. A vehicle identification number processor **314** may be used for making requests regarding specific automobiles and automobiles with specific sets of features. For example, a vehicle identification number processor **314** may determine a specific set of features that a specific car has based on a picture of that specific car's vehicle identification number. Interface generation unit **316** may provide, for example, HTML files which are used at the consumer interface **304**, dealer interface **306**, and manufacturer interface **308** interface to provide information to the users **114**. It should be appreciated that he the consumer interface **304**, dealer interface **306**, and manufacturer interface **308**

**6**

may be considered to be part of the automobile market information processing system **302**, however, for discussion purposes, the consumer interface **304**, dealer interface **306**, and manufacturer interface **308** may be referred to as separate from the automobile market information processing system **302**.

For example, a user **114** may interact with a consumer interface **304** to research new or used automobiles the user **114** is interested in buying and/or selling. For example, a consumer may be looking for a four door sedan with specific features, including a global positioning system (GPS), a sunroof, tinted windows, rated for at least thirty miles per gallon, four wheel drive, etc. The consumer may interact with the consumer interface **304** by inputting required and/or desired features, monthly budget or full price, etc. The consumer interface **304** may provide a wide variety of features and specifications which the consumer may choose from in providing a request. Based on the information put into the consumer interface **304** from the consumer, the consumer interface **304** may provide one or more reports or offers to the consumer. As will be discussed in further detail below, the information provided by the consumer interface **304** may include current market prices for automobiles, including information relating to additional features, and may include information on specific automobiles, for example, which may be en route to a dealer near the consumer's present location or may be already owned by the consumer. The automobile market information processing system **302** may process data received by the consumer interface **304**, as well as the dealer interface **306** and/or the manufacturer interface **308**, to respond to a request from a consumer. For example, data from database system **310** may be queried for use in a report, or a recommendation may be provided by recommendation engine **312** according to the consumer request and current market data. The automobile market information processing system **302** may integrate data received from consumer interface **304**, dealer interface **306**, and manufacturer interface **308** to provide current and accurate information relating to the automobile market.

It should be appreciated that the consumer interface **304** may be specific to one particular manufacturer or may provide information for automobiles manufactured by multiple different manufacturers. For example, a consumer interface **304** may be a website with information for many manufacturers. For example, the consumer interface **304** may access or link to the manufacturer specific websites (e.g., Ford), particularly with regard to new automobile information, but also for used automobile information. Also, for example, a consumer interface **304** may be implemented as an automobile manufacturer's website. Typically, a manufacturer's website may provide consumers with a catalog like feature that provides information on different automobile models with any available options or features. For example, a manufacturer website may allow a consumer to select options that are desired to "build" a particular new automobile, and may provide price comparisons using suggested retail prices, which may consumers use for initial research into what pricing the dealer may offer for a particular automobile with a particular feature set. Also, typically, the consumer may enter information, including, for example, name, an address or zip code, and telephone number. This information may be passed on from the manufacturer to a nearby dealer and/or nearby dealer information may be provided to the consumer (e.g., the dealer in or nearest to the consumer's entered zip code). Accordingly, the dealer may contact the consumer, or the consumer may inquire with the dealer, regarding the specific automobiles available on that dealer's lot and particular pric-

US 9,123,075 B2

7

ing being offered, etc. In many cases, consumers may not inquire with dealers that the manufacturer may recommend, and similarly, dealers may not diligently follow up with consumers that have an interest in purchasing an automobile. Further, it should be appreciated that the information provided via a consumer interface **304** and/or a manufacturer website may be very useful to consumers. For example, in the past, dealers often provided brochures with all the information on a manufacturer's available car models, including all the features and options information. However, dealers typically do not provide comprehensive information brochures, which may be relatively expensive to produce, and rather, that information is typically located on a manufacturer website and/or a consumer interface **304**. It should also be appreciated that information on a manufacturer website and/or a consumer interface **304** may be directed to both new and used automobiles. For example, historical and statistical information which demonstrates favorable safety ratings, quality and reliability data, low maintenance costs, low insurance prices, low emissions, high gas mileage, etc. based on specific models for specific years, and/or groups of models and years may be provided on a manufacturer website and/or a consumer interface **304**.

Accordingly, the consumer interface **304** may provide a wide range of information, for example, based on any searches or queries performed by a user **114**. In an example embodiment, based on a user search or request for a response, the consumer interface **304** will display a quality index or value index based on normalized calculations for an automobile. The recommendation engine **312** may provide recommendations to a consumer based on the current automobile market data stored in the automobile market information processing system **302**. For example, metrics on gas mileage, emissions, operating and maintenance costs, safety ratings, etc. may be benchmarked against comparable automobiles of the same and different manufacturers. Similar purchase options to a specific search may also be provided, based on feature matching, price range, consumer popularity, etc. Information including price ranges, including MSRP, invoice prices, inventory levels, the user's **114** credit ratings (e.g., FICO score), may be provided which may include monthly payment estimates or projections. It should be appreciated that such data may be provided for both new and used automobiles. For example, a financing calculator may help a user **114** determine what financing rate is appropriate for an automobile purchase. It should be appreciated that dealers may mislead consumers into believing that a higher financing rate will be required to secure a loan. Further, for example, a lease vs. buy calculator may be provided which may use current market data including prices, interest rates, incentives, estimated mileage per year, etc. for providing an analysis for a particular consumer regarding purchasing or leasing. Also, the consumer interface **304** may provide a purchase checklist, for example, of ten steps to buying a car. A qualitative checklist may allow a user to ask the right questions and get the right answers from a dealer. Additional tips may be provided, such as a list of products or services dealers may attempt to sell to a consumer with an analysis of the value of these products or services and a recommendation to accept or decline these dealer offers. Further, beyond analysis relating to automobiles, additional analysis or reports may be provided, for example, relating to dealer reviews, other supplemental products, financial entities that may provide financing, etc. For example, dealer reviews may provide a consumer with information the consumer may use in addition to automobile pricing and delivery options. Moreover, the consumer interface **304** may provide a wide variety of useful information to a

8

consumer, for at home research and preparation, and/or in a dealer location while shopping as a negotiating tool that may provide confirmation on pricing, useful tips, and the like. As will be discussed in FIG. 3B in further detail below, the consumer interface **304** may include a used automobile seller interface **318** and a used automobile buyer interface **320**.

In an example embodiment, a dealer interface **306** may provide a user **114**, such as a dealer employee, information relating to the current automobile market. The dealer interface **306** allows a dealer to interact with automobile market information processing system **302** to provide the dealer with a wide variety of information, including, for example, current market pricing. Other automobile market information a dealer may receive on a dealer interface **306** includes information relating to lot inventory, turnover rates, automobile transportation and/or shipping costs, incentives, and various ratings, such as ratings relating to quality, safety, insurance, a consumer credit score, dealer ratings, residual or resale values, etc. A dealer may input information into dealer interface **306** relating to sales data, including current pricing offered, special sales offers, actual transaction data, inventory data, etc. In an example embodiment, the dealer may provide information through dealer interface **306** which will be used by automobile market information processing system **302** to prepare reports or offers to consumers and/or manufacturers. It should be appreciated that a dealer is typically a franchise entity, while a distribution location may not be a franchise entity. For brevity, throughout this specification, the term dealer may be used to describe both franchise entity dealers and non-franchise entity distribution location. Accordingly, as used in this disclosure, the term dealer does not indicate whether an entity is a franchise entity. Moreover, a franchise dealer or a non-franchise distribution location may utilize a dealer interface **306** as described herein.

In an example embodiment, a manufacturer interface **308** may provide a user **114**, such as a manufacturer employee, information relating to the current automobile market, including consumer requests. For example, an manufacturer interface **308** may provide a manufacturer a request received from a consumer interface **304**. Additionally, the manufacturer interface **308** may provide information such as a report that allows the manufacturer to provide a response to the requesting consumer. A report may include information from database system **310** relating to current market pricing, recent sales figures and trends, current manufacturer incentives, current inventory, including dealer inventory, inventory in transit, and/or build times or lead times for a desired automobile, etc. The manufacturer may use this information to provide a response to a consumer request. The manufacturer may provide the manufacturer interface **308** with information to provide a confirmation, a verification, or an offer to a consumer via consumer interface **304**. For example, a confirmation number associated with the particular consumer request may be provided for the consumer. Also, a recommendation may be provided from the recommendation engine **312** to the manufacturer in relation to automobile pricing, responding to a specific request, manufacturer incentives, inventory management, production schedules, shipping schedules, etc. It should be appreciated that a manufacturer may be referred to as an OEM or original equipment manufacturer. Further, it should be appreciated that a manufacturer may include various related affiliate entities all doing business as, or operating under, the same manufacturer name. For example, a manufacturer typically may include a manufacturing company (e.g., operating the manufacturing plant), a sales company (e.g., operating automobile sales activities), and a captive finance company (e.g., operating financing and leasing activi-

US 9,123,075 B2

**9**

ties). The manufacturer interface **308** may provide a manufacturer with a real-time lens into the automobile market which may allow the manufacturer to adjust production schedules, pricing plans, marketing activities, etc., which may provide a significant advantage for manufacturers.

As illustrated in FIG. 3B, a consumer interface **304** may include a used automobile seller interface **318** and a used automobile buyer interface **320**. The used automobile seller interface **318** may be used by consumer sellers to sell used automobiles, while the used automobile buyer interface **320** may be used by consumers to buy used automobiles. It should be appreciated that consumers may be able to access both interfaces **318** and **320** from consumer interface **304**. In an example embodiment, the used automobile seller interface **318** and a used automobile buyer interface **320** may be integrated within a single website or application, or for example, may be implemented as distinct websites. Similarly, in an example embodiment, a used automobile buyer interface **320** may be integrated with features of a consumer interface **304** for searching both new and used automobiles for purchase, or new and used automobiles may not be simultaneously searchable on a particular implementation of a consumer interface **304**. As will be discussed further below, a used automobile seller interface **318** may be used by a consumer seller of a specific used automobile to receive information on the specific automobile and request bids for the specific automobile. Similarly, a used automobile buyer interface **320** may be used for used automobile buyers to receive information on a used automobile and place a bid on that specific automobile.

It should be appreciated that, for example, a consumer seller of a used automobile may be considered different than a dealer seller of a used automobile in some respects. For example, a consumer seller of a used automobile is often selling through different channels, such as offering for sale in classified advertisements versus from a dealer lot. It should be appreciated that such differences may be relevant to the ability to maximize the value of a sale or purchase of a used automobile. Accordingly, where appropriate, the present disclosure may distinguish a consumer seller from a dealer seller, or distinguish a consumer buyer from a dealer buyer. Also, as discussed in further detail below, a manufacturer off-lease seller of a used automobile may also be considered different from a consumer seller and/or a dealer seller.

A dealer interface **306** may include a used automobile buyer interface **322**. For example, a typical dealer may use a dealer interface **306** primarily for facilitating sales of new and used automobiles, however, the dealer interface **306** may also be used to facilitate purchasing used automobiles. For example, a used automobile buyer interface **322** may be used by dealers similarly to the way that the used automobile buyer interface **320** may be used by consumers. It should be appreciated that in an example embodiment, the used automobile buyer interfaces **320**, **322** may be similar or the same, and/or may integrated as part of single website or application. In an example embodiment, a dealer may use the used automobile buyer interface **322** to facilitate bringing a consumer in to purchase a new automobile based on providing a competitive bid to purchase a used automobile as a trade in.

A manufacturer interface **308** may include a used automobile off-lease interface **324**. For example, a manufacturer may use a manufacturer interface **308** primarily for facilitating sales of new automobiles, however, the manufacturer interface **308** may also be used to facilitate selling off-lease automobiles which have been returned by a consumer lessor whose lease is expiring. An off-lease seller interface **324** may be used by a manufacturer, typically, a captive finance company of the manufacturer, similarly to the way

**10**

that the used automobile seller interface **318** may be used by consumers. It should be appreciated that, a manufacturer off-lease seller may have limited options to sell a used off-lease automobile and may have time constraints that are may be typically imposed on a consumer seller of a used automobile. Typically, an off-lease automobile may be dropped off by a consumer lessee at any one of a variety of dealer locations. The manufacturer lessor may then wish to sell the used off-lease automobile, however, the dealer where the off-lease automobile was dropped off may have a significant bargaining advantage to purchase that automobile, as the manufacturer may need to sell the off-lease automobile quickly and may have limited options. Typically, the dealer may not offer the manufacturer off-lease seller full market value for the off-lease automobile. It should be appreciated that the manufacturer off-lease seller may transport the car to an auction in an attempt to obtain a higher price. However, transportation costs, auction fees, and delay in selling the off-lease automobile may cause the manufacturer off-lease seller to accept less than market value for the off-lease automobile from the dealer, or otherwise not maximize the value of the off-lease automobile. For example, typically, an off-lease automobile sold at auction for near or even above the current market value is significantly offset by transportation costs and auction fees.

The off-lease seller interface **324** may provide a manufacturer off-lease seller with leverage, not only through the ability to obtain bids to purchase the off-lease automobile, but through the ability to determine the number of matches or search hits for an off-lease automobile. The dealer that has the off-lease automobile may know that the manufacturer may have the ability to track searches for the off-lease automobile performed by consumers and/or other dealers. The manufacturer off-lease seller may provide the dealer in possession of an off-lease automobile with matches and/or bids, which may provide the dealer with firm evidence of current demand or interest in the off-lease automobile. The dealer may be able to use this information to determine an appropriate price, and possibly even more profitably than the manufacturer. Accordingly, a dealer may often be inclined to make a significantly more competitive bid for an off-lease automobile. It should be appreciated that the manufacturer may use the off-lease seller interface **324** to identify in-market buyers, and even without receiving bids from those buyers, the manufacturer's bargaining power may improve, resulting in a greater value for off-lease sales.

Accordingly, information may be provided to the automobile market information processing system **302** from consumers, dealers, and manufacturers with a very high degree of granularity, as every transaction that occurs and even every request or search may be stored and used by the automobile market information processing system **302**. This allows the automobile market information processing system **302** to use the most current automobile market data to provide information to consumers, dealers, and manufacturers. It should be appreciated that market prices can change relatively quickly, particularly when major events drive consumer behavior or manufacturer production, such as natural disasters. Accordingly, reports and recommendations provided by the automobile market information processing system **302** may be highly accurate, reliable, and sensitive to market changes.

It should be appreciated that the users **114** of the automobile market information processing system **302**, including consumers, dealers, and manufacturers, and buyers and sellers of new and used automobiles, may be required to agree to and/or execute a terms of use agreement or terms of service agreement. Various forms of enforcing the agreement may be implemented, including a transaction deposit policy, which

US 9,123,075 B2

11                                          12

may require a deposit or a credit card hold, or the like, and a standard schedule of fees or default payment schedule for infractions such as improper condition of an automobile, delay in delivery, etc. Accordingly, all parties may be protected from another party breaching the agreement.

It should be appreciated that certain functions described as performed, for example, at automobile market information processing system **302**, may instead be performed locally at consumer interface **304**, dealer interface **306**, and manufacturer interface **308**, or vice versa. Further, in certain cases, tasks may be performed using consumer interface **304**, dealer interface **306**, and manufacturer interface **308** or, for example, performed in person, such as a consumer signing documents at a dealer location, or a dealer communicating with a manufacturer using a telephone. It should be appreciated that the consumer interface **304**, dealer interface **306**, and manufacturer interface **308** may be implemented, for example, in a web browser using an HTML file received from the automobile market information processing system **302**. In an example embodiment, the consumer interface **304**, dealer interface **306**, and manufacturer interface **308** may be located on a website, and may further be implemented as a secure website. Also, consumer interface **304**, dealer interface **306**, and manufacturer interface **308** may require a local application, for example, which a manufacturer or dealer may pay for to have access to, for example, information from the automobile market information processing system **302** such as requests from consumers.

FIG. **4** is a flowchart of an example process **400** for facilitating a used automobile transaction. Although the process **400** is described with reference to the flowchart illustrated in FIG. **4**, it will be appreciated that many other methods of performing the acts associated with the process **400** may be used. For example, the order of many of the blocks may be changed, certain blocks may be combined with other blocks, and many of the blocks described are optional.

The example process **400** for facilitating a used automobile transaction may allow users **114** to efficiently sell and purchase automobiles. The example process **400** may begin with automobile market data including at least pricing data is stored in a database system (block **402**). For example, automobile market data from dealers, consumers, and manufacturers regarding pricing, inventory, insurance information, quality ratings, safety ratings, and other ratings is collected and stored in a database. For example, inventory data may include data regarding off-lease automobiles, including scheduled drop off dates of automobiles with expiring leases. In an example embodiment, a wide variety of data is stored in a database system **310**. Automobile market data may include various relevant ratings, reports, awards, or other information, including quality information, safety information, insurance information, consumer credit information, dealer rating information, incentive information, residual value information, and/or any other data which may be relevant to consumers. For example, ratings data may include information from the National Highway Traffic Safety Administration (NHTSA), the Environmental Protection Agency (EPA), and/or the Insurance Institute for Highway Safety (IIHS). The data may include information from a consumer interface **304**, such as data in consumer searches or requests, information from a dealer interface **306**, such as currently offered dealer pricing, transaction data for finalized sales, current inventory data, transport or shipping costs, and information from a manufacturer interface **308**, such as current manufacturer prices and suggested pricing, manufacturer incentives, and current inventory including finished inventory on hand, production scheduling, shipment scheduling, inventory in tran-

sit, and manufacturing lead times. The automobile market data may be comprised solely of information received from the consumer interface **304**, dealer interface **306**, and manufacturer interface **308**, or may include additional information received from other sources, for example, industry analysts, consumer reports groups, government agencies, etc. It should be appreciated that various methods of storing the automobile market data may be employed according to the system requirements. For example, database system **310** may be organized according to different manufacturers or dealers, automobile make and model, different information categories (e.g., suggested pricing, market prices, production, shipping, lot inventory), etc., and may consist of one or more databases on one or more servers **108**, **226** which may be remotely located from each other and/or a host device **104** of the automobile market information processing system **302**. As will be discussed further below, the automobile market data may be continually updated as new data is provided to the automobile market information processing system **302**.

The automobile market data may be used by any or all parties involved in a used automobile transaction, including used automobile sellers including consumer sellers and manufacturer off-lease sellers, and used automobile buyers including consumer buyers and dealer buyers. In the example process **400**, as discussed further below, the used automobile seller described by way of example as a consumer seller. It should be appreciated that the example process **400** may work similarly or the same for a manufacturer off-lease seller. In an example embodiment, the consumer used automobile seller interface **318** and manufacturer off-lease seller interface **324** may be provided as a combined interface. Certain aspects of the disclosed example process **400** may be of greater or lesser advantage to a manufacturer off-lease seller compared with a consumer seller. For example, consumer sellers typically sell used automobiles infrequently, while manufacturer off-lease sellers may be selling thousands of used off-lease automobiles each month. Accordingly, the goals of the user **114** may vary between consumer sellers and manufacturer off-lease sellers. Certain notable aspects that may be distinguishable between a consumer seller and manufacturer off-lease seller will be discussed below.

The example process **400** continues with a consumer seller providing a request for a response (block **404**). For example, a used car seller takes a picture of the vehicle identification number (VIN) of a used car and fills in price parameters and other information into a mobile application to receive a response based on current market data. In an example embodiment, the seller's request may be transmitted from used automobile seller interface **318**, **324** via the internet to the automobile market information processing system **302**. For example, using an application stored on a mobile device **103**, the used car seller takes a picture of the VIN on the used car and fills in a minimum bid price, delivery parameters, etc. The seller's parameters may specify a pickup location by distance from an address, an area code, etc., which allows for matching the seller with buyers that are in-market. The picture of the VIN may be processed using optical character recognition, which allows the automobile market information processing system **302** to determine the make and model of the car, along with various other characteristics of the car. Also, for example, the used car seller may take a picture of the odometer, and the mileage may be determined using optical character recognition. It should be appreciated that the VIN may include human readable characters, a bar code, or any other graphical or machine readable information which acts as a vehicle identification number.

**13**

Also, the used car seller may input into a mobile application or website a wide variety of additional information about the used car. For example, pictures of the used car may be uploaded with the request. In an example embodiment, pictures of the exterior, interior, dashboard, and/or odometer may be provided. Also, for example, service records, ownership records, and other documents or information may be included with a request. Further, a written description of the car may be provided. Accordingly, because the used car seller can provide information such as pictures, in addition to information which the seller may not have access to, such as the original manufacturer specifications of the used car, potential buyers may have access to a great deal of information on the used car. Further, in an example embodiment, a mobile application may include the geolocation of a used car seller, so the seller does not need to enter such information. Accordingly, the buyer may perform research, for example, while at home or while shopping at a dealer location. It should be appreciated that certain used car buyers may be highly interested in the geolocation of the consumer seller. For example, a dealer may find the consumer seller's geolocation to be more important than a consumer buyer, because a dealer may require a minimal cost for picking up a car to ensure profitability, and to optimize the opportunity for creating a new customer relationship. Similarly, certain used automobile sellers may be very interested in the geolocation of the used automobile buyer. For example, a manufacturer off-lease seller may have a high interest in determining the amount of in-market interest or demand for an off-lease automobile.

In an example embodiment, a manufacturer off-lease seller may provide a request for a response for an automobile that will be dropped off by a consumer lessee in the near future. For example, a manufacturer user **114** may input a VIN into off-lease seller interface **324** by typing, speaking, or providing an image of the VIN. The manufacturer off-lease seller may provide a parameter that the used off-lease automobile will be available only after a certain date. The manufacturer off-lease seller may find that providing a request for a response prior to the consumer lessee actually dropping off an off-lease automobile may significantly improve the value of off-lease automobiles. It should be appreciated that the dealer where the consumer lessee drops off the off-lease automobile may be bargaining without any particular advantage because the manufacturer off-lease seller may have multiple interested used automobile buyers that, based on search parameters, have received the off-lease automobile as a match, and/or bids from used automobile buyers.

Used car buyers may perform a search with used automobile buyer interfaces **320**, **322**, and may typically include parameters limiting the search to a specific automobile type, make, or model, certain options or features, a price range, and a pickup location or area. Further, for example, the buyer may take a picture of a VIN anywhere or manually type in a VIN number, including at automobile trade shows, mall displays, or anywhere new or used cars are for sale. The buyer may even take a picture of a car parked in the street as the buyer walks down the street. Any request or query communicated from the consumer interface **304** may be stored, for example, in database system **310**, thereby updating the automobile market information processing system **302** with current automobile market data.

The example process **400** may continue with providing automobile market data to used automobile buyers based on the consumer seller request (block **406**). For example, a group of consumers and dealers receive a real-time report including local used car sales data, inventory data, quality and safety ratings data, insurance data, and gas mileage data of the

**14**

specific used car which is identified based on the VIN. The group of consumers and dealers that receive a real-time report may be based on prior searches conducted by consumers on used automobile buyer interface **320** and searches conducted by dealers with used automobile buyer interface **322**. In an example embodiment, a report may include quality information, safety information, insurance information, recall information, EPA gas mileage and emissions information, consumer credit information (e.g., buyer FICO score), dealer rating information, incentive information, residual value information, and/or any other data which may be relevant to consumers and/or dealers. In an example embodiment, a report may include a specific history information for the specific used car, such as a CARFAX report. The request and/or the report may be provided in real-time and may also provide real-time data. Data reported based on a real-time updates in the automobile market information processing system **302** may provide significant advantages, for example, when pricing conditions may change quickly due to unforeseen market conditions. The recommendation engine **312** may provide recommendations to a used automobile buyer based on the current automobile market data. For example, a report may indicate various estimated sales probabilities for different prices that the used automobile buyer may offer or bid. In an example embodiment, a estimated sale price or range may be provided. For example, a probability analysis may be provided with prices and corresponding probabilities may be estimated as, e.g., 80% chance to purchase at $6,000; 60% chance to purchase at $5,500; 30% chance to purchase at $5,000; 10% chance to purchase at $4,500. Such information may be illustrated in various ways, such as a bell curve graph or a chart. Further, for example, the recommendation engine may provide daily suggestions (e.g., a deal of the day) for dealers and/or consumers. Consumers may use such suggestions to save money or get a better value on a used car purchase by buying from another consumer rather than a dealer. Dealers may use such suggestions to purchase used cars at good deals, and/or to attract consumers to visit the dealer in person or online, as well as prepare responses or bids to other consumer requests. Dealers or consumers may customize the used automobile buyer interface **320**, **322** to provide information in a pre-specified manner to suit the particular needs of the specific dealer or consumer. In an example embodiment, a manufacturer off-lease seller may receive automobile market data including inventory information including data regarding off-lease cars which have been dropped off at dealer locations and cars which will soon be coming off-lease. Further, dealers and/or consumers may be able to receive information regarding off-lease cars as well. For example, information may include a specific automobile identified by a VIN with an expected drop off location and date based on a lease expiration.

A bid to purchase the used automobile from the consumer seller is requested from used automobile buyers (block **408**). For example, a group of consumers and dealers within a certain radius of the used car seller location may receive a bid request based on used automobile buyer searches via used automobile buyer interfaces **320**, **322**. Each used automobile buyer's bid may include, for example, a price and a delivery option or delivery suggestion. The used automobile buyer interfaces **320**, **322** may provide for simple input of necessary and optional data. Further, a used automobile buyer's bid may contain certain limitations, restrictions, or conditions. For example, a dealer may provide a bid with the condition that a new car be purchased and the used car be traded in at the bid price.

US 9,123,075 B2

15

In an example embodiment, the request may provide one or more options, products, services, or add-ons for a used automobile buyer to select from. For example, used automobile buyers may be able to select financing options, warranties, extended service contracts, insurance plans, or other hard add accessories. These selectable options may be offered directly from the used automobile seller or may be offered through the automobile market information processing system **302**. Accordingly, a seller may not be offering any options for a buyer to select, but the system may automatically provide the option to purchase further add-ons. In an example embodiment, automobile market information processing system **302** may provide for third party providers of add-ons to provide live auction bids for a used automobile buyer to select for inclusion in a bid. Accordingly, for example, several insurance companies may provide a bid for key insurance, or several financial companies may provide bids for a loan. It should be appreciated that certain bids may depend on the particular buyer, so for example, a buyer's credit or driving record may cause different buyers to receive different third party bids for add-ons. For example, a particular buyer may be able to increase a bid to purchase a used automobile if third party add-ons are particularly advantageous, which may benefit a consumer seller or manufacturer off-lease seller. For example, a buyer may receive a better than expected interest rate and insurance price, and therefore be able to offer an additional $1,000 to the seller, while staying within the buyer's predetermined monthly budget. It should be appreciated that third parties may include dealers which may be otherwise involved in a transaction. Also, in an example embodiment, the automobile market information processing system **302** may provide at no charge to the buyers or sellers, certain add-ons, such as a limited thirty day warranty. Accordingly, the automobile market information processing system **302** may gain trust from buyers even if the buyers generally do not trust the sellers. It should also be appreciated that a buyer may not select any add-ons offered by third parties and/or the automobile market information processing system **302**. A used automobile seller may have no interest in whether a buyer selects any add-ons, or the seller may receive additional compensation if an add-on is selected, so a buyer selection of add-ons may or may not affect a seller's value associated with the buyer's bid.

One or more buyer bids are provided to the consumer seller (block **410**). For example, several consumers and dealers provide bids based on current pricing data, options information of the specific used car, and potential pickup locations, so several different prices and delivery options may be available to the used car seller via the used automobile seller interface **318**. Typically, the bid will include at least a specified price and pickup time and location. In an example embodiment, a used car seller that has taken a picture of a VIN with a mobile device and entered some basic information such as an odometer reading may receive used car buyer bids within minutes or seconds on the mobile device. Accordingly, the bids may be used in real-time as the consumer seller may be actively selling a used car or shopping for a new or used car, for example, on a dealer lot. Typically, a pickup location will be at the consumer seller location, a consumer buyer location, or at a dealer lot or distribution location. In an example embodiment, the consumer buyer location may be determined using the geolocation of the buyer's mobile device **103**. It should be appreciated that some consumers may be flexible as to the delivery options and that some dealers may have multiple locations which could serve as a pickup location. In an example embodiment, the automobile market data may indicate that the particular used car that a consumer seller has

16

requested bids for should be priced at, for example, $6,000. However, various factors may affect the bid or offer that a consumer or dealer may make for the specific used car. For example, for a consumer, personal preference for certain features or looks, convenience, insurance implications, gas mileage, and/or service records, may play a large role in pricing a bid above or below a suggested bid price. For example, for a dealer, the potential for forming a customer relationship, the value of potential other sales, add-on products, and/or services, or competition with other parties. All used automobile buyers that are interested may place a bid for a used car seller's consideration.

It should be appreciated that various alternative delivery options may be provided from several used automobile buyers' bids, for example, based on preferences or parameters indicated by the consumer seller of the used automobile. For example, the used automobile seller interface **318** may provide several different bids with different delivery options and prices to the used car seller, for example, a price of $6,000 to drop off the car at an out of state dealer the next day or a price of $5,500 to drop off the car at a local consumer buyer location in five days. For example, a consumer buyer may determine the cost of picking up the used car from the consumer seller and provide two pricing and delivery options, for example, $5,500 to pick up the used car from the consumer seller or $5,800 to have the used car delivered to the consumer buyer's home. For example, a manufacturer off-lease seller may review bid prices and delivery options on a number factors on used automobile seller interface **324**, but may be very interested in finding an in-market buyer to eliminate transportation costs. A manufacturer off-lease seller may often have somewhat different concerns than a consumer seller. For example, to meet a quarterly budget, a manufacturer off-lease seller may be primarily interested eliminating a high back log of off-lease cars even if selling cars at a significant discount is required.

Further, for example, used automobile buyers may use information such as ratings data to optimize their bids. For example, if gasoline prices are increasing, mileage ratings for a particular car may dictate increasing or decreasing a bid. If a vehicle has very good gas mileage, and gas prices are skyrocketing, that car may have an increasing demand as gas prices increase, or vice versa. Similarly, safety ratings of vehicles may be important to consumer demand if high profile problems have appeared for a particular automobile style, make, or model. As discussed above, various automobile market information may be used by a used automobile buyer including safety information, insurance information, consumer credit information, dealer rating information, incentive information, residual value information, and/or any other data which may be relevant.

The used automobile seller interface **318**, **324** may organize used automobile buyer bids based on a variety of factors and may provide supplemental information. For example, certain buyer bids may be selected as the best options, all buyer bids may be summarized, various additional ratings, reviews, or popularity information, special offers, etc. may also be provided to a consumer along with any used automobile buyer bids. The recommendation engine **312** may provide recommendations to a consumer seller based on the current automobile market data. For example, of ten used automobile buyer bids provided with a response, three bids may be recommended, for example, as "Great Deals!" It should be appreciated that in some cases, a particular used car seller request may not return any buyer bids, for example, if the used car for sale is in low demand or a unique item with a limited market. Also, for example, if only one or two bids are

US 9,123,075 B2

<table>
<tr><td>17</td><td>18</td></tr>
</table>

received, the recommendation engine **312** may recommend that a consumer seller wait for a better bid because the bids provided are not competitive offers based on the current automobile market data stored in the database system **310**. Further, in an example embodiment, buyer bids may be organized according to distance to a pickup location, highest price, closest match to the consumer seller entered criteria, a normalized quality index or value index, etc. The consumer seller or manufacturer off-lease seller may be able to toggle between different viewing options for buyer bids.

Further, in an example embodiment, a consumer seller may be at a dealer lot (e.g., a Nissan dealer) and take a picture of a VIN on a used car (e.g., a Maxima), which the consumer seller intends to trade in. A bid from a competing dealer (e.g., a Toyota dealer) across the street may be received on the mobile device within seconds and include information for a competing trade in value, and may have further information relating to other new or used cars which may be intended to cause the consumer seller to go to the competing dealer, for example, including various price comparisons, gas mileage ratings, safety ratings, residual value, driving directions to the competing dealer, etc. Accordingly, a consumer seller may weigh the pros and cons of various used automobile buyer bids from consumers and/or dealers, based on delivery options, pricing, and any other relevant variants. Any bids communicated from used automobile buyer interfaces **320, 322** may be stored, for example, in database system **310**, to further update the automobile market information processing system **302** with current automobile market data.

The consumer seller selects a buyer bid including a price and a delivery option (block **412**). For example, the used car seller chooses to sell the used car based on the price and the pickup location of a consumer buyer bid. The seller may select an offer with a specified price and delivery option on the used automobile seller interface **318, 324**. The used car seller may have been weighing two or more different delivery options, price differences, etc., based on the response(s) received through the used automobile seller interface **318, 324**. As noted above, the used automobile seller interface **318** may organize received bids and other helpful information in a variety of ways, which may make the information easier for a consumer seller to digest. It should be appreciated that a consumer seller will typically want to deliver a used car at a convenient location, often at or near the seller's home. Accordingly, used automobile buyers may attempt to provide delivery options tailored towards maximizing profit and convenience, while still providing a superior bid to other used automobile buyers. By providing multiple bids with different delivery options, the consumer seller may be allowed to make extra money or save time based on the seller's particular situation. It should be appreciated that the consumer seller selection of a bid may, for example, occur simultaneously with the consumer seller and used automobile buyer executing the sale or providing a deposit or down payment, or the like (see, e.g., block **414**). Accordingly, in an example embodiment, once a consumer seller or manufacturer off-lease seller selects a bid, the used automobile buyer has effectively purchased the car, and both parties do not need to worry about the other party backing out of the deal.

It should be appreciated that a consumer seller may not want to drive to a distant pickup location without first receiving some form of deposit, or likewise, a used automobile buyer may not want to go to a distant pickup location to without assurance that the used automobile will actually be available for pickup and in good working order. Likewise, a manufacturer off-lease seller may be concerned with obtaining maximum value for an off-lease automobile within the

required time constraints, but transportation costs may be strictly budgeted. The automobile market information processing system **302** may accommodate for deposits to provide any reasonable or necessary assurances to both buyers and sellers. For example, the automobile market information processing system **302** may provide and/or require the use of a terms of service agreement, which the consumer seller or manufacturer off-lease seller and the used automobile buyer may sign and agree to the terms provided therein. For example, a credit card could be charged a default payment in the event that either party breaches the terms of service agreement. In an example embodiment, a schedule of various breaches may require different default payments, for example, if a buyer determines a headlight does not work, a standard $30 fee may be assessed from the consumer seller. Also, a variable default agreement may be based on a distance between a seller and a buyer, so that a party which travels a great distance may be compensated if the other party breaches the agreement. Also, for example, a time period for inspection may be specified in a request and/or a bid. A bid may be conditional based on one or more seller representations. Moreover, a terms of service agreement may provide assurances for any issues which may arise in the sale of a used car, and may provide one or more options based on a breach, including payment of fees or nullification of a bid acceptance and/or sale execution. Any consumer seller selections, counter offers, or additional requests or responses may be stored in database system **310**, as the communications are processed by automobile market information processing system **302**, providing further data updates. Accordingly, in an example embodiment, a consumer seller may select a bid in order to sell the used car, and that sale information may then be provided to another consumer searching for information regarding the same type of car with similar features, for example, the next day.

The consumer seller and the used automobile buyer execute the sale of the used automobile (block **414**). For example, the used automobile buyer electronically signs a contract and performs an electronic funds transfer or credit card payment. After a buyer bid is selected, an electronic contract may be prepared by the automobile market information processing system **302** and provided for the used automobile buyer who may e-sign the contract or other documentation as needed. Similarly, the consumer seller may e-sign the contract or other documentation as needed, either prior to selecting a bid, at the time of selecting a bid, or at a later time. A contract may be e-signed through the used automobile seller interface **318, 324**, and the used automobile buyer interface **320, 322**, respectively. In another example embodiment, paper copies of a contract may be signed, for example, after the used automobile buyer prints them or receives them through the mail. In an example embodiment, the used automobile buyer may provide cash or a paper check. It should be appreciated that the process of executing a contract may take some time. Also, it should be appreciated that, for example, the consumer seller selection of a bid discussed above (see, e.g., block **412**) may occur simultaneously with the consumer executing the sale. Once the sale is completed, the actual transaction data including the final sale price, may be provided to and stored in database system **310**. Accordingly, the automobile market information processing system **302** may be updated with current automobile market data from every step in the used car sales process between a consumer seller or manufacturer off-lease seller and a used automobile buyer. In an example embodiment, the updates provided to the automobile market information processing system **302** are provided in real-time, for example, data may be transmitted and

US 9,123,075 B2

**19**

processed within seconds or minutes. Further, for example, it should be appreciated that certain data may be provided to the automobile market information processing system **302** according to a batch processing schedule.

Next, the consumer seller makes the purchased used automobile available according to the consumer seller bid selection (block **416**). For example, the seller drives the used car to the pickup location if the pickup location is not the used car seller's location. It should be appreciated that the consumer seller or a manufacturer off-lease seller and the used automobile buyer may use a wide variety of locations as a pickup location, and may work out a delivery option which is convenient for both parties. A consumer seller may interact with the automobile market information processing system **302** using used automobile seller interface **318**, for example, to provide notification that a car is at the pickup location and ready for delivery. A manufacturer off-lease seller may interact with the automobile market information processing system **302** using used automobile seller interface **324**, for example, to provide notification that a car has been dropped off by a consumer lessee and is at the pickup location and ready for delivery to the buyer. Similarly, a notification may be sent via used automobile buyer interface **322**, **322** to the used car buyer that the used car is available for pickup at the specified location.

Finally, the used automobile buyer receives the purchased used automobile according to the consumer seller selected delivery option (block **418**). For example, the used car buyer receives the used car at the pickup location the same day the sale is executed. The used car buyer may pick up the car without ever having to talk to or negotiate, in person or over the telephone, with the consumer seller or manufacturer off-lease seller. For example, the used car buyer may arrive at the pickup location, show identification and provide a proof of purchase, and be provided the keys to the car by the seller. The parties may sign paperwork indicating or confirming the car has been picked up. Proof of purchase documentation may include any or all documents that are legally required for an automobile sale for a given jurisdiction, for example, the title, odometer statement, or any other document required by the Department of Motor Vehicles. For example, the consumer seller or manufacturer off-lease seller may be required to provide any legally required documents to fully execute and record the sale of the used car.

Further, in an example embodiment, a consumer seller or manufacturer off-lease seller may offer various insurance policies or service contracts to a used car buyer, for example, etch insurance, key insurance, gap insurance, or a ninety day warranty may be provided. For example, a consumer seller or manufacturer off-lease seller may purchase insurance through the automobile market information processing system **302** in placing a request for bids, which may increase interest from buyers. Also, for example, an insurance policy or service contract may be provided for a used car being sold at no charge to the consumer seller or manufacturer off-lease seller, for example, as a convenience to all users **114** using the disclosed system. For example, key insurance may be provided at no cost to both the consumer seller and the used car buyer. It should be appreciated that, for example, using options provided through the automobile market information processing system **302**, a consumer seller or manufacturer off-lease seller may sell or provide any add-on products or services that a dealer would typically offer or provide in the sale of a used automobile. Also, if the used automobile buyer is a dealer, additional products or services may be offered to the consumer seller at the time of pickup. For example, the dealer may offer new or used cars, including related financing

**20**

options, warranties, service plans, insurance plans, and hard add accessories to the buyer, as discussed in further detail above.

Accordingly, it should be appreciated that consumers, manufacturers, and dealers, may receive significant benefits from the method of facilitating a used automobile transaction disclosed herein. Consumers that are selling and buying used automobiles may benefit from more competitive pricing, piece of mind knowing that a fair market price is being offered for prospective purchases or sales, and improved delivery options that allow the consumer to weigh the benefits and drawbacks of different delivery options, pricing, and other variables. In an example embodiment, consumers can view prices paid for comparable cars in specific locations based on the automobile market data in the automobile market information processing system **302**, for example, within a certain time frame such as one month and within a certain proximity to the consumer. Manufacturers selling off-lease automobiles may benefit from reduced transportation costs, saving auction fees, and an improved bargaining position with a dealer in possession of an off-lease automobile. For example, the ability to identify in-market buyers may be particularly advantageous to manufacturer off-lease sellers, which may be able to identify matching searches of in-market buyers. Also, dealers and/or various third parties may benefit from the opportunity to sell insurance, credit, service contracts, hard add accessories, and other add-ons with used automobiles. Moreover, various inefficiencies in the automobile industry may be minimized utilizing the presently disclosed system and method.

FIG. **5** illustrates a block diagram of an example data architecture **500**. In the example data architecture **500**, interface data **502**, administrative data **504**, and automobile market data **506** interact with each other, for example, based on user commands or requests. The interface data **502**, administrative data **504**, and automobile market data **506** may be stored on any suitable storage medium (e.g., server **226**). It should be appreciated that different types of data may use different data formats, storage mechanisms, etc. Further, various applications may be associated with processing interface data **502**, administrative data **504**, and automobile market data **506**. Various other or different types of data may be included in the example data architecture **500**.

Interface data **502** may include input and output data of various kinds. For example, input data may include mouse click data, scrolling data, hover data, keyboard data, touch screen data, voice recognition data, etc., while output data may include image data, text data, video data, audio data, etc. Interface data **502** may include formatting, user interface options, links or access to other websites or applications, and the like. Interface data **502** may include applications used to provide or monitor interface activities and handle input and output data.

Administrative data **504** may include data and applications regarding user accounts. For example, administrative data **504** may include information used for updating accounts, such as creating or modifying consumer accounts and/or dealer accounts. Further, administrative data **504** may include access data and/or security data. Administrative data **504** may include a terms of service agreement. Administrative data **504** may interact with interface data in various manners, providing a user interface **304**, **306**, **308** with administrative features, such as implementing a user login and the like.

Automobile market data **506** may include, for example, executed sales data **508**, consumer data **510**, dealer data **512**, manufacturer data **514**, statistical data **516**, and/or historical data **518**. Executed sales data **508** may include actual nego-

US 9,123,075 B2

21

tiated prices for manufacturer and dealer sales, differences in list prices to negotiated prices, sales demographics, etc. Consumer data **510** may include consumer search activity, consumer requests and offers, consumer feedback, etc. Dealer data **512** may include dealer pricing, including list prices, sale prices for limited time dealer offers or deals of the day, negotiation information such as bottom line pricing, offers received, foot traffic activity, and dealer inventory data, including current on location data, automobile turnover rates, etc. Manufacturer data **514** may include manufacturer pricing, including suggested pricing, preferred dealer pricing, etc., manufacturer incentives including cash rebates, special lease rates, special APR rates, zero down offers, lifetime warranties, guaranteed trade-in offers, etc., and inventory information including dealer inventory, inventory by location, inventory in transit, manufacturing or production lead times or build times, production scheduling, shipping scheduling, lease information, etc. Statistical data **516** may include information used for providing reports including graphs, forecasts, recommendations, calculators, depreciation schedules, tax information, etc., including equations and other data used for statistical analysis. Historical data **518** may include past sales data, such as historical list prices, actual sale prices, manufacturer and dealer margins, operating costs, service costs or profitability, loyalty information, etc. It should be appreciated that data may fall under one or more categories of automobile market data **506**, and/or change with the passage of time. For example, industry analyst data may include historical data **518** and statistical data **516** relating to safety or quality reports, efficiency data, recall data, and the like for used automobiles, which may be organized or re-organized under various categories of automobile market data **506** as time passes or as supplemental data is provided to the automobile market information processing system **302**. It should be appreciated that a system administrator may load data into the automobile market information processing system **302** as it becomes available. For example, annual, quarterly, and/or monthly reports relating to safety, insurance, etc., may be input into automobile market data **506** on a regular basis. It should also be appreciated that automobile market data **506** may be tailored for a particular manufacturer and/or dealer, for example, a manufacturer may request that a specific type of data that is not normally stored or used be stored in the database system **310**. Accordingly, for example, customized reports may be provided to a manufacturer interface **308** using that specific data for the manufacturer, for example, relating to resale values of used automobiles.

The integration of the various types of automobile market data **506** received from the consumer interface **304**, dealer interface **306**, and manufacturer interface **308** may provide a synergistic and optimal resource for consumers, dealers, and manufacturers alike. In an example embodiment, a used automobile seller and a used automobile buyer may benefit greatly from using an application in a mobile device **103** to provide a request for buyer bids on a used automobile by taking a picture of the VIN of the used automobile, for example, using used automobile seller interface **318**, **324**. Used automobile buyers may search for used automobiles for sale by consumer sellers, for example, using used automobile buyer interface **320**. The used automobile buyers may receive intrabrand and/or interbrand seller request information in real-time. The intrabrand and interbrand information provided on the used automobile buyer interface **320** may allow the best automobile options for a particular consumer to be provided to that consumer, and may allow consumer sellers, manufacturer off-lease sellers, and dealers to compete with each other taking into account a greater amount of automobile market infor-

22

mation, which may result in a more efficient automobile market. Consumers that are selling used automobiles and consumers that are buying used automobiles may similarly receive benefits from the presently disclosed system. Also, as discussed above, manufacturer off-lease sellers may benefit greatly from the presently disclosed system, for example, using bids and/or matches or search hits for an off-lease automobile to improve bargaining power with a dealer in possession of the off-lease automobile and other dealers and/or consumers.

Automobile market data **506** may be maintained in various servers **108**, in databases or other files. It should be appreciated that, for example, a host device **104** may manipulate automobile market data **506** in accordance with the administrative data **504** and interface data **502** to provide requests or reports to users **114** including consumers, dealers, and manufacturers, and perform other associated tasks. It should also be appreciated that automobile market data **506** represents automobile market information, and that these terms may be used interchangeably in this disclosure depending upon the context.

FIG. **6** is flow diagram illustrating an example process **600** for facilitating a used automobile transaction, according to an example embodiment of the present invention. Although the process **600** is described with reference to the flow diagram illustrated in FIG. **6**, it will be appreciated that many other methods of performing the acts associated with the process **600** may be used. For example, the order of many of the blocks may be changed, certain blocks may be combined with other blocks, and many of the blocks described are optional.

In the example process **600**, data may flow between the automobile market information processing system **302** and a used automobile seller interface **318**, **324** and a used automobile buyer interface **320**, **322**, as discussed above based on used automobile seller and buyer interaction with the automobile market information processing system **302**. As discussed above, a used automobile seller interface **318** and used automobile buyer interface **320** may be included in a consumer interface **304**, a used automobile buyer interface **322** may be included a dealer interface **306**, and a used automobile seller interface **324** may be included in a manufacturer interface **308**. It should be appreciated that the automobile market information processing system **302** may update the automobile market information stored in the database system **310** when automobile market information is received from a buyer or seller, and/or a consumer, a dealer, a manufacturer, an industry analyst, and/or from any other information source. Accordingly, the automobile market information may remain current and/or provide sufficiently recent data for the benefit of consumers, dealers, and/or manufacturers.

The example process **600** may begin with a consumer seller or a manufacturer off-lease seller of a used automobile taking a picture of the VIN using a mobile phone application and entering in information such as pricing parameters (block **602**). The used automobile seller interface **318**, **324** may use OCR to determine and provide the VIN and pricing parameters to the automobile market information processing system **302** as a consumer seller request or a manufacturer off-lease seller request (block **604**). It should be appreciated that OCR may occur in the automobile market information processing system **302** or at the used automobile seller interface **318**, **324**. The automobile market information processing system **302** receives the seller request and prepares automobile market information based on the seller request (block **606**). The automobile market information processing system **302** may send a bid request and automobile market information based on the seller request to the used auto buyer interface **320**, **322**

US 9,123,075 B2

23

for one or more consumers and/or dealers (block 608). It should be appreciated that while the seller request is automobile market information, typically, additional automobile market information would be provided with the seller request. For example, typically, data relating to recent sales of similar used automobiles and/or comparable automobiles may be provided. In an example embodiment, a target price or "true" value of the used automobile, or an expected price range, may be provided. Also, for example, various gas mileage data, safety ratings, recall information, quality reports, estimated insurance costs, and the like may be provided. Further, add-on products or services, such as insurance, credit, warranties, service contracts, or hard add accessories, which may be determined based on a third party bidding process, may also be provided. One or more used automobile buyers, including consumers and/or dealers, receive the bid request and automobile market information, determine prices and delivery options for the used automobile using the automobile market information, and prepare and provide bids for the consumer seller or a manufacturer off-lease seller (block 610). A buyer bid may be sent from the used automobile buyer interface 320, 322 to the automobile market information processing system 302 for each consumer and/or dealer that wants to provide a bid (block 612). The automobile market information processing system 302 receives and processes buyer bids and prepares the bids and automobile market data for the consumer seller or manufacturer off-lease seller (block 614).

The automobile market information processing system 302 may send buyer bids and automobile market information to the used automobile seller interface 318, 324 (block 616). It should be appreciated that automobile market information may be provided to the consumer seller or manufacturer off-lease seller before buyer bids are provided, and/or concurrently with buyer bids. The seller may receive the buyer bids and automobile market information and may select a bid including a delivery option based on the automobile market information (block 618). The used automobile seller interface 318, 324 may send to the automobile market information processing system 302 a selection of a bid indicating that the consumer seller or manufacturer off-lease seller wants to sell the used automobile based on the selected bid (block 620). The automobile market information processing system 302 receives and processes the seller bid selection (block 622). For example, the automobile market information processing system 302 may send the bid selection to the used automobile buyer interface 320, 322 (block 624). The used automobile buyer may receive the bid selection and coordinate a sale by, for example, setting up a pick up time and location for the used automobile at the seller location or the buyer location (block 626). Also, for example, the automobile market information processing system 302 may provide contract or loan documents, collect a deposit or down payment, or the like, from the consumer seller, the manufacturer off-lease seller, and/or the used automobile buyer. As discussed above, in each of blocks 606, 614, and 622, the automobile market information processing system 302 may update the automobile market information in the database system 310 based on the information received from the consumer, manufacturer, and/or dealer.

For exemplary purposes, the present disclosure discusses a various examples relating to a purchase of a used car. However, it should be appreciated that the disclosed system, methods, and apparatus may be advantageously used in relation to various used automobiles other than cars including, for example, trucks, vans, sport utility vehicles, jeeps, motorcycles, commercial vehicles, and/or automobiles that have a VIN and require a license plate to operate.

24

It will be appreciated that all of the disclosed methods and procedures described herein can be implemented using one or more computer programs or components. These components may be provided as a series of computer instructions on any conventional computer-readable medium, including RAM, ROM, flash memory, magnetic or optical disks, optical memory, or other storage media. The instructions may be configured to be executed by a processor, which when executing the series of computer instructions performs or facilitates the performance of all or part of the disclosed methods and procedures.

Further, it will be appreciated that the presently disclosed system, methods, and apparatus for performing used automobile transactions may be utilized in conjunction with other systems or methods. For example, the presently disclosed system, methods, and apparatus may be used in conjunction with the disclosure in the co-pending commonly-owned patent applications filed on Jul. 5, 2011, entitled "AUTOMOBILE TRANSACTION FACILITATION USING A MANUFACTURER RESPONSE," application Ser. No. 13/176,497, and entitled "AUTOMOBILE TRANSACTION FACILITATION BASED ON CUSTOMER SELECTION OF A SPECIFIC AUTOMOBILE," application Ser. No. 13/176,525, the entire contents of each of which is incorporated by reference herein, and in an example embodiment, the features of which may be combined with the features of the present disclosure.

It should be understood that various changes and modifications to the example embodiments described herein will be apparent to those skilled in the art. Such changes and modifications can be made without departing from the spirit and scope of the present subject matter and without diminishing its intended advantages. It is therefore intended that such changes and modifications be covered by the appended claims.

The invention is claimed as follows:

1. A method comprising:

storing, on a computer readable medium, automobile market data which is representative of recent automobile market characteristics, including at least pricing data, wherein the automobile market data includes information received from at least a plurality of consumers;

receiving, via a used automobile consumer seller interface, a first request for a response regarding a first used automobile, the first request made by a consumer used automobile seller located at a first location and including a vehicle identification number and geolocation information of the consumer used automobile seller;

executing instructions, by at least one processing device, to:

determine, using on the geolocation information, that the consumer used automobile seller is located at the first location;

generate, based on the determined first location, an in-market used automobile buyer area;

determine that at least one used automobile buyer is located within the in-market used automobile buyer area;

provide first automobile market data, based on the first request, via a used automobile buyer interface;

request, via the used automobile buyer interface from the at least one used automobile buyer, a bid to purchase the first used automobile based on the first request;

receive, via the used automobile buyer interface, at least one bid from at least one used automobile buyer, the at least one bid including a first bid from a first used

US 9,123,075 B2

25 26

automobile buyer located at a second location within the in-market used automobile buyer area;

generate, based on receiving the first bid, driving directions from the first location to the second location; and

provide the response including the first bid via the used automobile consumer seller interface, the first bid including at least a price for the first used automobile, and the response including the driving directions from the first location to the second location; and

receiving a consumer used automobile seller selection of the first bid, wherein the consumer used automobile seller selection indicates a consumer used automobile seller intention to sell the first used automobile based on the first bid to the first used automobile buyer.

**2**. The method of claim **1**, wherein the first request is made by a consumer on a website.

**3**. The method of claim **1**, wherein the vehicle identification number is manually entered by a consumer.

**4**. The method of claim **1**, wherein the first request is made by a consumer using a mobile device which takes a picture of a vehicle identification number.

**5**. The method of claim **4**, wherein the vehicle identification number is recognized using optical character recognition.

**6**. The method of claim **1**, wherein the first request is made by a consumer using a mobile device including a microphone, and the vehicle identification number is input via the microphone.

**7**. The method of claim **6**, wherein the vehicle identification number is recognized using speech recognition.

**8**. The method of claim **1**, wherein the first used automobile buyer is one of a consumer and a dealer.

**9**. The method of claim **1**, wherein the first automobile market data is based on real-time automobile market data.

**10**. The method of claim **1**, wherein the first request includes a picture of at least one of the exterior of the automobile, the interior of the automobile, the dashboard of the automobile, the odometer of the automobile, service records of the automobile, and ownership records of the automobile.

**11**. The method of claim **1**, wherein the first request includes data provided with at least one graphical user interface component.

**12**. The method of claim **1**, wherein the first request includes at least one price parameter.

**13**. The method of claim **1**, wherein the pricing data includes used automobile data and new automobile data, including actual prices of executed transactions, dealer listing prices, dealer sale prices, manufacturer incentives, dealer bids, consumer bids, and consumer pricing parameters.

**14**. The method of claim **1**, further comprising:

causing the at least one processing device to process the consumer used automobile seller selection of the first bid to facilitate executing a sale including at least one of providing for electronic signature of documents and providing for an electronic funds transfer.

**15**. The method of claim **1**, wherein an add-on, including at least one of insurance, financing, a service contract, a warranty, and a hard-add accessory, is provided by a third party to the first used automobile buyer with the first request, via the used automobile buyer interface, wherein the third party is different from the consumer used automobile seller and the first used automobile buyer.

**16**. The method of claim **15**, wherein the add-on is selected for inclusion in the first bid by the first used automobile buyer.

**17**. A system comprising:

a computer readable medium storing automobile market data which is representative of recent automobile market characteristics, including at least pricing data, wherein the automobile market data includes information received from at least a plurality of consumers;

at least one processing device operably coupled to the computer readable medium, the at least one processing device executing instructions to:

receive, via a used automobile consumer seller interface, a first request for a response regarding a first used automobile, the first request made by a consumer used automobile seller located at a first location and including a vehicle identification number and geolocation information of the consumer used automobile seller;

determine, using on the geolocation information, that the consumer used automobile seller is located at the first location;

generate, based on the determined first location, an in-market used automobile buyer area;

determine that at least one used automobile buyer is located within the in-market used automobile buyer area;

provide first automobile market data, based on the first request, via a used automobile buyer interface;

request, via the used automobile buyer interface from the at least one used automobile buyer, a bid to purchase the first used automobile based on the first request;

receive, via the used automobile buyer interface, at least one bid from at least one used automobile buyer, the at least one bid including a first bid from a first used automobile buyer located at a second location within the in-market used automobile buyer area;

generate, based on receiving the first bid, driving directions from the first location to the second location; and

provide the response including the first bid via the used automobile consumer seller interface, the first bid including at least a price for the first used automobile, and the response including the driving directions from the first location to the second location; and

receive a consumer used automobile seller selection of the first bid, wherein the consumer used automobile seller selection indicates a consumer used automobile seller intention to sell the first used automobile based on the first bid to the first used automobile buyer.

**18**. A non-transitory computer readable medium storing instructions which, when executed, are configured to cause an information processing apparatus to:

store automobile market data which is representative of recent automobile market characteristics, including at least pricing data, wherein the automobile market data includes information received from at least a plurality of consumers;

receive, via a used automobile consumer seller interface, a first request for a response regarding a first used automobile, the first request made by a consumer used automobile seller located at a first location and including a vehicle identification number and geolocation information of the consumer used automobile seller;

determine, using on the geolocation information, that the consumer used automobile seller is located at the first location;

generate, based on the determined first location, an in-market used automobile buyer area;

determine that at least one used automobile buyer is located within the in-market used automobile buyer area;

provide first automobile market data, based on the first request, via a used automobile buyer interface;

US 9,123,075 B2

**27**                                                              **28**

request, via the used automobile buyer interface from the at least one used automobile buyer, a bid to purchase the first used automobile based on the first request;

receive, via the used automobile buyer interface, at least one bid from at least one used automobile buyer, the at least one bid including a first bid from a first used automobile buyer located at a second location within the in-market used automobile buyer area;

generate, based on receiving the first bid, driving directions from the first location to the second location; and

provide the response including the first bid via the used automobile consumer seller interface, the first bid including at least a price for the first used automobile, and the response including the driving directions from the first location to the second location; and

receive a consumer used automobile seller selection of the first bid, wherein the consumer used automobile seller selection indicates a consumer used automobile seller intention to sell the first used automobile based on the first bid to the first used automobile buyer.

                          *     *     *     *     *

US009147216B2

(12) **United States Patent**
Seergy et al.

(10) Patent No.: **US 9,147,216 B2**
(45) Date of Patent: *Sep. 29, 2015

(54) **AUTOMOBILE TRANSACTION FACILITATION BASED ON CUSTOMER SELECTION OF A SPECIFIC AUTOMOBILE**

(71) Applicant: **Sidekick Technology LLC**, Pine Brook, NJ (US)

(72) Inventors: **Michael J. Seergy**, Pine Brook, NJ (US); **Benjamin N. S. Brown**, Pine Brook, NJ (US)

(73) Assignee: **Sidekick Technology LLC**, Pine Brook, NJ (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

This patent is subject to a terminal disclaimer.

(21) Appl. No.: **14/293,665**

(22) Filed: **Jun. 2, 2014**

(65) **Prior Publication Data**

US 2015/0032562 A1    Jan. 29, 2015

**Related U.S. Application Data**

(63) Continuation of application No. 13/176,525, filed on Jul. 5, 2011, now Pat. No. 8,744,925.

(51) **Int. Cl.**
| | |
|---|---|
| *G06Q 30/00* | (2012.01) |
| *G06Q 30/08* | (2012.01) |
| *G06Q 30/06* | (2012.01) |

(52) **U.S. Cl.**
CPC ............... *G06Q 30/08* (2013.01); *G06Q 30/06* (2013.01)

(58) **Field of Classification Search**
CPC ..... G06Q 30/08; G06Q 30/06; G06Q 10/087; G06Q 30/0275; G06Q 30/0283; G06Q 30/0625

USPC ............................................... 705/26.1, 27.1
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 5,970,472 | A | 10/1999 | Allsop et al. |
| 6,006,201 | A | 12/1999 | Berent et al. |
| 6,321,221 | B1 | 11/2001 | Bieganski |
| 6,463,431 | B1 | 10/2002 | Schmitt |
| 6,533,173 | B2 | 3/2003 | Benyak |

(Continued)

OTHER PUBLICATIONS

AutoTrader.com, Inc..: Private Company Information—Business Week, http://investing.businessweek.com/research/stocks/private/snapshot.asp?privcapId=92642.

(Continued)

*Primary Examiner* — Brandy A Zukanovich
(74) *Attorney, Agent, or Firm* — K&L Gates LLP

(57) **ABSTRACT**

A system, methods, and apparatus for performing automobile transactions are disclosed. In an example embodiment, automobile market data representative of current automobile market characteristics is stored. The automobile market data may include pricing, inventory, and consumer interest information received from dealers, manufacturers, and consumers. A consumer may provide a request for a response regarding a specific automobile using an image of a vehicle identification number or a graphical user interface. Automobile market data may be provided to a dealer based on the request. Bids to sell the specific automobile may be requested from dealers based on the request. Dealer bids may be provided to the consumer with prices and a delivery options. The consumer may select a bid which specifies a pickup location at a first dealer.

**25 Claims, 7 Drawing Sheets**



(56)    **References Cited**

### U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 6,868,388 | B1 | 3/2005 | Millsap et al. |
| 6,868,389 | B1 | 3/2005 | Wilkins et al. |
| 7,395,223 | B1 | 7/2008 | Buzzell et al. |
| 7,406,436 | B1 | 7/2008 | Reisman |
| 7,479,949 | B1 | 1/2009 | Jobs et al. |
| 7,636,574 | B2 | 12/2009 | Poosala |
| 8,160,929 | B1 | 4/2012 | Park et al. |
| 8,392,193 | B2 | 3/2013 | Schultz et al. |
| 2002/0065707 | A1 | 5/2002 | Lancaster et al. |
| 2002/0082978 | A1 | 6/2002 | Ghouri et al. |
| 2002/0099628 | A1 | 7/2002 | Takaoka et al. |
| 2002/0111877 | A1 | 8/2002 | Nelson |
| 2002/0128946 | A1 | 9/2002 | Chehade et al. |
| 2003/0088435 | A1 | 5/2003 | King |
| 2003/0200151 | A1 | 10/2003 | Ellenson et al. |
| 2003/0229577 | A1 | 12/2003 | Nabel |
| 2004/0034544 | A1 | 2/2004 | Fields et al. |
| 2004/0059626 | A1 | 3/2004 | Smallwood |
| 2005/0004819 | A1 | 1/2005 | Etzioni et al. |
| 2005/0050097 | A1 | 3/2005 | Yeh et al. |
| 2005/0108112 | A1 | 5/2005 | Ellenson et al. |
| 2005/0240512 | A1 | 10/2005 | Quintero et al. |
| 2006/0020477 | A1 | 1/2006 | Retzbach et al. |
| 2007/0150362 | A1 | 6/2007 | Sharma et al. |
| 2007/0255663 | A1 | 11/2007 | Jordan et al. |
| 2007/0260526 | A1 | 11/2007 | Bartel |
| 2008/0046331 | A1 | 2/2008 | Rand |
| 2008/0177653 | A1 | 7/2008 | Famolari et al. |
| 2008/0183552 | A1 | 7/2008 | O'Hagan |
| 2008/0187125 | A1 | 8/2008 | Siegrist |
| 2008/0201184 | A1 | 8/2008 | Rose et al. |
| 2008/0201188 | A1 | 8/2008 | Heyman et al. |
| 2008/0201203 | A1 | 8/2008 | Rose et al. |
| 2008/0208731 | A1 | 8/2008 | Ruckart |
| 2008/0228657 | A1 | 9/2008 | Nabors et al. |
| 2009/0076896 | A1 | 3/2009 | DeWitt et al. |
| 2009/0132348 | A1 | 5/2009 | Bria et al. |
| 2009/0149199 | A1 | 6/2009 | Maghoul |
| 2009/0171761 | A1 | 7/2009 | Noy et al. |
| 2009/0187478 | A1 | 7/2009 | Shipley |
| 2009/0187513 | A1 | 7/2009 | Noy et al. |
| 2009/0198557 | A1 | 8/2009 | Wang et al. |
| 2009/0204600 | A1 | 8/2009 | Kalik et al. |
| 2010/0048242 | A1 | 2/2010 | Rhoads et al. |
| 2010/0106580 | A1 | 4/2010 | Etheredge et al. |
| 2010/0217525 | A1 | 8/2010 | King et al. |
| 2010/0274627 | A1 | 10/2010 | Carlson |
| 2010/0332292 | A1 | 12/2010 | Anderson |
| 2011/0040642 | A1 | 2/2011 | O'Dell |
| 2011/0082759 | A1 | 4/2011 | Swinson et al. |
| 2011/0087430 | A1 | 4/2011 | Boss et al. |
| 2011/0087556 | A1 | 4/2011 | Pitkow |
| 2011/0099036 | A1 | 4/2011 | Sarkissian et al. |
| 2011/0208418 | A1 | 8/2011 | Looney et al. |
| 2011/0238474 | A1 | 9/2011 | Carr et al. |
| 2011/0238514 | A1 | 9/2011 | Ramalingam et al. |
| 2011/0276394 | A1 | 11/2011 | Chan |

### OTHER PUBLICATIONS

Autotrader.com Introduces IPhone App to Create a More Personalized "PC-to-Pocket" Experience for Car Shoppers, http://www.prnewswire.com/news-releases/autotradercom, Jul. 7, 2011.

AppStore—AutoTrader.com, http://itunes.apple.com/us/app/autotrader-com/id444552888?mt=8, Oct. 31, 2011.

International Search Report issued Sep. 21, 2012 for Intl. Appln. No. PCT/US2012/045546.

Charlton, Auto Trader: iPhone app review. Mar. 15, 2010 [retrieved on Sep. 6, 2012] from the internet: http://www.econsultancy.com/us/blog/5593-auto-trader-iphone-app-review> entire document.

Autotraderuk. Introducing the Auto Trader iPhone App. Mar. 12, 2010 [retrieved on Sep. 6, 2012]from the internet: http://www.youtube.com/watch?v+6g_1g8IRG4&feature= player_embedded> entire document.

International Search Report mailed Oct. 5, 2012 for Intl. Appln. No. PCT/US2012/045545.

Anonymous, "instaVIN to offer free auto accident history reports for mobile phones," Wireless News, Jun. 2, 2010.



Fig. 1



Fig. 2



Fig. 3



Start
400
402
Automobile market data including at least pricing data and inventory data is stored in a database system (e.g., data from dealers, consumers, and manufacturers, regarding pricing, lot inventory, turnover rates, transport costs, and quality, safety, and other ratings is collected and stored in a database)
404
A request for a response regarding an automobile is received from a consumer (e.g., a car buyer fills in a request form on a website or takes a picture of a VIN at a dealer to receive a response based on current market data)
406
Automobile market data is provided to dealers based on the consumer request (e.g., a group of dealers receives a real-time report including local car sales data, inventory data, ratings data, and transport cost data of the subject car)
408
A bid to sell the automobile to the consumer is requested from dealers (e.g., a group of dealers within a certain radius of the buyer receive a bid request)
410
Dealer bids are provided to the consumer (e.g., several dealers provide bids based on current pricing data, dealer pickup locations, and potential add-ons, so several different prices and delivery options may be available to the car buyer)
412
The consumer selects a bid including a delivery option which specifies a pickup location (e.g., the car buyer chooses to pickup at a nearby dealer in five days)
414
The dealer provides the automobile at the dealer according to the consumer bid selection (e.g., the dealer notifies a commonly owned dealer that the car must be transported to the dealer pickup location for delivery in less than five days)
416
The consumer and dealer execute the sale of the automobile (e.g., the car buyer e-signs a loan application and contract, and electronically transfers funds)
Fig. 4B

Fig. 4A

( Fig. 4A )                          ⟋ 400

⟋ 418

The dealer makes the purchased automobile available according to the
consumer bid selection (e.g., the dealer transports the car from the commonly
owned dealer location to the dealer pickup location selected by the car buyer if
the car is not already located at the dealer pickup location)

⟋ 420

The consumer picks up the purchased automobile according to the consumer
selected delivery option at the dealer (e.g., the car buyer picks up the car at the
nearby dealer five days after the car sale is executed)

Fig. 4B



Fig. 5



Fig. 6

US 9,147,216 B2

<table>
<tr><td>1</td><td>2</td></tr>
</table>

**AUTOMOBILE TRANSACTION FACILITATION BASED ON CUSTOMER SELECTION OF A SPECIFIC AUTOMOBILE**

PRIORITY CLAIM AND CROSS REFERENCE TO RELATED APPLICATIONS

This application is a continuation of U.S. patent application Ser. No. 13/176,525, filed on Jul. 5, 2011, which is related to co-pending commonly-owned patent application, also filed on Jul. 5, 2011, entitled "AUTOMOBILE TRANSACTION FACILITATION USING A MANUFACTURER RESPONSE," U.S. application Ser. No. 13/176,497, the entire content of which is incorporated by reference herein.

BACKGROUND

In the automobile industry, consumers typically purchase automobiles from dealers or dealerships. Dealers often purchase new automobiles from several manufacturers, to sell to consumers. Consumers typically negotiate a lower price than the manufacturer suggested retail price typically referred to as the "sticker price" and/or the price the dealer initially offers. In many cases, the negotiation process for an automobile may include a large degree of uncertainty for the consumer. Generally, the negotiation process is a zero sum process, and because the consumer and the dealer are each trying to get a better deal, there is typically some lack of trust during the negotiation. Accordingly, both dealers and consumers often base the negotiations on established market prices. However, market prices can fluctuate rapidly depending a variety of factors. For example, consumer demand may be affected by economic factors, such as changes in gasoline prices, unemployment rates, government sponsored tax rebates for automobile purchases, etc.

In many cases, a consumer may have concerns that a dealer may not offer a fair and competitive price. Various products and services have become available that allow consumers to perform research on market prices for automobiles. Similarly, dealers negotiating an automobile sale generally do not know the maximum price a consumer will be willing to pay for a particular automobile, or how long it will take to sell an automobile in inventory for a given price. Accordingly, dealers also use products and services for determining and/or tracking market prices. Further, automobile manufacturers may also have an interest in the market prices for automobiles, because the market activity captured as automobile market information may allow the manufacturer to, for example, more profitably determine which automobiles to manufacture, what prices the manufacture should offer to dealers, and whether manufacturer incentives should be offered on existing dealer automobile inventory.

SUMMARY

The present disclosure provides a new and innovative system, methods and apparatus for providing automobile market information and performing automobile transactions. In an example embodiment, automobile market data representative of recent automobile market characteristics is stored. The automobile market data may include pricing, inventory, and consumer interest information received from dealers, manufacturers, and consumers. A consumer may provide a request for a response regarding a specific automobile using an image of a vehicle identification number or a graphical user interface. Automobile market data may be provided to a dealer based on the request. Bids to sell the specific automobile may

be requested from dealers based on the request. Dealer bids may be provided to the consumer with prices and a delivery options. The consumer may select a bid which specifies a pickup location at a particular dealer.

Additional features and advantages of the disclosed method and apparatus are described in, and will be apparent from, the following Detailed Description and the Figures.

BRIEF DESCRIPTION OF THE FIGURES

FIG. **1** is a high level block diagram of an example network communicating system, according to an example embodiment of the present invention.

FIG. **2** is a detailed block diagram showing an example of a computing device, according to an example embodiment of the present invention.

FIG. **3** is a block diagram showing an example automobile transaction network structure, according to an example embodiment of the present invention.

FIGS. **4**A and **4**B include a flowchart illustrating an example process for facilitating an automobile transaction, according to an example embodiment of the present invention.

FIG. **5** is a block diagram showing an example data architecture, according to an example embodiment of the present invention.

FIG. **6** is flow diagram illustrating an example process for facilitating an automobile transaction, according to an example embodiment of the present invention.

DETAILED DESCRIPTION OF EXAMPLE EMBODIMENTS

The present disclosure relates in general to a system for facilitating automobile transactions and, in particular, to automobile transaction based on a consumer selection of a specific automobile. Briefly, in an example embodiment, a system is provided which allows a consumer to request information regarding a specific car including dealer bids. For example, a consumer may use a mobile device to take a picture of a vehicle identification number. The specific vehicle may be identified using optical character recognition to request real-time information on that automobile. Dealers may provide bids based on the consumer request using real-time automobile market information, including intrabrand bids and interbrand bids. A consumer may select a dealer bid to purchase or lease an automobile based on the prices and delivery options available. Also, the presently disclosed system may advantageously allow for inventoryless bidding by dealers. For example, a dealer that does not have an automobile in its inventory (e.g., on the dealer lot) can make a bid to sell that automobile, and then have that automobile produced by a manufacturer or transported to the dealer lot. In a non-limiting example embodiment, certain features disclosed in the present patent application may be commercially embodied in products and services offered by Sidekick Technology LLC, the assignee of the present application.

The present system may be readily realized in a network communications system. A high level block diagram of an example network communications system **100** is illustrated in FIG. **1**. The illustrated system **100** includes one or more client devices **102**, and one or more host devices **104**. The system **100** may include a variety of client devices **102**, such as desktop computers and the like, which typically include a display **112**, which is a user display for providing information to users **114**, and various interface elements as will be discussed in further detail below. A client device **102** may be a

US 9,147,216 B2

3                                                                                                      4

mobile device **103**, which may be a cellular phone, a personal digital assistant, a laptop computer, a tablet computer, etc. The client devices **102** may communicate with the host device **104** via a connection to one or more communications channels **106** such as the Internet or some other data network, including, but not limited to, any suitable wide area network or local area network. It should be appreciated that any of the devices described herein may be directly connected to each other instead of over a network. Typically, one or more servers **108** may be part of the network communications system **100**, and may communicate with host servers **104** and client devices **102**.

One host device **104** may interact with a large number of users **114** at a plurality of different client devices **102**. Accordingly, each host device **104** is typically a high end computer with a large storage capacity, one or more fast microprocessors, and one or more high speed network connections. Conversely, relative to a typical host device **104**, each client device **102** typically includes less storage capacity, a single microprocessor, and a single network connection. It should be appreciated that a user **114** as described herein may include any person or entity which uses the presently disclosed system and may include a wide variety of parties. For example, as will be discussed in further detail below, users **114** of the presently disclosed system may include a consumer, a dealer, and/or a manufacturer.

Typically, host devices **104** and servers **108** store one or more of a plurality of files, programs, databases, and/or web pages in one or more memories for use by the client devices **102**, and/or other host devices **104** or servers **108**. A host device **104** or server **108** may be configured according to its particular operating system, applications, memory, hardware, etc., and may provide various options for managing the execution of the programs and applications, as well as various administrative tasks. A host device **104** or server may interact via one or more networks with one or more other host devices **104** or servers **108**, which may be operated independently. For example, host devices **104** and servers **108** operated by a separate and distinct entities may interact together according to some agreed upon protocol.

A detailed block diagram of the electrical systems of an example computing device (e.g., a client device **102**, and a host device **104**) is illustrated in FIG. **2**. In this example, the computing device **102**, **104** includes a main unit **202** which preferably includes one or more processors **204** electrically coupled by an address/data bus **206** to one or more memory devices **208**, other computer circuitry **210**, and one or more interface circuits **212**. The processor **204** may be any suitable processor, such as a microprocessor from the INTEL PEN-TIUM® family of microprocessors. The memory **208** preferably includes volatile memory and non-volatile memory. Preferably, the memory **208** stores a software program that interacts with the other devices in the system **100** as described below. This program may be executed by the processor **204** in any suitable manner. In an example embodiment, memory **208** may be part of a "cloud" such that cloud computing may be utilized by a computing devices **102**, **104**. The memory **208** may also store digital data indicative of documents, files, programs, web pages, etc. retrieved from a computing device **102**, **104** and/or loaded via an input device **214**.

The interface circuit **212** may be implemented using any suitable interface standard, such as an Ethernet interface and/ or a Universal Serial Bus (USB) interface. One or more input devices **214** may be connected to the interface circuit **212** for entering data and commands into the main unit **202**. For example, the input device **214** may be a keyboard, mouse, touch screen, track pad, track ball, isopoint, image sensor, character recognition, barcode scanner, and/or a voice recognition system.

One or more displays **112**, printers, speakers, and/or other output devices **216** may also be connected to the main unit **202** via the interface circuit **212**. The display **112** may be a cathode ray tube (CRTs), a liquid crystal display (LCD), or any other type of display. The display **112** generates visual displays generated during operation of the computing device **102**, **104**. For example, the display **112** may provide a user interface, which will be described in further detail below, and may display one or more web pages received from a computing device **102**, **104**. A user interface may include prompts for human input from a user **114** including links, buttons, tabs, checkboxes, thumbnails, text fields, drop down boxes, etc., and may provide various outputs in response to the user inputs, such as text, still images, videos, audio, and animations.

One or more storage devices **218** may also be connected to the main unit **202** via the interface circuit **212**. For example, a hard drive, CD drive, DVD drive, and/or other storage devices may be connected to the main unit **202**. The storage devices **218** may store any type of data, such as pricing data, transaction data, operations data, inventory data, commission data, manufacturing data, image data, video data, audio data, tagging data, historical access or usage data, statistical data, security data, etc., which may be used by the computing device **102**, **104**.

The computing device **102**, **104** may also exchange data with other network devices **220** via a connection to the network **106**. Network devices **220** may include one or more servers **226**, which may be used to store certain types of data, and particularly large volumes of data which may be stored in one or more data repository **222**. A server **226** may include any kind of data **224** including databases, programs, files, libraries, pricing data, transaction data, operations data, inventory data, commission data, manufacturing data, configuration data, index or tagging data, historical access or usage data, statistical data, security data, etc. A server **226** may store and operate various applications relating to receiving, transmitting, processing, and storing the large volumes of data. It should be appreciated that various configurations of one or more servers **226** may be used to support and maintain the system **100**. For example, servers **226** may be operated by various different entities, including automobile manufacturers, brokerage services, automobile information services, etc. Also, certain data may be stored in a client device **102** which is also stored on the server **226**, either temporarily or permanently, for example in memory **208** or storage device **218**. The network connection may be any type of network connection, such as an Ethernet connection, digital subscriber line (DSL), telephone line, coaxial cable, wireless connection, etc.

Access to a computing device **102**, **104** can be controlled by appropriate security software or security measures. An individual users' **114** access can be defined by the computing device **102**, **104** and limited to certain data and/or actions. Accordingly, users **114** of the system **100** may be required to register with one or more computing devices **102**, **104**. For example, registered users **114** may be able to request or manipulate data, such as submitting requests for pricing information or providing an offer or a bid.

As noted previously, various options for managing data located within the computing device **102**, **104** and/or in a server **226** may be implemented. A management system may manage security of data and accomplish various tasks such as facilitating a data backup process. A management system may be implemented in a client **102**, a host device **104**, and a

US 9,147,216 B2

5

server **226**. The management system may update, store, and back up data locally and/or remotely. A management system may remotely store data using any suitable method of data transmission, such as via the Internet and/or other networks **106**.

FIG. **3** is a block diagram showing an example automobile transaction network structure **300** which includes an automobile market information processing system **302**, a consumer interface **304**, a dealer interface **306**, and a manufacturer interface **308**. The example automobile market information processing system **302** may be implemented on one or more host devices **104** accessing one or more servers **108**, **226**. In an example embodiment, the automobile market information processing system **302** includes a database system **310**, a recommendation engine **312**, a vehicle identification number processor **314**, and an interface generation unit **316**. A user **114** may be a consumer, a dealer, or a manufacturer that interacts with the consumer interface **304**, dealer interface **306**, or manufacturer interface **308**, respectively. A database system **310** may include a wide variety of automobile market data. A recommendation engine **312** may provide recommendations for consumers, dealers, and manufacturers. A vehicle identification number processor **314** may be used for making requests regarding specific automobiles and automobiles with specific sets of features. For example, a vehicle identification number processor **314** may determine a specific set of features that a specific car has based on a picture of that specific car's vehicle identification number. Interface generation unit **316** may provide, for example, HTML files which are used at the consumer interface **304**, dealer interface **306**, and manufacturer interface **308** interface to provide information to the users **114**. It should be appreciated that the consumer interface **304**, dealer interface **306**, and manufacturer interface **308** may be considered to be part of the automobile market information processing system **302**, however, for discussion purposes, the consumer interface **304**, dealer interface **306**, and manufacturer interface **308** may be referred to as separate from the automobile market information processing system **302**.

For example, a user **114** may interact with a consumer interface **304** to research automobiles the user **114** is interested in buying. For example, a consumer may be looking for a four door sedan with specific features, including a global positioning system (GPS), a sunroof, tinted windows, rated for at least thirty miles per gallon, four wheel drive, etc. The consumer may interact with the consumer interface **304** by inputting required and/or desired features, monthly budget or full price, etc. The consumer interface **304** may provide a wide variety of features and specifications which the consumer may choose from in providing a request. Based on the information put into the consumer interface **304** from the consumer, the consumer interface **304** may provide one or more reports or offers to the consumer. As will be discussed in further detail below, the information provided by the consumer interface **304** may include current market prices for automobiles, including information relating to additional features, and may include information on specific automobiles, for example, which may be en route to a dealer near the consumer's present location. The automobile market information processing system **302** may process data received by the consumer interface **304**, as well as the dealer interface **306** and/or the manufacturer interface **308**, to respond to a request from a consumer. For example, data from database system **310** may be queried for use in a report, or a recommendation may be provided by recommendation engine **312** according to the consumer request and current market data. The automobile market information processing system **302** may inte-

6

grate data received from consumer interface **304**, dealer interface **306**, and manufacturer interface **308** to provide current and accurate information relating to the automobile market.

It should be appreciated that the consumer interface **304** may be specific to one particular manufacturer or may provide information for multiple different manufacturers. For example, a consumer interface **304** may be a website with information on many manufacturers, and further, the consumer interface **304** may access or link to the manufacturer specific websites (e.g., Ford). Also, for example, a consumer interface **304** may be implemented as an automobile manufacturer's website. Typically, a manufacturer's website may provide consumers with a catalog like feature that provides information on different automobile models with any available options or features. For example, a manufacturer website may allow a consumer to select options that are desired to "build" a particular automobile, and may provide price comparisons using suggested retail prices, which may consumers use for initial research into what pricing the dealer may offer for a particular automobile with a particular feature set. Also, typically, the consumer may enter information, including, for example, name, an address or zip code, and telephone number. This information may be passed on from the manufacturer to a nearby dealer and/or nearby dealer information may be provided to the consumer (e.g., the dealer in or nearest to the consumer's entered zip code). Accordingly, the dealer may contact the consumer, or the consumer may inquire with the dealer, regarding the specific automobiles available on that dealer's lot and particular pricing being offered, etc. In many cases, consumers may not inquire with dealers that the manufacturer may recommend, and similarly, dealers may not diligently follow up with consumers that have an interest in purchasing an automobile. Further, it should be appreciated that the information provided via a consumer interface **304** and/or a manufacturer website may be very useful to consumers. For example, in the past, dealers often provided brochures with all the information on a manufacturer's available car models, including all the features and options information. However, dealers typically do not provide comprehensive information brochures, which may be relatively expensive to produce, and rather, that information is typically located on a manufacturer website and/or a consumer interface **304**.

Accordingly, the consumer interface **304** may provide a wide range of information, for example, based on any searches or queries performed by a user **114**. In an example embodiment, based on a user search or request for a response, the consumer interface **304** will display a quality index or value index based on normalized calculations for an automobile. The recommendation engine **312** may provide recommendations to a consumer based on the current automobile market data stored in the automobile market information processing system **302**. For example, metrics on gas mileage, emissions, operating and maintenance costs, safety ratings, etc. may be benchmarked against comparable automobiles of the same and different manufacturers. Similar purchase options to a specific search may also be provided, based on feature matching, price range, consumer popularity, etc. Information including price ranges, including MSRP, invoice prices, inventory levels, the user's **114** credit ratings (e.g., FICO score), may be provided which may include monthly payment estimates or projections. For example, a financing calculator may help a user **114** determine what financing rate is appropriate. It should be appreciated that dealers may mislead consumers into believing that a higher financing rate will be required to secure a loan. Further, for example, a lease vs. buy calculator may be provided which may use current market data including prices, interest rates, incentives, estimated

7
8

mileage per year, etc. for providing an analysis for a particular consumer regarding purchasing or leasing. Also, the consumer interface **304** may provide a purchase checklist, for example, of ten steps to buying a car. A qualitative checklist may allow a user to ask the right questions and get the right answers from a dealer. Additional tips may be provided, such as a list of products or services dealers may attempt to sell to a consumer with an analysis of the value of these products or services and a recommendation to accept or decline these dealer offers. Further, beyond analysis relating to automobiles, additional analysis or reports may be provided, for example, relating to dealer reviews, other supplemental products, financial entities that may provide financing, etc. For example, dealer reviews may provide a consumer with information the consumer may use in addition to automobile pricing and delivery options. Moreover, the consumer interface **304** may provide a wide variety of useful information to a consumer, for at home research and preparation, and/or in a dealer location while shopping as a negotiating tool that may provide confirmation on pricing, useful tips, and the like.

In an example embodiment, a dealer interface **306** may provide a user **114**, such as a dealer employee, information relating to the current automobile market. The dealer interface **306** allows a dealer to interact with automobile market information processing system **302** to provide the dealer with a wide variety of information, including, for example, current market pricing. Other automobile market information a dealer may receive on a dealer interface **306** includes information relating to lot inventory, turnover rates, automobile transportation and/or shipping costs, incentives, and various ratings, such as ratings relating to quality, safety, insurance, a consumer credit score, dealer ratings, residual or resale values, etc. A dealer may input information into dealer interface **306** relating to sales data, including current pricing offered, special sales offers, actual transaction data, inventory data, etc. In an example embodiment, the dealer may provide information through dealer interface **306** which will be used by automobile market information processing system **302** to prepare reports or offers to consumers and/or manufacturers. It should be appreciated that a dealer is typically a franchise entity, while a distribution location may not be a franchise entity. For brevity, throughout this specification, the term dealer may be used to describe both franchise entity dealers and non-franchise entity distribution location. Accordingly, as used in this disclosure, the term dealer does not indicate whether an entity is a franchise entity. Moreover, a franchise dealer or a non-franchise distribution location may utilize a dealer interface **306** as described herein.

In an example embodiment, a manufacturer interface **308** may provide a user **114**, such as a manufacturer employee, information relating to the current automobile market, including consumer requests. For example, an manufacturer interface **308** may provide a manufacturer a request received from a consumer interface **304**. Additionally, the manufacturer interface **308** may provide information such as a report that allows the manufacturer to provide a response to the requesting consumer. A report may include information from database system **310** relating to current market pricing, recent sales figures and trends, current manufacturer incentives, current inventory, including dealer inventory, inventory in transit, and/or build times or lead times for a desired automobile, etc. The manufacturer may use this information to provide a response to a consumer request. The manufacturer may provide the manufacturer interface **308** with information to provide a confirmation, a verification, or an offer to a consumer via consumer interface **304**. For example, a confirmation number associated with the particular consumer request may

be provided for the consumer. Also, a recommendation may be provided from the recommendation engine **312** to the manufacturer in relation to automobile pricing, responding to a specific request, manufacturer incentives, inventory management, production schedules, shipping schedules, etc. It should be appreciated that a manufacturer may be referred to as an OEM or original equipment manufacturer. The manufacturer interface **308** may provide a manufacturer with a real-time lens into the automobile market which may allow the manufacturer to adjust production schedules, pricing plans, marketing activities, etc., which may provide a significant advantage for manufacturers.

Accordingly, information may be provided to the automobile market information processing system **302** from consumers, dealers, and manufacturers with a very high degree of granularity, as every transaction that occurs and even every request or search may be stored and used by the automobile market information processing system **302**. This allows the automobile market information processing system **302** to use the most current automobile market data to provide information to consumers, dealers, and manufacturers. It should be appreciated that market prices can change relatively quickly, particularly when major events drive consumer behavior or manufacturer production, such as natural disasters. Accordingly, reports and recommendations provided by the automobile market information processing system **302** may be highly accurate, reliable, and sensitive to market changes.

It should be appreciated that certain functions described as performed, for example, at automobile market information processing system **302**, may instead be performed locally at consumer interface **304**, dealer interface **306**, and manufacturer interface **308**, or vice versa. Further, in certain cases, tasks may be performed using consumer interface **304**, dealer interface **306**, and manufacturer interface **308** or, for example, performed in person, such as a consumer signing documents at a dealer location, or a dealer communicating with a manufacturer using a telephone. It should be appreciated that the consumer interface **304**, dealer interface **306**, and manufacturer interface **308** may be implemented, for example, in a web browser using an HTML file received from the automobile market information processing system **302**. In an example embodiment, the consumer interface **304**, dealer interface **306**, and manufacturer interface **308** may be located on a website, and may further be implemented as a secure website. Also, consumer interface **304**, dealer interface **306**, and manufacturer interface **308** may require a local application, for example, which a manufacturer may pay for to have access to, for example, information from the automobile market information processing system **302** such as requests from consumers.

FIGS. **4**A and **4**B are a flowchart of an example process **400** for facilitating an automobile transaction. Although the process **400** is described with reference to the flowchart illustrated in FIGS. **4**A and **4**B, it will be appreciated that many other methods of performing the acts associated with the process **400** may be used. For example, the order of many of the blocks may be changed, certain blocks may be combined with other blocks, and many of the blocks described are optional.

The example process **400** for facilitating an automobile transaction may allow users **114**, including dealers and consumers, as well as manufacturers, to efficiently sell and purchase automobiles, respectively. The example process **400** may begin with automobile market data including at least pricing data and inventory data stored in a database system (block **402**). For example, automobile market data from dealers, consumers, and manufacturers regarding pricing, lot

9

inventory, turnover rates, transport costs, and quality, safety, and/or other ratings is collected and stored in a database. In an example embodiment, a wide variety of data is stored in a database system **310**. For example, transport costs may include manufacturer to dealer shipping costs and/or dealer to dealer costs for shipping or transporting an automobile (e.g., a dealer with multiple locations may drive automobiles between locations if necessary). Automobile market data may include various relevant ratings, reports, awards, or other information, including quality information, safety information, insurance information, consumer credit information, dealer rating information, incentive information, residual value information, and/or any other data which may be relevant to consumers. For example, ratings data may include information from the National Highway Traffic Safety Administration (NHTSA), the Environmental Protection Agency (EPA), and/or the Insurance Institute for Highway Safety (IIHS). The data may include information from a consumer interface **304**, such as data in consumer searches or requests, information from a dealer interface **306**, such as currently offered dealer pricing, transaction data for finalized sales, current inventory data, transport or shipping costs, and information from a manufacturer interface **308**, such as current manufacturer prices and suggested pricing, manufacturer incentives, and current inventory including finished inventory on hand, production scheduling, shipment scheduling, inventory in transit, and manufacturing lead times. The automobile market data may be comprised solely of information received from the consumer interface **304**, dealer interface **306**, and manufacturer interface **308**, or may include additional information received from other sources. It should be appreciated that various methods of storing the automobile market data may be employed according to the system requirements. For example, database system **310** may be organized according to different manufacturers or dealers, automobile make and model, different information categories (e.g., suggested pricing, market prices, production, shipping, lot inventory), etc., and may consist of one or more databases on one or more servers **108**, **226** which may be remotely located from each other and/or a host device **104** of the automobile market information processing system **302**. As will be discussed further below, the automobile market data may be continually updated as new data is provided to the automobile market information processing system **302**.

The example process **400** continues with a consumer providing a request for a response of whether an automobile can be provided (block **404**). For example, a car buyer fills in a request form on a website or takes a picture of a VIN at a dealer to receive a response based on current market data. In an example embodiment, the buyer's request may be transmitted from consumer interface **304** via the internet to the automobile market information processing system **302**. In another example embodiment, a car buyer takes a picture of a vehicle identification number (VIN) on a car that the buyer would like to receive information for. For example, using an application stored on a mobile device **103**, the buyer may be located at a dealer location and take a picture of the VIN on a car. The buyer may want information on that specific car or on other comparable cars with the same or similar features and/or options. The picture of the VIN may be processed using optical character recognition, which allows the automobile market information processing system **302** to determine the make and model of the car, along with various other characteristics of the car. It should be appreciated that the VIN may include human readable characters, a bar code, or any other graphical or machine readable information which acts as a vehicle identification number. Accordingly, the buyer may

10

perform research, for example, while at home or while shopping at a dealer location. Further, for example, the buyer may take a picture of a VIN anywhere, including at automobile trade shows, mall displays, or anywhere new cars or cars for sale are displayed. The buyer may even take a picture of a car parked in the street as the buyer walks down the street. Any request or query communicated from the consumer interface **304** may be stored, for example, in database system **310**, thereby updating the automobile market information processing system **302** with current automobile market data.

The example process **400** may continue with providing automobile market data to dealers based on the consumer request (block **406**). For example, a group of dealers receives a real-time report including local car sales data, inventory data, ratings data, and transport cost data of the consumer's requested car. In an example embodiment, a report may include quality information, safety information, insurance information, consumer credit information (e.g., buyer FICO score), dealer rating information, incentive information, residual value information, and/or any other data which may be relevant to consumers. The report may be provided through dealer interface **306** and include the consumer requirements and preferences. The request and/or the report may be provided in real-time and may provide real-time data. Data reported based on a real-time updates in the automobile market information processing system **302** may provide significant advantages, for example, when pricing conditions may change quickly due to unforeseen market conditions. The recommendation engine **312** may provide recommendations to a dealer based on the current automobile market data. For example, a report may indicate various estimated sales probabilities for different prices that the dealer may offer or bid. In an example embodiment, a probability to sell within a time frame may be provided, for example, for a 24 hour period, probabilities and prices may be estimated as, e.g., 80% chance to sell at $22,000; 60% chance to sell at $23,000; 50% chance to sell at $24,000; 20% chance to sell at $25,000. Such information may be illustrated in various ways, such as a bell curve graph or a chart. Further, the recommendation engine may provide daily suggestions (e.g., a deal of the day). Dealers may use such information to attract consumers to visit the dealer in person or online as well as prepare responses or bids to consumer requests. In an example embodiment the dealer interface **306** may provide information that is limited to cars which meet the consumer request requirements. Dealers may customize the dealer interface **306** to provide information in a pre-specified manner to suit the dealers particular needs.

A bid to sell the automobile to the consumer is requested from dealers (block **408**). For example, a group of dealers within a certain radius of the buyer location may receive a bid request. Each dealer's bid may include a price, for example, a price with no additional add-on products or services, such as service contracts, warranties, aftermarket accessories, etc. For example, add-on products may provide substantial value to a dealer, above and beyond the profit margin for the sale of the requested car. A dealer may profit from selling financing options, for example, if a consumer needs financing, the financier may pay the dealer for sourcing the loan. A dealer may sell service plans or maintenance packages (e.g., an extended service contract), selling warranties (e.g., a lifetime warranty), or selling insurance plans (e.g., life, accident, and health insurance, liability insurance, comprehensive insurance, etc.). Also, a dealer may also sell various hard add accessories, for example, bicycle racks, hitches, commercial accessories (e.g., lights and sirens), or any aftermarket products or modifications (e.g., sunroof).

11                                12

One or more dealer bids are provided to the consumer (block **410**). For example, several dealers provide bids based on current pricing data, dealer pickup locations, and potential add-ons, so several different prices and delivery options may be available to the car buyer. Typically, the bid will include at least a specified price and pickup time and location. In an example embodiment, a buyer that has taken a picture of a VIN with a mobile device may receive dealer bids within minutes or seconds on the mobile device. Accordingly, the bids may be used in real-time as the buyer may be actively shopping for a car on a dealer lot. Typically, a pickup location will be a dealer lot or distribution location. It should be appreciated that some dealers may have multiple locations which could serve as a pickup location. In an example embodiment, the automobile market data may indicate that the particular car requested by a consumer should be priced at, for example, $26,000. However, various factors may affect the bid or offer that a dealer will make for the particular car. For example, the potential for forming a customer relationship, the value of potential add-on products and services, or competition with other dealers may cause a dealer to bid lower than normal. In such a case, the dealer may bid $25,000 in an effort to create a customer relationship, sell add-on products, and/or undercut the competition pricing. Other factors, such as the buyer's credit score (e.g., FICO score), may be used by a dealer in determining a bid, as this may affect the profitability of a sale.

Further, for example, the particular automobile requested may not be available for immediate pickup near the buyer, and various alternative delivery options may be provided from several dealers' bids. For example, a car that is located at an out of state dealer may be transported to a dealer near the buyer. Therefore, for example, the consumer interface **304** may provide several different bids with different delivery options and prices to the buyer. For example, a price of $26,000 to pick up the car at an out of state dealer the next day or a price of $26,500 to pick up the car at a local dealer in five days. For example, a dealer may determine a cost to transport a car from one dealer location to another based on the automobile market data such as current market pricing, current inventory levels, current shipping costs, and the like. Accordingly, a dealer response may be adjusted by current automobile market conditions. An offer to provide or ship a particular car to a dealer location near a consumer may be authorized through the dealer interface **306**. Inventoryless bidding may be highly beneficial when dealers that do not have a requested automobile in inventory can still profitably provide a bid. Further, for example, cars that are not exactly what the buyer requested may also be offered to the buyer. For example, the buyer may request a four wheel drive car, but if a two wheel drive car that meets all the other buyer criteria is immediately available at a nearby dealer, the dealer may provide an offer to the buyer for this car, possibly at a significantly lower price, such as $23,000 instead of $26,000 for a four wheel drive car as requested. Further, for example, dealers may use information such as ratings data to optimize their bids. For example, if gasoline prices are increasing, mileage ratings for a particular car may dictate increasing or decreasing a bid. If a vehicle has very good gas mileage, and gas prices are skyrocketing, that car may have an increasing demand as gas prices increase, or vice versa. Similarly, safety ratings of vehicles may be important to consumer demand if high profile problems have appeared for a particular automobile style, make, or model. As discussed above, various automobile market information may be used by a dealer including safety information, insurance information, consumer credit information, dealer rating information, incentive information, residual value information, and/or any other data which may be relevant to consumers.

The consumer interface **304** may organize dealer bids based on a variety of factors and may provide supplemental information. For example, certain dealer bids may be selected as the best options, all dealer bids may be summarized, various additional ratings, reviews, or popularity information, financing information, etc. may also be provided to a consumer along with any dealer bids. The recommendation engine **312** may provide recommendations to a consumer based on the current automobile market data. For example, of ten dealer bids provided with a response, three bids may be recommended, for example, as "Great Deals!" It should be appreciated that in some cases, a particular consumer search may not return any dealer bids, for example, if consumer search requirements are unrealistic for the consumer's required price range. Also, for example, if only one or two bids are received, the recommendation engine **312** may recommend that a consumer wait for a better bid because the bids provided are not competitive offers based on the current automobile market data stored in the database system **310**. Further, in an example embodiment, dealer bids may be organized according to distance to a dealer pickup location, lowest price, closest match to the consumer entered criteria, a normalized quality index or value index, etc. The consumer may be able to toggle between different viewing options for dealer bids or search results.

Further, in an example embodiment, a buyer may be at a dealer lot (e.g., a Nissan dealer) and take a picture of a VIN on a car (e.g., a Maxima). A bid from a competing dealer (e.g., a Toyota dealer) across the street may be received on the mobile device within seconds and include information for a comparable car (e.g., an Avalon) relating to, for example, gas mileage, safety ratings, price comparisons, residual value, driving directions to the competing dealer, etc. In an example embodiment, a dealer may use the geolocation of the buyer, such as in instances when the buyer is physically located close to the dealer. Accordingly, competing dealer bids may be interbrand or intrabrand in nature, and may be tailored to the buyer's particular situation, which a consumer may find highly advantageous. For example, the buyer may have a bid for a car the buyer wants to test drive as well as a bid for a comparable car across the street before a salesman from the dealer even introduces himself. Accordingly, a consumer may weigh the pros and cons of various dealer bids, based on delivery options, pricing, and any other relevant variants. Any bids communicated from a dealer interface **306** may be stored, for example, in database system **310**, to further update the automobile market information processing system **302** with current automobile market data.

The consumer selects a bid including a delivery option which specifies a pickup location (block **412**). For example, the car buyer chooses a delivery option of picking up the car at a nearby dealer in five days. As noted above, a dealer may be a franchise dealer entity or a non-franchise distribution location. The buyer may select an offer with a specified delivery option on the consumer interface **304**. The car buyer may have been weighing two or more different delivery options and/or different features, price differences, etc., based on the response(s) received through the consumer interface **304**. As noted above, the consumer interface may organize bids and other helpful information in a variety of ways, which may make the information easier for a consumer to digest. It should be appreciated that a buyer will typically want to pick up a new car at a convenient location, often near the buyer's home. Accordingly, dealers may attempt to provide delivery

US 9,147,216 B2

13

options tailored towards maximizing profit for the dealer while also maximizing convenience to the buyer, while also providing a superior bid to other dealers. By providing multiple bids with different delivery options, the buyer may be allowed to save time or money based on the buyer's particular needs. In an example embodiment, the buyer may provide a counter offer or different request via the consumer interface **304** to a dealer via the dealer interface **306**. Accordingly, the dealer may respond in kind, and may update delivery options or other terms. It should be appreciated that the consumer selection of a bid may, for example, occur simultaneously with the consumer executing the sale or providing a deposit or down payment, or the like (see, e.g., block **416**). Accordingly, in an example embodiment, once the buyer selects a bid, the buyer has effectively purchased the car, and the dealer does need to worry about the buyer backing out of the deal. Any consumer selections, counter offers, or additional requests or responses may be stored in database system **310**, as the communications are processed by automobile market information processing system **302**, providing further data updates. Accordingly, in an example embodiment, a consumer may select a bid to purchase a car, and that purchase information may then be provided to another consumer searching for the same type of car with similar features, for example, the next day.

Once a bid with a specific delivery option has been selected, the dealer provides the automobile at the selected dealer according to the consumer bid selection (block **414**). For example, the dealer notifies a commonly owned dealer that the car must be transported to the dealer pickup location for delivery in less than five days. In a typical example, the dealer may already have the car in question on the dealer lot, so the car would not need to be transported. In an example embodiment, the dealer may send a notification or instruction message through the dealer interface **306**, which would be received by a commonly owned dealer in another city or state. It should be appreciated that the specific manner of notification or instruction may be changed based on the particular application, for example, the automobile market information processing system **302** may automatically provide a notification or instruction to a dealer to produce or transport a car based on inventory data. It should also be appreciated that particular events may be required to trigger instructing a car to be delivered to a dealer, such as a deposit, financing approval, etc. Further, the consumer may be required to send an instruction message from the consumer interface **304** to the dealer interface **306** affirming that the buyer has agreed to purchase the car from the dealer.

The consumer and the dealer execute the sale of the automobile (block **416**). For example, the consumer electronically signs documentation such as loan application and a contract and performs an electronic funds transfer or credit card payment. After the delivery option is selected, an electronic contract may be provided by the dealer for the buyer who may e-sign the contract, and/or any other loan applications or other documentation as needed. In another example embodiment, paper copies of a contract may be signed, for example, after the buyer prints them or receives them from a nearby dealer or through the mail. In an example embodiment, the buyer may provide cash or a paper check. It should be appreciated that the process of executing a contract may take some time. For example, the process may occur in several steps, as loan processing may be required prior to executing a contract for sale of a car. Also, it should be appreciated that, for example, the consumer selection of a bid discussed above (see, e.g., block **412**) may occur simultaneously with the consumer executing the sale. Once the sale is completed,

14

the actual transaction data including the final negotiated price, may be provided to and stored in database system **310**. Accordingly, the automobile market information processing system **302** may be updated with current automobile market data from every step in the negotiation process between a consumer and a manufacturer. In an example embodiment, the updates provided to the automobile market information processing system **302** are provided in real-time, for example, data may be transmitted and processed within seconds or minutes. Further, for example, it should be appreciated that certain data may be provided to the automobile market information processing system **302** according to a batch processing schedule.

Next, the dealer makes the purchased automobile available according to the consumer bid selection (block **418**). For example, the dealer transports the car from the commonly owned dealer location to the dealer pickup location selected by the car buyer if the car is not already located at the dealer pickup location. When a purchased car is already at the dealer location where the buyer has agreed to pick the car up, the car does not need to be transported. Many dealers have multiple locations under the same ownership, and these dealers may drive or ship cars from one dealer location to another if the cost of transporting the car is justifiable. If a buyer chooses a quicker delivery option, the car may then be transported from a different dealer location to the selected dealer pickup location. A dealer may interact with the automobile market information processing system **302** using dealer interface **306**, for example, to receive notification that a car will be picked up by a buyer, and to report that a car has been delivered to the dealer pickup location. A notification may also be sent via consumer interface **304** to the buyer that the car is available for pickup at the specified dealer.

Finally, the consumer picks up the purchased automobile according to the consumer selected delivery option at the dealer (block **420**). For example, the car buyer picks up the car at the nearby dealer five days after the car sale is executed. The buyer may pick up the car without ever having to talk to or negotiate, in person or over the telephone, with the dealer. For example, the buyer may arrive at the dealer, show identification and proof of purchase, and be provided the keys to the car. The buyer may sign paperwork indicating the car has been picked up. Also, the dealer may offer or provide additional products or services to the buyer when the buyer goes to the dealer to pick up the car. For example, the dealer may offer financing options, warranties, service plans, insurance plans, and hard add accessories to the buyer, as discussed in further detail above.

Accordingly, it should be appreciated that consumers, dealers, and manufacturers may receive significant benefits from the method of facilitating an automobile transaction disclosed herein. For example, price setting, inventory management, and production scheduling, may be greatly improved for dealers and manufacturers by utilizing the disclosed system and method. Consumers may benefit from more competitive pricing, piece of mind knowing that a fair market price is being offered for prospective purchases, and improved delivery options that allow the consumer to weigh the benefits and drawbacks of different delivery options, pricing, and other variables. In an example embodiment, consumers can view prices paid for comparable cars in specific locations based on the automobile market data in the automobile market information processing system **302**, for example, within a certain time frame such as one month and within a certain proximity to the consumer. Moreover, various inefficiencies in the automobile industry may be minimized utilizing the presently disclosed system and method.

US 9,147,216 B2

15

16

FIG. **5** illustrates a block diagram of an example data architecture **500**. In the example data architecture **500**, interface data **502**, administrative data **504**, and automobile market data **506** interact with each other, for example, based on user commands or requests. The interface data **502**, administrative data **504**, and automobile market data **506** may be stored on any suitable storage medium (e.g., server **226**). It should be appreciated that different types of data may use different data formats, storage mechanisms, etc. Further, various applications may be associated with processing interface data **502**, administrative data **504**, and automobile market data **506**. Various other or different types of data may be included in the example data architecture **500**.

Interface data **502** may include input and output data of various kinds. For example, input data may include mouse click data, scrolling data, hover data, keyboard data, touch screen data, voice recognition data, etc., while output data may include image data, text data, video data, audio data, etc. Interface data **502** may include formatting, user interface options, links or access to other websites or applications, and the like. Interface data **502** may include applications used to provide or monitor interface activities and handle input and output data.

Administrative data **504** may include data and applications regarding project data or data related to project compensation. For example, administrative data **504** may include information used for updating accounts, such as creating or modifying manufacturer accounts or dealer accounts. Further, administrative data **504** may include access data and/or security data. Administrative data **504** may interact with interface data in various manners, providing a user interface **304**, **306**, **308** with administrative features, such as implementing a user login and the like.

Automobile market data **506** may include, for example, executed sales data **508**, consumer data **510**, dealer data **512**, manufacturer data **514**, statistical data **516**, and/or historical data **518**. Executed sales data **508** may include actual negotiated prices for manufacturer and dealer sales, differences in list prices to negotiated prices, sales demographics, etc. Consumer data **510** may include consumer search activity, consumer requests and offers, consumer feedback, etc. Dealer data **512** may include dealer pricing, including list prices, sale prices for limited time dealer offers or deals of the day, negotiation information such as bottom line pricing, offers received, foot traffic activity, and dealer inventory data, including current on location data, automobile turnover rates, etc. Manufacturer data **514** may include manufacturer pricing, including suggested pricing, preferred dealer pricing, etc., manufacturer incentives including cash rebates, special lease rates, special APR rates, zero down offers, lifetime warranties, guaranteed trade-in offers, etc., and inventory information including dealer inventory, inventory by location, inventory in transit, manufacturing or production lead times or build times, production scheduling, shipping scheduling, etc. Statistical data **516** may include information used for providing reports including graphs, forecasts, recommendations, calculators, depreciation schedules, tax information, etc., including equations and other data used for statistical analysis. Historical data **518** may include past sales data, such as historical list prices, actual sale prices, manufacturer and dealer margins, operating costs, service costs or profitability, loyalty information, etc. It should be appreciated that data may fall under multiple categories of automobile market data **506**, or change with the passage of time. It should also be appreciated that automobile market data **506** may be tailored for a particular manufacturer or dealer, for example, a manufacturer may request that a specific type of data that is not normally stored or used be stored in the database system **310**. Accordingly, for example, customized reports may be provided to a manufacturer interface **308** using that specific data for the manufacturer.

The integration of the various types of automobile market data **506** received from the consumer interface **304**, dealer interface **306**, and manufacturer interface **308** may provide a synergistic and optimal resource for consumers, dealers, and manufacturers alike. In an example embodiment, a consumer may benefit greatly from using an application in a mobile device **103** to receive both intraband information and interbrand information in real-time, based only on taking a picture of VIN. Dealers and manufacturers may be able to provide information to the consumer in a manner that highlights the benefits of the products the respective dealer or manufacturer would like to sell. The intraband and interbrand information provided on a consumer interface **304** may allow the best automobile options for a particular consumer to be provided to that consumer, may allow dealers to compete with other dealers taking into account a greater amount of automobile market information, and may allow manufacturers to better follow through with opportunities for sales, which may result in a more efficient automobile market.

Automobile market data **506** may be maintained in various servers **108**, in databases or other files. It should be appreciated that, for example, a host device **104** may manipulate automobile market data **506** in accordance with the administrative data **504** and interface data **502** to provide requests or reports to users **114** including consumers, dealers, and manufacturers, and perform other associated tasks. It should also be appreciated that automobile market data **506** represents automobile market information, and that these terms may be used interchangeably in this disclosure depending upon the context.

FIG. **6** is flow diagram illustrating an example process **600** for facilitating an automobile transaction, according to an example embodiment of the present invention. Although the process **600** is described with reference to the flow diagram illustrated in FIG. **6**, it will be appreciated that many other methods of performing the acts associated with the process **600** may be used. For example, the order of many of the blocks may be changed, certain blocks may be combined with other blocks, and many of the blocks described are optional.

In the example process **600**, data may flow between the automobile market information processing system **302** and a consumer interface **304** and a dealer interface **306**, as discussed above based on consumer and dealer interaction with the automobile market information processing system **302**. It should be appreciated that the automobile market information processing system **302** may update the automobile market information stored in the database system **310** when automobile market information is received from a consumer, a dealer, or a manufacturer, or from any other information source. Accordingly, the automobile market information may remain current and/or provide sufficiently recent data for the benefit of consumers, dealers, and/or manufacturers.

The example process **600** may begin with a consumer taking a picture of a VIN using a mobile phone application (block **602**). The consumer interface **304** may use OCR to determine and provide the VIN to the automobile market information processing system **302** to provide a consumer request (block **604**). It should be appreciated that OCR may occur in the automobile market information processing system **302** or at the consumer interface **304**. The automobile market information processing system **302** receives the consumer request and prepares automobile market information based on the request (block **606**). The automobile market

US 9,147,216 B2

17                                                    18

information processing system **302** may send a bid request and automobile market information based on the consumer request to the dealer interface **306** for one or more dealers (block **608**). It should be appreciated that while the consumer request is automobile market information, typically, additional automobile market information would be provided with the consumer request. For example, typically, data relating to recent sales of the requested automobile and/or comparable automobiles may be provided. In an example embodiment, a target price or "true" value of the requested automobile may be provided. One or more dealers receive the bid request and automobile market information, determine prices and delivery options for the automobile using the automobile market information, and prepare and provide bids for the consumer (block **610**). A dealer bid may be sent from the dealer interface **306** to the automobile market information processing system **302** for each dealer that wants to provide a bid (block **612**). The automobile market information processing system **302** receives and processes dealer bids and prepares the bids and automobile market data for the consumer (block **614**).

The automobile market information processing system **302** may send dealer bids and automobile market information to the consumer interface **304** (block **616**). It should be appreciated that automobile market information may be provided to the consumer before dealer bids are provided, and/or concurrently with dealer bids. The consumer may receive the dealer bids and automobile market information and may select a bid including a delivery option based on the automobile market information (block **618**). The consumer interface **304** may send to the automobile market information processing system **302** a selection of a bid indicating that the consumer wants to purchase or lease the automobile based on the selected bid (block **620**). The automobile market information processing system **302** receives and processes the consumer bid selection (block **622**). For example, the automobile market information processing system **302** may send the bid selection to the dealer interface **306** (block **624**). The dealer may receive the bid selection and coordinate a sale by, for example, transporting the automobile from one dealer location to the dealer location selected for delivery (block **626**). Also, for example, the dealer may provide contract or loan documents, collect a deposit or down payment, or the like. As discussed above, in each of blocks **606**, **614**, **626**, and **634**, the automobile market information processing system **302** may update the automobile market information in the database system **310** based on the information received from the consumer, dealer, and/or manufacturer.

For exemplary purposes, the present disclosure discusses a various examples relating to a purchase of a car. However, it should be appreciated that the disclosed system, methods, and apparatus may be advantageously used in relation to various automobiles other than cars including, for example, trucks, vans, sport utility vehicles, jeeps, motorcycles, commercial vehicles, and/or automobiles that have a VIN and require a license plate to operate.

It will be appreciated that all of the disclosed methods and procedures described herein can be implemented using one or more computer programs or components. These components may be provided as a series of computer instructions on any conventional computer-readable medium, including RAM, ROM, flash memory, magnetic or optical disks, optical memory, or other storage media. The instructions may be configured to be executed by a processor, which when executing the series of computer instructions performs or facilitates the performance of all or part of the disclosed methods and procedures.

Further, it will be appreciated that the presently disclosed system, methods, and apparatus for performing automobile transactions may be utilized in conjunction with other systems or methods. For example, the presently disclosed system, methods, and apparatus may be used in conjunction with the disclosure in the co-pending commonly-owned patent application filed on Jul. 5, 2011, entitled "AUTOMOBILE TRANSACTION FACILITATION USING A MANUFACTURER RESPONSE," U.S. application Ser. No. 13/176,497, the entire contents of which are hereby incorporated by reference herein, and in an example embodiment, the features of which may be combined with the features of the present disclosure.

It should be understood that various changes and modifications to the example embodiments described herein will be apparent to those skilled in the art. Such changes and modifications can be made without departing from the spirit and scope of the present subject matter and without diminishing its intended advantages. It is therefore intended that such changes and modifications be covered by the appended claims.

The invention is claimed as follows:

**1**. A method comprising:

storing, on a computer readable medium, automobile market data which is representative of recent automobile market characteristics, including at least pricing data and inventory data, wherein the automobile market data includes information received from a plurality of dealers and a plurality of consumers;

receiving, via a consumer interface, a first request for a response regarding a first automobile, the first request made by a consumer located at a first location and including geolocation information of the consumer;

executing instructions, by at least one processing device, to:

determine, using the information, that the consumer is located at the first location;

determine, based on a determination that the consumer is located at the first location, that the consumer is located at a first dealer;

generate, based on the first dealer, an in-market dealer area proximately located to the first dealer;

determine that a second dealer is located at a second location within the in-market dealer area;

provide first automobile market data to the second dealer, based on the first request, via a dealer interface;

request, via the dealer interface from the second dealer, a bid to sell the first automobile based on the first request; and

receive, via the dealer interface, a first bid from the second dealer located at the second location within the in-market dealer area;

generate, based on receiving the first bid, driving directions from the first location to the second location;

provide the response including the first bid via the consumer interface, the first bid including at least a price for the first automobile, and the response including the driving directions from the first location to the second location; and

receiving a consumer selection of the first bid.

**2**. The method of claim **1**, wherein the pricing data includes normal listing prices, sale prices, manufacturer incentives, actual prices of executed transactions, and consumer offers.

**3**. The method of claim **1**, wherein the inventory data includes at least one of inventory data by location, inventory

US 9,147,216 B2

**19**

in transit data, production lead time data, production schedule data, and shipping schedule data.

**4**. The method of claim **1**, wherein the first request includes a vehicle identification number that is manually entered by the consumer using at least one graphical user interface component.

**5**. The method of claim **1**, wherein the first request is made by the consumer using a mobile device which takes a picture of a vehicle identification number.

**6**. The method of claim **5**, wherein the vehicle identification number is recognized using optical character recognition.

**7**. The method of claim **1**, wherein the first automobile is one of a particular type of car with a specific set of features and a particular car with a specific vehicle identification number.

**8**. The method of claim **1**, wherein the first automobile market data provided to the second dealer consists of at least one of the first request and a suggested bid price.

**9**. The method of claim **1**, wherein the first automobile market data is based on real-time automobile market data and actual sales data for comparable automobiles within a predetermined time period and within a predetermined geographic area.

**10**. The method of claim **1**, wherein the first bid is an inventoryless bid requiring the first automobile to be at least one of manufactured and transferred from the inventory of another entity to the second dealer.

**11**. The method of claim **1**, wherein the consumer selection of the first bid indicates that the consumer intends to lease the first automobile.

**12**. The method of claim **1**, further comprising:

executing instructions, by the at least one processing device, to process the consumer selection of the first bid to facilitate executing a sale including at least one of providing for electronic signature of documents and providing for an electronic funds transfer.

**13**. The method of claim **12**, wherein the first automobile is made available for pickup at the second dealer according to a consumer selected first delivery option.

**14**. The method of claim **1**, further comprising:

executing instructions, by the at least one processing device, based on a request from the dealer interface, to request data via a consumer interface from a plurality of consumers.

**15**. The method of claim **1**, further comprising:

executing instructions, by the at least one processing device, based on a request from the dealer interface, to request data via a manufacturer interface from at least one manufacturer.

**16**. The method of claim **1**, further comprising:

executing instructions, by the at least one processing device, to include in the response at least one of a financing plan, a service plan, an insurance plan, a warranty, and a hard add accessory, for at least the first automobile, which is at least one of provided and offered by the second dealer.

**17**. The method of claim **1**, wherein the second dealer is at least one of a franchise dealer and a non-franchise distribution location.

**18**. The method of claim **1**, wherein the automobile market data includes consumer interest data.

**19**. The method of claim **1**, further comprising:

executing instructions, by the at least one processing device, to provide a manufacturer response via the consumer interface including an acknowledgement of interest.

**20**

**20**. The method of claim **1**, further comprising:

executing instructions, by the at least one processing device, to provide a manufacturer response via the consumer interface including at least one of a verification, a confirmation, and an offer indicating that the first automobile can be provided for the consumer.

**21**. The method of claim **1**, wherein the first automobile market data provides a recommended deal of the day.

**22**. The method of claim **1**, wherein the first bid includes a first delivery option which specifies a first pickup location at the second dealer and a second delivery option which specifies a different second pickup location, wherein the consumer selection indicates a consumer intention to purchase the first automobile based on the first bid and specifies one of the first delivery option and the second delivery option.

**23**. The method of claim **1**, wherein the first request is made by the consumer using a mobile device which takes a picture of a vehicle identification number at the first dealer, and in the first bid from the second dealer, the first automobile is an interbrand comparable car which is located at the second dealer.

**24**. A system comprising:

a computer readable medium storing automobile market data which is representative of recent automobile market characteristics, including at least pricing data and inventory data, wherein the automobile market data includes information received from a plurality of dealers and a plurality of consumers; and

at least one processing device operably coupled to the computer readable medium, the at least one processing device executing instructions to:

receive, via a consumer interface, a first request for a response regarding a first automobile, the first request made by a consumer located at a first location and including geolocation information of the consumer;

determine, using the information, that the consumer is located at the first location;

determine, based on a determination that the consumer is located at the first location, that the consumer is located at a first dealer;

generate, based on the first dealer, an in-market dealer area proximately located to the first dealer;

determine that a second dealer is located at a second location within the in-market dealer area;

provide first automobile market data to the second dealer, based on the first request, via a dealer interface;

request, via the dealer interface from the second dealer, a bid to sell the first automobile based on the first request;

receive, via the dealer interface, a first bid from the second dealer located at the second location within the in-market dealer area;

generate, based on receiving the first bid, driving directions from the first location to the second location;

provide the response including the first bid via the consumer interface, the first bid including at least a price for the first automobile, and the response including the driving directions from the first location to the second location; and

receiving a consumer selection of the first bid.

**25**. A non-transitory computer readable medium storing instructions which, when executed, are configured to cause an information processing apparatus to:

store automobile market data which is representative of recent automobile market characteristics, including at least pricing data and inventory data, wherein the auto-

US 9,147,216 B2

**21**

mobile market data includes information received from a plurality of dealers and a plurality of consumers;

receive, via a consumer interface, a first request for a response regarding a first automobile, the first request made by a consumer located at a first location and including geolocation information of the consumer;

determine, using the geolocation information, that the consumer is located at the first location;

determine, based on a determination that the consumer is located at the first location, that the consumer is located at a first dealer;

generate, based on the first dealer, an in-market dealer area proximately located to the first dealer;

determine that a second dealer is located at a second location within the in-market dealer area;

provide first automobile market data to the second dealer, based on the first request, via a dealer interface;

request, via the dealer interface from the second dealer, a bid to sell the first automobile based on the first request;

receive, via the dealer interface, a first bid from the second dealer located at the second location within the in-market dealer area;

generate, based on receiving the first bid, driving directions from the first location to the second location;

provide the response including the first bid via the consumer interface, the first bid including at least a price for the first automobile, and the response including the driving directions from the first location to the second location; and

receive a consumer selection of the first bid.

\*    \*    \*    \*    \*

**22**

US009460467B2

(12) **United States Patent**
Seergy et al.

(10) **Patent No.:** **US 9,460,467 B2**
(45) **Date of Patent:** **Oct. 4, 2016**

(54) **USED AUTOMOBILE TRANSACTION FACILITATION FOR A SPECIFIC USED AUTOMOBILE**

(71) Applicant: **Sidekick Technology LLC**, Pine Brook, NJ (US)

(72) Inventors: **Michael J. Seergy**, Pine Brook, NJ (US); **Benjamin N. S. Brown**, Pine Brook, NJ (US)

(73) Assignee: **Sidekick Technology LLC**, Pine Brook, NJ (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

(21) Appl. No.: **14/841,157**

(22) Filed: **Aug. 31, 2015**

(65) **Prior Publication Data**

US 2015/0371323 A1    Dec. 24, 2015

**Related U.S. Application Data**

(63) Continuation of application No. 14/176,700, filed on Feb. 10, 2014, now Pat. No. 9,123,075, which is a continuation of application No. 13/207,858, filed on Aug. 11, 2011, now Pat. No. 8,650,093, which is a

(Continued)

(51) **Int. Cl.**
*G06Q 30/00*　　　(2012.01)
*G06Q 30/08*　　　(2012.01)
(Continued)

(52) **U.S. Cl.**
CPC ............... *G06Q 30/08* (2013.01); *G01C 21/34* (2013.01); *G06Q 30/06* (2013.01)

(58) **Field of Classification Search**
CPC .... G06Q 30/08; G06Q 30/06; G06Q 10/087; G06Q 30/0275; G06Q 30/0283; G06Q 30/0625
USPC ...................................... 705/26.1, 26.4, 27.1
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

5,970,472 A    10/1999    Allsop et al.
6,006,201 A    12/1999    Berent et al.
6,321,221 B1    11/2001    Bieganski

(Continued)

OTHER PUBLICATIONS

AutoTrader.com, Inc..: Private Company Information-Business Week, http://investing.businessweek.com/research/stocks/private/snapshot.asp?privcapId=92642.

(Continued)

*Primary Examiner* — Brandy A Zukanovich
(74) *Attorney, Agent, or Firm* — K&L Gates LLP

(57) **ABSTRACT**

A system, methods, and apparatus for performing used automobile transactions are disclosed. In an example embodiment, automobile market data representative of current automobile market characteristics is stored. The automobile market data may include pricing and consumer interest information received from consumers, dealers, and manufacturers. A consumer seller or manufacturer off-lease seller may provide a request for a response regarding a specific used automobile with a specific a vehicle identification number. Automobile market data may be provided to a used automobile buyer based on the request. Bids to purchase the specific used automobile may be requested from used automobile buyers based on the request. Buyer bids may be provided to the consumer seller or manufacturer off-lease seller with prices and a delivery options. The consumer seller or manufacturer off-lease seller may select a bid to sell the specific used automobile based on the bid.

**20 Claims, 7 Drawing Sheets**



**US 9,460,467 B2**

Page 2

### Related U.S. Application Data

continuation-in-part of application No. 13/176,497, filed on Jul. 5, 2011, now Pat. No. 9,141,984, and a continuation-in-part of application No. 13/176,525, filed on Jul. 5, 2011, now Pat. No. 8,744,925.

(51) **Int. Cl.**
| | | |
|---|---|---|
| *G06Q 30/06* | | (2012.01) |
| *G01C 21/34* | | (2006.01) |

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 6,463,431 | B1 | 10/2002 | Schmitt |
| 6,533,173 | B2 | 3/2003 | Benyak |
| 6,868,388 | B1 | 3/2005 | Millsap et al. |
| 6,868,389 | B1 | 3/2005 | Wilkins et al. |
| 7,395,223 | B1 | 7/2008 | Buzzell et al. |
| 7,406,436 | B1 | 7/2008 | Reisman |
| 7,479,949 | B2 | 1/2009 | Jobs et al. |
| 7,636,574 | B2 | 12/2009 | Poosala |
| 8,160,929 | B1 | 4/2012 | Park et al. |
| 8,392,193 | B2 | 3/2013 | Schultz et al. |
| 8,606,604 | B1 | 12/2013 | Huber et al. |
| 2002/0065707 | A1 | 5/2002 | Lancaster et al. |
| 2002/0082978 | A1 | 6/2002 | Ghouri et al. |
| 2002/0099628 | A1 | 7/2002 | Takaoka et al. |
| 2002/0111877 | A1 | 8/2002 | Nelson |
| 2002/0128946 | A1 | 9/2002 | Chehade et al. |
| 2003/0088435 | A1 | 5/2003 | King |
| 2003/0200151 | A1* | 10/2003 | Ellenson ............ G06Q 30/0278 |
| | | | 705/306 |
| 2003/0229577 | A1 | 12/2003 | Nabel |
| 2004/0034544 | A1 | 2/2004 | Fields et al. |
| 2004/0059626 | A1 | 3/2004 | Smallwood |
| 2005/0004819 | A1 | 1/2005 | Etzioni et al. |
| 2005/0050097 | A1 | 3/2005 | Yeh et al. |
| 2005/0108112 | A1 | 5/2005 | Ellenson et al. |
| 2005/0240512 | A1 | 10/2005 | Quintero et al. |
| 2006/0020477 | A1 | 1/2006 | Retzbach et al. |
| 2007/0150362 | A1 | 6/2007 | Sharma et al. |
| 2007/0250403 | A1 | 10/2007 | Altschuler |
| 2007/0255663 | A1 | 11/2007 | Jordan et al. |
| 2007/0260526 | A1 | 11/2007 | Bartel |
| 2008/0046331 | A1 | 2/2008 | Rand |
| 2008/0177653 | A1 | 7/2008 | Famolari et al. |
| 2008/0183552 | A1 | 7/2008 | O'Hagan |
| 2008/0187125 | A1 | 8/2008 | Siegrist |
| 2008/0201184 | A1 | 8/2008 | Rose et al. |
| 2008/0201188 | A1 | 8/2008 | Heyman et al. |
| 2008/0201203 | A1 | 8/2008 | Rose et al. |
| 2008/0208731 | A1 | 8/2008 | Ruckart |
| 2008/0228657 | A1* | 9/2008 | Nabors ................ G06Q 30/02 |
| | | | 705/80 |
| 2009/0076896 | A1 | 3/2009 | DeWitt et al. |
| 2009/0132348 | A1 | 5/2009 | Bria et al. |
| 2009/0149199 | A1 | 6/2009 | Maghoul |
| 2009/0171761 | A1 | 7/2009 | Noy et al. |
| 2009/0187478 | A1 | 7/2009 | Shipley |
| 2009/0187513 | A1 | 7/2009 | Noy et al. |
| 2009/0198557 | A1 | 8/2009 | Wang et al. |
| 2009/0204600 | A1 | 8/2009 | Kalik et al. |
| 2010/0048242 | A1 | 2/2010 | Rhoads et al. |
| 2010/0106580 | A1 | 4/2010 | Etheredge et al. |
| 2010/0217525 | A1 | 8/2010 | King et al. |
| 2010/0274627 | A1 | 10/2010 | Carlson |
| 2010/0332292 | A1 | 12/2010 | Anderson |
| 2011/0040642 | A1 | 2/2011 | O'Dell |
| 2011/0082759 | A1 | 4/2011 | Swinson et al. |
| 2011/0087430 | A1 | 4/2011 | Boss et al. |
| 2011/0087556 | A1 | 4/2011 | Pitkow |
| 2011/0099036 | A1 | 4/2011 | Sarkissian et al. |
| 2011/0208418 | A1 | 8/2011 | Looney et al. |
| 2011/0238474 | A1 | 9/2011 | Carr et al. |
| 2011/0238514 | A1 | 9/2011 | Ramalingam et al. |
| 2011/0276394 | A1* | 11/2011 | Chan ................ G06F 17/30876 |
| | | | 705/14.49 |

OTHER PUBLICATIONS

Autotrader.com Introduces IPhone App to Create a More Personalized "PC-to-Pocket" Experience for Car Shoppers, http://www.prnewswire.com/news-releases/autotradercom, Jul. 7, 2011.
AppStore—AutoTrader.com, http://itunes.apple.com/us/app/autotrader-com/id444552888?mt=8, Oct. 31, 2011.
International Search Report issued Sep. 21, 2012 for Intl. Appln. No. PCT/US2012/045546.
Charlton, Auto Trader: iPhone app review. Mar. 15, 2010 [retrieved on Sep. 6, 2012] from the internet: http://www.econsultancy.com/us/blog/5593-auto-trader-iphone-app-review> entire document.
Autotraderuk. Introducing the Auto Trader iPhone App. Mar. 12, 2010 [retrieved on Sep. 6, 2012] from the internet: http://www.youtube.com/watch?v+6g_Ig8IRG4&feature=player_embedded> entire document.
International Search Report mailed Oct. 5, 2012 for Intl. Appln. No. PCT/US2012/045545.
Anonymous, "instaVIN to offer free auto accident history reports for mobile phones," Wireless News, Jun. 2, 2010.

* cited by examiner



Fig. 1



Fig. 2



Fig. 3A



Fig. 3B



Start
400
402
Automobile market data including at least pricing data is stored in a database system (e.g., data from consumers, dealers, manufacturers, and industry analysts, regarding pricing, inventory, insurance information, quality ratings, safety ratings, and other ratings is collected and stored in a database)
404
A request for a response regarding a used automobile is received from a consumer seller (e.g., a used car seller takes a picture of the VIN of a used car and fills in price parameters and other information into a mobile application to receive a response based on current market data)
406
Automobile market data is provided to used automobile buyers based on the consumer seller request (e.g., a group of consumers and dealers receive a real-time report including local used car sales data, inventory data, quality and safety ratings data, insurance data, and gas mileage data of the specific used car)
408
A bid to purchase the automobile from the consumer seller is requested from used automobile buyers (e.g., a group of consumers and dealers within a certain radius of the used car seller receive a bid request based on buyer searches)
410
Buyer bids are provided to the consumer seller (e.g., several consumers and dealers provide bids based on current pricing data, options information on the specific used car, and potential pickup locations, so several different prices and delivery options may be available to the used car seller)
412
The consumer seller selects a buyer bid including a price and a delivery option (e.g., the used car seller chooses to sell the used car based on the price and the pickup location of a consumer buyer bid)
414
The consumer seller and used automobile buyer execute the sale of the automobile (e.g., the used car buyer e-signs a contract and electronically transfers funds to the used car seller based on the consumer bid)
416
The consumer seller makes the purchased used automobile available according to the consumer seller bid selection (e.g., the seller drives the used car to the pickup location if the pickup location is not the used car seller's location)
418
The used automobile buyer receives the purchased used automobile according to the consumer seller selected delivery option (e.g., the used car buyer receives the used car at the pickup location the same day the sale is executed)

Fig. 4



Fig. 5



Fig. 6

US 9,460,467 B2

<table>
<tr><td>1</td><td>2</td></tr>
</table>

**USED AUTOMOBILE TRANSACTION FACILITATION FOR A SPECIFIC USED AUTOMOBILE**

CROSS REFERENCE TO RELATED APPLICATIONS AND PRIORITY CLAIM

This application is a continuation of U.S. patent application Ser. No. 14/176,700, filed Feb. 10, 2014, which is a continuation of U.S. patent application Ser. No. 13/207,858, filed on Aug. 11, 2011, which is a continuation-in-part of the following co-pending commonly-owned patent applications filed on Jul. 5, 2011, entitled "AUTOMOBILE TRANSACTION FACILITATION USING A MANUFACTURER RESPONSE," application Ser. No. 13/176,497, and entitled "AUTOMOBILE TRANSACTION FACILITATION BASED ON CUSTOMER SELECTION OF A SPECIFIC AUTOMOBILE," application Ser. No. 13/176,525, now U.S. Pat. No. 8,744,925, issued Jun. 3, 2014, the entire content of each of which is incorporated by reference herein.

BACKGROUND

In the used automobile market, consumers typically sell or trade in used automobiles to dealers or dealerships, or privately sell to other consumers, for example, through personal advertisements. Dealers often purchase used automobiles from consumers as part of a deal for a new automobile, typically referred to as a trade in. Typically, a description of a used automobile in a personal advertisement may include the make, model, and mileage of an automobile, but certain other relevant descriptive information may not be available to a potential buyer. Further, a dealer making a trade in offer for a used automobile may not have certain relevant descriptive information on that used automobile. In many cases, the negotiation process for a used automobile may include a large degree of uncertainty for consumers, including both a selling consumer and a purchasing consumer. A consumer seller may be particularly disadvantaged when negotiating with a dealer for a trade in value, as dealers typically have great knowledge and experience with the process, while consumers typically do not. Generally, the negotiation process is a zero sum process, and because a consumer seller of a used automobile and a used automobile buyer are each trying to get a better deal, there is typically some lack of trust during the negotiation. Accordingly, used automobile buyers and sellers, including consumers and dealers, often base the negotiations on established market prices. However, market prices can fluctuate rapidly depending a variety of factors. For example, consumer demand may be affected by economic factors, such as changes in gasoline prices, unemployment rates, government sponsored tax rebates for automobile purchases, etc.

In many cases, a consumer seller of a used automobile may have concerns that a buyer may not offer a fair and competitive price. Various products and services have become available that allow sellers and buyers, including consumers and dealers, to perform research on market prices for used automobiles. Typically, the highest possible value available to a consumer seller may be through a sale to another consumer, as opposed to trading in the used automobile to a dealer.

In addition to consumers and dealers, automobile manufacturers may also have an interest in the resale values of used automobiles. Further, in many cases, a manufacturer may want to sell used off-lease automobiles which have been returned by consumer lessees. In many cases, a manufac-turer off-lease seller may not be able to receive the full market value of a used off-lease automobile.

SUMMARY

The present disclosure provides a new and innovative system, methods and apparatus for providing automobile market information and facilitating used automobile transactions. In an example embodiment, automobile market data representative of current automobile market characteristics is stored. The automobile market data may include pricing and consumer interest information received from consumers, dealers, and manufacturers. A consumer seller or manufacturer off-lease seller may provide a request for a response regarding a specific used automobile with a specific a vehicle identification number. Automobile market data may be provided to a used automobile buyer based on the request. Bids to purchase the specific used automobile may be requested from used automobile buyers based on the request. Buyer bids may be provided to the consumer seller or manufacturer off-lease seller with prices and a delivery options. The consumer seller or manufacturer off-lease seller may select a bid to sell the specific used automobile based on the bid.

Additional features and advantages of the disclosed method and apparatus are described in, and will be apparent from, the following Detailed Description and the Figures.

BRIEF DESCRIPTION OF THE FIGURES

FIG. 1 is a high level block diagram of an example network communicating system, according to an example embodiment of the present invention.

FIG. 2 is a detailed block diagram showing an example of a computing device, according to an example embodiment of the present invention.

FIGS. 3A and 3B provide a block diagram showing an example automobile transaction network structure, according to an example embodiment of the present invention.

FIG. 4 is a flowchart illustrating an example process for facilitating a used automobile transaction, according to an example embodiment of the present invention.

FIG. 5 is a block diagram showing an example data architecture, according to an example embodiment of the present invention.

FIG. 6 is flow diagram illustrating an example process for facilitating a used automobile transaction, according to an example embodiment of the present invention.

DETAILED DESCRIPTION OF EXAMPLE EMBODIMENTS

The present disclosure relates in general to a system for facilitating used automobile transactions and, in particular, to an automobile transaction for a specific used automobile. Briefly, in an example embodiment, a system is provided which allows a consumer seller or a manufacturer off-lease seller of a used automobile to request bids and information regarding a specific automobile identified with a specific vehicle identification number. For example, a consumer may use a mobile device to take a picture of a vehicle identification number and may enter a desired price range or minimum asking price. The specific automobile may be identified using optical character recognition to provide, for example, a full list of the original manufacturer features and options, and the original manufacturer suggested retail price and invoice information, for that specific used automobile

US 9,460,467 B2

<table>
<tr><td>3</td><td>4</td></tr>
</table>

based on the vehicle identification number. Accordingly, the consumer seller need not enter all of this information, but may request bids and information in real-time for that specific used automobile. Used automobile buyers may include consumers and/or dealers which may provide bids based on the consumer seller request using real-time automobile market information. A consumer seller may select a buyer bid to sell a used automobile based on the prices and delivery options available. Accordingly, typically unavailable or difficult to obtain data may be provided for offering a used automobile for sale, including a full listing of the manufacturer features and options, EPA mileage, safety ratings, recalls, quality reports, estimated insurance costs, etc. In an example embodiment, a manufacturer off-lease seller may select a buyer bid based on the prices and delivery options to maximize value, for example, by reducing costs typically associated with selling an off-lease automobile. The used automobile market is presently approximately three times the size of the new automobile market in the United States, as approximately 40 million used automobiles are sold each year. Accordingly, the present disclosure may be helpful for facilitating large numbers of used automobile transactions. In an example embodiment, the disclosed system matches seller and buyer parameters, such as price and pickup location, to facilitate a live bidding process, which allows a used automobile seller to accept or reject bids using a great deal of information not typically available. In a non-limiting example embodiment, certain features disclosed in the present patent application may be commercially embodied in products and services offered by Sidekick Technology LLC, the assignee of the present application.

The present system may be readily realized in a network communications system. A high level block diagram of an example network communications system 100 is illustrated in FIG. 1. The illustrated system 100 includes one or more client devices 102, and one or more host devices 104. The system 100 may include a variety of client devices 102, such as desktop computers and the like, which typically include a display 112, which is a user display for providing information to users 114, and various interface elements as will be discussed in further detail below. A client device 102 may be a mobile device 103, which may be a cellular phone, a personal digital assistant, a laptop computer, a tablet computer, etc. The client devices 102 may communicate with the host device 104 via a connection to one or more communications channels 106 such as the Internet or some other data network, including, but not limited to, any suitable wide area network or local area network. It should be appreciated that any of the devices described herein may be directly connected to each other instead of over a network. Typically, one or more servers 108 may be part of the network communications system 100, and may communicate with host servers 104 and client devices 102.

One host device 104 may interact with a large number of users 114 at a plurality of different client devices 102. Accordingly, each host device 104 is typically a high end computer with a large storage capacity, one or more fast microprocessors, and one or more high speed network connections. Conversely, relative to a typical host device 104, each client device 102 typically includes less storage capacity, a single microprocessor, and a single network connection. It should be appreciated that a user 114 as described herein may include any person or entity which uses the presently disclosed system and may include a wide variety of parties. For example, as will be discussed in

further detail below, users 114 of the presently disclosed system may include a consumer, a dealer, and/or a manufacturer.

Typically, host devices 104 and servers 108 store one or more of a plurality of files, programs, databases, and/or web pages in one or more memories for use by the client devices 102, and/or other host devices 104 or servers 108. A host device 104 or server 108 may be configured according to its particular operating system, applications, memory, hardware, etc., and may provide various options for managing the execution of the programs and applications, as well as various administrative tasks. A host device 104 or server may interact via one or more networks with one or more other host devices 104 or servers 108, which may be operated independently. For example, host devices 104 and servers 108 operated by a separate and distinct entities may interact together according to some agreed upon protocol.

A detailed block diagram of the electrical systems of an example computing device (e.g., a client device 102, and a host device 104) is illustrated in FIG. 2. In this example, the computing device 102, 104 includes a main unit 202 which preferably includes one or more processors 204 electrically coupled by an address/data bus 206 to one or more memory devices 208, other computer circuitry 210, and one or more interface circuits 212. The processor 204 may be any suitable processor, such as a microprocessor from the INTEL PENTIUM® family of microprocessors. The memory 208 preferably includes volatile memory and non-volatile memory. Preferably, the memory 208 stores a software program that interacts with the other devices in the system 100 as described below. This program may be executed by the processor 204 in any suitable manner. In an example embodiment, memory 208 may be part of a "cloud" such that cloud computing may be utilized by a computing devices 102, 104. The memory 208 may also store digital data indicative of documents, files, programs, web pages, etc. retrieved from a computing device 102, 104 and/or loaded via an input device 214.

The interface circuit 212 may be implemented using any suitable interface standard, such as an Ethernet interface and/or a Universal Serial Bus (USB) interface. One or more input devices 214 may be connected to the interface circuit 212 for entering data and commands into the main unit 202. For example, the input device 214 may be a keyboard, mouse, touch screen, track pad, track ball, isopoint, image sensor, character recognition, barcode scanner, microphone, and/or a speech/voice recognition system.

One or more displays 112, printers, speakers, and/or other output devices 216 may also be connected to the main unit 202 via the interface circuit 212. The display 112 may be a cathode ray tube (CRTs), a liquid crystal display (LCD), or any other type of display. The display 112 generates visual displays generated during operation of the computing device 102, 104. For example, the display 112 may provide a user interface, which will be described in further detail below, and may display one or more web pages received from a computing device 102, 104. A user interface may include prompts for human input from a user 114 including links, buttons, tabs, checkboxes, thumbnails, text fields, drop down boxes, etc., and may provide various outputs in response to the user inputs, such as text, still images, videos, audio, and animations.

One or more storage devices 218 may also be connected to the main unit 202 via the interface circuit 212. For example, a hard drive, CD drive, DVD drive, and/or other storage devices may be connected to the main unit 202. The storage devices 218 may store any type of data, such as

5

pricing data, transaction data, operations data, inventory data, commission data, manufacturing data, image data, video data, audio data, tagging data, historical access or usage data, statistical data, security data, etc., which may be used by the computing device 102, 104.

The computing device 102, 104 may also exchange data with other network devices 220 via a connection to the network 106. Network devices 220 may include one or more servers 226, which may be used to store certain types of data, and particularly large volumes of data which may be stored in one or more data repository 222. A server 226 may include any kind of data 224 including databases, programs, files, libraries, pricing data, transaction data, operations data, inventory data, commission data, manufacturing data, configuration data, index or tagging data, historical access or usage data, statistical data, security data, etc. A server 226 may store and operate various applications relating to receiving, transmitting, processing, and storing the large volumes of data. It should be appreciated that various configurations of one or more servers 226 may be used to support and maintain the system 100. For example, servers 226 may be operated by various different entities, including automobile manufacturers, brokerage services, automobile information services, etc. Also, certain data may be stored in a client device 102 which is also stored on the server 226, either temporarily or permanently, for example in memory 208 or storage device 218. The network connection may be any type of network connection, such as an Ethernet connection, digital subscriber line (DSL), telephone line, coaxial cable, wireless connection, etc.

Access to a computing device 102, 104 can be controlled by appropriate security software or security measures. An individual users' 114 access can be defined by the computing device 102, 104 and limited to certain data and/or actions. Accordingly, users 114 of the system 100 may be required to register with one or more computing devices 102, 104. For example, registered users 114 may be able to request or manipulate data, such as submitting requests for pricing information or providing an offer or a bid.

As noted previously, various options for managing data located within the computing device 102, 104 and/or in a server 226 may be implemented. A management system may manage security of data and accomplish various tasks such as facilitating a data backup process. A management system may be implemented in a client 102, a host device 104, and a server 226. The management system may update, store, and back up data locally and/or remotely. A management system may remotely store data using any suitable method of data transmission, such as via the Internet and/or other networks 106.

FIGS. 3A and 3B provide a block diagram showing an example automobile transaction network structure 300. As illustrated in FIG. 3A, the example automobile transaction network structure 300 includes an automobile market information processing system 302, a consumer interface 304, a dealer interface 306, and a manufacturer interface 308. The example automobile market information processing system 302 may be implemented on one or more host devices 104 accessing one or more servers 108, 226. In an example embodiment, the automobile market information processing system 302 includes a database system 310, a recommendation engine 312, a vehicle identification number processor 314, and an interface generation unit 316. A user 114 may be a consumer, a dealer, or a manufacturer that interacts with the consumer interface 304, dealer interface 306, or manufacturer interface 308, respectively. A database system 310 may include a wide variety of automobile market data. A

6

recommendation engine 312 may provide recommendations for consumers, dealers, and manufacturers. A vehicle identification number processor 314 may be used for making requests regarding specific automobiles and automobiles with specific sets of features. For example, a vehicle identification number processor 314 may determine a specific set of features that a specific car has based on a picture of that specific car's vehicle identification number. Interface generation unit 316 may provide, for example, HTML files which are used at the consumer interface 304, dealer interface 306, and manufacturer interface 308 interface to provide information to the users 114. It should be appreciated that he the consumer interface 304, dealer interface 306, and manufacturer interface 308 may be considered to be part of the automobile market information processing system 302, however, for discussion purposes, the consumer interface 304, dealer interface 306, and manufacturer interface 308 may be referred to as separate from the automobile market information processing system 302.

For example, a user 114 may interact with a consumer interface 304 to research new or used automobiles the user 114 is interested in buying and/or selling. For example, a consumer may be looking for a four door sedan with specific features, including a global positioning system (GPS), a sunroof, tinted windows, rated for at least thirty miles per gallon, four wheel drive, etc. The consumer may interact with the consumer interface 304 by inputting required and/or desired features, monthly budget or full price, etc. The consumer interface 304 may provide a wide variety of features and specifications which the consumer may choose from in providing a request. Based on the information put into the consumer interface 304 from the consumer, the consumer interface 304 may provide one or more reports or offers to the consumer. As will be discussed in further detail below, the information provided by the consumer interface 304 may include current market prices for automobiles, including information relating to additional features, and may include information on specific automobiles, for example, which may be en route to a dealer near the consumer's present location or may be already owned by the consumer. The automobile market information processing system 302 may process data received by the consumer interface 304, as well as the dealer interface 306 and/or the manufacturer interface 308, to respond to a request from a consumer. For example, data from database system 310 may be queried for use in a report, or a recommendation may be provided by recommendation engine 312 according to the consumer request and current market data. The automobile market information processing system 302 may integrate data received from consumer interface 304, dealer interface 306, and manufacturer interface 308 to provide current and accurate information relating to the automobile market.

It should be appreciated that the consumer interface 304 may be specific to one particular manufacturer or may provide information for automobiles manufactured by multiple different manufacturers. For example, a consumer interface 304 may be a website with information for many manufacturers. For example, the consumer interface 304 may access or link to the manufacturer specific websites (e.g., Ford), particularly with regard to new automobile information, but also for used automobile information. Also, for example, a consumer interface 304 may be implemented as an automobile manufacturer's website. Typically, a manufacturer's website may provide consumers with a catalog like feature that provides information on different automobile models with any available options or features. For example, a manufacturer website may allow a consumer to

7

select options that are desired to "build" a particular new automobile, and may provide price comparisons using suggested retail prices, which may consumers use for initial research into what pricing the dealer may offer for a particular automobile with a particular feature set. Also, typically, the consumer may enter information, including, for example, name, an address or zip code, and telephone number. This information may be passed on from the manufacturer to a nearby dealer and/or nearby dealer information may be provided to the consumer (e.g., the dealer in or nearest to the consumer's entered zip code). Accordingly, the dealer may contact the consumer, or the consumer may inquire with the dealer, regarding the specific automobiles available on that dealer's lot and particular pricing being offered, etc. In many cases, consumers may not inquire with dealers that the manufacturer may recommend, and similarly, dealers may not diligently follow up with consumers that have an interest in purchasing an automobile. Further, it should be appreciated that the information provided via a consumer interface **304** and/or a manufacturer website may be very useful to consumers. For example, in the past, dealers often provided brochures with all the information on a manufacturer's available car models, including all the features and options information. However, dealers typically do not provide comprehensive information brochures, which may be relatively expensive to produce, and rather, that information is typically located on a manufacturer website and/or a consumer interface **304**. It should also be appreciated that information on a manufacturer website and/or a consumer interface **304** may be directed to both new and used automobiles. For example, historical and statistical information which demonstrates favorable safety ratings, quality and reliability data, low maintenance costs, low insurance prices, low emissions, high gas mileage, etc. based on specific models for specific years, and/or groups of models and years may be provided on a manufacturer website and/or a consumer interface **304**.

Accordingly, the consumer interface **304** may provide a wide range of information, for example, based on any searches or queries performed by a user **114**. In an example embodiment, based on a user search or request for a response, the consumer interface **304** will display a quality index or value index based on normalized calculations for an automobile. The recommendation engine **312** may provide recommendations to a consumer based on the current auto-mobile market data stored in the automobile market information processing system **302**. For example, metrics on gas mileage, emissions, operating and maintenance costs, safety ratings, etc. may be benchmarked against comparable automobiles of the same and different manufacturers. Similar purchase options to a specific search may also be provided, based on feature matching, price range, consumer popularity, etc. Information including price ranges, including MSRP, invoice prices, inventory levels, the user's **114** credit ratings (e.g., FICO score), may be provided which may include monthly payment estimates or projections. It should be appreciated that such data may be provided for both new and used automobiles. For example, a financing calculator may help a user **114** determine what financing rate is appropriate for an automobile purchase. It should be appreciated that dealers may mislead consumers into believing that a higher financing rate will be required to secure a loan. Further, for example, a lease vs. buy calculator may be provided which may use current market data including prices, interest rates, incentives, estimated mileage per year, etc. for providing an analysis for a particular consumer regarding purchasing or leasing. Also, the consumer inter-

8

face **304** may provide a purchase checklist, for example, of ten steps to buying a car. A qualitative checklist may allow a user to ask the right questions and get the right answers from a dealer. Additional tips may be provided, such as a list of products or services dealers may attempt to sell to a consumer with an analysis of the value of these products or services and a recommendation to accept or decline these dealer offers. Further, beyond analysis relating to automobiles, additional analysis or reports may be provided, for example, relating to dealer reviews, other supplemental products, financial entities that may provide financing, etc. For example, dealer reviews may provide a consumer with information the consumer may use in addition to automobile pricing and delivery options. Moreover, the consumer interface **304** may provide a wide variety of useful information to a consumer, for at home research and preparation, and/or in a dealer location while shopping as a negotiating tool that may provide confirmation on pricing, useful tips, and the like. As will be discussed in FIG. **3B** in further detail below, the consumer interface **304** may include a used automobile seller interface **318** and a used automobile buyer interface **320**.

In an example embodiment, a dealer interface **306** may provide a user **114**, such as a dealer employee, information relating to the current automobile market. The dealer interface **306** allows a dealer to interact with automobile market information processing system **302** to provide the dealer with a wide variety of information, including, for example, current market pricing. Other automobile market information a dealer may receive on a dealer interface **306** includes information relating to lot inventory, turnover rates, automobile transportation and/or shipping costs, incentives, and various ratings, such as ratings relating to quality, safety, insurance, a consumer credit score, dealer ratings, residual or resale values, etc. A dealer may input information into dealer interface **306** relating to sales data, including current pricing offered, special sales offers, actual transaction data, inventory data, etc. In an example embodiment, the dealer may provide information through dealer interface **306** which will be used by automobile market information processing system **302** to prepare reports or offers to consumers and/or manufacturers. It should be appreciated that a dealer is typically a franchise entity, while a distribution location may not be a franchise entity. For brevity, throughout this specification, the term dealer may be used to describe both franchise entity dealers and non-franchise entity distribution location. Accordingly, as used in this disclosure, the term dealer does not indicate whether an entity is a franchise entity. Moreover, a franchise dealer or a non-franchise distribution location may utilize a dealer interface **306** as described herein.

In an example embodiment, a manufacturer interface **308** may provide a user **114**, such as a manufacturer employee, information relating to the current automobile market, including consumer requests. For example, an manufacturer interface **308** may provide a manufacturer a request received from a consumer interface **304**. Additionally, the manufacturer interface **308** may provide information such as a report that allows the manufacturer to provide a response to the requesting consumer. A report may include information from database system **310** relating to current market pricing, recent sales figures and trends, current manufacturer incentives, current inventory, including dealer inventory, inventory in transit, and/or build times or lead times for a desired automobile, etc. The manufacturer may use this information to provide a response to a consumer request. The manufacturer may provide the manufacturer interface **308** with

9

information to provide a confirmation, a verification, or an offer to a consumer via consumer interface **304**. For example, a confirmation number associated with the particular consumer request may be provided for the consumer. Also, a recommendation may be provided from the recommendation engine **312** to the manufacturer in relation to automobile pricing, responding to a specific request, manufacturer incentives, inventory management, production schedules, shipping schedules, etc. It should be appreciated that a manufacturer may be referred to as an OEM or original equipment manufacturer. Further, it should be appreciated that a manufacturer may include various related affiliate entities all doing business as, or operating under, the same manufacturer name. For example, a manufacturer typically may include a manufacturing company (e.g., operating the manufacturing plant), a sales company (e.g., operating automobile sales activities), and a captive finance company (e.g., operating financing and leasing activities). The manufacturer interface **308** may provide a manufacturer with a real-time lens into the automobile market which may allow the manufacturer to adjust production schedules, pricing plans, marketing activities, etc., which may provide a significant advantage for manufacturers.

As illustrated in FIG. 3B, a consumer interface **304** may include a used automobile seller interface **318** and a used automobile buyer interface **320**. The used automobile seller interface **318** may be used by consumer sellers to sell used automobiles, while the used automobile buyer interface **320** may be used by consumers to buy used automobiles. It should be appreciated that consumers may be able to access both interfaces **318** and **320** from consumer interface **304**. In an example embodiment, the used automobile seller interface **318** and a automobile buyer interface **320** may be integrated within a single website or application, or for example, may be implemented as distinct websites. Similarly, in an example embodiment, a used automobile buyer interface **320** may be integrated with features of a consumer interface **304** for searching both new and used automobiles for purchase, or new and used automobiles may not be simultaneously searchable on a particular implementation of a consumer interface **304**. As will be discussed further below, a used automobile seller interface **318** may be used by a consumer seller of a specific used automobile to receive information on the specific automobile and request bids for the specific automobile. Similarly, a used automobile buyer interface **320** may be used for used automobile buyers to receive information on a used automobile and place a bid on that specific automobile.

It should be appreciated that, for example, a consumer seller of a used automobile may be considered different than a dealer seller of a used automobile in some respects. For example, a consumer seller of a used automobile is often selling through different channels, such as offering for sale in classified advertisements versus from a dealer lot. It should be appreciated that such differences may be relevant to the ability to maximize the value of a sale or purchase of a used automobile. Accordingly, where appropriate, the present disclosure may distinguish a consumer seller from a dealer seller, or distinguish a consumer buyer from a dealer buyer. Also, as discussed in further detail below, a manufacturer off-lease seller of a used automobile may also be considered different from a consumer seller and/or a dealer seller.

A dealer interface **306** may include a used automobile buyer interface **322**. For example, a typical dealer may use a dealer interface **306** primarily for facilitating sales of new and used automobiles, however, the dealer interface **306** may also be used to facilitate purchasing used automobiles.

10

For example, a used automobile buyer interface **322** may be used by dealers similarly to the way that the used automobile buyer interface **320** may be used by consumers. It should be appreciated that in an example embodiment, the used automobile buyer interfaces **320**, **322** may be similar or the same, and/or may integrated as part of single website or application. In an example embodiment, a dealer may use the used automobile buyer interface **322** to facilitate bringing a consumer in to purchase a new automobile based on providing a competitive bid to purchase a used automobile as a trade in.

A manufacturer interface **308** may include a used automobile off-lease interface **324**. For example, a manufacturer may use a manufacturer interface **308** primarily for facilitating sales of new automobiles, however, the manufacturer interface **308** may also be used to facilitate selling off-lease automobiles which have been returned by a consumer lessor whose lease is expiring. For example, an off-lease seller interface **324** may be used by a manufacturer, typically, a captive finance company of the manufacturer, similarly to the way that the used automobile seller interface **318** may be used by consumers. It should be appreciated that, a manufacturer off-lease seller may have limited options to sell a used off-lease automobile and may have time constraints that are may be typically imposed on a consumer seller of a used automobile. Typically, an off-lease automobile may be dropped off by a consumer lessee at any one of a variety of dealer locations. The manufacturer lessor may then wish to sell the used off-lease automobile, however, the dealer where the off-lease automobile was dropped off may have a significant bargaining advantage to purchase that automobile, as the manufacturer may need to sell the off-lease automobile quickly and may have limited options. Typically, the dealer may not offer the manufacturer off-lease seller full market value for the off-lease automobile. It should be appreciated that the manufacturer off-lease seller may transport the car to an auction in an attempt to obtain a higher price. However, transportation costs, auction fees, and delay in selling the off-lease automobile may cause the manufacturer off-lease seller to accept less than market value for the off-lease automobile from the dealer, or otherwise not maximize the value of the off-lease automobile. For example, typically, an off-lease automobile sold at auction for near or even above the current market value is significantly offset by transportation costs and auction fees.

The off-lease seller interface **324** may provide a manufacturer off-lease seller with leverage, not only through the ability to obtain bids to purchase the off-lease automobile, but through the ability to determine the number of matches or search hits for an off-lease automobile. The dealer that has the off-lease automobile may know that the manufacturer may have the ability to track searches for the off-lease automobile performed by consumers and/or other dealers. The manufacturer off-lease seller may provide the dealer in possession of an off-lease automobile with matches and/or bids, which may provide the dealer with firm evidence of current demand or interest in the off-lease automobile. The dealer may be able to use this information to determine an appropriate price, and possibly even more profitably than the manufacturer. Accordingly, a dealer may often be inclined to make a significantly more competitive bid for an off-lease automobile. It should be appreciated that the manufacturer may use the off-lease seller interface **324** to identify in-market buyers, and even without receiving bids from those buyers, the manufacturer's bargaining power may improve, resulting in a greater value for off-lease sales.

US 9,460,467 B2

11

Accordingly, information may be provided to the automobile market information processing system **302** from consumers, dealers, and manufacturers with a very high degree of granularity, as every transaction that occurs and even every request or search may be stored and used by the automobile market information processing system **302**. This allows the automobile market information processing system **302** to use the most current automobile market data to provide information to consumers, dealers, and manufacturers. It should be appreciated that market prices can change relatively quickly, particularly when major events drive consumer behavior or manufacturer production, such as natural disasters. Accordingly, reports and recommendations provided by the automobile market information processing system **302** may be highly accurate, reliable, and sensitive to market changes.

It should be appreciated that the users **114** of the automobile market information processing system **302**, including consumers, dealers, and manufacturers, and buyers and sellers of new and used automobiles, may be required to agree to and/or execute a terms of use agreement or terms of service agreement. Various forms of enforcing the agreement may be implemented, including a transaction deposit policy, which may require a deposit or a credit card hold, or the like, and a standard schedule of fees or default payment schedule for infractions such as improper condition of an automobile, delay in delivery, etc. Accordingly, all parties may be protected from another party breaching the agreement.

It should be appreciated that certain functions described as performed, for example, at automobile market information processing system **302**, may instead be performed locally at consumer interface **304**, dealer interface **306**, and manufacturer interface **308**, or vice versa. Further, in certain cases, tasks may be performed using consumer interface **304**, dealer interface **306**, and manufacturer interface **308** or, for example, performed in person, such as a consumer signing documents at a dealer location, or a dealer communicating with a manufacturer using a telephone. It should be appreciated that the consumer interface **304**, dealer interface **306**, and manufacturer interface **308** may be implemented, for example, in a web browser using an HTML file received from the automobile market information processing system **302**. In an example embodiment, the consumer interface **304**, dealer interface **306**, and manufacturer interface **308** may be located on a website, and may further be implemented as a secure website. Also, consumer interface **304**, dealer interface **306**, and manufacturer interface **308** may require a local application, for example, which a manufacturer or dealer may pay for to have access to, for example, information from the automobile market information processing system **302** such as requests from consumers.

FIG. **4** is a flowchart of an example process **400** for facilitating a used automobile transaction. Although the process **400** is described with reference to the flowchart illustrated in FIG. **4**, it will be appreciated that many other methods of performing the acts associated with the process **400** may be used. For example, the order of many of the blocks may be changed, certain blocks may be combined with other blocks, and many of the blocks described are optional.

The example process **400** for facilitating a used automobile transaction may allow users **114** to efficiently sell and purchase automobiles. The example process **400** may begin with automobile market data including at least pricing data is stored in a database system (block **402**). For example, automobile market data from dealers, consumers, and manu-

12

facturers regarding pricing, inventory, insurance information, quality ratings, safety ratings, and other ratings is collected and stored in a database. For example, inventory data may include data regarding off-lease automobiles, including scheduled drop off dates of automobiles with expiring leases. In an example embodiment, a wide variety of data is stored in a database system **310**. Automobile market data may include various relevant ratings, reports, awards, or other information, including quality information, safety information, insurance information, consumer credit information, dealer rating information, incentive information, residual value information, and/or any other data which may be relevant to consumers. For example, ratings data may include information from the National Highway Traffic Safety Administration (NHTSA), the Environmental Protection Agency (EPA), and/or the Insurance Institute for Highway Safety (IIHS). The data may include information from a consumer interface **304**, such as data in consumer searches or requests, information from a dealer interface **306**, such as currently offered dealer pricing, transaction data for finalized sales, current inventory data, transport or shipping costs, and information from a manufacturer interface **308**, such as current manufacturer prices and suggested pricing, manufacturer incentives, and current inventory including finished inventory on hand, production scheduling, shipment scheduling, inventory in transit, and manufacturing lead times. The automobile market data may be comprised solely of information received from the consumer interface **304**, dealer interface **306**, and manufacturer interface **308**, or may include additional information received from other sources, for example, industry analysts, consumer reports groups, government agencies, etc. It should be appreciated that various methods of storing the automobile market data may be employed according to the system requirements. For example, database system **310** may be organized according to different manufacturers or dealers, automobile make and model, different information categories (e.g., suggested pricing, market prices, production, shipping, lot inventory), etc., and may consist of one or more databases on one or more servers **108**, **226** which may be remotely located from each other and/or a host device **104** of the automobile market information processing system **302**. As will be discussed further below, the automobile market data may be continually updated as new data is provided to the automobile market information processing system **302**.

The automobile market data may be used by any or all parties involved in a used automobile transaction, including used automobile sellers including consumer sellers and manufacturer off-lease sellers, and used automobile buyers including consumer buyers and dealer buyers. In the example process **400**, as discussed further below, the used automobile seller described by way of example as a consumer seller. It should be appreciated that the example process **400** may work similarly or the same for a manufacturer off-lease seller. In an example embodiment, the consumer used automobile seller interface **318** and manufacturer off-lease seller interface **324** may be provided as a combined interface. Certain aspects of the disclosed example process **400** may be of greater or lesser advantage to a manufacturer off-lease seller compared with a consumer seller. For example, consumer sellers typically sell used automobiles infrequently, while manufacturer off-lease sellers may be selling thousands of used off-lease automobiles each month. Accordingly, the goals of the user **114** may vary between consumer sellers and manufacturer off-lease sellers.

US 9,460,467 B2

13

Certain notable aspects that may be distinguishable between a consumer seller and manufacturer off-lease seller will be discussed below.

The example process **400** continues with a consumer seller providing a request for a response (block **404**). For example, a used car seller takes a picture of the vehicle identification number (VIN) of a used car and fills in price parameters and other information into a mobile application to receive a response based on current market data. In an example embodiment, the seller's request may be transmitted from used automobile seller interface **318**, **324** via the internet to the automobile market information processing system **302**. For example, using an application stored on a mobile device **103**, the used car seller takes a picture of the VIN on the used car and fills in a minimum bid price, delivery parameters, etc. The seller's parameters may specify a pickup location by distance from an address, an area code, etc., which allows for matching the seller with buyers that are in-market. The picture of the VIN may be processed using optical character recognition, which allows the automobile market information processing system **302** to determine the make and model of the car, along with various other characteristics of the car. Also, for example, the used car seller may take a picture of the odometer, and the mileage may be determined using optical character recognition. It should be appreciated that the VIN may include human readable characters, a bar code, or any other graphical or machine readable information which acts as a vehicle identification number.

Also, the used car seller may input into a mobile application or website a wide variety of additional information about the used car. For example, pictures of the used car may be uploaded with the request. In an example embodiment, pictures of the exterior, interior, dashboard, and/or odometer may be provided. Also, for example, service records, ownership records, and other documents or information may be included with a request. Further, a written description of the car may be provided. Accordingly, because the used car seller can provide information such as pictures, in addition to information which the seller may not have access to, such as the original manufacturer specifications of the used car, potential buyers may have access to a great deal of information on the used car. Further, in an example embodiment, a mobile application may include the geolocation of a used car seller, so the seller does not need to enter such information. Accordingly, the buyer may perform research, for example, while at home or while shopping at a dealer location. It should be appreciated that certain used car buyers may be highly interested in the geolocation of the consumer seller. For example, a dealer may find the consumer seller's geolocation to be more important than a consumer buyer, because a dealer may require a minimal cost for picking up a car to ensure profitability, and to optimize the opportunity for creating a new customer relationship. Similarly, certain used automobile sellers may be very interested in the geolocation of the used automobile buyer. For example, a manufacturer off-lease seller may have a high interest in determining the amount of in-market interest or demand for an off-lease automobile.

In an example embodiment, a manufacturer off-lease seller may provide a request for a response for an automobile that will be dropped off by a consumer lessee in the near future. For example, a manufacturer user **114** may input a VIN into off-lease seller interface **324** by typing, speaking, or providing an image of the VIN. The manufacturer off-lease seller may provide a parameter that the used off-lease automobile will be available only after a certain date. The

14

manufacturer off-lease seller may find that providing a request for a response prior to the consumer lessee actually dropping off an off-lease automobile may significantly improve the value of off-lease automobiles. It should be appreciated that the dealer where the consumer lessee drops off the off-lease automobile may be bargaining without any particular advantage because the manufacturer off-lease seller may have multiple interested used automobile buyers that, based on search parameters, have received the off-lease automobile as a match, and/or bids from used automobile buyers.

Used car buyers may perform a search with used automobile buyer interfaces **320**, **322**, and may typically include parameters limiting the search to a specific automobile type, make, or model, certain options or features, a price range, and a pickup location or area. Further, for example, the buyer may take a picture of a VIN anywhere or manually type in a VIN number, including at automobile trade shows, mall displays, or anywhere new or used cars are for sale. The buyer may even take a picture of a car parked in the street as the buyer walks down the street. Any request or query communicated from the consumer interface **304** may be stored, for example, in database system **310**, thereby updating the automobile market information processing system **302** with current automobile market data.

The example process **400** may continue with providing automobile market data to used automobile buyers based on the consumer seller request (block **406**). For example, a group of consumers and dealers receive a real-time report including local used car sales data, inventory data, quality and safety ratings data, insurance data, and gas mileage data of the specific used car which is identified based on the VIN. The group of consumers and dealers that receive a real-time report may be based on prior searches conducted by consumers on used automobile buyer interface **320** and searches conducted by dealers with used automobile buyer interface **322**. In an example embodiment, a report may include quality information, safety information, insurance information, recall information, EPA gas mileage and emissions information, consumer credit information (e.g., buyer FICO score), dealer rating information, incentive information, residual value information, and/or any other data which may be relevant to consumers and/or dealers. In an example embodiment, a report may include a specific history information for the specific used car, such as a CARFAX report. The request and/or the report may be provided in real-time and may also provide real-time data. Data reported based on a real-time updates in the automobile market information processing system **302** may provide significant advantages, for example, when pricing conditions may change quickly due to unforeseen market conditions. The recommendation engine **312** may provide recommendations to a used automobile buyer based on the current automobile market data. For example, a report may indicate various estimated sales probabilities for different prices that the used automobile buyer may offer or bid. In an example embodiment, an estimated sale price or range may be provided. For example, a probability analysis may be provided with prices and corresponding probabilities may be estimated as, e.g., 80% chance to purchase at $6,000; 60% chance to purchase at $5,500; 30% chance to purchase at $5,000; 10% chance to purchase at $4,500. Such information may be illustrated in various ways, such as a bell curve graph or a chart. Further, for example, the recommendation engine may provide daily suggestions (e.g., a deal of the day) for dealers and/or consumers. Consumers may use such suggestions to save money or get a better value on a used car purchase by buying

US 9,460,467 B2

15

from another consumer rather than a dealer. Dealers may use such suggestions to purchase used cars at good deals, and/or to attract consumers to visit the dealer in person or online, as well as prepare responses or bids to other consumer requests. Dealers or consumers may customize the used automobile buyer interface **320, 322** to provide information in a pre-specified manner to suit the particular needs of the specific dealer or consumer. In an example embodiment, a manufacturer off-lease seller may receive automobile market data including inventory information including data regarding off-lease cars which have been dropped off at dealer locations and cars which will soon be coming off-lease. Further, dealers and/or consumers may be able to receive information regarding off-lease cars as well. For example, information may include a specific automobile identified by a VIN with an expected drop off location and date based on a lease expiration.

A bid to purchase the used automobile from the consumer seller is requested from used automobile buyers (block **408**). For example, a group of consumers and dealers within a certain radius of the used car seller location may receive a bid request based on used automobile buyer searches via used automobile buyer interfaces **320, 322**. Each used automobile buyer's bid may include, for example, a price and a delivery option or delivery suggestion. The used automobile buyer interfaces **320, 322** may provide for simple input of necessary and optional data. Further, a used automobile buyer's bid may contain certain limitations, restrictions, or conditions. For example, a dealer may provide a bid with the condition that a new car be purchased and the used car be traded in at the bid price.

In an example embodiment, the request may provide one or more options, products, services, or add-ons for a used automobile buyer to select from. For example, used automobile buyers may be able to select financing options, warranties, extended service contracts, insurance plans, or other hard add accessories. These selectable options may be offered directly from the used automobile seller or may be offered through the automobile market information processing system **302**. Accordingly, a seller may not be offering any options for a buyer to select, but the system may automatically provide the option to purchase further add-ons. In an example embodiment, automobile market information processing system **302** may provide for third party providers of add-ons to provide live auction bids for a used automobile buyer to select for inclusion in a bid. Accordingly, for example, several insurance companies may provide a bid for key insurance, or several financial companies may provide bids for a loan. It should be appreciated that certain bids may depend on the particular buyer, so for example, a buyer's credit or driving record may cause different buyers to receive different third party bids for add-ons. For example, a particular buyer may be able to increase a bid to purchase a used automobile if third party add-ons are particularly advantageous, which may benefit a consumer seller or manufacturer off-lease seller. For example, a buyer may receive a better than expected interest rate and insurance price, and therefore be able to offer an additional $1,000 to the seller, while staying within the buyer's predetermined monthly budget. It should be appreciated that third parties may include dealers which may be otherwise involved in a transaction. Also, in an example embodiment, the automobile market information processing system **302** may provide at no charge to the buyers or sellers, certain add-ons, such as a limited thirty day warranty. Accordingly, the automobile market information processing system **302** may gain trust from buyers even if the buyers

16

generally do not trust the sellers. It should also be appreciated that a buyer may not select any add-ons offered by third parties and/or the automobile market information processing system **302**. A used automobile seller may have no interest in whether a buyer selects any add-ons, or the seller may receive additional compensation if an add-on is selected, so a buyer selection of add-ons may or may not affect a seller's value associated with the buyer's bid.

One or more buyer bids are provided to the consumer seller (block **410**). For example, several consumers and dealers provide bids based on current pricing data, options information of the specific used car, and potential pickup locations, so several different prices and delivery options may be available to the used car seller via the used automobile seller interface **318**. Typically, the bid will include at least a specified price and pickup time and location. In an example embodiment, a used car seller that has taken a picture of a VIN with a mobile device and entered some basic information such as an odometer reading may receive used car buyer bids within minutes or seconds on the mobile device. Accordingly, the bids may be used in real-time as the consumer seller may be actively selling a used car or shopping for a new or used car, for example, on a dealer lot. Typically, a pickup location will be at the consumer seller location, a consumer buyer location, or at a dealer lot or distribution location. In an example embodiment, the consumer buyer location may be determined using the geolocation of the buyer's mobile device **103**. It should be appreciated that some consumers may be flexible as to the delivery options and that some dealers may have multiple locations which could serve as a pickup location. In an example embodiment, the automobile market data may indicate that the particular used car that a consumer seller has requested bids for should be priced at, for example, $6,000. However, various factors may affect the bid or offer that a consumer or dealer may make for the specific used car. For example, for a consumer, personal preference for certain features or looks, convenience, insurance implications, gas mileage, and/or service records, may play a large role in pricing a bid above or below a suggested bid price. For example, for a dealer, the potential for forming a customer relationship, the value of potential other sales, add-on products, and/or services, or competition with other parties. All used automobile buyers that are interested may place a bid for a used car seller's consideration.

It should be appreciated that various alternative delivery options may be provided from several used automobile buyers' bids, for example, based on preferences or parameters indicated by the consumer seller of the used automobile. For example, the used automobile seller interface **318** may provide several different bids with different delivery options and prices to the used car seller, for example, a price of $6,000 to drop off the car at an out of state dealer the next day or a price of $5,500 to drop off the car at a local consumer buyer location in five days. For example, a consumer buyer may determine the cost of picking up the used car from the consumer seller and provide two pricing and delivery options, for example, $5,500 to pick up the used car from the consumer seller or $5,800 to have the used car delivered to the consumer buyer's home. For example, a manufacturer off-lease seller may review bid prices and delivery options on a number factors on used automobile seller interface **324**, but may be very interested in finding an in-market buyer to eliminate transportation costs. A manufacturer off-lease seller may often have somewhat different concerns than a consumer seller. For example, to meet a quarterly budget, a manufacturer off-lease seller may be

US 9,460,467 B2

17

primarily interested eliminating a high back log of off-lease cars even if selling cars at a significant discount is required.

Further, for example, used automobile buyers may use information such as ratings data to optimize their bids. For example, if gasoline prices are increasing, mileage ratings for a particular car may dictate increasing or decreasing a bid. If a vehicle has very good gas mileage, and gas prices are skyrocketing, that car may have an increasing demand as gas prices increase, or vice versa. Similarly, safety ratings of vehicles may be important to consumer demand if high profile problems have appeared for a particular automobile style, make, or model. As discussed above, various automobile market information may be used by a used automobile buyer including safety information, insurance information, consumer credit information, dealer rating information, incentive information, residual value information, and/or any other data which may be relevant.

The used automobile seller interface **318, 324** may organize used automobile buyer bids based on a variety of factors and may provide supplemental information. For example, certain buyer bids may be selected as the best options, all buyer bids may be summarized, various additional ratings, reviews, or popularity information, special offers, etc. may also be provided to a consumer along with any used automobile buyer bids. The recommendation engine **312** may provide recommendations to a consumer seller based on the current automobile market data. For example, of ten used automobile buyer bids provided with a response, three bids may be recommended, for example, as "Great Deals!" It should be appreciated that in some cases, a particular used car seller request may not return any buyer bids, for example, if the used car for sale is in low demand or a unique item with a limited market. Also, for example, if only one or two bids are received, the recommendation engine **312** may recommend that a consumer seller wait for a better bid because the bids provided are not competitive offers based on the current automobile market data stored in the database system **310**. Further, in an example embodiment, buyer bids may be organized according to distance to a pickup location, highest price, closest match to the consumer seller entered criteria, a normalized quality index or value index, etc. The consumer seller or manufacturer off-lease seller may be able to toggle between different viewing options for buyer bids.

Further, in an example embodiment, a consumer seller may be at a dealer lot (e.g., a Nissan dealer) and take a picture of a VIN on a used car (e.g., a Maxima), which the consumer seller intends to trade in. A bid from a competing dealer (e.g., a Toyota dealer) across the street may be received on the mobile device within seconds and include information for a competing trade in value, and may have further information relating to other new or used cars which may be intended to cause the consumer seller to go to the competing dealer, for example, including various price comparisons, gas mileage ratings, safety ratings, residual value, driving directions to the competing dealer, etc. Accordingly, a consumer seller may weigh the pros and cons of various used automobile buyer bids from consumers and/or dealers, based on delivery options, pricing, and any other relevant variants. Any bids communicated from used automobile buyer interfaces **320, 322** may be stored, for example, in database system **310**, to further update the automobile market information processing system **302** with current automobile market data.

The consumer seller selects a buyer bid including a price and a delivery option (block **412**). For example, the used car seller chooses to sell the used car based on the price and the pickup location of a consumer buyer bid. The seller may

18

select an offer with a specified price and delivery option on the used automobile seller interface **318, 324**. The used car seller may have been weighing two or more different delivery options, price differences, etc., based on the response(s) received through the used automobile seller interface **318, 324**. As noted above, the used automobile seller interface **318** may organize received bids and other helpful information in a variety of ways, which may make the information easier for a consumer seller to digest. It should be appreciated that a consumer seller will typically want to deliver a used car at a convenient location, often at or near the seller's home. Accordingly, used automobile buyers may attempt to provide delivery options tailored towards maximizing profit and convenience, while still providing a superior bid to other used automobile buyers. By providing multiple bids with different delivery options, the consumer seller may be allowed to make extra money or save time based on the seller's particular situation. It should be appreciated that the consumer seller selection of a bid may, for example, occur simultaneously with the consumer seller and used automobile buyer executing the sale or providing a deposit or down payment, or the like (see, e.g., block **414**). Accordingly, in an example embodiment, once a consumer seller or manufacturer off-lease seller selects a bid, the used automobile buyer has effectively purchased the car, and both parties do not need to worry about the other party backing out of the deal.

It should be appreciated that a consumer seller may not want to drive to a distant pickup location without first receiving some form of deposit, or likewise, a used automobile buyer may not want to go to a distant pickup location to without assurance that the used automobile will actually be available for pickup and in good working order. Likewise, a manufacturer off-lease seller may be concerned with obtaining maximum value for an off-lease automobile within the required time constraints, but transportation costs may be strictly budgeted. The automobile market information processing system **302** may accommodate for deposits to provide any reasonable or necessary assurances to both buyers and sellers. For example, the automobile market information processing system **302** may provide and/or require the use of a terms of service agreement, which the consumer seller or manufacturer off-lease seller and the used automobile buyer may sign and agree to the terms provided therein. For example, a credit card could be charged a default payment in the event that either party breaches the terms of service agreement. In an example embodiment, a schedule of various breaches may require different default payments, for example, if a buyer determines a headlight does not work, a standard $30 fee may be assessed from the consumer seller. Also, a variable default agreement may be based on a distance between a seller and a buyer, so that a party which travels a great distance may be compensated if the other party breaches the agreement. Also, for example, a time period for inspection may be specified in a request and/or a bid. A bid may be conditional based on one or more seller representations. Moreover, a terms of service agreement may provide assurances for any issues which may arise in the sale of a used car, and may provide one or more options based on a breach, including payment of fees or nullification of a bid acceptance and/or sale execution. Any consumer seller selections, counter offers, or additional requests or responses may be stored in database system **310**, as the communications are processed by automobile market information processing system **302**, providing further data updates. Accordingly, in an example embodiment, a consumer seller may select a bid in order to sell the used car, and

**19**

that sale information may then be provided to another consumer searching for information regarding the same type of car with similar features, for example, the next day.

The consumer seller and the used automobile buyer execute the sale of the used automobile (block **414**). For example, the used automobile buyer electronically signs a contract and performs an electronic funds transfer or credit card payment. After a buyer bid is selected, an electronic contract may be prepared by the automobile market information processing system **302** and provided for the used automobile buyer who may e-sign the contract or other documentation as needed. Similarly, the consumer seller may e-sign the contract or other documentation as needed, either prior to selecting a bid, at the time of selecting a bid, or at a later time. A contract may be e-signed through the used automobile buyer interface **318**, **324**, and the used automobile buyer interface **320**, **322**, respectively. In another example embodiment, paper copies of a contract may be signed, for example, after the used automobile buyer prints them or receives them through the mail. In an example embodiment, the used automobile buyer may provide cash or a paper check. It should be appreciated that the process of executing a contract may take some time. Also, it should be appreciated that, for example, the consumer seller selection of a bid discussed above (see, e.g., block **412**) may occur simultaneously with the consumer executing the sale. Once the sale is completed, the actual transaction data including the final sale price, may be provided to and stored in database system **310**. Accordingly, the automobile market information processing system **302** may be updated with current automobile market data from every step in the used car sales process between a consumer seller or manufacturer off-lease seller and a used automobile buyer. In an example embodiment, the updates provided to the automobile market information processing system **302** are provided in real-time, for example, data may be transmitted and processed within seconds or minutes. Further, for example, it should be appreciated that certain data may be provided to the automobile market information processing system **302** according to a batch processing schedule.

Next, the consumer seller makes the purchased used automobile available according to the consumer seller bid selection (block **416**). For example, the seller drives the used car to the pickup location if the pickup location is not the used car seller's location. It should be appreciated that the consumer seller or a manufacturer off-lease seller and the used automobile buyer may use a wide variety of locations as a pickup location, and may work out a delivery option which is convenient for both parties. A consumer seller may interact with the automobile market information processing system **302** using used automobile seller interface **318**, for example, to provide notification that a car is at the pickup location and ready for delivery. A manufacturer off-lease seller may interact with the automobile market information processing system **302** using used automobile seller interface **324**, for example, to provide notification that a car has been dropped off by a consumer lessee and is at the pickup location and ready for delivery to the buyer. Similarly, a notification may be sent via used automobile buyer interface **322**, **322** to the used car buyer that the used car is available for pickup at the specified location.

Finally, the used automobile buyer receives the purchased used automobile according to the consumer seller selected delivery option (block **418**). For example, the used car buyer receives the used car at the pickup location the same day the sale is executed. The used car buyer may pick up the car without ever having to talk to or negotiate, in person or over

**20**

the telephone, with the consumer seller or manufacturer off-lease seller. For example, the used car buyer may arrive at the pickup location, show identification and provide a proof of purchase, and be provided the keys to the car by the seller. The parties may sign paperwork indicating or confirming the car has been picked up. Proof of purchase documentation may include any or all documents that are legally required for an automobile sale for a given jurisdiction, for example, the title, odometer statement, or any other document required by the Department of Motor Vehicles. For example, the consumer seller or manufacturer off-lease seller may be required to provide any legally required documents to fully execute and record the sale of the used car.

Further, in an example embodiment, a consumer seller or manufacturer off-lease seller may offer various insurance policies or service contracts to a used car buyer, for example, etch insurance, key insurance, gap insurance, or a ninety day warranty may be provided. For example, a consumer seller or manufacturer off-lease seller may purchase insurance through the automobile market information processing system **302** in placing a request for bids, which may increase interest from buyers. Also, for example, an insurance policy or service contract may be provided for a used car being sold at no charge to the consumer seller or manufacturer off-lease seller, for example, as a convenience to all users **114** using the disclosed system. For example, key insurance may be provided at no cost to both the consumer seller and the used car buyer. It should be appreciated that, for example, using options provided through the automobile market information processing system **302**, a consumer seller or manufacturer off-lease seller may sell or provide any add-on products or services that a dealer would typically offer or provide in the sale of a used automobile. Also, if the used automobile buyer is a dealer, additional products or services may be offered to the consumer seller at the time of pickup. For example, the dealer may offer new or used cars, including related financing options, warranties, service plans, insurance plans, and hard add accessories to the buyer, as discussed in further detail above.

Accordingly, it should be appreciated that consumers, manufacturers, and dealers, may receive significant benefits from the method of facilitating a used automobile transaction disclosed herein. Consumers that are selling and buying used automobiles may benefit from more competitive pricing, piece of mind knowing that a fair market price is being offered for prospective purchases or sales, and improved delivery options that allow the consumer to weigh the benefits and drawbacks of different delivery options, pricing, and other variables. In an example embodiment, consumers can view prices paid for comparable cars in specific locations based on the automobile market data in the automobile market information processing system **302**, for example, within a certain time frame such as one month and within a certain proximity to the consumer. Manufacturers selling off-lease automobiles may benefit from reduced transportation costs, saving auction fees, and an improved bargaining position with a dealer in possession of an off-lease automobile. For example, the ability to identify in-market buyers may be particularly advantageous to manufacturer off-lease sellers, which may be able to identify matching searches of in-market buyers. Also, dealers and/or various third parties may benefit from the opportunity to sell insurance, credit, service contracts, hard add accessories, and other add-ons with used automobiles. Moreover, various inefficiencies in the automobile industry may be minimized utilizing the presently disclosed system and method.

US 9,460,467 B2

21

FIG. **5** illustrates a block diagram of an example data architecture **500**. In the example data architecture **500**, interface data **502**, administrative data **504**, and automobile market data **506** interact with each other, for example, based on user commands or requests. The interface data **502**, administrative data **504**, and automobile market data **506** may be stored on any suitable storage medium (e.g., server **226**). It should be appreciated that different types of data may use different data formats, storage mechanisms, etc. Further, various applications may be associated with processing interface data **502**, administrative data **504**, and automobile market data **506**. Various other or different types of data may be included in the example data architecture **500**.

Interface data **502** may include input and output data of various kinds. For example, input data may include mouse click data, scrolling data, hover data, keyboard data, touch screen data, voice recognition data, etc., while output data may include image data, text data, video data, audio data, etc. Interface data **502** may include formatting, user interface options, links or access to other websites or applications, and the like. Interface data **502** may include applications used to provide or monitor interface activities and handle input and output data.

Administrative data **504** may include data and applications regarding user accounts. For example, administrative data **504** may include information used for updating accounts, such as creating or modifying consumer accounts and/or dealer accounts. Further, administrative data **504** may include access data and/or security data. Administrative data **504** may include a terms of service agreement. Administrative data **504** may interact with interface data in various manners, providing a user interface **304**, **306**, **308** with administrative features, such as implementing a user login and the like.

Automobile market data **506** may include, for example, executed sales data **508**, consumer data **510**, dealer data **512**, manufacturer data **514**, statistical data **516**, and/or historical data **518**. Executed sales data **508** may include actual negotiated prices for manufacturer and dealer sales, differences in list prices to negotiated prices, sales demographics, etc. Consumer data **510** may include consumer search activity, consumer requests and offers, consumer feedback, etc. Dealer data **512** may include dealer pricing, including list prices, sale prices for limited time dealer offers or deals of the day, negotiation information such as bottom line pricing, offers received, foot traffic activity, and dealer inventory data, including current on location data, automobile turnover rates, etc. Manufacturer data **514** may include manufacturer pricing, including suggested pricing, preferred dealer pricing, etc., manufacturer incentives including cash rebates, special lease rates, special APR rates, zero down offers, lifetime warranties, guaranteed trade-in offers, etc., and inventory information including dealer inventory, inventory by location, inventory in transit, manufacturing or production lead times or build times, production scheduling, shipping scheduling, lease information, etc. Statistical data **516** may include information used for providing reports including graphs, forecasts, recommendations, calculators, depreciation schedules, tax information, etc., including equations and other data used for statistical analysis. Historical data **518** may include past sales data, such as historical list prices, actual sale prices, manufacturer and dealer margins, operating costs, service costs or profitability, loyalty information, etc. It should be appreciated that data may fall under one or more categories of automobile market data **506**, and/or change with the passage of time. For example, industry

22

analyst data may include historical data **518** and statistical data **516** relating to safety or quality reports, efficiency data, recall data, and the like for used automobiles, which may be organized or re-organized under various categories of automobile market data **506** as time passes or as supplemental data is provided to the automobile market information processing system **302**. It should be appreciated that a system administrator may load data into the automobile market information processing system **302** as it becomes available. For example, annual, quarterly, and/or monthly reports relating to safety, insurance, etc., may be input into automobile market data **506** on a regular basis. It should also be appreciated that automobile market data **506** may be tailored for a particular manufacturer and/or dealer, for example, a manufacturer may request that a specific type of data that is not normally stored or used be stored in the database system **310**. Accordingly, for example, customized reports may be provided to a manufacturer interface **308** using that specific data for the manufacturer, for example, relating to resale values of used automobiles.

The integration of the various types of automobile market data **506** received from the consumer interface **304**, dealer interface **306**, and manufacturer interface **308** may provide a synergistic and optimal resource for consumers, dealers, and manufacturers alike. In an example embodiment, a used automobile seller and a used automobile buyer may benefit greatly from using an application in a mobile device **103** to provide a request for buyer bids on a used automobile by taking a picture of the VIN of the used automobile, for example, using used automobile seller interface **318**, **324**. Used automobile buyers may search for used automobiles for sale by consumer sellers, for example, using used automobile buyer interface **320**. The used automobile buyers may receive intrabrand and/or interbrand seller request information in real-time. The intrabrand and interbrand information provided on the used automobile buyer interface **320** may allow the best automobile options for a particular consumer to be provided to that consumer, and may allow consumer sellers, manufacturer off-lease sellers, and dealers to compete with each other taking into account a greater amount of automobile market information, which may result in a more efficient automobile market. Consumers that are selling used automobiles and consumers that are buying used automobiles may similarly receive benefits from the presently disclosed system. Also, as discussed above, manufacturer off-lease sellers may benefit greatly from the presently disclosed system, for example, using bids and/or matches or search hits for an off-lease automobile to improve bargaining power with a dealer in possession of the off-lease automobile and other dealers and/or consumers.

Automobile market data **506** may be maintained in various servers **108**, in databases or other files. It should be appreciated that, for example, a host device **104** may manipulate automobile market data **506** in accordance with the administrative data **504** and interface data **502** to provide requests or reports to users **114** including consumers, dealers, and manufacturers, and perform other associated tasks. It should also be appreciated that automobile market data **506** represents automobile market information, and that these terms may be used interchangeably in this disclosure depending upon the context.

FIG. **6** is flow diagram illustrating an example process **600** for facilitating a used automobile transaction, according to an example embodiment of the present invention. Although the process **600** is described with reference to the flow diagram illustrated in FIG. **6**, it will be appreciated that many other methods of performing the acts associated with

US 9,460,467 B2

23

the process **600** may be used. For example, the order of many of the blocks may be changed, certain blocks may be combined with other blocks, and many of the blocks described are optional.

In the example process **600**, data may flow between the automobile market information processing system **302** and a used automobile seller interface **318**, **324** and a used automobile buyer interface **320**, **322**, as discussed above based on used automobile seller and buyer interaction with the automobile market information processing system **302**. As discussed above, used automobile seller interface **318** and used automobile buyer interface **320** may be included in a consumer interface **304**, a used automobile buyer interface **322** may be included a dealer interface **306**, and a used automobile seller interface **324** may be included in a manufacturer interface **308**. It should be appreciated that the automobile market information processing system **302** may update the automobile market information stored in the database system **310** when automobile market information is received from a buyer and/or, and/or a consumer, a dealer, a manufacturer, an industry analyst, and/or from any other information source. Accordingly, the automobile market information may remain current and/or provide sufficiently recent data for the benefit of consumers, dealers, and/or manufacturers.

The example process **600** may begin with a consumer seller or a manufacturer off-lease seller of a used automobile taking a picture of the VIN using a mobile phone application and entering in information such as pricing parameters (block **602**). The used automobile seller interface **318**, **324** may use OCR to determine and provide the VIN and pricing parameters to the automobile market information processing system **302** as a consumer seller request or a manufacturer off-lease seller request (block **604**). It should be appreciated that OCR may occur in the automobile market information processing system **302** or at the used automobile seller interface **318**, **324**. The automobile market information processing system **302** receives the seller request and prepares automobile market information based on the seller request (block **606**). The automobile market information processing system **302** may send a bid request and automobile market information based on the seller request to the used auto buyer interface **320**, **322** for one or more consumers and/or dealers (block **608**). It should be appreciated that while the seller request is automobile market information, typically, additional automobile market information would be provided with the seller request. For example, typically, data relating to recent sales of similar used automobiles and/or comparable automobiles may be provided. In an example embodiment, a target price or "true" value of the used automobile, or an expected price range, may be provided. Also, for example, various gas mileage data, safety ratings, recall information, quality reports, estimated insurance costs, and the like may be provided. Further, add-on products or services, such as insurance, credit, warranties, service contracts, or hard add accessories, which may be determined based on a third party bidding process, may also be provided. One or more used automobile buyers, including consumers and/or dealers, receive the bid request and automobile market information, determine prices and delivery options for the used automobile using the automobile market information, and prepare and provide bids for the consumer seller or a manufacturer off-lease seller (block **610**). A buyer bid may be sent from the used automobile buyer interface **320**, **322** to the automobile market information processing system **302** for each consumer and/or dealer that wants to provide a bid (block **612**). The automobile market informa-

24

tion processing system **302** receives and processes buyer bids and prepares the bids and automobile market data for the consumer seller or manufacturer off-lease seller (block **614**).

The automobile market information processing system **302** may send buyer bids and automobile market information to the used automobile seller interface **318**, **324** (block **616**). It should be appreciated that automobile market information may be provided to the consumer seller or manufacturer off-lease seller before buyer bids are provided, and/or concurrently with buyer bids. The seller may receive the buyer bids and automobile market information and may select a bid including a delivery option based on the automobile market information (block **618**). The used automobile seller interface **318**, **324** may send to the automobile market information processing system **302** a selection of a bid indicating that the consumer seller or manufacturer off-lease seller wants to sell the used automobile based on the selected bid (block **620**). The automobile market information processing system **302** receives and processes the seller bid selection (block **622**). For example, the automobile market information processing system **302** may send the bid selection to the used automobile buyer interface **320**, **322** (block **624**). The used automobile buyer may receive the bid selection and coordinate a sale by, for example, setting up a pick up time and location for the used automobile at the seller location or the buyer location (block **626**). Also, for example, the automobile market information processing system **302** may provide contract or loan documents, collect a deposit or down payment, or the like, from the consumer seller, the manufacturer off-lease seller, and/or the used automobile buyer. As discussed above, in each of blocks **606**, **614**, and **622**, the automobile market information processing system **302** may update the automobile market information in the database system **310** based on the information received from the consumer, manufacturer, and/or dealer.

For exemplary purposes, the present disclosure discusses a various examples relating to a purchase of a used car. However, it should be appreciated that the disclosed system, methods, and apparatus may be advantageously used in relation to various used automobiles other than cars including, for example, trucks, vans, sport utility vehicles, jeeps, motorcycles, commercial vehicles, and/or automobiles that have a VIN and require a license plate to operate.

It will be appreciated that all of the disclosed methods and procedures described herein can be implemented using one or more computer programs or components. These components may be provided as a series of computer instructions on any conventional computer-readable medium, including RAM, ROM, flash memory, magnetic or optical disks, optical memory, or other storage media. The instructions may be configured to be executed by a processor, which when executing the series of computer instructions performs or facilitates the performance of all or part of the disclosed methods and procedures.

Further, it will be appreciated that the presently disclosed system, methods, and apparatus for performing used automobile transactions may be utilized in conjunction with other systems or methods. For example, the presently disclosed system, methods, and apparatus may be used in conjunction with the disclosure in the co-pending commonly-owned patent applications filed on Jul. 5, 2011, entitled "AUTOMOBILE TRANSACTION FACILITA-TION USING A MANUFACTURER RESPONSE," application Ser. No. 13/176,497, and entitled "AUTOMOBILE TRANSACTION FACILITATION BASED ON CUS-

US 9,460,467 B2

25                                                    26

TOMER SELECTION OF A SPECIFIC AUTOMOBILE,"
application Ser. No. 13/176,525, the entire contents of
each of which is incorporated by reference herein, and in an
example embodiment, the features of which may be com-
bined with the features of the present disclosure.

It should be understood that various changes and modi-
fications to the example embodiments described herein will
be apparent to those skilled in the art. Such changes and
modifications can be made without departing from the spirit
and scope of the present subject matter and without dimin-
ishing its intended advantages. It is therefore intended that
such changes and modifications be covered by the appended
claims.

The invention is claimed as follows:

**1.** A method comprising:

receiving, via a used automobile consumer seller inter-
face, a first request for a response regarding a first used
automobile, the first request made by a consumer used
automobile seller located at a first location and includ-
ing a vehicle identifier and geolocation information of
the consumer used automobile seller;

executing instructions, by at least one processing device,
to:

determine, based on the geolocation information, that
the consumer used automobile seller is located at the
first location;

generate, based on the determined first location, an
in-market used automobile buyer area;

determine that at least one used automobile buyer is
located within the in-market used automobile buyer
area;

receive, via a used automobile buyer interface, a first
bid from a first used automobile buyer located at a
second location within the in-market used automo-
bile buyer area;

generate, based on receiving the first bid, driving
directions from the first location to the second loca-
tion; and

provide, via the used automobile consumer seller inter-
face, the first bid including at least a price for the first
used automobile and the driving directions from the
first location to the second location.

**2.** The method of claim **1**, further comprising:

receiving, via a used automobile consumer seller inter-
face, a consumer used automobile seller selection of the
first bid, wherein the consumer used automobile seller
selection indicates a consumer used automobile seller
intention to sell the first used automobile based on the
first bid to the first used automobile buyer.

**3.** The method of claim **1**, wherein the first request is made
by the consumer used automobile seller on a website.

**4.** The method of claim **1**, wherein the vehicle identifier
is manually entered by the consumer used automobile seller.

**5.** The method of claim **1**, wherein the first request is made
by the consumer used automobile seller using a mobile
device which takes a picture of a vehicle identifier.

**6.** The method of claim **5**, wherein the vehicle identifier
is recognized using optical character recognition.

**7.** The method of claim **1**, wherein the first request is made
by the consumer used automobile seller using a mobile
device including a microphone, and the vehicle identifier is
input via the microphone.

**8.** The method of claim **7**, wherein the vehicle identifier
is recognized using speech recognition.

**9.** The method of claim **1**, wherein the first used automo-
bile buyer is one of a consumer and a dealer.

**10.** The method of claim **1**, further comprising:

storing, on a computer readable medium, automobile
market data that is representative of recent automobile
market characteristics, wherein the automobile market
data is based on real-time automobile market data.

**11.** The method of claim **1**, wherein the first request
includes a picture of at least one of the exterior of the
automobile, the interior of the automobile, the dashboard of
the automobile, the odometer of the automobile, service
records of the automobile, and ownership records of the
automobile.

**12.** The method of claim **1**, wherein the first request
includes data provided with at least one graphical user
interface component.

**13.** The method of claim **1**, wherein the first request
includes at least one price parameter.

**14.** The method of claim **1**, further comprising:

storing, on a computer readable medium, pricing data
including used automobile data and new automobile
data, including actual prices of executed transactions,
dealer listing prices, dealer sale prices, manufacturer
incentives, dealer bids, consumer bids, and consumer
pricing parameters.

**15.** The method of claim **1**, further comprising executing
instructions, by the at least one processing device, to:

process the consumer used automobile seller selection of
the first bid to facilitate executing a sale including at
least one of providing for electronic signature of docu-
ments and providing for an electronic funds transfer.

**16.** The method of claim **1**, wherein an add-on, including
at least one of insurance, financing, a service contract, a
warranty, and a hard-add accessory, is provided by a third
party to the first used automobile buyer with the first request,
via the used automobile buyer interface, wherein the third
party is different from the consumer used automobile seller
and the first used automobile buyer.

**17.** The method of claim **16**, wherein the add-on is
selected for inclusion in the first bid by the first used
automobile buyer.

**18.** The method of claim **1**, further comprising executing
instructions, by the at least one processing device, to:

receive, via the used automobile buyer interface, a second
bid from a second used automobile buyer located at a
third location within the in-market used automobile
buyer area;

generate, based on receiving the second bid, second
driving directions from the first location to the third
location; and

provide, via the used automobile consumer seller inter-
face, the second bid including at least a second price for
the first used automobile and the second driving direc-
tions from the first location to the third location.

**19.** A system comprising:

a computer readable medium storing instructions;

at least one processing device operably coupled to the
computer readable medium, the at least one processing
device executing the instructions to:

receive, via a used automobile consumer seller inter-
face, a first request for a response regarding a first
used automobile, the first request made by a con-
sumer used automobile seller located at a first loca-
tion and including a vehicle identifier and geoloca-
tion information of the consumer used automobile
seller;

determine, based on the geolocation information, that
the consumer used automobile seller is located at the
first location;

27

generate, based on the determined first location, an in-market used automobile buyer area;

determine that at least one used automobile buyer is located within the in-market used automobile buyer area;

receive, via a used automobile buyer interface, a first bid from a first used automobile buyer located at a second location within the in-market used automobile buyer area;

generate, based on receiving the first bid, driving directions from the first location to the second location; and

provide, via the used automobile consumer seller interface, the first bid including at least a price for the first used automobile and the driving directions from the first location to the second location.

**20**. A non-transitory computer readable medium storing instructions which, when executed, are configured to cause an information processing apparatus to:

receive, via a used automobile consumer seller interface, a first request for a response regarding a first used automobile, the first request made by a consumer used automobile seller located at a first location and includ-

28

ing a vehicle identifier and geolocation information of the consumer used automobile seller;

determine, based on the geolocation information, that the consumer used automobile seller is located at the first location;

generate, based on the determined first location, an in-market used automobile buyer area;

determine that at least one used automobile buyer is located within the in-market used automobile buyer area;

receive, via a used automobile buyer interface, a first bid from a first used automobile buyer located at a second location within the in-market used automobile buyer area;

generate, based on receiving the first bid, driving directions from the first location to the second location; and

provide, via the used automobile consumer seller interface, the first bid including at least a price for the first used automobile and the driving directions from the first location to the second location.

\*     \*     \*     \*     \*

US009626704B2

(12) **United States Patent**       (10) **Patent No.:**    **US 9,626,704 B2**
Seergy et al.                        (45) **Date of Patent:**    \***Apr. 18, 2017**

(54) **AUTOMOBILE TRANSACTION FACILITATION BASED ON A CUSTOMER SELECTION OF A SPECIFIC AUTOMOBILE**

(71) Applicant: **Sidekick Technology LLC**, Pine Brook, NJ (US)

(72) Inventors: **Michael J. Seergy**, Pine Brook, NJ (US); **Benjamin N. S. Brown**, Pine Brook, NJ (US)

(73) Assignee: **Sidekick Technology LLC**, Pine Brook, NJ (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

This patent is subject to a terminal disclaimer.

(21) Appl. No.: **14/868,091**

(22) Filed: **Sep. 28, 2015**

(65) **Prior Publication Data**

US 2016/0155168 A1     Jun. 2, 2016

**Related U.S. Application Data**

(63) Continuation of application No. 14/293,665, filed on Jun. 2, 2014, now Pat. No. 9,147,216, which is a (Continued)

(51) **Int. Cl.**
*G06Q 30/00*       (2012.01)
*G06Q 30/06*       (2012.01)
(Continued)

(52) **U.S. Cl.**
CPC ......... *G06Q 30/0611* (2013.01); *G01C 21/34* (2013.01); *G06Q 30/06* (2013.01); (Continued)

(58) **Field of Classification Search**
CPC ...................... G06Q 30/0206; G06Q 30/0601
(Continued)

(56) **References Cited**

U.S. PATENT DOCUMENTS

5,970,472 A     10/1999  Allsop et al.
6,006,201 A     12/1999  Berent et al.
(Continued)

OTHER PUBLICATIONS

AutoTrader.com, Inc.: Private Company Information-Business Week, http://investing.businessweek. com/research/stocks/private/ snapshot,asp?privcapId=92642.
(Continued)

*Primary Examiner* — Brandy A Zukanovich
(74) *Attorney, Agent, or Firm* — K&L Gates LLP

(57) **ABSTRACT**

A system, methods, and apparatus for performing automobile transactions are disclosed. In an example embodiment, automobile market data representative of current automobile market characteristics is stored. The automobile market data may include pricing, inventory, and consumer interest information received from dealers, manufacturers, and consumers. A consumer may provide a request for a response regarding a specific automobile using an image of a vehicle identification number or a graphical user interface. Automobile market data may be provided to a dealer based on the request. Bids to sell the specific automobile may be requested from dealers based on the request. Dealer bids may be provided to the consumer with prices and a delivery options. The consumer may select a bid which specifies a pickup location at a first dealer.

**38 Claims, 7 Drawing Sheets**



**US 9,626,704 B2**

Page 2

**Related U.S. Application Data**

continuation of application No. 13/176,525, filed on Jul. 5, 2011, now Pat. No. 8,744,925.

(51) **Int. Cl.**
    *G06Q 30/08*      (2012.01)
    *G01C 21/34*      (2006.01)

(52) **U.S. Cl.**
    CPC ..... *G06Q 30/0627* (2013.01); *G06Q 30/0639* (2013.01); *G06Q 30/08* (2013.01)

(58) **Field of Classification Search**
    USPC ...................... 705/26.1, 26.4, 27.1
    See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 6,321,221 | B1 | 11/2001 | Bieganski |
| 6,463,431 | B1 | 10/2002 | Schmitt |
| 6,533,173 | B2 | 3/2003 | Benyak |
| 6,868,388 | B1 | 3/2005 | Millsap et al. |
| 6,868,389 | B1 | 3/2005 | Wilkins et al. |
| 7,395,223 | B1 | 7/2008 | Buzzell et al. |
| 7,406,436 | B1 | 7/2008 | Reisman |
| 7,479,949 | B2 | 1/2009 | Jobs et al. |
| 7,636,574 | B2 | 12/2009 | Poosala |
| 8,160,929 | B1 | 4/2012 | Park et al. |
| 8,392,193 | B2 | 3/2013 | Schultz et al. |
| 8,606,604 | B1 | 12/2013 | Huber et al. |
| 2002/0065707 | A1 | 5/2002 | Lancaster et al. |
| 2002/0082978 | A1 | 6/2002 | Ghouri et al. |
| 2002/0099628 | A1 | 7/2002 | Takaoka et al. |
| 2002/0111877 | A1 | 8/2002 | Nelson |
| 2002/0128946 | A1 | 9/2002 | Chehade et al. |
| 2003/0088435 | A1 | 5/2003 | King |
| 2003/0200151 | A1 | 10/2003 | Ellenson et al. |
| 2003/0229577 | A1 | 12/2003 | Nabel |
| 2004/0034544 | A1 | 2/2004 | Fields et al. |
| 2004/0059626 | A1 | 3/2004 | Smallwood |
| 2005/0004819 | A1 | 1/2005 | Etzioni et al. |
| 2005/0050097 | A1 | 3/2005 | Yeh et al. |
| 2005/0108112 | A1 | 5/2005 | Ellenson et al. |
| 2005/0240512 | A1 | 10/2005 | Quintero et al. |
| 2006/0020477 | A1 | 1/2006 | Retzbach et al. |
| 2007/0150362 | A1 | 6/2007 | Sharma et al. |
| 2007/0250403 | A1 | 10/2007 | Altschuler |
| 2007/0255663 | A1 | 11/2007 | Jordan et al. |
| 2007/0260526 | A1 | 11/2007 | Bartel |
| 2008/0046331 | A1 | 2/2008 | Rand |
| 2008/0177653 | A1 | 7/2008 | Famolari et al. |
| 2008/0183552 | A1 | 7/2008 | O'Hagan |
| 2008/0187125 | A1 | 8/2008 | Siegrist |
| 2008/0201184 | A1 | 8/2008 | Rose et al. |
| 2008/0201188 | A1 | 8/2008 | Heyman et al. |
| 2008/0201203 | A1 | 8/2008 | Rose et al. |
| 2008/0208731 | A1 | 8/2008 | Ruckart |
| 2008/0228657 | A1 | 9/2008 | Nabors et al. |
| 2009/0076896 | A1 | 3/2009 | DeWitt et al. |
| 2009/0132348 | A1 | 5/2009 | Bria et al. |
| 2009/0149199 | A1 | 6/2009 | Maghoul |
| 2009/0171761 | A1 | 7/2009 | Noy et al. |
| 2009/0187478 | A1 | 7/2009 | Shipley |
| 2009/0187513 | A1 | 7/2009 | Noy et al. |
| 2009/0198557 | A1 | 8/2009 | Wang et al. |
| 2009/0204600 | A1 | 8/2009 | Kalik et al. |
| 2010/0048242 | A1 | 2/2010 | Rhoads et al. |
| 2010/0106580 | A1 | 4/2010 | Etheredge et al. |
| 2010/0217525 | A1 | 8/2010 | King et al. |
| 2010/0274627 | A1 | 10/2010 | Carlson |
| 2010/0332292 | A1 | 12/2010 | Anderson |
| 2011/0040642 | A1 | 2/2011 | O'Dell |
| 2011/0082759 | A1 | 4/2011 | Swinson et al. |
| 2011/0087430 | A1 | 4/2011 | Boss et al. |
| 2011/0087556 | A1 | 4/2011 | Pitkow |
| 2011/0099036 | A1 | 4/2011 | Sarkissian et al. |
| 2011/0208418 | A1 | 8/2011 | Looney et al. |
| 2011/0238474 | A1 | 9/2011 | Carr et al. |
| 2011/0238514 | A1 | 9/2011 | Ramalingam et al. |
| 2011/0276394 | A1 | 11/2011 | Chan |

OTHER PUBLICATIONS

Autotrader.com Introduces IPhone App to Create a More Personalized "PC-to-Pocket" Experience for Car Shoppers, http://www.prnewswire.com/news-releases/autotradercom, Jul. 7, 2011.
AppStore-AutoTrader.com, http://itunes.apple.com/us/app/autotrader-com/id444552888?mt=8, Oct. 31, 2011.
International Search Report issued Sep. 21, 2012 for Intl. Appln. No. PCT/US2012/045546.
Charlton, Auto Trader: iPhone app review. Mar. 15, 2010 [retrieved on Sep. 6, 2012] from the internet: http://www.econsultancy.com/us/blog/5593-auto-trader-iphone-app-review> entire document.
Autodraderuk. Introducing the Auto Trader iPhone App. Mar. 12, 2010 [retrieved on Sep. 6, 2012] from the internet: http://www.youtube.com/watch?v+6g_1g8IRG4&feature= player_embed-ded> entire document.
International Search Report mailed Oct. 5, 2012 for Intl. Appln. No. PCT/US2012/045545.
Anonymous, "instaVIN to offer free auto accident history reports for mobile phones," Wireless News, Jun. 2, 2010.



Fig. 1



Fig. 2



Fig. 3



Start
400
402
Automobile market data including at least pricing data and inventory data is stored in a database system (e.g., data from dealers, consumers, and manufacturers, regarding pricing, lot inventory, turnover rates, transport costs, and quality, safety, and other ratings is collected and stored in a database)
404
A request for a response regarding an automobile is received from a consumer (e.g., a car buyer fills in a request form on a website or takes a picture of a VIN at a dealer to receive a response based on current market data)
406
Automobile market data is provided to dealers based on the consumer request (e.g., a group of dealers receives a real-time report including local car sales data, inventory data, ratings data, and transport cost data of the subject car)
408
A bid to sell the automobile to the consumer is requested from dealers (e.g., a group of dealers within a certain radius of the buyer receive a bid request)
410
Dealer bids are provided to the consumer (e.g., several dealers provide bids based on current pricing data, dealer pickup locations, and potential add-ons, so several different prices and delivery options may be available to the car buyer)
412
The consumer selects a bid including a delivery option which specifies a pickup location (e.g., the car buyer chooses to pickup at a nearby dealer in five days)
414
The dealer provides the automobile at the dealer according to the consumer bid selection (e.g., the dealer notifies a commonly owned dealer that the car must be transported to the dealer pickup location for delivery in less than five days)
416
The consumer and dealer execute the sale of the automobile (e.g., the car buyer e-signs a loan application and contract, and electronically transfers funds)
Fig. 4B

Fig. 4A



Fig. 4A

— 400

— 418

The dealer makes the purchased automobile available according to the consumer bid selection (e.g., the dealer transports the car from the commonly owned dealer location to the dealer pickup location selected by the car buyer if the car is not already located at the dealer pickup location)

— 420

The consumer picks up the purchased automobile according to the consumer selected delivery option at the dealer (e.g., the car buyer picks up the car at the nearby dealer five days after the car sale is executed)

Fig. 4B



Fig. 5



Fig. 6

US 9,626,704 B2

1

## AUTOMOBILE TRANSACTION FACILITATION BASED ON A CUSTOMER SELECTION OF A SPECIFIC AUTOMOBILE

### PRIORITY CLAIM AND CROSS REFERENCE TO RELATED APPLICATIONS

This application is a continuation of U.S. patent application Ser. No. 14/293,665, filed Jun. 2, 2014, which is a continuation of U.S. patent application Ser. No. 13/176,525, filed on Jul. 5, 2011, which is related to the commonly-owned patent application, also filed on Jul. 5, 2011, entitled "AUTOMOBILE TRANSACTION FACILITATION USING A MANUFACTURER RESPONSE," U.S. application Ser. No. 13/176,497, the entire content of each of which is incorporated by reference herein.

### BACKGROUND

In the automobile industry, consumers typically purchase automobiles from dealers or dealerships. Dealers often purchase new automobiles from several manufacturers, to sell to consumers. Consumers typically negotiate a lower price than the manufacturer suggested retail price typically referred to as the "sticker price" and/or the price the dealer initially offers. In many cases, the negotiation process for an automobile may include a large degree of uncertainty for the consumer. Generally, the negotiation process is a zero sum process, and because the consumer and the dealer are each trying to get a better deal, there is typically some lack of trust during the negotiation. Accordingly, both dealers and consumers often base the negotiations on established market prices. However, market prices can fluctuate rapidly depending a variety of factors. For example, consumer demand may be affected by economic factors, such as changes in gasoline prices, unemployment rates, government sponsored tax rebates for automobile purchases, etc.

In many cases, a consumer may have concerns that a dealer may not offer a fair and competitive price. Various products and services have become available that allow consumers to perform research on market prices for automobiles. Similarly, dealers negotiating an automobile sale generally do not know the maximum price a consumer will be willing to pay for a particular automobile, or how long it will take to sell an automobile in inventory for a given price. Accordingly, dealers also use products and services for determining and/or tracking market prices. Further, automobile manufacturers may also have an interest in the market prices for automobiles, because the market activity captured as automobile market information may allow the manufacturer to, for example, more profitably determine which automobiles to manufacture, what prices the manufacture should offer to dealers, and whether manufacturer incentives should be offered on existing dealer automobile inventory.

### SUMMARY

The present disclosure provides a new and innovative system, methods and apparatus for providing automobile market information and performing automobile transactions. In an example embodiment, automobile market data representative of recent automobile market characteristics is stored. The automobile market data may include pricing, inventory, and consumer interest information received from dealers, manufacturers, and consumers. A consumer may provide a request for a response regarding a specific automobile using an image of a vehicle identification number or a graphical user interface. Automobile market data may be provided to a dealer based on the request. Bids to sell the specific automobile may be requested from dealers based on the request. Dealer bids may be provided to the consumer with prices and a delivery options. The consumer may select a bid which specifies a pickup location at a particular dealer.

Additional features and advantages of the disclosed method and apparatus are described in, and will be apparent from, the following Detailed Description and the Figures.

### BRIEF DESCRIPTION OF THE FIGURES

FIG. **1** is a high level block diagram of an example network communicating system, according to an example embodiment of the present invention.

FIG. **2** is a detailed block diagram showing an example of a computing device, according to an example embodiment of the present invention.

FIG. **3** is a block diagram showing an example automobile transaction network structure, according to an example embodiment of the present invention.

FIGS. **4**A and **4**B include a flowchart illustrating an example process for facilitating an automobile transaction, according to an example embodiment of the present invention.

FIG. **5** is a block diagram showing an example data architecture, according to an example embodiment of the present invention.

FIG. **6** is flow diagram illustrating an example process for facilitating an automobile transaction, according to an example embodiment of the present invention.

### DETAILED DESCRIPTION OF EXAMPLE EMBODIMENTS

The present disclosure relates in general to a system for facilitating automobile transactions and, in particular, to automobile transaction based on a consumer selection of a specific automobile. Briefly, in an example embodiment, a system is provided which allows a consumer to request information regarding a specific car including dealer bids. For example, a consumer may use a mobile device to take a picture of a vehicle identification number. The specific vehicle may be identified using optical character recognition to request real-time information on that automobile. Dealers may provide bids based on the consumer request using real-time automobile market information, including intra-brand bids and interbrand bids. A consumer may select a dealer bid to purchase or lease an automobile based on the prices and delivery options available. Also, the presently disclosed system may advantageously allow for inventory-less bidding by dealers. For example, a dealer that does not have an automobile in its inventory (e.g., on the dealer lot) can make a bid to sell that automobile, and then have that automobile produced by a manufacturer or transported to the dealer lot. In a non-limiting example embodiment, certain features disclosed in the present patent application may be commercially embodied in products and services offered by Sidekick Technology LLC, the assignee of the present application.

The present system may be readily realized in a network communications system. A high level block diagram of an example network communications system **100** is illustrated in FIG. **1**. The illustrated system **100** includes one or more client devices **102**, and one or more host devices **104**. The system **100** may include a variety of client devices **102**, such as desktop computers and the like, which typically include

US 9,626,704 B2

3

a display **112**, which is a user display for providing information to users **114**, and various interface elements as will be discussed in further detail below. A client device **102** may be a mobile device **103**, which may be a cellular phone, a personal digital assistant, a laptop computer, a tablet computer, etc. The client devices **102** may communicate with the host device **104** via a connection to one or more communications channels **106** such as the Internet or some other data network, including, but not limited to, any suitable wide area network or local area network. It should be appreciated that any of the devices described herein may be directly connected to each other instead of over a network. Typically, one or more servers **108** may be part of the network communications system **100**, and may communicate with host servers **104** and client devices **102**.

One host device **104** may interact with a large number of users **114** at a plurality of different client devices **102**. Accordingly, each host device **104** is typically a high end computer with a large storage capacity, one or more fast microprocessors, and one or more high speed network connections. Conversely, relative to a typical host device **104**, each client device **102** typically includes less storage capacity, a single microprocessor, and a single network connection. It should be appreciated that a user **114** as described herein may include any person or entity which uses the presently disclosed system and may include a wide variety of parties. For example, as will be discussed in further detail below, users **114** of the presently disclosed system may include a consumer, a dealer, and/or a manufacturer.

Typically, host devices **104** and servers **108** store one or more of a plurality of files, programs, databases, and/or web pages in one or more memories for use by the client devices **102**, and/or other host devices **104** or servers **108**. A host device **104** or server **108** may be configured according to its particular operating system, applications, memory, hardware, etc., and may provide various options for managing the execution of the programs and applications, as well as various administrative tasks. A host device **104** or server may interact via one or more networks with one or more other host devices **104** or servers **108**, which may be operated independently. For example, host devices **104** and servers **108** operated by a separate and distinct entities may interact together according to some agreed upon protocol.

A detailed block diagram of the electrical systems of an example computing device (e.g., a client device **102**, and a host device **104**) is illustrated in FIG. **2**. In this example, the computing device **102**, **104** includes a main unit **202** which preferably includes one or more processors **204** electrically coupled by an address/data bus **206** to one or more memory devices **208**, other computer circuitry **210**, and one or more interface circuits **212**. The processor **204** may be any suitable processor, such as a microprocessor from the INTEL PENTIUM® family of microprocessors. The memory **208** preferably includes volatile memory and non-volatile memory. Preferably, the memory **208** stores a software program that interacts with the other devices in the system **100** as described below. This program may be executed by the processor **204** in any suitable manner. In an example embodiment, memory **208** may be part of a "cloud" such that cloud computing may be utilized by a computing devices **102**, **104**. The memory **208** may also store digital data indicative of documents, files, programs, web pages, etc. retrieved from a computing device **102**, **104** and/or loaded via an input device **214**.

The interface circuit **212** may be implemented using any suitable interface standard, such as an Ethernet interface

4

and/or a Universal Serial Bus (USB) interface. One or more input devices **214** may be connected to the interface circuit **212** for entering data and commands into the main unit **202**. For example, the input device **214** may be a keyboard, mouse, touch screen, track pad, track ball, isopoint, image sensor, character recognition, barcode scanner, and/or a voice recognition system.

One or more displays **112**, printers, speakers, and/or other output devices **216** may also be connected to the main unit **202** via the interface circuit **212**. The display **112** may be a cathode ray tube (CRTs), a liquid crystal display (LCD), or any other type of display. The display **112** generates visual displays generated during operation of the computing device **102**, **104**. For example, the display **112** may provide a user interface, which will be described in further detail below, and may display one or more web pages received from a computing device **102**, **104**. A user interface may include prompts for human input from a user **114** including links, buttons, tabs, checkboxes, thumbnails, text fields, drop down boxes, etc., and may provide various outputs in response to the user inputs, such as text, still images, videos, audio, and animations.

One or more storage devices **218** may also be connected to the main unit **202** via the interface circuit **212**. For example, a hard drive, CD drive, DVD drive, and/or other storage devices may be connected to the main unit **202**. The storage devices **218** may store any type of data, such as pricing data, transaction data, operations data, inventory data, commission data, manufacturing data, image data, video data, audio data, tagging data, historical access or usage data, statistical data, security data, etc., which may be used by the computing device **102**, **104**.

The computing device **102**, **104** may also exchange data with other network devices **220** via a connection to the network **106**. Network devices **220** may include one or more servers **226**, which may be used to store certain types of data, and particularly large volumes of data which may be stored in one or more data repository **222**. A server **226** may include any kind of data **224** including databases, programs, files, libraries, pricing data, transaction data, operations data, inventory data, commission data, manufacturing data, configuration data, index or tagging data, historical access or usage data, statistical data, security data, etc. A server **226** may store and operate various applications relating to receiving, transmitting, processing, and storing the large volumes of data. It should be appreciated that various configurations of one or more servers **226** may be used to support and maintain the system **100**. For example, servers **226** may be operated by various different entities, including automobile manufacturers, brokerage services, automobile information services, etc. Also, certain data may be stored in a client device **102** which is also stored on the server **226**, either temporarily or permanently, for example in memory **208** or storage device **218**. The network connection may be any type of network connection, such as an Ethernet connection, digital subscriber line (DSL), telephone line, coaxial cable, wireless connection, etc.

Access to a computing device **102**, **104** can be controlled by appropriate security software or security measures. An individual users' **114** access can be defined by the computing device **102**, **104** and limited to certain data and/or actions. Accordingly, users **114** of the system **100** may be required to register with one or more computing devices **102**, **104**. For example, registered users **114** may be able to request or manipulate data, such as submitting requests for pricing information or providing an offer or a bid.

US 9,626,704 B2

5

As noted previously, various options for managing data located within the computing device 102, 104 and/or in a server 226 may be implemented. A management system may manage security of data and accomplish various tasks such as facilitating a data backup process. A management system may be implemented in a client 102, a host device 104, and a server 226. The management system may update, store, and back up data locally and/or remotely. A management system may remotely store data using any suitable method of data transmission, such as via the Internet and/or other networks 106.

FIG. 3 is a block diagram showing an example automobile transaction network structure 300 which includes an automobile market information processing system 302, a consumer interface 304, a dealer interface 306, and a manufacturer interface 308. The example automobile market information processing system 302 may be implemented on one or more host devices 104 accessing one or more servers 108, 226. In an example embodiment, the automobile market information processing system 302 includes a database system 310, a recommendation engine 312, a vehicle identification number processor 314, and an interface generation unit 316. A user 114 may be a consumer, a dealer, or a manufacturer that interacts with the consumer interface 304, dealer interface 306, or manufacturer interface 308, respectively. A database system 310 may include a wide variety of automobile market data. A recommendation engine 312 may provide recommendations for consumers, dealers, and manufacturers. A vehicle identification number processor 314 may be used for making requests regarding specific automobiles and automobiles with specific sets of features. For example, a vehicle identification number processor 314 may determine a specific set of features that a specific car has based on a picture of that specific car's vehicle identification number. Interface generation unit 316 may provide, for example, HTML files which are used at the consumer interface 304, dealer interface 306, and manufacturer interface 308 interface to provide information to the users 114. It should be appreciated that he the consumer interface 304, dealer interface 306, and manufacturer interface 308 may be considered to be part of the automobile market information processing system 302, however, for discussion purposes, the consumer interface 304, dealer interface 306, and manufacturer interface 308 may be referred to as separate from the automobile market information processing system 302.

For example, a user 114 may interact with a consumer interface 304 to research automobiles the user 114 is interested in buying. For example, a consumer may be looking for a four door sedan with specific features, including a global positioning system (GPS), a sunroof, tinted windows, rated for at least thirty miles per gallon, four wheel drive, etc. The consumer may interact with the consumer interface 304 by inputting required and/or desired features, monthly budget or full price, etc. The consumer interface 304 may provide a wide variety of features and specifications which the consumer may choose from in providing a request. Based on the information put into the consumer interface 304 from the consumer, the consumer interface 304 may provide one or more reports or offers to the consumer. As will be discussed in further detail below, the information provided by the consumer interface 304 may include current market prices for automobiles, including information relating to additional features, and may include information on specific automobiles, for example, which may be en route to a dealer near the consumer's present location. The automobile market information processing system 302 may process data received by the consumer interface 304, as well as the

6

dealer interface 306 and/or the manufacturer interface 308, to respond to a request from a consumer. For example, data from database system 310 may be queried for use in a report, or a recommendation may be provided by recommendation engine 312 according to the consumer request and current market data. The automobile market information processing system 302 may integrate data received from consumer interface 304, dealer interface 306, and manufacturer interface 308 to provide current and accurate information relating to the automobile market.

It should be appreciated that the consumer interface 304 may be specific to one particular manufacturer or may provide information for multiple different manufacturers. For example, a consumer interface 304 may be a website with information on many manufacturers, and further, the consumer interface 304 may access or link to the manufacturer specific websites (e.g., Ford). Also, for example, a consumer interface 304 may be implemented as an automobile manufacturer's website. Typically, a manufacturer's website may provide consumers with a catalog like feature that provides information on different automobile models with any available options or features. For example, a manufacturer website may allow a consumer to select options that are desired to "build" a particular automobile, and may provide price comparisons using suggested retail prices, which may consumers use for initial research into what pricing the dealer may offer for a particular automobile with a particular feature set. Also, typically, the consumer may enter information, including, for example, name, an address or zip code, and telephone number. This information may be passed on from the manufacturer to a nearby dealer and/or nearby dealer information may be provided to the consumer (e.g., the dealer in or nearest to the consumer's entered zip code). Accordingly, the dealer may contact the consumer, or the consumer may inquire with the dealer, regarding the specific automobiles available on that dealer's lot and particular pricing being offered, etc. In many cases, consumers may not inquire with dealers that the manufacturer may recommend, and similarly, dealers may not diligently follow up with consumers that have an interest in purchasing an automobile. Further, it should be appreciated that the information provided via a consumer interface 304 and/or a manufacturer website may be very useful to consumers. For example, in the past, dealers often provided brochures with all the information on a manufacturer's available car models, including all the features and options information. However, dealers typically do not provide comprehensive information brochures, which may be relatively expensive to produce, and rather, that information is typically located on a manufacturer website and/or a consumer interface 304.

Accordingly, the consumer interface 304 may provide a wide range of information, for example, based on any searches or queries performed by a user 114. In an example embodiment, based on a user search or request for a response, the consumer interface 304 will display a quality index or value index based on normalized calculations for an automobile. The recommendation engine 312 may provide recommendations to a consumer based on the current automobile market data stored in the automobile market information processing system 302. For example, metrics on gas mileage, emissions, operating and maintenance costs, safety ratings, etc. may be benchmarked against comparable automobiles of the same and different manufacturers. Similar purchase options to a specific search may also be provided, based on feature matching, price range, consumer popularity, etc. Information including price ranges, including

7 8

MSRP, invoice prices, inventory levels, the user's **114** credit ratings (e.g., FICO score), may be provided which may include monthly payment estimates or projections. For example, a financing calculator may help a user **114** determine what financing rate is appropriate. It should be appreciated that dealers may mislead consumers into believing that a higher financing rate will be required to secure a loan. Further, for example, a lease vs. buy calculator may be provided which may use current market data including prices, interest rates, incentives, estimated mileage per year, etc. for providing an analysis for a particular consumer regarding purchasing or leasing. Also, the consumer interface **304** may provide a purchase checklist, for example, of ten steps to buying a car. A qualitative checklist may allow a user to ask the right questions and get the right answers from a dealer. Additional tips may be provided, such as a list of products or services dealers may attempt to sell to a consumer with an analysis of the value of these products or services and a recommendation to accept or decline these dealer offers. Further, beyond analysis relating to automobiles, additional analysis or reports may be provided, for example, relating to dealer reviews, other supplemental products, financial entities that may provide financing, etc. For example, dealer reviews may provide a consumer with information the consumer may use in addition to automobile pricing and delivery options. Moreover, the consumer interface **304** may provide a wide variety of useful information to a consumer, for at home research and preparation, and/or in a dealer location while shopping as a negotiating tool that may provide confirmation on pricing, useful tips, and the like.

In an example embodiment, a dealer interface **306** may provide a user **114**, such as a dealer employee, information relating to the current automobile market. The dealer interface **306** allows a dealer to interact with automobile market information processing system **302** to provide the dealer with a wide variety of information, including, for example, current market pricing. Other automobile market information a dealer may receive on a dealer interface **306** includes information relating to lot inventory, turnover rates, automobile transportation and/or shipping costs, incentives, and various ratings, such as ratings relating to quality, safety, insurance, a consumer credit score, dealer ratings, residual or resale values, etc. A dealer may input information into dealer interface **306** relating to sales data, including current pricing offered, special sales offers, actual transaction data, inventory data, etc. In an example embodiment, the dealer may provide information through dealer interface **306** which will be used by automobile market information processing system **302** to prepare reports or offers to consumers and/or manufacturers. It should be appreciated that a dealer is typically a franchise entity, while a distribution location may not be a franchise entity. For brevity, throughout this specification, the term dealer may be used to describe both franchise entity dealers and non-franchise entity distribution location. Accordingly, as used in this disclosure, the term dealer does not indicate whether an entity is a franchise entity. Moreover, a franchise dealer or a non-franchise distribution location may utilize a dealer interface **306** as described herein.

In an example embodiment, a manufacturer interface **308** may provide a user **114**, such as a manufacturer employee, information relating to the current automobile market, including consumer requests. For example, an manufacturer interface **308** may provide a manufacturer a request received from a consumer interface **304**. Additionally, the manufacturer interface **308** may provide information such as a report

that allows the manufacturer to provide a response to the requesting consumer. A report may include information from database system **310** relating to current market pricing, recent sales figures and trends, current manufacturer incentives, current inventory, including dealer inventory, inventory in transit, and/or build times or lead times for a desired automobile, etc. The manufacturer may use this information to provide a response to a consumer request. The manufacturer may provide the manufacturer interface **308** with information to provide a confirmation, a verification, or an offer to a consumer via consumer interface **304**. For example, a confirmation number associated with the particular consumer request may be provided for the consumer. Also, a recommendation may be provided from the recommendation engine **312** to the manufacturer in relation to automobile pricing, responding to a specific request, manufacturer incentives, inventory management, production schedules, shipping schedules, etc. It should be appreciated that a manufacturer may be referred to as an OEM or original equipment manufacturer. The manufacturer interface **308** may provide a manufacturer with a real-time lens into the automobile market which may allow the manufacturer to adjust production schedules, pricing plans, marketing activities, etc., which may provide a significant advantage for manufacturers.

Accordingly, information may be provided to the automobile market information processing system **302** from consumers, dealers, and manufacturers with a very high degree of granularity, as every transaction that occurs and even every request or search may be stored and used by the automobile market information processing system **302**. This allows the automobile market information processing system **302** to use the most current automobile market data to provide information to consumers, dealers, and manufacturers. It should be appreciated that market prices can change relatively quickly, particularly when major events drive consumer behavior or manufacturer production, such as natural disasters. Accordingly, reports and recommendations provided by the automobile market information processing system **302** may be highly accurate, reliable, and sensitive to market changes.

It should be appreciated that certain functions described as performed, for example, at automobile market information processing system **302**, may instead be performed locally at consumer interface **304**, dealer interface **306**, and manufacturer interface **308**, or vice versa. Further, in certain cases, tasks may be performed using consumer interface **304**, dealer interface **306**, and manufacturer interface **308** or, for example, performed in person, such as a consumer signing documents at a dealer location, or a dealer communicating with a manufacturer using a telephone. It should be appreciated that the consumer interface **304**, dealer interface **306**, and manufacturer interface **308** may be implemented, for example, in a web browser using an HTML file received from the automobile market information processing system **302**. In an example embodiment, the consumer interface **304**, dealer interface **306**, and manufacturer interface **308** may be located on a website, and may further be implemented as a secure website. Also, consumer interface **304**, dealer interface **306**, and manufacturer interface **308** may require a local application, for example, which a manufacturer may pay for to have access to, for example, information from the automobile market information processing system **302** such as requests from consumers.

FIGS. **4A** and **4B** include a flowchart of an example process **400** for facilitating an automobile transaction. Although the process **400** is described with reference to the

**9**

flowchart illustrated in FIGS. **4**A and **4**B, it will be appreciated that many other methods of performing the acts associated with the process **400** may be used. For example, the order of many of the blocks may be changed, certain blocks may be combined with other blocks, and many of the blocks described are optional.

The example process **400** for facilitating an automobile transaction may allow users **114**, including dealers and consumers, as well as manufacturers, to efficiently sell and purchase automobiles, respectively. The example process **400** may begin with automobile market data including at least pricing data and inventory data stored in a database system (block **402**). For example, automobile market data from dealers, consumers, and manufacturers regarding pricing, lot inventory, turnover rates, transport costs, and quality, safety, and/or other ratings is collected and stored in a database. In an example embodiment, a wide variety of data is stored in a database system **310**. For example, transport costs may include manufacturer to dealer shipping costs and/or dealer to dealer costs for shipping or transporting an automobile (e.g., a dealer with multiple locations may drive automobiles between locations if necessary). Automobile market data may include various relevant ratings, reports, awards, or other information, including quality information, safety information, insurance information, consumer credit information, dealer rating information, incentive information, residual value information, and/or any other data which may be relevant to consumers. For example, ratings data may include information from the National Highway Traffic Safety Administration (NHTSA), the Environmental Protection Agency (EPA), and/or the Insurance Institute for Highway Safety (IIHS). The data may include information from a consumer interface **304**, such as data in consumer searches or requests, information from a dealer interface **306**, such as currently offered dealer pricing, transaction data for finalized sales, current inventory data, transport or shipping costs, and information from a manufacturer interface **308**, such as current manufacturer prices and suggested pricing, manufacturer incentives, and current inventory including finished inventory on hand, production scheduling, shipment scheduling, inventory in transit, and manufacturing lead times. The automobile market data may be comprised solely of information received from the consumer interface **304**, dealer interface **306**, and manufacturer interface **308**, or may include additional information received from other sources. It should be appreciated that various methods of storing the automobile market data may be employed according to the system requirements. For example, database system **310** may be organized according to different manufacturers or dealers, automobile make and model, different information categories (e.g., suggested pricing, market prices, production, shipping, lot inventory), etc., and may consist of one or more databases on one or more servers **108**, **226** which may be remotely located from each other and/or a host device **104** of the automobile market information processing system **302**. As will be discussed further below, the automobile market data may be continually updated as new data is provided to the automobile market information processing system **302**.

The example process **400** continues with a consumer providing a request for a response of whether an automobile can be provided (block **404**). For example, a car buyer fills in a request form on a website or takes a picture of a VIN at a dealer to receive a response based on current market data. In an example embodiment, the buyer's request may be transmitted from consumer interface **304** via the internet to the automobile market information processing system **302**.

**10**

In another example embodiment, a car buyer takes a picture of a vehicle identification number (VIN) on a car that the buyer would like to receive information for. For example, using an application stored on a mobile device **103**, the buyer may be located at a dealer location and take a picture of the VIN on a car. The buyer may want information on that specific car or on other comparable cars with the same or similar features and/or options. The picture of the VIN may be processed using optical character recognition, which allows the automobile market information processing system **302** to determine the make and model of the car, along with various other characteristics of the car. It should be appreciated that the VIN may include human readable characters, a bar code, or any other graphical or machine readable information which acts as a vehicle identification number. Accordingly, the buyer may perform research, for example, while at home or while shopping at a dealer location. Further, for example, the buyer may take a picture of a VIN anywhere, including at automobile trade shows, mall displays, or anywhere new cars or cars for sale are displayed. The buyer may even take a picture of a car parked in the street as the buyer walks down the street. Any request or query communicated from the consumer interface **304** may be stored, for example, in database system **310**, thereby updating the automobile market information processing system **302** with current automobile market data.

The example process **400** may continue with providing automobile market data to dealers based on the consumer request (block **406**). For example, a group of dealers receives a real-time report including local car sales data, inventory data, ratings data, and transport cost data of the consumer's requested car. In an example embodiment, a report may include quality information, safety information, insurance information, consumer credit information (e.g., buyer FICO score), dealer rating information, incentive information, residual value information, and/or any other data which may be relevant to consumers. The report may be provided through dealer interface **306** and include the consumer requirements and preferences. The request and/or report may be provided in real-time and may provide real-time data. Data reported based on a real-time updates in the automobile market information processing system **302** may provide significant advantages, for example, when pricing conditions may change quickly due to unforeseen market conditions. The recommendation engine **312** may provide recommendations to a dealer based on the current automobile market data. For example, a report may indicate various estimated sales probabilities for different prices that the dealer may offer or bid. In an example embodiment, a probability to sell within a time frame may be provided, for example, for a 24 hour period, probabilities and prices may be estimated as, e.g., 80% chance to sell at $22,000; 60% chance to sell at $23,000; 50% chance to sell at $24,000; 20% chance to sell at $25,000. Such information may be illustrated in various ways, such as a bell curve graph or a chart. Further, the recommendation engine may provide daily suggestions (e.g., a deal of the day). Dealers may use such information to attract consumers to visit the dealer in person or online as well as prepare responses or bids to consumer requests. In an example embodiment the dealer interface **306** may provide information that is limited to cars which meet the consumer request requirements. Dealers may customize the dealer interface **306** to provide information in a pre-specified manner to suit the dealers particular needs.

A bid to sell the automobile to the consumer is requested from dealers (block **408**). For example, a group of dealers

US 9,626,704 B2

11

within a certain radius of the buyer location may receive a bid request. Each dealer's bid may include a price, for example, a price with no additional add-on products or services, such as service contracts, warranties, aftermarket accessories, etc. For example, add-on products may provide substantial value to a dealer, above and beyond the profit margin for the sale of the requested car. A dealer may profit from selling financing options, for example, if a consumer needs financing, the financier may pay the dealer for sourcing the loan. A dealer may sell service plans or maintenance packages (e.g., an extended service contract), selling warranties (e.g., a lifetime warranty), or selling insurance plans (e.g., life, accident, and health insurance, liability insurance, comprehensive insurance, etc.). Also, a dealer may also sell various hard add accessories, for example, bicycle racks, hitches, commercial accessories (e.g., lights and sirens), or any aftermarket products or modifications (e.g., sunroof).

One or more dealer bids are provided to the consumer (block **410**). For example, several dealers provide bids based on current pricing data, dealer pickup locations, and potential add-ons, so several different prices and delivery options may be available to the car buyer. Typically, the bid will include at least a specified price and pickup time and location. In an example embodiment, a buyer that has taken a picture of a VIN with a mobile device may receive dealer bids within minutes or seconds on the mobile device. Accordingly, the bids may be used in real-time as the buyer may be actively shopping for a car on a dealer lot. Typically, a pickup location will be a dealer lot or distribution location. It should be appreciated that some dealers may have multiple locations which could serve as a pickup location. In an example embodiment, the automobile market data may indicate that the particular car requested by a consumer should be priced at, for example, $26,000. However, various factors may affect the bid or offer that a dealer will make for the particular car. For example, the potential for forming a customer relationship, the value of potential add-on products and services, or competition with other dealers may cause a dealer to bid lower than normal. In such a case, the dealer may bid $25,000 in an effort to create a customer relationship, sell add-on products, and/or undercut the competition pricing. Other factors, such as the buyer's credit score (e.g., FICO score), may be used by a dealer in determining a bid, as this may affect the profitability of a sale.

Further, for example, the particular automobile requested may not be available for immediate pickup near the buyer, and various alternative delivery options may be provided from several dealers' bids. For example, a car that is located at an out of state dealer may be transported to a dealer near the buyer. Therefore, for example, the consumer interface **304** may provide several different bids with different delivery options and prices to the buyer, for example, a price of $26,000 to pick up the car at an out of state dealer the next day or a price of $26,500 to pick up the car at a local dealer in five days. For example, a dealer may determine a cost to transport a car from one dealer location to another based on the automobile market data such as current market pricing, current inventory levels, current shipping costs, and the like. Accordingly, a dealer response may be adjusted by current automobile market conditions. An offer to provide or ship a particular car to a dealer location near a consumer may be authorized through the dealer interface **306**. Inventoryless bidding may be highly beneficial when dealers that do not have a requested automobile in inventory can still profitably provide a bid. Further, for example, cars that are not exactly what the buyer requested may also be offered to the buyer. For example, the buyer may request a four wheel drive car,

12

but if a two wheel drive car that meets all the other buyer criteria is immediately available at a nearby dealer, the dealer may provide an offer to the buyer for this car, possibly at a significantly lower price, such as $23,000 instead of $26,000 for a four wheel drive car as requested. Further, for example, dealers may use information such as ratings data to optimize their bids. For example, if gasoline prices are increasing, mileage ratings for a particular car may dictate increasing or decreasing a bid. If a vehicle has very good gas mileage, and gas prices are skyrocketing, that car may have an increasing demand as gas prices increase, or vice versa. Similarly, safety ratings of vehicles may be important to consumer demand if high profile problems have appeared for a particular automobile style, make, or model. As discussed above, various automobile market information may be used by a dealer including safety information, insurance information, consumer credit information, dealer rating information, incentive information, residual value information, and/or any other data which may be relevant to consumers.

The consumer interface **304** may organize dealer bids based on a variety of factors and may provide supplemental information. For example, certain dealer bids may be selected as the best options, all dealer bids may be summarized, various additional ratings, reviews, or popularity information, financing information, etc. may also be provided to a consumer along with any dealer bids. The recommendation engine **312** may provide recommendations to a consumer based on the current automobile market data. For example, of ten dealer bids provided with a response, three bids may be recommended, for example, as "Great Deals!" It should be appreciated that in some cases, a particular consumer search may not return any dealer bids, for example, if consumer search requirements are unrealistic for the consumer's required price range. Also, for example, if only one or two bids are received, the recommendation engine **312** may recommend that a consumer wait for a better bid because the bids provided are not competitive offers based on the current automobile market data stored in the database system **310**. Further, in an example embodiment, dealer bids may be organized according to distance to a dealer pickup location, lowest price, closest match to the consumer entered criteria, a normalized quality index or value index, etc. The consumer may be able to toggle between different viewing options for dealer bids or search results.

Further, in an example embodiment, a buyer may be at a dealer lot (e.g., a Nissan dealer) and take a picture of a VIN on a car (e.g., a Maxima). A bid from a competing dealer (e.g., a Toyota dealer) across the street may be received on the mobile device within seconds and include information for a comparable car (e.g., an Avalon) relating to, for example, gas mileage, safety ratings, price comparisons, residual value, driving directions to the competing dealer, etc. In an example embodiment, a dealer may use the geolocation of the buyer, such as in instances when the buyer is physically located close to the dealer. Accordingly, competing dealer bids may be interbrand or intrabrand in nature, and may be tailored to the buyer's particular situation, which a consumer may find highly advantageous. For example, the buyer may have a bid for a car the buyer wants to test drive as well as a bid for a comparable car across the street before a salesman from the dealer even introduces himself. Accordingly, a consumer may weigh the pros and cons of various dealer bids, based on delivery options, pricing, and any other relevant variants. Any bids communicated from a dealer interface **306** may be stored, for example, in database system

US 9,626,704 B2

13 | 14

310, to further update the automobile market information processing system 302 with current automobile market data.

The consumer selects a bid including a delivery option which specifies a pickup location (block 412). For example, the car buyer chooses a delivery option of picking up the car at a nearby dealer in five days. As noted above, a dealer may be a franchise dealer entity or a non-franchise distribution location. The buyer may select an offer with a specified delivery option on the consumer interface 304. The car buyer may have been weighing two or more different delivery options and/or different features, price differences, etc., based on the response(s) received through the consumer interface 304. As noted above, the consumer interface may organize bids and other helpful information in a variety of ways, which may make the information easier for a consumer to digest. It should be appreciated that a buyer will typically want to pick up a new car at a convenient location, often near the buyer's home. Accordingly, dealers may attempt to provide delivery options tailored towards maximizing profit for the dealer while also maximizing convenience to the buyer, while also providing a superior bid to other dealers. By providing multiple bids with different delivery options, the buyer may be allowed to save time or money based on the buyer's particular needs. In an example embodiment, the buyer may provide a counter offer or different request via the consumer interface 304 to a dealer via the dealer interface 306. Accordingly, the dealer may respond in kind, and may update delivery options or other terms. It should be appreciated that the consumer selection of a bid may, for example, occur simultaneously with the consumer executing the sale or providing a deposit or down payment, or the like (see, e.g., block 416). Accordingly, in an example embodiment, once the buyer selects a bid, the buyer has effectively purchased the car, and the dealer does need to worry about the buyer backing out of the deal. Any consumer selections, counter offers, or additional requests or responses may be stored in database system 310, as the communications are processed by automobile market information processing system 302, providing further data updates. Accordingly, in an example embodiment, a consumer may select a bid to purchase a car, and that purchase information may then be provided to another consumer searching for the same type of car with similar features, for example, the next day.

Once a bid with a specific delivery option has been selected, the dealer provides the automobile at the selected dealer according to the consumer bid selection (block 414). For example, the dealer notifies a commonly owned dealer that the car must be transported to the dealer pickup location for delivery in less than five days. In a typical example, the dealer may already have the car in question on the dealer lot, so the car would not need to be transported. In an example embodiment, the dealer may send a notification or instruction message through the dealer interface 306, which would be received by a commonly owned dealer in another city or state. It should be appreciated that the specific manner of notification or instruction may be changed based on the particular application, for example, the automobile market information processing system 302 may automatically provide a notification or instruction to a dealer to produce or transport a car based on inventory data. It should also be appreciated that particular events may be required to trigger instructing a car to be delivered to a dealer, such as a deposit, financing approval, etc. Further, the consumer may be required to send an instruction message from the consumer interface 304 to the dealer interface 306 affirming that the buyer has agreed to purchase the car from the dealer.

The consumer and the dealer execute the sale of the automobile (block 416). For example, the consumer electronically signs documentation such as loan application and a contract and performs an electronic funds transfer or credit card payment. After the delivery option is selected, an electronic contract may be provided by the dealer for the buyer who may e-sign the contract, and/or any other loan applications or other documentation as needed. In another example embodiment, paper copies of a contract may be signed, for example, after the buyer prints them or receives them from a nearby dealer or through the mail. In an example embodiment, the buyer may provide cash or a paper check. It should be appreciated that the process of executing a contract may take some time. For example, the process may occur in several steps, as loan processing may be required prior to executing a contract for sale of a car. Also, it should be appreciated that, for example, the consumer selection of a bid discussed above (see, e.g., block 412) may occur simultaneously with the consumer executing the sale. Once the sale is completed, the actual transaction data including the final negotiated price, may be provided to and stored in database system 310. Accordingly, the automobile market information processing system 302 may be updated with current automobile market data from every step in the negotiation process between a consumer and a manufacturer. In an example embodiment, the updates provided to the automobile market information processing system 302 are provided in real-time, for example, data may be transmitted and processed within seconds or minutes. Further, for example, it should be appreciated that certain data may be provided to the automobile market information processing system 302 according to a batch processing schedule.

Next, the dealer makes the purchased automobile available according to the consumer bid selection (block 418). For example, the dealer transports the car from the commonly owned dealer location to the dealer pickup location selected by the car buyer if the car is not already located at the dealer pickup location. When a purchased car is already at the dealer location where the buyer has agreed to pick the car up, the car does not need to be transported. Many dealers have multiple locations under the same ownership, and these dealers may drive or ship cars from one dealer location to another if the cost of transporting the car is justifiable. If a buyer chooses a quicker delivery option, the car may then be transported from a different dealer location to the selected dealer pickup location. A dealer may interact with the automobile market information processing system 302 using dealer interface 306, for example, to receive notification that a car will be picked up by a buyer, and to report that a car has been delivered to the dealer pickup location. A notification may also be sent via consumer interface 304 to the buyer that the car is available for pickup at the specified dealer.

Finally, the consumer picks up the purchased automobile according to the consumer selected delivery option at the dealer (block 420). For example, the car buyer picks up the car at the nearby dealer five days after the car sale is executed. The buyer may pick up the car without ever having to talk to or negotiate, in person or over the telephone, with the dealer. For example, the buyer may arrive at the dealer, show identification and proof of purchase, and be provided the keys to the car. The buyer may sign paperwork indicating the car has been picked up. Also, the dealer may offer or provide additional products or services to the buyer when the buyer goes to the dealer to pick up the car. For example, the dealer may offer financing options, warranties, service

US 9,626,704 B2

15

plans, insurance plans, and hard add accessories to the buyer, as discussed in further detail above.

Accordingly, it should be appreciated that consumers, dealers, and manufacturers may receive significant benefits from the method of facilitating an automobile transaction disclosed herein. For example, price setting, inventory management, and production scheduling, may be greatly improved for dealers and manufacturers by utilizing the disclosed system and method. Consumers may benefit from more competitive pricing, piece of mind knowing that a fair market price is being offered for prospective purchases, and improved delivery options that allow the consumer to weigh the benefits and drawbacks of different delivery options, pricing, and other variables. In an example embodiment, consumers can view prices paid for comparable cars in specific locations based on the automobile market data in the automobile market information processing system **302**, for example, within a certain time frame such as one month and within a certain proximity to the consumer. Moreover, various inefficiencies in the automobile industry may be minimized utilizing the presently disclosed system and method.

FIG. **5** illustrates a block diagram of an example data architecture **500**. In the example data architecture **500**, interface data **502**, administrative data **504**, and automobile market data **506** interact with each other, for example, based on user commands or requests. The interface data **502**, administrative data **504**, and automobile market data **506** may be stored on any suitable storage medium (e.g., server **226**). It should be appreciated that different types of data may use different data formats, storage mechanisms, etc. Further, various applications may be associated with processing interface data **502**, administrative data **504**, and automobile market data **506**. Various other or different types of data may be included in the example data architecture **500**.

Interface data **502** may include input and output data of various kinds. For example, input data may include mouse click data, scrolling data, hover data, keyboard data, touch screen data, voice recognition data, etc., while output data may include image data, text data, video data, audio data, etc. Interface data **502** may include formatting, user interface options, links or access to other websites or applications, and the like. Interface data **502** may include applications used to provide or monitor interface activities and handle input and output data.

Administrative data **504** may include data and applications regarding user accounts. For example, administrative data **504** may include information used for updating accounts, such as creating or modifying manufacturer accounts or dealer accounts. Further, administrative data **504** may include access data and/or security data. Administrative data **504** may interact with interface data in various manners, providing a user interface **304**, **306**, **308** with administrative features, such as implementing a user login and the like.

Automobile market data **506** may include, for example, executed sales data **508**, consumer data **510**, dealer data **512**, manufacturer data **514**, statistical data **516**, and/or historical data **518**. Executed sales data **508** may include actual negotiated prices for manufacturer and dealer sales, differences in list prices to negotiated prices, sales demographics, etc. Consumer data **510** may include consumer search activity, consumer requests and offers, consumer feedback, etc. Dealer data **512** may include dealer pricing, including list prices, sale prices for limited time dealer offers or deals of the day, negotiation information such as bottom line pricing, offers received, foot traffic activity, and dealer inventory

16

data, including current on location data, automobile turnover rates, etc. Manufacturer data **514** may include manufacturer pricing, including suggested pricing, preferred dealer pricing, etc., manufacturer incentives including cash rebates, special lease rates, special APR rates, zero down offers, lifetime warranties, guaranteed trade-in offers, etc., and inventory information including dealer inventory, inventory by location, inventory in transit, manufacturing or production lead times or build times, production scheduling, shipping scheduling, etc. Statistical data **516** may include information used for providing reports including graphs, forecasts, recommendations, calculators, depreciation schedules, tax information, etc., including equations and other data used for statistical analysis. Historical data **508** may include past sales data, such as historical list prices, actual sale prices, manufacturer and dealer margins, operating costs, service costs or profitability, loyalty information, etc. It should be appreciated that data may fall under multiple categories of automobile market data **506**, or change with the passage of time. It should also be appreciated that automobile market data **506** may be tailored for a particular manufacturer or dealer, for example, a manufacturer may request that a specific type of data that is not normally stored or used be stored in the database system **310**. Accordingly, for example, customized reports may be provided to a manufacturer interface **308** using that specific data for the manufacturer.

The integration of the various types of automobile market data **506** received from the consumer interface **304**, dealer interface **306**, and manufacturer interface **308** may provide a synergistic and optimal resource for consumers, dealers, and manufacturers alike. In an example embodiment, a consumer may benefit greatly from using an application in a mobile device **103** to receive both intrabrand information and interbrand information in real-time, based only on taking a picture of VIN. Dealers and manufacturers may be able to provide information to the consumer in a manner that highlights the benefits of the products the respective dealer or manufacturer would like to sell. The intrabrand and interbrand information provided on a consumer interface **304** may allow the best automobile options for a particular consumer to be provided to that consumer, may allow dealers to compete with other dealers taking into account a greater amount of automobile market information, and may allow manufacturers to better follow through with opportunities for sales, which may result in a more efficient automobile market.

Automobile market data **506** may be maintained in various servers **108**, in databases or other files. It should be appreciated that, for example, a host device **104** may manipulate automobile market data **506** in accordance with the administrative data **504** and interface data **502** to provide requests or reports to users **114** including consumers, dealers, and manufacturers, and perform other associated tasks. It should also be appreciated that automobile market data **506** represents automobile market information, and that these terms may be used interchangeably in this disclosure depending upon the context.

FIG. **6** is flow diagram illustrating an example process **600** for facilitating an automobile transaction, according to an example embodiment of the present invention. Although the process **600** is described with reference to the flow diagram illustrated in FIG. **6**, it will be appreciated that many other methods of performing the acts associated with the process **600** may be used. For example, the order of

US 9,626,704 B2

17

many of the blocks may be changed, certain blocks may be combined with other blocks, and many of the blocks described are optional.

In the example process **600**, data may flow between the automobile market information processing system **302** and a consumer interface **304** and a dealer interface **306**, as discussed above based on consumer and dealer interaction with the automobile market information processing system **302**. It should be appreciated that the automobile market information processing system **302** may update the automobile market information stored in the database system **310** when automobile market information is received from a consumer, a dealer, or a manufacturer, or from any other information source. Accordingly, the automobile market information may remain current and/or provide sufficiently recent data for the benefit of consumers, dealers, and/or manufacturers.

The example process **600** may begin with a consumer taking a picture of a VIN using a mobile phone application (block **602**). The consumer interface **304** may use OCR to determine and provide the VIN to the automobile market information processing system **302** to provide a consumer request (block **604**). It should be appreciated that OCR may occur in the automobile market information processing system **302** or at the consumer interface **304**. The automobile market information processing system **302** receives the consumer request and prepares automobile market information based on the request (block **606**). The automobile market information processing system **302** may send a bid request and automobile market information based on the consumer request to the dealer interface **306** for one or more dealers (block **608**). It should be appreciated that while the consumer request is automobile market information, typically, additional automobile market information would be provided with the consumer request. For example, typically, data relating to recent sales of the requested automobile and/or comparable automobiles may be provided. In an example embodiment, a target price or "true" value of the requested automobile may be provided. One or more dealers receive the bid request and automobile market information, determine prices and delivery options for the automobile using the automobile market information, and prepare and provide bids for the consumer (block **610**). A dealer bid may be sent from the dealer interface **306** to the automobile market information processing system **302** for each dealer that wants to provide a bid (block **612**). The automobile market information processing system **302** receives and processes dealer bids and prepares the bids and automobile market data for the consumer (block **614**).

The automobile market information processing system **302** may send dealer bids and automobile market information to the consumer interface **304** (block **616**). It should be appreciated that automobile market information may be provided to the consumer before dealer bids are provided, and/or concurrently with dealer bids. The consumer may receive the dealer bids and automobile market information and may select a bid including a delivery option based on the automobile market information (block **618**). The consumer interface **304** may send to the automobile market information processing system **302** a selection of a bid indicating that the consumer wants to purchase or lease the automobile based on the selected bid (block **620**). The automobile market information processing system **302** receives and processes the consumer bid selection (block **622**). For example, the automobile market information processing system **302** may send the bid selection to the dealer interface **306** (block **624**). The dealer may receive the bid selection

18

and coordinate a sale by, for example, transporting the automobile from one dealer location to the dealer location selected for delivery (block **626**). Also, for example, the dealer may provide contract or loan documents, collect a deposit or down payment, or the like. As discussed above, in each of blocks **606**, **614**, **626**, and **634**, the automobile market information processing system **302** may update the automobile market information in the database system **310** based on the information received from the consumer, dealer, and/or manufacturer.

For exemplary purposes, the present disclosure discusses a various examples relating to a purchase of a car. However, it should be appreciated that the disclosed system, methods, and apparatus may be advantageously used in relation to various automobiles other than cars including, for example, trucks, vans, sport utility vehicles, jeeps, motorcycles, commercial vehicles, and/or automobiles that have a VIN and require a license plate to operate.

It will be appreciated that all of the disclosed methods and procedures described herein can be implemented using one or more computer programs or components. These components may be provided as a series of computer instructions on any conventional computer-readable medium, including RAM, ROM, flash memory, magnetic or optical disks, optical memory, or other storage media. The instructions may be configured to be executed by a processor, which when executing the series of computer instructions performs or facilitates the performance of all or part of the disclosed methods and procedures.

Further, it will be appreciated that the presently disclosed system, methods, and apparatus for performing automobile transactions may be utilized in conjunction with other systems or methods. For example, the presently disclosed system, methods, and apparatus may be used in conjunction with the disclosure in the co-pending commonly-owned patent application filed on Jul. 5, 2011, entitled "AUTOMOBILE TRANSACTION FACILITATION USING A MANUFACTURER RESPONSE," U.S. application Ser. No. 13/176,497, the entire contents of which are hereby incorporated by reference herein, and in an example embodiment, the features of which may be combined with the features of the present disclosure.

It should be understood that various changes and modifications to the example embodiments described herein will be apparent to those skilled in the art. Such changes and modifications can be made without departing from the spirit and scope of the present subject matter and without diminishing its intended advantages. It is therefore intended that such changes and modifications be covered by the appended claims.

The invention is claimed as follows:

1. A method comprising:

receiving, via a consumer interface, a first request for a response regarding a first automobile, the first request made by a consumer located at a first location and including geolocation information of the consumer;

executing instructions, by at least one processing device, to:

determine, based on the geolocation information, that the consumer is located at the first location;

generate, based on the first location, an in-market dealer area proximately located to the first location;

determine that a first dealer is located at a second location within the in-market dealer area;

request, via a dealer interface from the first dealer, a bid to sell the first automobile based on the first request;

US 9,626,704 B2

<table>
<tr><td>19</td><td>20</td></tr>
</table>

receive, via the dealer interface, a first bid from the first dealer located at the second location within the in-market dealer area;

generate, based on receiving the first bid, driving directions from the first location to the second location; and

provide the first bid and the driving directions via the consumer interface, the first bid including at least a price for the first automobile.

**2**. The method of claim **1**, wherein the first request includes a vehicle identification number that is manually entered by the consumer using at least one graphical user interface component.

**3**. The method of claim **1**, wherein the first request is made by the consumer using a mobile device which takes a picture of a vehicle identification number.

**4**. The method of claim **3**, wherein the vehicle identification number is recognized using optical character recognition.

**5**. The method of claim **1**, wherein the first automobile is one of a particular type of car with a specific set of features and a particular car with a specific vehicle identification number.

**6**. The method of claim **1**, wherein the first bid is an inventoryless bid requiring the first automobile to be at least one of manufactured and transferred from the inventory of another entity to the first dealer.

**7**. The method of claim **1**, further comprising receiving a consumer selection of the first bid.

**8**. The method of claim **7**, wherein the first bid includes a first delivery option which specifies a first pickup location at the first dealer and a second delivery option which specifies a different second pickup location, wherein the consumer selection indicates a consumer intention to purchase the first automobile based on the first bid and specifies one of the first delivery option and the second delivery option.

**9**. The method of claim **7**, wherein the consumer selection of the first bid indicates that the consumer intends to lease the first automobile.

**10**. The method of claim **7**, further comprising:

causing executing instructions, by the at least one processing device, to process the consumer selection of the first bid to facilitate executing a sale including at least one of providing for electronic signature of documents and providing for an electronic funds transfer.

**11**. The method of claim **10**, wherein the first automobile is made available for pickup at the first dealer according to a consumer selected first delivery option.

**12**. The method of claim **1**, further comprising:

executing instructions, by the at least one processing device, based on a request from the dealer interface, to request data via a consumer interface from a plurality of consumers.

**13**. The method of claim **1**, further comprising:

executing instructions, by the at least one processing device, based on a request from the dealer interface, to request data via a manufacturer interface from at least one manufacturer.

**14**. The method of claim **1**, further comprising:

executing instructions, by the at least one processing device, to provide via the consumer interface at least one of a financing plan, a service plan, an insurance plan, a warranty, and a hard add accessory, for at least one of provided and offered by the first dealer.

**15**. The method of claim **1**, wherein the first dealer is at least one of a franchise dealer and a non-franchise distribution location.

**16**. The method of claim **1**, further comprising:

causing executing instructions, by the at least one processing device, to provide a manufacturer response via the consumer interface including an acknowledgement of interest.

**17**. The method of claim **1**, further comprising:

causing executing instructions, by the at least one processing device, to provide a manufacturer response via the consumer interface including at least one of a verification, a confirmation, and an offer indicating that the first automobile can be provided for the consumer.

**18**. The method of claim **1**, wherein the first request is made by the consumer using a mobile device which takes a picture of a vehicle identification number, and in the first bid from the first dealer, the first automobile is an interbrand comparable car which is located at the first dealer.

**19**. The method of claim **1**, further comprising:

determine that a second dealer is located at a third location within the in-market dealer area;

request, via the dealer interface from the second dealer, a second bid to sell the first automobile based on the first request;

receive, via the dealer interface, the second bid from the second dealer located at the third location within the in-market dealer area;

generate, based on receiving the second bid, second driving directions from the first location to the third location; and

provide the second bid and the second driving directions via the consumer interface, the second bid including at least a price for the second automobile.

**20**. The method of claim **1**, wherein the consumer is a person.

**21**. The method of claim **1**, wherein the consumer is an entity.

**22**. The method of claim **1**, wherein the consumer chooses a pickup location.

**23**. The method of claim **1**, wherein the first dealer is a franchise entity.

**24**. The method of claim **1**, wherein the first dealer is a non-franchise entity distribution location.

**25**. The method of claim **24**, wherein the consumer chooses a pickup location.

**26**. The method of claim **25**, wherein the first automobile is at the consumer's chosen pickup location, such that the first automobile does not need to be transported to the consumer's chosen pickup location.

**27**. The method of claim **25**, wherein the consumer submits a request to the first dealer to change a first delivery option to include the consumer's chosen pickup location.

**28**. The method of claim **27**, wherein, based on the consumer's request to change the first delivery option, the first dealer provides a second delivery option including the consumer's chosen pickup location.

**29**. The method of claim **28**, wherein a notification is sent to the consumer that the first automobile is available for pickup at the consumer's chosen pickup location.

**30**. The method of claim **29**, wherein the consumer picks up the first automobile at the consumer's chosen pickup location.

**31**. The method of claim **28**, wherein the first automobile is transported to the consumer's chosen pickup location.

US 9,626,704 B2

21

**32**. The method of claim **31**, wherein the first automobile is transported directly from a third location to the consumer's chosen pickup location.

**33**. The method of claim **32**, wherein a second dealer is located at the third location.

**34**. The method of claim **33**, wherein the first dealer and the second dealer are commonly owned.

**35**. The method of claim **32**, wherein a manufacturer is located at the third location.

**36**. The method of claim **1**, wherein the first dealer provides the first automobile to the consumer at a pickup location by one of (i) having the first automobile transported to the pickup location and (ii) having a manufacturer produce the first automobile.

**37**. A system comprising:

a computer readable medium storing instructions; and

at least one processing device operably coupled to the computer readable medium, the at least one processing device the executing instructions to:

receive, via a consumer interface, a first request for a response regarding a first automobile, the first request made by a consumer located at a first location and including geolocation information of the consumer;

determine, using the geolocation information, that the consumer is located at the first location;

generate, based on the first location, an in-market dealer area proximately located to the first location;

determine that a first dealer is located at a second location within the in-market dealer area;

request, via a dealer interface from the first dealer, a bid to sell the first automobile based on the first request;

22

receive, via the dealer interface, a first bid from the first dealer located at the second location within the in-market dealer area;

generate, based on receiving the first bid, driving directions from the first location to the second location; and

provide the first bid and the driving directions via the consumer interface, the first bid including at least a price for the first automobile.

**38**. A non-transitory computer readable medium storing instructions which, when executed, are configured to cause an information processing apparatus to:

receive, via a consumer interface, a first request for a response regarding a first automobile, the first request made by a consumer located at a first location and including geolocation information of the consumer;

determine, using the geolocation information, that the consumer is located at the first location;

generate, based on the first location, an in-market dealer area proximately located to the first location;

determine that a first dealer is located at a second location within the in-market dealer area;

request, via a dealer interface from the first dealer, a bid to sell the first automobile based on the first request;

receive, via the dealer interface, a first bid from the first dealer located at the second location within the in-market dealer area;

generate, based on receiving the first bid, driving directions from the first location to the second location; and

provide the first bid and the driving directions via the consumer interface, the first bid including at least a price for the first automobile.

* * * * *

US009665897B2

## (12) United States Patent
### Seergy et al.

(10) **Patent No.:** **US 9,665,897 B2**

(45) **Date of Patent:** **\*May 30, 2017**

(54) **AUTOMOBILE TRANSACTION FACILITATION USING A MANUFACTURER RESPONSE**

(71) Applicant: **Sidekick Technology LLC**, Pine Brook, NJ (US)

(72) Inventors: **Michael J. Seergy**, Pine Brook, NJ (US); **Benjamin N. S. Brown**, Pine Brook, NJ (US)

(73) Assignee: **Sidekick Technology LLC**, Pine Brook, NJ (US)

( \* ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

This patent is subject to a terminal disclaimer.

(21) Appl. No.: **14/860,229**

(22) Filed: **Sep. 21, 2015**

(65) **Prior Publication Data**

US 2016/0148290 A1     May 26, 2016

**Related U.S. Application Data**

(63) Continuation of application No. 13/176,497, filed on Jul. 5, 2011, now Pat. No. 9,141,984.

(51) **Int. Cl.**
*G06Q 30/00*     (2012.01)
*G06Q 30/06*     (2012.01)

(52) **U.S. Cl.**
CPC ..... *G06Q 30/0609* (2013.01); *G06Q 30/0605* (2013.01); *G06Q 30/0611* (2013.01);
(Continued)

(58) **Field of Classification Search**
CPC ...................... G06Q 30/0206; G06Q 30/0601
(Continued)

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 5,970,472 A | 10/1999 | Allsop et al. | |
| 6,006,201 A | 12/1999 | Berent et al. | |

(Continued)

OTHER PUBLICATIONS

AutoTrader.com, Inc . . . : Private Company Information—Business Week, http://investing.businessweek.com/research/stocks/private/snapshot.asp?privcapId=92642.
(Continued)

*Primary Examiner* — Brandy A Zukanovich
(74) *Attorney, Agent, or Firm* — K&L Gates LLP

(57) **ABSTRACT**

A system, methods, and apparatus for performing automobile transactions are disclosed. In an example embodiment, automobile market data representative of current automobile market characteristics is stored. The automobile market data may include pricing, inventory, and consumer interest information received from manufacturers, dealers, and consumers. A consumer may provide a request for a manufacturer response indicating whether a specific automobile can be provided. Automobile market data may be provided to a manufacturer based on the request and a manufacturer response provides a verification, confirmation, or offer indicating that the specific automobile can be provided for the consumer. Bids to sell the specific automobile may be requested from dealers based on the manufacturer response. Dealer bids may be provided to the consumer with prices and a delivery options. The consumer may select a bid which specifies a pickup location at a first dealer.

**40 Claims, 7 Drawing Sheets**



(52) **U.S. Cl.**
 CPC ..... *G06Q 30/0627* (2013.01); *G06Q 30/0639*
 (2013.01); *G06Q 30/0641* (2013.01)

(58) **Field of Classification Search**
 USPC ..................................... 705/26.1, 26.4, 27.1
 See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 6,321,221 | B1 | 11/2001 | Bieganski |
| 6,463,431 | B1 | 10/2002 | Schmitt |
| 6,533,173 | B2 | 3/2003 | Benyak |
| 6,868,388 | B1 | 3/2005 | Millsap et al. |
| 6,868,389 | B1 | 3/2005 | Wilkins et al. |
| 7,395,223 | B1 | 7/2008 | Buzzell et al. |
| 7,406,436 | B1 | 7/2008 | Reisman |
| 7,479,949 | B2 | 1/2009 | Jobs et al. |
| 7,636,574 | B2 | 12/2009 | Poosala |
| 8,160,929 | B1 | 4/2012 | Park et al. |
| 8,392,193 | B2 | 3/2013 | Schultz et al. |
| 8,606,604 | B1 | 12/2013 | Huber et al. |
| 2002/0065707 | A1 | 5/2002 | Lancaster et al. |
| 2002/0082978 | A1 | 6/2002 | Ghouri et al. |
| 2002/0099628 | A1 | 7/2002 | Takaoka et al. |
| 2002/0111877 | A1 | 8/2002 | Nelson |
| 2002/0128946 | A1 | 9/2002 | Chehade et al. |
| 2003/0088435 | A1 | 5/2003 | King |
| 2003/0200151 | A1 | 10/2003 | Ellenson et al. |
| 2003/0229577 | A1 | 12/2003 | Nabel |
| 2004/0034544 | A1 | 2/2004 | Fields et al. |
| 2004/0059626 | A1 | 3/2004 | Smallwood |
| 2005/0004819 | A1 | 1/2005 | Etzioni et al. |
| 2005/0050097 | A1 | 3/2005 | Yeh et al. |
| 2005/0108112 | A1 | 5/2005 | Ellenson et al. |
| 2005/0240512 | A1 | 10/2005 | Quintero et al. |
| 2006/0020477 | A1 | 1/2006 | Retzbach et al. |
| 2007/0150362 | A1 | 6/2007 | Sharma et al. |
| 2007/0250403 | A1 | 10/2007 | Altschuler |
| 2007/0255663 | A1 | 11/2007 | Jordan et al. |
| 2007/0260526 | A1 | 11/2007 | Bartel |
| 2008/0046331 | A1 | 2/2008 | Rand |
| 2008/0177653 | A1 | 7/2008 | Famolari et al. |
| 2008/0183552 | A1 | 7/2008 | O'Hagan |
| 2008/0187125 | A1 | 8/2008 | Siegrist |
| 2008/0201184 | A1 | 8/2008 | Rose et al. |
| 2008/0201188 | A1 | 8/2008 | Heyman et al. |
| 2008/0201203 | A1 | 8/2008 | Rose et al. |
| 2008/0208731 | A1 | 8/2008 | Ruckart |
| 2008/0228657 | A1 | 9/2008 | Nabors et al. |
| 2009/0076896 | A1 | 3/2009 | DeWitt et al. |
| 2009/0132348 | A1 | 5/2009 | Bria et al. |
| 2009/0149199 | A1 | 6/2009 | Maghoul |
| 2009/0171761 | A1 | 7/2009 | Noy et al. |
| 2009/0187478 | A1 | 7/2009 | Shipley |
| 2009/0187513 | A1 | 7/2009 | Noy et al. |
| 2009/0198557 | A1 | 8/2009 | Wang et al. |
| 2009/0204600 | A1 | 8/2009 | Kalik et al. |
| 2010/0048242 | A1 | 2/2010 | Rhoads et al. |
| 2010/0106580 | A1 | 4/2010 | Etheredge et al. |
| 2010/0217525 | A1 | 8/2010 | King et al. |
| 2010/0274627 | A1 | 10/2010 | Carlson |
| 2010/0332292 | A1 | 12/2010 | Anderson |
| 2011/0040642 | A1 | 2/2011 | O'Dell |
| 2011/0082759 | A1 | 4/2011 | Swinson et al. |
| 2011/0087430 | A1 | 4/2011 | Boss et al. |
| 2011/0087556 | A1 | 4/2011 | Pitkow |
| 2011/0099036 | A1 | 4/2011 | Sarkissian et al. |
| 2011/0208418 | A1 | 8/2011 | Looney et al. |
| 2011/0238474 | A1 | 9/2011 | Carr et al. |
| 2011/0238514 | A1 | 9/2011 | Ramalingam et al. |
| 2011/0276394 | A1 | 11/2011 | Chan |

OTHER PUBLICATIONS

Autotrader.com Introduces IPhone App to Create a More Personalized "PC-to-Pocket" Experience for Car Shoppers, http://www.prnewswire.com/news-releases/autotradercom, Jul. 7, 2011.
AppStore-AutoTrader.com, http://itunes.apple.com/us/app/autotrader-com/id444552888?mt=8, Oct. 31, 2011.
International Search Report issued Sep. 21, 2012 for Intl. Appln. No. PCT/US2012/045546.
Charlton, Auto Trader: iPhone app review. Mar. 15, 2010 [retrieved on Sep. 6, 2012] from the internet: http://www.econsultancy.com/us/blog/5593-auto-trader-iphone-app-review> entire document.
AUTODRADERUK. Introducing the Auto Trader iPhone App. Mar. 12, 2010 [retrieved on Sep. 6, 2012] from the internet: http://www.youtube.com/watch?v+6g_1g8IRG4&feature= player_embedded> entire document.
International Search Report mailed Oct. 5, 2012 for Intl. Appln. No. PCT/US2012/045545.
Anonymous, "instaVIN to offer free auto accident history reports for mobile phones," Wireless News, Jun. 2, 2010.



Fig. 1



Fig. 2



Fig. 3



Start
400
402
Automobile market data including at least pricing data and inventory data is stored in a database system (e.g., data from manufacturers, dealers, and consumers regarding pricing, lot inventory, production scheduling, and shipment scheduling is collected and stored in a database)
404
A request for a response of whether an automobile can be provided is received from a consumer (e.g., a car buyer fills in a request form on a website or takes a picture of a VIN to receive a verification that a car can be produced or delivered)
406
Automobile market data is provided to a manufacturer based on the consumer request (e.g., the car maker receives a real-time report including local car sales data, inventory data, car delivery data, and car build time data of the subject car)
408
A manufacturer response is provided to the consumer indicating that the automobile can be provided for the consumer (e.g., the car maker provides a verification that a car can be produced, shipped, or is already in inventory based on current pricing data, car locations, and build times for the subject car)
410
A bid to sell the automobile to the consumer is requested from dealers based on the manufacturer response (e.g., several dealers provide bids based on the verification, current pricing data, dealer pickup locations, and potential add-ons)
412
Dealer bids are provided to the consumer (e.g., several dealers provide bids, so several different prices and delivery options may be available to the car buyer)
414
The consumer selects a bid including a delivery option which specifies a pickup location (e.g., the car buyer chooses to pickup at a nearby dealer in five days)
416
The manufacturer is instructed to provide the automobile to a dealer according to the consumer bid selection (e.g., the car maker is instructed to re-route a car already in transit to the dealer pickup location for delivery in less than five days)
418
The consumer and dealer execute the sale of the automobile (e.g., the car buyer e-signs a loan application and contract, and electronically transfers funds)
Fig. 4B

Fig. 4A



Fig. 4A                    400

420

The manufacturer provides the dealer with the purchased automobile according to the consumer bid selection (e.g., the car maker re-routes a car en route to delivery at another dealer to the dealer pickup location selected by the car buyer or transports the car directly from the factory to the dealer pickup location)

422

The consumer picks up the purchased automobile according to the consumer selected delivery option at the dealer (e.g., the car buyer picks up the car at the nearby dealer five days after the car sale is executed)

Fig. 4B



Fig. 5



Fig. 6

US 9,665,897 B2

| 1 | 2 |

# AUTOMOBILE TRANSACTION FACILITATION USING A MANUFACTURER RESPONSE

## CROSS REFERENCE TO RELATED APPLICATIONS

This application is a continuation of U.S. application Ser. No. 13/176,497, filed Jul. 5, 2011, which is related to the commonly-owned patent application filed on Jul. 5, 2011, entitled "AUTOMOBILE TRANSACTION FACILITATION BASED ON CUSTOMER SELECTION OF A SPECIFIC AUTOMOBILE," U.S. application Ser. No. 13/176,525, now U.S. Pat. No. 8,744,925, the entire content of each of which is hereby incorporated by reference herein.

## BACKGROUND

In the automobile industry, consumers typically purchase automobiles from dealers or dealerships. Dealers often purchase new automobiles from several manufacturers, to sell to consumers. Consumers typically negotiate a lower price than the manufacturer suggested retail price typically referred to as the "sticker price" and/or the price the dealer initially offers. In many cases, the negotiation process for an automobile may include a large degree of uncertainty for the consumer. Generally, the negotiation process is a zero sum process, and because the consumer and the dealer are each trying to get a better deal, there is typically some lack of trust during the negotiation. Accordingly, both dealers and consumers often base the negotiations on established market prices. However, market prices can fluctuate rapidly depending a variety of factors. For example, consumer demand may be affected by economic factors, such as changes in gasoline prices, unemployment rates, government sponsored tax rebates for automobile purchases, etc.

In many cases, a consumer may have concerns that a dealer may not offer a fair and competitive price. Various products and services have become available that allow consumers to perform research on market prices for automobiles. Similarly, dealers negotiating an automobile sale generally do not know the maximum price a consumer will be willing to pay for a particular automobile, or how long it will take to sell an automobile in inventory for a given price. Accordingly, dealers also use products and services for determining and/or tracking market prices. Further, automobile manufacturers may also have an interest in the market prices for automobiles, because the market activity captured as automobile market information may allow the manufacturer to, for example, more profitably determine which automobiles to manufacture, what prices the manufacture should offer to dealers, and whether manufacturer incentives should be offered on existing dealer automobile inventory.

## SUMMARY

The present disclosure provides a new and innovative system, methods and apparatus for providing automobile market information and performing automobile transactions. In an example embodiment, automobile market data representative of recent automobile market characteristics is stored. The automobile market data may include pricing, inventory, and consumer interest information received from manufacturers, dealers, and consumers. A consumer may provide a request for a manufacturer response indicating whether a specific automobile can be provided. Automobile market data may be provided to a manufacturer based on the request and a manufacturer response may provide a verification, confirmation, or offer indicating that the specific automobile can be provided for the consumer. Bids to sell the specific automobile may be requested from dealers based on the manufacturer response. Dealer bids may be provided to the consumer with prices and a delivery options. The consumer may select a bid which specifies a pickup location at a particular dealer.

Additional features and advantages of the disclosed method and apparatus are described in, and will be apparent from, the following Detailed Description and the Figures.

## BRIEF DESCRIPTION OF THE FIGURES

FIG. **1** is a high level block diagram of an example network communicating system, according to an example embodiment of the present invention.

FIG. **2** is a detailed block diagram showing an example of a computing device, according to an example embodiment of the present invention.

FIG. **3** is a block diagram showing an example automobile transaction network structure, according to an example embodiment of the present invention.

FIGS. **4**A and **4**B include a flowchart illustrating an example process for facilitating an automobile transaction, according to an example embodiment of the present invention.

FIG. **5** is a block diagram showing an example data architecture, according to an example embodiment of the present invention.

FIG. **6** is flow diagram illustrating an example process for facilitating an automobile transaction, according to an example embodiment of the present invention.

## DETAILED DESCRIPTION OF EXAMPLE EMBODIMENTS

The present disclosure relates in general to a system for facilitating automobile transactions and, in particular, to automobile transaction facilitation using a manufacturer response. Briefly, in an example embodiment, a system is provided which allows a consumer to request a verification that a specific car can be obtained. For example, a consumer may use a mobile device to take a picture of a vehicle identification number and using optical character recognition, request real-time information on that automobile. For example, a manufacturer can provide a verification to the consumer and dealers that the automobile can be provided, along with specific logistics for delivery. Dealers may provide bids based on the consumer request and the manufacturer verification, including intrabrand bids and interbrand bids. A consumer may select a dealer bid to purchase or lease an automobile based on the prices and delivery options available. Also, the presently disclosed system may advantageously allow for inventoryless bidding by dealers. For example, a dealer does not need to have an automobile in its inventory (e.g., on the dealer lot), but can make a bid to sell that automobile anyways, and then have that automobile produced by a manufacturer or transported to the dealer lot. In a non-limiting example embodiment, certain features disclosed in the present patent application may be commercially embodied in products and services offered by Sidekick Technology LLC, the assignee of the present application.

The present system may be readily realized in a network communications system. A high level block diagram of an example network communications system **100** is illustrated in FIG. **1**. The illustrated system **100** includes one or more

US 9,665,897 B2

3

client devices **102**, and one or more host devices **104**. The system **100** may include a variety of client devices **102**, such as desktop computers and the like, which typically include a display **112**, which is a user display for providing information to users **114**, and various interface elements as will be discussed in further detail below. A client device **102** may be a mobile device **103**, which may be a cellular phone, a personal digital assistant, a laptop computer, a tablet computer, etc. The client devices **102** may communicate with the host device **104** via a connection to one or more communications channels **106** such as the Internet or some other data network, including, but not limited to, any suitable wide area network or local area network. It should be appreciated that any of the devices described herein may be directly connected to each other instead of over a network. Typically, one or more servers **108** may be part of the network communications system **100**, and may communicate with host servers **104** and client devices **102**.

One host device **104** may interact with a large number of users **114** at a plurality of different client devices **102**. Accordingly, each host device **104** is typically a high end computer with a large storage capacity, one or more fast microprocessors, and one or more high speed network connections. Conversely, relative to a typical host device **104**, each client device **102** typically includes less storage capacity, a single microprocessor, and a single network connection. It should be appreciated that a user **114** as described herein may include any person or entity which uses the presently disclosed system and may include a wide variety of parties. For example, as will be discussed in further detail below, users **114** of the presently disclosed system may include a consumer, a dealer, and/or a manufacturer.

Typically, host devices **104** and servers **108** store one or more of a plurality of files, programs, databases, and/or web pages in one or more memories for use by the client devices **102**, and/or other host devices **104** or servers **108**. A host device **104** or server **108** may be configured according to its particular operating system, applications, memory, hardware, etc., and may provide various options for managing the execution of the programs and applications, as well as various administrative tasks. A host device **104** or server may interact via one or more networks with one or more other host devices **104** or servers **108**, which may be operated independently. For example, host devices **104** and servers **108** operated by a separate and distinct entities may interact together according to some agreed upon protocol.

A detailed block diagram of the electrical systems of an example computing device (e.g., a client device **102**, and a host device **104**) is illustrated in FIG. **2**. In this example, the computing device **102**, **104** includes a main unit **202** which preferably includes one or more processors **204** electrically coupled by an address/data bus **206** to one or more memory devices **208**, other computer circuitry **210**, and one or more interface circuits **212**. The processor **204** may be any suitable processor, such as a microprocessor from the INTEL PENTIUM® family of microprocessors. The memory **208** preferably includes volatile memory and non-volatile memory. Preferably, the memory **208** stores a software program that interacts with the other devices in the system **100** as described below. This program may be executed by the processor **204** in any suitable manner. In an example embodiment, memory **208** may be part of a "cloud" such that cloud computing may be utilized by a computing devices **102**, **104**. The memory **208** may also store digital data indicative of documents, files, programs, web pages,

4

etc. retrieved from a computing device **102**, **104** and/or loaded via an input device **214**.

The interface circuit **212** may be implemented using any suitable interface standard, such as an Ethernet interface and/or a Universal Serial Bus (USB) interface. One or more input devices **214** may be connected to the interface circuit **212** for entering data and commands into the main unit **202**. For example, the input device **214** may be a keyboard, mouse, touch screen, track pad, track ball, isopoint, image sensor, character recognition, barcode scanner, and/or a voice recognition system.

One or more displays **112**, printers, speakers, and/or other output devices **216** may also be connected to the main unit **202** via the interface circuit **212**. The display **112** may be a cathode ray tube (CRTs), a liquid crystal display (LCD), or any other type of display. The display **112** generates visual displays generated during operation of the computing device **102**, **104**. For example, the display **112** may provide a user interface, which will be described in further detail below, and may display one or more web pages received from a computing device **102**, **104**. A user interface may include prompts for human input from a user **114** including links, buttons, tabs, checkboxes, thumbnails, text fields, drop down boxes, etc., and may provide various outputs in response to the user inputs, such as text, still images, videos, audio, and animations.

One or more storage devices **218** may also be connected to the main unit **202** via the interface circuit **212**. For example, a hard drive, CD drive, DVD drive, and/or other storage devices may be connected to the main unit **202**. The storage devices **218** may store any type of data, such as pricing data, transaction data, operations data, inventory data, commission data, manufacturing data, image data, video data, audio data, tagging data, historical access or usage data, statistical data, security data, etc., which may be used by the computing device **102**, **104**.

The computing device **102**, **104** may also exchange data with other network devices **220** via a connection to the network **106**. Network devices **220** may include one or more servers **226**, which may be used to store certain types of data, and particularly large volumes of data which may be stored in one or more data repository **222**. A server **226** may include any kind of data **224** including databases, programs, files, libraries, pricing data, transaction data, operations data, inventory data, commission data, manufacturing data, configuration data, index or tagging data, historical access or usage data, statistical data, security data, etc. A server **226** may store and operate various applications relating to receiving, transmitting, processing, and storing the large volumes of data. It should be appreciated that various configurations of one or more servers **226** may be used to support and maintain the system **100**. For example, servers **226** may be operated by various different entities, including automobile manufacturers, brokerage services, automobile information services, etc. Also, certain data may be stored in a client device **102** which is also stored on the server **226**, either temporarily or permanently, for example in memory **208** or storage device **218**. The network connection may be any type of network connection, such as an Ethernet connection, digital subscriber line (DSL), telephone line, coaxial cable, wireless connection, etc.

Access to a computing device **102**, **104** can be controlled by appropriate security software or security measures. An individual users' **114** access can be defined by the computing device **102**, **104** and limited to certain data and/or actions. Accordingly, users **114** of the system **100** may be required to register with one or more computing devices

US 9,665,897 B2

5                                                              6

**102**, **104**. For example, registered users **114** may be able to request or manipulate data, such as submitting requests for pricing information or providing an offer or a bid.

As noted previously, various options for managing data located within the computing device **102**, **104** and/or in a server **226** may be implemented. A management system may manage security of data and accomplish various tasks such as facilitating a data backup process. A management system may be implemented in a client **102**, a host device **104**, and a server **226**. The management system may update, store, and back up data locally and/or remotely. A management system may remotely store data using any suitable method of data transmission, such as via the Internet and/or other networks **106**.

FIG. **3** is a block diagram showing an example automobile transaction network structure **300** which includes an automobile market information processing system **302**, a consumer interface **304**, a dealer interface **306**, and a manufacturer interface **308**. The example automobile market information processing system **302** may be implemented on one or more host devices **104** accessing one or more servers **108**, **226**. In an example embodiment, the automobile market information processing system **302** includes a database system **310**, a recommendation engine **312**, a vehicle identification number processor **314**, and an interface generation unit **316**. A user **114** may be a consumer, a dealer, or a manufacturer that interacts with the consumer interface **304**, dealer interface **306**, or manufacturer interface **308**, respectively. A database system **310** may include a wide variety of automobile market data. A recommendation engine **312** may provide recommendations for consumers, dealers, and manufacturers. A vehicle identification number processor **314** may be used for making requests regarding specific automobiles and automobiles with specific sets of features. For example, a vehicle identification number processor **314** may determine a specific set of features that a specific car has based on a picture of that specific car's vehicle identification number. Interface generation unit **316** may provide, for example, HTML files which are used at the consumer interface **304**, dealer interface **306**, and manufacturer interface **308** interface to provide information to the users **114**. It should be appreciated that he consumer interface **304**, dealer interface **306**, and manufacturer interface **308** may be considered to be part of the automobile market information processing system **302**, however, for discussion purposes, the consumer interface **304**, dealer interface **306**, and manufacturer interface **308** may be referred to as separate from the automobile market information processing system **302**.

For example, a user **114** may interact with a consumer interface **304** to research automobiles the user **114** is interested in buying. For example, a consumer may be looking for a four door sedan with specific features, including a global positioning system (GPS), a sunroof, tinted windows, rated for at least thirty miles per gallon, four wheel drive, etc. The consumer may interact with the consumer interface **304** by inputting required and/or desired features, monthly budget or full price, etc. The consumer interface **304** may provide a wide variety of features and specifications which the consumer may choose from in providing a request. Based on the information put into the consumer interface **304** from the consumer, the consumer interface **304** may provide one or more reports or offers to the consumer. As will be discussed in further detail below, the information provided by the consumer interface **304** may include current market prices for automobiles, including information relating to additional features, and may include information on specific automobiles, for example, which may be en route to

a dealer near the consumer's present location. The automobile market information processing system **302** may process data received by the consumer interface **304**, as well as the dealer interface **306** and/or the manufacturer interface **308**, to respond to a request from a consumer. For example, data from database system **310** may be queried for use in a report, or a recommendation may be provided by recommendation engine **312** according to the consumer request and current market data. The automobile market information processing system **302** may integrate data received from consumer interface **304**, dealer interface **306**, and manufacturer interface **308** to provide current and accurate information relating to the automobile market.

It should be appreciated that the consumer interface **304** may be specific to one particular manufacturer or may provide information for multiple different manufacturers. For example, a consumer interface **304** may be a website with information on many manufacturers, and further, the consumer interface **304** may access or link to the manufacturer specific websites (e.g., Ford). Also, for example, a consumer interface **304** may be implemented as an automobile manufacturer's website. Typically, a manufacturer's website may provide consumers with a catalog like feature that provides information on different automobile models with any available options or features. For example, a manufacturer website may allow a consumer to select options that are desired to "build" a particular automobile, and may provide price comparisons using suggested retail prices, which may consumers use for initial research into what pricing the dealer may offer for a particular automobile with a particular feature set. Also, typically, the consumer may enter information, including, for example, name, an address or zip code, and telephone number. This information may be passed on from the manufacturer to a nearby dealer and/or nearby dealer information may be provided to the consumer (e.g., the dealer in or nearest to the consumer's entered zip code). Accordingly, the dealer may contact the consumer, or the consumer may inquire with the dealer, regarding the specific automobiles available on that dealer's lot and particular pricing being offered, etc. In many cases, consumers may not inquire with dealers that the manufacturer may recommend, and similarly, dealers may not diligently follow up with consumers that have an interest in purchasing an automobile. Further, it should be appreciated that the information provided via a consumer interface **304** and/or a manufacturer website may be very useful to consumers. For example, in the past, dealers often provided brochures with all the information on a manufacturer's available car models, including all the features and options information. However, dealers typically do not provide comprehensive information brochures, which may be relatively expensive to produce, and rather, that information is typically located on a manufacturer website and/or a consumer interface **304**.

Accordingly, the consumer interface **304** may provide a wide range of information, for example, based on any searches or queries performed by a user **114**. In an example embodiment, based on a user search or request for a response, the consumer interface **304** will display a quality index or value index based on normalized calculations for an automobile. The recommendation engine **312** may provide recommendations to a consumer based on the current automobile market data stored in the automobile market information processing system **302**. For example, metrics on gas mileage, emissions, operating and maintenance costs, safety ratings, etc. may be benchmarked against comparable automobiles of the same and different manufacturers. Similar

US 9,665,897 B2

7

purchase options to a specific search may also be provided, based on feature matching, price range, consumer popularity, etc. Information including price ranges, including MSRP, invoice prices, inventory levels, the user's **114** credit ratings (e.g., FICO score), may be provided which may include monthly payment estimates or projections. For example, a financing calculator may help a user **114** determine what financing rate is appropriate. It should be appreciated that dealers may mislead consumers into believing that a higher financing rate will be required to secure a loan. Further, for example, a lease vs. buy calculator may be provided which may use current market data including prices, interest rates, incentives, estimated mileage per year, etc. for providing an analysis for a particular consumer regarding purchasing or leasing. Also, the consumer interface **304** may provide a purchase checklist, for example, of ten steps to buying a car. A qualitative checklist may allow a user to ask the right questions and get the right answers from a dealer. Additional tips may be provided, such as a list of products or services dealers may attempt to sell to a consumer with an analysis of the value of these products or services and a recommendation to accept or decline these dealer offers. Further, beyond analysis relating to automobiles, additional analysis or reports may be provided, for example, relating to dealer reviews, other supplemental products, financial entities that may provide financing, etc. For example, dealer reviews may provide a consumer with information the consumer may use in addition to automobile pricing and delivery options. Moreover, the consumer interface **304** may provide a wide variety of useful information to a consumer, for at home research and preparation, and/or in a dealer location while shopping as a negotiating tool that may provide confirmation on pricing, useful tips, and the like.

In an example embodiment, a dealer interface **306** may provide a user **114**, such as a dealer employee, information relating to the current automobile market. The dealer interface **306** allows a dealer to interact with automobile market information processing system **302** to provide the dealer with a wide variety of information, including, for example, current market pricing. Other automobile market information a dealer may receive on a dealer interface **306** includes information relating to lot inventory, turnover rates, automobile transportation and/or shipping costs, incentives, and various ratings, such as ratings relating to quality, safety, insurance, a consumer credit score, dealer ratings, residual or resale values, etc. A dealer may input information into dealer interface **306** relating to sales data, including current pricing offered, special sales offers, actual transaction data, inventory data, etc. In an example embodiment, the dealer may provide information through dealer interface **306** which will be used by automobile market information processing system **302** to prepare reports or offers to consumers and/or manufacturers. It should be appreciated that a dealer is typically a franchise entity, while a distribution location may not be a franchise entity. For brevity, throughout this specification, the term dealer may be used to describe both franchise entity dealers and non-franchise entity distribution location. Accordingly, as used in this disclosure, the term dealer does not indicate whether an entity is a franchise entity. Moreover, a franchise dealer or a non-franchise distribution location may utilize a dealer interface **306** as described herein.

In an example embodiment, a manufacturer interface **308** may provide a user **114**, such as a manufacturer employee, information relating to the current automobile market, including consumer requests. For example, an manufacturer

8

interface **308** may provide a manufacturer a request received from a consumer interface **304**. Additionally, the manufacturer interface **308** may provide information such as a report that allows the manufacturer to provide a response to the requesting consumer. A report may include information from database system **310** relating to current market pricing, recent sales figures and trends, current manufacturer incentives, current inventory, including dealer inventory, inventory in transit, and/or build times or lead times for a desired automobile, etc. The manufacturer may use this information to provide a response to a consumer request. The manufacturer may provide the manufacturer interface **308** with information to provide a confirmation, a verification, or an offer to a consumer via consumer interface **304**. For example, a confirmation number associated with the particular consumer request may be provided for the consumer. Also, a recommendation may be provided from the recommendation engine **312** to the manufacturer in relation to automobile pricing, responding to a specific request, manufacturer incentives, inventory management, production schedules, shipping schedules, etc. It should be appreciated that a manufacturer may be referred to as an OEM or original equipment manufacturer. The manufacturer interface **308** may provide a manufacturer with a real-time lens into the automobile market which may allow the manufacturer to adjust production schedules, pricing plans, marketing activities, etc., which may provide a significant advantage for manufacturers.

Accordingly, information may be provided to the automobile market information processing system **302** from consumers, dealers, and manufacturers with a very high degree of granularity, as every transaction that occurs and even every request or search may be stored and used by the automobile market information processing system **302**. This allows the automobile market information processing system **302** to use the most current automobile market data to provide information to consumers, dealers, and manufacturers. It should be appreciated that market prices can change relatively quickly, particularly when major events drive consumer behavior or manufacturer production, such as natural disasters. Accordingly, reports and recommendations provided by the automobile market information processing system **302** may be highly accurate, reliable, and sensitive to market changes.

It should be appreciated that certain functions described as performed, for example, at automobile market information processing system **302**, may instead be performed locally at consumer interface **304**, dealer interface **306**, and manufacturer interface **308**, or vice versa. Further, in certain cases, tasks may be performed using consumer interface **304**, dealer interface **306**, and manufacturer interface **308** or, for example, performed in person, such as a consumer signing documents at a dealer location, or a dealer communicating with a manufacturer using a telephone. It should be appreciated that the consumer interface **304**, dealer interface **306**, and manufacturer interface **308** may be implemented, for example, in a web browser using an HTML file received from the automobile market information processing system **302**. In an example embodiment, the consumer interface **304**, dealer interface **306**, and manufacturer interface **308** may be located on a website, and may further be implemented as a secure website. Also, consumer interface **304**, dealer interface **306**, and manufacturer interface **308** may require a local application, for example, which a manufacturer may pay for to have access to, for example, information from the automobile market information processing system **302** such as requests from consumers.

US 9,665,897 B2

9

FIGS. **4**A and **4**B include a flowchart of an example process **400** for facilitating an automobile transaction. Although the process **400** is described with reference to the flowchart illustrated in FIGS. **4**A and **4**B, it will be appreciated that many other methods of performing the acts associated with the process **400** may be used. For example, the order of many of the blocks may be changed, certain blocks may be combined with other blocks, and many of the blocks described are optional.

The example process **400** for facilitating an automobile transaction may allow users **114**, including manufacturers and consumers, as well as dealers, to efficiently sell and purchase automobiles, respectively. The example process **400** may begin with automobile market data including at least pricing data and inventory data stored in a database system (block **402**). For example, automobile market data from manufacturers, dealers, and consumers regarding pricing, lot inventory, production scheduling, and shipment scheduling is collected and stored in a database. In an example embodiment, a wide variety of data is stored in a database system **310**. Automobile market data may include various relevant ratings, reports, awards, or other information, including quality information, safety information, insurance information, consumer credit information, dealer rating information, incentive information, residual value information, and/or any other data which may be relevant to consumers. For example, ratings data may include information from the National Highway Traffic Safety Administration (NHTSA), the Environmental Protection Agency (EPA), and/or the Insurance Institute for Highway Safety (IIHS). The data may include information from a consumer interface **304**, such as data in consumer searches or requests, information from a dealer interface **306**, such as currently offered dealer pricing, transaction data for finalized sales, current inventory data, shipping costs, and information from a manufacturer interface **308**, such as current manufacturer prices and suggested pricing, manufacturer incentives, and current inventory including finished inventory on hand, production scheduling, shipment scheduling, inventory in transit, and manufacturing lead times. The automobile market data may be comprised solely of information received from the consumer interface **304**, dealer interface **306**, and manufacturer interface **308**, or may include additional information received from other sources. It should be appreciated that various methods of storing the automobile market data may be employed according to the system requirements. For example, database system **310** may be organized according to different manufacturers, automobile make and model, different information categories (e.g., suggested pricing, market prices, production, shipping, lot inventory), etc., and may consist of one or more databases on one or more servers **108**, **226** which may be remotely located from each other and/or a host device **104** of the automobile market information processing system **302**. As will be discussed further below, the automobile market data may be continually updated as new data is provided to the automobile market information processing system **302**.

The example process **400** continues with a consumer providing a request to a manufacturer for a response of whether an automobile can be provided (block **404**). For example, a car buyer fills in a request form on a website to receive a verification that a car can be produced or delivered. In this example embodiment, the buyer's request may be transmitted from consumer interface **304** via the internet to the automobile market information processing system **302**. In another example embodiment, a car buyer may be located at a dealer location and take a picture of a vehicle identifi-

10

cation number (VIN) on a car that the buyer would like to receive information for. For example, using an application stored on a mobile device **103**, the buyer may take a picture of the VIN on a car. The buyer may want information on that specific car or on other comparable cars with the same or similar features and/or options. The picture of the VIN may be processed using optical character recognition, which allows the automobile market information processing system **302** to determine the make and model of the car, along with various other characteristics of the car. It should be appreciated that the VIN may include human readable characters, a bar code, or any other graphical or machine readable information which acts as a vehicle identification number. Accordingly, the buyer may perform research, for example, while at home or while shopping at a dealer location. Further, for example, the buyer may take a picture of a VIN anywhere, including at automobile trade shows, mall displays, or anywhere new cars or cars for sale are displayed. The buyer may even take a picture of a car parked in the street as the buyer walks down the street. Any request or query communicated from the consumer interface **304** may be stored, for example, in database system **310**, thereby updating the automobile market information processing system **302** with current automobile market data.

The example process **400** may continue with providing automobile market data to a manufacturer based on the consumer request (block **406**). For example, the car manufacturer receives a real-time report including local car sales data, inventory data, car delivery data, and car build time data of the consumer's requested car. In an example embodiment, a report may include quality information, safety information, insurance information, consumer credit information (e.g., buyer FICO score), dealer rating information, incentive information, residual value information, and/or any other data which may be relevant to consumers. The report may be provided through manufacturer interface **308** and include the consumer requirements and preferences. The request and/or the report may be provided in real-time and may provide real-time data. Data reported based on a real-time updates in the automobile market information processing system **302** may provide significant advantages, for example, when pricing conditions may change quickly due to unforeseen market conditions. The recommendation engine **312** may provide recommendations to a manufacturer based on the current automobile market data. For example, a report may indicate various estimated sales probabilities for different prices that a dealer may offer or bid, which can be very useful information for a manufacturer. In an example embodiment, a probability for a manufacturer or dealer to sell a certain lot of automobiles within a time frame may be provided. Such information may be illustrated in various ways, such as a bell curve graph or a chart. Further, the recommendation engine may provide suggestions regarding manufacturer incentives or other factors which affect the automobile market. Manufacturers may use such information in making important decisions, such as setting pricing, setting or modifying production schedules, marketing directives, future product features and focus, and the like. Also, in an example embodiment, the manufacturer interface **308** may provide information that is limited to cars which meet the consumer request requirements. The manufacturer may customize the manufacturer interface **308** to provide information in a pre-specified manner to suit the manufacturers needs.

A manufacturer response is provided to the consumer indicating that the automobile can be provided for the consumer (block **408**). For example, the car maker provides

US 9,665,897 B2

11

12

a verification that a car can be produced, shipped, or is already in inventory based on current pricing data, car locations, and build times for the subject car. The manufacturer interface **308** may be used to communicate a verification, or a confirmation or offer to a buyer. For example, a verification may state that a particular car with specific features may be produced within forty-five days if the buyer purchases that car and may provide a confirmation number associated with the verification. In another example, a particular car currently being shipped to New York may be re-routed to Illinois. The automobile market data may include, for example, shipping costs that the manufacturer may use for determining if an automobile should be re-routed. An offer to produce or ship a particular car to a dealer location near a consumer may be authorized through the manufacturer interface **308**. In an example embodiment, the automobile market information processing system **302** may be pre-authorized by a manufacturer to provide a confirmation of specific model with specific feature sets. A manufacturer may determine whether it is profitable to produce a car from scratch based on the automobile market data such as current market pricing, current inventory levels, and the like. Accordingly, a manufacturer response may be adjusted by current automobile market conditions. In an example embodiment, a manufacturer response may not require the use of manufacturer interface **308**, for example, a manufacturer may otherwise provide a consumer with a verification, which may be provided by the consumer for use in the automobile market information processing system **302**. Any verification, confirmation, offer, and/or response communicated from a manufacturer interface **308** may be stored, for example, in database system **310**, to further update the automobile market information processing system **302** with current automobile market data.

Then, a bid to sell the automobile to the consumer is requested from dealers based on the manufacturer response (block **410**). For example, several dealers provide bids based on the verification, current pricing data, dealer pickup locations, and potential add-ons. Each dealer's bid may include a price, for example, a price with no additional add-on products or services, such as service contracts, warranties, aftermarket accessories, etc. For example, add-on products may provide substantial value to a dealer, above and beyond the profit margin for the sale of the requested car. A dealer may profit from selling financing options, for example, if a consumer needs financing, the financier may pay the dealer for sourcing the loan. A dealer may sell service plans or maintenance packages (e.g., an extended service contract), selling warranties (e.g., a lifetime warranty), or selling insurance plans (e.g., life, accident, and health insurance, liability insurance, comprehensive insurance, etc.). Also, a dealer may also sell various hard add accessories, for example, bicycle racks, hitches, commercial accessories (e.g., lights and sirens), or any aftermarket products or modifications (e.g., sunroof).

One or more dealer bids are provided to the consumer (block **412**). For example, several dealers provide bids, so several different prices and delivery options may be available to the car buyer. Typically, the bid will include at least a specified price and pickup time and location. Typically, a pickup location will be a dealer lot or distribution location. In an example embodiment, a buyer that has taken a picture of a VIN with a mobile device may receive dealer bids within minutes or seconds on the mobile device. Accordingly, the bids may be used in real-time as the buyer may be actively shopping for a car on a dealer lot. It should be appreciated that some dealers may have multiple locations which could serve as a pickup location. In an example embodiment, the automobile market data may indicate that the particular car requested by a consumer should be priced at, for example, $26,000. However, various factors may affect the bid or offer that a dealer will make for the particular car. For example, the potential for forming a customer relationship, the value of potential add-on products and services, or competition with other dealers may cause a dealer to bid lower than normal. In such a case, the dealer may bid $25,000 in an effort to create a customer relationship, sell add-on products, and/or undercut the competition pricing. Other factors, such as the buyer's credit score (e.g., FICO score), may be used by a dealer in determining a bid, as this may affect the profitability of a sale.

Further, for example, the particular automobile requested may not be available for immediate pickup near the buyer, and various alternative delivery options may be provided from several dealers' bids. A car that is in transit to an out of state dealer may be re-routed to a dealer near the buyer, or a new car may be built to the buyer's desired specifications and delivered to a dealer near the buyer. Therefore, for example, the consumer interface **304** may provide several different bids with different delivery options and prices to the buyer, for example, a price of $26,000 to pick up the car at an out of state dealership the next day, a price of $26,000 to pick up the car at a local dealer in two months, or a price of $26,500 to pick up the car at a local dealer in five days. For example, the costs of re-routing a car already in shipment may be factored into dealer bids. Inventoryless bidding may be highly beneficial when dealers that do not have a requested automobile in inventory can still profitably provide a bid. Further, for example, cars that are not exactly what the buyer requested may also be offered to the buyer. For example, the buyer may request a four wheel drive car, but if a two wheel drive car that meets all the other buyer criteria is immediately available at a nearby dealer, the dealer may provide an offer to the buyer for this car, possibly at a significantly lower price, such as $23,000 instead of $26,000 for a four wheel drive car as requested. Further, for example, dealers may use information such as ratings data to optimize their bids. For example, if gasoline prices are increasing, mileage ratings for a particular car may dictate increasing or decreasing a bid. If a vehicle has very good gas mileage, and gas prices are skyrocketing, that car may have an increasing demand as gas prices increase, or vice versa. Similarly, safety ratings of vehicles may be important to consumer demand if high profile problems have appeared for a particular automobile style, make, or model. As discussed above, various automobile market information may be used by a dealer including safety information, insurance information, consumer credit information, dealer rating information, incentive information, residual value information, and/or any other data which may be relevant to consumers.

The consumer interface **304** may organize dealer bids based on a variety of factors and may provide supplemental information. For example, certain dealer bids may be selected as the best options, all dealer bids may be summarized, various additional ratings, reviews, or popularity information, financing information, etc. may also be provided to a consumer along with any dealer bids. The recommendation engine **312** may provide recommendations to a consumer based on the current automobile market data. For example, of ten dealer bids provided with a response, three bids may be recommended, for example, as "Great Deals!" It should be appreciated that in some cases, a particular consumer search may not return any dealer bids,

US 9,665,897 B2

13

for example, if consumer search requirements are unrealistic for the consumer's required price range. Also, for example, if only one or two bids are received, the recommendation engine 312 may recommend that a consumer wait for a better bid because the bids provided are not competitive offers based on the current automobile market data stored in the database system 310. Further, in an example embodiment, dealer bids may be organized according to distance to a dealer pickup location, lowest price, closest match to the consumer entered criteria, a normalized quality index or value index, etc. The consumer may be able to toggle between different viewing options for dealer bids or search results.

Further, in an example embodiment, a buyer may be at a dealer lot (e.g., a Nissan dealer) and take a picture of a VIN on a car (e.g., a Maxima). A bid from a competing dealer (e.g., a Toyota dealer) across the street may be received on the mobile device within seconds and include information for a comparable car (e.g., an Avalon) relating to, for example, gas mileage, safety ratings, price comparisons, residual value, driving directions to the competing dealer, etc. In an example embodiment, a dealer may use the geolocation of the buyer, such as in instances when the buyer is physically located close to the dealer. Accordingly, competing dealer bids may be interbrand or intrabrand in nature, and may be tailored to the buyer's particular situation, which a consumer may find highly advantageous. For example, the buyer may have a bid for a car the buyer wants to test drive as well as a bid for a comparable car across the street before a salesman from the dealer even introduces himself. Accordingly, a consumer may weigh the pros and cons of various dealer bids, based on delivery options, pricing, and any other relevant variants. Any bids communicated from a dealer interface 306 may be stored, for example, in database system 310, to further update the automobile market information processing system 302 with current automobile market data.

The consumer selects a bid including a delivery option which specifies a pickup location (block 414). For example, the car buyer chooses a delivery option of picking up the car at a nearby dealer in five days. As noted above, a dealer may be a franchise dealer entity or a non-franchise distribution location. The buyer may select an offer with a specified delivery option on the consumer interface 304. The car buyer may have been weighing two or more different delivery options and/or different features, price differences, etc., based on the response(s) received through the consumer interface 304. As noted above, the consumer interface 304 may organize bids and other helpful information in a variety of ways, which may make the information easier for a consumer to digest. It should be appreciated that a buyer will typically want to pick up a new car at a convenient location, often near the buyer's home. Accordingly, dealers may attempt to provide delivery options tailored towards maximizing profit for the dealer while also maximizing convenience to the buyer, while also providing a superior bid to other dealers. By providing multiple bids with different delivery options, the buyer may be allowed to save time or money based on the buyer's particular needs. In an example embodiment, the buyer may provide a counter offer or different request via the consumer interface 304 to a dealer via the dealer interface 306. Accordingly, the dealer may respond in kind, and may update delivery options or other terms. It should be appreciated that the consumer selection of a bid may, for example, occur simultaneously with the consumer executing the sale or providing a deposit or down payment, or the like (see, e.g., block 418). Accordingly, in an example embodiment, once the buyer selects a bid, the

14

buyer has effectively purchased the car, and the dealer does need to worry about the buyer backing out of the deal. Any consumer selections, counter offers, or additional requests or responses may be stored in database system 310, as the communications are processed by automobile market information processing system 302, providing further data updates. Accordingly, in an example embodiment, a consumer may select a bid to purchase a car, and that purchase information may then be provided to another consumer searching for the same type of car with similar features, for example, the next day.

Once a bid with a specific delivery option has been selected, the manufacturer is instructed to provide the automobile to a dealer according to the consumer bid selection (block 416). For example, the car maker is instructed to re-route a car already in transit to the dealer pickup location for delivery in less than five days. In an example embodiment, the dealer may be required to send an instruction message from the dealer interface 306 to the manufacturer interface 308. It should be appreciated that the specific manner of instruction may be changed based on the particular application, for example, the automobile market information processing system 302 may automatically provide an instruction to a manufacturer to produce a car or re-route a car. It should be appreciated that particular events may be required to trigger instructing a car to be delivered to a dealer, such as a deposit, financing approval, etc. Further, the consumer may be required to send an instruction message from the consumer interface 304 to the manufacturer interface 308 affirming that the buyer has agreed to purchase the car from the dealer.

The consumer and the dealer execute the sale of the automobile (block 418). For example, the consumer electronically signs documentation such as loan application and a contract and performs an electronic funds transfer or credit card payment. After the delivery option is selected, an electronic contract may be provided by the manufacturer for the buyer who may e-sign the contract, and/or any other loan applications or other documentation as needed. In another example embodiment, paper copies of a contract may be signed, for example, after the buyer prints them or receives them from a nearby dealer or through the mail. In an example embodiment, the buyer may provide cash or a paper check. It should be appreciated that the process of executing a contract may take some time. For example, the process may occur in several steps, as loan processing may be required prior to executing a contract for sale of a car. Also, it should be appreciated that, for example, the consumer selection of a bid discussed above (see, e.g., block 414) may occur simultaneously with the consumer executing the sale. Once the sale is completed, the actual transaction data including the final negotiated price, may be provided to and stored in database system 310. Accordingly, the automobile market information processing system 302 may be updated with current automobile market data from every step in the negotiation process between a consumer and a manufacturer. In an example embodiment, the updates provided to the automobile market information processing system 302 are provided in real-time, for example, data may be transmitted and processed within seconds or minutes. Further, for example, it should be appreciated that certain data may be provided to the automobile market information processing system 302 according to a batch processing schedule.

Next, the manufacturer provides the dealer with the purchased automobile according to the consumer bid selection (block 420). For example, the car maker re-routes a car en route to delivery at another dealer to the dealer pickup

US 9,665,897 B2

15                                                          16

location selected by the car buyer or transports the car directly from the factory to the dealer pickup location. If a buyer chooses a quicker delivery option, the car may need to be re-routed from a different destination to the selected dealer pickup location. If a buyer does not urgently need to have a car, a new car may be built to the buyer's exact specifications and delivered to the selected dealer pickup location. Also, for example, a purchased car may be already at a dealer which the buyer has agreed to pick the car up, in which case, the car does not need to be provided to the dealer. A dealer may interact with the automobile market information processing system **302** using dealer interface **306**, for example, to receive notification that a car will be picked up by a buyer, and to report that a car has been delivered to the dealer. A notification may also be sent via consumer interface **304** to the buyer that the car is available for pickup at the specified dealer.

Finally, the consumer picks up the purchased automobile according to the consumer selected delivery option at the dealer (block **422**). For example, the car buyer picks up the car at the nearby dealer five days after the car sale is executed. The buyer may pick up the car without ever having to talk to or negotiate, in person or over the telephone, with the dealer. For example, the buyer may arrive at the dealer, show identification and proof of purchase, and be provided the keys to the car. The buyer may sign paperwork indicating the car has been picked up. Also, the dealer may offer or provide additional products or services to the buyer when the buyer goes to the dealer to pick up the car. For example, the dealer may offer financing options, warranties, service plans, insurance plans, and hard add accessories to the buyer, as discussed in further detail above.

Accordingly, it should be appreciated that manufacturers, consumers, and dealers may receive significant benefits from the method of facilitating an automobile transaction disclosed herein. For example, production scheduling, price setting, inventory management, may be greatly improved for manufacturers and dealers by utilizing the disclosed system and method. Consumers may benefit from more competitive pricing, piece of mind knowing that a fair market price is being offered for prospective purchases, and improved delivery options that allow the consumer to weigh the benefits and drawbacks of different delivery options, pricing, and other variables. In an example embodiment, consumers can view prices paid for comparable cars in specific locations based on the automobile market data in the automobile market information processing system **302**, for example, within a certain time frame such as one month and within a certain proximity to the consumer. Moreover, various inefficiencies in the automobile industry may be minimized utilizing the presently disclosed system and method.

FIG. **5** illustrates a block diagram of an example data architecture **500**. In the example data architecture **500**, interface data **502**, administrative data **504**, and automobile market data **506** interact with each other, for example, based on user commands or requests. The interface data **502**, administrative data **504**, and automobile market data **506** may be stored on any suitable storage medium (e.g., server **226**). It should be appreciated that different types of data may use different data formats, storage mechanisms, etc. Further, various applications may be associated with processing interface data **502**, administrative data **504**, and automobile market data **506**. Various other or different types of data may be included in the example data architecture **500**.

Interface data **502** may include input and output data of various kinds. For example, input data may include mouse click data, scrolling data, hover data, keyboard data, touch screen data, voice recognition data, etc., while output data may include image data, text data, video data, audio data, etc. Interface data **502** may include data relating to formatting, user interface options, links or access to other websites or applications, and the like. Interface data **502** may include applications used to provide or monitor interface activities and handle input and output data.

Administrative data **504** may include data and applications regarding user accounts. For example, administrative data **504** may include information used for updating accounts, such as creating or modifying manufacturer accounts or dealer accounts. Further, administrative data **504** may include access data and/or security data. Administrative data **504** may interact with interface data in various manners, providing a user interface **304**, **306**, **308** with administrative features, such as implementing a user login and the like.

Automobile market data **506** may include, for example, executed sales data **508**, consumer data **510**, dealer data **512**, manufacturer data **514**, statistical data **516**, and/or historical data **518**. Executed sales data **508** may include actual negotiated prices for manufacturer and dealer sales, differences in list prices to negotiated prices, sales demographics, etc. Consumer data **510** may include consumer search activity, consumer requests and offers, consumer feedback, etc. Dealer data **512** may include dealer pricing, including list prices, sale prices for limited time dealer offers or deals of the day, negotiation information such as bottom line pricing, offers received, foot traffic activity, and dealer inventory data, including current on location data, automobile turnover rates, etc. Manufacturer data **514** may include manufacturer pricing, including suggested pricing, preferred dealer pricing, etc., manufacturer incentives including cash rebates, special lease rates, special APR rates, zero down offers, lifetime warranties, guaranteed trade-in offers, etc., and inventory information including dealer inventory, inventory by location, inventory in transit, manufacturing or production lead times or build times, production scheduling, shipping scheduling, etc. Statistical data **516** may include information used for providing reports including graphs, forecasts, recommendations, calculators, depreciation schedules, tax information, etc., including equations and other data used for statistical analysis. Historical data **508** may include past sales data, such as historical list prices, actual sale prices, manufacturer and dealer margins, operating costs, service costs or profitability, loyalty information, etc. It should be appreciated that data may fall under multiple categories of automobile market data **506**, or change with the passage of time. It should also be appreciated that automobile market data **506** may be tailored for a particular manufacturer or dealer, for example, a manufacturer may request that a specific type of data that is not normally stored or used be stored in the database system **310**. Accordingly, for example, customized reports may be provided to a manufacturer interface **308** using that specific data for the manufacturer.

The integration of the various types of automobile market data **506** received from the consumer interface **304**, dealer interface **306**, and manufacturer interface **308** may provide a synergistic and optimal resource for consumers, dealers, and manufacturers alike. In an example embodiment, a consumer may benefit greatly from using an application in a mobile device **103** to receive both intrabrand information and interbrand information in real-time, based only on taking a picture of VIN. Dealers and manufacturers may be able to provide information to the consumer in a manner that highlights the benefits of the products the respective dealer

US 9,665,897 B2

17

or manufacturer would like to sell. The intraband and interband information provided on a consumer interface **304** may allow the best automobile options for a particular consumer to be provided to that consumer, may allow manufacturers to better follow through with opportunities for sales, and may allow dealers to compete with other dealers taking into account a greater amount of automobile market information, all of which may result in a more efficient automobile market.

Automobile market data **506** may be maintained in various servers **108**, in databases or other files. It should be appreciated that, for example, a host device **104** may manipulate automobile market data **506** in accordance with the administrative data **504** and interface data **502** to provide requests or reports to users **114** including consumers, dealers, and manufacturers, and perform other associated tasks. It should also be appreciated that automobile market data **506** represents automobile market information, and that these terms may be used interchangeably in this disclosure depending upon the context.

FIG. **6** is flow diagram illustrating an example process **600** for facilitating an automobile transaction, according to an example embodiment of the present invention. Although the process **600** is described with reference to the flow diagram illustrated in FIG. **6**, it will be appreciated that many other methods of performing the acts associated with the process **600** may be used. For example, the order of many of the blocks may be changed, certain blocks may be combined with other blocks, and many of the blocks described are optional.

In the example process **600**, data may flow between the automobile market information processing system **302** and a consumer interface **304**, a manufacturer interface **308**, and a dealer interface **306**, as discussed above based on consumer, manufacturer, and dealer interaction with the automobile market information processing system **302**. It should be appreciated that the automobile market information processing system **302** may update the automobile market information stored in the database system **310** when automobile market information is received from a consumer, a dealer, or a manufacturer, or from any other information source. Accordingly, the automobile market information may remain current and/or provide sufficiently recent data for the benefit of consumers, dealers, and/or manufacturers.

The example process **600** may begin with a consumer taking a picture of a VIN using a mobile phone application (block **602**). The consumer interface **304** may use OCR to determine and provide the VIN to the automobile market information processing system **302** to provide a consumer request (block **604**). It should be appreciated that OCR may occur in the automobile market information processing system **302** or at the consumer interface **304**. The automobile market information processing system **302** receives the consumer request and prepares automobile market information based on the request (block **606**). The automobile market information processing system **302** may send the consumer request and automobile market information based on the consumer request to the manufacturer interface **308** (block **608**). It should be appreciated that while the consumer request is automobile market information, typically, additional automobile market information would be provided with the consumer request. For example, typically, data relating to recent sales of the requested automobile and/or comparable automobiles may be provided. In an example embodiment, a target price or "true" value of the requested automobile may be provided. The manufacturer receives the request, determines that an automobile can be

18

provided and prepares and provides verification information for consumer and dealers (block **610**). A manufacturer response with the verification information may be provided from the manufacturer interface **308** to the automobile market information processing system **302** (block **612**). The automobile market information processing system **302** receives and processes the manufacturer response with the verification and prepares and provides information for consumer and dealers (block **614**). The manufacturer response with a verification may be sent from the automobile market information processing system **302** to the consumer interface **304** (block **616**). It should be appreciated that other automobile market information may be provided to the consumer interface **304** with a verification, for example, suggested pricing, ratings information, etc. The consumer interface **304** receives the verification that the automobile can be provided, for example, as a confirmation message on the mobile device (block **618**).

The automobile market information processing system **302** may also send to the dealer interface **306** a bid request for one or more dealers (block **620**). One or more dealers receive a bid request, determine prices and delivery options for the automobile, and prepare and provide bids for the consumer (block **622**). A dealer bid may be sent from the dealer interface **306** to the automobile market information processing system **302** for each dealer that wants to provide a bid (block **624**). The automobile market information processing system **302** receives and processes dealer bids and prepares the bids and automobile market data for the consumer (block **626**). The automobile market information processing system **302** may send dealer bids and automobile market information to the consumer interface **304** (block **628**). It should be appreciated that automobile market information may be provided to the consumer before dealer bids are provided, and/or concurrently with dealer bids. Also, it should be appreciated that blocks **616** and **628** may be combined, particularly if the dealer bidding process can occur quickly, for example, in real-time. The consumer may receive dealer bids based on the verification and select a bid including a delivery option based on automobile market information (block **630**). The consumer interface **304** may send to the automobile market information processing system **302** a selection of a bid indicating that the consumer wants to purchase or lease the automobile based on the selected bid (block **632**). The automobile market information processing system **302** receives and processes the consumer bid selection (block **634**). For example, the automobile market information processing system **302** may send the bid selection to the dealer interface **306** (block **636**). The dealer may receive the bid selection and coordinate a sale by, for example, instructing the manufacturer to produce and ship the automobile to the dealer location for delivery to the consumer (block **638**). Also, for example, the dealer may provide contract or loan documents, collect a deposit or down payment, or the like. As discussed above, in each of blocks **606**, **614**, **626**, and **634**, the automobile market information processing system **302** may update the automobile market information in the database system **310** based on the information received from the consumer, dealer, and/or manufacturer.

For exemplary purposes, the present disclosure discusses a various examples relating to a purchase of a car. However, it should be appreciated that the disclosed system, methods, and apparatus may be advantageously used in relation to various automobiles other than cars including, for example, trucks, vans, sport utility vehicles, jeeps, motorcycles, com-

US 9,665,897 B2

19                                                                                    20

mercial vehicles, and/or automobiles that have a VIN and require a license plate to operate.

It will be appreciated that all of the disclosed methods and procedures described herein can be implemented using one or more computer programs or components. These components may be provided as a series of computer instructions on any conventional computer-readable medium, including RAM, ROM, flash memory, magnetic or optical disks, optical memory, or other storage media. The instructions may be configured to be executed by a processor, which when executing the series of computer instructions performs or facilitates the performance of all or part of the disclosed methods and procedures.

Further, it will be appreciated that the presently disclosed system, methods, and apparatus for performing automobile transactions may be utilized in conjunction with other systems or methods. For example, the presently disclosed system, methods, and apparatus may be used in conjunction with the disclosure in the co-pending commonly-owned patent application filed on Jul. 5, 2011, entitled "AUTOMOBILE TRANSACTION FACILITATION BASED ON CUSTOMER SELECTION OF A SPECIFIC AUTOMOBILE," application Ser. No. 13/176,525, the entire contents of which are hereby incorporated by reference herein, and in an example embodiment, the features of which may be combined with the features of the present disclosure.

It should be understood that various changes and modifications to the example embodiments described herein will be apparent to those skilled in the art. Such changes and modifications can be made without departing from the spirit and scope of the present subject matter and without diminishing its intended advantages. It is therefore intended that such changes and modifications be covered by the appended claims.

The invention is claimed as follows:

1. A method comprising:

receiving, via a consumer interface, a first request for a response regarding a first automobile, which is manufactured by a first manufacturer, the first request made by a consumer located at a first location and including geolocation information of the consumer;

executing instructions, by at least one processing device, to:

determine current inventory data of the first automobile, wherein the current inventory data of the first automobile includes a plurality of dealer inventories of a plurality of dealers, with each respective dealer of the plurality of dealers having a respective dealer inventory;

provide the current inventory data of the first automobile to the first manufacturer, based on the first request, via a manufacturer interface;

generate, based on the current inventory data of the first automobile, via the manufacturer interface, at least one of a verification indicating that the first automobile can be provided for the consumer, a confirmation indicating that the first automobile can be provided for the consumer, and an offer indicating that the first automobile can be provided for the consumer;

determine, based on the geolocation information, that the consumer is located at the first location;

generate, based on the first location, an in-market dealer area proximately located to the first location;

determine that at least a first dealer is located within the in-market dealer area, the first dealer located at a second location;

provide a first manufacturer response via the consumer interface, the first manufacturer response including the at least one of the verification indicating that the first automobile can be provided for the consumer, the confirmation indicating that the first automobile can be provided for the consumer, and the offer indicating that the first automobile can be provided for the consumer;

request, from the first dealer, via a dealer interface, a bid to sell the first automobile based on the first manufacturer response;

receive, from the first dealer located at the second location, the bid to provide the first automobile;

generate driving directions from the first location to the second location; and

provide the bid and the driving directions to the consumer interface, the bid including at least a price and a delivery option.

2. The method of claim 1, wherein the current inventory data includes at least one of inventory data by location, inventory in transit data, production lead time data, production schedule data, and shipping schedule data.

3. The method of claim 1, wherein the first request is made by a consumer on a website using a request form including at least one of a text box and a drop down list.

4. The method of claim 1, wherein the first request is made by a consumer using a mobile device which takes a picture of a vehicle identification number.

5. The method of claim 4, wherein the vehicle identification number is recognized using optical character recognition.

6. The method of claim 1, wherein the first automobile is one of a particular type of car with a specific set of features and a particular car with a specific vehicle identification number.

7. The method of claim 1, further comprising providing first automobile market data to the first manufacturer including a suggested bid price.

8. The method of claim 7, wherein the first automobile market data is based on real-time automobile market data.

9. The method of claim 1, further comprising:

executing instructions, by the at least one processing device, to process the consumer selection of the bid to facilitate:

instructing the first manufacturer to provide the first automobile to the first dealer based on a consumer selection of the bid; and

executing a sale, including at least one of providing for electronic signature of documents and providing for an electronic funds transfer.

10. The method of claim 1, wherein the manufacturer interface allows a manufacturer to at least one of request data via the consumer interface from a plurality of consumers and request data via the dealer interface from a plurality of dealers.

11. The method of claim 1, wherein the first dealer at least one of provides and offers at least one of a financing plan, a service plan, an insurance plan, a warranty, and a hard add accessory, for at least the first automobile.

12. The method of claim 1, wherein the first dealer is at least one of a franchise dealer and a non-franchise distribution location.

13. The method of claim 1, wherein the first manufacturer response includes an acknowledgement of interest.

14. The method of claim 1, wherein the first automobile is yet to be manufactured at the time the bid is received from the first dealer.

US 9,665,897 B2

21

**15**. The method of claim **1**, wherein the first automobile is in the inventory of an entity other than the first dealer at the time the bid is received from the first dealer.

**16**. The method of claim **1**, further comprising receiving a consumer selection of the bid including a first delivery option which specifies a pickup location at the first dealer, and the first automobile is made available for pickup at the first dealer.

**17**. The method of claim **1**, wherein the consumer selection of the bid indicates a consumer intention to purchase the first automobile.

**18**. The method of claim **1**, wherein the consumer selection of the bid indicates a consumer intention to lease the first automobile.

**19**. The method of claim **1**, wherein the bid includes a first price corresponding to a first delivery option and a second price corresponding to a second delivery option.

**20**. The method of claim **1**, further comprising executing instructions, by the at least one processing device, to:

request, from a second dealer located at a third location within the in-market dealer area, a second bid to sell the first automobile based on the first manufacturer response;

receive, from the second dealer, the second bid to sell the first automobile based on the first manufacturer response;

generate second driving directions from the first location to the third location; and

provide the second bid and the second driving directions to the consumer interface, the second bid including at least a second price and a second delivery option.

**21**. The method of claim **1**, wherein the consumer is a person.

**22**. The method of claim **1**, wherein the consumer is an entity.

**23**. The method of claim **1**, wherein the consumer chooses a pickup location.

**24**. The method of claim **1**, wherein the delivery option includes a first pickup location.

**25**. The method of claim **24**, wherein the consumer chooses the first pickup location.

**26**. The method of claim **1**, wherein the first dealer is a franchise entity.

**27**. The method of claim **1**, wherein the first dealer is a non-franchise entity distribution location.

**28**. The method of claim **27**, wherein the consumer chooses a pickup location.

**29**. The method of claim **28**, wherein the first automobile is at the consumer's chosen pickup location, such that the first automobile does not need to be transported to the consumer's chosen pickup location.

**30**. The method of claim **28**, wherein the consumer submits a request to the first dealer to change a first delivery option to include the consumer's chosen pickup location.

**31**. The method of claim **30**, wherein, based on the consumer's request to change the first delivery option, the first dealer provides a second delivery option including the consumer's chosen pickup location.

**32**. The method of claim **31**, wherein a notification is sent to the consumer that the first automobile is available for pickup at the consumer's chosen pickup location.

**33**. The method of claim **32**, wherein the consumer picks up the first automobile at the consumer's chosen pickup location.

**34**. The method of claim **31**, wherein the first automobile is transported to the consumer's chosen pickup location.

22

**35**. The method of claim **34**, wherein the first automobile is transported directly from a third location to the consumer's chosen pickup location.

**36**. The method of claim **35**, wherein a second dealer is located at the third location.

**37**. The method of claim **35**, wherein a manufacturer is located at the third location.

**38**. The method of claim **1**, wherein the first dealer provides the first automobile to the consumer at a pickup location by one of (i) having the first automobile transported to the pickup location and (ii) having a manufacturer produce the first automobile.

**39**. A system comprising:

a computer readable medium storing instructions; and

at least one processing device operably coupled to the computer readable medium, the at least one processing device executing the instructions to:

receive, via a consumer interface, a first request for a response regarding a first automobile, which is manufactured by a first manufacturer, the first request made by a consumer located at a first location and including geolocation information of the consumer;

determine current inventory data of the first automobile, wherein the current inventory data of the first automobile includes a plurality of dealer inventories of a plurality of dealers, with each respective dealer of the plurality of dealers having a respective dealer inventory;

provide the current inventory data of the first automobile to the first manufacturer, based on the first request, via a manufacturer interface;

generate, based on the current inventory data of the first automobile, via the manufacturer interface, at least one of a verification indicating that the first automobile can be provided for the consumer, a confirmation indicating that the first automobile can be provided for the consumer, and an offer indicating that the first automobile can be provided for the consumer;

determine, based on the geolocation information, that the consumer is located at the first location;

generate, based on the first location, an in-market dealer area proximately located to the first location;

determine that at least a first dealer is located within the in-market dealer area, the first dealer located at a second location;

provide a first manufacturer response via the consumer interface, the first manufacturer response including the at least one of the verification indicating that the first automobile can be provided for the consumer, the confirmation indicating that the first automobile can be provided for the consumer, and the offer indicating that the first automobile can be provided for the consumer;

request, from the first dealer, via a dealer interface, a bid to sell the first automobile based on the first manufacturer response;

receive, from the first dealer located at the second location, the bid to provide the first automobile;

generate driving directions from the first location to the second location; and

provide the bid and the driving directions via the consumer interface, the bid including at least a price and a delivery option.

US 9,665,897 B2

23

**40**. A non-transitory computer readable medium storing software instructions which, when executed, cause an information processing apparatus to:

receive, via a consumer interface, a first request for a response regarding a first automobile, which is manufactured by a first manufacturer, the first request made by a consumer located at a first location and including geolocation information of the consumer;

determine current inventory data of the first automobile, wherein the current inventory data of the first automobile includes a plurality of dealer inventories of a plurality of dealers, with each respective dealer of the plurality of dealers having a respective dealer inventory;

provide the current inventory data of the first automobile to the first manufacturer, based on the first request, via a manufacturer interface;

generate, based on the current inventory data of the first automobile, via the manufacturer interface, at least one of a verification indicating that the first automobile can be provided for the consumer, a confirmation indicating that the first automobile can be provided for the consumer, and an offer indicating that the first automobile can be provided for the consumer;

24

determine, based on the geolocation information, that the consumer is located at the first location;

generate, based on the first location, an in-market dealer area proximately located to the first location;

determine that at least a first dealer is located within the in-market dealer area, the first dealer located at a second location;

provide a first manufacturer response via the consumer interface, the first manufacturer response including the at least one of the verification indicating that the first automobile can be provided for the consumer, the confirmation indicating that the first automobile can be provided for the consumer, and the offer indicating that the first automobile can be provided for the consumer;

request, from the first dealer, via a dealer interface, a bid to sell the first automobile based on the first manufacturer response;

receive, from the first dealer located at the second location, the bid to provide the first automobile;

generate driving directions from the first location to the second location; and

provide the bid and the driving directions via the consumer interface, the bid including at least a price and a delivery option.

*  *  *  *  *

US010140655B2

(12) **United States Patent**　(10) **Patent No.:**　**US 10,140,655 B2**

Seergy et al.　(45) **Date of Patent:**　**\*Nov. 27, 2018**

(54) **USED AUTOMOBILE TRANSACTION FACILITATION FOR A SPECIFIC USED AUTOMOBILE**

(71) Applicant: **Sidekick Technology LLC**, Pine Brook, NJ (US)

(72) Inventors: **Michael J. Seergy**, Pine Brook, NJ (US); **Benjamin N. S. Brown**, Pine Brook, NJ (US)

(73) Assignee: **SIDEKICK TECHNOLOGY LLC**, Pine Brook, NJ (US)

( \* ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

This patent is subject to a terminal disclaimer.

(21) Appl. No.: **15/284,181**

(22) Filed: **Oct. 3, 2016**

(65) **Prior Publication Data**

US 2017/0154378 A1　Jun. 1, 2017

**Related U.S. Application Data**

(63) Continuation of application No. 14/841,157, filed on Aug. 31, 2015, now Pat. No. 9,460,467, which is a
(Continued)

(51) **Int. Cl.**
**G06Q 30/00** (2012.01)
**G06Q 30/08** (2012.01)
(Continued)

(52) **U.S. Cl.**
CPC ............. **G06Q 30/08** (2013.01); **G01C 21/34** (2013.01); **G01C 21/3679** (2013.01);
(Continued)

(58) **Field of Classification Search**
CPC ...... G06Q 30/08; G06Q 30/06; G06Q 10/087; G06Q 30/0275; G06Q 30/0283; G06Q 30/0625
(Continued)

(56) **References Cited**

U.S. PATENT DOCUMENTS

5,970,472 A 10/1999 Allsop et al.
6,006,201 A 12/1999 Berent et al.
(Continued)

OTHER PUBLICATIONS

AutoTrader.com, Inc..: Private Company Information—Business Week, http://investing.businessweek.com/research/stocks/private/snapshot.asp?privcapId=92642.
(Continued)

*Primary Examiner* — Brandy A Zukanovich
(74) *Attorney, Agent, or Firm* — K&L Gates LLP

(57) **ABSTRACT**

A system, methods, and apparatus for performing used automobile transactions are disclosed. In an example embodiment, automobile market data representative of current automobile market characteristics is stored. The automobile market data may include pricing and consumer interest information received from consumers, dealers, and manufacturers. A consumer seller or manufacturer off-lease seller may provide a request for a response regarding a specific used automobile with a specific a vehicle identification number. Automobile market data may be provided to a used automobile buyer based on the request. Bids to purchase the specific used automobile may be requested from used automobile buyers based on the request. Buyer bids may be provided to the consumer seller or manufacturer off-lease seller with prices and a delivery options. The consumer seller or manufacturer off-lease seller may select a bid to sell the specific used automobile based on the bid.

**28 Claims, 7 Drawing Sheets**



### Related U.S. Application Data

continuation of application No. 14/176,700, filed on Feb. 10, 2014, now Pat. No. 9,123,075, which is a continuation of application No. 13/207,858, filed on Aug. 11, 2011, now Pat. No. 8,650,093, which is a continuation-in-part of application No. 13/176,497, filed on Jul. 5, 2011, now Pat. No. 9,141,984, and a continuation-in-part of application No. 13/176,525, filed on Jul. 5, 2011, now Pat. No. 8,744,925.

(51) **Int. Cl.**

| | |
|---|---|
| *G06Q 30/06* | (2012.01) |
| *G01C 21/34* | (2006.01) |
| *G01C 21/36* | (2006.01) |
| *G06F 3/16* | (2006.01) |
| *H04W 4/021* | (2018.01) |

(52) **U.S. Cl.**

CPC ......... *G01C 21/3697* (2013.01); *G06F 3/167* (2013.01); *G06Q 30/06* (2013.01); *G06Q 30/0641* (2013.01); *H04W 4/021* (2013.01); *H05K 999/99* (2013.01)

(58) **Field of Classification Search**

USPC ................................................ 705/26.1, 27.1

See application file for complete search history.

(56) **References Cited**

#### U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 6,321,221 | B1 | 11/2001 | Bieganski |
| 6,463,431 | B1 | 10/2002 | Schmitt |
| 6,533,173 | B2 | 3/2003 | Benyak |
| 6,868,388 | B1 | 3/2005 | Millsap et al. |
| 6,868,389 | B1 | 3/2005 | Wilkins et al. |
| 7,395,223 | B1 | 7/2008 | Buzzell et al. |
| 7,406,436 | B1 | 7/2008 | Reisman |
| 7,479,949 | B2 | 1/2009 | Jobs et al. |
| 7,636,574 | B2 | 12/2009 | Poosala |
| 8,160,929 | B1 | 4/2012 | Park et al. |
| 8,392,193 | B2 | 3/2013 | Schultz et al. |
| 8,606,604 | B1 | 12/2013 | Huber et al. |
| 2002/0065707 | A1 | 5/2002 | Lancaster et al. |
| 2002/0082978 | A1 | 6/2002 | Ghouri et al. |
| 2002/0099628 | A1 | 7/2002 | Takaoka et al. |
| 2002/0111877 | A1 | 8/2002 | Nelson |
| 2002/0128946 | A1 | 9/2002 | Chehade et al. |
| 2003/0088435 | A1 | 5/2003 | King |
| 2003/0200151 | A1 | 10/2003 | Ellenson |
| 2003/0229577 | A1 | 12/2003 | Nabel |
| 2004/0034544 | A1 | 2/2004 | Fields et al. |
| 2004/0059626 | A1 | 3/2004 | Smallwood |
| 2005/0004819 | A1 | 1/2005 | Etzioni et al. |
| 2005/0050097 | A1 | 3/2005 | Yeh et al. |
| 2005/0108112 | A1 | 5/2005 | Ellenson et al. |

| | | | |
|---|---|---|---|
| 2005/0240512 | A1 | 10/2005 | Quintero et al. |
| 2006/0020477 | A1 | 1/2006 | Retzbach et al. |
| 2007/0150362 | A1 | 6/2007 | Sharma et al. |
| 2007/0250403 | A1 | 10/2007 | Altschuler |
| 2007/0255663 | A1 | 11/2007 | Jordan et al. |
| 2007/0260526 | A1 | 11/2007 | Bartel |
| 2008/0046331 | A1 | 2/2008 | Rand |
| 2008/0177653 | A1 | 7/2008 | Famolari et al. |
| 2008/0183552 | A1 | 7/2008 | O'Hagan |
| 2008/0187125 | A1 | 8/2008 | Siegrist |
| 2008/0201184 | A1 | 8/2008 | Rose et al. |
| 2008/0201188 | A1 | 8/2008 | Heyman et al. |
| 2008/0201203 | A1 | 8/2008 | Rose et al. |
| 2008/0208731 | A1 | 8/2008 | Ruckart |
| 2008/0228657 | A1 | 9/2008 | Nabors et al. |
| 2009/0076896 | A1 | 3/2009 | DeWitt et al. |
| 2009/0132348 | A1 | 5/2009 | Bria et al. |
| 2009/0149199 | A1 | 6/2009 | Maghoul |
| 2009/0171761 | A1 | 7/2009 | Noy et al. |
| 2009/0187478 | A1 | 7/2009 | Shipley |
| 2009/0187513 | A1 | 7/2009 | Noy et al. |
| 2009/0198557 | A1 | 8/2009 | Wang et al. |
| 2009/0204600 | A1 | 8/2009 | Kalik et al. |
| 2010/0048242 | A1 | 2/2010 | Rhoads et al. |
| 2010/0106580 | A1 | 4/2010 | Etheredge et al. |
| 2010/0217525 | A1 | 8/2010 | King et al. |
| 2010/0274627 | A1 | 10/2010 | Carlson |
| 2010/0332292 | A1 | 12/2010 | Anderson |
| 2011/0040642 | A1 | 2/2011 | O'Dell |
| 2011/0082759 | A1 | 4/2011 | Swinson et al. |
| 2011/0087430 | A1 | 4/2011 | Boss et al. |
| 2011/0087556 | A1 | 4/2011 | Pitkow |
| 2011/0099036 | A1 | 4/2011 | Sarkissian et al. |
| 2011/0208418 | A1 | 8/2011 | Looney et al. |
| 2011/0238474 | A1 | 9/2011 | Carr et al. |
| 2011/0238514 | A1 | 9/2011 | Ramalingam et al. |
| 2011/0276394 | A1 | 11/2011 | Chan |

#### OTHER PUBLICATIONS

Autotrader.com Introduces IPhone App to Create a More Personalized "PC-to-Pocket" Experience for Car Shoppers, http://www.prnewswire.com/news-releases/autotradercom, Jul. 7, 2011.

AppStore—AutoTrader.com, http://itunes.apple.com/us/app/autotrader-com/id444552888?mt=8, Oct. 31, 2011.

International Search Report dated Sep. 21, 2012 for Intl. Appln. No. PCT/US2012/045546.

Charlton, Auto Trader: iPhone app review. Mar. 15, 2010 [retrieved on Sep. 6, 2012] from the internet: http://www.econsultancy.com/us/blog/5593-auto-trader-iphone-app-review> entire document.

AUTODRADERUK. Introducing the Auto Trader iPhone App. Mar. 12, 2010 [retrieved on Sep. 6, 2012] from the internet: http/www.youtube.com/watch?v+6g_1g8IRG4&feature=player_embedded> entire document.

International Search Report dated Oct. 5, 2012 for Intl. Appln. No. PCT/US2012/045545.

Anonymous, "instaVIN to offer free auto accident history reports for mobile phones," Wireless News, Jun. 2, 2010.



Fig. 1



Fig. 2



Fig. 3A



Fig. 3B



Start
400
402
Automobile market data including at least pricing data is stored in a database system (e.g., data from consumers, dealers, manufacturers, and industry analysts, regarding pricing, inventory, insurance information, quality ratings, safety ratings, and other ratings is collected and stored in a database)
404
A request for a response regarding a used automobile is received from a consumer seller (e.g., a used car seller takes a picture of the VIN of a used car and fills in price parameters and other information into a mobile application to receive a response based on current market data)
406
Automobile market data is provided to used automobile buyers based on the consumer seller request (e.g., a group of consumers and dealers receive a real-time report including local used car sales data, inventory data, quality and safety ratings data, insurance data, and gas mileage data of the specific used car)
408
A bid to purchase the automobile from the consumer seller is requested from used automobile buyers (e.g., a group of consumers and dealers within a certain radius of the used car seller receive a bid request based on buyer searches)
410
Buyer bids are provided to the consumer seller (e.g., several consumers and dealers provide bids based on current pricing data, options information on the specific used car, and potential pickup locations, so several different prices and delivery options may be available to the used car seller)
412
The consumer seller selects a buyer bid including a price and a delivery option (e.g., the used car seller chooses to sell the used car based on the price and the pickup location of a consumer buyer bid)
414
The consumer seller and used automobile buyer execute the sale of the automobile (e.g., the used car buyer e-signs a contract and electronically transfers funds to the used car seller based on the consumer bid)
416
The consumer seller makes the purchased used automobile available according to the consumer seller bid selection (e.g., the seller drives the used car to the pickup location if the pickup location is not the used car seller's location)
418
The used automobile buyer receives the purchased used automobile according to the consumer seller selected delivery option (e.g., the used car buyer receives the used car at the pickup location the same day the sale is executed)

Fig. 4



Fig. 5



600
318, 324
302
320, 322
602
Seller takes a picture of a VIN and enters pricing parameters
604
Seller Request
606
System receives seller request and prepares automobile market data based on the request
608
Bid request and auto market information
610
Used auto buyers receive bid request and automobile market information to determine prices and delivery options for the used auto and prepare and provide bids for the used auto seller
612
Buyer bid
614
System receives and processes buyer bids and prepares bids and automobile market data for seller
616
Buyer bids and auto market information
618
Seller receives buyer bids and automobile market information and selects a bid including a delivery option based on automobile market information
620
Selection
622
System receives and processes bid selection
624
Selection
626
Buyer receives bid selection and coordinates a sale

Fig. 6

US 10,140,655 B2

**1**

# USED AUTOMOBILE TRANSACTION FACILITATION FOR A SPECIFIC USED AUTOMOBILE

## CROSS REFERENCE TO RELATED APPLICATIONS AND PRIORITY CLAIM

This application is a continuation of U.S. patent application Ser. No. 14/841,157, filed Aug. 31, 2015, which is a continuation of Ser. No. 14/176,700, filed Feb. 10, 2014, which is a continuation of U.S. patent application Ser. No. 13/207,858, filed on Aug. 11, 2011, which is a continuation-in-part of the following co-pending commonly-owned patent applications filed on Jul. 5, 2011, entitled "AUTOMOBILE TRANSACTION FACILITATION USING A MANUFACTURER RESPONSE," application Ser. No. 13/176,497, and entitled "AUTOMOBILE TRANSACTION FACILITATION BASED ON CUSTOMER SELECTION OF A SPECIFIC AUTOMOBILE," application Ser. No. 13/176,525, now U.S. Pat. No. 8,744,925, issued Jun. 3, 2014, the entire content of each of which is incorporated by reference herein.

## BACKGROUND

In the used automobile market, consumers typically sell or trade in used automobiles to dealers or dealerships, or privately sell to other consumers, for example, through personal advertisements. Dealers often purchase used automobiles from consumers as part of a deal for a new automobile, typically referred to as a trade in. Typically, a description of a used automobile in a personal advertisement may include the make, model, and mileage of an automobile, but certain other relevant descriptive information may not be available to a potential buyer. Further, a dealer making a trade in offer for a used automobile may not have certain relevant descriptive information on that used automobile. In many cases, the negotiation process for a used automobile may include a large degree of uncertainty for consumers, including both a selling consumer and a purchasing consumer. A consumer seller may be particularly disadvantaged when negotiating with a dealer for a trade in value, as dealers typically have great knowledge and experience with the process, while consumers typically do not. Generally, the negotiation process is a zero sum process, and because a consumer seller of a used automobile and a used automobile buyer are each trying to get a better deal, there is typically some lack of trust during the negotiation. Accordingly, used automobile buyers and sellers, including consumers and dealers, often base the negotiations on established market prices. However, market prices can fluctuate rapidly depending a variety of factors. For example, consumer demand may be affected by economic factors, such as changes in gasoline prices, unemployment rates, government sponsored tax rebates for automobile purchases, etc.

In many cases, a consumer seller of a used automobile may have concerns that a buyer may not offer a fair and competitive price. Various products and services have become available that allow sellers and buyers, including consumers and dealers, to perform research on market prices for used automobiles. Typically, the highest possible value available to a consumer seller may be through a sale to another consumer, as opposed to trading in the used automobile to a dealer.

In addition to consumers and dealers, automobile manufacturers may also have an interest in the resale values of used automobiles. Further, in many cases, a manufacturer

**2**

may want to sell used off-lease automobiles which have been returned by consumer lessees. In many cases, a manufacturer off-lease seller may not be able to receive the full market value of a used off-lease automobile.

## SUMMARY

The present disclosure provides a new and innovative system, methods and apparatus for providing automobile market information and facilitating used automobile transactions. In an example embodiment, automobile market data representative of current automobile market characteristics is stored. The automobile market data may include pricing and consumer interest information received from consumers, dealers, and manufacturers. A consumer seller or manufacturer off-lease seller may provide a request for a response regarding a specific used automobile with a specific vehicle identification number. Automobile market data may be provided to a used automobile buyer based on the request. Bids to purchase the specific used automobile may be requested from used automobile buyers based on the request. Buyer bids may be provided to the consumer seller or manufacturer off-lease seller with prices and a delivery options. The consumer seller or manufacturer off-lease seller may select a bid to sell the specific used automobile based on the bid.

Additional features and advantages of the disclosed method and apparatus are described in, and will be apparent from, the following Detailed Description and the Figures.

## BRIEF DESCRIPTION OF THE FIGURES

FIG. **1** is a high level block diagram of an example network communicating system, according to an example embodiment of the present invention.

FIG. **2** is a detailed block diagram showing an example of a computing device, according to an example embodiment of the present invention.

FIGS. **3**A and **3**B provide a block diagram, each showing an example automobile transaction network structure, according to an example embodiment of the present invention.

FIG. **4** is a flowchart illustrating an example process for facilitating a used automobile transaction, according to an example embodiment of the present invention.

FIG. **5** is a block diagram showing an example data architecture, according to an example embodiment of the present invention.

FIG. **6** is flow diagram illustrating an example process for facilitating a used automobile transaction, according to an example embodiment of the present invention.

## DETAILED DESCRIPTION OF EXAMPLE EMBODIMENTS

The present disclosure relates in general to a system for facilitating used automobile transactions and, in particular, to an automobile transaction for a specific used automobile. Briefly, in an example embodiment, a system is provided which allows a consumer seller or a manufacturer off-lease seller of a used automobile to request bids and information regarding a specific automobile identified with a specific vehicle identification number. For example, a consumer may use a mobile device to take a picture of a vehicle identification number and may enter a desired price range or minimum asking price. The specific automobile may be identified using optical character recognition to provide, for

US 10,140,655 B2

3

example, a full list of the original manufacturer features and options, and the original manufacturer suggested retail price and invoice information, for that specific used automobile based on the vehicle identification number. Accordingly, the consumer seller need not enter all of this information, but may request bids and information in real-time for that specific used automobile. Used automobile buyers may include consumers and/or dealers which may provide bids based on the consumer seller request using real-time automobile market information. A consumer seller may select a buyer bid to sell a used automobile based on the prices and delivery options available. Accordingly, typically unavailable or difficult to obtain data may be provided for offering a used automobile for sale, including a full listing of the manufacturer features and options, EPA mileage, safety ratings, recalls, quality reports, estimated insurance costs, etc. In an example embodiment, a manufacturer off-lease seller may select a buyer bid based on the prices and delivery options to maximize value, for example, by reducing costs typically associated with selling an off-lease automobile. The used automobile market is presently approximately three times the size of the new automobile market in the United States, as approximately 40 million used automobiles are sold each year. Accordingly, the present disclosure may be helpful for facilitating large numbers of used automobile transactions. In an example embodiment, the disclosed system matches seller and buyer parameters, such as price and pickup location, to facilitate a live bidding process, which allows a used automobile seller to accept or reject bids using a great deal of information not typically available. In a non-limiting example embodiment, certain features disclosed in the present patent application may be commercially embodied in products and services offered by Sidekick Technology LLC, the assignee of the present application.

The present system may be readily realized in a network communications system. A high level block diagram of an example network communications system 100 is illustrated in FIG. 1. The illustrated system 100 includes one or more client devices 102, and one or more host devices 104. The system 100 may include a variety of client devices 102, such as desktop computers and the like, which typically include a display 112, which is a user display for providing information to users 114, and various interface elements as will be discussed in further detail below. A client device 102 may be a mobile device 103, which may be a cellular phone, a personal digital assistant, a laptop computer, a tablet computer, etc. The client devices 102 may communicate with the host device 104 via a connection to one or more communications channels 106 such as the Internet or some other data network, including, but not limited to, any suitable wide area network or local area network. It should be appreciated that any of the devices described herein may be directly connected to each other instead of over a network. Typically, one or more servers 108 may be part of the network communications system 100, and may communicate with host servers 104 and client devices 102.

One host device 104 may interact with a large number of users 114 at a plurality of different client devices 102. Accordingly, each host device 104 is typically a high end computer with a large storage capacity, one or more fast microprocessors, and one or more high speed network connections. Conversely, relative to a typical host device 104, each client device 102 typically includes less storage capacity, a single microprocessor, and a single network connection. It should be appreciated that a user 114 as is described herein may include any person or entity which uses the presently disclosed system and may include a wide

4

variety of parties. For example, as will be discussed in further detail below, users 114 of the presently disclosed system may include a consumer, a dealer, and/or a manufacturer.

Typically, host devices 104 and servers 108 store one or more of a plurality of files, programs, databases, and/or web pages in one or more memories for use by the client devices 102, and/or other host devices 104 or servers 108. A host device 104 or server 108 may be configured according to its particular operating system, applications, memory, hardware, etc., and may provide various options for managing the execution of the programs and applications, as well as various administrative tasks. A host device 104 or server may interact via one or more networks with one or more other host devices 104 or servers 108, which may be operated independently. For example, host devices 104 and servers 108 operated by a separate and distinct entities may interact together according to some agreed upon protocol.

A detailed block diagram of the electrical systems of an example computing device (e.g., a client device 102, and a host device 104) is illustrated in FIG. 2. In this example, the computing device 102, 104 includes a main unit 202 which preferably includes one or more processors 204 electrically coupled by an address/data bus 206 to one or more memory devices 208, other computer circuitry 210, and one or more interface circuits 212. The processor 204 may be any suitable processor, such as a microprocessor from the INTEL PENTIUM® family of microprocessors. The memory 208 preferably includes volatile memory and non-volatile memory. Preferably, the memory 208 stores a software program that interacts with the other devices in the system 100 as described below. This program may be executed by the processor 204 in any suitable manner. In an example embodiment, memory 208 may be part of a "cloud" such that cloud computing may be utilized by a computing devices 102, 104. The memory 208 may also store digital data indicative of documents, files, programs, web pages, etc. retrieved from a computing device 102, 104 and/or loaded via an input device 214.

The interface circuit 212 may be implemented using any suitable interface standard, such as an Ethernet interface and/or a Universal Serial Bus (USB) interface. One or more input devices 214 may be connected to the interface circuit 212 for entering data and commands into the main unit 202. For example, the input device 214 may be a keyboard, mouse, touch screen, track pad, track ball, isopoint, image sensor, character recognition, barcode scanner, microphone, and/or a speech/voice recognition system.

One or more displays 112, printers, speakers, and/or other output devices 216 may also be connected to the main unit 202 via the interface circuit 212. The display 112 may be a cathode ray tube (CRTs), a liquid crystal display (LCD), or any other type of display. The display 112 generates visual displays generated during operation of the computing device 102, 104. For example, the display 112 may provide a user interface, which will be described in further detail below, and may display one or more web pages received from a computing device 102, 104. A user interface may include prompts for human input from a user 114 including links, buttons, tabs, checkboxes, thumbnails, text fields, drop down boxes, etc., and may provide various outputs in response to the user inputs, such as text, still images, videos, audio, and animations.

One or more storage devices 218 may also be connected to the main unit 202 via the interface circuit 212. For example, a hard drive, CD drive, DVD drive, and/or other storage devices may be connected to the main unit 202. The

US 10,140,655 B2

5

storage devices **218** may store any type of data, such as pricing data, transaction data, operations data, inventory data, commission data, manufacturing data, image data, video data, audio data, tagging data, historical access or usage data, statistical data, security data, etc., which may be used by the computing device **102**, **104**.

The computing device **102**, **104** may also exchange data with other network devices **220** via a connection to the network **106**. Network devices **220** may include one or more servers **226**, which may be used to store certain types of data, and particularly large volumes of data which may be stored in one or more data repository **222**. A server **226** may include any kind of data **224** including databases, programs, files, libraries, pricing data, transaction data, operations data, inventory data, commission data, manufacturing data, configuration data, index or tagging data, historical access or usage data, statistical data, security data, etc. A server **226** may store and operate various applications relating to receiving, transmitting, processing, and storing the large volumes of data. It should be appreciated that various configurations of one or more servers **226** may be used to support and maintain the system **100**. For example, servers **226** may be operated by various different entities, including automobile manufacturers, brokerage services, automobile information services, etc. Also, certain data may be stored in a client device **102** which is also stored on the server **226**, either temporarily or permanently, for example in memory **208** or storage device **218**. The network connection may be any type of network connection, such as an Ethernet connection, digital subscriber line (DSL), telephone line, coaxial cable, wireless connection, etc.

Access to a computing device **102**, **104** can be controlled by appropriate security software or security measures. An individual users' **114** access can be defined by the computing device **102**, **104** and limited to certain data and/or actions. Accordingly, users **114** of the system **100** may be required to register with one or more computing devices **102**, **104**. For example, registered users **114** may be able to request or manipulate data, such as submitting requests for pricing information or providing an offer or a bid.

As noted previously, various options for managing data located within the computing device **102**, **104** and/or in a server **226** may be implemented. A management system may manage security of data and accomplish various tasks such as facilitating a data backup process. A management system may be implemented in a client **102**, a host device **104**, and a server **226**. The management system may update, store, and back up data locally and/or remotely. A management system may remotely store data using any suitable method of data transmission, such as via the Internet and/or other networks **106**.

FIGS. **3A** and **3B** provide block diagrams, each showing an example automobile transaction network structure **300**. As illustrated in FIG. **3A**, the example automobile transaction network structure **300** includes an automobile market information processing system **302**, a consumer interface **304**, a dealer interface **306**, and a manufacturer interface **308**. The example automobile market information processing system **302** may be implemented on one or more host devices **104** accessing one or more servers **108**, **226**. In an example embodiment, the automobile market information processing system **302** includes a database system **310**, a recommendation engine **312**, a vehicle identification number processor **314**, and an interface generation unit **316**. A user **114** may be a consumer, a dealer, or a manufacturer that interacts with the consumer interface **304**, dealer interface **306**, or manufacturer interface **308**, respectively. A database

6

system **310** may include a wide variety of automobile market data. A recommendation engine **312** may provide recommendations for consumers, dealers, and manufacturers. A vehicle identification number processor **314** may be used for making requests regarding specific automobiles and automobiles with specific sets of features. For example, a vehicle identification number processor **314** may determine a specific set of features that a specific car has based on a picture of that specific car's vehicle identification number. Interface generation unit **316** may provide, for example, HTML files which are used at the consumer interface **304**, dealer interface **306**, and manufacturer interface **308** interface to provide information to the users **114**. It should be appreciated that he the consumer interface **304**, dealer interface **306**, and manufacturer interface **308** may be considered to be part of the automobile market information processing system **302**, however, for discussion purposes, the consumer interface **304**, dealer interface **306**, and manufacturer interface **308** may be referred to as separate from the automobile market information processing system **302**.

For example, a user **114** may interact with a consumer interface **304** to research new or used automobiles the user **114** is interested in buying or selling. For example, a consumer may be looking for a four door sedan with specific features, including a global positioning system (GPS), a sunroof, tinted windows, rated for at least thirty miles per gallon, four wheel drive, etc. The consumer may interact with the consumer interface **304** by inputting required and/or desired features, monthly budget or full price, etc. The consumer interface **304** may provide a wide variety of features and specifications which the consumer may choose from in providing a request. Based on the information put into the consumer interface **304** from the consumer, the consumer interface **304** may provide one or more reports or offers to the consumer. As will be discussed in further detail below, the information provided by the consumer interface **304** may include current market prices for automobiles, including information relating to additional features, and may include information on specific automobiles, for example, which may be en route to a dealer near the consumer's present location or may be already owned by the consumer. The automobile market information processing system **302** may process data received by the consumer interface **304**, as well as the dealer interface **306** and/or the manufacturer interface **308**, to respond to a request from a consumer. For example, data from database system **310** may be queried for use in a report, or a recommendation may be provided by recommendation engine **312** according to the consumer request and current market data. The automobile market information processing system **302** may integrate data received from consumer interface **304**, dealer interface **306**, and manufacturer interface **308** to provide current and accurate information relating to the automobile market.

It should be appreciated that the consumer interface **304** may be specific to one particular manufacturer or may provide information for automobiles manufactured by multiple different manufacturers. For example, a consumer interface **304** may be a website with information for many manufacturers. For example, the consumer interface **304** may access or link to the manufacturer specific websites (e.g., Ford), particularly with regard to new automobile information, but also for used automobile information. Also, for example, a consumer interface **304** may be implemented as an automobile manufacturer's website. Typically, a manufacturer's website may provide consumers with a catalog like feature that provides information on different automobile models with any available options or features. For

US 10,140,655 B2

7      8

example, a manufacturer website may allow a consumer to select options that are desired to "build" a particular new automobile, and may provide price comparisons using suggested retail prices, which may consumers use for initial research into what pricing the dealer may offer for a particular automobile with a particular feature set. Also, typically, the consumer may enter information, including, for example, name, an address or zip code, and telephone number. This information may be passed on from the manufacturer to a nearby dealer and/or nearby dealer information may be provided to the consumer (e.g., the dealer in or nearest to the consumer's entered zip code) Accordingly, the dealer may contact the consumer, or the consumer may inquire with the dealer, regarding the specific automobiles available on that dealer's lot and particular pricing being offered, in many cases, consumers may not inquire with dealers that the manufacturer may recommend, and similarly, dealers may not diligently follow up with consumers that have an interest in purchasing an automobile. Further, it should be appreciated that the information provided via a consumer interface **304** and/or a manufacturer website may be very useful to consumers. For example, in the past, dealers often provided brochures with all the information on a manufacturer's available car models, including all the features and options information. However, dealers typically do not provide comprehensive information brochures, which may be relatively expensive to produce, and rather, that information is typically located on a manufacturer website and/or a consumer interface **304**. It should also be appreciated that information on a manufacturer website and/or a consumer interface **304** may be directed to both new and used automobiles. For example, historical and statistical information which demonstrates favorable safety ratings, quality and reliability data, low maintenance costs, low insurance prices, low emissions, high gas mileage, etc. based on specific models for specific years, and/or groups of models and years may be provided on a manufacturer website and/or a consumer interface **304**.

Accordingly, the consumer interface **304** may provide a wide range of information, for example, based on any searches or queries performed by a user **114**. In an example embodiment, based on a user search or request for a response, the consumer interface **304** will display a quality index or value index based on normalized calculations for an automobile. The recommendation engine **312** may provide recommendations to a consumer based on the current automobile market data stored in the automobile market information processing system **302**. For example, metrics on gas mileage, emissions, operating and maintenance costs, safety ratings, etc. may be benchmarked against comparable automobiles of the same and different manufacturers. Similar purchase options to a specific search may also be provided, based on feature matching, price range, consumer popularity, etc. Information including price ranges, including MSRP, invoice prices, inventory levels, the user's **114** credit ratings (e.g., FICO score), may be provided which may include monthly payment estimates or projections. It should be appreciated that such data may be provided for both new and used automobiles. For example, a financing calculator may help a user **114** determine what financing rate is appropriate for an automobile purchase. It should be appreciated that dealers may mislead consumers into believing that a higher financing rate will be required to secure a loan. Further, for example, a lease vs. buy calculator may be provided which may use current market data including prices, interest rates, incentives, estimated mileage per year, etc. for providing an analysis for a particular consumer regarding purchasing or leasing. Also, the consumer interface **304** may provide a purchase checklist, for example, of ten steps to buying a car. A qualitative checklist may allow a user to ask the right questions and get the right answers from a dealer. Additional tips may be provided, such as a list of products or services dealers may attempt to sell to a consumer with an analysis of the value of these products or services and a recommendation to accept or decline these dealer offers. Further, beyond analysis relating to automobiles, additional analysis or reports may be provided, for example, relating to dealer reviews, other supplemental products, financial entities that may provide financing, etc. For example, dealer reviews may provide a consumer with information the consumer may use in addition to automobile pricing and delivery options. Moreover, the consumer interface **304** may provide a wide variety of useful information to a consumer, for at home research and preparation, and/or in a dealer location while shopping as a negotiating tool that may provide confirmation on pricing, useful tips, and the like. As will be discussed in FIG. 3B in further detail below, the consumer interface **304** may include a used automobile seller interface **318** and a used automobile buyer interface **320**.

In an example embodiment, a dealer interface **306** may provide a user **114**, such as a dealer employee, information relating to the current automobile market. The dealer interface **306** allows a dealer to interact with automobile market information processing system **302** to provide the dealer with a wide variety of information, including, for example, current market pricing. Other automobile market information a dealer may receive on a dealer interface **306** includes information relating to lot inventory, turnover rates, automobile transportation and/or shipping costs, incentives, and various ratings, such as ratings relating to quality, safety, insurance, a consumer credit score, dealer ratings, residual or resale values, etc. A dealer may input information into dealer interface **306** relating to sales data, including current pricing offered, special sales offers, actual transaction data, inventory data, etc. In an example embodiment, the dealer may provide information through dealer interface **306** which will be used by automobile market information processing system **302** to prepare reports or offers to consumers and/or manufacturers. It should be appreciated that a dealer is typically a franchise entity, while a distribution location may not be a franchise entity. For brevity, throughout this specification, the term dealer may be used to describe both franchise entity dealers and non-franchise entity distribution location. Accordingly, as used in this disclosure, the term dealer does not indicate whether an entity is a franchise entity. Moreover, a franchise dealer or a non-franchise distribution location may utilize a dealer interface **306** as described herein.

In an example embodiment, a manufacturer interface **308** may provide a user **114**, such as a manufacturer employee, information relating to the current automobile market, including consumer requests. For example, a manufacturer interface **308** may provide a manufacturer a request received from a consumer interface **304**. Additionally, the manufacturer interface **308** may provide information such as a report that allows the manufacturer to provide a response to the requesting consumer. A report may include information from database system **310** relating to current market pricing, recent sales figures and trends, current manufacturer incentives, current inventory, including dealer inventory, inventory in transit, and/or build times or lead times for a desired automobile, etc. The manufacturer may use this information to provide a response to a consumer request. The manufac-

US 10,140,655 B2

9

turer may provide the manufacturer interface **308** with information to provide a confirmation, a verification, or an offer to a consumer via consumer interface **304**. For example, a confirmation number associated with the particular consumer request may be provided for the consumer. Also, a recommendation may be provided from the recommendation engine **312** to the manufacturer in relation to automobile pricing, responding to a specific request, manufacturer incentives, inventory management, production schedules, shipping schedules, etc. It should be appreciated that a manufacturer may be referred to as an OEM or original equipment manufacturer. Further, it should be appreciated that a manufacturer may include various related affiliate entities all doing business as, or operating under, the same manufacturer name. For example, a manufacturer typically may include a manufacturing company (e.g., operating the manufacturing plant), a sales company (e.g., operating automobile sales activities), and a captive finance company (e.g., operating financing and leasing activities). The manufacturer interface **308** may provide a manufacturer with a real-time lens into the automobile market which may allow the manufacturer to adjust production schedules, pricing, marketing activities, etc., which may provide a significant advantage for manufacturers.

As illustrated in FIG. **3**B, a consumer interface **304** may include a used automobile seller interface **318** and a used automobile buyer interface **320**. The used automobile seller interface **318** may be used by consumer sellers to sell used automobiles, while the used automobile buyer interface **320** may be used by consumers to buy used automobiles. It should be appreciated that consumers may be able to access both interfaces **318** and **320** from consumer interface **304**. In an example embodiment, the used automobile seller interface **318** and a used automobile buyer interface **320** may be integrated within a single website or application, or for example, may be implemented as distinct websites. Similarly, in an example embodiment, a used automobile buyer interface **320** may be integrated with features of a consumer interface **304** for searching both new and used automobiles for purchase, or new and used automobiles may not be simultaneously searchable on a particular implementation of a consumer interface **304**. As will be discussed further below, an automobile seller interface **318** may be used by a consumer seller of a specific used automobile to receive information on the specific automobile and request bids for the specific automobile. Similarly, a used automobile buyer interface **320** may be used for used automobile buyers to receive information on a used automobile and place a bid on that specific automobile.

It should be appreciated that, for example, a consumer seller of a used automobile may be considered different than a dealer seller of a used automobile in some respects. For example, a consumer seller of a used automobile is often selling through different channels, such as offering for sale in classified advertisements versus from a dealer lot. It should be appreciated that such differences may be relevant to the ability to maximize the value of a sale or purchase of a used automobile. Accordingly, where appropriate, the present disclosure may distinguish a consumer seller from a dealer seller, or distinguish a consumer buyer from a dealer buyer. Also, as discussed in further detail below, a manufacturer off-lease seller of a used automobile may also be considered different from a consumer seller and/or a dealer seller.

A dealer interface **306** may include a used automobile buyer interface **322**. For example, a typical dealer may use a dealer interface **306** primarily for facilitating sales of new

10

and used automobiles, however, the dealer interface **306** may also be used to facilitate purchasing used automobiles. For example, a used automobile buyer interface **322** may be used by dealers similarly to the way that the used automobile buyer interface **320** may be used by consumers. It should be appreciated that in an example embodiment, the used automobile buyer interfaces **320**, **322** may be similar or the same, and/or may integrated as part of single website or application. In an example embodiment, a dealer may use the used automobile buyer interface **322** to facilitate bringing a consumer in to purchase a new automobile based on providing a competitive bid to purchase a used automobile as a trade in.

A manufacturer interface **308** may include a used automobile off-lease interface **324**. For example, a manufacturer may use a manufacturer interface **308** primarily for facilitating sales of new automobiles, however, the manufacturer interface **308** may also be used to facilitate selling off-lease automobiles which have been returned by a consumer lessor whose lease is expiring. For example, an off-lease seller interface **324** may be used by a manufacturer, typically, a captive finance company of the manufacturer, similarly to the way that the used automobile seller interface **318** may be used by consumers. It should be appreciated that, a manufacturer off-lease seller may have limited options to sell a used off-lease automobile and may have time constraints that are may be typically imposed on a consumer seller of a used automobile. Typically, an off-lease automobile may be dropped off by a consumer lessee at any one of a variety of dealer locations. The manufacturer lessor may then wish to sell the used off-lease automobile, however, the dealer where the off-lease automobile was dropped off may have a significant bargaining advantage to purchase that automobile, as the manufacturer may need to sell the off-lease automobile quickly and may have limited options. Typically, the dealer may not offer the manufacturer off-lease seller full market value for the off-lease automobile. It should be appreciated that the manufacturer off-lease seller may transport the car to an auction in an attempt to obtain a higher price. However, transportation costs, auction fees, and delay in selling the off-lease automobile may cause the manufacturer off-lease seller to accept less than market value for the off-lease automobile from the dealer, or otherwise not maximize the value of the off-lease automobile. For example, typically, an off-lease automobile sold at auction for near or even above the current market value is significantly offset by transportation costs and auction fees.

The off-lease seller interface **324** may provide a manufacturer off-lease seller with leverage, not only through the ability to obtain bids to purchase the off-lease automobile, but through the ability to determine the number of matches or search hits for an off-lease automobile. The dealer that has the off-lease automobile may know that the manufacturer may have the ability to track searches for the off-lease automobile performed by consumers and/or other dealers. The manufacturer off-lease seller may provide the dealer in possession of an off-lease automobile with matches and/or bids, which may provide the dealer with firm evidence of current demand or interest in the off-lease automobile. The dealer may be able to use this information to determine an appropriate price, and possibly even more profitably than the manufacturer. Accordingly, a dealer may often be inclined to make a significantly more competitive bid for an off-lease automobile. It should be appreciated that the manufacturer may use the off-lease seller interface **324** to identify in-market buyers, and even without receiving bids from those

US 10,140,655 B2

**11**

buyers, the manufacturer's bargaining power may improve, resulting in a greater value for off-lease sales.

Accordingly, information may be provided to the automobile market information processing system **302** from consumers, dealers, and manufacturers with a very high degree of granularity, as every transaction that occurs and even every request or search may be stored and used by the automobile market information processing system **302**. This allows the automobile market information processing system **302** to use the most current automobile market data to provide information to consumers, dealers, and manufacturers. It should be appreciated that market prices can change relatively quickly, particularly when major events drive consumer behavior or manufacturer production, such as natural disasters. Accordingly, reports and recommendations provided by the automobile market information processing system **302** may be highly accurate, reliable, and sensitive to market changes.

It should be appreciated that the users **114** of the automobile market information processing system **302**, including consumers, dealers, and manufacturers, and buyers and sellers of new and used automobiles, may be required to agree to and/or execute a terms of use agreement or terms of service agreement. Various forms of enforcing the agreement may be implemented, including a transaction deposit policy, which may require a deposit or a credit card hold, or the like, and a standard schedule of fees or default payment schedule for infractions such as improper condition of an automobile, delay in delivery, etc. Accordingly, all parties may be protected from another party breaching the agreement.

It should be appreciated that certain functions described as performed, for example, at automobile market information processing system **302**, may instead be performed locally at consumer interface **304**, dealer interface **306**, and manufacturer interface **308**, or vice versa. Further, in certain cases, tasks may be performed using consumer interface **304**, dealer interface **306**, and manufacturer interface **308** or, for example, performed in person, such as a consumer signing documents at a dealer location, or a dealer communicating with a manufacturer using a telephone. It should be appreciated that the consumer interface **304**, dealer interface **306**, and manufacturer interface **308** may be implemented, for example, in a web browser using an HTML file received from the automobile market information processing system **302**. In an example embodiment, the consumer interface **304**, dealer interface **306**, and manufacturer interface **308** may be located on a website, and may further be implemented as a secure website. Also, consumer interface **304**, dealer interface **306**, and manufacturer interface **308** may require a local application, for example, which a manufacturer or dealer may pay for to have access to, for example, information from the automobile market information processing system **302** such as requests from consumers.

FIG. **4** is a flowchart of an example process **400** for facilitating a used automobile transaction. Although the process **400** is described with reference to the flowchart illustrated in FIG. **4**, it will be appreciated that many other methods of performing the acts associated with the process **400** may be used. For example, the order of many of the blocks may be changed, certain blocks may be combined with other blocks, and many of the blocks described are optional.

The example process **400** for facilitating a used automobile transaction may allow users **114** to efficiently sell and purchase automobiles. The example process **400** may begin with automobile market data including at least pricing data

**12**

is stored in a database system (block **402**). For example, automobile market data from dealers, consumers, and manufacturers regarding pricing, inventory, insurance information, quality ratings, safety ratings, and other ratings is collected and stored in a database. For example, inventory data may include data regarding off-lease automobiles, including scheduled drop off dates of automobiles with expiring leases. In an example embodiment, a wide variety of data is stored in a database system **310**. Automobile market data may include various relevant ratings, reports, awards, or other information, including quality information, safety information, insurance information, consumer credit information, dealer rating information, incentive information, residual value information, and/or any other data which may be relevant to consumers. For example, ratings data may include information from the National Highway Traffic Safety Administration (NHTSA), the Environmental Protection Agency (EPA), and/or the Insurance Institute for Highway Safety (IIHS). The data may include information from a consumer interface **304**, such as data in consumer searches or requests, information from a dealer interface **306**, such as currently offered dealer pricing, transaction data for finalized sales, current inventory data, transport or shipping costs, and information from a manufacturer interface **308**, such as current manufacturer prices and suggested pricing, manufacturer incentives, and current inventory including finished inventory on hand, production scheduling, shipment scheduling, inventory in transit, and manufacturing lead times. The automobile market data may be comprised solely of information received from the consumer interface **304**, dealer interface **306**, and manufacturer interface **308**, or may include additional information received from other sources, for example, industry analysts, consumer reports groups, government agencies, etc. It should be appreciated that various methods of storing the automobile market data may be employed according to the system requirements. For example, database system **310** may be organized according to different manufacturers or dealers, automobile make and model, different information categories (e.g., suggested pricing, market prices, production, shipping, lot inventory), etc., and may consist of one or more databases on one or more servers **108**, **226** which may be remotely located from each other and/or a host device **104** of the automobile market information processing system **302**. As will be discussed further below, the automobile market data may be continually updated as new data is provided to the automobile market information processing system **302**.

The automobile market data may be used by any or all parties involved in a used automobile transaction, including used automobile sellers including consumer sellers and manufacturer off-lease sellers, and used automobile buyers including consumer buyers and dealer buyers. In the example process **400**, as discussed further below, the used automobile seller described by way of example as a consumer seller. It should be appreciated that the example process **400** may work similarly or the same for a manufacturer off-lease seller. In an example embodiment, the consumer used automobile seller interface **318** and manufacturer off-lease seller interface **324** may be provided as a combined interface. Certain aspects of the disclosed example process **400** may be of greater or lesser advantage to a manufacturer off-lease seller compared with a consumer seller. For example, consumer sellers typically sell used automobiles infrequently, while manufacturer off-lease sellers may be selling thousands of used off-lease automobiles each month. Accordingly, the goals of the user **114** may vary between consumer sellers and manufacturer off-lease sellers.

US 10,140,655 B2

13

Certain notable aspects that may be distinguishable between a consumer seller and manufacturer off-lease seller will be discussed below.

The example process **400** continues with a consumer seller providing a request for a response (block **404**). For example, a used car seller takes a picture of the vehicle identification number (VIN) of a used car and fills in price parameters and other information into a mobile application to receive a response based on current market data. In an example embodiment, the seller's request may be transmitted from used automobile seller interface **318**, **324** via the internet to the automobile market information processing system **302**. For example, using an application stored on a mobile device **103**, the used car seller takes a picture of the VIN on the used car and fills in a minimum bid price, delivery parameters, etc. The seller's parameters may specify a pickup location by distance from an address, an area code, etc., which allows for matching the seller with buyers that are in-market. The picture of the VIN may be processed using optical character recognition, which allows the automobile market information processing system **302** to determine the make and model of the car, along with various other characteristics of the car. Also, for example, the used car seller may take a picture of the odometer, and the mileage may be determined using optical character recognition. It should be appreciated that the VIN may include human readable characters, a bar code, or any other graphical or machine readable information which acts as a vehicle identification number.

Also, the used car seller may input into a mobile application or website a wide variety of additional information about the used car. For example, pictures of the used car may be uploaded with the request. In an example embodiment, pictures of the exterior, interior, dashboard, and/or odometer may be provided. Also, for example, service records, ownership records, and other documents or information may be included with a request. Further, a written description of the car may be provided. Accordingly, because the used car seller can provide information such as pictures, in addition to information which the seller may not have access to, such as the original manufacturer specifications of the used car, potential buyers may have access to a great deal of information on the used car. Further, in an example embodiment, a mobile application may include the geolocation of a used car seller, so the seller does not need to enter such information. Accordingly, the buyer may perform research, for example, while at home or while shopping at a dealer location. It should be appreciated that certain used car buyers may be highly interested in the geolocation of the consumer seller. For example, a dealer may find the consumer seller's geolocation to be more important than a consumer buyer, because a dealer may require a minimal cost for picking up a car to ensure profitability, and to optimize the opportunity for creating a new customer relationship. Similarly, certain used automobile sellers may be very interested in the geolocation of the used automobile buyer. For example, a manufacturer off-lease seller may have a high interest in determining the amount of in-market interest or demand for an off-lease automobile.

In an example embodiment, a manufacturer off-lease seller may provide a request for a response for an automobile that will be dropped off by a consumer lessee in the near future. For example, a manufacturer user **114** may input a VIN into off-lease seller interface **324** by typing, speaking, or providing an image of the VIN. The manufacturer off-lease seller may provide a parameter that the used off-lease automobile will be available only after a certain date. The

14

manufacturer off-lease seller may find that providing a request for a response prior to the consumer lessee actually dropping off an off-lease automobile may significantly improve the value of off-lease automobiles. It should be appreciated that the dealer where the consumer lessee drops off the off-lease automobile may be bargaining without any particular advantage because the manufacturer off-lease seller may have multiple interested automobile buyers that, based on search parameters, have received the off-lease automobile as a match, and/or bids from used automobile buyers.

Used car buyers may perform a search with used automobile buyer interfaces **320**, **322**, and may typically include parameters limiting the search to a specific automobile type, make, or model, certain options or features, a price range, and a pickup location or area. Further, for example, the buyer may take a picture of a VIN anywhere or manually type in a VIN number, including at automobile trade shows, mall displays, or anywhere new or used cars are for sale. The buyer may even take a picture of a car parked in the street as the buyer walks down the street. Any request or query communicated from the consumer interface **304** may be stored, for example, in database system **310**, thereby updating the automobile market information processing system **302** with current automobile market data.

The example process **400** may continue with providing automobile market data to used automobile buyers based on the consumer seller request (block **406**). For example, a group of consumers and dealers receive a real-time report including local used car sales data, inventory data, quality and safety ratings data, insurance data, and gas mileage data of the specific used car which is identified based on the VIN. The group of consumers and dealers that receive a real-time report may be based on prior searches conducted by consumers on used automobile buyer interface **320** and searches conducted by dealers with used automobile buyer interface **322**. In an example embodiment, a report may include quality information, safety information, insurance information, recall information, EPA gas mileage and emissions information, consumer credit information (e.g., buyer FICO score), dealer rating information, incentive information, residual value information, and/or any other data which may be relevant to consumers and/or dealers. In an example embodiment, a report may include a specific history information for the specific used car, such as a CARFAX report. The request and/or the report may be provided in real-time and may also provide real-time data. Data reported based on a real-time updates in the automobile market information processing system **302** may provide significant advantages, for example, when pricing conditions may change quickly due to unforeseen market conditions. The recommendation engine **312** may provide recommendations to a used automobile buyer based on the current automobile market data. For example, a report may indicate various estimated sales probabilities for different prices that the used automobile buyer may offer or bid. In an example embodiment, an estimated sale price or range may be provided. For example, a probability analysis may be provided with prices and corresponding probabilities may be estimated as, e.g., 80% chance to purchase at $6,000; 60% chance to purchase at $5,500; 30% chance to purchase at $5,000; 10% chance to purchase at $4,500. Such information may be illustrated in various ways, such as a bell curve graph or a chart. Further, for example, the recommendation engine may provide daily suggestions (e.g., a deal of the day) for dealers and/or consumers. Consumers may use such suggestions to save money or get a better value on a used car purchase by buying

US 10,140,655 B2

15

from another consumer rather than a dealer. Dealers may use such suggestions to purchase used cars at good deals, and/or to attract consumers to visit the dealer in person or online, as well as prepare responses or bids to other consumer requests. Dealers or consumers may customize the used automobile buyer interface **320**, **322** to provide information in a pre-specified manner to suit the particular needs of the specific dealer or consumer. In an example embodiment, a manufacturer off-lease seller may receive automobile market data including inventory information including data regarding off-lease cars which have been dropped off at dealer locations and cars which will soon be coming off-lease. Further, dealers and/or consumers may be able to receive information regarding off-lease cars as well. For example, information may include a specific automobile identified by a VIN with an expected drop off location and date based on a lease expiration.

A bid to purchase the used automobile from the consumer seller is requested from used automobile buyers (block **408**). For example, a group of consumers and dealers within a certain radius of the used car seller location may receive a bid request based on used automobile buyer searches via used automobile buyer interfaces **320**, **322**. Each used automobile buyer's bid may include, for example, a price and a delivery option or delivery suggestion. The used automobile buyer interfaces **320**, **322** may provide for simple input of necessary and optional data. Further, a used automobile buyer's bid may contain certain limitations, restrictions, or conditions. For example, a dealer may provide a bid with the condition that a new car be purchased and the used car be traded in at the bid price.

In an example embodiment, the request may provide one or more options, products, services, or add-ons for a used automobile buyer to select from. For example, used automobile buyers may be able to select financing options, warranties, extended service contracts, insurance plans, or other hard add accessories. These selectable options may be offered directly from the used automobile seller or may be offered through the automobile market information processing system **302**. Accordingly, a seller may not be offering any options for a buyer to select, but the system may automatically provide the option to purchase further add-ons. In an example embodiment, automobile market information processing system **302** may provide for third party providers of add-ons to provide live auction bids for a used automobile buyer to select for inclusion in a bid. Accordingly, for example, several insurance companies may provide a bid for key insurance, or several financial companies may provide bids for a loan. It should be appreciated that certain bids may depend on the particular buyer, so for example, a buyer's credit or driving record may cause different buyers to receive different third party bids for add-ons. For example, a particular buyer may be able to increase a bid to purchase a used automobile if third party add-ons are particularly advantageous, which may benefit a consumer seller or manufacturer off-lease seller. For example, a buyer may receive a better than expected interest rate and insurance price, and therefore be able to offer an additional $1,000 to the seller, while staying within the buyer's predetermined monthly budget. It should be appreciated that third parties may include dealers which may be otherwise involved in a transaction. Also, in an example embodiment, the automobile market information processing system **302** may provide at no charge to the buyers or sellers, certain add-ons, such as a limited thirty day warranty. Accordingly, the automobile market information processing system **302** may gain trust from buyers even if the buyers

16

generally do not trust the sellers. It should also be appreciated that a buyer may not select any add-ons offered by third parties and/or the automobile market information processing system **302**. A used automobile seller may have no interest in whether a buyer selects any add-ons, or the seller may receive additional compensation if an add-on is selected, so a buyer selection of add-ons may or may not affect a seller's value associated with the buyer's bid.

One or more buyer bids are provided to the consumer seller (block **410**). For example, several consumers and dealers provide bids based on current pricing data, options information of the specific used car, and potential pickup locations, so several different prices and delivery options may be available to the used car seller via the used automobile seller interface **318**. Typically, the bid will include at least a specified price and pickup time and location. In an example embodiment, a used car seller that has taken a picture of a VIN with a mobile device and entered some basic information such as an odometer reading may receive used car buyer bids within minutes or seconds on the mobile device. Accordingly, the bids may be used in real-time as the consumer seller may be actively selling a used car or shopping for a new or used car, for example, on a dealer lot. Typically, a pickup location will be at the consumer seller location, a consumer buyer location, or at a dealer lot or distribution location. In an example embodiment, the consumer buyer location may be determined using the geolocation of the buyer's mobile device **103**. It should be appreciated that some consumers may be flexible as to the delivery options and that some dealers may have multiple locations which could serve as a pickup location. In an example embodiment, the automobile market data may indicate that the particular used car that a consumer seller has requested bids for should be priced at, for example, $6,000. However, various factors may affect the bid or offer that a consumer or dealer may make for the specific used car. For example, for a consumer, personal preference for certain features or looks, convenience, insurance implications, gas mileage, and/or service records, may play a large role in pricing a bid above or below a suggested bid price. For example, for a dealer, the potential for forming a customer relationship, the value of potential other sales, add-on products, and/or services, or competition with other parties. All used automobile buyers that are interested may place a bid for a used car seller's consideration.

It should be appreciated that various alternative delivery options may be provided from several used automobile buyers' bids, for example, based on preferences or parameters indicated by the consumer seller of the used automobile. For example, the used automobile seller interface **318** may provide several different bids with different delivery options and prices to the used car seller, for example, a price of $6,000 to drop off the car at an out of state dealer the next day or a price of $5,500 to drop off the car at a local consumer buyer location in five days. For example, a consumer buyer may determine the cost of picking up the used car from the consumer seller and provide two pricing and delivery options, for example, $5,500 to pick up the used car from the consumer seller or $5,800 to have the used car delivered to the consumer buyer's home. For example, a manufacturer off-lease seller may review bid prices and delivery options on a number factors on used automobile seller interface **324**, but may be very interested in finding an in-market buyer to eliminate transportation costs. A manufacturer off-lease seller may often have somewhat different concerns than a consumer seller. For example, to meet a quarterly budget, a manufacturer off-lease seller may be

US 10,140,655 B2

**17**

primarily interested eliminating a high back log of off-lease cars even if selling cars at a significant discount is required.

Further, for example, used automobile buyers may use information such as ratings data to optimize their bids. For example, if gasoline prices are increasing, mileage ratings for a particular car may dictate increasing or decreasing a bid. If a vehicle has very good gas mileage, and gas prices are skyrocketing, that car may have an increasing demand as gas prices increase, or vice versa. Similarly, safety ratings of vehicles may be important to consumer demand if high profile problems have appeared for a particular automobile style, make, or model. As discussed above, various automobile market information may be used by a used automobile buyer including safety information, insurance information, consumer credit information, dealer rating information, incentive information, residual value information, or any other data which may be relevant.

The used automobile seller interface **318, 324** may organize used automobile buyer bids based on a variety of factors and may provide supplemental information. For example, certain buyer bids may be selected as the best options, all buyer bids may be summarized, various additional ratings, reviews, or popularity information, special offers, etc. may also be provided to a consumer along with any used automobile buyer bids. The recommendation engine **312** may provide recommendations to a consumer seller based on the current automobile market data. For example, of ten used automobile buyer bids provided with a response, three bids may be recommended, for example, as "Great Deals!" It should be appreciated that in some cases, a particular used car seller request may not return any buyer bids, for example, if the used car for sale is in low demand or a unique item with a limited market. Also, for example, if only one or two bids are received, the recommendation engine **312** may recommend that a consumer seller wait for a better bid because the bids provided are not competitive offers based on the current automobile market data stored in the database system **310**. Further, in an example embodiment, buyer bids may be organized according to distance to a pickup location, highest price, closest match to the consumer seller entered criteria, a normalized quality index or value index, etc. The consumer seller or manufacturer off-lease seller may be able to toggle between different viewing options for buyer bids.

Further, in an example embodiment, a consumer seller may be at a dealer lot (e.g., a Nissan dealer) and take a picture of a VIN on a used car (e.g., a Maxima), which the consumer seller intends to trade in. A bid from a competing dealer (e.g., a Toyota dealer) across the street may be received on the mobile device within seconds and include information for a competing trade in value, and may have further information relating to other new or used cars which may be intended to cause the consumer seller to go to the competing dealer, for example, including various price comparisons, gas mileage ratings, safety ratings, residual value, driving directions to the competing dealer, etc. Accordingly, a consumer seller may weigh the pros and cons of various used automobile buyer bids from consumers and/or dealers, based on delivery options, pricing, and any other relevant variants. Any bids communicated from used automobile buyer interfaces **320, 322** may be stored, for example, in database system **310**, to further update the automobile market information processing system **302** with current automobile market data.

The consumer seller selects a buyer bid including a price and a delivery option (block **412**). For example, the used car seller chooses to sell the used car based on the price and the pickup location of a consumer buyer bid. The seller may

**18**

select an offer with a specified price and delivery option on the used automobile seller interface **318, 324**. The used car seller may have been weighing two or more different delivery options, price differences, etc., based on the response(s) received through the used automobile seller interface **318, 324**. As noted above, the used automobile seller interface **318** may organize received bids and other helpful information in a variety of ways, which may make the information easier for a consumer seller to digest. It should be appreciated that a consumer seller will typically want to deliver a used car at a convenient location, often at or near the seller's home. Accordingly, used automobile buyers may attempt to provide delivery options tailored towards maximizing profit and convenience, while still providing a superior bid to other used automobile buyers. By providing multiple bids with different delivery options, the consumer seller may be allowed to make extra money or save time based on the seller's particular situation. It should be appreciated that the consumer seller selection of a bid may, for example, occur simultaneously with the consumer seller and used automobile buyer executing the sale or providing a deposit or down payment, or the like (see, e.g., block **414**). Accordingly, in an example embodiment, once a consumer seller or manufacturer off-lease seller selects a bid, the used automobile buyer has effectively purchased the car, and both parties do not need to worry about the other party backing out of the deal.

It should be appreciated that a consumer seller may not want to drive to a distant pickup location without first receiving some form of deposit, or likewise, a used automobile buyer may not want to go to a distant pickup location to without assurance that the used automobile will actually be available for pickup and in good working order. Likewise, a manufacturer off-lease seller may be concerned with obtaining maximum value for an off-lease automobile within the required time constraints, but transportation costs may be strictly budgeted. The automobile market information processing system **302** may accommodate for deposits to provide any reasonable or necessary assurances to both buyers and sellers. For example, the automobile market information processing system **302** may provide and/or require the use of a terms of service agreement, which the consumer seller or manufacturer off-lease seller and the used automobile buyer may sign and agree to the terms provided therein. For example, a credit card could be charged a default payment in the event that either party breaches the terms of service agreement. In an example embodiment, a schedule of various breaches may require different default payments, for example, if a buyer determines a headlight does not work, a standard $30 fee may be assessed from the consumer seller. Also, a variable default agreement may be based on a distance between a seller and a buyer, so that a party which travels a great distance may be compensated if the other party breaches the agreement. Also, for example, a time period for inspection may be specified in a request and/or a bid. A bid may be conditional based on one or more seller representations. Moreover, a terms of service agreement may provide assurances for any issues which may arise in the sale of a used car, and may provide one or more options based on a breach, including payment of fees or nullification of a bid acceptance and/or sale execution. Any consumer seller selections, counter offers, or additional requests or responses may be stored in database system **310**, as the communications are processed by automobile market information processing system **302**, providing further data updates. Accordingly, in an example embodiment, a consumer seller may select a bid in order to sell the used car, and

US 10,140,655 B2

19

that sale information may then be provided to another consumer searching for information regarding the same type of car with similar features, for example, the next day.

The consumer seller and the used automobile buyer execute the sale of the used automobile (block **414**). For example, the used automobile buyer electronically signs a contract and performs an electronic funds transfer or credit card payment. After a buyer bid is selected, an electronic contract may be prepared by the automobile market information processing system **302** and provided for the used automobile buyer who may e-sign the contract or other documentation as needed. Similarly, the consumer seller may e-sign the contract or other documentation as needed, either prior to selecting a bid, at the time of selecting a bid, or at a later time. A contract may be e-signed through the used automobile seller interface **318**, **324**, and the used automobile buyer interface **320**, **322**, respectively. In another example embodiment, paper copies of a contract may be signed, for example, after the used automobile buyer prints them or receives them through the mail. In an example embodiment, the used automobile buyer may provide cash or a paper check. It should be appreciated that the process of executing a contract may take some time. Also, it should be appreciated that, for example, the consumer seller selection of a bid discussed above (see, e.g., block **412**) may occur simultaneously with the consumer executing the sale. Once the sale is completed, the actual transaction data including the final sale price, may be provided to and stored in database system **310**. Accordingly, the automobile market information processing system **302** may be updated with current automobile market data from every step in the used car sales process between a consumer seller or manufacturer off-lease seller and a used automobile buyer. In an example embodiment, the updates provided to the automobile market information processing system **302** are provided in real-time, for example, data may be transmitted and processed within seconds or minutes. Further, for example, it should be appreciated that certain data may be provided to the automobile market information processing system **302** according to a batch processing schedule.

Next, the consumer seller makes the purchased used automobile available according to the consumer seller bid selection (block **416**). For example, the seller drives the used car to the pickup location if the pickup location is not the used car seller's location. It should be appreciated that the consumer seller or a manufacturer off-lease seller and the used automobile buyer may use a wide variety of locations as a pickup location, and may work out a delivery option which is convenient for both parties. A consumer seller may interact with the automobile market information processing system **302** using used automobile seller interface **318**, for example, to provide notification that a car is at the pickup location and ready for delivery. A manufacturer off-lease seller may interact with the automobile market information processing system **302** using used automobile seller interface **324**, for example, to provide notification that a car has been dropped off by a consumer lessee and is at the pickup location and ready for delivery to the buyer. Similarly, a notification may be sent via used automobile buyer interface **322**, **322** to the used car buyer that the used car is available for pickup at the specified location.

Finally, the used automobile buyer receives the purchased used automobile according to the consumer seller selected delivery option (block **418**). For example, the used car buyer receives the used car at the pickup location the same day the sale is executed. The used car buyer may pick up the car without ever having to talk to or negotiate, in person or over

20

the telephone, with the consumer seller or manufacturer off-lease seller. For example, the used car buyer may arrive at the pickup location, show identification and provide a proof of purchase, and be provided the keys to the car by the seller. The parties may sign paperwork indicating or confirming the car has been picked up. Proof of purchase documentation may include any or all documents that are legally required for an automobile sale for a given jurisdiction, for example, the title, odometer statement, or any other document required by the Department of Motor Vehicles. For example, the consumer seller or manufacturer off-lease seller may be required to provide any legally required documents to fully execute and record the sale of the used car.

Further, in an example embodiment, a consumer seller or manufacturer off-lease seller may offer various insurance policies or service contracts to a used car buyer, for example, etch insurance, key insurance, gap insurance, or a ninety day warranty may be provided. For example, a consumer seller or manufacturer off-lease seller may purchase insurance through the automobile market information processing system **302** in placing a request for bids, which may increase interest from buyers. Also, for example, an insurance policy or service contract may be provided for a used car being sold at no charge to the consumer seller or manufacturer off-lease seller, for example, as a convenience to all users **114** using the disclosed system. For example, key insurance may be provided at no cost to both the consumer seller and the used car buyer. It should be appreciated that, for example, using options provided through the automobile market information processing system **302**, a consumer seller or manufacturer off-lease seller may sell or provide any add-on products or services that a dealer would typically offer or provide in the sale of a used automobile. Also, if the used automobile buyer is a dealer, additional products or services may be offered to the consumer seller at the time of pickup. For example, the dealer may offer new or used cars, including related financing options, warranties, service plans, insurance plans, and hard add accessories to the buyer, as discussed in further detail above.

Accordingly, it should be appreciated that consumers, manufacturers, and dealers, may receive significant benefits from the method of facilitating a used automobile transaction disclosed herein. Consumers that are selling and buying used automobiles may benefit from more competitive pricing, piece of mind knowing that a fair market price is being offered for prospective purchases or sales, and improved delivery options that allow the consumer to weigh the benefits and drawbacks of different delivery options, pricing, and other variables. In an example embodiment, consumers can view prices paid for comparable cars in specific locations based on the automobile market data in the automobile market information processing system **302**, for example, within a certain time frame such as one month and within a certain proximity to the consumer. Manufacturers selling off-lease automobiles may benefit from reduced transportation costs, saving auction fees, and an improved bargaining position with a dealer in possession of an off-lease automobile. For example, the ability to identify in-market buyers may be particularly advantageous to manufacturer off-lease sellers, which may be able to identify matching searches of in-market buyers. Also, dealers and/or various third parties may benefit from the opportunity to sell insurance, credit, service contracts, hard add accessories, and other add-ons with used automobiles. Moreover, various inefficiencies in the automobile industry may be minimized utilizing the presently disclosed system and method.

US 10,140,655 B2

21

FIG. **5** illustrates a block diagram of an example data architecture **500**. In the example data architecture **500**, interface data **502**, administrative data **504**, and automobile market data **506** interact with each other, for example, based on user commands or requests. The interface data **502**, administrative data **504**, and automobile market data **506** may be stored on any suitable storage medium (e.g., server **226**). It should be appreciated that different types of data may use different data formats, storage mechanisms, etc. Further, various applications may be associated with processing interface data **502**, administrative data **504**, and automobile market data **506**. Various other or different types of data may be included in the example data architecture **500**.

Interface data **502** may include input and output data of various kinds. For example, input data may include mouse click data, scrolling data, hover data, keyboard data, touch screen data, voice recognition data, etc., while output data may include image data, text data, video data, audio data, etc. Interface data **502** may include formatting, user interface options, links or access to other websites or applications, and the like. Interface data **502** may include applications used to provide or monitor interface activities and handle input and output data.

Administrative data **504** may include data and applications regarding user accounts. For example, administrative data **504** may include information used for updating accounts, such as creating or modifying consumer accounts and/or dealer accounts. Further, administrative data **504** may include access data and/or security data. Administrative data **504** may include a terms of service agreement. Administrative data **504** may interact with interface data in various manners, providing a user interface **304**, **306**, **308** with administrative features, such as implementing a user login and the like.

Automobile market data **506** may include, for example, executed sales data **508**, consumer data **510**, dealer data **512**, manufacturer data **514**, statistical data **516**, and/or historical data **518**. Executed sales data **508** may include actual negotiated prices for manufacturer and dealer sales, differences in list prices to negotiated prices, sales demographics, etc. Consumer data **510** may include consumer search activity, consumer requests and offers, consumer feedback, etc. Dealer data **512** may include dealer pricing, including list prices, sale prices for limited time dealer offers or deals of the day, negotiation information such as bottom line pricing, offers received, foot traffic activity, and dealer inventory data, including current on location data, automobile turnover rates, etc. Manufacturer data **514** may include manufacturer pricing, including suggested pricing, preferred dealer pricing, etc., manufacturer incentives including cash rebates, special lease rates, special APR rates, zero down offers, lifetime warranties, guaranteed trade-in offers, etc., and inventory information including dealer inventory, inventory by location, inventory in transit, manufacturing or production lead times or build times, production scheduling, shipping scheduling, lease information, etc. Statistical data **516** may include information used for providing reports including graphs, forecasts, recommendations, calculators, depreciation schedules, tax information, etc., including equations and other data used for statistical analysis. Historical data **518** may include past sales data, such as historical list prices, actual sale prices, manufacturer and dealer margins, operating costs, service costs or profitability, loyalty information, etc. It should be appreciated that data may fall under one or more categories of automobile market data **506**, and/or change with the passage of time. For example, industry

22

analyst data may include historical data **518** and statistical data **516** relating to safety or quality reports, efficiency data, recall data, and the like for used automobiles, which may be organized or re-organized under various categories of automobile market data **506** as time passes or as supplemental data is provided to the automobile market information processing system **302**. It should be appreciated that a system administrator may load data into the automobile market information processing system **302** as it becomes available. For example, annual, quarterly, and/or monthly reports relating to safety, insurance, etc., may be input into automobile market data **506** on a regular basis. It should also be appreciated that automobile market data **506** may be tailored for a particular manufacturer and/or dealer, for example, a manufacturer may request that a specific type of data that is not normally stored or used be stored in the database system **310**. Accordingly, for example, customized reports may be provided to a manufacturer interface **308** using that specific data for the manufacturer, for example, relating to resale values of used automobiles.

The integration of the various types of automobile market data **506** received from the consumer interface **304**, dealer interface **306**, and manufacturer interface **308** may provide a synergistic and optimal resource for consumers, dealers, and manufacturers alike. In an example embodiment, a used automobile seller and a used automobile buyer may benefit greatly from using an application in a mobile device **103** to provide a request for buyer bids on a used automobile by taking a picture of the VIN of the used automobile, for example, using used automobile seller interface **318**, **324**. Used automobile buyers may search for used automobiles for sale by consumer sellers, for example, using used automobile buyer interface **320**. The used automobile buyers may receive intrabrand and/or interbrand seller request information in real-time. The intrabrand and interbrand information provided on the used automobile buyer interface **320** may allow the best automobile options for a particular consumer to be provided to that consumer, and may allow consumer sellers, manufacturer off-lease sellers, and dealers to compete with each other taking into account a greater amount of automobile market information, which may result in a more efficient automobile market. Consumers that are selling used automobiles and consumers that are buying used automobiles may similarly receive benefits from the presently disclosed system. Also, as discussed above, manufacturer off-lease sellers may benefit greatly from the presently disclosed system, for example, using bids and/or matches or search hits for an off-lease automobile to improve bargaining power with a dealer in possession of the off-lease automobile and other dealers and/or consumers.

Automobile market data **506** may be maintained in various servers **108**, in databases or other files. It should be appreciated that, for example, a host device **104** may manipulate automobile market data **506** in accordance with the administrative data **504** and interface data **502** to provide requests or reports to users **114** including consumers, dealers, and manufacturers, and perform other associated tasks. It should also be appreciated that automobile market data **506** represents automobile market information, and that these terms may be used interchangeably in this disclosure depending upon the context.

FIG. **6** is flow diagram illustrating an example process **600** for facilitating a used automobile transaction, according to an example embodiment of the present invention. Although the process **600** is described with reference to the flow diagram illustrated in FIG. **6**, it will be appreciated that many other methods of performing the acts associated with

US 10,140,655 B2

23

the process **600** may be used. For example, the order of many of the blocks may be changed, certain blocks may be combined with other blocks, and many of the blocks described are optional.

In the example process **600**, data may flow between the automobile market information processing system **302** and a used automobile seller interface **318**, **324** and a used automobile buyer interface **320**, **322**, as discussed above based on used automobile seller and buyer interaction with the automobile market information processing system **302**. As discussed above, a used automobile seller interface **318** and used automobile buyer interface **320** may be included in a consumer interface **304**, a used automobile buyer interface **322** may be included a dealer interface **306**, and a used automobile seller interface **324** may be included in a manufacturer interface **308**. It should be appreciated that the automobile market information processing system **302** may update the automobile market information stored in the database system **310** when automobile market information is received from a buyer or seller, and/or a consumer, a dealer, a manufacturer, an industry analyst, and/or from any other information source. Accordingly, the automobile market information may remain current and/or provide sufficiently recent data for the benefit of consumers, dealers, and/or manufacturers.

The example process **600** may begin with a consumer seller or a manufacturer off-lease seller of a used automobile taking a picture of the VIN using a mobile phone application and entering in information such as pricing parameters (block **602**). The used automobile seller interface **318**, **324** may use OCR to determine and provide the VIN and pricing parameters to the automobile market information processing system **302** as a consumer seller request or a manufacturer off-lease seller request (block **604**). It should be appreciated that OCR may occur in the automobile market information processing system **302** or at the used automobile seller interface **318**, **324**. The automobile market information processing system **302** receives the seller request and prepares automobile market information based on the seller request (block **606**). The automobile market information processing system **302** may send a bid request and automobile market information based on the seller request to the used auto buyer interface **320**, **322** for one or more consumers and/or dealers (block **608**). It should be appreciated that while the seller request is automobile market information, typically, additional automobile market information would be provided with the seller request. For example, typically, data relating to recent sales of similar used automobiles and/or comparable automobiles may be provided. In an example embodiment, a target price or "true" value of the used automobile, or an expected price range, may be provided. Also, for example, various gas mileage data, safety ratings, recall information, quality reports, estimated insurance costs, and the like may be provided. Further, add-on products or services, such as insurance, credit, warranties, service contracts, or hard add accessories, which may be determined based on a third party bidding process, may also be provided. One or more used automobile buyers, including consumers and/or dealers, receive the bid request and automobile market information, determine prices and delivery options for the used automobile using the automobile market information, and prepare and provide bids for the consumer seller or a manufacturer off-lease seller (block **610**). A buyer bid may be sent from the used automobile buyer interface **320**, **322** to the automobile market information processing system **302** for each consumer and/or dealer that wants to provide a bid (block **612**). The automobile market informa-

24

tion processing system **302** receives and processes buyer bids and prepares the bids and automobile market data for the consumer seller or manufacturer off-lease seller (block **614**).

The automobile market information processing system **302** may send buyer bids and automobile market information to the used automobile seller interface **318**, **324** (block **616**). It should be appreciated that automobile market information may be provided to the consumer seller or manufacturer off-lease seller before buyer bids are provided, and/or concurrently with buyer bids. The seller may receive the buyer bids and automobile market information and may select a bid including a delivery option based on the automobile market information (block **618**). The used automobile seller interface **318**, **324** may send to the automobile market information processing system **302** a selection of a bid indicating that the consumer seller or manufacturer off-lease seller wants to sell the used automobile based on the selected bid (block **620**). The automobile market information processing system **302** receives and processes the seller bid selection (block **622**). For example, the automobile market information processing system **302** may send the bid selection to the used automobile buyer interface **320**, **322** (block **624**). The used automobile buyer may receive the bid selection and coordinate a sale by, for example, setting up a pick up time and location for the used automobile at the seller location or the buyer location (block **626**). Also, for example, the automobile market information processing system **302** may provide contract or loan documents, collect a deposit or down payment, or the like, from the consumer seller, the manufacturer off-lease seller, and/or the used automobile buyer. As discussed above, in each of blocks **606**, **614**, and **622**, the automobile market information processing system **302** may update the automobile market information in the database system **310** based on the information received from the consumer, manufacturer, and/or dealer.

For exemplary purposes, the present disclosure discusses a various examples relating to a purchase of a used car. However, it should be appreciated that the disclosed system, methods, and apparatus may be advantageously used in relation to various used automobiles other than cars including, for example, trucks, vans, sport utility vehicles, jeeps, motorcycles, commercial vehicles, and/or automobiles that have a VIN and require a license plate to operate.

It will be appreciated that all of the disclosed methods and procedures described herein can be implemented using one or more computer programs or components. These components may be provided as a series of computer instructions on any conventional computer-readable medium, including RAM, ROM, flash memory, magnetic or optical disks, optical memory, or other storage media. The instructions may be configured to be executed by a processor, which when executing the series of computer instructions performs or facilitates the performance of all or part of the disclosed methods and procedures.

Further, it will be appreciated that the presently disclosed system, methods, and apparatus for performing used automobile transactions may be utilized in conjunction with other systems or methods. For example, the presently disclosed system, methods, and apparatus may be used in conjunction with the disclosure in the co-pending commonly-owned patent applications filed on Jul. 5, 2011, entitled "AUTOMOBILE TRANSACTION FACILITATION USING A MANUFACTURER RESPONSE," application Ser. No. 13/176,497, and entitled "AUTOMOBILE TRANSACTION FACILITATION BASED ON CUS-

US 10,140,655 B2

TOMER SELECTION OF A SPECIFIC AUTOMOBILE," application Ser. No. 13/176,525, the entire contents of each of which is incorporated by reference herein, and in an example embodiment, the features of which may be combined with the features of the present disclosure.

It should be understood that various changes and modifications to the example embodiments described herein will be apparent to those skilled in the art. Such changes and modifications can be made without departing from the spirit and scope of the present subject matter and without diminishing its intended advantages. It is therefore intended that such changes and modifications be covered by the appended claims.

The invention is claimed as follows:

**1**. A method comprising:

receiving, via a used automobile seller interface, a first request for a response regarding a first used automobile, the first request made by a used automobile seller located at a first location and including a vehicle identifier and geolocation information of the used automobile;

executing instructions, by at least one processing device, to:

determine, based on the geolocation information, that the used automobile is located at the first location;

generate, based on the determined first location, an in-market used automobile buyer area;

determine that at least one used automobile buyer is located within the in-market used automobile buyer area;

receive, via a used automobile buyer interface, a first bid from a first used automobile buyer located at a second location within the in-market used automobile buyer area;

generate, based on receiving the first bid, driving directions from the first location to the second location; and

provide, via the used automobile seller interface, the first bid including at least a price for the first used automobile and the driving directions from the first location to the second location.

**2**. The method of claim **1**, wherein the used automobile seller interface is a manufacturer off-lease seller interface, further comprising:

receiving, via the manufacturer off-lease seller interface, a manufacturer used automobile seller selection of the first bid, wherein the manufacturer used automobile seller selection indicates a manufacturer used automobile seller intention to sell the first used automobile based on the first bid to the first used automobile buyer.

**3**. The method of claim **1**, wherein the first request is made by the used automobile seller on a website.

**4**. The method of claim **1**, wherein the vehicle identifier is manually entered by the used automobile seller.

**5**. The method of claim **1**, wherein the first request is made by the used automobile seller using a mobile device which takes a picture of a vehicle identifier.

**6**. The method of claim **5**, wherein the vehicle identifier is recognized using optical character recognition.

**7**. The method of claim **1**, wherein the first request is made by the used automobile seller using a mobile device including a microphone, and the vehicle identifier is input via the microphone.

**8**. The method of claim **7**, wherein the vehicle identifier is recognized using speech recognition.

**9**. The method of claim **1**, wherein the first used automobile buyer is one of a consumer and a dealer.

**10**. The method of claim **1**, further comprising:

storing, on a computer readable medium, automobile market data that is representative of recent automobile market characteristics, wherein the automobile market data is based on real-time automobile market data.

**11**. The method of claim **1**, wherein the first request includes a picture of at least one of the exterior of the automobile, the interior of the automobile, the dashboard of the automobile, the odometer of the automobile, service records of the automobile, and ownership records of the automobile.

**12**. The method of claim **1**, wherein the first request includes data provided with at least one graphical user interface component.

**13**. The method of claim **1**, wherein the first request includes at least one price parameter.

**14**. The method of claim **1**, further comprising:

storing, on a computer readable medium, pricing data including used automobile data and new automobile data, including actual prices of executed transactions, dealer listing prices, dealer sale prices, manufacturer incentives, dealer bids, consumer bids, and consumer pricing parameters.

**15**. The method of claim **1**, further comprising executing instructions, by the at least one processing device, to:

process a used automobile seller selection of the first bid to facilitate executing a sale including at least one of providing for electronic signature of documents and providing for an electronic funds transfer.

**16**. The method of claim **1**, wherein an add-on, including at least one of insurance, financing, a service contract, a warranty, and a hard-add accessory, is provided by a third party to the first used automobile buyer with the first request, via the used automobile buyer interface, wherein the third party is different from the used automobile seller and the first used automobile buyer.

**17**. The method of claim **16**, wherein the add-on is selected for inclusion in the first bid by the first used automobile buyer.

**18**. The method of claim **1**, further comprising executing instructions, by the at least one processing device, to:

receive, via the used automobile buyer interface, a second bid from a second used automobile buyer located at a third location within the in-market used automobile buyer area;

generate, based on receiving the second bid, second driving directions from the first location to the third location; and

provide, via the used automobile seller interface, the second bid including at least a second price for the first used automobile and the second driving directions from the first location to the third location.

**19**. A system comprising:

a computer readable medium storing instructions;

at least one processing device operably coupled to the computer readable medium, the at least one processing device executing the instructions to:

receive, via a used automobile seller interface, a first request for a response regarding a first used automobile, the first request made by a used automobile seller located at a first location and including a vehicle identifier and geolocation information of the used automobile seller;

determine, based on the geolocation information, that the used automobile is located at the first location;

generate, based on the determined first location, an in-market used automobile buyer area;

US 10,140,655 B2

27

determine that at least one used automobile buyer is located within the in-market used automobile buyer area;

receive, via a used automobile buyer interface, a first bid from a first used automobile buyer located at a second location within the in-market used automobile buyer area;

generate, based on receiving the first bid, driving directions from the first location to the second location; and

provide, via the used automobile seller interface, the first bid including at least a price for the first used automobile and the driving directions from the first location to the second location.

**20**. The system of claim **19**, wherein the system includes a used automobile seller interface and a manufacturer off-lease seller interface that is different from the used automobile seller interface.

**21**. The system of claim **19**, wherein the first used automobile is an off-lease automobile, and the first location is a dealer in possession of the first used automobile.

**22**. The system of claim **19**, wherein the used automobile seller interface is a manufacturer off-lease seller interface.

**23**. The system of claim **22**, wherein the manufacturer off-lease seller interface includes a number of matches or search hits for the first used automobile.

**24**. The system of claim **22**, wherein a manufacturer user inputs the vehicle identifier into the manufacturer off-lease seller interface by one of typing, speaking, or providing an image of the vehicle identifier.

**25**. The system of claim **22**, wherein the manufacturer off-lease seller interface includes information regarding automobiles that are coming off-lease.

28

**26**. The system of claim **22**, wherein the manufacturer off-lease seller interface receives a parameter that the first used automobile will be available for pickup only after a certain date.

**27**. The system of claim **22**, wherein the used automobile seller interface and the used automobile buyer interface are integrated within at least one of a single website and a single application.

**28**. A non-transitory computer readable medium storing instructions which, when executed, are configured to cause an information processing apparatus to:

receive, via a used automobile seller interface, a first request for a response regarding a first used automobile, the first request made by a used automobile seller located at a first location and including a vehicle identifier and geolocation information of the used automobile;

determine, based on the geolocation information, that the used automobile is located at the first location;

generate, based on the determined first location, an in-market used automobile buyer area;

determine that at least one used automobile buyer is located within the in-market used automobile buyer area;

receive, via a used automobile buyer interface, a first bid from a first used automobile buyer located at a second location within the in-market used automobile buyer area;

generate, based on receiving the first bid, driving directions from the first location to the second location; and

provide, via the used automobile seller interface, the first bid including at least a price for the first used automobile and the driving directions from the first location to the second location.

*    *    *    *    *

(12) **United States Patent**
Seergy et al.

(10) Patent No.: **US 10,223,720 B2**
(45) Date of Patent: ***Mar. 5, 2019**

(54) **AUTOMOBILE TRANSACTION FACILITATION USING A MANUFACTURER RESPONSE**

(71) Applicant: **Sidekick Technology LLC**, Pine Brook, NJ (US)

(72) Inventors: **Michael J. Seergy**, Pine Brook, NJ (US); **Benjamin N. S. Brown**, Pine Brook, NJ (US)

(73) Assignee: **Sidekick Technology LLC**, Pine Brook, NJ (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

This patent is subject to a terminal disclaimer.

(21) Appl. No.: **15/606,733**

(22) Filed: **May 26, 2017**

(65) **Prior Publication Data**

US 2018/0018722 A1    Jan. 18, 2018

**Related U.S. Application Data**

(63) Continuation of application No. 14/860,229, filed on Sep. 21, 2015, now Pat. No. 9,665,897, which is a
(Continued)

(51) **Int. Cl.**
*G06Q 30/00* (2012.01)
*G06Q 30/06* (2012.01)

(52) **U.S. Cl.**
CPC ..... *G06Q 30/0609* (2013.01); *G06Q 30/0605* (2013.01); *G06Q 30/0611* (2013.01);
(Continued)

(58) **Field of Classification Search**
CPC ........................ G06Q 30/0206; G06Q 30/0601
(Continued)

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 5,970,472 | A | 10/1999 | Allsop et al. |
| 6,006,201 | A | 12/1999 | Berent et al. |

(Continued)

OTHER PUBLICATIONS

AutoTrader.com, Inc..: Private Company Information-Business Week, http://investing.businessweek.com/research/stocks/private/snapshot.asp?privcapId=92642.
(Continued)

*Primary Examiner* — Brandy A Zukanovich
(74) *Attorney, Agent, or Firm* — K&L Gates LLP

(57) **ABSTRACT**

A system, methods, and apparatus for performing automobile transactions are disclosed. In an example embodiment, automobile market data representative of current automobile market characteristics is stored. The automobile market data may include pricing, inventory, and consumer interest information received from manufacturers, dealers, and consumers. A consumer may provide a request for a manufacturer response indicating whether a specific automobile can be provided. Automobile market data may be provided to a manufacturer based on the request and a manufacturer response provides a verification, confirmation, or offer indicating that the specific automobile can be provided for the consumer. Bids to sell the specific automobile may be requested from dealers based on the manufacturer response. Dealer bids may be provided to the consumer with prices and a delivery options. The consumer may select a bid which specifies a pickup location at a first dealer.

**34 Claims, 7 Drawing Sheets**



**US 10,223,720 B2**

Page 2

### Related U.S. Application Data

continuation of application No. 13/176,497, filed on
Jul. 5, 2011, now Pat. No. 9,141,984.

(52) **U.S. Cl.**
CPC ..... *G06Q 30/0627* (2013.01); *G06Q 30/0639*
(2013.01); *G06Q 30/0641* (2013.01)

(58) **Field of Classification Search**
USPC .................................... 705/26.1, 26.3, 27.1
See application file for complete search history.

(56) **References Cited**

#### U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 6,321,221 | B1 | 11/2001 | Bieganski |
| 6,463,431 | B1 | 10/2002 | Schmitt |
| 6,533,173 | B2 | 3/2003 | Benyak |
| 6,868,388 | B1 | 3/2005 | Millsap et al. |
| 6,868,389 | B1 | 3/2005 | Wilkins et al. |
| 7,395,223 | B1 | 7/2008 | Buzzell et al. |
| 7,406,436 | B1 | 7/2008 | Reisman |
| 7,479,949 | B2 | 1/2009 | Jobs et al. |
| 7,636,574 | B2 | 12/2009 | Poosala |
| 8,160,929 | B1 | 4/2012 | Park et al. |
| 8,392,193 | B2 | 3/2013 | Schultz et al. |
| 8,606,604 | B1 | 12/2013 | Huber et al. |
| 2002/0065707 | A1 | 5/2002 | Lancaster et al. |
| 2002/0082978 | A1 | 6/2002 | Ghouri et al. |
| 2002/0099628 | A1 | 7/2002 | Takaoka et al. |
| 2002/0111877 | A1 | 8/2002 | Nelson |
| 2002/0128946 | A1 | 9/2002 | Chehade et al. |
| 2003/0088435 | A1 | 5/2003 | King |
| 2003/0200151 | A1 | 10/2003 | Ellenson et al. |
| 2003/0229577 | A1 | 12/2003 | Nabel |
| 2004/0034544 | A1 | 2/2004 | Fields et al. |
| 2004/0059626 | A1 | 3/2004 | Smallwood |
| 2005/0004819 | A1 | 1/2005 | Etzioni et al. |
| 2005/0050097 | A1 | 3/2005 | Yeh et al. |
| 2005/0108112 | A1 | 5/2005 | Ellenson et al. |
| 2005/0240512 | A1 | 10/2005 | Quintero et al. |
| 2006/0020477 | A1 | 1/2006 | Retzbach et al. |
| 2007/0150362 | A1 | 6/2007 | Sharma et al. |
| 2007/0250403 | A1 | 10/2007 | Altschuler |
| 2007/0255663 | A1 | 11/2007 | Jordan et al. |
| 2007/0260526 | A1 | 11/2007 | Bartel |
| 2008/0046331 | A1 | 2/2008 | Rand |
| 2008/0177653 | A1 | 7/2008 | Famolari et al. |
| 2008/0183552 | A1 | 7/2008 | O'Hagan |
| 2008/0187125 | A1 | 8/2008 | Siegrist |
| 2008/0201184 | A1 | 8/2008 | Rose et al. |
| 2008/0201188 | A1 | 8/2008 | Heyman et al. |
| 2008/0201203 | A1 | 8/2008 | Rose et al. |
| 2008/0208731 | A1 | 8/2008 | Ruckart |
| 2008/0228657 | A1 | 9/2008 | Nabors et al. |
| 2009/0076896 | A1 | 3/2009 | DeWitt et al. |
| 2009/0132348 | A1 | 5/2009 | Bria et al. |
| 2009/0149199 | A1 | 6/2009 | Maghoul |
| 2009/0171761 | A1 | 7/2009 | Noy et al. |
| 2009/0187478 | A1 | 7/2009 | Shipley |
| 2009/0187513 | A1 | 7/2009 | Noy et al. |
| 2009/0198557 | A1 | 8/2009 | Wang et al. |
| 2009/0204600 | A1 | 8/2009 | Kalik et al. |
| 2010/0048242 | A1 | 2/2010 | Rhoads et al. |
| 2010/0106580 | A1 | 4/2010 | Etheredge et al. |
| 2010/0217525 | A1 | 8/2010 | King et al. |
| 2010/0274627 | A1 | 10/2010 | Carlson |
| 2010/0332292 | A1 | 12/2010 | Anderson |
| 2011/0040642 | A1 | 2/2011 | O'Dell |
| 2011/0082759 | A1 | 4/2011 | Swinson et al. |
| 2011/0087430 | A1 | 4/2011 | Boss et al. |
| 2011/0087556 | A1 | 4/2011 | Pitkow |
| 2011/0099036 | A1 | 4/2011 | Sarkissian et al. |
| 2011/0208418 | A1 | 8/2011 | Looney et al. |
| 2011/0238474 | A1 | 9/2011 | Carr et al. |
| 2011/0238514 | A1 | 9/2011 | Ramalingam et al. |
| 2011/0276394 | A1 | 11/2011 | Chan |

#### OTHER PUBLICATIONS

Autotrader.com Introduces IPhone App to Create a More Personalized "PC-to-Pocket" Experience for Car Shoppers, http://www.prnewswire.com/news-releases/autotradercom, Jul. 7, 2011.
App Store—AutoTrader, http://itunes.apple.com/us/app/autotrader-com/id444552888?mt=8, Oct. 31, 2011.
International Search Report dated Sep. 21, 2012 for Intl. Appln. No. PCT/US2012/045546.
Charlton, Auto Trader: iPhone app review. Mar. 15, 2010 [retrieved on Sep. 6, 2012] from the internet: http://www.econsultancy.com/us/blog/5593-auto-trader-iphone-app-review> entire document.
AutoDraderUK. Introducing the Auto Trader iPhone App. Mar. 12, 2010 [retrieved on Mar. 12, 2010] from the internet: http://www.youtube.com/watch?v+6g_lg8IRG4&feature=player_embedded> entire document.
International Search Report dated Oct. 5, 2012 for Intl. Appln. No. PCT/US2012/045545.
Anonymous, "instaVIN to offer free auto accident history reports for mobile phones," Wireless News, Jun. 2, 2010.



Fig. 1



Fig. 2



Fig. 3



Start
400
402
Automobile market data including at least pricing data and inventory data is stored in a database system (e.g., data from manufacturers, dealers, and consumers regarding pricing, lot inventory, production scheduling, and shipment scheduling is collected and stored in a database)
404
A request for a response of whether an automobile can be provided is received from a consumer (e.g., a car buyer fills in a request form on a website or takes a picture of a VIN to receive a verification that a car can be produced or delivered)
406
Automobile market data is provided to a manufacturer based on the consumer request (e.g., the car maker receives a real-time report including local car sales data, inventory data, car delivery data, and car build time data of the subject car)
408
A manufacturer response is provided to the consumer indicating that the automobile can be provided for the consumer (e.g., the car maker provides a verification that a car can be produced, shipped, or is already in inventory based on current pricing data, car locations, and build times for the subject car)
410
A bid to sell the automobile to the consumer is requested from dealers based on the manufacturer response (e.g., several dealers provide bids based on the verification, current pricing data, dealer pickup locations, and potential add-ons)
412
Dealer bids are provided to the consumer (e.g., several dealers provide bids, so several different prices and delivery options may be available to the car buyer)
414
The consumer selects a bid including a delivery option which specifies a pickup location (e.g., the car buyer chooses to pickup at a nearby dealer in five days)
416
The manufacturer is instructed to provide the automobile to a dealer according to the consumer bid selection (e.g., the car maker is instructed to re-route a car already in transit to the dealer pickup location for delivery in less than five days)
418
The consumer and dealer execute the sale of the automobile (e.g., the car buyer e-signs a loan application and contract, and electronically transfers funds)
Fig. 4B

Fig. 4A



( Fig. 4A )    ⟋— 400

⟋— 420

The manufacturer provides the dealer with the purchased automobile according to the consumer bid selection (e.g., the car maker re-routes a car en route to delivery at another dealer to the dealer pickup location selected by the car buyer or transports the car directly from the factory to the dealer pickup location)

⟋— 422

The consumer picks up the purchased automobile according to the consumer selected delivery option at the dealer (e.g., the car buyer picks up the car at the nearby dealer five days after the car sale is executed)

Fig. 4B



Fig. 5



600
304
302
308
306
602
Consumer takes a picture of a VIN
604
Consumer Request
606
System receives request and prepares automobile market data based on the request
608
Request and auto market information
610
Manufacturer determines that an automobile can be provided and prepares verification information for consumer and dealers
612
Verification
614
System receives and processes manufacturer response with verification and prepares and provides information for consumer and dealers
616
Verification
618
Consumer receives verification that the automobile can be provided
620
Bid request
622
Dealers receive bid request and determine prices and delivery options for the automobile and prepare and provide bids for the consumer
624
Dealer bid
626
System receives and processes dealer bids and prepares bids and automobile market data for consumer
628
Dealer bids and auto market information
630
Consumer receives dealer bids based on the verification and selects a bid including a delivery option based on automobile market information
632
Selection
634
System receives and processes bid selection
636
Selection
638
Dealer receives bid selection and coordinates a sale

Fig. 6

US 10,223,720 B2

1

**AUTOMOBILE TRANSACTION FACILITATION USING A MANUFACTURER RESPONSE**

CROSS REFERENCE TO RELATED APPLICATIONS

This application is a continuation of U.S. application Ser. No. 14/860,229, filed Sep. 21, 2015, which is a continuation of U.S. application Ser. No. 13/176,497, filed Jul. 5, 2011, which is related to the commonly-owned patent application filed on Jul. 5, 2011, entitled "AUTOMOBILE TRANSACTION FACILITATION BASED ON CUSTOMER SELECTION OF A SPECIFIC AUTOMOBILE," U.S. application Ser. No. 13/176,525, and the entire content of each of which is hereby incorporated by reference herein.

BACKGROUND

In the automobile industry, consumers typically purchase automobiles from dealers or dealerships. Dealers often purchase new automobiles from several manufacturers, to sell to consumers. Consumers typically negotiate a lower price than the manufacturer suggested retail price typically referred to as the "sticker price" and/or the price the dealer initially offers. In many cases, the negotiation process for an automobile may include a large degree of uncertainty for the consumer. Generally, the negotiation process is a zero sum process, and because the consumer and the dealer are each trying to get a better deal, there is typically some lack of trust during the negotiation. Accordingly, both dealers and consumers often base the negotiations on established market prices. However, market prices can fluctuate rapidly depending a variety of factors. For example, consumer demand may be affected by economic factors, such as changes in gasoline prices, unemployment rates, government sponsored tax rebates for automobile purchases, etc.

In many cases, a consumer may have concerns that a dealer may not offer a fair and competitive price. Various products and services have become available that allow consumers to perform research on market prices for automobiles. Similarly, dealers negotiating an automobile sale generally do not know the maximum price a consumer will be willing to pay for a particular automobile, or how long it will take to sell an automobile in inventory for a given price. Accordingly, dealers also use products and services for determining and/or tracking market prices. Further, automobile manufacturers may also have an interest in the market prices for automobiles, because the market activity captured as automobile market information may allow the manufacturer to, for example, more profitably determine which automobiles to manufacture, what prices the manufacture should offer to dealers, and whether manufacturer incentives should be offered on existing dealer automobile inventory.

SUMMARY

The present disclosure provides a new and innovative system, methods and apparatus for providing automobile market information and performing automobile transactions. In an example embodiment, automobile market data representative of recent automobile market characteristics is stored. The automobile market data may include pricing, inventory, and consumer interest information received from manufacturers, dealers, and consumers. A consumer may provide a request for a manufacturer response indicating whether a specific automobile can be provided. Automobile market data may be provided to a manufacturer based on the request and a manufacturer response may provide a verification, confirmation, or offer indicating that the specific automobile can be provided for the consumer. Bids to sell the specific automobile may be requested from dealers based on the manufacturer response. Dealer bids may be provided to the consumer with prices and a delivery options. The consumer may select a bid which specifies a pickup location at a particular dealer.

Additional features and advantages of the disclosed method and apparatus are described in, and will be apparent from, the following Detailed Description and the Figures.

BRIEF DESCRIPTION OF THE FIGURES

FIG. 1 is a high level block diagram of an example network communicating system, according to an example embodiment of the present invention.

FIG. 2 is a detailed block diagram showing an example of a computing device, according to an example embodiment of the present invention.

FIG. 3 is a block diagram showing an example automobile transaction network structure, according to an example embodiment of the present invention.

FIGS. 4A and 4B include a flowchart illustrating an example process for facilitating an automobile transaction, according to an example embodiment of the present invention.

FIG. 5 is a block diagram showing an example data architecture, according to an example embodiment of the present invention.

FIG. 6 is flow diagram illustrating an example process for facilitating an automobile transaction, according to an example embodiment of the present invention.

DETAILED DESCRIPTION OF EXAMPLE EMBODIMENTS

The present disclosure relates in general to a system for facilitating automobile transactions and, in particular, to automobile transaction facilitation using a manufacturer response. Briefly, in an example embodiment, a system is provided which allows a consumer to request a verification that a specific car can be obtained. For example, a consumer may use a mobile device to take a picture of a vehicle identification number and using optical character recognition, request real-time information on that automobile. For example, a manufacturer can provide a verification to the consumer and dealers that the automobile can be provided, along with specific logistics for delivery. Dealers may provide bids based on the consumer request and the manufacturer verification, including intrabrand bids and interbrand bids. A consumer may select a dealer bid to purchase or lease an automobile based on the prices and delivery options available. Also, the presently disclosed system may advantageously allow for inventoryless bidding by dealers. For example, a dealer does not need to have an automobile in its inventory (e.g., on the dealer lot), but can make a bid to sell that automobile anyways, and then have that automobile produced by a manufacturer or transported to the dealer lot. In a non-limiting example embodiment, certain features disclosed in the present patent application may be commercially embodied in products and services offered by Sidekick Technology LLC, the assignee of the present application.

The present system may be readily realized in a network communications system. A high level block diagram of an example network communications system 100 is illustrated

US 10,223,720 B2

3

in FIG. 1. The illustrated system 100 includes one or more client devices 102, and one or more host devices 104. The system 100 may include a variety of client devices 102, such as desktop computers and the like, which typically include a display 112, which is a user display for providing information to users 114, and various interface elements as will be discussed in further detail below. A client device 102 may be a mobile device 103, which may be a cellular phone, a personal digital assistant, a laptop computer, a tablet computer, etc. The client devices 102 may communicate with the host device 104 via a connection to one or more communications channels 106 such as the Internet or some other data network, including, but not limited to, any suitable wide area network or local area network. It should be appreciated that any of the devices described herein may be directly connected to each other instead of over a network. Typically, one or more servers 108 may be part of the network communications system 100, and may communicate with host servers 104 and client devices 102.

One host device 104 may interact with a large number of users 114 at a plurality of different client devices 102. Accordingly, each host device 104 is typically a high end computer with a large storage capacity, one or more fast microprocessors, and one or more high speed network connections. Conversely, relative to a typical host device 104, each client device 102 typically includes less storage capacity, a single microprocessor, and a single network connection. It should be appreciated that a user 114 as described herein may include any person or entity which uses the presently disclosed system and may include a wide variety of parties. For example, as will be discussed in further detail below, users 114 of the presently disclosed system may include a consumer, a dealer, and/or a manufacturer.

Typically, host devices 104 and servers 108 store one or more of a plurality of files, programs, databases, and/or web pages in one or more memories for use by the client devices 102, and/or other host devices 104 or servers 108. A host device 104 or server 108 may be configured according to its particular operating system, applications, memory, hardware, etc., and may provide various options for managing the execution of the programs and applications, as well as various administrative tasks. A host device 104 or server may interact via one or more networks with one or more other host devices 104 or servers 108, which may be operated independently. For example, host devices 104 and servers 108 operated by a separate and distinct entities may interact together according to some agreed upon protocol.

A detailed block diagram of the electrical systems of an example computing device (e.g., a client device 102, and a host device 104) is illustrated in FIG. 2. In this example, the computing device 102, 104 includes a main unit 202 which preferably includes one or more processors 204 electrically coupled by an address/data bus 206 to one or more memory devices 208, other computer circuitry 210, and one or more interface circuits 212. The processor 204 may be any suitable processor, such as a microprocessor from the INTEL PENTIUM® family of microprocessors. The memory 208 preferably includes volatile memory and non-volatile memory. Preferably, the memory 208 stores a software program that interacts with the other devices in the system 100 as described below. This program may be executed by the processor 204 in any suitable manner. In an example embodiment, memory 208 may be part of a "cloud" such that cloud computing may be utilized by a computing devices 102, 104. The memory 208 may also store digital data indicative of documents, files, programs, web pages,

4

etc. retrieved from a computing device 102, 104 and/or loaded via an input device 214.

The interface circuit 212 may be implemented using any suitable interface standard, such as an Ethernet interface and/or a Universal Serial Bus (USB) interface. One or more input devices 214 may be connected to the interface circuit 212 for entering data and commands into the main unit 202. For example, the input device 214 may be a keyboard, mouse, touch screen, track pad, track ball, isopoint, image sensor, character recognition, barcode scanner, and/or a voice recognition system.

One or more displays 112, printers, speakers, and/or other output devices 216 may also be connected to the main unit 202 via the interface circuit 212. The display 112 may be a cathode ray tube (CRTs), a liquid crystal display (LCD), or any other type of display. The display 112 generates visual displays generated during operation of the computing device 102, 104. For example, the display 112 may provide a user interface, which will be described in further detail below, and may display one or more web pages received from a computing device 102, 104. A user interface may include prompts for human input from a user 114 including links, buttons, tabs, checkboxes, thumbnails, text fields, drop down boxes, etc., and may provide various outputs in response to the user inputs, such as text, still images, videos, audio, and animations.

One or more storage devices 218 may also be connected to the main unit 202 via the interface circuit 212. For example, a hard drive, CD drive, DVD drive, and/or other storage devices may be connected to the main unit 202. The storage devices 218 may store any type of data, such as pricing data, transaction data, operations data, inventory data, commission data, manufacturing data, image data, video data, audio data, tagging data, historical access or usage data, statistical data, security data, etc., which may be used by the computing device 102, 104.

The computing device 102, 104 may also exchange data with other network devices 220 via a connection to the network 106. Network devices 220 may include one or more servers 226, which may be used to store certain types of data, and particularly large volumes of data which may be stored in one or more data repository 222. A server 226 may include any kind of data 224 including databases, programs, files, libraries, pricing data, transaction data, operations data, inventory data, commission data, manufacturing data, configuration data, index or tagging data, historical access or usage data, statistical data, security data, etc. A server 226 may store and operate various applications relating to receiving, transmitting, processing, and storing the large volumes of data. It should be appreciated that various configurations of one or more servers 226 may be used to support and maintain the system 100. For example, servers 226 may be operated by various different entities, including automobile manufacturers, brokerage services, automobile information services, etc. Also, certain data may be stored in a client device 102 which is also stored on the server 226, either temporarily or permanently, for example in memory 208 or storage device 218. The network connection may be any type of network connection, such as an Ethernet connection, digital subscriber line (DSL), telephone line, coaxial cable, wireless connection, etc.

Access to a computing device 102, 104 can be controlled by appropriate security software or security measures. An individual users' 114 access can be defined by the computing device 102, 104 and limited to certain data and/or actions. Accordingly, users 114 of the system 100 may be required to register with one or more computing devices

US 10,223,720 B2

5

**102**, **104**. For example, registered users **114** may be able to request or manipulate data, such as submitting requests for pricing information or providing an offer or a bid.

As noted previously, various options for managing data located within the computing device **102**, **104** and/or in a server **226** may be implemented. A management system may manage security of data and accomplish various tasks such as facilitating a data backup process. A management system may be implemented in a client **102**, a host device **104**, and a server **226**. The management system may update, store, and back up data locally and/or remotely. A management system may remotely store data using any suitable method of data transmission, such as via the Internet and/or other networks **106**.

FIG. **3** is a block diagram showing an example automobile transaction network structure **300** which includes an automobile market information processing system **302**, a consumer interface **304**, a dealer interface **306**, and a manufacturer interface **308**. The example automobile market information processing system **302** may be implemented on one or more host devices **104** accessing one or more servers **108**, **226**. In an example embodiment, the automobile market information processing system **302** includes a database system **310**, a recommendation engine **312**, a vehicle identification number processor **314**, and an interface generation unit **316**. A user **114** may be a consumer, a dealer, or a manufacturer that interacts with the consumer interface **304**, dealer interface **306**, or manufacturer interface **308**, respectively. A database system **310** may include a wide variety of automobile market data. A recommendation engine **312** may provide recommendations for consumers, dealers, and manufacturers. A vehicle identification number processor **314** may be used for making requests regarding specific automobiles and automobiles with specific sets of features. For example, a vehicle identification number processor **314** may determine a specific set of features that a specific car has based on a picture of that specific car's vehicle identification number. Interface generation unit **316** may provide, for example, HTML files which are used at the consumer interface **304**, dealer interface **306**, and manufacturer interface **308** interface to provide information to the users **114**. It should be appreciated that he consumer interface **304**, dealer interface **306**, and manufacturer interface **308** may be considered to be part of the automobile market information processing system **302**, however, for discussion purposes, the consumer interface **304**, dealer interface **306**, and manufacturer interface **308** may be referred to as separate from the automobile market information processing system **302**.

For example, a user **114** may interact with a consumer interface **304** to research automobiles the user **114** is interested in buying. For example, a consumer may be looking for a four door sedan with specific features, including a global positioning system (GPS), a sunroof, tinted windows, rated for at least thirty miles per gallon, four wheel drive, etc. The consumer may interact with the consumer interface **304** by inputting required and/or desired features, monthly budget or full price, etc. The consumer interface **304** may provide a wide variety of features and specifications which the consumer may choose from in providing a request. Based on the information put into the consumer interface **304** from the consumer, the consumer interface **304** may provide one or more reports or offers to the consumer. As will be discussed in further detail below, the information provided by the consumer interface **304** may include current market prices for automobiles, including information relating to additional features, and may include information on specific automobiles, for example, which may be en route to

6

a dealer near the consumer's present location. The automobile market information processing system **302** may process data received by the consumer interface **304**, as well as the dealer interface **306** and/or the manufacturer interface **308**, to respond to a request from a consumer. For example, data from database system **310** may be queried for use in a report, or a recommendation may be provided by recommendation engine **312** according to the consumer request and current market data. The automobile market information processing system **302** may integrate data received from consumer interface **304**, dealer interface **306**, and manufacturer interface **308** to provide current and accurate information relating to the automobile market.

It should be appreciated that the consumer interface **304** may be specific to one particular manufacturer or may provide information for multiple different manufacturers. For example, a consumer interface **304** may be a website with information on many manufacturers, and further, the consumer interface **304** may access or link to the manufacturer specific websites (e.g., Ford). Also, for example, a consumer interface **304** may be implemented as an automobile manufacturer's website. Typically, a manufacturer's website may provide consumers with a catalog like feature that provides information on different automobile models with any available options or features. For example, a manufacturer website may allow a consumer to select options that are desired to "build" a particular automobile, and may provide price comparisons using suggested retail prices, which may consumers use for initial research into what pricing the dealer may offer for a particular automobile with a particular feature set. Also, typically, the consumer may enter information, including, for example, name, an address or zip code, and telephone number. This information may be passed on from the manufacturer to a nearby dealer and/or nearby dealer information may be provided to the consumer (e.g., the dealer in or nearest to the consumer's entered zip code). Accordingly, the dealer may contact the consumer, or the consumer may inquire with the dealer, regarding the specific automobiles available on that dealer's lot and particular pricing being offered, etc. In many cases, consumers may not inquire with dealers that the manufacturer may recommend, and similarly, dealers may not diligently follow up with consumers that have an interest in purchasing an automobile. Further, it should be appreciated that the information provided via a consumer interface **304** and/or a manufacturer website may be very useful to consumers. For example, in the past, dealers often provided brochures with all the information on a manufacturer's available car models, including all the features and options information. However, dealers typically do not provide comprehensive information brochures, which may be relatively expensive to produce, and rather, that information is typically located on a manufacturer website and/or a consumer interface **304**.

Accordingly, the consumer interface **304** may provide a wide range of information, for example, based on any searches or queries performed by a user **114**. In an example embodiment, based on a user search or request for a response, the consumer interface **304** will display a quality index or value index based on normalized calculations for an automobile. The recommendation engine **312** may provide recommendations to a consumer based on the current automobile market data stored in the automobile market information processing system **302**. For example, metrics on gas mileage, emissions, operating and maintenance costs, safety ratings, etc. may be benchmarked against comparable automobiles of the same and different manufacturers. Similar

US 10,223,720 B2

7

purchase options to a specific search may also be provided, based on feature matching, price range, consumer popularity, etc. Information including price ranges, including MSRP, invoice prices, inventory levels, the user's **114** credit ratings (e.g., FICO score), may be provided which may include monthly payment estimates or projections. For example, a financing calculator may help a user **114** determine what financing rate is appropriate. It should be appreciated that dealers may mislead consumers into believing that a higher financing rate will be required to secure a loan. Further, for example, a lease vs. buy calculator may be provided which may use current market data including prices, interest rates, incentives, estimated mileage per year, etc. for providing an analysis for a particular consumer regarding purchasing or leasing. Also, the consumer interface **304** may provide a purchase checklist, for example, of ten steps to buying a car. A qualitative checklist may allow a user to ask the right questions and get the right answers from a dealer. Additional tips may be provided, such as a list of products or services dealers may attempt to sell to a consumer with an analysis of the value of these products or services and a recommendation to accept or decline these dealer offers. Further, beyond analysis relating to automobiles, additional analysis or reports may be provided, for example, relating to dealer reviews, other supplemental products, financial entities that may provide financing, etc. For example, dealer reviews may provide a consumer with information the consumer may use in addition to automobile pricing and delivery options. Moreover, the consumer interface **304** may provide a wide variety of useful information to a consumer, for at home research and preparation, and/or in a dealer location while shopping as a negotiating tool that may provide confirmation on pricing, useful tips, and the like.

In an example embodiment, a dealer interface **306** may provide a user **114**, such as a dealer employee, information relating to the current automobile market. The dealer interface **306** allows a dealer to interact with automobile market information processing system **302** to provide the dealer with a wide variety of information, including, for example, current market pricing. Other automobile market information a dealer may receive on a dealer interface **306** includes information relating to lot inventory, turnover rates, automobile transportation and/or shipping costs, incentives, and various ratings, such as ratings relating to quality, safety, insurance, a consumer credit score, dealer ratings, residual or resale values, etc. A dealer may input information into dealer interface **306** relating to sales data, including current pricing offered, special sales offers, actual transaction data, inventory data, etc. In an example embodiment, the dealer may provide information through dealer interface **306** which will be used by automobile market information processing system **302** to prepare reports or offers to consumers and/or manufacturers. It should be appreciated that a dealer is typically a franchise entity, while a distribution location may not be a franchise entity. For brevity, throughout this specification, the term dealer may be used to describe both franchise entity dealers and non-franchise entity distribution location. Accordingly, as used in this disclosure, the term dealer does not indicate whether an entity is a franchise entity. Moreover, a franchise dealer or a non-franchise distribution location may utilize a dealer interface **306** as described herein.

In an example embodiment, a manufacturer interface **308** may provide a user **114**, such as a manufacturer employee, information relating to the current automobile market, including consumer requests. For example, an manufacturer

8

interface **308** may provide a manufacturer a request received from a consumer interface **304**. Additionally, the manufacturer interface **308** may provide information such as a report that allows the manufacturer to provide a response to the requesting consumer. A report may include information from database system **310** relating to current market pricing, recent sales figures and trends, current manufacturer incentives, current inventory, including dealer inventory, inventory in transit, and/or build times or lead times for a desired automobile, etc. The manufacturer may use this information to provide a response to a consumer request. The manufacturer may provide the manufacturer interface **308** with information to provide a confirmation, a verification, or an offer to a consumer via consumer interface **304**. For example, a confirmation number associated with the particular consumer request may be provided for the consumer. Also, a recommendation may be provided from the recommendation engine **312** to the manufacturer in relation to automobile pricing, responding to a specific request, manufacturer incentives, inventory management, production schedules, shipping schedules, etc. It should be appreciated that a manufacturer may be referred to as an OEM or original equipment manufacturer. The manufacturer interface **308** may provide a manufacturer with a real-time lens into the automobile market which may allow the manufacturer to adjust production schedules, pricing plans, marketing activities, etc., which may provide a significant advantage for manufacturers.

Accordingly, information may be provided to the automobile market information processing system **302** from consumers, dealers, and manufacturers with a very high degree of granularity, as every transaction that occurs and even every request or search may be stored and used by the automobile market information processing system **302**. This allows the automobile market information processing system **302** to use the most current automobile market data to provide information to consumers, dealers, and manufacturers. It should be appreciated that market prices can change relatively quickly, particularly when major events drive consumer behavior or manufacturer production, such as natural disasters. Accordingly, reports and recommendations provided by the automobile market information processing system **302** may be highly accurate, reliable, and sensitive to market changes.

It should be appreciated that certain functions described as performed, for example, at automobile market information processing system **302**, may instead be performed locally at consumer interface **304**, dealer interface **306**, and manufacturer interface **308**, or vice versa. Further, in certain cases, tasks may be performed using consumer interface **304**, dealer interface **306**, and manufacturer interface **308** or, for example, performed in person, such as a consumer signing documents at a dealer location, or a dealer communicating with a manufacturer using a telephone. It should be appreciated that the consumer interface **304**, dealer interface **306**, and manufacturer interface **308** may be implemented, for example, in a web browser using an HTML file received from the automobile market information processing system **302**. In an example embodiment, the consumer interface **304**, dealer interface **306**, and manufacturer interface **308** may be located on a website, and may further be implemented as a secure website. Also, consumer interface **304**, dealer interface **306**, and manufacturer interface **308** may require a local application, for example, which a manufacturer may pay for to have access to, for example, information from the automobile market information processing system **302** such as requests from consumers.

US 10,223,720 B2

9 10

FIGS. **4**A and **4**B include a flowchart of an example process **400** for facilitating an automobile transaction. Although the process **400** is described with reference to the flowchart illustrated in FIGS. **4**A and **4**B, it will be appreciated that many other methods of performing the acts associated with the process **400** may be used. For example, the order of many of the blocks may be changed, certain blocks may be combined with other blocks, and many of the blocks described are optional.

The example process **400** for facilitating an automobile transaction may allow users **114**, including manufacturers and consumers, as well as dealers, to efficiently sell and purchase automobiles, respectively. The example process **400** may begin with automobile market data including at least pricing data and inventory data stored in a database system (block **402**). For example, automobile market data from manufacturers, dealers, and consumers regarding pricing, lot inventory, production scheduling, and shipment scheduling is collected and stored in a database. In an example embodiment, a wide variety of data is stored in a database system **310**. Automobile market data may include various relevant ratings, reports, awards, or other information, including quality information, safety information, insurance information, consumer credit information, dealer rating information, incentive information, residual value information, and/or any other data which may be relevant to consumers. For example, ratings data may include information from the National Highway Traffic Safety Administration (NHTSA), the Environmental Protection Agency (EPA), and/or the Insurance Institute for Highway Safety (IIHS). The data may include information from a consumer interface **304**, such as data in consumer searches or requests, information from a dealer interface **306**, such as currently offered dealer pricing, transaction data for finalized sales, current inventory data, shipping costs, and information from a manufacturer interface **308**, such as current manufacturer prices and suggested pricing, manufacturer incentives, and current inventory including finished inventory on hand, production scheduling, shipment scheduling, inventory in transit, and manufacturing lead times. The automobile market data may be comprised solely of information received from the consumer interface **304**, dealer interface **306**, and manufacturer interface **308**, or may include additional information received from other sources. It should be appreciated that various methods of storing the automobile market data may be employed according to the system requirements. For example, database system **310** may be organized according to different manufacturers, automobile make and model, different information categories (e.g., suggested pricing, market prices, production, shipping, lot inventory), etc., and may consist of one or more databases on one or more servers **108**, **226** which may be remotely located from each other and/or a host device **104** of the automobile market information processing system **302**. As will be discussed further below, the automobile market data may be continually updated as new data is provided to the automobile market information processing system **302**.

The example process **400** continues with a consumer providing a request to a manufacturer for a response of whether an automobile can be provided (block **404**). For example, a car buyer fills in a request form on a website to receive a verification that a car can be produced or delivered. In this example embodiment, the buyer's request may be transmitted from consumer interface **304** via the internet to the automobile market information processing system **302**. In another example embodiment, a car buyer may be located at a dealer location and take a picture of a vehicle identifi-

cation number (VIN) on a car that the buyer would like to receive information for. For example, using an application stored on a mobile device **103**, the buyer may take a picture of the VIN on a car. The buyer may want information on that specific car or on other comparable cars with the same or similar features and/or options. The picture of the VIN may be processed using optical character recognition, which allows the automobile market information processing system **302** to determine the make and model of the car, along with various other characteristics of the car. It should be appreciated that the VIN may include human readable characters, a bar code, or any other graphical or machine readable information which acts as a vehicle identification number. Accordingly, the buyer may perform research, for example, while at home or while shopping at a dealer location. Further, for example, the buyer may take a picture of a VIN anywhere, including at automobile trade shows, mall displays, or anywhere new cars or cars for sale are displayed. The buyer may even take a picture of a car parked in the street as the buyer walks down the street. Any request or query communicated from the consumer interface **304** may be stored, for example, in database system **310**, thereby updating the automobile market information processing system **302** with current automobile market data.

The example process **400** may continue with providing automobile market data to a manufacturer based on the consumer request (block **406**). For example, the car manufacturer receives a real-time report including local car sales data, inventory data, car delivery data, and car build time data of the consumer's requested car. In an example embodiment, a report may include quality information, safety information, insurance information, consumer credit information (e.g., buyer FICO score), dealer rating information, incentive information, residual value information, and/or any other data which may be relevant to consumers. The report may be provided through manufacturer interface **308** and include the consumer requirements and preferences. The request and/or the report may be provided in real-time and may provide real-time data. Data reported based on a real-time updates in the automobile market information processing system **302** may provide significant advantages, for example, when pricing conditions may change quickly due to unforeseen market conditions. The recommendation engine **312** may provide recommendations to a manufacturer based on the current automobile market data. For example, a report may indicate various estimated sales probabilities for different prices that a dealer may offer or bid, which can be very useful information for a manufacturer. In an example embodiment, a probability for a manufacturer or dealer to sell a certain lot of automobiles within a time frame may be provided. Such information may be illustrated in various ways, such as a bell curve graph or a chart. Further, the recommendation engine may provide suggestions regarding manufacturer incentives or other factors which affect the automobile market. Manufacturers may use such information in making important decisions, such as setting prices, setting or modifying production schedules, marketing directives, future product features and focus, and the like. Also, in an example embodiment, the manufacturer interface **308** may provide information that is limited to cars which meet the consumer request requirements. The manufacturer may customize the manufacturer interface **308** to provide information in a pre-specified manner to suit the manufacturers needs.

A manufacturer response is provided to the consumer indicating that the automobile can be provided for the consumer (block **408**). For example, the car maker provides

US 10,223,720 B2

11

a verification that a car can be produced, shipped, or is already in inventory based on current pricing data, car locations, and build times for the subject car. The manufacturer interface **308** may be used to communicate a verification, or a confirmation or offer to a buyer. For example, a verification may state that a particular car with specific features may be produced within forty-five days if the buyer purchases that car and may provide a confirmation number associated with the verification. In another example, a particular car currently being shipped to New York may be re-routed to Illinois. The automobile market data may include, for example, shipping costs that the manufacturer may use for determining if an automobile should be re-routed. An offer to produce or ship a particular car to a dealer location near a consumer may be authorized through the manufacturer interface **308**. In an example embodiment, the automobile market information processing system **302** may be pre-authorized by a manufacturer to provide a confirmation of specific model with specific feature sets. A manufacturer may determine whether it is profitable to produce a car from scratch based on the automobile market data such as current market pricing, current inventory levels, and the like. Accordingly, a manufacturer response may be adjusted by current automobile market conditions. In an example embodiment, a manufacturer response may not require the use of manufacturer interface **308**, for example, a manufacturer may otherwise provide a consumer with a verification, which may be provided by the consumer for use in the automobile market information processing system **302**. Any verification, confirmation, offer, and/or response communicated from a manufacturer interface **308** may be stored, for example, in database system **310**, to further update the automobile market information processing system **302** with current automobile market data.

Then, a bid to sell the automobile to the consumer is requested from dealers based on the manufacturer response (block **410**). For example, several dealers provide bids based on the verification, current pricing data, dealer pickup locations, and potential add-ons. Each dealer's bid may include a price, for example, a price with no additional add-on products or services, such as service contracts, warranties, aftermarket accessories, etc. For example, add-on products may provide substantial value to a dealer, above and beyond the profit margin for the sale of the requested car. A dealer may profit from selling financing options, for example, if a consumer needs financing, the financier may pay the dealer for sourcing the loan. A dealer may sell service plans or maintenance packages (e.g., an extended service contract), selling warranties (e.g., a lifetime warranty), or selling insurance plans (e.g., life, accident, and health insurance, liability insurance, comprehensive insurance, etc.). Also, a dealer may also sell various hard add accessories, for example, bicycle racks, hitches, commercial accessories (e.g., lights and sirens), or any aftermarket products or modifications (e.g., sunroof).

One or more dealer bids are provided to the consumer (block **412**). For example, several dealers provide bids, so several different prices and delivery options may be available to the car buyer. Typically, the bid will include at least a specified price and pickup time and location. Typically, a pickup location will be a dealer lot or distribution location. In an example embodiment, a buyer that has taken a picture of a VIN with a mobile device may receive dealer bids within minutes or seconds on the mobile device. Accordingly, the bids may be used in real-time as the buyer may be actively shopping for a car on a dealer lot. It should be appreciated that some dealers may have multiple locations

12

which could serve as a pickup location. In an example embodiment, the automobile market data may indicate that the particular car requested by a consumer should be priced at, for example, $26,000. However, various factors may affect the bid or offer that a dealer will make for the particular car. For example, the potential for forming a customer relationship, the value of potential add-on products and services, or competition with other dealers may cause a dealer to bid lower than normal. In such a case, the dealer may bid $25,000 in an effort to create a customer relationship, sell add-on products, and/or undercut the competition pricing. Other factors, such as the buyer's credit score (e.g., FICO score), may be used by a dealer in determining a bid, as this may affect the profitability of a sale.

Further, for example, the particular automobile requested may not be available for immediate pickup near the buyer, and various alternative delivery options may be provided from several dealers' bids. A car that is in transit to an out of state dealer may be re-routed to a dealer near the buyer, or a new car may be built to the buyer's desired specifications and delivered to a dealer near the buyer. Therefore, for example, the consumer interface **304** may provide several different bids with different delivery options and prices to the buyer, for example, a price of $26,000 to pick up the car at an out of state dealership the next day, a price of $26,000 to pick up the car at a local dealer in two months, or a price of $26,500 to pick up the car at a local dealer in five days. For example, the costs of re-routing a car already in shipment may be factored into dealer bids. Inventoryless bidding may be highly beneficial when dealers that do not have a requested automobile in inventory can still profitably provide a bid. Further, for example, cars that are not exactly what the buyer requested may also be offered to the buyer. For example, the buyer may request a four wheel drive car, but if a two wheel drive car that meets all the other buyer criteria is immediately available at a nearby dealer, the dealer may provide an offer to the buyer for this car, possibly at a significantly lower price, such as $23,000 instead of $26,000 for a four wheel drive car as requested. Further, for example, dealers may use information such as ratings data to optimize their bids. For example, if gasoline prices are increasing, mileage ratings for a particular car may dictate increasing or decreasing a bid. If a vehicle has very good gas mileage, and gas prices are skyrocketing, that car may have an increasing demand as gas prices increase, or vice versa. Similarly, safety ratings of vehicles may be important to consumer demand if high profile problems have appeared for a particular automobile style, make, or model. As discussed above, various automobile market information may be used by a dealer including safety information, insurance information, consumer credit information, dealer rating information, incentive information, residual value information, and/or any other data which may be relevant to consumers.

The consumer interface **304** may organize dealer bids based on a variety of factors and may provide supplemental information. For example, certain dealer bids may be selected as the best options, all dealer bids may be summarized, various additional ratings, reviews, or popularity information, financing information, etc. may also be provided to a consumer along with any dealer bids. The recommendation engine **312** may provide recommendations to a consumer based on the current automobile market data. For example, of ten dealer bids provided with a response, three bids may be recommended, for example, as "Great Deals!" It should be appreciated that in some cases, a particular consumer search may not return any dealer bids,

US 10,223,720 B2

13

for example, if consumer search requirements are unrealistic for the consumer's required price range. Also, for example, if only one or two bids are received, the recommendation engine **312** may recommend that a consumer wait for a better bid because the bids provided are not competitive offers based on the current automobile market data stored in the database system **310**. Further, in an example embodiment, dealer bids may be organized according to distance to a dealer pickup location, lowest price, closest match to the consumer entered criteria, a normalized quality index or value index, etc. The consumer may be able to toggle between different viewing options for dealer bids or search results.

Further, in an example embodiment, a buyer may be at a dealer lot (e.g., a Nissan dealer) and take a picture of a VIN on a car (e.g., a Maxima). A bid from a competing dealer (e.g., a Toyota dealer) across the street may be received on the mobile device within seconds and include information for a comparable car (e.g., an Avalon) relating to, for example, gas mileage, safety ratings, price comparisons, residual value, driving directions to the competing dealer, etc. In an example embodiment, a dealer may use the geolocation of the buyer, such as in instances when the buyer is physically located close to the dealer. Accordingly, competing dealer bids may be interbrand or intrabrand in nature, and may be tailored to the buyer's particular situation, which a consumer may find highly advantageous. For example, the buyer may have a bid for a car the buyer wants to test drive as well as a bid for a comparable car across the street before a salesman from the dealer even introduces himself. Accordingly, a consumer may weigh the pros and cons of various dealer bids, based on delivery options, pricing, and any other relevant variants. Any bids communicated from a dealer interface **306** may be stored, for example, in database system **310**, to further update the automobile market information processing system **302** with current automobile market data.

The consumer selects a bid including a delivery option which specifies a pickup location (block **414**). For example, the car buyer chooses a delivery option of picking up the car at a nearby dealer in five days. As noted above, a dealer may be a franchise dealer entity or a non-franchise distribution location. The buyer may select an offer with a specified delivery option on the consumer interface **304**. The car buyer may have been weighing two or more different delivery options and/or different features, price differences, etc., based on the response(s) received through the consumer interface **304**. As noted above, the consumer interface **304** may organize bids and other helpful information in a variety of ways, which may make the information easier for a consumer to digest. It should be appreciated that a buyer will typically want to pick up a new car at a convenient location, often near the buyer's home. Accordingly, dealers may attempt to provide delivery options tailored towards maximizing profit for the dealer while also maximizing convenience to the buyer, while also providing a superior bid to other dealers. By providing multiple bids with different delivery options, the buyer may be allowed to save time or money based on the buyer's particular needs. In an example embodiment, the buyer may provide a counter offer or different request via the consumer interface **304** to a dealer via the dealer interface **306**. Accordingly, the dealer may respond in kind, and may update delivery options or other terms. It should be appreciated that the consumer selection of a bid may, for example, occur simultaneously with the consumer executing the sale or providing a deposit or down payment, or the like (see, e.g., block **418**). Accordingly, in an example embodiment, once the buyer selects a bid, the

14

buyer has effectively purchased the car, and the dealer does need to worry about the buyer backing out of the deal. Any consumer selections, counter offers, or additional requests or responses may be stored in database system **310**, as the communications are processed by automobile market information processing system **302**, providing further data updates. Accordingly, in an example embodiment, a consumer may select a bid to purchase a car, and that purchase information may then be provided to another consumer searching for the same type of car with similar features, for example, the next day.

Once a bid with a specific delivery option has been selected, the manufacturer is instructed to provide the automobile to a dealer according to the consumer bid selection (block **416**). For example, the car maker is instructed to re-route a car already in transit to the dealer pickup location for delivery in less than five days. In an example embodiment, the dealer may be required to send an instruction message from the dealer interface **306** to the manufacturer interface **308**. It should be appreciated that the specific manner of instruction may be changed based on the particular application, for example, the automobile market information processing system **302** may automatically provide an instruction to a manufacturer to produce a car or re-route a car. It should also be appreciated that particular events may be required to trigger instructing a car to be delivered to a dealer, such as a deposit, financing approval, etc. Further, the consumer may be required to send an instruction message from the consumer interface **304** to the manufacturer interface **308** affirming that the buyer has agreed to purchase the car from the dealer.

The consumer and the dealer execute the sale of the automobile (block **418**). For example, the consumer electronically signs documentation such as loan application and a contract and performs an electronic funds transfer or credit card payment. After the delivery option is selected, an electronic contract may be provided by the manufacturer for the buyer who may e-sign the contract, and/or any other loan applications or other documentation as needed. In another example embodiment, paper copies of a contract may be signed, for example, after the buyer prints them or receives them from a nearby dealer or through the mail. In an example embodiment, the buyer may provide cash or a paper check. It should be appreciated that the process of executing a contract may take some time. For example, the process may occur in several steps, as loan processing may be required prior to executing a contract for sale of a car. Also, it should be appreciated that, for example, the consumer selection of a bid discussed above (see, e.g., block **414**) may occur simultaneously with the consumer executing the sale. Once the sale is completed, the actual transaction data including the final negotiated price, may be provided to and stored in database system **310**. Accordingly, the automobile market information processing system **302** may be updated with current automobile market data from every step in the negotiation process between a consumer and a manufacturer. In an example embodiment, the updates provided to the automobile market information processing system **302** are provided in real-time, for example, data may be transmitted and processed within seconds or minutes. Further, for example, it should be appreciated that certain data may be provided to the automobile market information processing system **302** according to a batch processing schedule.

Next, the manufacturer provides the dealer with the purchased automobile according to the consumer bid selection (block **420**). For example, the car maker re-routes a car en route to delivery at another dealer to the dealer pickup

US 10,223,720 B2

15 16

location selected by the car buyer or transports the car directly from the factory to the dealer pickup location. If a buyer chooses a quicker delivery option, the car may need to be re-routed from a different destination to the selected dealer pickup location. If a buyer does not urgently need to have a car, a new car may be built to the buyer's exact specifications and delivered to the selected dealer pickup location. Also, for example, a purchased car may be already at a dealer which the buyer has agreed to pick the car up, in which case, the car does not need to be provided to the dealer. A dealer may interact with the automobile market information processing system **302** using dealer interface **306**, for example, to receive notification that a car will be picked up by a buyer, and to report that a car has been delivered to the dealer. A notification may also be sent via consumer interface **304** to the buyer that the car is available for pickup at the specified dealer.

Finally, the consumer picks up the purchased automobile according to the consumer selected delivery option at the dealer (block **422**). For example, the car buyer picks up the car at the nearby dealer five days after the car sale is executed. The buyer may pick up the car without ever having to talk to or negotiate, in person or over the telephone, with the dealer. For example, the buyer may arrive at the dealer, show identification and proof of purchase, and be provided the keys to the car. The buyer may sign paperwork indicating the car has been picked up. Also, the dealer may offer or provide additional products or services to the buyer when the buyer goes to the dealer to pick up the car. For example, the dealer may offer financing options, warranties, service plans, insurance plans, and hard add accessories to the buyer, as discussed in further detail above.

Accordingly, it should be appreciated that manufacturers, consumers, and dealers may receive significant benefits from the method of facilitating an automobile transaction disclosed herein. For example, production scheduling, price setting, inventory management, may be greatly improved for manufacturers and dealers by utilizing the disclosed system and method. Consumers may benefit from more competitive pricing, piece of mind knowing that a fair market price is being offered for prospective purchases, and improved delivery options that allow the consumer to weigh the benefits and drawbacks of different delivery options, pricing, and other variables. In an example embodiment, consumers can view prices paid for comparable cars in specific locations based on the automobile market data in the automobile market information processing system **302**, for example, within a certain time frame such as one month and within a certain proximity to the consumer. Moreover, various inefficiencies in the automobile industry may be minimized utilizing the presently disclosed system and method.

FIG. **5** illustrates a block diagram of an example data architecture **500**. In the example data architecture **500**, interface data **502**, administrative data **504**, and automobile market data **506** interact with each other, for example, based on user commands or requests. The interface data **502**, administrative data **504**, and automobile market data **506** may be stored on any suitable storage medium (e.g., server **226**). It should be appreciated that different types of data may use different data formats, storage mechanisms, etc. Further, various applications may be associated with processing interface data **502**, administrative data **504**, and automobile market data **506**. Various other or different types of data may be included in the example data architecture **500**.

Interface data **502** may include input and output data of various kinds. For example, input data may include mouse click data, scrolling data, hover data, keyboard data, touch screen data, voice recognition data, etc., while output data may include image data, text data, video data, audio data, etc. Interface data **502** may include data relating to formatting, user interface options, links or access to other websites or applications, and the like. Interface data **502** may include applications used to provide or monitor interface activities and handle input and output data.

Administrative data **504** may include data and applications regarding user accounts. For example, administrative data **504** may include information used for updating accounts, such as creating or modifying manufacturer accounts or dealer accounts. Further, administrative data **504** may include access data and/or security data. Administrative data **504** may interact with interface data in various manners, providing a user interface **304**, **306**, **308** with administrative features, such as implementing a user login and the like.

Automobile market data **506** may include, for example, executed sales data **508**, consumer data **510**, dealer data **512**, manufacturer data **514**, statistical data **516**, and/or historical data **518**. Executed sales data **508** may include actual negotiated prices for manufacturer and dealer sales, differences in list prices to negotiated prices, sales demographics, etc. Consumer data **510** may include consumer search activity, consumer requests and offers, consumer feedback, etc. Dealer data **512** may include dealer pricing, including list prices, sale prices for limited time dealer offers or deals of the day, negotiation information such as bottom line pricing, offers received, foot traffic activity, and dealer inventory data, including current on location data, automobile turnover rates, etc. Manufacturer data **514** may include manufacturer pricing, including suggested pricing, preferred dealer pricing, etc., manufacturer incentives including cash rebates, special lease rates, special APR rates, zero down offers, lifetime warranties, guaranteed trade-in offers, etc., and inventory information including dealer inventory, inventory by location, inventory in transit, manufacturing or production lead times or build times, production scheduling, shipping scheduling, etc. Statistical data **516** may include information used for providing reports including graphs, forecasts, recommendations, calculators, depreciation schedules, tax information, etc., including equations and other data used for statistical analysis. Historical data **508** may include past sales data, such as historical list prices, actual sale prices, manufacturer and dealer margins, operating costs, service costs or profitability, loyalty information, etc. It should be appreciated that data may fall under multiple categories of automobile market data **506**, or change with the passage of time. It should also be appreciated that automobile market data **506** may be tailored for a particular manufacturer or dealer, for example, a manufacturer may request that a specific type of data that is not normally stored or used be stored in the database system **310**. Accordingly, for example, customized reports may be provided to a manufacturer interface **308** using that specific data for the manufacturer.

The integration of the various types of automobile market data **506** received from the consumer interface **304**, dealer interface **306**, and manufacturer interface **308** may provide a synergistic and optimal resource for consumers, dealers, and manufacturers alike. In an example embodiment, a consumer may benefit greatly from using an application in a mobile device **103** to receive both intrabrand information and interbrand information in real-time, based only on taking a picture of VIN. Dealers and manufacturers may be able to provide information to the consumer in a manner that highlights the benefits of the products the respective dealer

US 10,223,720 B2

17

18

or manufacturer would like to sell. The intrabrand and interbrand information provided on a consumer interface **304** may allow the best automobile options for a particular consumer to be provided to that consumer, may allow manufacturers to better follow through with opportunities for sales, and may allow dealers to compete with other dealers taking into account a greater amount of automobile market information, all of which may result in a more efficient automobile market.

Automobile market data **506** may be maintained in various servers **108**, in databases or other files. It should be appreciated that, for example, a host device **104** may manipulate automobile market data **506** in accordance with the administrative data **504** and interface data **502** to provide requests or reports to users **114** including consumers, dealers, and manufacturers, and perform other associated tasks. It should also be appreciated that automobile market data **506** represents automobile market information, and that these terms may be used interchangeably in this disclosure depending upon the context.

FIG. **6** is flow diagram illustrating an example process **600** for facilitating an automobile transaction, according to an example embodiment of the present invention. Although the process **600** is described with reference to the flow diagram illustrated in FIG. **6**, it will be appreciated that many other methods of performing the acts associated with the process **600** may be used. For example, the order of many of the blocks may be changed, certain blocks may be combined with other blocks, and many of the blocks described are optional.

In the example process **600**, data may flow between the automobile market information processing system **302** and a consumer interface **304**, a manufacturer interface **308**, and a dealer interface **306**, as discussed above based on consumer, manufacturer, and dealer interaction with the automobile market information processing system **302**. It should be appreciated that the automobile market information processing system **302** may update the automobile market information stored in the database system **310** when automobile market information is received from a consumer, a dealer, or a manufacturer, or from any other information source. Accordingly, the automobile market information may remain current and/or provide sufficiently recent data for the benefit of consumers, dealers, and/or manufacturers.

The example process **600** may begin with a consumer taking a picture of a VIN using a mobile phone application (block **602**). The consumer interface **304** may use OCR to determine and provide the VIN to the automobile market information processing system **302** to provide a consumer request (block **604**). It should be appreciated that OCR may occur in the automobile market information processing system **302** or at the consumer interface **304**. The automobile market information processing system **302** receives the consumer request and prepares automobile market information based on the request (block **606**). The automobile market information processing system **302** may send the consumer request and automobile market information based on the consumer request to the manufacturer interface **308** (block **608**). It should be appreciated that while the consumer request is automobile market information, typically, additional automobile market information would be provided with the consumer request. For example, typically, data relating to recent sales of the requested automobile and/or comparable automobiles may be provided. In an example embodiment, a target price or "true" value of the requested automobile may be provided. The manufacturer receives the request, determines that an automobile can be provided and prepares and provides verification information for consumer and dealers (block **610**). A manufacturer response with the verification information may be provided from the manufacturer interface **308** to the automobile market information processing system **302** (block **612**). The automobile market information processing system **302** receives and processes the manufacturer response with the verification and prepares and provides information for consumer and dealers (block **614**). The manufacturer response with a verification may be sent from the automobile market information processing system **302** to the consumer interface **304** (block **616**). It should be appreciated that other automobile market information may be provided to the consumer interface **304** with a verification, for example, suggested pricing, ratings information, etc. The consumer interface **304** receives the verification that the automobile can be provided, for example, as a confirmation message on the mobile device (block **618**).

The automobile market information processing system **302** may also send to the dealer interface **306** a bid request for one or more dealers (block **620**). One or more dealers receive a bid request, determine prices and delivery options for the automobile, and prepare and provide bids for the consumer (block **622**). A dealer bid may be sent from the dealer interface **306** to the automobile market information processing system **302** for each dealer that wants to provide a bid (block **624**). The automobile market information processing system **302** receives and processes dealer bids and prepares the bids and automobile market data for the consumer (block **626**). The automobile market information processing system **302** may send dealer bids and automobile market information to the consumer interface **304** (block **628**). It should be appreciated that automobile market information may be provided to the consumer before dealer bids are provided, and/or concurrently with dealer bids. Also, it should be appreciated that blocks **616** and **628** may be combined, particularly if the dealer bidding process can occur quickly, for example, in real-time. The consumer may receive dealer bids based on the verification and select a bid including a delivery option based on automobile market information (block **630**). The consumer interface **304** may send to the automobile market information processing system **302** a selection of a bid indicating that the consumer wants to purchase or lease the automobile based on the selected bid (block **632**). The automobile market information processing system **302** receives and processes the consumer bid selection (block **634**). For example, the automobile market information processing system **302** may send the bid selection to the dealer interface **306** (block **636**). The dealer may receive the bid selection and coordinate a sale by, for example, instructing the manufacturer to produce and ship the automobile to the dealer location for delivery to the consumer (block **638**). Also, for example, the dealer may provide contract or loan documents, collect a deposit or down payment, or the like. As discussed above, in each of blocks **606**, **614**, **626**, and **634**, the automobile market information processing system **302** may update the automobile market information in the database system **310** based on the information received from the consumer, dealer, and/or manufacturer.

For exemplary purposes, the present disclosure discusses a various examples relating to a purchase of a car. However, it should be appreciated that the disclosed system, methods, and apparatus may be advantageously used in relation to various automobiles other than cars including, for example, trucks, vans, sport utility vehicles, jeeps, motorcycles, com-

US 10,223,720 B2

19                                          20

mercial vehicles, and/or automobiles that have a VIN and require a license plate to operate.

It will be appreciated that all of the disclosed methods and procedures described herein can be implemented using one or more computer programs or components. These components may be provided as a series of computer instructions on any conventional computer-readable medium, including RAM, ROM, flash memory, magnetic or optical disks, optical memory, or other storage media. The instructions may be configured to be executed by a processor, which when executing the series of computer instructions performs or facilitates the performance of all or part of the disclosed methods and procedures.

Further, it will be appreciated that the presently disclosed system, methods, and apparatus for performing automobile transactions may be utilized in conjunction with other systems or methods. For example, the presently disclosed system, methods, and apparatus may be used in conjunction with the disclosure in the co-pending commonly-owned patent application filed on Jul. 5, 2011, entitled "AUTO-MOBILE TRANSACTION FACILITATION BASED ON CUSTOMER SELECTION OF A SPECIFIC AUTOMO-BILE," application Ser. No. 13/176,525, the entire content of which is hereby incorporated by reference herein, and in an example embodiment, the features of which may be combined with the features of the present disclosure.

It should be understood that various changes and modifications to the example embodiments described herein will be apparent to those skilled in the art. Such changes and modifications can be made without departing from the spirit and scope of the present subject matter and without diminishing its intended advantages. It is therefore intended that such changes and modifications be covered by the appended claims.

The invention is claimed as follows:

**1**. A method comprising:

receiving, via a consumer interface, a first request for a response regarding a first automobile, which is manufactured by a first manufacturer, the first request made by a consumer located at a first location and including geolocation information of the consumer;

executing instructions, by at least one processing device, to:

generate, based on current inventory data of the first automobile at least one of a verification indicating that the first automobile can be provided for the consumer, a confirmation indicating that the first automobile can be provided for the consumer, and an offer indicating that the first automobile can be provided for the consumer;

determine, based on the geolocation information, that the consumer is located at the first location;

generate, based on the first location, an in-market dealer area proximately located to the first location;

determine that at least a first dealer is located within the in-market dealer area, the first dealer located at a second location;

provide a first manufacturer response via the consumer interface, the first manufacturer response including the at least one of the verification indicating that the first automobile can be provided for the consumer, the confirmation indicating that the first automobile can be provided for the consumer, and the offer indicating that the first automobile can be provided for the consumer;

receive, from the first dealer located at the second location, the bid to provide the first automobile;

generate driving directions between the first location and the second location; and

provide the bid and the driving directions to the consumer interface, the bid including at least a price.

**2**. The method of claim **1**, wherein the current inventory data includes at least one of inventory data by location, inventory in transit data, production lead time data, production schedule data, and shipping schedule data.

**3**. The method of claim **1**, wherein the first request is made by a consumer using a mobile device which takes a picture of a vehicle identification number, which is recognized using optical character recognition.

**4**. The method of claim **1**, wherein the first automobile is one of a particular type of car with a specific set of features and a particular car with a specific vehicle identification number.

**5**. The method of claim **1**, further comprising providing first automobile market data to the first manufacturer including a suggested bid price, wherein the first automobile market data is based on real-time automobile market data.

**6**. The method of claim **1**, further comprising:

executing instructions, by the at least one processing device, to process a consumer selection of the bid to facilitate:

instructing the first manufacturer to provide the first automobile to the first dealer based on the consumer selection of the bid; and

executing a sale, including at least one of providing for electronic signature of documents and providing for an electronic funds transfer.

**7**. The method of claim **1**, wherein a manufacturer interface allows a manufacturer to at least one of request data via the consumer interface from a plurality of consumers and request data via a dealer interface from a plurality of dealers.

**8**. The method of claim **1**, wherein the first dealer at least one of provides and offers at least one of a financing plan, a service plan, an insurance plan, a warranty, and a hard add accessory, for at least the first automobile.

**9**. The method of claim **1**, wherein the first dealer is at least one of a franchise dealer and a non-franchise distribution location.

**10**. The method of claim **1**, wherein the first manufacturer response includes an acknowledgement of interest.

**11**. The method of claim **1**, wherein the first automobile is yet to be manufactured at the time the bid is received from the first dealer.

**12**. The method of claim **1**, wherein the first automobile is in the inventory of an entity other than the first dealer at the time the bid is received from the first dealer.

**13**. The method of claim **1**, further comprising receiving a consumer selection of the bid including a delivery option which specifies a pickup location at the first dealer, and the first automobile is made available for pickup at the first dealer.

**14**. The method of claim **1**, wherein the consumer selection of the bid indicates a consumer intention to one of purchase the first automobile and lease the first automobile.

**15**. The method of claim **1**, wherein the bid includes a first price corresponding to a first delivery option and a second price corresponding to a second delivery option.

**16**. The method of claim **1**, wherein the consumer is at least one of a person and an entity.

**17**. The method of claim **1**, wherein the consumer chooses a pickup location.

**18**. The method of claim **1**, wherein the bid includes a delivery option that includes a first pickup location, and the consumer chooses the first pickup location.

**19**. The method of claim **1**, wherein the first dealer provides a first delivery option and is one of a franchise entity and a non-franchise entity distribution location.

**20**. The method of claim **19**, wherein the first automobile is at a consumer's chosen pickup location, such that the first automobile does not need to be transported to the consumer's chosen pickup location.

**21**. The method of claim **19**, wherein the consumer submits a request to the first dealer to change the first delivery option to include the consumer's chosen pickup location.

**22**. The method of claim **21**, wherein based on the consumer's request to change the first delivery option, the first dealer provides a second delivery option including the consumer's chosen pickup location.

**23**. The method of claim **22**, wherein a notification is sent to the consumer that the first automobile is available for pickup at the consumer's chosen pickup location.

**24**. The method of claim **23**, wherein the consumer picks up the first automobile at the consumer's chosen pickup location.

**25**. The method of claim **22**, wherein the first automobile is transported to the consumer's chosen pickup location.

**26**. The method of claim **25**, wherein the first automobile is transported directly from a third location to the consumer's chosen pickup location, wherein at least one of a second dealer and a manufacturer is located at the third location.

**27**. The method of claim **1**, wherein the first dealer provides the first automobile to the consumer at a pickup location by one of (i) having the first automobile transported to the pickup location and (ii) having a manufacturer produce the first automobile.

**28**. The method of claim **1**, further comprising executing instructions, by the at least one processing device, to:

receive, from a second dealer located at a third location within the in-market dealer area, the second bid to sell the first automobile;

generate second driving directions between the first location and the third location; and

provide the second bid and the second driving directions to the consumer interface, the second bid including at least a second price.

**29**. A system comprising:

a computer readable medium storing instructions; and

at least one processing device operably coupled to the computer readable medium, the at least one processing device executing the instructions to:

receive, via a consumer interface, a first request for a response regarding a first automobile, which is manufactured by a first manufacturer, the first request made by a consumer located at a first location and including geolocation information of the consumer;

generate, based on current inventory data of the first automobile at least one of a verification indicating that the first automobile can be provided for the consumer, a confirmation indicating that the first automobile can be provided for the consumer, and an offer indicating that the first automobile can be provided for the consumer;

determine, based on the geolocation information, that the consumer is located at the first location;

generate, based on the first location, an in-market dealer area proximately located to the first location;

determine that at least a first dealer is located within the in-market dealer area, the first dealer located at a second location;

provide a first manufacturer response via the consumer interface, the first manufacturer response including the at least one of the verification indicating that the first automobile can be provided for the consumer, the confirmation indicating that the first automobile can be provided for the consumer, and the offer indicating that the first automobile can be provided for the consumer;

receive, from the first dealer located at the second location, the bid to provide the first automobile;

generate driving directions between the first location and the second location; and

provide the bid and the driving directions via the consumer interface, the bid including at least a price.

**30**. The system of claim **29**, wherein the consumer interface only receives as an input a picture, from an image sensor, to generate a request.

**31**. The system of claim **29**, wherein the consumer interface is configured to receive input from at least one of a touch screen and a barcode scanner.

**32**. The system of claim **29**, wherein the consumer interface is configured to toggle between different viewing options.

**33**. The system of claim **29**, wherein one or more applications are configured to handle input or output data.

**34**. A non-transitory computer readable medium storing software instructions which, when executed, cause an information processing apparatus to:

receive, via a consumer interface, a first request for a response regarding a first automobile, which is manufactured by a first manufacturer, the first request made by a consumer located at a first location and including geolocation information of the consumer;

generate, based on current inventory data of the first automobile at least one of a verification indicating that the first automobile can be provided for the consumer, a confirmation indicating that the first automobile can be provided for the consumer, and an offer indicating that the first automobile can be provided for the consumer;

determine, based on the geolocation information, that the consumer is located at the first location;

generate, based on the first location, an in-market dealer area proximately located to the first location;

determine that at least a first dealer is located within the in-market dealer area, the first dealer located at a second location;

provide a first manufacturer response via the consumer interface, the first manufacturer response including the at least one of the verification indicating that the first automobile can be provided for the consumer, the confirmation indicating that the first automobile can be provided for the consumer, and the offer indicating that the first automobile can be provided for the consumer;

receive, from the first dealer located at the second location, the bid to provide the first automobile;

generate driving directions between the first location and the second location; and

provide the bid and the driving directions via the consumer interface, the bid including at least a price.

* * * * *

US010223722B2

(12) **United States Patent**      (10) **Patent No.:** **US 10,223,722 B2**

Seergy et al.      (45) **Date of Patent:** **\*Mar. 5, 2019**

(54) **AUTOMOBILE TRANSACTION FACILITATION BASED ON A CUSTOMER SELECTION OF A SPECIFIC AUTOMOBILE**

(71) Applicant: **Sidekick Technology LLC**, Pine Brook, NJ (US)

(72) Inventors: **Michael J. Seergy**, Pine Brook, NJ (US); **Benjamin N. S. Brown**, Pine Brook, NJ (US)

(73) Assignee: **Sidekick Technology LLC**, Pine Brook, NJ (US)

( \* ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

This patent is subject to a terminal disclaimer.

(21) Appl. No.: **15/489,280**

(22) Filed: **Apr. 17, 2017**

(65) **Prior Publication Data**

US 2017/0352080 A1      Dec. 7, 2017

**Related U.S. Application Data**

(63) Continuation of application No. 14/868,091, filed on Sep. 28, 2015, now Pat. No. 9,626,704, which is a
(Continued)

(51) **Int. Cl.**
| | |
|---|---|
| **G06Q 30/00** | (2012.01) |
| **G06Q 30/06** | (2012.01) |
(Continued)

(52) **U.S. Cl.**
CPC ......... **G06Q 30/0611** (2013.01); **G01C 21/34** (2013.01); **G06Q 30/06** (2013.01);
(Continued)

(58) **Field of Classification Search**
CPC ...................... G06Q 30/0206; G06Q 30/0601
(Continued)

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 5,970,472 A | 10/1999 | Allsop et al. | |
| 6,006,201 A | 12/1999 | Berent et al. | |
(Continued)

OTHER PUBLICATIONS

AutoTrader.com, Inc.: Private Company Information-Business Week, http://investing.businessweek.com/research/stock/private/snapshot. asp?privcapId=92642.
(Continued)

*Primary Examiner* — Brandy A Zukanovich
(74) *Attorney, Agent, or Firm* — K&L Gates LLP

(57) **ABSTRACT**

A system, methods, and apparatus for performing automobile transactions are disclosed. In an example embodiment, automobile market data representative of current automobile market characteristics is stored. The automobile market data may include pricing, inventory, and consumer interest information received from dealers, manufacturers, and consumers. A consumer may provide a request for a response regarding a specific automobile using an image of a vehicle identification number or a graphical user interface. Automobile market data may be provided to a dealer based on the request. Bids to sell the specific automobile may be requested from dealers based on the request. Dealer bids may be provided to the consumer with prices and a delivery options. The consumer may select a bid which specifies a pickup location at a first dealer.

**33 Claims, 7 Drawing Sheets**



Fig. 4B

**US 10,223,722 B2**

Page 2

### Related U.S. Application Data

continuation of application No. 14/293,665, filed on Jun. 2, 2014, now Pat. No. 9,147,216, which is a continuation of application No. 13/176,525, filed on Jul. 5, 2011, now Pat. No. 8,744,925.

(51) **Int. Cl.**
  **G06Q 30/08**          (2012.01)
  **G01C 21/34**          (2006.01)
(52) **U.S. Cl.**
  CPC ..... **G06Q 30/0627** (2013.01); **G06Q 30/0639** (2013.01); **G06Q 30/08** (2013.01)
(58) **Field of Classification Search**
  USPC .................................. 705/26.1, 26.3, 27.1
  See application file for complete search history.

(56)                **References Cited**

#### U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 6,321,221 | B1 | 11/2001 | Bieganski |
| 6,463,431 | B1 | 10/2002 | Schmitt |
| 6,533,173 | B2 | 3/2003 | Benyak |
| 6,868,388 | B1 | 3/2005 | Millsap et al. |
| 6,868,389 | B1 | 3/2005 | Wilkins et al. |
| 7,395,223 | B1 | 7/2008 | Buzzell et al. |
| 7,406,436 | B1 | 7/2008 | Reisman |
| 7,479,949 | B2 | 1/2009 | Jobs et al. |
| 7,636,574 | B2 | 12/2009 | Poosala |
| 8,160,929 | B1 | 4/2012 | Park et al. |
| 8,392,193 | B2 | 3/2013 | Schultz et al. |
| 8,606,604 | B1 | 12/2013 | Huber et al. |
| 2002/0065707 | A1 | 5/2002 | Lancaster et al. |
| 2002/0082978 | A1 | 6/2002 | Ghouri et al. |
| 2002/0099628 | A1 | 7/2002 | Takaoka et al. |
| 2002/0111877 | A1 | 8/2002 | Nelson |
| 2002/0128946 | A1 | 9/2002 | Chehade et al. |
| 2003/0088435 | A1 | 5/2003 | King |
| 2003/0200151 | A1 | 10/2003 | Ellenson et al. |
| 2003/0229577 | A1 | 12/2003 | Nabel |
| 2004/0034544 | A1 | 2/2004 | Fields et al. |
| 2004/0059626 | A1 | 3/2004 | Smallwood |
| 2005/0004819 | A1 | 1/2005 | Etzioni et al. |
| 2005/0050097 | A1 | 3/2005 | Yeh et al. |
| 2005/0108172 | A1 | 5/2005 | Ellenson et al. |
| 2005/0240512 | A1 | 10/2005 | Quintero et al. |
| 2006/0020477 | A1 | 1/2006 | Retzbach et al. |
| 2007/0150362 | A1 | 6/2007 | Sharma et al. |
| 2007/0250403 | A1 | 10/2007 | Altschuler |
| 2007/0255663 | A1 | 11/2007 | Jordan et al. |
| 2007/0260526 | A1 | 11/2007 | Bartel |
| 2008/0046331 | A1 | 2/2008 | Rand |
| 2008/0177653 | A1 | 7/2008 | Famolari et al. |
| 2008/0183552 | A1 | 7/2008 | O'Hagan |
| 2008/0187125 | A1 | 8/2008 | Siegrist |
| 2008/0201184 | A1 | 8/2008 | Rose et al. |
| 2008/0201188 | A1 | 8/2008 | Heyman et al. |
| 2008/0201203 | A1 | 8/2008 | Rose et al. |
| 2008/0208731 | A1 | 8/2008 | Ruckart |
| 2008/0228657 | A1 | 9/2008 | Nabors et al. |
| 2009/0076896 | A1 | 3/2009 | DeWitt et al. |
| 2009/0132348 | A1 | 5/2009 | Bria et al. |
| 2009/0149199 | A1 | 6/2009 | Maghoul |
| 2009/0171761 | A1 | 7/2009 | Noy et al. |
| 2009/0187478 | A1 | 7/2009 | Shipley |
| 2009/0187513 | A1 | 7/2009 | Noy et al. |
| 2009/0198557 | A1 | 8/2009 | Wang et al. |
| 2009/0204600 | A1 | 8/2009 | Kalik et al. |
| 2010/0048242 | A1 | 2/2010 | Rhoads et al. |
| 2010/0106580 | A1 | 4/2010 | Etheredge et al. |
| 2010/0217525 | A1 | 8/2010 | King et al. |
| 2010/0274627 | A1 | 10/2010 | Carlson |
| 2010/0332292 | A1 | 12/2010 | Anderson |
| 2011/0040642 | A1 | 2/2011 | O'Dell |
| 2011/0082759 | A1 | 4/2011 | Swinson et al. |
| 2011/0087430 | A1 | 4/2011 | Boss et al. |
| 2011/0087556 | A1 | 4/2011 | Pitkow |
| 2011/0099036 | A1 | 4/2011 | Sarkissian et al. |
| 2011/0208418 | A1 | 8/2011 | Looney et al. |
| 2011/0238474 | A1 | 9/2011 | Carr et al. |
| 2011/0238514 | A1 | 9/2011 | Ramalingam et al. |
| 2011/0276394 | A1 | 11/2011 | Chan |

#### OTHER PUBLICATIONS

Autotrader.com Introduces IPhone App to Create a More Personalized "PC-to-Pocket" Experience for Car Shoppers, http://www.prnewswire.com/news-releases/autotraidercom, Jul. 7, 2011.

AppStore-AutoTrader.com, http://itunes.apple.com/us/app/autotrader-com/id444552888?mt=8, Oct. 31, 2011.

International Search Report dated Sep. 21, 2012 for Intl. Appln. No. PCT/US2012/045546.

Charlton, Auto Trader: iPhone app review. Mar. 15, 2010 [retrieved on Sep. 6, 2012] from the internet: http://www.econsultancy.com/us/blog/5593-auto-trader-iphone-app-review> entire document.

Autotraderuk. Introducing the Auto Trader iPhone App. Mar. 12, 2010 [retrieved on Sep. 6, 2012] from the internet: http://www.youtube.com/watch?v+6g_1g8IRG4&feature=player_embedded> entire document.

International Search Report dated Oct. 5, 2012 for Intl. Appln. No. PCT/US2012/045545.

Anonymous, "instaVIN to offer free auto accident history reports for mobile phones," Wireless News, Jun. 2, 2010.



Fig. 1



Fig. 2



Fig. 3



Start

— 400

Automobile market data including at least pricing data and inventory data is stored in a database system (e.g., data from dealers, consumers, and manufacturers, regarding pricing, lot inventory, turnover rates, transport costs, and quality, safety, and other ratings is collected and stored in a database) — 402

A request for a response regarding an automobile is received from a consumer (e.g., a car buyer fills in a request form on a website or takes a picture of a VIN at a dealer to receive a response based on current market data) — 404

Automobile market data is provided to dealers based on the consumer request (e.g., a group of dealers receives a real-time report including local car sales data, inventory data, ratings data, and transport cost data of the subject car) — 406

A bid to sell the automobile to the consumer is requested from dealers (e.g., a group of dealers within a certain radius of the buyer receive a bid request) — 408

Dealer bids are provided to the consumer (e.g., several dealers provide bids based on current pricing data, dealer pickup locations, and potential add-ons, so several different prices and delivery options may be available to the car buyer) — 410

The consumer selects a bid including a delivery option which specifies a pickup location (e.g., the car buyer chooses to pickup at a nearby dealer in five days) — 412

The dealer provides the automobile at the dealer according to the consumer bid selection (e.g., the dealer notifies a commonly owned dealer that the car must be transported to the dealer pickup location for delivery in less than five days) — 414

The consumer and dealer execute the sale of the automobile (e.g., the car buyer e-signs a loan application and contract, and electronically transfers funds) — 416

Fig. 4A    Fig. 4B



( Fig. 4A )                    ⌐— 400

⌐— 418

The dealer makes the purchased automobile available according to the consumer bid selection (e.g., the dealer transports the car from the commonly owned dealer location to the dealer pickup location selected by the car buyer if the car is not already located at the dealer pickup location)

⌐— 420

The consumer picks up the purchased automobile according to the consumer selected delivery option at the dealer (e.g., the car buyer picks up the car at the nearby dealer five days after the car sale is executed)

Fig. 4B



Fig. 5



600
304
302
306
602
Consumer takes a picture of a VIN
604
Consumer Request
606
System receives request and prepares automobile market data based on the request
608
Bid request and auto market information
610
Dealers receive bid request and automobile market information to determine prices and delivery options for the automobile and prepare and provide bids for the consumer
612
Dealer bid
614
System receives and processes dealer bids and prepares bids and automobile market data for consumer
616
Dealer bids and auto market information
618
Consumer receives dealer bids and automobile market information and selects a bid including a delivery option based on automobile market information
620
Selection
622
System receives and processes bid selection
624
Selection
626
Dealer receives bid selection and coordinates a sale

Fig. 6

US 10,223,722 B2

1

## AUTOMOBILE TRANSACTION FACILITATION BASED ON A CUSTOMER SELECTION OF A SPECIFIC AUTOMOBILE

### PRIORITY CLAIM AND CROSS REFERENCE TO RELATED APPLICATIONS

This application is a continuation of U.S. patent application Ser. No. 14/868,091, filed Sep. 28, 2015, which is a continuation of U.S. patent application Ser. No. 14/293,665, filed Jun. 2, 2014, which is a continuation of U.S. patent application Ser. No. 13/176,525, filed on Jul. 5, 2011, which is related to the commonly-owned patent application, also filed on Jul. 5, 2011, entitled "AUTOMOBILE TRANSACTION FACILITATION USING A MANUFACTURER RESPONSE," U.S. application Ser. No. 13/176,497, the entire content of each of which is incorporated by reference herein.

### BACKGROUND

In the automobile industry, consumers typically purchase automobiles from dealers or dealerships. Dealers often purchase new automobiles from several manufacturers, to sell to consumers. Consumers typically negotiate a lower price than the manufacturer suggested retail price typically referred to as the "sticker price" and/or the price the dealer initially offers. In many cases, the negotiation process for an automobile may include a large degree of uncertainty for the consumer. Generally, the negotiation process is a zero sum process, and because the consumer and the dealer are each trying to get a better deal, there is typically some lack of trust during the negotiation. Accordingly, both dealers and consumers often base the negotiations on established market prices. However, market prices can fluctuate rapidly depending a variety of factors. For example, consumer demand may be affected by economic factors, such as changes in gasoline prices, unemployment rates, government sponsored tax rebates for automobile purchases, etc.

In many cases, a consumer may have concerns that a dealer may not offer a fair and competitive price. Various products and services have become available that allow consumers to perform research on market prices for automobiles. Similarly, dealers negotiating an automobile sale generally do not know the maximum price a consumer will be willing to pay for a particular automobile, or how long it will take to sell an automobile in inventory for a given price. Accordingly, dealers also use products and services for determining and/or tracking market prices. Further, automobile manufacturers may also have an interest in the market prices for automobiles, because the market activity captured as automobile market information may allow the manufacturer to, for example, more profitably determine which automobiles to manufacture, what prices the manufacture should offer to dealers, and whether manufacturer incentives should be offered on existing dealer automobile inventory.

### SUMMARY

The present disclosure provides a new and innovative system, methods and apparatus for providing automobile market information and performing automobile transactions. In an example embodiment, automobile market data representative of recent automobile market characteristics is stored. The automobile market data may include pricing, inventory, and consumer interest information received from dealers, manufacturers, and consumers. A consumer may

2

provide a request for a response regarding a specific automobile using an image of a vehicle identification number or a graphical user interface. Automobile market data may be provided to a dealer based on the request. Bids to sell the specific automobile may be requested from dealers based on the request. Dealer bids may be provided to the consumer with prices and a delivery options. The consumer may select a bid which specifies a pickup location at a particular dealer.

Additional features and advantages of the disclosed method and apparatus are described in, and will be apparent from, the following Detailed Description and the Figures.

### BRIEF DESCRIPTION OF THE FIGURES

FIG. **1** is a high level block diagram of an example network communicating system, according to an example embodiment of the present invention.

FIG. **2** is a detailed block diagram showing an example of a computing device, according to an example embodiment of the present invention.

FIG. **3** is a block diagram showing an example automobile transaction network structure, according to an example embodiment of the present invention.

FIGS. **4**A and **4**B include a flowchart illustrating an example process for facilitating an automobile transaction, according to an example embodiment of the present invention.

FIG. **5** is a block diagram showing an example data architecture, according to an example embodiment of the present invention.

FIG. **6** is flow diagram illustrating an example process for facilitating an automobile transaction, according to an example embodiment of the present invention.

### DETAILED DESCRIPTION OF EXAMPLE EMBODIMENTS

The present disclosure relates in general to a system for facilitating automobile transactions and, in particular, to automobile transaction based on a consumer selection of a specific automobile. Briefly, in an example embodiment, a system is provided which allows a consumer to request information regarding a specific car including dealer bids. For example, a consumer may use a mobile device to take a picture of a vehicle identification number. The specific vehicle may be identified using optical character recognition to request real-time information on that automobile. Dealers may provide bids based on the consumer request using real-time automobile market information, including intra-brand bids and interbrand bids. A consumer may select a dealer bid to purchase or lease an automobile based on the prices and delivery options available. Also, the presently disclosed system may advantageously allow for inventory-less bidding by dealers. For example, a dealer that does not have an automobile in its inventory (e.g., on the dealer lot) can make a bid to sell that automobile, and then have that automobile produced by a manufacturer or transported to the dealer lot. In a non-limiting example embodiment, certain features disclosed in the present patent application may be commercially embodied in products and services offered by Sidekick Technology LLC, the assignee of the present application.

The present system may be readily realized in a network communications system. A high level block diagram of an example network communications system **100** is illustrated in FIG. **1**. The illustrated system **100** includes one or more client devices **102**, and one or more host devices **104**. The

US 10,223,722 B2

3

system **100** may include a variety of client devices **102**, such as desktop computers and the like, which typically include a display **112**, which is a user display for providing information to users **114**, and various interface elements as will be discussed in further detail below. A client device **102** may be a mobile device **103**, which may be a cellular phone, a personal digital assistant, a laptop computer, a tablet computer, etc. The client devices **102** may communicate with the host device **104** via a connection to one or more communications channels **106** such as the Internet or some other data network, including, but not limited to, any suitable wide area network or local area network. It should be appreciated that any of the devices described herein may be directly connected to each other instead of over a network. Typically, one or more servers **108** may be part of the network communications system **100**, and may communicate with host servers **104** and client devices **102**.

One host device **104** may interact with a large number of users **114** at a plurality of different client devices **102**. Accordingly, each host device **104** is typically a high end computer with a large storage capacity, one or more fast microprocessors, and one or more high speed network connections. Conversely, relative to a typical host device **104**, each client device **102** typically includes less storage capacity, a single microprocessor, and a single network connection. It should be appreciated that a user **114** as described herein may include any person or entity which uses the presently disclosed system and may include a wide variety of parties. For example, as will be discussed in further detail below, users **114** of the presently disclosed system may include a consumer, a dealer, and/or a manufacturer.

Typically, host devices **104** and servers **108** store one or more of a plurality of files, programs, databases, and/or web pages in one or more memories for use by the client devices **102**, and/or other host devices **104** or servers **108**. A host device **104** or server **108** may be configured according to its particular operating system, applications, memory, hardware, etc., and may provide various options for managing the execution of the programs and applications, as well as various administrative tasks. A host device **104** or server may interact via one or more networks with one or more other host devices **104** or servers **108**, which may be operated independently. For example, host devices **104** and servers **108** operated by a separate and distinct entities may interact together according to some agreed upon protocol.

A detailed block diagram of the electrical systems of an example computing device (e.g., a client device **102**, and a host device **104**) is illustrated in FIG. **2**. In this example, the computing device **102**, **104** includes a main unit **202** which preferably includes one or more processors **204** electrically coupled by an address/data bus **206** to one or more memory devices **208**, other computer circuitry **210**, and one or more interface circuits **212**. The processor **204** may be any suitable processor, such as a microprocessor from the INTEL PENTIUM® family of microprocessors. The memory **208** preferably includes volatile memory and non-volatile memory. Preferably, the memory **208** stores a software program that interacts with the other devices in the system **100** as described below. This program may be executed by the processor **204** in any suitable manner. In an example embodiment, memory **208** may be part of a "cloud" such that cloud computing may be utilized by a computing devices **102**, **104**. The memory **208** may also store digital data indicative of documents, files, programs, web pages, etc. retrieved from a computing device **102**, **104** and/or loaded via an input device **214**.

4

The interface circuit **212** may be implemented using any suitable interface standard, such as an Ethernet interface and/or a Universal Serial Bus (USB) interface. One or more input devices **214** may be connected to the interface circuit **212** for entering data and commands into the main unit **202**. For example, the input device **214** may be a keyboard, mouse, touch screen, track pad, track ball, isopoint, image sensor, character recognition, barcode scanner, and/or a voice recognition system.

One or more displays **112**, printers, speakers, and/or other output devices **216** may also be connected to the main unit **202** via the interface circuit **212**. The display **112** may be a cathode ray tube (CRTs), a liquid crystal display (LCD), or any other type of display. The display **112** generates visual displays generated during operation of the computing device **102**, **104**. For example, the display **112** may provide a user interface, which will be described in further detail below, and may display one or more web pages received from a computing device **102**, **104**. A user interface may include prompts for human input from a user **114** including links, buttons, tabs, checkboxes, thumbnails, text fields, drop down boxes, etc., and may provide various outputs in response to the user inputs, such as text, still images, videos, audio, and animations.

One or more storage devices **218** may also be connected to the main unit **202** via the interface circuit **212**. For example, a hard drive, CD drive, DVD drive, and/or other storage devices may be connected to the main unit **202**. The storage devices **218** may store any type of data, such as pricing data, transaction data, operations data, inventory data, commission data, manufacturing data, image data, video data, audio data, tagging data, historical access or usage data, statistical data, security data, etc., which may be used by the computing device **102**, **104**.

The computing device **102**, **104** may also exchange data with other network devices **220** via a connection to the network **106**. Network devices **220** may include one or more servers **226**, which may be used to store certain types of data, and particularly large volumes of data which may be stored in one or more data repository **222**. A server **226** may include any kind of data **224** including databases, programs, files, libraries, pricing data, transaction data, operations data, inventory data, commission data, manufacturing data, configuration data, index or tagging data, historical access or usage data, statistical data, security data, etc. A server **226** may store and operate various applications relating to receiving, transmitting, processing, and storing the large volumes of data. It should be appreciated that various configurations of one or more servers **226** may be used to support and maintain the system **100**. For example, servers **226** may be operated by various different entities, including automobile manufacturers, brokerage services, automobile information services, etc. Also, certain data may be stored in a client device **102** which is also stored on the server **226**, either temporarily or permanently, for example in memory **208** or storage device **218**. The network connection may be any type of network connection, such as an Ethernet connection, digital subscriber line (DSL), telephone line, coaxial cable, wireless connection, etc.

Access to a computing device **102**, **104** can be controlled by appropriate security software or security measures. An individual users' **114** access can be defined by the computing device **102**, **104** and limited to certain data and/or actions. Accordingly, users **114** of the system **100** may be required to register with one or more computing devices **102**, **104**. For example, registered users **114** may be able to

US 10,223,722 B2

5      6

request or manipulate data, such as submitting requests for pricing information or providing an offer or a bid.

As noted previously, various options for managing data located within the computing device 102, 104 and/or in a server 226 may be implemented. A management system may manage security of data and accomplish various tasks such as facilitating a data backup process. A management system may be implemented in a client 102, a host device 104, and a server 226. The management system may update, store, and back up data locally and/or remotely. A management system may remotely store data using any suitable method of data transmission, such as via the Internet and/or other networks 106.

FIG. 3 is a block diagram showing an example automobile transaction network structure 300 which includes an automobile market information processing system 302, a consumer interface 304, a dealer interface 306, and a manufacturer interface 308. The example automobile market information processing system 302 may be implemented on one or more host devices 104 accessing one or more servers 108, 226. In an example embodiment, the automobile market information processing system 302 includes a database system 310, a recommendation engine 312, a vehicle identification number processor 314, and an interface generation unit 316. A user 114 may be a consumer, a dealer, or a manufacturer that interacts with the consumer interface 304, dealer interface 306, or manufacturer interface 308, respectively. A database system 310 may include a wide variety of automobile market data. A recommendation engine 312 may provide recommendations for consumers, dealers, and manufacturers. A vehicle identification number processor 314 may be used for making requests regarding specific automobiles and automobiles with specific sets of features. For example, a vehicle identification number processor 314 may determine a specific set of features that a specific car has based on a picture of that specific car's vehicle identification number. Interface generation unit 316 may provide, for example, HTML files which are used at the consumer interface 304, dealer interface 306, and manufacturer interface 308 interface to provide information to the users 114. It should be appreciated that he the consumer interface 304, dealer interface 306, and manufacturer interface 308 may be considered to be part of the automobile market information processing system 302, however, for discussion purposes, the consumer interface 304, dealer interface 306, and manufacturer interface 308 may be referred to as separate from the automobile market information processing system 302.

For example, a user 114 may interact with a consumer interface 304 to research automobiles the user 114 is interested in buying. For example, a consumer may be looking for a four door sedan with specific features, including a global positioning system (GPS), a sunroof, tinted windows, rated for at least thirty miles per gallon, four wheel drive, etc. The consumer may interact with the consumer interface 304 by inputting required and/or desired features, monthly budget or full price, etc. The consumer interface 304 may provide a wide variety of features and specifications which the consumer may choose from in providing a request. Based on the information put into the consumer interface 304 from the consumer, the consumer interface 304 may provide one or more reports or offers to the consumer. As will be discussed in further detail below, the information provided by the consumer interface 304 may include current market prices for automobiles, including information relating to additional features, and may include information on specific automobiles, for example, which may be en route to a dealer near the consumer's present location. The automo-

bile market information processing system 302 may process data received by the consumer interface 304, as well as the dealer interface 306 and/or the manufacturer interface 308, to respond to a request from a consumer. For example, data from database system 310 may be queried for use in a report, or a recommendation may be provided by recommendation engine 312 according to the consumer request and current market data. The automobile market information processing system 302 may integrate data received from consumer interface 304, dealer interface 306, and manufacturer interface 308 to provide current and accurate information relating to the automobile market.

It should be appreciated that the consumer interface 304 may be specific to one particular manufacturer or may provide information for multiple different manufacturers. For example, a consumer interface 304 may be a website with information on many manufacturers, and further, the consumer interface 304 may access or link to the manufacturer specific websites (e.g., Ford). Also, for example, a consumer interface 304 may be implemented as an automobile manufacturer's website. Typically, a manufacturer's website may provide consumers with a catalog like feature that provides information on different automobile models with any available options or features. For example, a manufacturer website may allow a consumer to select options that are desired to "build" a particular automobile, and may provide price comparisons using suggested retail prices, which may consumers use for initial research into what pricing the dealer may offer for a particular automobile with a particular feature set. Also, typically, the consumer may enter information, including, for example, name, an address or zip code, and telephone number. This information may be passed on from the manufacturer to a nearby dealer and/or nearby dealer information may be provided to the consumer (e.g., the dealer in or nearest to the consumer's entered zip code). Accordingly, the dealer may contact the consumer, or the consumer may inquire with the dealer, regarding the specific automobiles available on that dealer's lot and particular pricing being offered, etc. In many cases, consumers may not inquire with dealers that the manufacturer may recommend, and similarly, dealers may not diligently follow up with consumers that have an interest in purchasing an automobile. Further, it should be appreciated that the information provided via a consumer interface 304 and/or a manufacturer website may be very useful to consumers. For example, in the past, dealers often provided brochures with all the information on a manufacturer's available car models, including all the features and options information. However, dealers typically do not provide comprehensive information brochures, which may be relatively expensive to produce, and rather, that information is typically located on a manufacturer website and/or a consumer interface 304.

Accordingly, the consumer interface 304 may provide a wide range of information, for example, based on any searches or queries performed by a user 114. In an example embodiment, based on a user search or request for a response, the consumer interface 304 will display a quality index or value index based on normalized calculations for an automobile. The recommendation engine 312 may provide recommendations to a consumer based on the current automobile market data stored in the automobile market information processing system 302. For example, metrics on gas mileage, emissions, operating and maintenance costs, safety ratings, etc. may be benchmarked against comparable automobiles of the same and different manufacturers. Similar purchase options to a specific search may also be provided,

US 10,223,722 B2

7

based on feature matching, price range, consumer popularity, etc. Information including price ranges, including MSRP, invoice prices, inventory levels, the user's 114 credit ratings (e.g., FICO score), may be provided which may include monthly payment estimates or projections. For example, a financing calculator may help a user 114 determine what financing rate is appropriate. It should be appreciated that dealers may mislead consumers into believing that a higher financing rate will be required to secure a loan. Further, for example, a lease vs. buy calculator may be provided which may use current market data including prices, interest rates, incentives, estimated mileage per year, etc. for providing an analysis for a particular consumer regarding purchasing or leasing. Also, the consumer interface 304 may provide a purchase checklist, for example, of ten steps to buying a car. A qualitative checklist may allow a user to ask the right questions and get the right answers from a dealer. Additional tips may be provided, such as a list of products or services dealers may attempt to sell to a consumer with an analysis of the value of these products or services and a recommendation to accept or decline these dealer offers. Further, beyond analysis relating to automobiles, additional analysis or reports may be provided, for example, relating to dealer reviews, other supplemental products, financial entities that may provide financing, etc. For example, dealer reviews may provide a consumer with information the consumer may use in addition to automobile pricing and delivery options. Moreover, the consumer interface 304 may provide a wide variety of useful information to a consumer, for at home research and preparation, and/or in a dealer location while shopping as a negotiating tool that may provide confirmation on pricing, useful tips, and the like.

In an example embodiment, a dealer interface 306 may provide a user 114, such as a dealer employee, information relating to the current automobile market. The dealer interface 306 allows a dealer to interact with automobile market information processing system 302 to provide the dealer with a wide variety of information, including, for example, current market pricing. Other automobile market information a dealer may receive on a dealer interface 306 includes information relating to lot inventory, turnover rates, automobile transportation and/or shipping costs, incentives, and various ratings, such as ratings relating to quality, safety, insurance, a consumer credit score, dealer ratings, residual or resale values, etc. A dealer may input information into dealer interface 306 relating to sales data, including current pricing offered, special sales offers, actual transaction data, inventory data, etc. In an example embodiment, the dealer may provide information through dealer interface 306 which will be used by automobile market information processing system 302 to prepare reports or offers to consumers and/or manufacturers. It should be appreciated that a dealer is typically a franchise entity, while a distribution location may not be a franchise entity. For brevity, throughout this specification, the term dealer may be used to describe both franchise entity dealers and non-franchise entity distribution location. Accordingly, as used in this disclosure, the term dealer does not indicate whether an entity is a franchise entity. Moreover, a franchise dealer or a non-franchise distribution location may utilize a dealer interface 306 as described herein.

In an example embodiment, a manufacturer interface 308 may provide a user 114, such as a manufacturer employee, information relating to the current automobile market, including consumer requests. For example, an manufacturer interface 308 may provide a manufacturer a request received

8

from a consumer interface 304. Additionally, the manufacturer interface 308 may provide information such as a report that allows the manufacturer to provide a response to the requesting consumer. A report may include information from database system 310 relating to current market pricing, recent sales figures and trends, current manufacturer incentives, current inventory, including dealer inventory, inventory in transit, and/or build times or lead times for a desired automobile, etc. The manufacturer may use this information to provide a response to a consumer request. The manufacturer may provide the manufacturer interface 308 with information to provide a confirmation, a verification, or an offer to a consumer via consumer interface 304. For example, a confirmation number associated with the particular consumer request may be provided for the consumer. Also, a recommendation may be provided from the recommendation engine 312 to the manufacturer in relation to automobile pricing, responding to a specific request, manufacturer incentives, inventory management, production schedules, shipping schedules, etc. It should be appreciated that a manufacturer may be referred to as an OEM or original equipment manufacturer. The manufacturer interface 308 may provide a manufacturer with a real-time lens into the automobile market which may allow the manufacturer to adjust production schedules, pricing plans, marketing activities, etc., which may provide a significant advantage for manufacturers.

Accordingly, information may be provided to the automobile market information processing system 302 from consumers, dealers, and manufacturers with a very high degree of granularity, as every transaction that occurs and even every request or search may be stored and used by the automobile market information processing system 302. This allows the automobile market information processing system 302 to use the most current automobile market data to provide information to consumers, dealers, and manufacturers. It should be appreciated that market prices can change relatively quickly, particularly when major events drive consumer behavior or manufacturer production, such as natural disasters. Accordingly, reports and recommendations provided by the automobile market information processing system 302 may be highly accurate, reliable, and sensitive to market changes.

It should be appreciated that certain functions described as performed, for example, at automobile market information processing system 302, may instead be performed locally at consumer interface 304, dealer interface 306, and manufacturer interface 308, or vice versa. Further, in certain cases, tasks may be performed using consumer interface 304, dealer interface 306, and manufacturer interface 308 or, for example, performed in person, such as a consumer signing documents at a dealer location, or a dealer communicating with a manufacturer using a telephone. It should be appreciated that the consumer interface 304, dealer interface 306, and manufacturer interface 308 may be implemented, for example, in a web browser using an HTML file received from the automobile market information processing system 302. In an example embodiment, the consumer interface 304, dealer interface 306, and manufacturer interface 308 may be located on a website, and may further be implemented as a secure website. Also, consumer interface 304, dealer interface 306, and manufacturer interface 308 may require a local application, for example, which a manufacturer may pay for to have access to, for example, information from the automobile market information processing system 302 such as requests from consumers.

US 10,223,722 B2

9                                                                          10

FIGS. **4**A and **4**B include a flowchart of an example process **400** for facilitating an automobile transaction. Although the process **400** is described with reference to the flowchart illustrated in FIGS. **4**A and **4**B, it will be appreciated that many other methods of performing the acts associated with the process **400** may be used. For example, the order of many of the blocks may be changed, certain blocks may be combined with other blocks, and many of the blocks described are optional.

The example process **400** for facilitating an automobile transaction may allow users **114**, including dealers and consumers, as well as manufacturers, to efficiently sell and purchase automobiles, respectively. The example process **400** may begin with automobile market data including at least pricing data and inventory data stored in a database system (block **402**). For example, automobile market data from dealers, consumers, and manufacturers regarding pricing, lot inventory, turnover rates, transport costs, and quality, safety, and/or other ratings is collected and stored in a database. In an example embodiment, a wide variety of data is stored in a database system **310**. For example, transport costs may include manufacturer to dealer shipping costs and/or dealer to dealer costs for shipping or transporting an automobile (e.g., a dealer with multiple locations may drive automobiles between locations if necessary). Automobile market data may include various relevant ratings, reports, awards, or other information, including quality information, safety information, insurance information, consumer credit information, dealer rating information, incentive information, residual value information, and/or any other data which may be relevant to consumers. For example, ratings data may include information from the National Highway Traffic Safety Administration (NHTSA), the Environmental Protection Agency (EPA), and/or the Insurance Institute for Highway Safety (IIHS). The data may include information from a consumer interface **304**, such as data in consumer searches or requests, information from a dealer interface **306**, such as currently offered dealer pricing, transaction data for finalized sales, current inventory data, transport or shipping costs, and information from a manufacturer interface **308**, such as current manufacturer prices and suggested pricing, manufacturer incentives, and current inventory including finished inventory on hand, production scheduling, shipment scheduling, inventory in transit, and manufacturing lead times. The automobile market data may be comprised solely of information received from the consumer interface **304**, dealer interface **306**, and manufacturer interface **308**, or may include additional information received from other sources. It should be appreciated that various methods of storing the automobile market data may be employed according to the system requirements. For example, database system **310** may be organized according to different manufacturers or dealers, automobile make and model, different information categories (e.g., suggested pricing, market prices, production, shipping, lot inventory), etc., and may consist of one or more databases on one or more servers **108**, **226** which may be remotely located from each other and/or a host device **104** of the automobile market information processing system **302**. As will be discussed further below, the automobile market data may be continually updated as new data is provided to the automobile market information processing system **302**.

The example process **400** continues with a consumer providing a request for a response of whether an automobile can be provided (block **404**). For example, a car buyer fills in a request form on a website or takes a picture of a VIN at a dealer to receive a response based on current market data. In an example embodiment, the buyer's request may be transmitted from consumer interface **304** via the internet to the automobile market information processing system **302**. In another example embodiment, a car buyer takes a picture of a vehicle identification number (VIN) on a car that the buyer would like to receive information for. For example, using an application stored on a mobile device **103**, the buyer may be located at a dealer location and take a picture of the VIN on a car. The buyer may want information on that specific car or on other comparable cars with the same or similar features and/or options. The picture of the VIN may be processed using optical character recognition, which allows the automobile market information processing system **302** to determine the make and model of the car, along with various other characteristics of the car. It should be appreciated that the VIN may include human readable characters, a bar code, or any other graphical or machine readable information which acts as a vehicle identification number. Accordingly, the buyer may perform research, for example, while at home or while shopping at a dealer location. Further, for example, the buyer may take a picture of a VIN anywhere, including at automobile trade shows, mall displays, or anywhere new cars or cars for sale are displayed. The buyer may even take a picture of a car parked in the street as the buyer walks down the street. Any request or query communicated from the consumer interface **304** may be stored, for example, in database system **310**, thereby updating the automobile market information processing system **302** with current automobile market data.

The example process **400** may continue with providing automobile market data to dealers based on the consumer request (block **406**). For example, a group of dealers receives a real-time report including local car sales data, inventory data, ratings data, and transport cost data of the consumer's requested car. In an example embodiment, a report may include quality information, safety information, insurance information, consumer credit information (e.g., buyer FICO score), dealer rating information, incentive information, residual value information, and/or any other data which may be relevant to consumers. The report may be provided through dealer interface **306** and include the consumer requirements and preferences. The request and/or the report may be provided in real-time and may provide real-time data. Data reported based on a real-time updates in the automobile market information processing system **302** may provide significant advantages, for example, when pricing conditions may change quickly due to unforeseen market conditions. The recommendation engine **312** may provide recommendations to a dealer based on the current automobile market data. For example, a report may indicate various estimated sales probabilities for different prices that the dealer may offer or bid. In an example embodiment, a probability to sell within a time frame may be provided, for example, for a 24 hour period, probabilities and prices may be estimated as, e.g., 80% chance to sell at $22,000; 60% chance to sell at $23,000; 50% chance to sell at $24,000; 20% chance to sell at $25,000. Such information may be illustrated in various ways, such as a bell curve graph or a chart. Further, the recommendation engine may provide daily suggestions (e.g., a deal of the day). Dealers may use such information to attract consumers to visit the dealer in person or online as well as prepare responses or bids to consumer requests. In an example embodiment the dealer interface **306** may provide information that is limited to cars which meet the consumer request requirements. Dealers

US 10,223,722 B2

<table><tr><td>11</td><td>12</td></tr></table>

may customize the dealer interface **306** to provide information in a pre-specified manner to suit the dealers particular needs.

A bid to sell the automobile to the consumer is requested from dealers (block **408**). For example, a group of dealers within a certain radius of the buyer location may receive a bid request. Each dealer's bid may include a price, for example, a price with no additional add-on products or services, such as service contracts, warranties, aftermarket accessories, etc. For example, add-on products may provide substantial value to a dealer, above and beyond the profit margin for the sale of the requested car. A dealer may profit from selling financing options, for example, if a consumer needs financing, the financier may pay the dealer for sourcing the loan. A dealer may sell service plans or maintenance packages (e.g., an extended service contract), selling warranties (e.g., a lifetime warranty), or selling insurance plans (e.g., life, accident, and health insurance, liability insurance, comprehensive insurance, etc.). Also, a dealer may also sell various hard add accessories, for example, bicycle racks, hitches, commercial accessories (e.g., lights and sirens), or any aftermarket products or modifications (e.g., sunroof).

One or more dealer bids are provided to the consumer (block **410**). For example, several dealers provide bids based on current pricing data, dealer pickup locations, and potential add-ons, so several different prices and delivery options may be available to the car buyer. Typically, the bid will include at least a specified price and pickup time and location. In an example embodiment, a buyer that has taken a picture of a VIN with a mobile device may receive dealer bids within minutes or seconds on the mobile device. Accordingly, the bids may be used in real-time as the buyer may be actively shopping for a car on a dealer lot. Typically, a pickup location will be a dealer lot or distribution location. It should be appreciated that some dealers may have multiple locations which could serve as a pickup location. In an example embodiment, the automobile market data may indicate that the particular car requested by a consumer should be priced at, for example, $26,000. However, various factors may affect the bid or offer that a dealer will make for the particular car. For example, the potential for forming a customer relationship, the value of potential add-on products and services, or competition with other dealers may cause a dealer to bid lower than normal. In such a case, the dealer may bid $25,000 in an effort to create a customer relationship, sell add-on products, and/or undercut the competition pricing. Other factors, such as the buyer's credit score (e.g., FICO score), may be used by a dealer in determining a bid, as this may affect the profitability of a sale.

Further, for example, the particular automobile requested may not be available for immediate pickup near the buyer, and various alternative delivery options may be provided from several dealers' bids. For example, a car that is located at an out of state dealer may be transported to a dealer near the buyer. Therefore, for example, the consumer interface **304** may provide several different bids with different delivery options and prices to the buyer, for example, a price of $26,000 to pick up the car at an out of state dealer the next day or a price of $26,500 to pick up the car at a local dealer in five days. For example, a dealer may determine a cost to transport a car from one dealer location to another based on the automobile market data such as current market pricing, current inventory levels, current shipping costs, and the like. Accordingly, a dealer response may be adjusted by current automobile market conditions. An offer to provide or ship a particular car to a dealer location near a consumer may be authorized through the dealer interface **306**. Inventoryless

bidding may be highly beneficial when dealers that do not have a requested automobile in inventory can still profitably provide a bid. Further, for example, cars that are not exactly what the buyer requested may also be offered to the buyer. For example, the buyer may request a four wheel drive car, but if a two wheel drive car that meets all the other buyer criteria is immediately available at a nearby dealer, the dealer may provide an offer to the buyer for this car, possibly at a significantly lower price, such as $23,000 instead of $26,000 for a four wheel drive car as requested. Further, for example, dealers may use information such as ratings data to optimize their bids. For example, if gasoline prices are increasing, mileage ratings for a particular car may dictate increasing or decreasing a bid. If a vehicle has very good gas mileage, and gas prices are skyrocketing, that car may have an increasing demand as gas prices increase, or vice versa. Similarly, safety ratings of vehicles may be important to consumer demand if high profile problems have appeared for a particular automobile style, make, or model. As discussed above, various automobile market information may be used by a dealer including safety information, insurance information, consumer credit information, dealer rating information, incentive information, residual value information, and/or any other data which may be relevant to consumers.

The consumer interface **304** may organize dealer bids based on a variety of factors and may provide supplemental information. For example, certain dealer bids may be selected as the best options, all dealer bids may be summarized, various additional ratings, reviews, or popularity information, financing information, etc. may also be provided to a consumer along with any dealer bids. The recommendation engine **312** may provide recommendations to a consumer based on the current automobile market data. For example, of ten dealer bids provided with a response, three bids may be recommended, for example, as "Great Deals!" It should be appreciated that in some cases, a particular consumer search may not return any dealer bids, for example, if consumer search requirements are unrealistic for the consumer's required price range. Also, for example, if only one or two bids are received, the recommendation engine **312** may recommend that a consumer wait for a better bid because the bids provided are not competitive offers based on the current automobile market data stored in the database system **310**. Further, in an example embodiment, dealer bids may be organized according to distance to a dealer pickup location, lowest price, closest match to the consumer entered criteria, a normalized quality index or value index, etc. The consumer may be able to toggle between different viewing options for dealer bids or search results.

Further, in an example embodiment, a buyer may be at a dealer lot (e.g., a Nissan dealer) and take a picture of a VIN on a car (e.g., a Maxima). A bid from a competing dealer (e.g., a Toyota dealer) across the street may be received on the mobile device within seconds and include information for a comparable car (e.g., an Avalon) relating to, for example, gas mileage, safety ratings, price comparisons, residual value, driving directions to the competing dealer, etc. In an example embodiment, a dealer may use the geolocation of the buyer, such as in instances when the buyer is physically located close to the dealer. Accordingly, competing dealer bids may be interbrand or intrabrand in nature, and may be tailored to the buyer's particular situation, which a consumer may find highly advantageous. For example, the buyer may have a bid for a car the buyer wants to test drive as well as a bid for a comparable car across the street before

US 10,223,722 B2

13 14

a salesman from the dealer even introduces himself. Accordingly, a consumer may weigh the pros and cons of various dealer bids, based on delivery options, pricing, and any other relevant variants. Any bids communicated from a dealer interface **306** may be stored, for example, in database system **310**, to further update the automobile market information processing system **302** with current automobile market data.

The consumer selects a bid including a delivery option which specifies a pickup location (block **412**). For example, the car buyer chooses a delivery option of picking up the car at a nearby dealer in five days. As noted above, a dealer may be a franchise dealer entity or a non-franchise distribution location. The buyer may select an offer with a specified delivery option on the consumer interface **304**. The car buyer may have been weighing two or more different delivery options and/or different features, price differences, etc., based on the response(s) received through the consumer interface **304**. As noted above, the consumer interface may organize bids and other helpful information in a variety of ways, which may make the information easier for a consumer to digest. It should be appreciated that a buyer will typically want to pick up a new car at a convenient location, often near the buyer's home. Accordingly, dealers may attempt to provide delivery options tailored towards maximizing profit for the dealer while also maximizing convenience to the buyer, while also providing a superior bid to other dealers. By providing multiple bids with different delivery options, the buyer may be allowed to save time or money based on the buyer's particular needs. In an example embodiment, the buyer may provide a counter offer or different request via the consumer interface **304** to a dealer via the dealer interface **306**. Accordingly, the dealer may respond in kind, and may update delivery options or other terms. It should be appreciated that the consumer selection of a bid may, for example, occur simultaneously with the consumer executing the sale or providing a deposit or down payment, or the like (see, e.g., block **416**). Accordingly, in an example embodiment, once the buyer selects a bid, the buyer has effectively purchased the car, and the dealer does need to worry about the buyer backing out of the deal. Any consumer selections, counter offers, or additional requests or responses may be stored in database system **310**, as the communications are processed by automobile market information processing system **302**, providing further data updates. Accordingly, in an example embodiment, a consumer may select a bid to purchase a car, and that purchase information may then be provided to another consumer searching for the same type of car with similar features, for example, the next day.

Once a bid with a specific delivery option has been selected, the dealer provides the automobile at the selected dealer according to the consumer bid selection (block **414**). For example, the dealer notifies a commonly owned dealer that the car must be transported to the dealer pickup location for delivery in less than five days. In a typical example, the dealer may already have the car in question on the dealer lot, so the car would not need to be transported. In an example embodiment, the dealer may send a notification or instruction message through the dealer interface **306**, which would be received by a commonly owned dealer in another city or state. It should be appreciated that the specific manner of notification or instruction may be changed based on the particular application, for example, the automobile market information processing system **302** may automatically provide a notification or instruction to a dealer to produce or transport a car based on inventory data. It should also be appreciated that particular events may be required to trigger

instructing a car to be delivered to a dealer, such as a deposit, financing approval, etc. Further, the consumer may be required to send an instruction message from the consumer interface **304** to the dealer interface **306** affirming that the buyer has agreed to purchase the car from the dealer.

The consumer and the dealer execute the sale of the automobile (block **416**). For example, the consumer electronically signs documentation such as loan application and a contract and performs an electronic funds transfer or credit card payment. After the delivery option is selected, an electronic contract may be provided by the dealer for the buyer who may e-sign the contract, and/or any other loan applications or other documentation as needed. In another example embodiment, paper copies of a contract may be signed, for example, after the buyer prints them or receives them from a nearby dealer or through the mail. In an example embodiment, the buyer may provide cash or a paper check. It should be appreciated that the process of executing a contract may take some time. For example, the process may occur in several steps, as loan processing may be required prior to executing a contract for sale of a car. Also, it should be appreciated that, for example, the consumer selection of a bid discussed above (see, e.g., block **412**) may occur simultaneously with the consumer executing the sale. Once the sale is completed, the actual transaction data including the final negotiated price, may be provided to and stored in database system **310**. Accordingly, the automobile market information processing system **302** may be updated with current automobile market data from every step in the negotiation process between a consumer and a manufacturer. In an example embodiment, the updates provided to the automobile market information processing system **302** are provided in real-time, for example, data may be transmitted and processed within seconds or minutes. Further, for example, it should be appreciated that certain data may be provided to the automobile market information processing system **302** according to a batch processing schedule.

Next, the dealer makes the purchased automobile available according to the consumer bid selection (block **418**). For example, the dealer transports the car from the commonly owned dealer location to the dealer pickup location selected by the car buyer if the car is not already located at the dealer pickup location. When a purchased car is already at the dealer location where the buyer has agreed to pick the car up, the car does not need to be transported. Many dealers have multiple locations under the same ownership, and these dealers may drive or ship cars from one dealer location to another if the cost of transporting the car is justifiable. If a buyer chooses a quicker delivery option, the car may then be transported from a different dealer location to the selected dealer pickup location. A dealer may interact with the automobile market information processing system **302** using dealer interface **306**, for example, to receive notification that a car will be picked up by a buyer, and to report that a car has been delivered to the dealer pickup location. A notification may also be sent via consumer interface **304** to the buyer that the car is available for pickup at the specified dealer.

Finally, the consumer picks up the purchased automobile according to the consumer selected delivery option at the dealer (block **420**). For example, the car buyer picks up the car at the nearby dealer five days after the car sale is executed. The buyer may pick up the car without ever having to talk to or negotiate, in person or over the telephone, with the dealer. For example, the buyer may arrive at the dealer, show identification and proof of purchase, and be provided the keys to the car. The buyer may sign paperwork indicating

**15**

the car has been picked up. Also, the dealer may offer or provide additional products or services to the buyer when the buyer goes to the dealer to pick up the car. For example, the dealer may offer financing options, warranties, service plans, insurance plans, and hard add accessories to the buyer, as discussed in further detail above.

Accordingly, it should be appreciated that consumers, dealers, and manufacturers may receive significant benefits from the method of facilitating an automobile transaction disclosed herein. For example, price setting, inventory management, and production scheduling, may be greatly improved for dealers and manufacturers by utilizing the disclosed system and method. Consumers may benefit from more competitive pricing, piece of mind knowing that a fair market price is being offered for prospective purchases, and improved delivery options that allow the consumer to weigh the benefits and drawbacks of different delivery options, pricing, and other variables. In an example embodiment, consumers can view prices paid for comparable cars in specific locations based on the automobile market data in the automobile market information processing system 302, for example, within a certain time frame such as one month and within a certain proximity to the consumer. Moreover, various inefficiencies in the automobile industry may be minimized utilizing the presently disclosed system and method.

FIG. 5 illustrates a block diagram of an example data architecture 500. In the example data architecture 500, interface data 502, administrative data 504, and automobile market data 506 interact with each other, for example, based on user commands or requests. The interface data 502, administrative data 504, and automobile market data 506 may be stored on any suitable storage medium (e.g., server 226). It should be appreciated that different types of data may use different data formats, storage mechanisms, etc. Further, various applications may be associated with processing interface data 502, administrative data 504, and automobile market data 506. Various other or different types of data may be included in the example data architecture 500.

Interface data 502 may include input and output data of various kinds. For example, input data may include mouse click data, scrolling data, hover data, keyboard data, touch screen data, voice recognition data, etc., while output data may include image data, text data, video data, audio data, etc. Interface data 502 may include formatting, user interface options, links or access to other websites or applications, and the like. Interface data 502 may include applications used to provide or monitor interface activities and handle input and output data.

Administrative data 504 may include data and applications regarding user accounts. For example, administrative data 504 may include information used for updating accounts, such as creating or modifying manufacturer accounts or dealer accounts. Further, administrative data 504 may include access data and/or security data. Administrative data 504 may interact with interface data in various manners, providing a user interface 304, 306, 308 with administrative features, such as implementing a user login and the like.

Automobile market data 506 may include, for example, executed sales data 508, consumer data 510, dealer data 512, manufacturer data 514, statistical data 516, and/or historical data 518. Executed sales data 508 may include actual negotiated prices for manufacturer and dealer sales, differences in list prices to negotiated prices, sales demographics, etc. Consumer data 510 may include consumer search activity, consumer requests and offers, consumer feedback, etc.

**16**

Dealer data 512 may include dealer pricing, including list prices, sale prices for limited time dealer offers or deals of the day, negotiation information such as bottom line pricing, offers received, foot traffic activity, and dealer inventory data, including current on location data, automobile turnover rates, etc. Manufacturer data 514 may include manufacturer pricing, including suggested pricing, preferred dealer pricing, etc., manufacturer incentives including cash rebates, special lease rates, special APR rates, zero down offers, lifetime warranties, guaranteed trade-in offers, etc., and inventory information including dealer inventory, inventory by location, inventory in transit, manufacturing or production lead times or build times, production scheduling, shipping scheduling, etc. Statistical data 516 may include information used for providing reports including graphs, forecasts, recommendations, calculators, depreciation schedules, tax information, etc., including equations and other data used for statistical analysis. Historical data 508 may include past sales data, such as historical list prices, actual sale prices, manufacturer and dealer margins, operating costs, service costs or profitability, loyalty information, etc. It should be appreciated that data may fall under multiple categories of automobile market data 506, or change with the passage of time. It should also be appreciated that automobile market data 506 may be tailored for a particular manufacturer or dealer, for example, a manufacturer may request that a specific type of data that is not normally stored or used be stored in the database system 310. Accordingly, for example, customized reports may be provided to a manufacturer interface 308 using that specific data for the manufacturer.

The integration of the various types of automobile market data 506 received from the consumer interface 304, dealer interface 306, and manufacturer interface 308 may provide a synergistic and optimal resource for consumers, dealers, and manufacturers alike. In an example embodiment, a consumer may benefit greatly from using an application in a mobile device 103 to receive both intrabrand information and interbrand information in real-time, based only on taking a picture of VIN. Dealers and manufacturers may be able to provide information to the consumer in a manner that highlights the benefits of the products the respective dealer or manufacturer would like to sell. The intrabrand and interbrand information provided on a consumer interface 304 may allow the best automobile options for a particular consumer to be provided to that consumer, may allow dealers to compete with other dealers taking into account a greater amount of automobile market information, and may allow manufacturers to better follow through with opportunities for sales, which may result in a more efficient automobile market.

Automobile market data 506 may be maintained in various servers 108, in databases or other files. It should be appreciated that, for example, a host device 104 may manipulate automobile market data 506 in accordance with the administrative data 504 and interface data 502 to provide requests or reports to users 114 including consumers, dealers, and manufacturers, and perform other associated tasks. It should also be appreciated that automobile market data 506 represents automobile market information, and that these terms may be used interchangeably in this disclosure depending upon the context.

FIG. 6 is flow diagram illustrating an example process 600 for facilitating an automobile transaction, according to an example embodiment of the present invention. Although the process 600 is described with reference to the flow diagram illustrated in FIG. 6, it will be appreciated that

US 10,223,722 B2

17                                                           18

many other methods of performing the acts associated with the process **600** may be used. For example, the order of many of the blocks may be changed, certain blocks may be combined with other blocks, and many of the blocks described are optional.

In the example process **600**, data may flow between the automobile market information processing system **302** and a consumer interface **304** and a dealer interface **306**, as discussed above based on consumer and dealer interaction with the automobile market information processing system **302**. It should be appreciated that the automobile market information processing system **302** may update the automobile market information stored in the database system **310** when automobile market information is received from a consumer, a dealer, or a manufacturer, or from any other information source. Accordingly, the automobile market information may remain current and/or provide sufficiently recent data for the benefit of consumers, dealers, and/or manufacturers.

The example process **600** may begin with a consumer taking a picture of a VIN using a mobile phone application (block **602**). The consumer interface **304** may use OCR to determine and provide the VIN to the automobile market information processing system **302** to provide a consumer request (block **604**). It should be appreciated that OCR may occur in the automobile market information processing system **302** or at the consumer interface **304**. The automobile market information processing system **302** receives the consumer request and prepares automobile market information based on the request (block **606**). The automobile market information processing system **302** may send a bid request and automobile market information based on the consumer request to the dealer interface **306** for one or more dealers (block **608**). It should be appreciated that while the consumer request is automobile market information, typically, additional automobile market information would be provided with the consumer request. For example, typically, data relating to recent sales of the requested automobile and/or comparable automobiles may be provided. In an example embodiment, a target price or "true" value of the requested automobile may be provided. One or more dealers receive the bid request and automobile market information, determine prices and delivery options for the automobile using the automobile market information, and prepare and provide bids for the consumer (block **610**). A dealer bid may be sent from the dealer interface **306** to the automobile market information processing system **302** for each dealer that wants to provide a bid (block **612**). The automobile market information processing system **302** receives and processes dealer bids and prepares the bids and automobile market data for the consumer (block **614**).

The automobile market information processing system **302** may send dealer bids and automobile market information to the consumer interface **304** (block **616**). It should be appreciated that automobile market information may be provided to the consumer before dealer bids are provided, and/or concurrently with dealer bids. The consumer may receive the dealer bids and automobile market information and may select a bid including a delivery option based on the automobile market information (block **618**). The consumer interface **304** may send to the automobile market information processing system **302** a selection of a bid indicating that the consumer wants to purchase or lease the automobile based on the selected bid (block **620**). The automobile market information processing system **302** receives and processes the consumer bid selection (block **622**). For example, the automobile market information processing

system **302** may send the bid selection to the dealer interface **306** (block **624**). The dealer may receive the bid selection and coordinate a sale by, for example, transporting the automobile from one dealer location to the dealer location selected for delivery (block **626**). Also, for example, the dealer may provide contract or loan documents, collect a deposit or down payment, or the like. As discussed above, in each of blocks **606**, **614**, **626**, and **634**, the automobile market information processing system **302** may update the automobile market information in the database system **310** based on the information received from the consumer, dealer, and/or manufacturer.

For exemplary purposes, the present disclosure discusses a various examples relating to a purchase of a car. However, it should be appreciated that the disclosed system, methods, and apparatus may be advantageously used in relation to various automobiles other than cars including, for example, trucks, vans, sport utility vehicles, jeeps, motorcycles, commercial vehicles, and/or automobiles that have a VIN and require a license plate to operate.

It will be appreciated that all of the disclosed methods and procedures described herein can be implemented using one or more computer programs or components. These components may be provided as a series of computer instructions on any conventional computer-readable medium, including RAM, ROM, flash memory, magnetic or optical disks, optical memory, or other storage media. The instructions may be configured to be executed by a processor, which when executing the series of computer instructions performs or facilitates the performance of all or part of the disclosed methods and procedures.

Further, it will be appreciated that the presently disclosed system, methods, and apparatus for performing automobile transactions may be utilized in conjunction with other systems or methods. For example, the presently disclosed system, methods, and apparatus may be used in conjunction with the disclosure in the co-pending commonly-owned patent application filed on Jul. 5, 2011, entitled "AUTOMOBILE TRANSACTION FACILITATION USING A MANUFACTURER RESPONSE," U.S. application Ser. No. 13/176,497, the entire contents of which are hereby incorporated by reference herein, and in an example embodiment, the features of which may be combined with the features of the present disclosure.

It should be understood that various changes and modifications to the example embodiments described herein will be apparent to those skilled in the art. Such changes and modifications can be made without departing from the spirit and scope of the present subject matter and without diminishing its intended advantages. It is therefore intended that such changes and modifications be covered by the appended claims.

The invention is claimed as follows:

**1**. A method comprising:

receiving, via a consumer interface, a first request for a response regarding a first automobile, the first request made by a consumer located at a first location and including geolocation information of the consumer;

executing instructions, by at least one processing device, to:

determine, based on the geolocation information, that the consumer is located at the first location;

generate, based on the first location, an in-market dealer area proximately located to the first location;

determine that a first dealer is located at a second location within the in-market dealer area;

US 10,223,722 B2

19 20

receive, via a dealer interface, a first bid from the first dealer located at the second location within the in-market dealer area;

generate, after receiving the first bid, driving directions between the first location and the second location; and

provide the first bid and the driving directions via the consumer interface, the first bid including at least a price for the first automobile.

**2.** The method of claim **1**, wherein the first automobile is one of a particular type of car with a specific set of features and a particular car with a specific vehicle identification number.

**3.** The method of claim **1**, wherein the first bid is an inventoryless bid requiring the first automobile to be at least one of manufactured and transferred from the inventory of another entity to the first dealer.

**4.** The method of claim **1**, wherein the first bid includes a first delivery option which specifies a first pickup location at the first dealer and a second delivery option which specifies a different second pickup location, wherein a consumer selection indicates a consumer intention to purchase the first automobile based on the first bid and specifies one of the first delivery option and the second delivery option.

**5.** The method of claim **1**, further comprising:

executing instructions, by the at least one processing device, to process a consumer selection of the first bid to facilitate executing a sale including at least one of providing for electronic signature of documents and providing for an electronic funds transfer.

**6.** The method of claim **5**, wherein the first automobile is made available for pickup at the first dealer according to a consumer selected first delivery option.

**7.** The method of claim **1**, further comprising:

executing instructions, by the at least one processing device, to provide via the consumer interface at least one of a financing plan, a service plan, an insurance plan, a warranty, and a hard add accessory, for at least the first automobile, which is at least one of provided and offered by the first dealer.

**8.** The method of claim **1**, wherein the first dealer is at least one of a franchise dealer and a non-franchise distribution location.

**9.** The method of claim **1**, further comprising:

executing instructions, by the at least one processing device, to provide a manufacturer response via the consumer interface including an acknowledgement of interest.

**10.** The method of claim **1**, further comprising:

executing instructions, by the at least one processing device, to provide a manufacturer response via the consumer interface including at least one of a verification, a confirmation, and an offer indicating that the first automobile can be provided for the consumer.

**11.** The method of claim **1**, wherein the first request is made by the consumer using a mobile device which takes a picture of a vehicle identification number, and in the first bid from the first dealer, the first automobile is an interbrand comparable car which is located at the first dealer.

**12.** The method of claim **1**, wherein the consumer is at least one of a person and an entity.

**13.** The method of claim **1**, wherein the consumer chooses a pickup location.

**14.** The method of claim **1**, wherein the first dealer is one of a franchise entity and a non-franchise entity distribution location.

**15.** The method of claim **14**, wherein the first automobile is at a consumer's chosen pickup location, such that the first automobile does not need to be transported to the consumer's chosen pickup location.

**16.** The method of claim **14**, wherein the consumer submits a request to the first dealer to change a first delivery option to include the consumer's chosen pickup location.

**17.** The method of claim **16**, wherein, based on the consumer's request to change the first delivery option, the first dealer provides a second delivery option including the consumer's chosen pickup location.

**18.** The method of claim **17**, wherein a notification is sent to the consumer that the first automobile is available for pickup at the consumer's chosen pickup location.

**19.** The method of claim **18**, wherein the consumer picks up the first automobile at the consumer's chosen pickup location.

**20.** The method of claim **17**, wherein the first automobile is transported to the consumer's chosen pickup location.

**21.** The method of claim **20**, wherein the first automobile is transported directly from a third location to the consumer's chosen pickup location.

**22.** The method of claim **21**, wherein a second dealer is located at the third location.

**23.** The method of claim **22**, wherein the first dealer and the second dealer are commonly owned.

**24.** The method of claim **21**, wherein a manufacturer is located at the third location.

**25.** The method of claim **1**, wherein the first dealer provides the first automobile to the consumer at a pickup location by one of (i) having the first automobile transported to the pickup location and (ii) having a manufacturer produce the first automobile.

**26.** The method of claim **1**, further comprising:

determine that a second dealer is located at a third location within the in-market dealer area;

receive, via the dealer interface, the second bid from the second dealer located at the third location within the in-market dealer area;

generate, after receiving the second bid, second driving directions between the first location and the third location; and

provide the second bid and the second driving directions via the consumer interface, the second bid including at least a price for the first automobile.

**27.** A system comprising:

a computer readable medium storing instructions; and

at least one processing device operably coupled to the computer readable medium, the at least one processing device the executing instructions to:

receive, via a consumer interface, a first request for a response regarding a first automobile, the first request made by a consumer located at a first location and including geolocation information of the consumer;

determine, using the geolocation information, that the consumer is located at the first location;

generate, based on the first location, an in-market dealer area proximately located to the first location;

determine that a first dealer is located at a second location within the in-market dealer area;

receive, via a dealer interface, a first bid from the first dealer located at the second location within the in-market dealer area;

generate, after receiving the first bid, driving directions between the first location and the second location; and

US 10,223,722 B2

21

provide the first bid and the driving directions via the consumer interface, the first bid including at least a price for the first automobile.

**28**. The system of claim **27**, wherein the consumer interface only receives as an input a picture, from an image sensor, to generate a request.

**29**. The system of claim **27**, wherein the consumer interface is configured to receive input from at least one of a touch screen and a barcode scanner.

**30**. The system of claim **27**, wherein the consumer interface is configured to toggle between different viewing options.

**31**. The system of claim **27**, wherein one or more applications are configured to handle input or output data.

**32**. The system of claim **27**, wherein the consumer interface is provided on a mobile device that stores an application configured to take a picture of a vehicle identification number.

**33**. A non-transitory computer readable medium storing instructions which, when executed, are configured to cause an information processing apparatus to:

22

receive, via a consumer interface, a first request for a response regarding a first automobile, the first request made by a consumer located at a first location and including geolocation information of the consumer;

determine, using the geolocation information, that the consumer is located at the first location;

generate, based on the first location, an in-market dealer area proximately located to the first location;

determine that a first dealer is located at a second location within the in-market dealer area;

receive, via a dealer interface, a first bid from the first dealer located at the second location within the in-market dealer area;

generate, after receiving the first bid, driving directions between the first location and the second location; and

provide the first bid and the driving directions via the consumer interface, the first bid including at least a price for the first automobile.

\* \* \* \* \*

US010796362B2

(12) **United States Patent**  (10) **Patent No.:** **US 10,796,362 B2**
Seergy et al.  (45) **Date of Patent:** **\*Oct. 6, 2020**

(54) **USED AUTOMOBILE TRANSACTION FACILITATION FOR A SPECIFIC USED AUTOMOBILE**

(71) Applicant: **Sidekick Technology LLC**, Pine Brook, NJ (US)

(72) Inventors: **Michael J. Seergy**, Pine Brook, NJ (US); **Benjamin N. S. Brown**, Pine Brook, NJ (US)

(73) Assignee: **SIDEKICK TECHNOLOGY LLC**, Pine Brook, NJ (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

This patent is subject to a terminal disclaimer.

(21) Appl. No.: **16/200,078**

(22) Filed: **Nov. 26, 2018**

(65) **Prior Publication Data**

US 2019/0095987 A1  Mar. 28, 2019

**Related U.S. Application Data**

(63) Continuation of application No. 15/284,181, filed on Oct. 3, 2016, now Pat. No. 10,140,655, which is a (Continued)

(51) **Int. Cl.**
**G06Q 30/00** (2012.01)
**G06Q 30/08** (2012.01)
(Continued)

(52) **U.S. Cl.**
CPC ............. **G06Q 30/08** (2013.01); **G01C 21/34** (2013.01); **G01C 21/3679** (2013.01);
(Continued)

(58) **Field of Classification Search**
CPC ................. G06Q 30/0601–0645; G06Q 30/80
(Continued)

(56) **References Cited**

U.S. PATENT DOCUMENTS

5,970,472 A   10/1999 Allsop et al.
6,006,201 A   12/1999 Berent et al.
(Continued)

OTHER PUBLICATIONS

AutoTrader.com, Inc..: Private Company Information—Business Week, http://investing.businessweek.com/research/stocks/private/snapshot.asp?privcapId=92642.
(Continued)

*Primary Examiner* — Brandy A Zukanovich
(74) *Attorney, Agent, or Firm* — K&L Gates LLP

(57) **ABSTRACT**

A system, methods, and apparatus for performing used automobile transactions are disclosed. In an example embodiment, automobile market data representative of current automobile market characteristics is stored. The automobile market data may include pricing and consumer interest information received from consumers, dealers, and manufacturers. A consumer seller or manufacturer off-lease seller may provide a request for a response regarding a specific used automobile with a specific a vehicle identification number. Automobile market data may be provided to a used automobile buyer based on the request. Bids to purchase the specific used automobile may be requested from used automobile buyers based on the request. Buyer bids may be provided to the consumer seller or manufacturer off-lease seller with prices and a delivery options. The consumer seller or manufacturer off-lease seller may select a bid to sell the specific used automobile based on the bid.

**63 Claims, 7 Drawing Sheets**



**US 10,796,362 B2**

Page 2

### Related U.S. Application Data

continuation of application No. 14/841,157, filed on Aug. 31, 2015, now Pat. No. 9,460,467, which is a continuation of application No. 14/176,700, filed on Feb. 10, 2014, now Pat. No. 9,123,075, which is a continuation of application No. 13/207,858, filed on Aug. 11, 2011, now Pat. No. 8,650,093, which is a continuation-in-part of application No. 13/176,497, filed on Jul. 5, 2011, now Pat. No. 9,141,984, and a continuation-in-part of application No. 13/176,525, filed on Jul. 5, 2011, now Pat. No. 8,744,925.

(51) **Int. Cl.**

| | |
|---|---|
| *G06Q 30/06* | (2012.01) |
| *G01C 21/34* | (2006.01) |
| *G01C 21/36* | (2006.01) |
| *G06F 3/16* | (2006.01) |
| *H04W 4/021* | (2018.01) |

(52) **U.S. Cl.**

CPC ......... *G01C 21/3697* (2013.01); *G06F 3/167* (2013.01); *G06Q 30/06* (2013.01); *G06Q 30/0641* (2013.01); *H04W 4/021* (2013.01); *H05K 999/99* (2013.01)

(58) **Field of Classification Search**

USPC ..... 705/26.1, 26.2, 26.25, 26.3, 26.35, 26.4, 705/26.41, 26.42, 26.43, 26.44, 26.5, 705/26.6, 26.61, 26.62, 26.63, 26.64, 705/26.7, 26.8, 26.81, 26.82, 26.9, 27.1, 705/27.2

See application file for complete search history.

(56) **References Cited**

#### U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 6,321,221 | B1 | 11/2001 | Bieganski |
| 6,463,431 | B1 | 10/2002 | Schmitt |
| 6,533,173 | B2 | 3/2003 | Benyak |
| 6,868,388 | B1 | 3/2005 | Millsap et al. |
| 6,868,389 | B1 | 3/2005 | Wilkins et al. |
| 7,395,223 | B1 | 7/2008 | Buzzell et al. |
| 7,406,436 | B1 | 7/2008 | Reisman |
| 7,479,949 | B2 | 1/2009 | Jobs et al. |
| 7,636,574 | B2 | 12/2009 | Poosala |
| 8,160,929 | B1 | 4/2012 | Park et al. |
| 8,392,193 | B2 | 3/2013 | Schultz et al. |
| 8,606,604 | B1 | 12/2013 | Huber et al. |
| 2002/0065707 | A1 | 5/2002 | Lancaster et al. |
| 2002/0082978 | A1 | 6/2002 | Ghouri et al. |
| 2002/0099628 | A1 | 7/2002 | Takaoka et al. |
| 2002/0111877 | A1 | 8/2002 | Nelson |
| 2002/0128946 | A1 | 9/2002 | Chehade et al. |
| 2003/0088435 | A1 | 5/2003 | King |
| 2003/0200151 | A1 | 10/2003 | Ellenson |
| 2003/0229577 | A1 | 12/2003 | Nabel |
| 2004/0034544 | A1 | 2/2004 | Fields et al. |

| | | | |
|---|---|---|---|
| 2004/0059626 | A1 | 3/2004 | Smallwood |
| 2005/0004819 | A1 | 1/2005 | Etzioni et al. |
| 2005/0050097 | A1 | 3/2005 | Yeh et al. |
| 2005/0108112 | A1 | 5/2005 | Ellenson et al. |
| 2005/0240512 | A1 | 10/2005 | Quintero et al. |
| 2006/0020477 | A1 | 1/2006 | Retzbach et al. |
| 2007/0150362 | A1 | 6/2007 | Sharma et al. |
| 2007/0250403 | A1 | 10/2007 | Altschuler |
| 2007/0255663 | A1 | 11/2007 | Jordan et al. |
| 2007/0260526 | A1 | 11/2007 | Bartel |
| 2008/0046331 | A1 | 2/2008 | Rand |
| 2008/0177653 | A1 | 7/2008 | Famolari et al. |
| 2008/0183552 | A1 | 7/2008 | O'Hagan |
| 2008/0187125 | A1 | 8/2008 | Siegrist |
| 2008/0201184 | A1 | 8/2008 | Rose et al. |
| 2008/0201188 | A1 | 8/2008 | Heyman et al. |
| 2008/0201203 | A1 | 8/2008 | Rose et al. |
| 2008/0208731 | A1 | 8/2008 | Ruckart |
| 2008/0228657 | A1 | 9/2008 | Nabors et al. |
| 2009/0076896 | A1 | 3/2009 | DeWitt et al. |
| 2009/0132348 | A1 | 5/2009 | Bria et al. |
| 2009/0149199 | A1 | 6/2009 | Maghoul |
| 2009/0171761 | A1 | 7/2009 | Noy et al. |
| 2009/0187478 | A1 | 7/2009 | Shipley |
| 2009/0187513 | A1 | 7/2009 | Noy et al. |
| 2009/0198557 | A1 | 8/2009 | Wang et al. |
| 2009/0204600 | A1 | 8/2009 | Kalik et al. |
| 2010/0048242 | A1 | 2/2010 | Rhoads et al. |
| 2010/0106580 | A1 | 4/2010 | Etheredge et al. |
| 2010/0217525 | A1 | 8/2010 | King et al. |
| 2010/0274627 | A1 | 10/2010 | Carlson |
| 2010/0332292 | A1 | 12/2010 | Anderson |
| 2011/0040642 | A1 | 2/2011 | O'Dell |
| 2011/0082759 | A1 | 4/2011 | Swinson et al. |
| 2011/0087430 | A1 | 4/2011 | Boss et al. |
| 2011/0087556 | A1 | 4/2011 | Pitkow |
| 2011/0099036 | A1 | 4/2011 | Sarkissian et al. |
| 2011/0208418 | A1 | 8/2011 | Looney et al. |
| 2011/0238474 | A1 | 9/2011 | Carr et al. |
| 2011/0238514 | A1 | 9/2011 | Ramalingam et al. |
| 2011/0276394 | A1 | 11/2011 | Chan |

#### OTHER PUBLICATIONS

Autotrader.com Introduces IPhone App to Create a More Personalized "PC-to-Pocket" Experience for Car Shoppers, http://www.prnewswire.com/news-releases/autotradercom, Jul. 7, 2011.
AppStore—AutoTrader.com, http://itunes.apple.com/us/app/autotrader-com/id444552888?mt=8, Oct. 31, 2011.
International Search Report dated Sep. 21, 2012 for Intl. Appln. No. PCT/US2012/045546.
Charlton, Auto Trader: iPhone app review. Mar. 15, 2010 [retrieved on Sep. 6, 2012] from the internet: http://www.econsultancy.com/us/blog/5593-auto-trader-iphone-app-review> entire document.
Autotraderuk. Introducing the Auto Trader iPhone App. Mar. 12, 2010 [retrieved on Sep. 6, 2012] from the internet: http://www.youtube.com/watch?v+6g_1g81RG4&fature=player_embedded> entire document.
International Search Report dated Oct. 5, 2012 for Intl. Appln. No. PCT/US2012/045545.
Anonymous, "instaVIN to offer free auto accident history reports for mobile phones," Wireless News, Jun. 2, 2010.



Fig. 1



Fig. 2



Fig. 3A



Fig. 3B



Start

400

402 — Automobile market data including at least pricing data is stored in a database system (e.g., data from consumers, dealers, manufacturers, and industry analysts, regarding pricing, inventory, insurance information, quality ratings, safety ratings, and other ratings is collected and stored in a database)

404 — A request for a response regarding a used automobile is received from a consumer seller (e.g., a used car seller takes a picture of the VIN of a used car and fills in price parameters and other information into a mobile application to receive a response based on current market data)

406 — Automobile market data is provided to used automobile buyers based on the consumer seller request (e.g., a group of consumers and dealers receive a real-time report including local used car sales data, inventory data, quality and safety ratings data, insurance data, and gas mileage data of the specific used car)

408 — A bid to purchase the automobile from the consumer seller is requested from used automobile buyers (e.g., a group of consumers and dealers within a certain radius of the used car seller receive a bid request based on buyer searches)

410 — Buyer bids are provided to the consumer seller (e.g., several consumers and dealers provide bids based on current pricing data, options information on the specific used car, and potential pickup locations, so several different prices and delivery options may be available to the used car seller)

412 — The consumer seller selects a buyer bid including a price and a delivery option (e.g., the used car seller chooses to sell the used car based on the price and the pickup location of a consumer buyer bid)

414 — The consumer seller and used automobile buyer execute the sale of the automobile (e.g., the used car buyer e-signs a contract and electronically transfers funds to the used car seller based on the consumer bid)

416 — The consumer seller makes the purchased used automobile available according to the consumer seller bid selection (e.g., the seller drives the used car to the pickup location if the pickup location is not the used car seller's location)

418 — The used automobile buyer receives the purchased used automobile according to the consumer seller selected delivery option (e.g., the used car buyer receives the used car at the pickup location the same day the sale is executed)

Fig. 4



Fig. 5



600
318, 324
302
320, 322
602
Seller takes a picture of a VIN and enters pricing parameters
604
Seller Request
606
System receives seller request and prepares automobile market data based on the request
608
Bid request and auto market information
610
Used auto buyers receive bid request and automobile market information to determine prices and delivery options for the used auto and prepare and provide bids for the used auto seller
612
Buyer bid
614
System receives and processes buyer bids and prepares bids and automobile market data for seller
616
Buyer bids and auto market information
618
Seller receives buyer bids and automobile market information and selects a bid including a delivery option based on automobile market information
620
Selection
622
System receives and processes bid selection
624
Selection
626
Buyer receives bid selection and coordinates a sale

Fig. 6

US 10,796,362 B2

<table>
<tr><td>1</td><td>2</td></tr>
</table>

# USED AUTOMOBILE TRANSACTION FACILITATION FOR A SPECIFIC USED AUTOMOBILE

## CROSS REFERENCE TO RELATED APPLICATIONS AND PRIORITY CLAIM

This application is a continuation of U.S. patent application Ser. No. 15/284,181, filed on Oct. 3, 2016, which a continuation of Ser. No. 14/841,157, filed Aug. 31, 2015, which is a continuation of Ser. No. 14/176,700, filed Feb. 10, 2014, which is a continuation of U.S. patent application Ser. No. 13/207,858, filed on Aug. 11, 2011, which is a continuation-in-part of the following co-pending commonly-owned patent applications filed on Jul. 5, 2011, entitled "AUTO-MOBILE TRANSACTION FACILITATION USING A MANUFACTURER RESPONSE," application Ser. No. 13/176,497, and entitled "AUTOMOBILE TRANSACTION FACILITATION BASED ON CUSTOMER SELECTION OF A SPECIFIC AUTOMOBILE," application Ser. No. 13/176,525, now U.S. Pat. No. 8,744,925, issued Jun. 3, 2014, the entire content of each of which is incorporated by reference herein.

## BACKGROUND

In the used automobile market, consumers typically sell or trade in used automobiles to dealers or dealerships, or privately sell to other consumers, for example, through personal advertisements. Dealers often purchase used automobiles from consumers as part of a deal for a new automobile, typically referred to as a trade in. Typically, a description of a used automobile in a personal advertisement may include the make, model, and mileage of an automobile, but certain other relevant descriptive information may not be available to a potential buyer. Further, a dealer making a trade in offer for a used automobile may not have certain relevant descriptive information on that used automobile. In many cases, the negotiation process for a used automobile may include a large degree of uncertainty for consumers, including both a selling consumer and a purchasing consumer. A consumer seller may be particularly disadvantaged when negotiating with a dealer for a trade in value, as dealers typically have great knowledge and experience with the process, while consumers typically do not. Generally, the negotiation process is a zero sum process, and because a consumer seller of a used automobile and a used automobile buyer are each trying to get a better deal, there is typically some lack of trust during the negotiation. Accordingly, used automobile buyers and sellers, including consumers and dealers, often base the negotiations on established market prices. However, market prices can fluctuate rapidly depending a variety of factors. For example, consumer demand may be affected by economic factors, such as changes in gasoline prices, unemployment rates, government sponsored tax rebates for automobile purchases, etc.

In many cases, a consumer seller of a used automobile may have concerns that a buyer may not offer a fair and competitive price. Various products and services have become available that allow sellers and buyers, including consumers and dealers, to perform research on market prices for used automobiles. Typically, the highest possible value available to a consumer seller may be through a sale to another consumer, as opposed to trading in the used automobile to a dealer.

In addition to consumers and dealers, automobile manufacturers may also have an interest in the resale values of used automobiles. Further, in many cases, a manufacturer may want to sell used off-lease automobiles which have been returned by consumer lessees. In many cases, a manufacturer off-lease seller may not be able to receive the full market value of a used off-lease automobile.

## SUMMARY

The present disclosure provides a new and innovative system, methods and apparatus for providing automobile market information and facilitating used automobile transactions. In an example embodiment, automobile market data representative of current automobile market characteristics is stored. The automobile market data may include pricing and consumer interest information received from consumers, dealers, and manufacturers. A consumer seller or manufacturer off-lease seller may provide a request for a response regarding a specific used automobile with a specific a vehicle identification number. Automobile market data may be provided to a used automobile buyer based on the request. Bids to purchase the specific used automobile may be requested from used automobile buyers based on the request. Buyer bids may be provided to the consumer seller or manufacturer off-lease seller with prices and a delivery options. The consumer seller or manufacturer off-lease seller may select a bid to sell the specific used automobile based on the bid.

Additional features and advantages of the disclosed method and apparatus are described in, and will be apparent from, the following Detailed Description and the Figures.

## BRIEF DESCRIPTION OF THE FIGURES

FIG. 1 is a high level block diagram of an example network communicating system, according to an example embodiment of the present invention.

FIG. 2 is a detailed block diagram showing an example of a computing device, according to an example embodiment of the present invention.

FIGS. 3A and 3B provide a block diagram, each showing an example automobile transaction network structure, according to an example embodiment of the present invention.

FIG. 4 is a flowchart illustrating an example process for facilitating a used automobile transaction, according to an example embodiment of the present invention.

FIG. 5 is a block diagram showing an example data architecture, according to an example embodiment of the present invention.

FIG. 6 is flow diagram illustrating an example process for facilitating a used automobile transaction, according to an example embodiment of the present invention.

## DETAILED DESCRIPTION OF EXAMPLE EMBODIMENTS

The present disclosure relates in general to a system for facilitating used automobile transactions and, in particular, to an automobile transaction for a specific used automobile. Briefly, in an example embodiment, a system is provided which allows a consumer seller or a manufacturer off-lease seller of a used automobile to request bids and information regarding a specific automobile identified with a specific vehicle identification number. For example, a consumer may use a mobile device to take a picture of a vehicle identification number and may enter a desired price range or minimum asking price. The specific automobile may be

US 10,796,362 B2

3

identified using optical character recognition to provide, for example, a full list of the original manufacturer features and options, and the original manufacturer suggested retail price and invoice information, for that specific used automobile based on the vehicle identification number. Accordingly, the consumer seller need not enter all of this information, but may request bids and information in real-time for that specific used automobile. Used automobile buyers may include consumers and/or dealers which may provide bids based on the consumer seller request using real-time auto-mobile market information. A consumer seller may select a buyer bid to sell a used automobile based on the prices and delivery options available. Accordingly, typically unavail-able or difficult to obtain data may be provided for offering a used automobile for sale, including a full listing of the manufacturer features and options, EPA mileage, safety ratings, recalls, quality reports, estimated insurance costs, etc. In an example embodiment, a manufacturer off-lease seller may select a buyer bid based on the prices and delivery options to maximize value, for example, by reducing costs typically associated with selling an off-lease automobile. The used automobile market is presently approximately three times the size of the new automobile market in the United States, as approximately 40 million used automobiles are sold each year. Accordingly, the present disclosure may be helpful for facilitating large numbers of used automobile transactions. In an example embodiment, the disclosed system matches seller and buyer parameters, such as price and pickup location, to facilitate a live bidding process, which allows a used automobile seller to accept or reject bids using a great deal of information not typically available. In a non-limiting example embodiment, certain features dis-closed in the present patent application may be commer-cially embodied in products and services offered by Sidekick Technology LLC, the assignee of the present application.

The present system may be readily realized in a network communications system. A high level block diagram of an example network communications system 100 is illustrated in FIG. 1. The illustrated system 100 includes one or more client devices 102, and one or more host devices 104. The system 100 may include a variety of client devices 102, such as desktop computers and the like, which typically include a display 112, which is a user display for providing infor-mation to users 114, and various interface elements as will be discussed in further detail below. A client device 102 may be a mobile device 103, which may be a cellular phone, a personal digital assistant, a laptop computer, a tablet com-puter, etc. The client devices 102 may communicate with the host device 104 via a connection to one or more communi-cations channels 106 such as the Internet or some other data network, including, but not limited to, any suitable wide area network or local area network. It should be appreciated that any of the devices described herein may be directly con-nected to each other instead of over a network. Typically, one or more servers 108 may be part of the network communications system 100, and may communicate with host servers 104 and client devices 102.

One host device 104 may interact with a large number of users 114 at a plurality of different client devices 102. Accordingly, each host device 104 is typically a high end computer with a large storage capacity, one or more fast microprocessors, and one or more high speed network connections. Conversely, relative to a typical host device 104, each client device 102 typically includes less storage capacity, a single microprocessor, and a single network connection. It should be appreciated that a user 114 as described herein may include any person or entity which

4

uses the presently disclosed system and may include a wide variety of parties. For example, as will be discussed in further detail below, users 114 of the presently disclosed system may include a consumer, a dealer, and/or a manu-facturer.

Typically, host devices 104 and servers 108 store one or more of a plurality of files, programs, databases, and/or web pages in one or more memories for use by the client devices 102, and/or other host devices 104 or servers 108. A host device 104 or server 108 may be configured according to its particular operating system, applications, memory, hard-ware, etc., and may provide various options for managing the execution of the programs and applications, as well as various administrative tasks. A host device 104 or server may interact via one or more networks with one or more other host devices 104 or servers 108, which may be operated independently. For example, host devices 104 and servers 108 operated by a separate and distinct entities may interact together according to some agreed upon protocol.

A detailed block diagram of the electrical systems of an example computing device (e.g., a client device 102, and a host device 104) is illustrated in FIG. 2. In this example, the computing device 102, 104 includes a main unit 202 which preferably includes one or more processors 204 electrically coupled by an address/data bus 206 to one or more memory devices 208, other computer circuitry 210, and one or more interface circuits 212. The processor 204 may be any suit-able processor, such as a microprocessor from the INTEL PENTIUM® family of microprocessors. The memory 208 preferably includes volatile memory and non-volatile memory. Preferably, the memory 208 stores a software program that interacts with the other devices in the system 100 as described below. This program may be executed by the processor 204 in any suitable manner. In an example embodiment, memory 208 may be part of a "cloud" such that cloud computing may be utilized by a computing devices 102, 104. The memory 208 may also store digital data indicative of documents, files, programs, web pages, etc. retrieved from a computing device 102, 104 and/or loaded via an input device 214.

The interface circuit 212 may be implemented using any suitable interface standard, such as an Ethernet interface and/or a Universal Serial Bus (USB) interface. One or more input devices 214 may be connected to the interface circuit 212 for entering data and commands into the main unit 202. For example, the input device 214 may be a keyboard, mouse, touch screen, track pad, track ball, isopoint, image sensor, character recognition, barcode scanner, microphone, and/or a speech/voice recognition system.

One or more displays 112, printers, speakers, and/or other output devices 216 may also be connected to the main unit 202 via the interface circuit 212. The display 112 may be a cathode ray tube (CRTs), a liquid crystal display (LCD), or any other type of display. The display 112 generates visual displays generated during operation of the computing device 102, 104. For example, the display 112 may provide a user interface, which will be described in further detail below, and may display one or more web pages received from a computing device 102, 104. A user interface may include prompts for human input from a user 114 including links, buttons, tabs, checkboxes, thumbnails, text fields, drop down boxes, etc., and may provide various outputs in response to the user inputs, such as text, still images, videos, audio, and animations.

One or more storage devices 218 may also be connected to the main unit 202 via the interface circuit 212. For example, a hard drive, CD drive, DVD drive, and/or other

5

storage devices may be connected to the main unit 202. The storage devices 218 may store any type of data, such as pricing data, transaction data, operations data, inventory data, commission data, manufacturing data, image data, video data, audio data, tagging data, historical access or usage data, statistical data, security data, etc., which may be used by the computing device 102, 104.

The computing device 102, 104 may also exchange data with other network devices 220 via a connection to the network 106. Network devices 220 may include one or more servers 226, which may be used to store certain types of data, and particularly large volumes of data which may be stored in one or more data repository 222. A server 226 may include any kind of data 224 including databases, programs, files, libraries, pricing data, transaction data, operations data, inventory data, commission data, manufacturing data, configuration data, index or tagging data, historical access or usage data, statistical data, security data, etc. A server 226 may store and operate various applications relating to receiving, transmitting, processing, and storing the large volumes of data. It should be appreciated that various configurations of one or more servers 226 may be used to support and maintain the system 100. For example, servers 226 may be operated by various different entities, including automobile manufacturers, brokerage services, automobile information services, etc. Also, certain data may be stored in a client device 102 which is also stored on the server 226, either temporarily or permanently, for example in memory 208 or storage device 218. The network connection may be any type of network connection, such as an Ethernet connection, digital subscriber line (DSL), telephone line, coaxial cable, wireless connection, etc.

Access to a computing device 102, 104 can be controlled by appropriate security software or security measures. An individual users' 114 access can be defined by the computing device 102, 104 and limited to certain data and/or actions. Accordingly, users 114 of the system 100 may be required to register with one or more computing devices 102, 104. For example, registered users 114 may be able to request or manipulate data, such as submitting requests for pricing information or providing an offer or a bid.

As noted previously, various options for managing data located within the computing device 102, 104 and/or in a server 226 may be implemented. A management system may manage security of data and accomplish various tasks such as facilitating a data backup process. A management system may be implemented in a client 102, a host device 104, and a server 226. The management system may update, store, and back up data locally and/or remotely. A management system may remotely store data using any suitable method of data transmission, such as via the Internet and/or other networks 106.

FIGS. 3A and 3B provide block diagrams, each showing an example automobile transaction network structure 300. As illustrated in FIG. 3A, the example automobile transaction network structure 300 includes an automobile market information processing system 302, a consumer interface 304, a dealer interface 306, and a manufacturer interface 308. The example automobile market information processing system 302 may be implemented on one or more host devices 104 accessing one or more servers 108, 226. In an example embodiment, the automobile market information processing system 302 includes a database system 310, a recommendation engine 312, a vehicle identification number processor 314, and an interface generation unit 316. A user 114 may be a consumer, a dealer, or a manufacturer that interacts with the consumer interface 304, dealer interface

6

306, or manufacturer interface 308, respectively. A database system 310 may include a wide variety of automobile market data. A recommendation engine 312 may provide recommendations for consumers, dealers, and manufacturers. A vehicle identification number processor 314 may be used for making requests regarding specific automobiles and automobiles with specific sets of features. For example, a vehicle identification number processor 314 may determine a specific set of features that a specific car has based on a picture of that specific car's vehicle identification number. Interface generation unit 316 may provide, for example, HTML files which are used at the consumer interface 304, dealer interface 306, and manufacturer interface 308 interface to provide information to the users 114. It should be appreciated that the consumer interface 304, dealer interface 306, and manufacturer interface 308 may be considered to be part of the automobile market information processing system 302, however, for discussion purposes, the consumer interface 304, dealer interface 306, and manufacturer interface 308 may be referred to as separate from the automobile market information processing system 302.

For example, a user 114 may interact with a consumer interface 304 to research new or used automobiles the user 114 is interested in buying and/or selling. For example, a consumer may be looking for a four door sedan with specific features, including a global positioning system (GPS), a sunroof, tinted windows, rated for at least thirty miles per gallon, four wheel drive, etc. The consumer may interact with the consumer interface 304 by inputting required and/or desired features, monthly budget or full price, etc. The consumer interface 304 may provide a wide variety of features and specifications which the consumer may choose from in providing a request. Based on the information put into the consumer interface 304 from the consumer, the consumer interface 304 may provide one or more reports or offers to the consumer. As will be discussed in further detail below, the information provided by the consumer interface 304 may include current market prices for automobiles, including information relating to additional features, and may include information on specific automobiles, for example, which may be en route to a dealer near the consumer's present location or may be already owned by the consumer. The automobile market information processing system 302 may process data received by the consumer interface 304, as well as the dealer interface 306 and/or the manufacturer interface 308, to respond to a request from a consumer. For example, data from database system 310 may be queried for use in a report, or a recommendation may be provided by recommendation engine 312 according to the consumer request and current market data. The automobile market information processing system 302 may integrate data received from consumer interface 304, dealer interface 306, and manufacturer interface 308 to provide current and accurate information relating to the automobile market.

It should be appreciated that the consumer interface 304 may be specific to one particular manufacturer or may provide information for automobiles manufactured by multiple different manufacturers. For example, a consumer interface 304 may be a website with information for many manufacturers. For example, the consumer interface 304 may access or link to the manufacturer specific websites (e.g., Ford), particularly with regard to new automobile information, but also for used automobile information. Also, for example, a consumer interface 304 may be implemented as an automobile manufacturer's website. Typically, a manufacturer's website may provide consumers with a catalog like feature that provides information on different automo-

US 10,796,362 B2

7 8

bile models with any available options or features. For example, a manufacturer website may allow a consumer to select options that are desired to "build" a particular new automobile, and may provide price comparisons using suggested retail prices, which may consumers use for initial research into what pricing the dealer may offer for a particular automobile with a particular feature set. Also, typically, the consumer may enter information, including, for example, name, an address or zip code, and telephone number. This information may be passed on from the manufacturer to a nearby dealer and/or nearby dealer information may be provided to the consumer (e.g., the dealer in or nearest to the consumer's entered zip code). Accordingly, the dealer may contact the consumer, or the consumer may inquire with the dealer, regarding the specific automobiles available on that dealer's lot and particular pricing being offered, etc. In many cases, consumers may not inquire with dealers that the manufacturer may recommend, and similarly, dealers may not diligently follow up with consumers that have an interest in purchasing an automobile. Further, it should be appreciated that the information provided via a consumer interface 304 and/or a manufacturer website may be very useful to consumers. For example, in the past, dealers often provided brochures with all the information on a manufacturer's available car models, including all the features and options information. However, dealers typically do not provide comprehensive information brochures, which may be relatively expensive to produce, and rather, that information is typically located on a manufacturer website and/or a consumer interface 304. It should also be appreciated that information on a manufacturer website and/or a consumer interface 304 may be directed to both new and used automobiles. For example, historical and statistical information which demonstrates favorable safety ratings, quality and reliability data, low maintenance costs, low insurance prices, low emissions, high gas mileage, etc. based on specific models for specific years, and/or groups of models and years may be provided on a manufacturer website and/or a consumer interface 304.

Accordingly, the consumer interface 304 may provide a wide range of information, for example, based on any searches or queries performed by a user 114. In an example embodiment, based on a user search or request for a response, the consumer interface 304 will display a quality index or value index based on normalized calculations for an automobile. The recommendation engine 312 may provide recommendations to a consumer based on the current automobile market data stored in the automobile market information processing system 302. For example, metrics on gas mileage, emissions, operating and maintenance costs, safety ratings, etc. may be benchmarked against comparable automobiles of the same and different manufacturers. Similar purchase options to a specific search may also be provided, based on feature matching, price range, consumer popularity, etc. Information including price ranges, including MSRP, invoice prices, inventory levels, the user's 114 credit ratings (e.g., FICO score), may be provided which may include monthly payment estimates or projections. It should be appreciated that such data may be provided for both new and used automobiles. For example, a financing calculator may help a user 114 determine what financing rate is appropriate for an automobile purchase. It should be appreciated that dealers may mislead consumers into believing that a higher financing rate will be required to secure a loan. Further, for example, a lease vs. buy calculator may be provided which may use current market data including prices, interest rates, incentives, estimated mileage per year,

etc. for providing an analysis for a particular consumer regarding purchasing or leasing. Also, the consumer interface 304 may provide a purchase checklist, for example, of ten steps to buying a car. A qualitative checklist may allow a user to ask the right questions and get the right answers from a dealer. Additional tips may be provided, such as a list of products or services dealers may attempt to sell to a consumer with an analysis of the value of these products or services and a recommendation to accept or decline these dealer offers. Further, beyond analysis relating to automobiles, additional analysis or reports may be provided, for example, relating to dealer reviews, other supplemental products, financial entities that may provide financing, etc. For example, dealer reviews may provide a consumer with information the consumer may use in addition to automobile pricing and delivery options. Moreover, the consumer interface 304 may provide a wide variety of useful information to a consumer, for at home research and preparation, and/or in a dealer location while shopping as a negotiating tool that may provide confirmation on pricing, useful tips, and the like. As will be discussed in FIG. 3B in further detail below, the consumer interface 304 may include a used automobile seller interface 318 and a used automobile buyer interface 320.

In an example embodiment, a dealer interface 306 may provide a user 114, such as a dealer employee, information relating to the current automobile market. The dealer interface 306 allows a dealer to interact with automobile market information processing system 302 to provide the dealer with a wide variety of information, including, for example, current market pricing. Other automobile market information a dealer may receive on a dealer interface 306 includes information relating to lot inventory, turnover rates, automobile transportation and/or shipping costs, incentives, and various ratings, such as ratings relating to quality, safety, insurance, a consumer credit score, dealer ratings, residual or resale values, etc. A dealer may input information into dealer interface 306 relating to sales data, including current pricing offered, special sales offers, actual transaction data, inventory data, etc. In an example embodiment, the dealer may provide information through dealer interface 306 which will be used by automobile market information processing system 302 to prepare reports or offers to consumers and/or manufacturers. It should be appreciated that a dealer is typically a franchise entity, while a distribution location may not be a franchise entity. For brevity, throughout this specification, the term dealer may be used to describe both franchise entity dealers and non-franchise entity distribution location. Accordingly, as used in this disclosure, the term dealer does not indicate whether an entity is a franchise entity. Moreover, a franchise dealer or a non-franchise distribution location may utilize a dealer interface 306 as described herein.

In an example embodiment, a manufacturer interface 308 may provide a user 114, such as a manufacturer employee, information relating to the current automobile market, including consumer requests. For example, an manufacturer interface 308 may provide a manufacturer a request received from a consumer interface 304. Additionally, the manufacturer interface 308 may provide information such as a report that allows the manufacturer to provide a response to the requesting consumer. A report may include information from database system 310 relating to current market pricing, recent sales figures and trends, current manufacturer incentives, current inventory, including dealer inventory, inventory in transit, and/or build times or lead times for a desired automobile, etc. The manufacturer may use this information

US 10,796,362 B2

9 10

to provide a response to a consumer request. The manufacturer may provide the manufacturer interface **308** with information to provide a confirmation, a verification, or an offer to a consumer via consumer interface **304**. For example, a confirmation number associated with the particular consumer request may be provided for the consumer. Also, a recommendation may be provided from the recommendation engine **312** to the manufacturer in relation to automobile pricing, responding to a specific request, manufacturer incentives, inventory management, production schedules, shipping schedules, etc. It should be appreciated that a manufacturer may be referred to as an OEM or original equipment manufacturer. Further, it should be appreciated that a manufacturer may include various related affiliate entities all doing business as, or operating under, the same manufacturer name. For example, a manufacturer typically may include a manufacturing company (e.g., operating the manufacturing plant), a sales company (e.g., operating automobile sales activities), and a captive finance company (e.g., operating financing and leasing activities). The manufacturer interface **308** may provide a manufacturer with a real-time lens into the automobile market which may allow the manufacturer to adjust production schedules, pricing plans, marketing activities, etc., which may provide a significant advantage for manufacturers.

As illustrated in FIG. 3B, a consumer interface **304** may include a used automobile seller interface **318** and a used automobile buyer interface **320**. The used automobile seller interface **318** may be used by consumer sellers to sell used automobiles, while the used automobile buyer interface **320** may be used by consumers to buy used automobiles. It should be appreciated that consumers may be able to access both interfaces **318** and **320** from consumer interface **304**. In an example embodiment, the used automobile seller interface **318** and a used automobile buyer interface **320** may be integrated within a single website or application, or for example, may be implemented as distinct websites. Similarly, in an example embodiment, a used automobile buyer interface **320** may be integrated with features of a consumer interface **304** for searching both new and used automobiles for purchase, or new and used automobiles may not be simultaneously searchable on a particular implementation of a consumer interface **304**. As will be discussed further below, a used automobile seller interface **318** may be used by a consumer seller of a specific used automobile to receive information on the specific automobile and request bids for the specific automobile. Similarly, a used automobile buyer interface **320** may be used for used automobile buyers to receive information on a used automobile and place a bid on that specific automobile.

It should be appreciated that, for example, a consumer seller of a used automobile may be considered different than a dealer seller of a used automobile in some respects. For example, a consumer seller of a used automobile is often selling through different channels, such as offering for sale in classified advertisements versus from a dealer lot. It should be appreciated that such differences may be relevant to the ability to maximize the value of a sale or purchase of a used automobile. Accordingly, where appropriate, the present disclosure may distinguish a consumer seller from a dealer seller, or distinguish a consumer buyer from a dealer buyer. Also, as discussed in further detail below, a manufacturer off-lease seller of a used automobile may also be considered different from a consumer seller and/or a dealer seller.

A dealer interface **306** may include a used automobile buyer interface **322**. For example, a typical dealer may use a dealer interface **306** primarily for facilitating sales of new and used automobiles, however, the dealer interface **306** may also be used to facilitate purchasing used automobiles. For example, a used automobile buyer interface **322** may be used by dealers similarly to the way that the used automobile buyer interface **320** may be used by consumers. It should be appreciated that in an example embodiment, the used automobile buyer interfaces **320**, **322** may be similar or the same, and/or may integrated as part of single website or application. In an example embodiment, a dealer may use the used automobile buyer interface **322** to facilitate bringing a consumer in to purchase a new automobile based on providing a competitive bid to purchase a used automobile as a trade in.

A manufacturer interface **308** may include a used automobile off-lease interface **324**. For example, a manufacturer may use a manufacturer interface **308** primarily for facilitating sales of new automobiles, however, the manufacturer interface **308** may also be used to facilitate selling off-lease automobiles which have been returned by a consumer lessor whose lease is expiring. For example, an off-lease seller interface **324** may be used by a manufacturer, typically, a captive finance company of the manufacturer, similarly to the way that the used automobile seller interface **318** may be used by consumers. It should be appreciated that, a manufacturer off-lease seller may have limited options to sell a used off-lease automobile and may have time constraints that are may be typically imposed on a consumer seller of a used automobile. Typically, an off-lease automobile may be dropped off by a consumer lessee at any one of a variety of dealer locations. The manufacturer lessor may then wish to sell the used off-lease automobile, however, the dealer where the off-lease automobile was dropped off may have a significant bargaining advantage to purchase that automobile, as the manufacturer may need to sell the off-lease automobile quickly and may have limited options. Typically, the dealer may not offer the manufacturer off-lease seller full market value for the off-lease automobile. It should be appreciated that the manufacturer off-lease seller may transport the car to an auction in an attempt to obtain a higher price. However, transportation costs, auction fees, and delay in selling the off-lease automobile may cause the manufacturer off-lease seller to accept less than market value for the off-lease automobile from the dealer, or otherwise not maximize the value of the off-lease automobile. For example, typically, an off-lease automobile sold at auction for near or even above the current market value is significantly offset by transportation costs and auction fees.

The off-lease seller interface **324** may provide a manufacturer off-lease seller with leverage, not only through the ability to obtain bids to purchase the off-lease automobile, but through the ability to determine the number of matches or search hits for an off-lease automobile. The dealer that has the off-lease automobile may know that the manufacturer may have the ability to track searches for the off-lease automobile performed by consumers and/or other dealers. The manufacturer off-lease seller may provide the dealer in possession of an off-lease automobile with matches and/or bids, which may provide the dealer with firm evidence of current demand or interest in the off-lease automobile. The dealer may be able to use this information to determine an appropriate price, and possibly even more profitably than the manufacturer. Accordingly, a dealer may often be inclined to make a significantly more competitive bid for an off-lease automobile. It should be appreciated that the manufacturer may use the off-lease seller interface **324** to identify in-market buyers, and even without receiving bids from those

US 10,796,362 B2

11 12

buyers, the manufacturer's bargaining power may improve, resulting in a greater value for off-lease sales.

Accordingly, information may be provided to the automobile market information processing system **302** from consumers, dealers, and manufacturers with a very high degree of granularity, as every transaction that occurs and even every request or search may be stored and used by the automobile market information processing system **302**. This allows the automobile market information processing system **302** to use the most current automobile market data to provide information to consumers, dealers, and manufacturers. It should be appreciated that market prices can change relatively quickly, particularly when major events drive consumer behavior or manufacturer production, such as natural disasters. Accordingly, reports and recommendations provided by the automobile market information processing system **302** may be highly accurate, reliable, and sensitive to market changes.

It should be appreciated that the users **114** of the automobile market information processing system **302**, including consumers, dealers, and manufacturers, and buyers and sellers of new and used automobiles, may be required to agree to and/or execute a terms of use agreement or terms of service agreement. Various forms of enforcing the agreement may be implemented, including a transaction deposit policy, which may require a deposit or a credit card hold, or the like, and a standard schedule of fees or default payment schedule for infractions such as improper condition of an automobile, delay in delivery, etc. Accordingly, all parties may be protected from another party breaching the agreement.

It should be appreciated that certain functions described as performed, for example, at automobile market information processing system **302**, may instead be performed locally at consumer interface **304**, dealer interface **306**, and manufacturer interface **308**, or vice versa. Further, in certain cases, tasks may be performed using consumer interface **304**, dealer interface **306**, and manufacturer interface **308** or, for example, performed in person, such as a consumer signing documents at a dealer location, or a dealer communicating with a manufacturer using a telephone. It should be appreciated that the consumer interface **304**, dealer interface **306**, and manufacturer interface **308** may be implemented, for example, in a web browser using an HTML file received from the automobile market information processing system **302**. In an example embodiment, the consumer interface **304**, dealer interface **306**, and manufacturer interface **308** may be located on a website, and may further be implemented as a secure website. Also, consumer interface **304**, dealer interface **306**, and manufacturer interface **308** may require a local application, for example, which a manufacturer or dealer may pay for to have access to, for example, information from the automobile market information processing system **302** such as requests from consumers.

FIG. **4** is a flowchart of an example process **400** for facilitating a used automobile transaction. Although the process **400** is described with reference to the flowchart illustrated in FIG. **4**, it will be appreciated that many other methods of performing the acts associated with the process **400** may be used. For example, the order of many of the blocks may be changed, certain blocks may be combined with other blocks, and many of the blocks described are optional.

The example process **400** for facilitating a used automobile transaction may allow users **114** to efficiently sell and purchase automobiles. The example process **400** may begin with automobile market data including at least pricing data is stored in a database system (block **402**). For example, automobile market data from dealers, consumers, and manufacturers regarding pricing, inventory, insurance information, quality ratings, safety ratings, and other ratings is collected and stored in a database. For example, inventory data may include data regarding off-lease automobiles, including scheduled drop off dates of automobiles with expiring leases. In an example embodiment, a wide variety of data is stored in a database system **310**. Automobile market data may include various relevant ratings, reports, awards, or other information, including quality information, safety information, insurance information, consumer credit information, dealer rating information, incentive information, residual value information, and/or any other data which may be relevant to consumers. For example, ratings data may include information from the National Highway Traffic Safety Administration (NHTSA), the Environmental Protection Agency (EPA), and/or the Insurance Institute for Highway Safety (IIHS). The data may include information from a consumer interface **304**, such as data in consumer searches or requests, information from a dealer interface **306**, such as currently offered dealer pricing, transaction data for finalized sales, current inventory data, transport or shipping costs, and information from a manufacturer interface **308**, such as current manufacturer prices and suggested pricing, manufacturer incentives, and current inventory including finished inventory on hand, production scheduling, shipment scheduling, inventory in transit, and manufacturing lead times. The automobile market data may be comprised solely of information received from the consumer interface **304**, dealer interface **306**, and manufacturer interface **308**, or may include additional information received from other sources, for example, industry analysts, consumer reports groups, government agencies, etc. It should be appreciated that various methods of storing the automobile market data may be employed according to the system requirements. For example, database system **310** may be organized according to different manufacturers or dealers, automobile make and model, different information categories (e.g., suggested pricing, market prices, production, shipping, lot inventory), etc., and may consist of one or more databases on one or more servers **108, 226** which may be remotely located from each other and/or a host device **104** of the automobile market information processing system **302**. As will be discussed further below, the automobile market data may be continually updated as new data is provided to the automobile market information processing system **302**.

The automobile market data may be used by any or all parties involved in a used automobile transaction, including used automobile sellers including consumer sellers and manufacturer off-lease sellers, and used automobile buyers including consumer buyers and dealer buyers. In the example process **400**, as discussed further below, the used automobile seller described by way of example as a consumer seller. It should be appreciated that the example process **400** may work similarly or the same for a manufacturer off-lease seller. In an example embodiment, the consumer used automobile seller interface **318** and manufacturer off-lease seller interface **324** may be provided as a combined interface. Certain aspects of the disclosed example process **400** may be of greater or lesser advantage to a manufacturer off-lease seller compared with a consumer seller. For example, consumer sellers typically sell used automobiles infrequently, while manufacturer off-lease sellers may be selling thousands of used off-lease automobiles each month. Accordingly, the goals of the user **114** may vary between consumer sellers and manufacturer off-lease sellers.

US 10,796,362 B2

**13**

Certain notable aspects that may be distinguishable between a consumer seller and manufacturer off-lease seller will be discussed below.

The example process **400** continues with a consumer seller providing a request for a response (block **404**). For example, a used car seller takes a picture of the vehicle identification number (VIN) of a used car and fills in price parameters and other information into a mobile application to receive a response based on current market data. In an example embodiment, the seller's request may be transmitted from automobile seller interface **318**, **324** via the internet to the automobile market information processing system **302**. For example, using an application stored on a mobile device **103**, the used car seller takes a picture of the VIN on the used car and fills in a minimum bid price, delivery parameters, etc. The seller's parameters may specify a pickup location by distance from an address, an area code, etc., which allows for matching the seller with buyers that are in-market. The picture of the VIN may be processed using optical character recognition, which allows the automobile market information processing system **302** to determine the make and model of the car, along with various other characteristics of the car. Also, for example, the used car seller may take a picture of the odometer, and the mileage may be determined using optical character recognition. It should be appreciated that the VIN may include human readable characters, a bar code, or any other graphical or machine readable information which acts as a vehicle identification number.

Also, the used car seller may input into a mobile application or website a wide variety of additional information about the used car. For example, pictures of the used car may be uploaded with the request. In an example embodiment, pictures of the exterior, interior, dashboard, and/or odometer may be provided. Also, for example, service records, ownership records, and other documents or information may be included with a request. Further, a written description of the car may be provided. Accordingly, because the used car seller can provide information such as pictures, in addition to information which the seller may not have access to, such as the original manufacturer specifications of the used car, potential buyers may have access to a great deal of information on the used car. Further, in an example embodiment, a mobile application may include the geolocation of a used car seller, so the seller does not need to enter such information. Accordingly, the buyer may perform research, for example, while at home or while shopping at a dealer location. It should be appreciated that certain used car buyers may be highly interested in the geolocation of the consumer seller. For example, a dealer may find the consumer seller's geolocation to be more important than a consumer buyer, because a dealer may require a minimal cost for picking up a car to ensure profitability, and to optimize the opportunity for creating a new customer relationship. Similarly, certain used automobile sellers may be very interested in the geolocation of the used automobile buyer. For example, a manufacturer off-lease seller may have a high interest in determining the amount of in-market interest or demand for an off-lease automobile.

In an example embodiment, a manufacturer off-lease seller may provide a request for a response for an automobile that will be dropped off by a consumer lessee in the near future. For example, a manufacturer user **114** may input a VIN into off-lease seller interface **324** by typing, speaking, or providing an image of the VIN. The manufacturer off-lease seller may provide a parameter that the used off-lease automobile will be available only after a certain date. The

**14**

manufacturer off-lease seller may find that providing a request for a response prior to the consumer lessee actually dropping off an off-lease automobile may significantly improve the value of off-lease automobiles. It should be appreciated that the dealer where the consumer lessee drops off the off-lease automobile may be bargaining without any particular advantage because the manufacturer off-lease seller may have multiple interested automobile buyers that, based on search parameters, have received the off-lease automobile as a match, and/or bids from used automobile buyers.

Used car buyers may perform a search with used automobile buyer interfaces **320**, **322**, and may typically include parameters limiting the search to a specific automobile type, make, or model, certain options or features, a price range, and a pickup location or area. Further, for example, the buyer may take a picture of a VIN anywhere or manually type in a VIN number, including at automobile trade shows, mall displays, or anywhere new or used cars are for sale. The buyer may even take a picture of a car parked in the street as the buyer walks down the street. Any request or query communicated from the consumer interface **304** may be stored, for example, in database system **310**, thereby updating the automobile market information processing system **302** with current automobile market data.

The example process **400** may continue with providing automobile market data to used automobile buyers based on the consumer seller request (block **406**). For example, a group of consumers and dealers receive a real-time report including local used car sales data, inventory data, quality and safety ratings data, insurance data, and gas mileage data of the specific used car which is identified based on the VIN. The group of consumers and dealers that receive a real-time report may be based on prior searches conducted by consumers on used automobile buyer interface **320** and searches conducted by dealers with used automobile buyer interface **322**. In an example embodiment, a report may include quality information, safety information, insurance information, recall information, EPA gas mileage and emissions information, consumer credit information (e.g., buyer FICO score), dealer rating information, incentive information, residual value information, and/or any other data which may be relevant to consumers and/or dealers. In an example embodiment, a report may include a specific history information for the specific used car, such as a CARFAX report. The request and/or the report may be provided in real-time and may also provide real-time data. Data reported based on a real-time updates in the automobile market information processing system **302** may provide significant advantages, for example, when pricing conditions may change quickly due to unforeseen market conditions. The recommendation engine **312** may provide recommendations to a used automobile buyer based on the current automobile market data. For example, a report may indicate various estimated sales probabilities for different prices that the used automobile buyer may offer or bid. In an example embodiment, an estimated sale price or range may be provided. For example, a probability analysis may be provided with prices and corresponding probabilities may be estimated as, e.g., 80% chance to purchase at $6,000; 60% chance to purchase at $5,500; 30% chance to purchase at $5,000; 10% chance to purchase at $4,500. Such information may be illustrated in various ways, such as a bell curve graph or a chart. Further, for example, the recommendation engine may provide daily suggestions (e.g., a deal of the day) for dealers and/or consumers. Consumers may use such suggestions to save money or get a better value on a used car purchase by buying

US 10,796,362 B2

15                                                          16

from another consumer rather than a dealer. Dealers may use such suggestions to purchase used cars at good deals, and/or to attract consumers to visit the dealer in person or online, as well as prepare responses or bids to other consumer requests. Dealers or consumers may customize the used automobile buyer interface **320, 322** to provide information in a pre-specified manner to suit the particular needs of the specific dealer or consumer. In an example embodiment, a manufacturer off-lease seller may receive automobile market data including inventory information including data regarding off-lease cars which have been dropped off at dealer locations and cars which will soon be coming off-lease. Further, dealers and/or consumers may be able to receive information regarding off-lease cars as well. For example, information may include a specific automobile identified by a VIN with an expected drop off location and date based on a lease expiration.

A bid to purchase the used automobile from the consumer seller is requested from used automobile buyers (block **408**). For example, a group of consumers and dealers within a certain radius of the used car seller location may receive a bid request based on used automobile buyer searches via used automobile buyer interfaces **320, 322**. Each used automobile buyer's bid may include, for example, a price and a delivery option or delivery suggestion. The used automobile buyer interfaces **320, 322** may provide for simple input of necessary and optional data. Further, a used automobile buyer's bid may contain certain limitations, restrictions, or conditions. For example, a dealer may provide a bid with the condition that a new car be purchased and the used car be traded in at the bid price.

In an example embodiment, the request may provide one or more options, products, services, or add-ons for a used automobile buyer to select from. For example, used automobile buyers may be able to select financing options, warranties, extended service contracts, insurance plans, or other hard add accessories. These selectable options may be offered directly from the used automobile seller or may be offered through the automobile market information processing system **302**. Accordingly, a seller may not be offering any options for a buyer to select, but the system may automatically provide the option to purchase further add-ons. In an example embodiment, automobile market information processing system **302** may provide for third party providers of add-ons to provide live auction bids for a used automobile buyer to select for inclusion in a bid. Accordingly, for example, several insurance companies may provide a bid for key insurance, or several financial companies may provide bids for a loan. It should be appreciated that certain bids may depend on the particular buyer, so for example, a buyer's credit or driving record may cause different buyers to receive different third party bids for add-ons. For example, a particular buyer may be able to increase a bid to purchase a used automobile if third party add-ons are particularly advantageous, which may benefit a consumer seller or manufacturer off-lease seller. For example, a buyer may receive a better than expected interest rate and insurance price, and therefore be able to offer an additional $1,000 to the seller, while staying within the buyer's predetermined monthly budget. It should be appreciated that third parties may include dealers which may be otherwise involved in a transaction. Also, in an example embodiment, the automobile market information processing system **302** may provide at no charge to the buyers or sellers, certain add-ons, such as a limited thirty day warranty. Accordingly, the automobile market information processing system **302** may gain trust from buyers even if the buyers

generally do not trust the sellers. It should also be appreciated that a buyer may not select any add-ons offered by third parties and/or the automobile market information processing system **302**. A used automobile seller may have no interest in whether a buyer selects any add-ons, or the seller may receive additional compensation if an add-on is selected, so a buyer selection of add-ons may or may not affect a seller's value associated with the buyer's bid.

One or more buyer bids are provided to the consumer seller (block **410**). For example, several consumers and dealers provide bids based on current pricing data, options information of the specific used car, and potential pickup locations, so several different prices and delivery options may be available to the used car seller via the used automobile seller interface **318**. Typically, the bid will include at least a specified price and pickup time and location. In an example embodiment, a used car seller that has taken a picture of a VIN with a mobile device and entered some basic information such as an odometer reading may receive used car buyer bids within minutes or seconds on the mobile device. Accordingly, the bids may be used in real-time as the consumer seller may be actively selling a used car or shopping for a new or used car, for example, on a dealer lot. Typically, a pickup location will be at the consumer seller location, a consumer buyer location, or at a dealer lot or distribution location. In an example embodiment, the consumer buyer location may be determined using the geolocation of the buyer's mobile device **103**. It should be appreciated that some consumers may be flexible as to the delivery options and that some dealers may have multiple locations which could serve as a pickup location. In an example embodiment, the automobile market data may indicate that the particular used car that a consumer seller has requested bids for should be priced at, for example, $6,000. However, various factors may affect the bid or offer that a consumer or dealer may make for the specific used car. For example, for a consumer, personal preference for certain features or looks, convenience, insurance implications, gas mileage, and/or service records, may play a large role in pricing a bid above or below a suggested bid price. For example, for a dealer, the potential for forming a customer relationship, the value of potential other sales, add-on products, and/or services, or competition with other parties. All used automobile buyers that are interested may place a bid for a used car seller's consideration.

It should be appreciated that various alternative delivery options may be provided from several used automobile buyers' bids, for example, based on preferences or parameters indicated by the consumer seller of the used automobile. For example, the used automobile seller interface **318** may provide several different bids with different delivery options and prices to the used car seller, for example, a price of $6,000 to drop off the car at an out of state dealer the next day or a price of $5,500 to drop off the car at a local consumer buyer location in five days. For example, a consumer buyer may determine the cost of picking up the used car from the consumer seller and provide two pricing and delivery options, for example, $5,500 to pick up the used car from the consumer seller or $5,800 to have the used car delivered to the consumer buyer's home. For example, a manufacturer off-lease seller may review bid prices and delivery options on a number factors on used automobile seller interface **324**, but may be very interested in finding an in-market buyer to eliminate transportation costs. A manufacturer off-lease seller may often have somewhat different concerns than a consumer seller. For example, to meet a quarterly budget, a manufacturer off-lease seller may be

US 10,796,362 B2

17

primarily interested eliminating a high back log of off-lease cars even if selling cars at a significant discount is required.

Further, for example, used automobile buyers may use information such as ratings data to optimize their bids. For example, if gasoline prices are increasing, mileage ratings for a particular car may dictate increasing or decreasing a bid. If a vehicle has very good gas mileage, and gas prices are skyrocketing, that car may have an increasing demand as gas prices increase, or vice versa. Similarly, safety ratings of vehicles may be important to consumer demand if high profile problems have appeared for a particular automobile style, make, or model. As discussed above, various automobile market information may be used by a used automobile buyer including safety information, insurance information, consumer credit information, dealer rating information, incentive information, residual value information, and/or any other data which may be relevant.

The used automobile seller interface **318, 324** may organize used automobile buyer bids based on a variety of factors and may provide supplemental information. For example, certain buyer bids may be selected as the best options, all buyer bids may be summarized, various additional ratings, reviews, or popularity information, special offers, etc. may also be provided to a consumer along with any used automobile buyer bids. The recommendation engine **312** may provide recommendations to a consumer seller based on the current automobile market data. For example, of ten used automobile buyer bids provided with a response, three bids may be recommended, for example, as "Great Deals!" It should be appreciated that in some cases, a particular used car seller request may not return any buyer bids, for example, if the used car for sale is in low demand or a unique item with a limited market. Also, for example, if only one or two bids are received, the recommendation engine **312** may recommend that a consumer seller wait for a better bid because the bids provided are not competitive offers based on the current automobile market data stored in the database system **310**. Further, in an example embodiment, buyer bids may be organized according to distance to a pickup location, highest price, closest match to the consumer seller entered criteria, a normalized quality index or value index, etc. The consumer seller or manufacturer off-lease seller may be able to toggle between different viewing options for buyer bids.

Further, in an example embodiment, a consumer seller may be at a dealer lot (e.g., a Nissan dealer) and take a picture of a VIN on a used car (e.g., a Maxima), which the consumer seller intends to trade in. A bid from a competing dealer (e.g., a Toyota dealer) across the street may be received on the mobile device within seconds and include information for a competing trade in value, and may have further information relating to other new or used cars which may be intended to cause the consumer seller to go to the competing dealer, for example, including various price comparisons, gas mileage ratings, safety ratings, residual value, driving directions to the competing dealer, etc. Accordingly, a consumer seller may weigh the pros and cons of various used automobile buyer bids from consumers and/or dealers, based on delivery options, pricing, and any other relevant variants. Any bids communicated from used automobile buyer interfaces **320, 322** may be stored, for example, in database system **310**, to further update the automobile market information processing system **302** with current automobile market data.

The consumer seller selects a buyer bid including a price and a delivery option (block **412**). For example, the used car seller chooses to sell the used car based on the price and the pickup location of a consumer buyer bid. The seller may

18

select an offer with a specified price and delivery option on the used automobile seller interface **318, 324**. The used car seller may have been weighing two or more different delivery options, price differences, etc., based on the response(s) received through the used automobile seller interface **318, 324**. As noted above, the used automobile seller interface **318** may organize received bids and other helpful information in a variety of ways, which may make the information easier for a consumer seller to digest. It should be appreciated that a consumer seller will typically want to deliver a used car at a convenient location, often at or near the seller's home. Accordingly, used automobile buyers may attempt to provide delivery options tailored towards maximizing profit and convenience, while still providing a superior bid to other used automobile buyers. By providing multiple bids with different delivery options, the consumer seller may be allowed to make extra money or save time based on the seller's particular situation. It should be appreciated that the consumer seller selection of a bid may, for example, occur simultaneously with the consumer seller and used automobile buyer executing the sale or providing a deposit or down payment, or the like (see, e.g., block **414**). Accordingly, in an example embodiment, once a consumer seller or manufacturer off-lease seller selects a bid, the used automobile buyer has effectively purchased the car, and both parties do not need to worry about the other party backing out of the deal.

It should be appreciated that a consumer seller may not want to drive to a distant pickup location without first receiving some form of deposit, or likewise, a used automobile buyer may not want to go to a distant pickup location to without assurance that the used automobile will actually be available for pickup and in good working order. Likewise, a manufacturer off-lease seller may be concerned with obtaining maximum value for an off-lease automobile within the required time constraints, but transportation costs may be strictly budgeted. The automobile market information processing system **302** may accommodate for deposits to provide any reasonable or necessary assurances to both buyers and sellers. For example, the automobile market information processing system **302** may provide and/or require the use of a terms of service agreement, which the consumer seller or manufacturer off-lease seller and the used automobile buyer may sign and agree to the terms provided therein. For example, a credit card could be charged a default payment in the event that either party breaches the terms of service agreement. In an example embodiment, a schedule of various breaches may require different default payments, for example, if a buyer determines a headlight does not work, a standard $30 fee may be assessed from the consumer seller. Also, a variable default agreement may be based on a distance between a seller and a buyer, so that a party which travels a great distance may be compensated if the other party breaches the agreement. Also, for example, a time period for inspection may be specified in a request and/or a bid. A bid may be conditional based on one or more seller representations. Moreover, a terms of service agreement may provide assurances for any issues which may arise in the sale of a used car, and may provide one or more options based on a breach, including payment of fees or nullification of a bid acceptance and/or sale execution. Any consumer seller selections, counter offers, or additional requests or responses may be stored in database system **310**, as the communications are processed by automobile market information processing system **302**, providing further data updates. Accordingly, in an example embodiment, a consumer seller may select a bid in order to sell the used car, and

US 10,796,362 B2

19

20

that sale information may then be provided to another consumer searching for information regarding the same type of car with similar features, for example, the next day.

The consumer seller and the used automobile buyer execute the sale of the used automobile (block **414**). For example, the used automobile buyer electronically signs a contract and performs an electronic funds transfer or credit card payment. After a buyer bid is selected, an electronic contract may be prepared by the automobile market information processing system **302** and provided for the used automobile buyer who may e-sign the contract or other documentation as needed. Similarly, the consumer seller may e-sign the contract or other documentation as needed, either prior to selecting a bid, at the time of selecting a bid, or at a later time. A contract may be e-signed through the used automobile seller interface **318**, **324**, and the used automobile buyer interface **320**, **322**, respectively. In another example embodiment, paper copies of a contract may be signed, for example, after the used automobile buyer prints them or receives them through the mail. In an example embodiment, the used automobile buyer may provide cash or a paper check. It should be appreciated that the process of executing a contract may take some time. Also, it should be appreciated that, for example, the consumer seller selection of a bid discussed above (see, e.g., block **412**) may occur simultaneously with the consumer executing the sale. Once the sale is completed, the actual transaction data including the final sale price, may be provided to and stored in database system **310**. Accordingly, the automobile market information processing system **302** may be updated with current automobile market data from every step in the used car sales process between a consumer seller or manufacturer off-lease seller and a used automobile buyer. In an example embodiment, the updates provided to the automobile market information processing system **302** are provided in real-time, for example, data may be transmitted and processed within seconds or minutes. Further, for example, it should be appreciated that certain data may be provided to the automobile market information processing system **302** according to a batch processing schedule.

Next, the consumer seller makes the purchased used automobile available according to the consumer seller bid selection (block **416**). For example, the seller drives the used car to the pickup location if the pickup location is not the used car seller's location. It should be appreciated that the consumer seller or a manufacturer off-lease seller and the used automobile buyer may use a wide variety of locations as a pickup location, and may work out a delivery option which is convenient for both parties. A consumer seller may interact with the automobile market information processing system **302** using used automobile seller interface **318**, for example, to provide notification that a car is at the pickup location and ready for delivery. A manufacturer off-lease seller may interact with the automobile market information processing system **302** using used automobile seller interface **324**, for example, to provide notification that a car has been dropped off by a consumer lessee and is at the pickup location and ready for delivery to the buyer. Similarly, a notification may be sent via used automobile buyer interface **322**, **322** to the used car buyer that the used car is available for pickup at the specified location.

Finally, the used automobile buyer receives the purchased used automobile according to the consumer seller selected delivery option (block **418**). For example, the used car buyer receives the used car at the pickup location the same day the sale is executed. The used car buyer may pick up the car without ever having to talk to or negotiate, in person or over the telephone, with the consumer seller or manufacturer off-lease seller. For example, the used car buyer may arrive at the pickup location, show identification and provide a proof of purchase, and be provided the keys to the car by the seller. The parties may sign paperwork indicating or confirming the car has been picked up. Proof of purchase documentation may include any or all documents that are legally required for an automobile sale for a given jurisdiction, for example, the title, odometer statement, or any other document required by the Department of Motor Vehicles. For example, the consumer seller or manufacturer off-lease seller may be required to provide any legally required documents to fully execute and record the sale of the used car.

Further, in an example embodiment, a consumer seller or manufacturer off-lease seller may offer various insurance policies or service contracts to a used car buyer, for example, etch insurance, key insurance, gap insurance, or a ninety day warranty may be provided. For example, a consumer seller or manufacturer off-lease seller may purchase insurance through the automobile market information processing system **302** in placing a request for bids, which may increase interest from buyers. Also, for example, an insurance policy or service contract may be provided for a used car being sold at no charge to the consumer seller or manufacturer off-lease seller, for example, as a convenience to all users **114** using the disclosed system. For example, key insurance may be provided at no cost to both the consumer seller and the used car buyer. It should be appreciated that, for example, using options provided through the automobile market information processing system **302**, a consumer seller or manufacturer off-lease seller may sell or provide any add-on products or services that a dealer would typically offer or provide in the sale of a used automobile. Also, if the used automobile buyer is a dealer, additional products or services may be offered to the consumer seller at the time of pickup. For example, the dealer may offer new or used cars, including related financing options, warranties, service plans, insurance plans, and hard add accessories to the buyer, as discussed in further detail above.

Accordingly, it should be appreciated that consumers, manufacturers, and dealers, may receive significant benefits from the method of facilitating a used automobile transaction disclosed herein. Consumers that are selling and buying used automobiles may benefit from more competitive pricing, piece of mind knowing that a fair market price is being offered for prospective purchases or sales, and improved delivery options that allow the consumer to weigh the benefits and drawbacks of different delivery options, pricing, and other variables. In an example embodiment, consumers can view prices paid for comparable cars in specific locations based on the automobile market data in the automobile market information processing system **302**, for example, within a certain time frame such as one month and within a certain proximity to the consumer. Manufacturers selling off-lease automobiles may benefit from reduced transportation costs, saving auction fees, and an improved bargaining position with a dealer in possession of an off-lease automobile. For example, the ability to identify in-market buyers may be particularly advantageous to manufacturer off-lease sellers, which may be able to identify matching searches of in-market buyers. Also, dealers and/or various third parties may benefit from the opportunity to sell insurance, credit, service contracts, hard add accessories, and other add-ons with used automobiles. Moreover, various inefficiencies in the automobile industry may be minimized utilizing the presently disclosed system and method.

US 10,796,362 B2

21

22

FIG. **5** illustrates a block diagram of an example data architecture **500**. In the example data architecture **500**, interface data **502**, administrative data **504**, and automobile market data **506** interact with each other, for example, based on user commands or requests. The interface data **502**, administrative data **504**, and automobile market data **506** may be stored on any suitable storage medium (e.g., server **226**). It should be appreciated that different types of data may use different data formats, storage mechanisms, etc. Further, various applications may be associated with processing interface data **502**, administrative data **504**, and automobile market data **506**. Various other or different types of data may be included in the example data architecture **500**.

Interface data **502** may include input and output data of various kinds. For example, input data may include mouse click data, scrolling data, hover data, keyboard data, touch screen data, voice recognition data, etc., while output data may include image data, text data, video data, audio data, etc. Interface data **502** may include formatting, user interface options, links or access to other websites or applications, and the like. Interface data **502** may include applications used to provide or monitor interface activities and handle input and output data.

Administrative data **504** may include data and applications regarding user accounts. For example, administrative data **504** may include information used for updating accounts, such as creating or modifying consumer accounts and/or dealer accounts. Further, administrative data **504** may include access data and/or security data. Administrative data **504** may include a terms of service agreement. Administrative data **504** may interact with interface data in various manners, providing a user interface **304**, **306**, **308** with administrative features, such as implementing a user login and the like.

Automobile market data **506** may include, for example, executed sales data **508**, consumer data **510**, dealer data **512**, manufacturer data **514**, statistical data **516**, and/or historical data **518**. Executed sales data **508** may include actual negotiated prices for manufacturer and dealer sales, differences in list prices to negotiated prices, sales demographics, etc. Consumer data **510** may include consumer search activity, consumer requests and offers, consumer feedback, etc. Dealer data **512** may include dealer pricing, including list prices, sale prices for limited time dealer offers or deals of the day, negotiation information such as bottom line pricing, offers received, foot traffic activity, and dealer inventory data, including current on location data, automobile turnover rates, etc. Manufacturer data **514** may include manufacturer pricing, including suggested pricing, preferred dealer pricing, etc., manufacturer incentives including cash rebates, special lease rates, special APR rates, zero down offers, lifetime warranties, guaranteed trade-in offers, etc., and inventory information including dealer inventory, inventory by location, inventory in transit, manufacturing or production lead times or build times, production scheduling, shipping schedule, lease information, etc. Statistical data **516** may include information used for providing reports including graphs, forecasts, recommendations, calculators, depreciation schedules, tax information, etc., including equations and other data used for statistical analysis. Historical data **518** may include past sales data, such as historical list prices, actual sale prices, manufacturer and dealer margins, operating costs, service costs or profitability, loyalty information, etc. It should be appreciated that data may fall under one or more categories of automobile market data **506**, and/or change with the passage of time. For example, industry

analyst data may include historical data **518** and statistical data **516** relating to safety or quality reports, efficiency data, recall data, and the like for used automobiles, which may be organized or re-organized under various categories of automobile market data **506** as time passes or as supplemental data is provided to the automobile market information processing system **302**. It should be appreciated that a system administrator may load data into the automobile market information processing system **302** as it becomes available. For example, annual, quarterly, and/or monthly reports relating to safety, insurance, etc., may be input into automobile market data **506** on a regular basis. It should also be appreciated that automobile market data **506** may be tailored for a particular manufacturer and/or dealer, for example, a manufacturer may request that a specific type of data that is not normally stored or used be stored in the database system **310**. Accordingly, for example, customized reports may be provided to a manufacturer interface **308** using that specific data for the manufacturer, for example, relating to resale values of used automobiles.

The integration of the various types of automobile market data **506** received from the consumer interface **304**, dealer interface **306**, and manufacturer interface **308** may provide a synergistic and optimal resource for consumers, dealers, and manufacturers alike. In an example embodiment, a used automobile seller and a used automobile buyer may benefit greatly from using an application in a mobile device **103** to provide a request for buyer bids on a used automobile by taking a picture of the VIN of the used automobile, for example, using used automobile seller interface **318**, **324**. Used automobile buyers may search for used automobiles for sale by consumer sellers, for example, using used automobile buyer interface **320**. The used automobile buyers may receive intrabrand and/or interbrand seller request information in real-time. The intrabrand and interbrand information provided on the used automobile buyer interface **320** may allow the best automobile options for a particular consumer to be provided to that consumer, and may allow consumer sellers, manufacturer off-lease sellers, and dealers to compete with each other taking into account a greater amount of automobile market information, which may result in a more efficient automobile market. Consumers that are selling used automobiles and consumers that are buying used automobiles may similarly receive benefits from the presently disclosed system. Also, as discussed above, manufacturer off-lease sellers may benefit greatly from the presently disclosed system, for example, using bids and/or matches or search hits for an off-lease automobile to improve bargaining power with a dealer in possession of the off-lease automobile and other dealers and/or consumers.

Automobile market data **506** may be maintained in various servers **108**, in databases or other files. It should be appreciated that, for example, a host device **104** may manipulate automobile market data **506** in accordance with the administrative data **504** and interface data **502** to provide requests or reports to users **114** including consumers, dealers, and manufacturers, and perform other associated tasks. It should also be appreciated that automobile market data **506** represents automobile market information, and that these terms may be used interchangeably in this disclosure depending upon the context.

FIG. **6** is flow diagram illustrating an example process **600** for facilitating a used automobile transaction, according to an example embodiment of the present invention. Although the process **600** is described with reference to the flow diagram illustrated in FIG. **6**, it will be appreciated that many other methods of performing the acts associated with

23

the process **600** may be used. For example, the order of many of the blocks may be changed, certain blocks may be combined with other blocks, and many of the blocks described are optional.

In the example process **600**, data may flow between the automobile market information processing system **302** and a used automobile seller interface **318**, **324** and a used automobile buyer interface **320**, **322**, as discussed above based on used automobile seller and buyer interaction with the automobile market information processing system **302**. As discussed above, a used automobile seller interface **318** and used automobile buyer interface **320** may be included in a consumer interface **304**, a used automobile buyer interface **322** may be included a dealer interface **306**, and a used automobile seller interface **324** may be included in a manufacturer interface **308**. It should be appreciated that the automobile market information processing system **302** may update the automobile market information stored in the database system **310** when automobile market information is received from a buyer or seller, and/or a consumer, a dealer, a manufacturer, an industry analyst, and/or from any other information source. Accordingly, the automobile market information may remain current and/or provide sufficiently recent data for the benefit of consumers, dealers, and/or manufacturers.

The example process **600** may begin with a consumer seller or a manufacturer off-lease seller of a used automobile taking a picture of the VIN using a mobile phone application and entering in information such as pricing parameters (block **602**). The used automobile seller interface **318**, **324** may use OCR to determine and provide the VIN and pricing parameters to the automobile market information processing system **302** as a consumer seller request or a manufacturer off-lease seller request (block **604**). It should be appreciated that OCR may occur in the automobile market information processing system **302** or at the used automobile seller interface **318**, **324**. The automobile market information processing system **302** receives the seller request and prepares automobile market information based on the seller request (block **606**). The automobile market information processing system **302** may send a bid request and automobile market information based on the seller request to the used auto buyer interface **320**, **322** for one or more consumers and/or dealers (block **608**). It should be appreciated that while the seller request is automobile market information, typically, additional automobile market information would be provided with the seller request. For example, data relating to recent sales of similar used automobiles and/or comparable automobiles may be provided. In an example embodiment, a target price or "true" value of the used automobile, or an expected price range, may be provided. Also, for example, various gas mileage data, safety ratings, recall information, quality reports, estimated insurance costs, and the like may be provided. Further, add-on products or services, such as insurance, credit, warranties, service contracts, or hard add accessories, which may be determined based on a third party bidding process, may also be provided. One or more used automobile buyers, including consumers and/or dealers, receive the bid request and automobile market information, determine prices and delivery options for the used automobile using the automobile market information, and prepare and provide bids for the consumer seller or a manufacturer off-lease seller (block **610**). A buyer bid may be sent from the used automobile buyer interface **320**, **322** to the automobile market information processing system **302** for each consumer and/or dealer that wants to provide a bid (block **612**). The automobile market informa-

24

tion processing system **302** receives and processes buyer bids and prepares the bids and automobile market data for the consumer seller or manufacturer off-lease seller (block **614**).

The automobile market information processing system **302** may send buyer bids and automobile market information to the used automobile seller interface **318**, **324** (block **616**). It should be appreciated that automobile market information may be provided to the consumer seller or manufacturer off-lease seller before buyer bids are provided, and/or concurrently with buyer bids. The seller may receive the buyer bids and automobile market information and may select a bid including a delivery option based on the automobile market information (block **618**). The used automobile seller interface **318**, **324** may send to the automobile market information processing system **302** a selection of a bid indicating that the consumer seller or manufacturer off-lease seller wants to sell the used automobile based on the selected bid (block **620**). The automobile market information processing system **302** receives and processes the seller bid selection (block **622**). For example, the automobile market information processing system **302** may send the bid selection to the used automobile buyer interface **320**, **322** (block **624**). The used automobile buyer may receive the bid selection and coordinate a sale by, for example, setting up a pick up time and location for the used automobile at the seller location or the buyer location (block **626**). Also, for example, the automobile market information processing system **302** may provide contract or loan documents, collect a deposit or down payment, or the like, from the consumer seller, the manufacturer off-lease seller, and/or the used automobile buyer. As discussed above, in each of blocks **606**, **614**, and **622**, the automobile market information processing system **302** may update the automobile market information in the database system **310** based on the information received from the consumer, manufacturer, and/or dealer.

For exemplary purposes, the present disclosure discusses a various examples relating to a purchase of a used car. However, it should be appreciated that the disclosed system, methods, and apparatus may be advantageously used in relation to various used automobiles other than cars including, for example, trucks, vans, sport utility vehicles, jeeps, motorcycles, commercial vehicles, and/or automobiles that have a VIN and require a license plate to operate.

It will be appreciated that all of the disclosed methods and procedures described herein can be implemented using one or more computer programs or components. These components may be provided as a series of computer instructions on any conventional computer-readable medium, including RAM, ROM, flash memory, magnetic or optical disks, optical memory, or other storage media. The instructions may be configured to be executed by a processor, which when executing the series of computer instructions performs or facilitates the performance of all or part of the disclosed methods and procedures.

Further, it will be appreciated that the presently disclosed system, methods, and apparatus for performing used automobile transactions may be utilized in conjunction with other systems or methods. For example, the presently disclosed system, methods, and apparatus may be used in conjunction with the disclosure in the co-pending commonly-owned patent applications filed on Jul. 5, 2011, entitled "AUTOMOBILE TRANSACTION FACILITATION USING A MANUFACTURER RESPONSE," application Ser. No. 13/176,497, and entitled "AUTOMOBILE TRANSACTION FACILITATION BASED ON CUS-

US 10,796,362 B2

25                                                          26

TOMER SELECTION OF A SPECIFIC AUTOMOBILE," application Ser. No. 13/176,525, the entire contents of each of which is incorporated by reference herein, and in an example embodiment, the features of which may be combined with the features of the present disclosure.

It should be understood that various changes and modifications to the example embodiments described herein will be apparent to those skilled in the art. Such changes and modifications can be made without departing from the spirit and scope of the present subject matter and without diminishing its intended advantages. It is therefore intended that such changes and modifications be covered by the appended claims.

The invention is claimed as follows:

1. A method comprising:
receiving, via a used automobile seller interface, a first request for a response regarding a first used automobile, the first request made by a used automobile seller located at a first location and including a vehicle identifier and geolocation information of the first used automobile;
determining, based on the geolocation information, that the first used automobile is located at the first location;
generating, based on the determined first location, an in-market used automobile buyer area;
determining that at least one used automobile buyer is located within the in-market used automobile buyer area;
receiving, via a used automobile buyer interface, a first bid from a first used automobile buyer located at a second location within the in-market used automobile buyer area;
generating, based on receiving the first bid, driving directions between the first location and the second location; and
providing, via the used automobile seller interface, the first bid including at least a price for the first used automobile and the driving directions between the first location and the second location.

2. The method of claim 1, wherein the used automobile seller interface is a manufacturer off-lease seller interface, further comprising:
receiving, via the manufacturer off-lease seller interface, a manufacturer used automobile seller selection of the first bid, wherein the manufacturer used automobile seller selection indicates a manufacturer used automobile seller intention to sell the first used automobile based on the first bid to the first used automobile buyer.

3. The method of claim 1, wherein the first request is made by the used automobile seller using a mobile device which takes a picture of a vehicle identifier, and the vehicle identifier is recognized using optical character recognition.

4. The method of claim 1, wherein the first request is made by the used automobile seller using a mobile device including a microphone, and the vehicle identifier is input via the microphone, and the vehicle identifier is recognized using speech recognition.

5. The method of claim 1, further comprising storing, on a computer readable medium, automobile market data that is representative of recent automobile market characteristics, wherein the automobile market data is based on real-time automobile market data.

6. The method of claim 1, wherein the first request includes a picture of at least one of the exterior of the automobile, the interior of the automobile, the dashboard of the automobile, the odometer of the automobile, service records of the automobile, and ownership records of the automobile.

7. The method of claim 1, further comprising storing, on a computer readable medium, pricing data including used automobile data and new automobile data, including actual prices of executed transactions, dealer listing prices, dealer sale prices, manufacturer incentives, dealer bids, consumer bids, and consumer pricing parameters.

8. The method of claim 1, wherein an add-on, including at least one of insurance, financing, a service contract, a warranty, and a hard-add accessory, is provided by a third party to the first used automobile buyer with the first request, via the used automobile buyer interface, wherein the third party is different from the used automobile seller and the first used automobile buyer.

9. The method of claim 8, wherein the add-on is selected for inclusion in the first bid by the first used automobile buyer.

10. The method of claim 1, further comprising providing second driving directions between the first location and a third location.

11. The method of claim 1, further comprising providing a plurality of pickup locations, each having different driving directions.

12. The method of claim 1, wherein a consumer receives at least one of an insurance policy and a service contract at no charge.

13. The method of claim 1, wherein the first used automobile is an off-lease automobile, and the first location is a dealer in possession of the first used automobile.

14. The method of claim 1, wherein the used automobile seller interface is a manufacturer off-lease seller interface.

15. The method of claim 14, wherein the manufacturer off-lease seller interface includes a number of matches or search hits for the first used automobile.

16. The method of claim 14, wherein a manufacturer user inputs the vehicle identifier into the manufacturer off-lease seller interface by one of typing, speaking, or providing an image of the vehicle identifier.

17. The method of claim 14, wherein the manufacturer off-lease seller interface receives a parameter that the first used automobile will be available for pickup only after a certain date.

18. The method of claim 1, wherein the used automobile seller interface and the used automobile buyer interface are integrated within at least one of a single website and a single application.

19. The method of claim 1, further comprising:
receiving, via the used automobile buyer interface, a second bid from a second used automobile buyer located at a third location within the in-market used automobile buyer area;
generating, based on receiving the second bid, second driving directions between the first location and the third location; and
providing, via the used automobile seller interface, the second bid including at least a second price for the first used automobile and the second driving directions between the first location and the third location.

20. The method of claim 1, wherein the used automobile seller is an original equipment manufacturer.

21. The method of claim 1, wherein the used automobile seller is not an original equipment manufacturer.

22. The method of claim 1, wherein a third party sells a plurality of used automobiles via the used automobile seller interface.

**23**. The method of claim **22**, wherein sales by the third party are made at negotiated prices.

**24**. The method of claim **22**, wherein the used automobile seller interface includes lot inventory of the third party.

**25**. The method of claim **22**, wherein the used automobile buyer interface includes lot inventory of the third party.

**26**. The method of claim **1**, wherein the used automobile seller is a company that operates at least one leasing activity.

**27**. The method of claim **1**, wherein the used automobile seller is a company that operates at least one financing activity.

**28**. The method of claim **1**, wherein the used automobile seller is a captive finance company.

**29**. The method of claim **1**, further comprising, receiving an auction bid from a third party.

**30**. The method of claim **1**, further comprising, providing an auction bid to the used automobile buyer interface.

**31**. The method of claim **1**, wherein the used automobile seller interface and the used automobile buyer interface are provided by at least one webpage.

**32**. A system comprising:

a computer readable medium storing instructions;

at least one processing device operably coupled to the computer readable medium, the at least one processing device executing the instructions to:

receive, via a used automobile seller interface, a first request for a response regarding a first used automobile, the first request made by a used automobile seller located at a first location and including a vehicle identifier and geolocation information of the first used automobile;

determine, based on the geolocation information, that the first used automobile is located at the first location;

generate, based on the determined first location, an in-market used automobile buyer area;

determine that at least one used automobile buyer is located within the in-market used automobile buyer area;

receive, via a used automobile buyer interface, a first bid from a first used automobile buyer located at a second location within the in-market used automobile buyer area;

generate, based on receiving the first bid, driving directions between the first location and the second location; and

provide, via the used automobile seller interface, the first bid including at least a price for the first used automobile and the driving directions between the first location and the second location.

**33**. The system of claim **32**, wherein the used automobile seller interface is a manufacturer off-lease seller interface, and

wherein the at least one processing device further executes the instructions to:

receive, via the manufacturer off-lease seller interface, a manufacturer used automobile seller selection of the first bid, wherein the manufacturer used automobile seller selection indicates a manufacturer user intention to sell the first used automobile based on the first bid to the first used automobile buyer.

**34**. The system of claim **32**, wherein the first request is made by the used automobile seller using a mobile device which takes a picture of a vehicle identifier, and the vehicle identifier is recognized using optical character recognition.

**35**. The system of claim **32**, wherein the first request is made by the used automobile seller using a mobile device

including a microphone, and the vehicle identifier is input via the microphone, and the vehicle identifier is recognized using speech recognition.

**36**. The system of claim **32**, wherein the computer readable medium stores automobile market data that is representative of recent automobile market characteristics, wherein the automobile market data is based on real-time automobile market data.

**37**. The system of claim **32**, wherein the first request includes a picture of at least one of the exterior of the automobile, the interior of the automobile, the dashboard of the automobile, the odometer of the automobile, service records of the automobile, and ownership records of the automobile.

**38**. The system of claim **32**, wherein the computer readable medium stores pricing data including used automobile data and new automobile data, including actual prices of executed transactions, dealer listing prices, dealer sale prices, manufacturer incentives, dealer bids, consumer bids, and consumer pricing parameters.

**39**. The system of claim **32**, wherein an add-on, including at least one of insurance, financing, a service contract, a warranty, and a hard-add accessory, is provided by a third party to the first used automobile buyer with the first request, via the used automobile buyer interface, wherein the third party is different from the used automobile seller and the first used automobile buyer.

**40**. The system of claim **39**, wherein the add-on is selected for inclusion in the first bid by the first used automobile buyer.

**41**. The system of claim **32**, wherein second driving directions are provided between the first location and a third location.

**42**. The system of claim **32**, wherein a plurality of pickup locations, each having different driving directions, are provided.

**43**. The system of claim **32**, wherein a consumer receives at least one of an insurance policy and a service contract at no charge.

**44**. The system of claim **32**, wherein the first used automobile is an off-lease automobile, and the first location is a dealer in possession of the first used automobile.

**45**. The system of claim **32**, wherein the used automobile seller interface is a manufacturer off-lease seller interface.

**46**. The system of claim **45**, wherein the manufacturer off-lease seller interface includes a number of matches or search hits for the first used automobile.

**47**. The system of claim **45**, wherein a manufacturer user inputs the vehicle identifier into the manufacturer off-lease seller interface by one of typing, speaking, or providing an image of the vehicle identifier.

**48**. The system of claim **45**, wherein the manufacturer off-lease seller interface receives a parameter that the first used automobile will be available for pickup only after a certain date.

**49**. The system of claim **32**, wherein the used automobile seller interface and the used automobile buyer interface are integrated within at least one of a single website and a single application.

**50**. The system of claim **32**, wherein the at least one processing device further executes the instructions to:

receive, via the used automobile buyer interface, a second bid from a second used automobile buyer located at a third location within the in-market used automobile buyer area;

US 10,796,362 B2

29

generate, based on receiving the second bid, second driving directions between the first location and the third location; and

provide, via the used automobile seller interface, the second bid including at least a second price for the first used automobile and the second driving directions between the first location and the third location.

**51**. The system of claim **32**, wherein the used automobile seller is an original equipment manufacturer.

**52**. The system of claim **32**, wherein the used automobile seller is not an original equipment manufacturer.

**53**. The system of claim **32**, wherein a third party sells a plurality of used automobiles via the used automobile seller interface.

**54**. The system of claim **53**, wherein sales by the third party are made at negotiated prices.

**55**. The system of claim **53**, wherein the used automobile seller interface includes lot inventory of the third party.

**56**. The system of claim **53**, wherein the used automobile buyer interface includes lot inventory of the third party.

**57**. The system of claim **32**, wherein the used automobile seller is a company that operates at least one leasing activity.

**58**. The system of claim **32**, wherein the used automobile seller is a company that operates at least one financing activity.

**59**. The system of claim **32**, wherein the used automobile seller is a captive finance company.

**60**. The system of claim **32**, wherein an auction bid is received from a third party.

**61**. The system of claim **32**, wherein an auction bid is provided to the used automobile buyer interface.

30

**62**. The system of claim **32**, wherein the used automobile seller interface and the used automobile buyer interface are provided by at least one webpage.

**63**. A non-transitory computer readable medium storing instructions which, when executed, are configured to cause an information processing apparatus to:

receive, via a used automobile seller interface, a first request for a response regarding a first used automobile, the first request made by a used automobile seller located at a first location and including a vehicle identifier and geolocation information of the first used automobile;

determine, based on the geolocation information, that the first used automobile is located at the first location;

generate, based on the determined first location, an in-market used automobile buyer area;

determine that at least one used automobile buyer is located within the in-market used automobile buyer area;

receive, via a used automobile buyer interface, a first bid from a first used automobile buyer located at a second location within the in-market used automobile buyer area;

generate, based on receiving the first bid, driving directions between the first location and the second location; and

provide, via the used automobile seller interface, the first bid including at least a price for the first used automobile and the driving directions between the first location and the second location.

\* \* \* \* \*